CLOSED, JURYDEMAND

# U.S. District Court
## WESTERN DISTRICT OF WASHINGTON (Seattle)
## CIVIL DOCKET FOR CASE #: 2:05-cv-01137-RSM
## Internal Use Only

Amazon.com Inc et al v. Cendant Corporation et al
Assigned to: Hon. Ricardo S Martinez
Cause: 35:271 Patent Infringement

Date Filed: 06/22/2005
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Amazon.com Inc**                     represented by   **C J Alice Chen**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500
Fax: 650-938-5200
Email: AChen@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darren E Donnelly**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500
Email: ddonnelly@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Thomas McDonald**
PRESTON GATES & ELLIS (SEA)
925 FOURTH AVE
STE 2900
SEATTLE, WA 98104-1158
206-623-7580
Fax: FAX 224-7095
Email: davidm@prestongates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hector Ribera**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500

Fax: 650-938-5200
Email: HRibera@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J David Hadden**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500
Fax: 650-494-0600
Email: dhadden@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn H Pasahow**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500
Email: lpasahow@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy L Bjerkness**
FENWICK & WEST (MT VIEW)
801 CALIFORNIA ST
MOUNTAIN VIEW, CA 94041
650-988-8500
Fax: 650-938-5200
Email: wbjerknes@fenwick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**A9.com Inc**                            represented by **C J Alice Chen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darren E Donnelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Thomas McDonald**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hector Ribera**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J David Hadden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn H Pasahow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wendy L Bjerkness**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cendant Corporation**                    represented by **Douglas E Olson**
PAUL HASTINGS JANOFSKY &
WALKER (SD)
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130
858-720-2500
Fax: 858-720-2555
Email: dougolson@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
PAUL HASTINGS JANOFSKY &
WALKER (SD)
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130
858-720-2500
Fax: 858-720-2555
Email: jamesfazio@paulhastings.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
GRAHAM & DUNN
2801 ALASKAN WAY
STE 300 PIER 70
SEATTLE, WA 98121-1128

206-624-8300
Fax: FAX 340-9599
Email: mfandel@grahamdunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
PAUL HASTINGS JANOFSKY &
WALKER (SD)
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130
858-720-2500
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
GRAHAM & DUNN (SEA)
2801 ALASKAN WAY
STE 300 PIER 70
SEATTLE, WA 98121-1128
206-340-9386
Email: cleffler@grahamdunn.com
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
GRAHAM & DUNN
2801 ALASKAN WAY
STE 300 PIER 70
SEATTLE, WA 98121-1128
206-624-8300
Fax: 206-340-9599
Email: dbyers@grahamdunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Trilegiant Corporation**                 represented by  **Douglas E Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Orbitz LLC**                    represented by    **Douglas E Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Orbitz Inc**                    represented by    **Douglas E Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Budget Rent A Car System Inc**                    represented by    **Douglas E Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Avis Rent A Car System Inc**                    represented by **Douglas E Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James V Fazio, III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent Michael Fandel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen S Korniczky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cristofer Ivan Leffler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Mark Byers**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2005 | 🔵1 | COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL against defendant(s) Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc (Summons(es) issued) (Receipt # 411866) , filed by Amazon.com Inc, A9.com Inc. (Attachments: # 1 Exhibit 1 Patent No. 5,715,399# 2 Exhibit 2 Patent No. 6,029,141# 3 Exhibit 3 Patent No. 6,629,079# 4 Exhibit 4 Patent No. 6,625,609# 5 Civil Cover Sheet)(PM, ) (Entered: 06/24/2005) |
| 06/28/2005 | | **NON-PUBLIC** ***Staff notes Preassignment of Judge Theiler in the event of consent. (PM, ) (Entered: 06/28/2005) |
| 06/28/2005 | 🔵2 | SERVICE OF SUMMONS and Complaint returned executed upon defendant Trilegiant Corporation on 6/23/2005; Orbitz LLC on 6/23/2005; Orbitz Inc on 6/23/2005 (RS, ) (Entered: 06/29/2005) |
| 06/29/2005 | 🔵3 | SERVICE OF SUMMONS and Complaint returned executed upon defendant Avis Rent A Car System Inc on 6/23/2005 (Attachments: # 1 return of service of summons executed upon Budget Rent a Car System on 6/23/05)(RS, ) (Entered: |

| | | |
|---|---|---|
| | | 07/01/2005) |
| 06/30/2005 | 4 | SERVICE OF SUMMONS and Complaint returned executed upon defendant Cendant Corporation on 6/23/2005 (RS, ) (Entered: 07/01/2005) |
| 07/06/2005 | 5 | NOTICE of Appearance by attorney Kent Michael Fandel on behalf of Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc (Fandel, Kent) (Entered: 07/06/2005) |
| 07/06/2005 | | ***Attorney David Mark Byers for Cendant Corporation; Trilegiant Corporation; Orbitz LLC; Orbitz Inc; Budget Rent A Car System Inc and Avis Rent A Car System Inc, Cristofer Ivan Leffler for Cendant Corporation; Trilegiant Corporation; Orbitz LLC; Orbitz Inc; Budget Rent A Car System Inc and Avis Rent A Car System Inc added. (VB, ) (Entered: 07/08/2005) |
| 07/11/2005 | 6 | REPORT on the filing or determination of an action. E-mailed to the US Patent Office. (MKB) (Entered: 07/11/2005) |
| 07/11/2005 | 7 | REPORT on the filing or determination of an action. E-mailed to the US Patent Office. (MKB) (Entered: 07/11/2005) |
| 07/20/2005 | 8 | APPLICATION by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc AND ORDER admitting Stephen S Korniczky for Cendant Corporation; Trilegiant Corporation; Orbitz LLC; Orbitz Inc; Budget Rent A Car System Inc and Avis Rent A Car System Inc pro hac vice. Receipt # 319950. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | 9 | APPLICATION by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc AND ORDER admitting James V Fazio, III for Cendant Corporation; Trilegiant Corporation; Orbitz LLC; Orbitz Inc; Budget Rent A Car System Inc and Avis Rent A Car System Inc pro hac vice. Receipt # 319951. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | 10 | APPLICATION by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc AND ORDER admitting Douglas E Olson for Cendant Corporation; Trilegiant Corporation; Orbitz LLC; Orbitz Inc; Budget Rent A Car System Inc and Avis Rent A Car System Inc pro hac vice. Receipt # 319952. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | 11 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting J David Hadden for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | 12 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting Darren E Donnelly for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | 13 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting Lynn H Pasahow for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |

| 07/20/2005 | ●14 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting Wendy L Bjerkness for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |
|---|---|---|
| 07/20/2005 | ●15 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting C J Alice Chen for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |
| 07/20/2005 | ●16 | APPLICATION by Plaintiffs Amazon.com Inc, A9.com Inc AND ORDER admitting Hector Ribera for Amazon.com Inc and A9.com Inc pro hac vice. Receipt # 852772. (RS, ) (Entered: 07/20/2005) |
| 08/12/2005 | ●17 | MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule* by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trileigant Corporation, Orbitz LLC, Orbitz Inc. Noting Date 9/9/2005.Oral Argument Requested. (Attachments: # 1 Proposed Order)(Fandel, Kent) (Entered: 08/12/2005) |
| 08/12/2005 | ●18 | MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Motion to Stay Discovery Pending Resolution of the Motions* by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trileigant Corporation, Orbitz LLC, Orbitz Inc. Noting Date 9/9/2005.Oral Argument Requested. (Attachments: # 1 Supplement Motion to Dismiss Part Two# 2 Proposed Order)(Fandel, Kent) (Entered: 08/12/2005) |
| 08/12/2005 | ●19 | MEMORANDUM filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trileigant Corporation, Orbitz LLC, Orbitz Inc re 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo Request for Judicial Notice in Support of their Motion to Dismiss or, in the alternative, for more definite statement, motion to stay all Discovery Pending Resolution of the Motions, and Motion to Transfer Venue* (Fandel, Kent) (Entered: 08/12/2005) |
| 08/12/2005 | ●20 | DECLARATION of Eric J. Bock filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trileigant Corporation, Orbitz LLC, Orbitz Inc re 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule,* 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* (Fandel, Kent) (Entered: 08/12/2005) |
| 08/12/2005 | ●21 | DECLARATION of James V. Fazio, III filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trileigant Corporation, Orbitz LLC, Orbitz Inc re 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer* |

| | | |
|---|---|---|
| | | *this action pursuant to the first to file rule*, 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* (Attachments: # 1 *Exhibit A, part one, pgs. 7-18*# 2 *Exhibit A, part 2, pgs. 19-26*# 3 *Exhibit B*# 4 *Exhibit C*# 5 *Exhibit D, part one, pgs. 29-36*# 6 *Exhibit D, part two, pgs. 37-43*# 7 *Exhibit E, part one, pgs. 44-55*# 8 *Exhibit E, part two, pgs. 56-67*# 9 *Exhibit E, part three, pgs. 68-79*# 10 *Exhibit E, part four, pgs. 80-87*# 11 *Exhibit F*# 12 *Exhibit G*# 13 *Exhibit H*# 14 *Exhibit I*# 15 *Exhibit J*# 16 *Exhibit K*# 17 *Exhibit L*# 18 *Exhibit M*# 19 *Exhibit N*# 20 *Exhibit O*# 21 *Exhibit P*# 22 *Exhibit Q*# 23 *Exhibit R*# 24 *Exhibit S*# 25 *Exhibit T*# 26 *Exhibit U*# 27 *Exhibit V*# 28 *Exhibit W*# 29 *Exhibit X*# 30 *Exhibit Y*# 31 *Exhibit Z*# 32 *Exhibit AA*# 33 *Exhibit BB*# 34 *Exhibit CC*# 35 *Exhibit DD*# 36 *Exhibit EE*# 37 *Exhibit FF*# 38 *Exhibit GG*# 39 *Exhibit H, part one, pgs. 204-214*# 40 *Exhibit H, part two, pgs. 215-224*# 41 *Exhibit II*# 42 *Exhibit JJ*# 43 *Exhibit KK*# 44 *Exhibit LL*# 45 *Exhibit MM*)(Fandel, Kent) (Entered: 08/12/2005)* |
| 08/31/2005 | 🔵22 | NOTICE by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz Inc that the following is RE-NOTED: 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule* Noting Date 9/16/2005. (Fandel, Kent) (Entered: 08/31/2005) |
| 08/31/2005 | 🔵23 | NOTICE by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz Inc that the following is RE-NOTED: 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* Noting Date 9/16/2005. *(Fandel, Kent) (Entered: 08/31/2005)* |
| 09/12/2005 | 🔵24 | RESPONSE, by Plaintiffs Amazon.com Inc, A9.com Inc, to 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo.* (McDonald, David) (Entered: 09/12/2005) |
| 09/12/2005 | 🔵25 | DECLARATION of C. J. Alice Chen filed by Plaintiffs Amazon.com Inc, A9.com Inc re 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* (Attachments: # 1 *Exhibit A1*# 2 *Exhibit A2*# 3 Exhibit B*# 4 Exhibit C*# 5 Exhibit D*# 6 Exhibit E*# 7 Exhibit F*# 8 Exhibit G*)(McDonald, David) (Entered: 09/12/2005)* |
| 09/12/2005 | 🔵26 | RESPONSE, by Plaintiffs Amazon.com Inc, A9.com Inc, to 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule*. (McDonald, David) (Entered: 09/12/2005) |
| 09/12/2005 | 🔵27 | DECLARATION of Wendy Bjerknes filed by Plaintiffs Amazon.com Inc, A9.com Inc re 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C.* |

| | | |
|---|---|---|
| | | *1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule* (McDonald, David) (Entered: 09/12/2005) |
| 09/12/2005 | 28 | DECLARATION of Kathryn Sheehan filed by Plaintiffs Amazon.com Inc, A9.com Inc re 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule* (McDonald, David) (Entered: 09/12/2005) |
| 09/12/2005 | 29 | CERTIFICATE OF SERVICE by Plaintiffs Amazon.com Inc, A9.com Inc re 28 Declaration,, 24 Response to Motion,, 25 Declaration,, 26 Response to Motion, 27 Declaration,. (McDonald, David) (Entered: 09/12/2005) |
| 09/16/2005 | 30 | REPLY, filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc, TO RESPONSE to 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule* (Fandel, Kent) (Entered: 09/16/2005) |
| 09/16/2005 | 31 | REPLY, filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc, TO RESPONSE to 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* (Fandel, Kent) (Entered: 09/16/2005) |
| 09/16/2005 | 32 | DECLARATION of James V. Fazio filed by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc re 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule*, 18 MOTION to Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo* (Attachments: # 1 Exhibit Ex A pgs. 4 - Ex. C pg. 15# 2 Exhibit C pgs. 16-21# 3 Exhibit C pgs. 22-27# 4 Exhibit C pg. 28 - Ex. D pg. 39# 5 Exhibit Ex D pg. 40- Ex F pg 51# 6 Exhibit F pg. 52- H pg. 63# 7 Exhibit H pg. 64 - K pg. 75# 8 Exhibit K pg. 76-80)(Fandel, Kent) (Entered: 09/16/2005) |
| 10/21/2005 | | Set Oral Argument on 17 MOTION to Transfer Case *Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule*, 18 MOTION to Dismiss *All Claims Against Cendant Corporation); 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo: Motion Hearing set for 11/21/2005 at 1:30 PM before Hon. Ricardo S Martinez.* (LW) (Entered: 10/21/2005) |
| 11/15/2005 | 33 | REQUEST by Defendants Budget Rent A Car System Inc, Avis Rent A Car System Inc, Cendant Corporation, Trilegiant Corporation, Orbitz LLC, Orbitz Inc for Judicial Notice in Support of Defendants' Motion to Dismiss or, in the alternative, for more definite statement, motion to stay all discovery pending resolution of the motions, and motion to transfer venue re 18 MOTION to |

| | | |
|---|---|---|
| | | Dismiss *All Claims Against Cendant Corporation; 2) Motion to Dismiss the Complaint for Failure to State a claim Pursuant to Fed.R.Civ.P.12(b)(6) or, in the alternative, for more definite statement pursuant to Fed.R.Civ.P.12(E); and (3) Mo,* 17 *MOTION to Transfer Case Venue Pursuant to 28 U.S.C. 1404(a) or, in the alternative, to dismiss, stay or transfer this action pursuant to the first to file rule. (Attachments: # 1 Exhibit A)(Fandel, Kent) (Entered: 11/15/2005)* |
| 11/21/2005 | 34 | MINUTE ENTRY for proceedings held before Judge Ricardo S Martinez - Dep Clerk: *Laurie Cuaresma*; Pla Counsel: *David McDonald, Lynn Pasahow, Dave Hadden*; Def Counsel: *Steven Korniczky, James Fazio, Douglas Olson, K. Michael Fandel*; CR: *Laurene Kelly*; Time of Hearing: *1:30 PM*; Courtroom: *13206*;**Motion Hearing** held on 11/21/2005 re 18 MOTION to Dismiss *17 MOTION to Transfer Case Court hears argument of counsel. Court takes matter under advisement and will rule as soon as possible. (LC, ) (Entered: 11/21/2005)* |
| 11/22/2005 | 35 | Letter from David T. McDonald. (McDonald, David) (Entered: 11/22/2005) |
| 12/13/2005 | 36 | ORDER granting dfts' 17 Motion to Transfer Case to District of Delaware;denying dfts' 18 Motion to Dismiss without prejudice to renewal in the Delaware court by Judge Ricardo S Martinez.(RS, ) (Entered: 12/13/2005) |

I hereby certify that the attached is a true and correct copy of the docket on file at the Western District of Washington

BRUCE RIFKIN, Clerk



By    S/Rhonda Stiles
        Deputy Clerk

The Honorable R. Martinez

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                  AT SEATTLE

10  AMAZON.COM, INC. and A9.COM, INC.,          )   No. 05-01137RSM
                                               )
11              Plaintiffs,                     )   **DECLARATION OF JAMES V.**
                                               )   **FAZIO, III IN SUPPORT OF**
12      vs.                                     )   **DEFENDANTS' MOTIONS (1) TO**
                                               )   **DISMISS ALL CLAIMS AGAINST**
13  CENDANT CORPORATION; TRILEGIANT             )   **CENDANT; (2) TO DISMISS THE**
    CORPORATION; ORBITZ, LLC; ORBITZ,          )   **COMPLAINT FOR FAILURE TO**
14  INC.; BUDGET RENT A CAR SYSTEM, INC.;      )   **STATE A CLAIM PURSUANT TO**
    and AVIS RENT A CAR SYSTEM, INC.,          )   **FED. R. CIV. P. 12(B)(6) OR, IN THE**
15                                             )   **ALTERNATIVE, FOR MORE**
                Defendants.                     )   **DEFINITE STATEMENT PURSUANT**
16                                             )   **TO FED. R. CIV. P. 12(E); (3) TO**
                                               )   **STAY ALL DISCOVERY PENDING**
17                                             )   **RESOLUTION OF THE MOTIONS;**
                                               )   **AND (4) TO TRANSFER THIS**
18                                             )   **ACTION TO A MORE CONVENIENT**
                                               )   **FORUM**
19                                             )
                                               )
20  ——————————————————————————

21

22

23

24

25

26

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

I, James V. Fazio, III, declare as follows:

1.    I am an associate with the law firm of Paul, Hastings, Janofsky & Walker LLP, counsel for defendants in the above-entitled action. I have been admitted to practice in this District *pro hac vice*. I have personal knowledge of the following facts and, if called upon to do so, I could and would testify competently thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of the complaint filed by Cendant Publishing, Inc. against Amazon.com, Inc. in the District of Delaware on June 20, 2005 (Civil Action No. 05-414 (JJF)) (the "Delaware Action").

3.    Attached hereto as Exhibit B is a true and correct copy of a Notice of Related Action Per Local Rule 3.1(b) filed by Amazon.com, Inc. in the Delaware Action dated July 8, 2005.

4.    Attached hereto as Exhibit C is a true and correct of a July 18, 2005 news article entitled "Amazon countersues Cendant" obtained from the www.news.com website.

5.    Attached hereto as Exhibit D is a true and correct copy of the original complaint filed by Cendant Publishing, Inc. against Amazon.com, Inc. in the Delaware Action on October 29, 2004.

6.    Attached hereto as Exhibit E is a true and correct copy of a complaint filed by BTG International, Inc. against Amazon.com, Inc. in the District of Delaware on September 14, 2004.

7.    According to the Administrative Office of the United States Courts, for the period ended September 30, 2004, the unweighted number of filings per judgeship in the District of Delaware was 441, and there were 1,931 civil cases pending. By contrast, for the period ended September 30, 2004, the unweighted number of filings per judgeship in the Western District of Washington was 655, and there were 4,085 cases pending. Attached hereto collectively as Exhibit F is a copy of Judicial Business of the United States Courts, *Table C –*

DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF
DEFENDANTS' MOTIONS -- 2
SAN/119491.1
No. 05-01137RSM
m32273-632283.doc

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

1 *U.S. District Courts – Civil Cases Commenced, Terminated, and Pending During the 12-Month*

2 *Periods Ending September 30, 2003 and 2004,*

3 <http://www.uscourts.gov/judbus2004/appendices/c.pdf>; and *Table X-1A – U.S. District*

4 *Courts – Weighted and Unweighted Filings per Authorized Judgeship During the 12-Month*

5 *Period Ending September 30, 2004,*

6 <http://www.uscourts.gov/jusbus2004/appendices/x1a.pdf>.

7   8. Attached hereto as Exhibit G is a copy of a printout from www.mapquest.com

8 that lists the distance from Cendant's headquarters in New York, New York to the federal

9 courthouse in Wilmington, Delaware as approximately 126 miles.

10   9. Attached hereto as Exhibit H is a copy of a printout from www.mapquest.com

11 that lists the distance from Parsippany, New Jersey (where both Avis and Budget are

12 headquartered) to the federal courthouse in Wilmington, Delaware as approximately 130 miles.

13   10. Attached hereto as Exhibit I is a copy of a printout from www.mapquest.com

14 that lists the distance from Trilegiant's headquarters in Norwalk, Connecticut to the federal

15 courthouse in Wilmington, Delaware as approximately 168 miles.

16   11. Attached hereto as Exhibit J is a copy of a printout from www.mapquest.com

17 that lists the distance from the headquarters of Orbitz, LLC and Orbitz, Inc. in Chicago, Illinois

18 to the federal courthouse in Wilmington, Delaware as approximately 752 miles.

19   12. Attached hereto as Exhibit K is a copy of a printout from www.mapquest.com

20 that lists the distance from the headquarters of Orbitz, LLC and Orbitz, Inc. in Chicago, Illinois

21 to the federal courthouse in Seattle, Washington as approximately 2,100 miles.

22   13. Attached hereto as Exhibit L is a copy of *Adv. Semiconductor Materials Am.,*

23 *Inc. v. Applied Materials, Inc.*, 30 U.S.P.Q.2d 1553 (D. Ariz. 1993).

24   14. Attached hereto as Exhibit M is a copy of *Agilent Tech., Inc. v. Micromuse, Inc.*,

25 2004 WL 2346152 (S.D. N.Y. Oct. 19, 2004).

26

DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF
DEFENDANTS' MOTIONS -- 3
SAN/119491.1
No. 05-01137RSM
m32273-632283.doc

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

1    15.    Attached hereto as Exhibit N is a copy of *Baird v. California Faculty Assn.*,

2  2000 WL 516378 (N.D. Cal. April 24, 2000).

3    16.    Attached hereto as Exhibit O is a copy of *Botkin v. Safeco Ins. Co. of Am., Inc.*,

4  2003 U.S. Dist. LEXIS 6293 (N.D. Cal. April 14, 2003).

5    17.    Attached hereto as Exhibit P is a copy of *Colida v. Sony Corp. of Am.*, 2004 U.S.

6  Dist. LEXIS 14907 (S.D. N.Y. July 29, 2004).

7    18.    Attached hereto as Exhibit Q is a copy of *Drucker v. Fernandez*, 1991 U.S. Dist.

8  LEXIS 7463 (E.D. Pa. June 3, 1991).

9    19.    Attached hereto as Exhibit R is a copy of *Google v. Am. Blind & Wallpaper*

10  *Factory, Inc.*, 2004 U.S. Dist. LEXIS 27601 (N.D. Cal. April 8, 2004).

11    20.    Attached hereto as Exhibit S is a copy of *Hewlett-Packard Co. v. Intergraph*

12  *Corp.*, 2003 WL 23884794 (N.D. Cal. Sept. 6, 2003).

13    21.    Attached hereto as Exhibit T is a copy of *Hyundai Space & Aircraft Co., LTD. v.*

14  *The Boeing Co.*, 1999 WL 910131 (C.D. Cal. Oct. 12, 1999).

15    22.    Attached hereto as Exhibit U is a copy of *IBM Credit Corp. v. Definitive*

16  *Computer Serv.*, 1996 U.S. Dist. LEXIS 2385 (N.D. Cal. Feb. 27, 1996).

17    23.    Attached hereto as Exhibit V is a copy of *Italian Colors Restaurant v. Am.*

18  *Express Co.*, 2003 U.S. Dist. LEXIS 20338 (N.D. Cal. Nov. 7, 20003).

19    24.    Attached hereto as Exhibit W is a copy of *K. Toy v. General Electric Co.*, 1995

20  WL 396848 (N.D. Cal. June 27, 1995).

21    25.    Attached hereto as Exhibit X is a copy of *Knits 'N' Tweeds, Inc. v. Jones New*

22  *York*, 205 U.S.P.Q. 966 (E.D. N.Y. 1979).

23    26.    Attached hereto as Exhibit Y is a copy of *Lear Corp. v. Bertrand and Faure*

24  *Technical Ctr.*, 2000 U.S. Dist. LEXIS 22525 (E.D. Mich. Oct. 10, 2000).

25    27.    Attached hereto as Exhibit Z is a copy of *Levinson v. Regal Ware Inc.*, 14

26

DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF
DEFENDANTS' MOTIONS -- 4
SAN/119491.1
No. 05-01137RSM
m32273-632283.doc

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

U.S.P.Q.2d 1064 (D. N.J. 1989).

28.    Attached hereto as Exhibit AA is a copy of *Mahnke v. Munchkin Products, Inc.*, 2001 WL 637378 (S.D. N.Y. June 7, 2001).

29.    Attached hereto as Exhibit BB is a copy of *Mastercard Intl. Inc. v. Lexcel Solutions, Inc.*, 2004 U.S. Dist. LEXIS 10906 (S.D. N.Y. June 16, 2004).

30.    Attached hereto as Exhibit CC is a copy of *Ondeo Nalco Co. v. Eka Chemicals, Inc.*, 2002 WL 1458853 (D. Del. June 10, 2002).

31.    Attached hereto as Exhibit DD is a copy of *In re Papst Licensing Patent Litig.*, 2001 WL 179926 (E.D. La. Feb. 22, 2001).

32.    Attached hereto as Exhibit EE is a copy of *Quantel Ltd. v. Adobe Sys. Inc.*, 1996 U.S. Dist. LEXIS 21651 (D. Del. Dec. 12, 1996).

33.    Attached hereto as Exhibit FF is a copy of *Ristvedt-Johnson, Inc.*, 1991 WL 255691 (N.D. Ill. Nov. 18, 1991).

34.    Attached hereto as Exhibit GG is a copy of *Savage Universal Corp. v. Grazier Const., Inc.*, 2004 U.S. Dist. LEXIS 16088 (S.D. N.Y. Aug. 12, 2004).

35.    Attached hereto as Exhibit HH is a copy of *Seiko Epson Corp. v. Print-Rite Holdings, LTD*, 2002 U.S. Dist. LEXIS 27427 (D. Or. Apr. 30, 2002).

36.    Attached hereto as Exhibit II is a copy of *SRI Intl., Inc. v. Internet Security Systems*, 2005 U.S. Dist. LEXIS 6797 (D. Del. Apr. 13, 2005).

37.    Attached hereto as Exhibit JJ is a copy of *Steelcase Inc. v. Haworth, Inc.*, 1996 U.S. Dist. LEXIS 20674 (C.D. Cal. May 15, 1996).

38.    Attached hereto as Exhibit KK is a copy of *Symbol Tech., Inc. v. Intermec Tech. Corp.*, 2005 U.S. Dist. LEXIS 14415 (W.D. Wis. July 14, 2005).

39.    Attached hereto as Exhibit LL is a copy of *Teknekron Software Systems, Inc. v. Cornell University*, 1993 U.S. Dist. LEXIS 21337 (N.D. Cal. June 14, 1993).

DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF
DEFENDANTS' MOTIONS -- 5
SAN/119491.1
No. 05-01137RSM
m32273-632283.doc

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

40.    Attached hereto as Exhibit MM is a copy of *TI Group Automotive Systems, Inc. v. VDO N. Am. L.L.C.*, 2002 U.S. Dist. LEXIS 4671 (D. Del. Mar. 7, 2002).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __11__ th day of August, 2005 at San Diego, California.


By: _____
                            JAMES V. FAZIO, III



## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2005, I presented the foregoing to the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David T. McDonald
davidm@prestongates.com

Attorneys for Plaintiffs

/s/ K. Michael Fandel
     K. Michael Fandel

DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF
DEFENDANTS' MOTIONS -- 6
SAN/119491.1
No. 05-01137RSM
m32273-632283.doc

PAUL, HASTINGS, JANOFSKY & WALKER
3579 VALLEY CENTRE DRIVE
SAN DIEGO, CA 92130

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CENDANT PUBLISHING, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. _____ |
| v. | ) |
| | ) |
| AMAZON.COM, INC., | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff, Cendant Publishing, Inc. ("Cendant Publishing"), by and through counsel, respectfully

submit this Complaint against Amazon.com, Inc. ("Amazon"). In support thereof, Plaintiff alleges as

follows:

### THE PARTIES

1.      Plaintiff Cendant Publishing, Inc. is a Delaware corporation with its principal place of

business at 10750 West Charleston Blvd., Suite 130, Las Vegas, Nevada 89135.

2.      Upon information and belief, Defendant Amazon.com, Inc. is a Delaware corporation

with its principal executive offices at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98114.

Amazon operates an Internet-based marketplace selling millions of items including books as shown by

its website at <http://www.amazon.com>. A key feature of Amazon's website includes web pages

tailored to individual preferences, such as recommendations and notifications.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C.
§ 1338(a).

4.     This Court has personal jurisdiction over defendant Amazon because of, *inter alia*, its
incorporation in Delaware and its operation of its Internet website, amazon.com, which is accessible to
and marketed to residents of Delaware.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## NATURE OF THE ACTION

6.     Cendant Publishing brings this action for infringement of United States Patent No.
6,782,370 ("'370 patent"). A copy of the '370 patent is attached as Exhibit A hereto.

7.     The '370 patent, entitled "System and Method for Providing Recommendation of
Goods or Services Based on Recorded Purchasing History" was duly and properly issued by the
United States Patent and Trademark Office ("PTO") on August 24, 2004. The '370 patent is valid and
enforceable.

8.     Amazon operates an on-line marketplace through its amazon.com website. Amazon's
online marketplace uses numerous features which recommend other goods to potential customers
based on prior customer purchasing history. Amazon's recommendation features, including, *inter alia*,
"Customers who bought this book also bought," infringe one or more claims of the '370 patent.

9.     Cendant Publishing was the assignee of the '370 patent at the time it was issued.

2

10.    Cendant Publishing is the owner of the '370 patent and has the right to sue for

infringement of the '370 patent.

## CLAIM I
## Infringement of the '370 Patent

11.    Cendant Publishing realleges the allegations of Paragraphs 1 to 10 above as if set forth

herein.

12.    Amazon has infringed the '370 patent and will continue to do so unless enjoined by this

Court.

13.    Amazon's continuing acts of infringement after notice of the '370 patent

constitute willful infringement of the '370 patent.

14.    Amazon's infringement of the '370 patent has damaged Cendant Publishing and will

continue to cause Cendant Publishing harm unless enjoined by this Court.

## DEMAND FOR JURY TRIAL

15.    Pursuant to Fed. R. Civ. P. 38 and District of Delaware L.R. 38.1, Cendant

Publishing respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Cendant Publishing prays for judgment as follows:

A.    That this Court adjudge and decree that the '370 patent is valid and infringed by

Amazon;

3

B.     That this Court adjudge and decree that Amazon's infringement of the '370 patent

has been willful;

C.     That this Court permanently enjoin Amazon, its agents, servants, employees, attorneys,

and all others in active concert or participation with Amazon from infringing the '370 patent;

D.     That this Court award Cendant Publishing damages adequate to compensate for

Amazon's infringement of the '370 patent;

E.     That this Court award Cendant Publishing its costs, disbursements, and attorneys' fees

for this action, including those pursuant to 35 U.S.C. § 285;

F.     That Cendant Publishing be awarded such further relief as this Court may deem just and

appropriate.

4

ASHBY & GEDDES

Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
222 Delaware Avenue, 17<sup>th</sup> Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Plaintiff Cendant Publishing, Inc.*

*Of Counsel:*

Steven Lieberman
Elizabeth A. Leff
Brian Rosenbloom
C. Nichole Gifford
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 783-6040

Dated: June 20, 2005
158689

5

# EXHIBIT A



US006782370B1

(12) **United States Patent**     (10) **Patent No.:**     **US 6,782,370 B1**
Stack     (45) **Date of Patent:**     **Aug. 24, 2004**

(54) **SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY**

(75) Inventor: **Charles Stack**, Cleveland, OH (US)

(73) Assignee: **Cendant Publishing, Inc.**, Aurora, CO (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1030 days.

(21) Appl. No.: 08/923,293

(22) Filed: **Sep. 4, 1997**

(51) Int. Cl.[7] ................................................ G06F 17/60
(52) U.S. Cl. ................................. 705/10; 705/26; 705/14
(58) Field of Search .............................. 705/10, 26, 27, 705/28, 29, 14; 235/376; 707/10, 104.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,870,579 A | * | 9/1989 | Hey | 705/27 |
| 4,996,642 A | * | 2/1991 | Hey | 705/27 |
| 5,583,763 A | * | 12/1996 | Atcheson et al. | 707/3 |
| 5,749,081 A | * | 5/1998 | Whiteis | 707/102 |
| 5,754,938 A | * | 5/1998 | Herz et al. | 725/116 |
| 5,774,868 A | * | 6/1998 | Cragun et al. | 705/10 |
| 5,790,426 A | * | 8/1998 | Robinson | 702/179 |
| 5,790,935 A | * | 8/1998 | Payton | 455/5.1 |
| 5,832,457 A | * | 11/1998 | O'Brien et al. | 705/14 |
| 5,867,799 A | * | 2/1999 | Lang et al. | 707/1 |
| 6,041,311 A | * | 3/2000 | Chislenko et al. | 705/27 |
| 6,049,777 A | * | 4/2000 | Sheena et al. | 705/10 |
| 6,058,367 A | * | 5/2000 | Sutcliffe et al. | 705/1 |
| 6,092,049 A | * | 7/2000 | Chislenko et al. | 705/10 |
| 6,112,186 A | * | 8/2000 | Bergh et al. | 705/10 |
| 6,266,649 B1 | * | 7/2001 | Linden et al. | 705/26 |
| 6,507,872 B1 | * | 1/2003 | Geshwind | 709/236 |
| 2001/0013009 A1 | * | 8/2001 | Greening et al. | 705/10 |

FOREIGN PATENT DOCUMENTS

WO     WO-97/02537 A1 *  1/1997

OTHER PUBLICATIONS

"How ICL Is Ensuring That Your Retailer Knows More About You Than You Know Yourself," Computergram International, Jun. 14, 1996.*
Wilder, Clinton, "E–Commerce Emerges," Information Week, Jun. 14, 1996.*
IBM press release, M2 Presswire, "Wide variety of retailers sign up for World Avenue, IBM's online shopping service.", Nov. 12, 1996.*
Tadjer, Rivka, "Giving Content a Push," Communications Week, Jun. 2, 1997.*
Broadvision press release, M2 Presswire, "Virgin Net teams with Broadvision to deliver personalised services on Virgin Online," May 15, 1996.*
Lach, Jennifer, "Reading your mind, reaching your wallet,", Nov. 1998.*
Hof et al., "Amazon.com: The Wide World of E–Commerce," Business Week, Dec. 14, 1998.*
PRNewswire, "Book Stacks Unlimited Announces Poetry Month Exhibit", Apr. 18, 1997.*
Business Wire, CUC International Inc. offers consumers customized book recommendations through its book stacks subsidiary, Apr. 22, 1997.*
Alexandria Digital Literature, www.alexlit.com, no date known.*
Amazon.com, www.amazon.com, no date known.*
"Amazon.com Catapults Electronic Commerce to Next Level With Powerful New Features", Sep. 23, 1997.*

* cited by examiner

*Primary Examiner*—Nicholas D. Rosen
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck

(57) **ABSTRACT**

A computer-implemented method and system utilizing a distributed network for the recommendation of goods and/or services to potential customers based on a potential customer's selection of goods and/or services and a database of previous customer purchasing history.

**16 Claims, 7 Drawing Sheets**





FIG.1



FIG.2



FIG. 3A



FIG. 3B

CLEAR AND PRESENT DANGER

Search Type: TITLE          Number of Books: 6

| Title | Author | Date | Bind | Price |
|-------|--------|------|------|-------|
| Clear and Present Danger | Clancy, Tom | 08/94 | PAP | $5.94 |
| Clear and Present Danger (Thorndike Large Print Series) | Clancy, Tom | 10/90 | TRD | $20.36 |
| Clear and Present Danger | Clancy, Tom | 08/89 | TRD | $21.21 |
| Clear and Present Danger | Clancy, Tom/ Stiers, David Ogden (Unk) | 07/94 | TRD | $17.00 |
| Clear and Present Danger | Clancy, Tom | 07/96 | PAP | $6.38 |
| Clear and Present Danger/Multi-Track Audio Cassettes | Clancy, Tom | 04/90 | TRD | $38.95 |

FIG. 3C

100

Exhibit A
Page 17

CLEAR AND PRESENT DANGER

By

Clancy, Tom

How Many Copies ?

PUBLISHER: BRKP
CATEGORY: Movies
PUB DATE: 08/94
BINDING: Paperback
PRICE: US$6.99

ISBN: 0425144372
BOOKMARKS: 5
*YOU SAVE:$1.05 (15%)*

YOUR PRICE: $5.94
MEMBER PRICE: $4.89

*AFFINITY* SM BY SAME PEN

FIG. 3D

100

af·fin·ity n. 1 similarity 2 close relationship; connection 3 liking or inclination toward something

With Affinity, our own agent-based technology, you can explore the tastes of our other customers who've bought this same book. It's completely anonymous, and requires no effort. Finally, a helpful recommendation service based on *real people's real interests!* Based on 5 years of our customer's buying history, we think you might enjoy the book(s) listed below, purchased by customers who enjoyed *Clear and Present Danger.*

| | Title | Author | Confidence In This Match |
|---|---|---|---|
| 📖 | *Eaters of the Dead* | -Crichton, Michael | 100% |
| 📖 | *Disclosure* | -Crichton, Michael | 100% |
| 📖 | *Red Storm Rising* | -Clancy, Tom | 100% |
| 📖 | *Patriot Games* | -Clancy, Tom | 100% |
| 📖 | *The Sum of All Fears* | -Clancy, Tom | 100% |
| 📖 | *Debt of Honor* | -Clancy, Tom | 100% |

📖 denotes additional information.

100

FIG. 3E



FIG.4

US 6,782,370 B1

1

## SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY

### BACKGROUND OF THE INVENTION

#### 1. Field Of The Invention

The present invention relates to the use of computer systems to facilitate the recommendation of goods or services utilizing a distributed network such as the Internet, specifically to provide recommendations of goods or services that may be of interest to potential customers based on a potential customers' selection of goods or services and a database of previous customer history with respect to the selected goods or services.

#### 2. Description Of The Background Art

Providing recommendations of goods or services of interest to customers in a computer system environment has been based on demographic profiles and usually requires extensive customer participation and divulgence of personal information (for example, the input of: age, profession, hobbies, gender, . . . ) to create a user profile, which is then compared against other user profiles to determine possible items of interest to the user. The need for extensive customer input limits the appeal of these feedback systems because they require the user to expend substantial time and effort in addition to revealing personal details in order to obtain the requested information.

The present invention allows potential customers to utilize a computer system interfaced with a distributed network to obtain recommendations of goods or services that may be of interest to them while substantially reducing the degree of customer input required in comparison to prior art systems. Instead of relying on the personal information provided by each potential customer as a basis for determining recommendations, the subject invention utilizes a customer activity history database to facilitate the determination of recommendations.

### SUMMARY OF THE INVENTION

A method for recommending goods or services is provided which allows the user of a computer system connected to a distributed network such as the Internet to receive recommendations of goods or services of potential interest based on a particular good or service selected by the user and previous customer buying history. The previous customer buying history is assembled by passively tracking and retaining or storing all purchasing decisions by previous customers.

The user first selects a particular good or service he may be interested in obtaining. This selection is treated as filter data input to a host computers' data processor. The data processor then compares this input data with a customer activity history database to determine if there are any possible goods or services that can be recommended to the user. If there are possible recommendations the user can choose to have those goods or services recommended to him by the system. The data processor then utilizes the filter data input and the customer history database to determine all of the customers who have purchased the particular good or service selected by the user and all the goods or services those customers have purchased. The goods or services purchased in common by this group of customers are returned as filtered output data and displayed to the user as recommended goods or services.

2

According to another aspect of the invention, a confidence factor indicating the level of confidence in the strength of the recommendation may be provided.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing one preferred embodiment of the present invention.

FIG. 2 is a flow diagram showing one preferred embodiment of user interaction with a customer history database.

FIG. 3A is a depiction of the home page of the website as displayed to the user which provides the search option to the user.

FIG. 3B is a depiction of the search page as displayed to the user where the user can search by author, title, keyword, or ISBN.

FIG. 3C is a depiction of the search results page as displayed to the user where the user can select a particular book.

FIG. 3D is a depiction of the book selection page as displayed to the user where the user can select to have recommendations of potential interest returned to him.

FIG. 3E is a depiction of the recommendations result page as displayed to the user.

FIG. 4 is a flow diagram showing one preferred embodiment of the computer-implemented systems' structure and data flow.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the preferred embodiment, books are recommended over the Internet using World Wide Web technology although any communication medium could be used including distributed networks such as Local Area Networks (LANs), Wide Area Networks (WANs), or Electronic Bulletin Board Systems (BBSs). For purposes of illustration, the preferred embodiment will be described in the context where the goods or services are books; however, the invention may be practiced with respect to any good or service.

With reference to FIG. 1 a remote user utilizing an operator interface 1 accesses a distributed network communication medium 2, such as, for example, the Internet via the World Wide Web. The operator interface 1 may be any computer with a modem, network card or any other device including wireless devices utilized in computer systems to facilitate the transmission of data and may be found in personal computers used in households, business offices or schools. The computer can be any device capable of processing data such as computers based on technology from Apple Computer (e.g., The Macintosh, The Performa, the PowerMac series, etc.) or technology based on processors by Intel, AMD, Cyrix, etc. and commonly referred to as IBM compatibles. It should be noted however that a user need not have a computer (i.e., a machine with processing power); a so-called "dummy terminal" being sufficient. Once logged onto the Internet, the user accesses a host computer 3 by specifying a website domain address, as is well known. The host computer 3 contains information regarding goods or services (such as books) for sale and also contains a customer purchasing history database 4 which stores data describing all purchases of previous customers.

One preferred method of retrieving recommendation information will be explained with reference to FIGS. 1, 2 and 3A–3E, and will be described with particular reference to retrieving information regarding the purchase and recommendation of books.

**3**

At step 10, a user logs onto the Internet network, such as by obtaining access through an Internet service provider, and at step 20, the user enters the website by retrieving information from host computer 3.

A screen display **100** as shown in FIG. 3A provides various hypertext selections for various actions to be performed. As indicated, a user may choose to browse, search, order, retrieve account information, or request help.

The user can select a book by choosing the Search function in FIG. 3A. Once the search function has been selected, the user may search for the book by either author, title, keyword or a International Standard Book Number (ISBN) as shown in FIG. 3B.

The user may utilize any of these methods to select a particular title. In FIG. 3C, a user has selected the title Clear and Present Danger by author Tom Clancy. As shown in FIG. 3C, any particular title may be available in a number of different formats or editions. Once a specific title is selected from among the choices in FIG. 3C, the host computer 3 determines if there are any possible recommendations available for this particular book. If no other books are available as recommendations, the host computer will not give the user the option to request recommendations; the user can still purchase the selected title or request other information concerning this book. If other books are available as recommendations the option to request recommendations is supplied to the user in the form of a hypertext display as shown in FIG. 3D as the Affinity™ service.

The system determines whether other books are available to be recommended by consulting the customer history database 4. The customer history database includes three relational database tables consisting of Customers, Orders and Items. The tables are related to each by keying unique customer IDs in the Customer table to order numbers in the Orders table and product identification numbers in the Items table. For example, books may be identified by their unique ISBN in the Items table. When a user has selected a particular book, the system searches the database 4 to determine all previous customers who have purchased that book. If there exist in the database at least two other customers who have purchased the user-selected book and those at least two customers have also purchased other books (or other products) in common, then the Affinity™ hypertext link will appear in the display page for the selected book. If the search does not find at least two customers who have purchased the selected book and who have also purchased another book in common, the Affinity™ hypertext link will not appear in the display page. Once the user activates the Affinity™ hypertext link, the books purchased in common will be displayed, as shown in FIG. 3E.

Another aspect of the invention is the indication of a "confidence match" factor as shown in FIG. 3E. The confidence factor is calculated based on the frequency of appearance of the recommended books (or other items) in the histories of the customers who have purchased the selected book (or other item). For example, if ten customers who purchased book A also purchased book B, the confidence factor in the recommendation of book B to a user who selected book A would be 100%. If on the other hand only 7 of the ten customers who purchased book A also purchased book B, the confidence factor for book B would be 70%. As previously explained above, if none of the customers who purchased book A also purchased at least one other book in common, the Affinity™ hypertext link would not be displayed.

The user makes a request for recommended books by selecting the Affinity™ hypertext using a tracking device

**4**

such as a mouse. The request is then transmitted to the host computer 3 via the Internet 2 and is processed at the host computer 3. To facilitate the processing and storage of data each customer is assigned a unique customer ID and each book is identified by its unique ISBN. The host computer utilizes these elements to track and retain the identification of all customers and their purchases. The retained customer purchasing history is stored in the customer history database 4 and is accessed whenever a request for recommendations is submitted to the host computer.

Utilizing the customer history database 4, the host computer 3 searches all the books purchased by all the customers who have purchased the particular book that was selected by the user. Titles which have been purchased in common among the customers are selected as recommendations for the user. This collaborative filter or intelligent agent is superior to other methods because it uses actual customer purchasing history to assemble recommendations. It does not require any customer effort nor impinge on customer privacy. The recommendations are then transmitted to the user via the Internet 2 and displayed on the user interface 1 as shown in FIG. 3E.

FIG. 4 illustrates one example of the system structure and data flow. An operator enters input data 21 consisting of a selected book. This input data 21 is transmitted from the operator to the processor 23 via a distributed network 22 similar to the distributed networks described earlier with reference to block 2 in FIG. 1. The processor utilizes database selection rules 25 as explained above in conjunction with the input data 21 to determine the recommendations that will be accessed from the database 26 which contains data on previous customer purchasing history. The recommendations are then transmitted from the processor 23 to the operator as output data 24 via a distributed network as previously described with reference to FIG. 1 block 2.

The invention having been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the following claims.

I claim:

1. A computer-implemented method for the recommendation of goods and/or services to potential customers over a distributed network based on customer buying history utilizing an information processing system containing processing means having transmission means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

receiving customer commands specifying a particular good or service to be used as filter data;

storing information pertaining to goods and/or services purchasing history of previous customers;

comparing said filter data with said stored information and determining whether, for said filter data, corresponding entries exist within the stored information; and

if corresponding entries exist, displaying the identity of other goods and/or services purchased by said previous customers who have purchased the good and/or service used as said filter data.

2. The method of claim 1 wherein said distributed network is the Internet.

3. The method of claim 1 wherein said distributed network is a Local Area Network.

4. The method of claim 1 wherein said distributed network is a Wide Area Network.

US 6,782,370 B1

5

5. The method of claim 1 wherein said distributed network is a Bulletin Board System.

6. The method of claim 1 wherein said goods are books.

7. A computer-implemented interactive system for assisting a potential customer in purchasing decisions from among a plurality of goods or services, the system comprising:

an operator interface for enabling potential customers to input requests to said computer, including requests for:

the purchase of goods or services,

information concerning goods or services,

recommendations of goods or services based on operator input;

a database maintained in said computer, containing information pertaining to goods and/or services purchasing history of previous customers;

means for processing inputted requests and for filtering relevant history information regarding said inputted requests from said database;

a distributed network for transmitting requests from said operator interface to said computer and for transmitting responsive information from said computer to said operator interface;

interface whereby goods and/or services identification information corresponding to goods and/or services purchased by previous customers who have purchased the goods and/or services requested by said potential customers are transmitted to said operator interface for use by said potential customers.

6

8. The system of claim 7 wherein said distributed network is the Internet.

9. The system of claim 7 wherein said distributed network is a Local Area Network.

10. The system of claim 7 wherein said distributed network is a Wide Area Network.

11. The system of claim 7 wherein said distributed network is a Bulletin Board System.

12. The system of claim 7 wherein said goods are books.

13. The system of claim 7 wherein said operator interface is a personal computer.

14. The system of claim 7 wherein said operator interface is a workstation.

15. The system of claim 7 wherein said operator interface is a dummy terminal.

16. A computer program product having a computer readable medium having computer readable code recorded thereon for the recommendation of goods or services in response to user input, comprising:

input means for receiving user commands specifying a particular good or service to be used as filter data;

database storage means for the retention of data concerning goods or services purchase decisions of prior users; and

means for filtering said database storage means using said specified particular good or service to obtain recommendations of other goods or services to a user based on said inputted user commands.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,782,370 B1                                      Page 1 of 1
DATED         : August 24, 2004
INVENTOR(S)   : Charles Stack

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 6,</u>
Line 26, "rood" should be -- good --.

Signed and Sealed this

Sixteenth Day of November, 2004



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

JS 44 (Rev. 3/99)

05 41¢

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither.replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| CENDANT PUBLISHING, INC. | AMAZON.COM, INC. |

(b) County of Residence of First Listed Plaintiff _____*_____
(EXCEPT IN U.S. PLAINTIFF CASES)

*Plaintiff is a Delaware corporation.

County of Residence of First Listed _____._____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Steven J. Balick
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE  19801    (302) 654-1888

Attorneys (If Known)

Unknown

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | DEF | | | DEF |
|---|---|---|---|---|
| Citizen of This State | ☐ 1  ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2  ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3  ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | PROPERTY RIGHTS | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | LABOR | SOCIAL SECURITY | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | FEDERAL TAX SUITS | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

This is an action arising out of the patent law of the United States, Title 35 U.S. Code.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ monetary--and injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
June 20, 2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 5 - 4 1 4 _____

## ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### NOTICE OF AVAILABILITY OF A
### UNITED STATES MAGISTRATE JUDGE
### TO EXERCISE JURISDICTION

I HEREBY ACKNOWLEDGE RECEIPT OF ___2___ COPIES OF AO FORM 85.

6-20-05
(Date forms issued)

Joseph L Saienni
(Signature of Party or their Representative)

Joseph J. Saienni
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

CENDANT PUBLISHING, INC.,

          Plaintiff,

v.

AMAZON.COM, INC.,

          Defendant.

Civil Action No. 05-414 (JJF)

### NOTICE OF RELATED ACTION PER LOCAL RULE 3.1(b)

**PLEASE TAKE NOTICE THAT** this case is related to Civil Action No. 04-1405-GMS, previously pending in this court and to Civil Action Number 2:05-cv-01137-RSM, currently pending in the Western District of Washington.

Civil Action No. 04-1405-GMS concerned the same parties, the same patent, and the same allegations as presented in this action. The case was voluntarily dismissed by Plaintiff, Cendant Publishing, Inc. ("Cendant"). Civil Action Number 2:05-cv-01137-RSM involves substantially the same parties. Cendant did not note either related action on the civil cover sheet filed in this action.

          *Karen E. Keller*

John W. Shaw (No. 3362)
jshaw@ycst.com
Karen E. Keller (No. 4489)
kkeller@ycst.com
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys for Defendant

Dated: July 8, 2005

[print version] Amazon countersues Cendant | CNET News.com                    Page 1 of 1

 **NEWS.COM**    http://www.news.com/

## Amazon countersues Cendant

By Paul Festa
http://news.com.com/Amazon+countersues+Cendant/2100-1030_3-5793244.html

Story last modified Mon Jul 18 12:18:00 PDT 2005

**Amazon.com has accused Cendant of patent infringement in what it described as a purely defensive countersuit.**

Amazon late last month filed the claims in the U.S. District Court for the Western District of Washington, alleging that Cendant and subsidiaries Orbitz, Avis, Budget and Trilegiant infringed four patents held by Amazon.

Cendant had sued Amazon for patent infringement in November. Following unsuccessful settlement negotiations, the company refiled its suit in June. Amazon subsequently filed its countersuit.

Amazon has walked a fine line between decrying the state of software and business process patent litigiousness and building its own healthy patent portfolio. Amazon CEO Jeff Bezos has advocated patent reform for years.

Amazon said its current patent action came only in self-defense.

"The suit was filed in direct response to Cendant's refiling of their patent infringement suit," said Amazon spokeswoman Patty Smith. "This is the first time that we have asserted any of these four patents, and we would not have asserted them if Cendant had not filed against us. It's purely a defensive measure."

Cendant did not immediately return calls seeking comment.


In other news
Open season at Linux show
Read story ▶

The four patents in question are U.S. Patent No. 5,715,399: secure method and system for communicating a list of credit card numbers over a nonsecure network; No. 6,029,141: Internet-based customer referral system; No. 6,625,609: method and system for navigating within a body of data using one of a number of alternative browse graphs; and No. 6,629,079: method and system for electronic commerce using multiple roles.

Copyright ©1995-2005 CNET Networks, Inc. All rights reserved.

Exhibit C
Page 28



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CENDANT PUBLISHING, INC.

                Plaintiff,

v.

AMAZON.COM, INC.,

                Defendant.

Civil Action No. ___0_4 – 1 4 0 5

### COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff, Cendant Publishing, Inc. ("Cendant Publishing"), for its cause of action against Amazon.com, Inc. ("Amazon"), states and alleges as follows:

### THE PARTIES

1.    Plaintiff Cendant Publishing is a Delaware corporation with its principal place of business at 10750 West Charleston, Suite 130, Las Vegas, Nevada 89135.

2.    Upon information and belief, Defendant Amazon is a Delaware corporation with its principal executive offices at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98114. Amazon operates an internet-based marketplace selling millions of items including books as shown by its website at <http://www.amazon.com>. A key feature of Amazon's website includes web pages tailored to individual preferences, such as recommendations and notifications.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

4.     This Court has personal jurisdiction over defendant Amzazon because of, *inter alia*, its incorporation in Delaware and its operation of its Internet website, amazon.com, which is accessible to and marketed to residents of Delaware.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## NATURE OF THE ACTION

6.     Cendant Publishing brings this action for infringement of United States Patent No. 6,782,370 ("'370 patent"). A copy of the '370 patent is attached as Exhibit A hereto.

7.     The '370 patent, entitled "System and Method for Providing Recommendation of Goods or Services Based on Recorded Purchasing History" was duly and properly issued by the United States Patent and Trademark Office ("PTO") on August 24, 2004. The '370 patent is valid and enforceable.

8.     Amazon operates an on-line marketplace through its amazon.com website. Amazon's online marketplace uses numerous features which recommend other goods to potential customers based on prior customer purchasing history. Amazon's recommendation features, *inter alia*, "Customers who bought this book also bought" infringe one or more claims of the '370 patent.

9.     Cendant Publishing was the assignee of the '370 patent at the time it was issued.

2

10.     Cendant Publishing is the owner of the '370 patent and has the right to sue for infringement of the '370 patent.

## CLAIM I
### Infringement of the '370 Patent

11.     Cendant Publishing realleges the allegations of Paragraphs 1 to 10 above as if set forth herein.

12.     Amazon has infringed the '370 patent and will continue to do so unless enjoined by this Court.

13.     Amazon's infringement of the '370 patent has damaged Cendant Publishing and will continue to cause Cendant Publishing harm unless enjoined by this Court.

## DEMAND FOR JURY TRIAL

14.     Pursuant To Fed. R. Civ. P. 38 and District of Delaware L.R. 38.1, Cendant Publishing respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Cendant Publishing prays for judgment as follows:

A.      That this Court adjudge and decree that the '370 patent is valid and infringed by Amazon;

B.      That this Court permanently enjoin Amazon, its agents, servants, employees, attorneys, and all others in active concert or participation with Amazon from infringing the '370 patent;

3

C.    That this Court award Cendant Publishing damages adequate to compensate for

Amazon's infringement of the '370 patent;

D.    That this Court award Cendant Publishing its costs, disbursements, and attorneys'

fees for this action, including those pursuant to 35 U.S.C. § 285;

E.    That Cendant Publishing be awarded such further relief as this Court may deem

just and appropriate.

ASHBY & GEDDES

*Steven J. Balick*

Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19989
(302) 654-1888

*Attorneys for Plaintiff Cendant Publishing, Inc.*

*Of Counsel:*

Steven Lieberman
Elizabeth A. Leff
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 783-6040

Dated: October 29, 2004
149417 v1

4

US006782370B1

US 00678 2370 B1

## (12) United States Patent
### Stack

(10) Patent No.: **US 6,782,370 B1**
(45) Date of Patent: **Aug. 24, 2004**

(54) **SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY**

(75) Inventor: **Charles Stack**, Cleveland, OH (US)

(73) Assignee: **Cendant Publishing, Inc.**, Aurora, CO (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1030 days.

(21) Appl. No.: **08/923,293**

(22) Filed: **Sep. 4, 1997**

(51) Int. Cl.[7] .................................................. G06F 17/60
(52) U.S. Cl. .............................. 705/10; 705/26; 705/14
(58) Field of Search ............................ 705/10, 26, 27, 705/28, 29, 14; 235/376; 707/10, 104.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,870,579 | A | * | 9/1989 | Hey ....................... 705/27 |
| 4,996,642 | A | * | 2/1991 | Hey ....................... 705/27 |
| 5,583,763 | A | * | 12/1996 | Atcheson et al. ........... 707/3 |
| 5,749,081 | A | * | 5/1998 | Whiteis .................. 707/102 |
| 5,754,938 | A | * | 5/1998 | Herz et al. ............... 725/116 |
| 5,774,868 | A | * | 6/1998 | Cragun et al. .............. 705/10 |
| 5,790,426 | A | * | 8/1998 | Robinson ................. 702/179 |
| 5,790,935 | A | * | 8/1998 | Payton .................... 455/5.1 |
| 5,832,457 | A | * | 11/1998 | O'Brien et al. ............ 705/14 |
| 5,867,799 | A | * | 2/1999 | Lang et al. ................ 707/1 |
| 6,041,311 | A | * | 3/2000 | Chislenko et al. .......... 705/27 |
| 6,049,777 | A | * | 4/2000 | Sheena et al. .............. 705/10 |
| 6,058,367 | A | * | 5/2000 | Sutcliffe et al. ........... 705/1 |
| 6,092,049 | A | * | 7/2000 | Chislenko et al. .......... 705/10 |
| 6,112,186 | A | * | 8/2000 | Bergh et al. ............... 705/10 |
| 6,266,649 | B1 | * | 7/2001 | Linden et al. .............. 705/26 |
| 6,507,872 | B1 | * | 1/2003 | Geshwind ................. 709/236 |
| 2001/0013009 | A1 | * | 8/2001 | Greening et al. ........... 705/10 |

FOREIGN PATENT DOCUMENTS

WO      WO-97/02537 A1 *  1/1997

OTHER PUBLICATIONS

"How ICL Is Ensuring That Your Retailer Knows More About You Than You Know Yourself," Computergram International, Jun. 14, 1996.*
Wilder, Clinton, "E-Commerce Emerges," Information Week, Jun. 14, 1996.*
IBM press release, M2 Presswire, "Wide variety of retailers sign up for World Avenue, IBM's online shopping service.", Nov. 12, 1996.*
Tedjer, Rivka, "Giving Content a Push," Communications Week, Jun. 2, 1997.*
Broadvision press release, M2 Presswire, "Virgin Net teams with Broadvision to deliver personalised services on Virgin Online", May 15, 1996.*
Lach, Jennifer, "Reading your mind, reaching your wallet,", Nov. 1998.*
Hof et al., "Amazon.com: The Wide World of E-Commerce," Business Week, Dec. 14, 1998.*
PRNewswire, "Book Stacks Unlimited Announces Poetry Month Exhibit", Apr. 18, 1997.*
Business Wire, CUC International Inc. offers consumers customized book recommendations through its book stacks subsidiary, Apr. 22, 1997.*
Alexandria Digital Literature, www.alexlit.com, no date known.*
Amazon.com, www.amazon.com, no date known.*
"Amazon.com Catapults Electronic Commerce to Next Level With Powerful New Features", Sep. 23, 1997.*

* cited by examiner

*Primary Examiner*—Nicholas D. Rosen
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck

(57) **ABSTRACT**

A computer-implemented method and system utilizing a distributed network for the recommendation of goods and/or services to potential customers based on a potential customer's selection of goods and/or services and a database of previous customer purchasing history.

**16 Claims, 7 Drawing Sheets**





FIG.1



FIG. 2



FIG. 3A



FIG. 3B

CLEAR AND PRESENT DANGER

Search Type: TITLE                                 Number of Books: 6

| Title | Author | Date | Bind | Price |
|-------|--------|------|------|-------|
| Clear and Present Danger | Clancy, Tom | 08/94 | PAP | $5.94 |
| Clear and Present Danger (Thorndike Large Print Series) | Clancy, Tom | 10/90 | TRD | $20.36 |
| Clear and Present Danger | Clancy, Tom | 08/89 | TRD | $21.21 |
| Clear and Present Danger | Clancy, Tom/ Stiers, David Ogden (Unk) | 07/94 | TRD | $17.00 |
| Clear and Present Danger | Clancy, Tom | 07/96 | PAP | $6.38 |
| Clear and Present Danger/Multi-Track Audio Cassettes | Clancy, Tom | 04/90 | TRD | $38.95 |

100

FIG. 3C

**U.S. Patent**    Aug. 24, 2004    Sheet 5 of 7    US 6,782,370 B1

CLEAR AND PRESENT DANGER

By

Clancy, Tom

How Many Copies ?

PUBLISHER: BRKP
CATEGORY: Movies
PUB DATE: 08/94
BINDING: Paperback
PRICE: US$6.99

ISBN: 0425144372
BOOKMARKS: 5
*YOU SAVE:$1.05 (15%)*

*AFFINITY* SM BY SAME PEN

YOUR PRICE: $5.94
MEMBER PRICE: $4.89

100

FIG. 3D

af·fin· i‖ty n. 1 similarity 2 close relationship; connection 3 liking or inclination toward something

With <u>Affinity</u>, our own agent-based technology, you can explore the tastes of our other customers who've bought this same book. It's completely anonymous, and requires no effort. Finally, a helpful recommendation service based on *real people's real interests!* Based on 5 years of our customer's buying history, we think you might enjoy the book(s) listed below, purchased by customers who enjoyed <u>*Clear and Present Danger*.</u>

| Title | Author | Confidence In This Match |
|---|---|---|
| 📖 *Eaters of the Dead* | —Crichton, Michael | 100% |
| 📖 *Disclosure* | —Crichton, Michael | 100% |
| 📖 *Red Storm Rising* | —Clancy, Tom | 100% |
| 📖 *Patriot Games* | —Clancy, Tom | 100% |
| 📖 *The Sum of All Fears* | —Clancy, Tom | 100% |
| 📖 *Debt of Honor* | —Clancy, Tom | 100% |

📖 denotes additional information.

FIG. 3E

100



FIG.4

US 6,782,370 B1

**1**

## SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY

### BACKGROUND OF THE INVENTION

#### 1. Field Of The Invention

The present invention relates to the use of computer systems to facilitate the recommendation of goods or services utilizing a distributed network such as the Internet, specifically to provide recommendations of goods or services that may be of interest to potential customers based on a potential customers' selection of goods or services and a database of previous customer history with respect to the selected goods or services.

#### 2. Description Of The Background Art

Providing recommendations of goods or services of interest to customers in a computer system environment has been based on demographic profiles and usually requires extensive customer participation and divulgence of personal information (for example, the input of: age, profession, hobbies, gender, . . . ) to create a user profile, which is then compared 'against other user profiles to determine possible items of interest to the user. The need for extensive customer input limits the appeal of these feedback systems because they require the user to expend substantial time and effort in addition to revealing personal details in order to obtain the requested information.

The present invention allows potential customers to utilize a computer system interfaced with a distributed network to obtain recommendations of goods or services that may be of interest to them while substantially reducing the degree of customer input required in comparison to prior art systems. Instead of relying on the personal information provided by each potential customer as a basis for determining recommendations, the subject invention utilizes a customer activity history database to facilitate the determination of recommendations.

### SUMMARY OF THE INVENTION

A method for recommending goods or services is provided which allows the user of a computer system connected to a distributed network such as the Internet to receive recommendations of goods or services of potential interest based on a particular good or service selected by the user and previous customer buying history. The previous customer buying history is assembled by passively tracking and retaining or storing all purchasing decisions by previous customers.

The user first selects a particular good or service he may be interested in obtaining. This selection is treated as filter data input to a host computers' data processor. The data processor then compares this input data with a customer activity history database to determine if there are any possible goods or services that can be recommended to the user. If there are possible recommendations the user can choose to have those goods or services recommended to him by the system. The data processor then utilizes the filter data input and the customer history database to determine all of the customers who have purchased the particular good or service selected by the user and all the goods or services those customers have purchased. The goods or services purchased in common by this group of customers are returned as filtered output data and displayed to the user as recommended goods or services.

**2**

According to another aspect of the invention, a confidence factor indicating the level of confidence in the strength of the recommendation may be provided.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing one preferred embodiment of the present invention.

FIG. 2 is a flow diagram showing one preferred embodiment of user interaction with a customer history database.

FIG. 3A is a depiction of the home page of the website as displayed to the user which provides the search option to the user.

FIG. 3B is a depiction of the search page as displayed to the user where the user can search by author, title, keyword, or ISBN.

FIG. 3C is a depiction of the search results page as displayed to the user where the user can select a particular book.

FIG. 3D is a depiction of the book selection page as displayed to the user where the user can select to have recommendations of potential interest returned to him.

FIG. 3E is a depiction of the recommendations result page as displayed to the user.

FIG. 4 is a flow diagram showing one preferred embodiment of the computer-implemented systems' structure and data flow.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the preferred embodiment, books are recommended over the Internet using World Wide Web technology although any communication medium could be used including distributed networks such as Local Area Networks (LANs), Wide Area Networks (WANs), or Electronic Bulletin Board Systems (BBSs). For purposes of illustration, the preferred embodiment will be described in the context where the goods or services are books; however, the invention may be practiced with respect to any good or service.

With reference to FIG. 1, a remote user utilizing an operator interface 1 accesses a distributed network communication medium 2, such as, for example, the Internet via the World Wide Web. The operator interface 1 may be any computer with a modem, network card or any other device including wireless devices utilized in computer systems to facilitate the transmission of data and may be found in personal computers used in households, business offices or schools. The computer can be any device capable of processing data such as computers based on technology from Apple Computer (e.g., The Macintosh, The Performa, the PowerMac series, etc.) or technology based on processors by Intel, AMD, Cyrix, etc. and commonly referred to as IBM compatibles, it should be noted however that a user need not have a computer (i.e., a machine with processing power); a so-called "dummy terminal" being sufficient. Once logged onto the Internet, the user accesses a host computer 3 by specifying a website domain address, as is well known. The host computer 3 contains information regarding goods or services (such as books) for sale and also contains a customer purchasing history database 4 which stores data describing all purchases of previous customers.

One preferred method of retrieving recommendation information will be explained with reference to FIGS. 1, 2 and 3A–3E, and will be described with particular reference to retrieving information regarding the purchase and recommendation of books.

US 6,782,370 B1

3

At step 10, a user logs onto the Internet network, such as by obtaining access through an Internet service provider, and at step 20, the user enters the website by retrieving information from host computer 3.

A screen display 100 as shown in FIG. 3A provides various hypertext selections for various actions to be performed. As indicated, a user may choose to browse, search, order, retrieve account information, or request help.

The user can select a book by choosing the Search function in FIG. 3A. Once the search function has been selected, the user may search for the book by either author, title, keyword or a International Standard Book Number (ISBN) as shown in FIG. 3B.

The user may utilize any of these methods to select a particular title. In FIG. 3C, a user has selected the title Clear and Present Danger by author Tom Clancy. As shown in FIG. 3C, any particular title may be available in a number of different formats or editions. Once a specific title is selected from among the choices in FIG. 3C, host computer 3 determines if there are any possible recommendations available for this particular book. If no other books are available as recommendations, the host computer will not give the user the option to request recommendations; the user can still purchase the selected title or request other information concerning this book. If other books are available as recommendations the option to request recommendations is supplied to the user in the form of a hypertext display as shown in FIG. 3D is the Affinity™ service.

The system determines whether other books are available to be recommended by consulting the customer history database 4. The customer history database includes three relational database tables consisting of Customers, Orders and Items. The tables are related to each other by keying unique customer IDs in the Customer table to order numbers in the Orders table and product identification numbers in the Items table. For example, books may be identified by their unique ISBN in the Items table. When a user has selected a particular book, the system searches the database 4 to determine all previous customers who have purchased that book. If there exist in the database at least two other customers who have purchased the user-selected book and those at least two customers have also purchased other books (or other products) in common, then the Affinity™ hypertext link will appear in the display page for the selected book. If the search does not find at least two customers who have purchased the selected book and who have also purchased another book in common, the Affinity™ hypertext link will not appear in the display page. Once the user activates the Affinity™ hypertext link, the books purchased in common will be displayed, as shown in FIG. 3E.

Another aspect of the invention is the indication of a "confidence match" factor as shown in FIG. 3E. The confidence factor is calculated based on the frequency of appearance of the recommended books (or other items) in the histories of the customers who have purchased the selected book (or other item). For example, if ten customers who purchased book A also purchased book B, the confidence factor in the recommendation of book B to a user who selected book A would be 100%. If on the other hand only 7 of the ten customers who purchased book A also purchased book B, the confidence factor for book B would be 70%. As previously explained above, if none of the customers who purchased book A also purchased at least one other book in common, the Affinity™ hypertext link would not be displayed.

The user makes a request for recommended books by selecting the Affinity™ hypertext using a tracking device

4

such as a mouse. The request is then transmitted to the host computer 3 via the Internet 2 and is processed at the host computer 3. To facilitate the processing and storage of data each customer is assigned a unique customer ID and each book is identified by its unique ISBN. The host computer utilizes these elements to track and retain the identification of all customers and their purchases. The retained customer purchasing history is stored in the customer history database 4 and is accessed whenever a request for recommendations is submitted to the host computer.

Utilizing the customer history database 4, the host computer 3 searches all the books purchased by all the customers who have purchased the particular book that was selected by the user. Titles which have been purchased in common among the customers are selected as recommendations for the user. This collaborative filter or intelligent agent is superior to other methods because it uses actual customer purchasing history to assemble recommendations. It does not require any customer effort nor impinge on customer privacy. The recommendations are then transmitted to the user via the Internet 2 and displayed on the user interface 1 as shown in FIG. 3E.

FIG. 4 illustrates one example of the system structure and data flow. An operator enters input data 21 consisting of a selected book. This input data 21 is transmitted from the operator to the processor 23 via a distributed network 22 similar to the distributed networks described earlier with reference to block 2 in FIG. 1. The processor utilizes database selection rules 25 as explained above in conjunction with the input data 21 to determine the recommendations that will be accessed from the database 26 which contains data on previous customer purchasing history. The recommendations are then transmitted from the processor 23 to the operator as output data 24 via a distributed network as previously described with reference to FIG. 1 block 2.

The invention having been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the following claims.

I claim:

1. A computer-implemented method for the recommendation of goods and/or services to potential customers over a distributed network based on customer buying history utilizing an information processing system containing processing means having transmission means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

receiving customer commands specifying a particular good or service to be used as filter data;

storing information pertaining to goods and/or services purchasing history of previous customers;

comparing said filter data with said stored information and determining whether, for said filter data, corresponding entries exist within the stored information; and

if corresponding entries exist, displaying the identity of other goods and/or services purchased by said previous customers who have purchased the good and/or service used as said filter data.

2. The method of claim 1 wherein said distributed network is the Internet.

3. The method of claim 1 wherein said distributed network is a Local Area Network.

4. The method of claim 1 wherein said distributed network is a Wide Area Network.

US 6,782,370 B1

5

5. The method of claim 1 wherein said distributed network is a Bulletin Board System.

6. The method of claim 1 wherein said goods are books.

7. A computer-implemented interactive system for assisting a potential customer in purchasing decisions from among a plurality of goods or services, the system comprising:

an operator interface for enabling potential customers to input requests to said computer, including requests for: the purchase of goods or services, information concerning goods or services, recommendations of goods or services based on operator input;

a database maintained in said computer, containing information pertaining to goods and/or services purchasing history of previous customers;

means for processing inputted requests and for filtering relevant history information regarding said inputted requests from said database;

a distributed network for transmitting requests from said operator interface to said computer and for transmitting responsive information from said computer to said operator interface;

interface whereby goods and/or services identification information corresponding to goods and/or services purchased by previous customers who have purchased the goods and/or services requested by said potential customers are transmitted to said operator interface for use by said potential customers.

6

8. The system of claim 7 wherein said distributed network is the Internet.

9. The system of claim 7 wherein said distributed network is a Local Area Network.

10. The system of claim 7 wherein said distributed network is a Wide Area Network.

11. The system of claim 7 wherein said distributed network is a Bulletin Board System.

12. The system of claim 7 wherein said goods are books.

13. The system of claim 7 wherein said operator interface is a personal computer.

14. The system of claim 7 wherein said operator interface is a workstation.

15. The system of claim 7 wherein said operator interface is a dummy terminal.

16. A computer program product having a computer readable medium having computer readable code recorded thereon for the recommendation of goods or services in response to user input, comprising:

input means for receiving user commands specifying a particular good or service to be used as filter data;

database storage means for the retention of data concerning goods or services purchase decisions of prior users; and

means for filtering said database storage means using said specified particular good or service to obtain recommendations of other goods or services to a user based on said inputted user commands.

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BTG INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.    0 4 - 1 2 6 4 |
| | ) | |
| AMAZON.COM, INC., AMAZON SERVICES, | ) | |
| INC., NETFLIX, INC., BARNESANDNOBLE.COM | ) | |
| INC. AND OVERSTOCK.COM, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff BTG International Inc., for its causes of action against Defendants Amazon.com,

Inc., Amazon Services, Inc., Netflix, Inc., Barnesandnoble.com Inc. and Overstock.com, Inc.

(collectively referred to as "Defendants"), states and alleges as follows:

### NATURE OF THE ACTION

1.    This is an action for patent infringement.

### THE PARTIES

2.    Plaintiff BTG International Inc. ("Plaintiff" or "BTG"), is a Delaware Corporation

having its principal place of business at Five Tower Bridge, 300 Barr Harbor Dr., 7th Floor, West

Conshohocken, Pennsylvania 19428-2998.

3.    Upon information and belief, Defendant Amazon.com, Inc. is a Delaware corporation

having its principal place of business at 1200 12th Avenue South, Suite 1200, Seattle, Washington

98144-2734.  Upon information and belief, Defendant Amazon Services, Inc. is a subsidiary of

Amazon.com and is a Nevada Corporation having its principal place of business at 502 East John

Street, Carson City, Nevada 89706. Amazon.com, Inc. and Amazon Services, Inc. are referred to collectively as "Amazon" throughout this Complaint.

4.    Upon information and belief, Defendant Netflix, Inc. ("Netflix") is a Delaware corporation having its principal place of business at 970 University Avenue, Los Gatos, California 95032.

5.    Upon information and belief, Defendant Barnesandnoble.com Inc. ("B&N") is a Delaware corporation having its principal place of business at 76 Ninth Avenue, New York, NY 10011.

6.    Upon information and belief, Defendant Overstock.com, Inc. ("Overstock") is a Delaware corporation having its principal place of business at 6322 South 3000 East, Suite 100, Salt Lake City, Utah 84121.

### JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under the provisions of 28 U.S.C. §§ 1331 and 1338(a), in that this action for patent infringement arises under the laws of the United States, including 35 U.S.C. §§ 271 and 281-285.

8.    Personal jurisdiction over Defendants comports with the United States Constitution and 10 Del. C. § 3104 because Defendants are either citizens of the State of Delaware or because, upon information and belief, Defendants do business in this judicial district, have committed and continue to commit, or have contributed and continue to contribute to, acts of patent infringement in this judicial district as alleged in this Complaint, or otherwise have sufficient contacts with the state.

2

9.    Venue is proper in this judicial district under the provisions of 28 U.S.C. §§ 1391(b), (c) and § 1400(b).

## FACTUAL BACKGROUND

10.    On January 27, 1998, United States Patent No. 5,712,979 ("the '979 patent") entitled "Method and Apparatus for Attaching Navigational History Information to Universal Resource Locator Links on a World Wide Web Page" was duly and legally issued to Infonautics Corporation. A copy of the '979 patent is attached hereto as Exhibit A.

11.    On February 10, 1998, United States Patent No. 5,717,860 ("the '860 patent") entitled "Method and Apparatus for Tracking the Navigation Path of a User on the World Wide Web" was duly and legally issued to Infonautics Corporation. A copy of the '860 patent is attached hereto as Exhibit B.

12.    On or about October 10, 2002, BTG acquired ownership of the '860 and '979 patents by assignment.

13.    BTG has been and is still the owner of the '860 and '979 patents.

14.    The '860 and '979 patents are valid and enforceable.

## COUNT I - AMAZON'S INFRINGEMENT OF PATENT NO. 5,717,860

15.    Amazon has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '860 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to Amazon's website.

16.    BTG has informed Amazon of the existence of the '860 patent and has offered Amazon the opportunity to acquire rights to the patent, which Amazon has not accepted. Despite

3

Amazon's knowledge of this patent, Amazon has willfully, deliberately and intentionally infringed claims of said patent.

17.    The infringement by Amazon of the '860 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.

### COUNT II - NETFLIX'S INFRINGEMENT OF PATENT NO. 5,717,860

18.    Netflix has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '860 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to Netflix's website.

19.    BTG has informed Netflix of the existence of the '860 patent and has offered Netflix the opportunity to acquire rights to the patent, which Netflix has not accepted. Despite Netflix's knowledge of this patent, Netflix has willfully, deliberately and intentionally infringed claims of said patent.

20.    The infringement by Netflix of the '860 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.

### COUNT III - B&N'S INFRINGEMENT OF PATENT NO. 5,717,860

21.    B&N has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '860 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to B&N's website.

4

Exhibit E
Page 47

22.    BTG has informed B&N of the existence of the '860 patent and has offered B&N the opportunity to acquire rights to the patent, which B&N has not accepted. Despite B&N's knowledge of this patent, B&N has willfully, deliberately and intentionally infringed claims of said patent.

23.    The infringement by B&N of the '860 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.

### COUNT IV - OVERSTOCK'S INFRINGEMENT OF PATENT NO. 5,717,860

24.    Overstock has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '860 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to Overstock's website.

25.    BTG has informed Overstock of the existence of the '860 patent and has offered Overstock the opportunity to acquire rights to the patent, which Overstock has not accepted. Despite Overstock's knowledge of this patent, Overstock has willfully, deliberately and intentionally infringed claims of said patent.

26.    The infringement by Overstock of the '860 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.

### COUNT V - AMAZON'S INFRINGEMENT OF PATENT NO. 5,712,979

27.    Amazon has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '979 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to Amazon's website.

5

28.    BTG has informed Amazon of the existence of the '979 patent and has offered Amazon the opportunity to acquire rights to the patent, which Amazon has not accepted. Despite Amazon's knowledge of this patent, Amazon has willfully, deliberately and intentionally infringed claims of said patent.  .

29.    The infringement by Amazon of the '979 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.  ·

## COUNT VI - B&N'S INFRINGEMENT OF PATENT NO. 5,712,979

30.    B&N has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '979 patent in this judicial district and elsewhere in the United States, literally and/or under the doctrine of equivalents, by using certain online advertising technologies that track the navigational history of a WWW user from a first website to B&N's website.

31.    BTG has informed B&N of the existence of the '979 patent and has offered B&N the opportunity to acquire rights to the patent, which B&N has not accepted. Despite B&N's knowledge of this patent, B&N has willfully, deliberately and intentionally infringed claims of said patent.

32.    The infringement by B&N of the '979 patent has injured BTG, has caused it financial damage, and will continue to do so unless enjoined by the Court.

## DEMAND FOR JURY TRIAL

33.    Pursuant to Fed. R. Civ. P. 38, BTG hereby respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BTG International Inc. prays for judgment as follows:

6

A.      That Defendants have infringed claims of the '860 patent literally and/or under the doctrine of equivalents;

B.      That the Defendants and their respective agents, servants, officers, directors, employees and all persons acting in concert with them, directly or indirectly, be permanently enjoined from infringing, inducing others to infringe, or contributing to the infringement of the '860 patent;

C.      That the Defendants be ordered to account for and pay to Plaintiff the damages to which Plaintiff is entitled as a consequence of the infringement of the '860 patent in an amount no less than a reasonable royalty for the use made of the invention by Defendants;

D.      That Defendants Amazon.com, Inc., Amazon Services, Inc. and Barnesandnoble.com Inc. have infringed claims of the '979 patent literally and/or under the doctrine of equivalents;

E.      That Defendants Amazon.com, Inc., Amazon Services, Inc. and Barnesandnoble.com Inc. and their respective agents, servants, officers, directors, employees and all persons acting in concert with them, directly or indirectly, be permanently enjoined from infringing, inducing others to infringe, or contributing to the infringement of the '979 patent;

F.      That Defendants Amazon.com, Inc., Amazon Services, Inc. and Barnesandnoble.com Inc. be ordered to account for and pay to Plaintiff the damages to which Plaintiff is entitled as a consequence of the infringement of the '979 patent in an amount no less than a reasonable royalty for the use made of the invention by Defendants Amazon.com, Inc., Amazon Services, Inc. and Barnesandnoble.com Inc.;

G.      That damages be trebled for the willful, deliberate and intentional infringement by Defendants as alleged herein in accordance with 35 U.S.C. § 284;

7

H.  That Plaintiff be awarded prejudgment interest, costs, disbursements and attorneys'

fees herein in accordance with 35 U.S.C. § 285; and

I.  That Plaintiff be awarded such other and further relief as this Court may deem just

and equitable.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19801
(302) 654-1888

*Of Counsel:*

Ronald J. Schutz
Niall A. MacLeod
Michael A. Collyard
ROBINS, KAPLAN, MILLER &
  CIRESI, LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

*Attorneys for Plaintiff*

Dated: September 14, 2004

147434

8

Exhibit E
Page 51

US005712979A

# United States Patent [19]

## Graber et al.

[11]  Patent Number:      5,712,979

[45]  Date of Patent:      Jan. 27, 1998

[54] METHOD AND APPARATUS FOR ATTACHING NAVIGATIONAL HISTORY INFORMATION TO UNIVERSAL RESOURCE LOCATOR LINKS ON A WORLD-WIDE WEB PAGE

[75] Inventors: **Terry E. Graber**, Downingtown; **Joshua Kopelman**, Malvern; **Edwin Howell Watkeys, III**, North Wales; **Marvin I. Weinberger**, Havertown, all of Pa.

[73] Assignee: **Infonautics Corporation**, Wayne, Pa.

[21] Appl. No.: **531,931**

[22] Filed: **Sep. 22, 1995**

[51] Int. Cl.⁶ .................................... G06F 11/30
[52] U.S. Cl. ................ 395/200.11; 395/200.02
[58] Field of Search ............ 395/200.02, 200.1

[56]                   **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,726,014 | 2/1918 | Goldman et al. | 370/328 |
| 4,885,789 | 12/1949 | Burger et al. | 340/25 |
| 5,095,480 | 3/1992 | Fenner | 370/238 |
| 5,159,669 | 10/1992 | Trigg | 395/159 |
| 5,210,820 | 5/1993 | Kenyon | 395/2.09 |
| 5,355,472 | 10/1994 | Lewis | 395/612 |
| 5,416,842 | 5/1995 | Aziz | 380/30 |
| 5,442,342 | 8/1995 | Kung | 340/825.34 |
| 5,491,820 | 2/1996 | Belove et al. | 395/603 |
| 5,499,297 | 3/1996 | Boebert | 380/23 |
| 5,530,852 | 6/1996 | Meske | 395/600 |
| 5,537,586 | 7/1996 | Amram et al. | 395/603 |
| 5,544,322 | 8/1996 | Cheng et al. | 395/200.12 |
| 5,557,721 | 9/1996 | Fite et al. | 395/154 |
| 5,561,706 | 10/1996 | Fenner | 379/60 |
| 5,572,643 | 11/1996 | Judson | 395/793 |
| 5,590,130 | 12/1996 | Toconcura et al. | 379/112 |
| 5,603,025 | 2/1997 | Tabb | 395/602 |
| 5,633,919 | 5/1997 | Hogan | 379/115 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 648113 | 11/1992 | Australia. |
| 4213393 | 10/1993 | Australia. |

## OTHER PUBLICATIONS

Using the World Wide Web, Pub by Que Corp., 1994, Indianapolis, IN, pp. 59–109.
Multimedia at Work Commerce on the Internet, IEEE Multimedia, 1994, by Thomas D.C. Little, Dept. Elec., Computer and Sys. Engr, Boston Univ., pp. 74–78.
Prook, John Evan "Web vs. Other Media Outlets," Interactive Age, a216, p. 5, Jun. 5, 1995.
Press Release, "Streams Readies Release of Breakthrough Internet Media Planning and Assessment," Chicago, USA, retrieved from internet http://streams.com/press_release-html, pp. 1–2, Aug. 31, 1995.
W3 Organization, "HTTP Request fields," retrieved from internet http://www.w3.org/pub/WWW/Protocols/HTTP/HTRQ_Headers. html, pp. 1–3, May 3, 1994.
Heylighen F., "World–Wide Web: a distributed hypermedia paradigm for global networking.", Proceedings, SHARE Europe Spring Conference, pp. 355–368, Apr. 18, 1994.
Brody E., "<internet@crossroads.$$$>, " Technology Review, vol. 98 ISS. 4, pp. 24–31, May 1995.
Moore, Steve "Internet Security Split: Let the Browser Beware," Abstract, Computerworld, v29, N35, P59(2), Aug. 28, 1995.

(List continued on next page.)

*Primary Examiner*—Eric Coleman
*Attorney, Agent, or Firm*—Reed Smith Shaw & McClay

[57]                   **ABSTRACT**

A method and apparatus for tracking the navigation path of a user that has been directed to a second site on the WWW from a first site on the WWW. A URL is received at the second WWW site when the user is directed from the first site to the second site. At the second WWW site, information representative of an identity of the first WWW site is captured by identifying a first code in the URL. A destination web page is determined for the user, and a revised destination web page is formed by attaching a second code representative of the identity of the first WWW site into at least one selected web page link associated with the destination web page. The revised destination web page is then transmitted to the user.

13 Claims, 7 Drawing Sheets



5,712,979
Page 2

OTHER PUBLICATIONS

Winer, W. "Clarifications and Extensions for the Bootstrap Protocol," RFC1532 pp. 1–19, Oct. 1993.

Bader, Rich "Electronics Publishing with Mosaic," PC Letter, v10, N14, P4(1), Aug. 15, 1994.

Ury, Jill "Delahaye Group to Offer NetBench," Business Wire, s1, p1, May 31, 1995.

"An Exclusive EMR Series—Part Three Strategies Diverge Among Web Service Providers," Electronic Marketplace Report, v9, n14, p6(1), Jul. 18, 1995.

"Research Firms Strive for Web Tracking That Counts," Interactive Marketing News, v2, n13, Jun. 23, 1995.

Krantz, Michael "Keeping an Eye on I/Pro," Mediaweek, v5, n15, p. 12, Apr. 10, 1995.

Lau, Teresa "Building a Hypermedia Information System on the Internet," Professional Communication Conference, 1994, pp. 192–196.

Resnick, Rosalind "Tread Lightly on the Internet," Home Office Computing, v12, n4, p80(2), Apr. 1994.

Rothschild, Michael "Stagecoach Days on the Infohighway," Forbes, v153, n5, pS25(2), Feb. 28, 1994.

LaPlante, Alice "Does Your Corporate Data Have Value?" InfoWorld, v15, n43, p60(1), Oct. 1993.

Foster, Marilyn S. "Hardcopy to Online Publications—It Can Be Done," IEEE, pp. 51–57, 1990.

"HotWired Gets Star from Nielsen," Advertising Age, v66, n25, p18, Jun. 19, 1995.

"Biznet Technologies Announces Release of Versatile Virtual Vending," PR Newswire, p0913D028, Oct. 1994.



*FIG. 1*



U.S. Patent        Jan. 27, 1998        Sheet 2 of 7        5,712,979

FIG. 2



FIG. 3

Exhibit E
Page 56



| 400 | |
|---|---|
| USER ID NUMBER | ~402 |
| CM ID NUMBER | ~404 |
| USER NAME | ~406 |
| USER ADDRESS | ~408 |
| USER TELEPHONE # | ~410 |
| GRADE LEVEL | ~412 |
| GENDER | ~414 |
| OCCUPATION PAR–1 | ~416 |
| OCCUPATION PAR–2 | ~418 |
| BROTHERS/SISTERS | ~420 |
| COMPUTER TYPE | ~422 |
| MODEM SPEED | ~424 |
| DISPLAY CAPACITY | ~426 |
| MEMORY SIZE | ~428 |
| COMM LINK | ~430 |
| ENROLLMENT DATE | ~432 |

| 450 | |
|---|---|
| USER ID NUMBER | ~452 |
| CM ID NUMBER | ~454 |
| USER NAME | ~456 |
| USER ADDRESS | ~458 |
| USER TELEPHONE # | ~460 |
| ENROLLMENT PLAN | ~462 |
| STATEMENT CYCLE | ~464 |
| TAX INFORMATION | ~466 |
| DISCOUNT INFORMATION | ~468 |
| ACCOUNT STATE | ~470 |
| ACCOUNT HISTORY | ~472 |
| CREDIT CARD INFO. | ~474 |
| ENROLLMENT DATE | ~476 |

| 440 | |
|---|---|
| CM ID NUMBER | ~442 |
| CM NAME | ~444 |
| ALLOWED ENROLLMENT PLANS | ~446 |

| 480 | |
|---|---|
| CM ID NUMBER | ~482 |
| CM NAME | ~484 |
| CM ADDRESS | ~486 |
| CM TELEPHONE # | ~488 |
| PREFERRED STATUS | ~490 |
| TOTAL ENROLLEES | ~492 |
| ENROLLEES LAST MONTH | ~494 |
| ENROLLEES THIS MONTH | ~496 |

FIG. 4



FIG. 5



FIG. 6



U.S. Patent        Jan. 27, 1998        Sheet 7 of 7        5,712,979

FIG. 7

5,712,979

| 1 | 2 |

## METHOD AND APPARATUS FOR ATTACHING NAVIGATIONAL HISTORY INFORMATION TO UNIVERSAL RESOURCE LOCATOR LINKS ON A WORLD WIDE WEB PAGE

### FIELD OF THE INVENTION

The present invention is directed to on-line computer systems for delivering information and computer services to users coupled to such systems. More particularly, the present invention is directed to an automated system for capturing information representing the identity of an entity that has directed a user to an on-line system. Still more particularly, the present invention is directed to a system for tracking user paths on the world wide web (WWW).

### BACKGROUND OF THE INVENTION

On-line computer services such as, for example, on-line information retrieval services, on-line travel reservation services, or on-line stock trading services, receive new subscribers from various sources. New subscribers are typically directed to an on-line service by advertisements placed by the on-line service itself, through word-of-mouth referrals given by existing system subscribers, or by third party computer system marketers (referred to hereinafter as co-marketers) of the on-line service. Different co-marketers may typically use different media for promoting a particular on-line computer service. For example, a magazine acting as a co-marketer for an on-line service might use a magazine advertisement, which includes a free software disk for accessing the on-line service, to promote the on-line service. Alternatively, various directory services available on the WWW such as, for example, the Yahoo® or Web Crawler® directory services, might use a listing on their directory pages and a link to a WWW page associated with an on-line service, to direct potential new subscribers to an on-line service. Thus, new subscribers can be directed to the same on-line service from different co-marketers and through different marketing channels. It would be desirable to be able to capture and track the co-marketing source which directed each new subscriber to an on-line service. In addition, it would be desirable to capture and track the co-marketing source which directed a new subscriber to an on-line service in a manner which required no participation or intervention from the new subscriber.

When a user navigates through various sites during a session on the WWW, the navigational history reflecting the past locations traversed by the user during the session is typically lost as the user moves from one site to the next site. Thus, unless the user wants to manually track the various sites traversed during a world wide web session, it would be difficult for the user, or for any service monitoring the user, to know the identity of any previous world wide web site traversed by the user during a session. It would be desirable to have a system for attaching navigational history information to a user traversing the WWW so that a current web site could determine electronically at least the previous WWW site visited by the user.

Universal resource locators are often used to direct users through various pages at a site on the world wide web. There are two different techniques for specifying addresses using universal resource locators. In a first technique, known as fully specified addressing, the full string associated with a universal resource locator is specified each time a user moves from one web page to the next web page. In the second technique, known as relative addressing, only information representing the root directory or the current directory (or subdirectory) of the user is specified as a user moves from one web page to the next web page. One drawback of using relative universal resource locator addressing is that it is impossible to move "up a directory tree" using such addressing, without specifying the root directory. UNIX symbolic links may be used in specifying a particular root directory. However, when relative addressing is used, it is impossible to carry this UNIX symbolic link information forward as a user moves from page to page. It would be desirable if this limitation of relative universal resource locator addressing could be ameliorated, such that the UNIX symbolic link information could be retained during the relative addressing of web pages.

It is therefore an object of the present invention to provide a unified system for capturing and tracking information representing a co-marketing source which directed a new subscriber to an on-line service.

It is a further object of the present invention to provide a system for capturing and tracking information identifying a co-marketing source which directed a new subscriber to an on-line service, which requires no participation or intervention from the new subscriber.

It is a still further object of the present invention to provide a system for attaching navigational history information to a user traversing the world wide web so that a current web site could determine electronically at least the previous world wide web site visited by the user.

It is a still further object of the present invention to provide a system which could be used in conjunction with relative universal resource locator addressing, which permitted a user in a particular directory at a web site to move up a directory tree.

These and other objects of the invention will become apparent from the description of the invention which follows.

### SUMMARY OF THE INVENTION

The present invention is directed to an apparatus for capturing and storing a co-marketer identification symbol representing an identity of an entity that has referred a user on a user station to a computer service, wherein the user station is coupled to the computer service by a communications path. A database is provided for storing a plurality of user records. Each of the user records includes a user identification field for storing information uniquely associating each of the user records with a user, and a co-marketer identification field for storing identity information representing the identity of an entity that directed the user to the computer service. An enrollment means is coupled to the communications path and the database, and is provided for enrolling a user on the computer service. The enrollment means includes means for determining a co-marketer that directed the user to the computer service, and means for assigning a unique user identification number to the user. The enrollment means further includes means for storing a co-marketer identification symbol representative of a co-marketer and the unique user identification number of a user in the co-marketer identification and user identification fields, respectively, of one of the user records.

In accordance with a further aspect, the present invention is directed to a method and apparatus for tracking the navigation path of a user that has been directed to a second site on the WWW from a first site on the WWW. The first site has a universal resource locator (URL) symbol for uniquely identifying an address of the first site on the WWW, and the second site has a URL symbol for uniquely

5,712,979

3

identifying an address of the second site on the WWW. A composite URL symbol is received at the second WWW site when the user is directed from the first site to the second site. The composite URL symbol has a first portion corresponding to the URL symbol of the second site, and a second portion that includes information corresponding to the identity of the first site. The information representative of the identity of the first site is captured at the second WWW site from the second portion of the composite URL. The identity of the first WWW site is thus determined at the second WWW site by comparing information from the second portion of the composite URL to a table having a plurality of entries each of which is representative of a known WWW site.

In accordance with a still further aspect, the present invention is directed to a method and apparatus for redirecting a user from a first location on the WWW to a second location on the WWW, wherein relative URL addressing is used during the redirecting process. A signal is received from the first location indicating that the user wishes to move from the first location on the WWW to the second location on said WWW. In response to the signal, a current URL representing an address of the first location on the WWW and a destination URL portion representative of an address of the second location on the WWW are passed to a redirecting means. The current URL includes first and second portions. A destination URL is formed with redirecting means by substituting the destination URL portion in place of the second portion in the current URL, wherein the destination URL represents a relative address of the second location on the WWW. The user is then moved from the first location on the WWW to the second location on the WWW in accordance with the destination URL formed by the redirecting means.

In accordance with a still further aspect, the present invention is directed to a method and apparatus for tracking the navigation path of a user that has been directed to a second site on the WWW from a first site on the WWW. A URL is received at the second WWW site when the user is directed from the first site to the second site. At the second WWW site, information representative of an identity of the first WWW site is captured by identifying a first code in the URL. A destination web page is determined for the user, and a revised destination web page is formed by inserting a second code representative of the identity of the first WWW site into at least one selected web page link associated with the destination web page. The revised destination web page is then transmitted to the user.

### BRIEF DESCRIPTION OF THE DRAWINGS

In order that the manner in which the above-recited and other advantages and objects of the invention are obtained and can be appreciated, a more particular description of the invention briefly described above will be rendered by reference to a specific embodiment thereof which is illustrated in the appended drawings. Understanding that these drawings depict only a typical embodiment of the invention and are not therefore to be considered limiting of its scope, the invention and the presently understood best mode thereof will be described and explained with additional specificity and detail through the use of the accompanying drawings.

FIG. 1 is a block diagram showing a system for enrolling new users on an on-line system and capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention.

FIG. 2 is a flow diagram illustrating the operation of a system for enrolling new users on an on-line system and

4

capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention.

FIG. 3 is a diagram of a look-up table for associating UNIX symbolic link information with co-marketers, in accordance with a preferred embodiment of the present invention.

FIG. 4 is a diagram illustrating preferred data structures for storing a Subscriber Information Directory Table, a Customer Information Directory Table, and first and second Co-Marketer Information Directory Tables, in accordance with a preferred embodiment of the present invention.

FIG. 5 is a schematic diagram illustrating the use of UNIX symbolic links and relative URL addressing for moving between locations on the WWW, in accordance with a preferred embodiment of the present invention.

FIG. 6 is a flow diagram illustrating the operation of a system for attaching a code representing the navigational history of a user on the WWW onto selected URL page links on a destination web page of a user, in accordance with an alternative preferred embodiment of the present invention.

FIG. 7 is a flow diagram illustrating the operation of a system for generating recurring bounty payment records, in accordance with a preferred embodiment of the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

Referring now to FIG. 1, there is shown a block diagram of a system 100 for enrolling new users on an on-line system and capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention. System 100 includes a first type of user station 102. The user station 102 includes a personal computer (PC) 104 and user software 106 which resides on PC 104. User software 106 includes a graphical user interface (not shown) for facilitating communications between user station 102 and On-Line Service (OLS) 140. OLS 140 represents a computer service such as, for example, an information retrieval service, a travel reservation service, or a stock trading service, which is available on-line to a user of user station 102. User station 102 is coupled to a Fiber Distributed Data Interface (FDDI) 141 in OLS 140 by a communications channel 108. In alternate embodiments, a standard communications bus or a local area network may be substituted for FDDI 141. Communications channel 108 may consist of a communications link formed over a public network such as the Internet. Alternatively, communications channel 108 may consist of a communications link formed between PC 104 and FDDI 141 over a commercial network. Thus, commercial networks such as, for example, the Prodigy® network, the CompuServe® network, or the Microsoft® network, may be used to establish a communications channel 108 for linking PC 104 and FDDI 141. Although in the preferred embodiment of the present invention, element 140 is shown as being an on-line computer service, it will be understood by those skilled in the art that element 140 may alternatively represent any computer service, regardless of whether the service is available on-line.

As explained more fully below, user software 106 is preferably provided to a user of user station 102 by an on-line service co-marketer (CM) and loaded onto PC 104 prior to the time the user of user station 102 attempts to enroll on OLS 140. User software is preferably provided to the user of user station 102 from the CM via a floppy disk,

5,712,979

5

CD-ROM disk, magnetic tape or through a File Transfer Protocol (FTP) site on the Internet. User software 106 preferably includes an embedded co-marketer symbol or code which can be recognized by OLS 140 whenever the user of user station 102 connects to OLS 140. The co-marketer symbol embedded in the user software uniquely represents the identity of the co-marketer that provided user software 106 to the user of user station 102. As an example of a co-marketer that might provide user software 106 to a user of user station 102 might include, for example, a magazine publisher that delivers OLS 140 in its magazine and includes a floppy disk with user software 106 together with the magazine advertisement.

System 100 also includes a second type of user station 102a. The user station 102a includes a PC 104a and user software 106a which resides on PC 104a. Like user software 106, user software 106a includes a graphical user interface (not shown) for facilitating communications between user station 102a and On-Line Service (OLS) 140. However, unlike user station 102, user station 102a is coupled to OLS 140 through the WWW 120. More particularly, user station 102a is coupled to an OLS web server 142 at OLS 140 through the WWW site 122 associated with OLS 140 on the WWW 120.

The navigation history of the user of user station 102a on WWW 120 is shown generally by dotted lines 124, 125 and solid line 126. As shown by dotted line 124, user station 102a was initially coupled to site 122a of a first co-marketer on WWW 120. In the preferred embodiment of the present invention, a page at site 122a includes an advertisement (not shown) for OLS 140. In addition, the advertisement at co-marketer site 122a is preferably such that a user of user station 102a may chose to connect to OLS site 128 simply by "clicking" on the advertisement at WWW site 122a. As explained more fully below in connection with FIG. 6, when the user of user station 102a clicks on the advertisement for OLS 140 at WWW site 122a, WWW site 122a forms a special destination URL having two parts. The first part of the destination URL is formed of the URL associated with OLS site 128 (e.g., WWW.OLS.COM). The second part of the destination URL is formed of a destination filename (e.g., INDEX. HTML) and a UNIX symbolic link (e.g., \CM1) that is prepended to the beginning of the destination filename by the co-marketer (co-marketer #1) associated with WWW site 122a. The symbol or code used to form the UNIX symbolic link (e.g., \CM1) inserted by co-marketer #1 at site 122a is uniquely associated with co-marketer #1 in system 100. The complete destination URL is used to route the user (along dotted line 125) from WWW site 122a of co-marketer #1 to OLS WWW site 128. Upon reaching OLS site 128, the user station 102a is coupled to OLS WWW site 128 by solid line 126, and the complete destination URL formed at site 122a (including the UNIX symbolic link portion of such destination URL) is passed to OLS 140 through OLS web server 142.

In addition to the co-marketer represented by site 122a (co-marketer #1), users may be directed to OLS site 128 on WWW 120 through advertisements (not shown) on pages at the sites of other co-marketers represented on the WWW 120 such as, for example, through an advertisement at WWW site 122b (representing co-marketer #2), of an advertisement at WWW site 122c (representing co-marketer #3). Like the situation described above wherein a user of user station 102a clicks on the advertisement for OLS 140 at WWW site 122a, when the user of user station 102b clicks on the advertisement for OLS 140 at WWW site 122b or 122c, WWW site 122b forms a special destination URL

6

having two parts. The first part of the destination URL is again formed of the URL associated with OLS site 128 (e.g., WWW.OLS.COM), and the second part of the destination URL is again formed of a UNIX symbolic link that is prepended to a destination filename. However, if the user has clicked on an advertisement for OLS 140 at site 122b, the UNIX symbolic link (e.g., \CM2) inserted by the co-marketer (co-marketer #2) will be uniquely associated in system 100 with co-marketer #2 and site 122b. Similarly, if the user has clicked on an advertisement for OLS 140 at site 122c, the UNIX symbolic link (e.g., \CM3) inserted by the co-marketer (co-marketer #3) will be uniquely associated in system 100 with co-marketer #3 and site 122c. A complete destination URL formed at either site 122b or 122c may be used as described above in connection with site 122a to route the user from site 122b or 122c to OLS WWW site 128. Although only three co-marketers are shown in FIG. 1 for directing users from the WWW sites of such co-marketers to OLS site 128, it will be understood by those skilled in the art that more than three co-marketing sites may be used in conjunction with the present invention for directing users to OLS site 128 on WWW 120.

In the preferred embodiment of system 100, OLS 140 will accept a user that has been routed to OLS site 128 by a co-marketer only if the co-marketer that has done the routing is an authorized co-marketer for OLS 140. In system 100, a co-marketer will be authorized to route users to site 128 only after the co-marketer has been assigned and has received a unique UNIX symbolic link associated with the co-marketer from OLS 140. First and second Co-Marketer Identification Tables are stored respectively on enrollment database 146 and accounting database 144 at OLS 140. As described more fully below in conjunction with FIG. 4, each Co-Marketer Identification Table includes a separate record for storing a co-marketer identification code associated with each co-marketer (e.g., co-marketer #1, co-marketer #2, co-marketer #3) that has been authorized by OLS 140 to route users to OLS site 128.

System 100 includes an enrollment server 145 for enrolling new users on OLS 140, and a billing server 143 for generating bounty payment records for issuing bounty payments to authorized co-marketers that have referred users of user stations 102, 102a to OLS 140. For purposes of the present application, the term "server", when used in conjunction with "enrollment" or "billing", is used to refer to a physical machine formed from at least one computer processor having associated memory and software suitable thereon for executing the functions to be performed by the server. In the preferred embodiment of the present invention, the hardware platform used for implementing enrollment server 145 consists of a Tandem Model 4412 computer having 2 processors, 200 MB of memory, a 1 GB system disk and a 4 GB RAID disk; a flow diagram illustrating the operation of a preferred software system for implementing enrollment server 145 on this hardware platform is shown in FIG. 2 and discussed below. In the preferred embodiment of the present invention, the hardware platform used for implementing billing server 143 consists of a Tandem Model 4412 computer having 2 processors, 200 MB of memory, a 1 GB system disk, and a 4 GB RAID disk; a flow diagram illustrating the operation of a preferred software system 700 for implementing billing server 143 on this hardware platform is shown in FIG. 7 and discussed below. Although specific hardware is disclosed herein for implementing enrollment server 145 and billing server 143, it will be understood by those skilled in the art that other suitable hardware platforms may alternatively be used to implement

5,712,979

7

servers 143, 145. However, the two hardware systems described above for implementing servers 143, 145 are preferred because these systems allow servers 143, 145 to be hardware-scalable. This "hardware scalability" allows OLS 140 to handle an increasing number of user stations 102, 102a simply by adding further processors to the existing hardware used for servers 143, 145, without modification of the software running on such hardware. In the embodiment shown in FIG. 1, enrollment server 145 and billing server 143 are implemented in software on separate machines which are physically distinct from the processor(s) used for implementing OLS session server 147. In alternative embodiments (not shown), enrollment server 145 and billing server 143 may be implemented in software together on a single server or as part of OLS session server 147.

Referring now to FIG. 2, there is shown a flow diagram illustrating the operation of a system 200 for enrolling new users associated with user stations 102, 102a onto OLS 140, and capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention. In step 205, a user station 102 or 102a connects to OLS 140. In the case of a user station 102, the connection to OLS 140 is made by the user station via communications channel 198 directly to FDDI 141; in the case of a user station 102a, the connection is made via OLS site 128 to OLS web server 142a. Next, in step 210, the enrollment means 145 determines whether the user which just connected to OLS 140 is a new subscriber to OLS 140. In a preferred embodiment, step 210 is performed either (i) by waiting for the user to issue an enrollment request (from page 514a described below) to OLS 140, or (ii) by prompting the user to enter a login name and comparing the login name entered by the user to a list of valid login names maintained in enrollment database 146. If the user is a new subscriber to OLS 140, processing proceeds to step 220, where the enrollment means 145 determines how the user connected to OLS 140. More particularly, if the user connected to OLS 140 through web server 142, the enrollment means 145 determines that the user is operating on a user station 102a which is connected to OLS 140 via WWW 129; otherwise, enrollment means 145 determines that the user is operating on a user station 102 which is connected to OLS 140 via communications channel 198.

If a determination is made in step 220 that the user is operating on a user station 102a that connected to OLS 140 through WWW 129, then processing proceeds to step 230 where enrollment means 145 determines a co-marketer identification symbol or code (CM ID) associated with the user station 102a. In this step, the complete destination URL which was passed to OLS web server 142 when the user was directed from a co-marketer site 122a, 122b, 122c to OLS site 128 is retrieved by OLS web server 142, and the second portion of the destination URL, which contains both a UNIX symbolic link and a destination filename (which may be specified implicitly), is then extracted from the complete destination URL. As mentioned above, the UNIX symbolic link embedded in the destination URL uniquely identifies a co-marketer which directed the user from the WWW site to OLS site 128. Next, in step 240, enrollment means 145 attempts to enroll the user in OLS 140. In this step, the enrollment means 145 obtains a co-marketer identification code (CMID) associated with the destination URL using look-up table 300 (shown in FIG. 3). For each valid co-marketer in system 100, table 300 has one or more entries representing the second portion of a potential destination URL that might be generated by such a co-marketer. Thus, each entry in table 300 has a record 310 representing a

8

UNIX symbolic link (310a) and destination filename (310b) that may be provided by a valid co-marketer, and a corresponding record 320 representing a CMID associated with the co-marketer assigned to UNIX symbolic link 310a in system 100. If the second portion of the destination URL is not recognized as corresponding to a valid CMID, the enrollment session is terminated. A list of valid (or authorized) CMID's is preferably stored in a Co-Marketer Information Directory Table on enrollment database 146 shown in FIG. 4. The Co-Marketer Information Directory Table on enrollment database 146 is formed of a plurality of individual records 440, each of which contains a field 442 for storing the CMID of a system authorized co-marketer.

Referring still to step 240, if the enrollment means 145 determines that the user has been directed to OLS 140 from an authorized co-marketer, the enrollment means attempts to enroll the user in OLS 140 by assigning the user a unique user identification number and then asking the user to enter various personal information which is then stored in a Subscriber Information Directory Table on enrollment database 146. As shown in FIG. 4, the Subscriber Information Directory Table on enrollment database 146 is formed of a plurality of individual records 490, each of which contains several fields for storing information about a particular user. More particularly, for each user enrolled on OLS 140 there is a record 490 with a field 402 for storing the unique user identification number assigned to the user, a field 404 for storing the CM ID of the co-marketer that directed the user to OLS 140, fields 406, 408, 410 for respectively storing the name, address and telephone number of the user, fields 412, 414 for respectively storing the grade level and grade of the user, fields 416, 418 for storing information representing the occupations of the user's parents, field 420 for storing the user's number of siblings, and fields 422, 424, 426, 428 and 430 for respectively storing information representing the type of computer used by the user, the user's modem speed, the display capabilities of the user's display, the size of the memory of the user's PC, and the identity of the communications link (e.g., the Internet, the Prodigy® network, the CompuServe® network, or the Microsoft® network) used for accessing OLS 140.

In addition to storing information about the user in the Subscriber Information Directory Table on enrollment database 146, information about the user being enrolled in step 240 is also stored on a separate Customer Information Directory located on accounting database 144. As shown in FIG. 4, the Customer Information Directory Table on accounting database 144 is formed of a plurality of individual records 450, each of which contains several fields for storing information about a particular user. Fields 452, 454, 456, 458 and 460 store substantially the same information as that which is stored respectively in fields 402, 404, 406, 408 and 410, respectively, described above. However, in step 240 the user is also prompted by the enrollment means 145 to choose an enrollment plan and enter certain personal information which is then stored in records 450. In a preferred embodiment, the user may select either a free trial membership or one of several active membership plans, and a code representing the enrollment plan selected by the user is then stored in field 462. If the user has selected either an active or free trial membership plan, the user is prompted to enter credit card information for paying for the selected enrollment plan. This credit card information is stored in field 474 and used by billing means 143 to verify that the user is credit worthy.

Referring again to FIG. 2, following the entry of the user information into records 400, 450, processing proceeds to

5,712,979

9

step 250, where enrollment means 145 downloads a copy of user software 106a onto user station 102a. Unlike the user software 106 described above, user software 106a does not include any embedded CM ID information, or, to state it another way, user software 106a contains a "null" CM ID field embedded therein.

Referring still to FIG. 2, if a determination is made in step 220 that the user is operating on a user station 102 that connected to OLS 140 through channel 198, then processing proceeds to step 260 where enrollment means 145 determines a CM ID associated with the user station 102a. In contrast to step 230, the CM ID is determined in step 260 from an embedded CM ID stored on user software 106 which was previously loaded (in step 202) on user station 102. Next, in step 270, enrollment means 145 attempts to enroll the user in OLS 140. Step 270 is substantially the same as step 240 described above, except in step 270 the CM ID used for creating and updating the records 460 and 450 represents the CM ID embedded in software 106, as opposed to a CM ID determined from a UNIX symbolic link passed to OLS 140 over WWW 120.

Following either step 250 or 270, processing proceeds to step 280, where enrollment means 145 communicates with billing means 143 to determine whether the user is credit worthy. In addition, enrollment means 145 determines if (based on the information stored in field 462) whether the user has enrolled as an active (i.e., non-trial) user. If the user is credit worthy and has enrolled as an active user, processing proceeds to step 285, where a payment record for paying a one-time bounty (or referral fee) to the co-marketer is directed the user to OLS 140 is created.

As explained more fully below, the amount of the one-time bounty payment created in step 285 is preferably dependent on the number of users previously directed to OLS 140 by the co-marketer during a previous period (month or quarter). A Co-Marketer Information Directory located on accounting database 144 is provided for storing information about each authorized co-marketer on OLS 140. As shown in FIG. 4, the Co-Marketer Information Directory Table on accounting database 144 is formed of a plurality of records 480, each of which contains several fields for storing information about a particular authorized co-marketer. More particularly, a field 482 is provided for storing the CM ID associated with a co-marketer, and fields 484, 486 and 488 are respectively provided for storing name, address and telephone number information representing the co-marketer. In addition, each time a user is enrolled on OLS 140, the values in fields 492 and 496, which respectively represent the total number of users directed to OLS 140 by the co-marketer and the number of users directed to OLS 140 during the current month are incremented. Each record 480 also contains a field 494 representing the number of users that were directed to OLS 140 by the co-marketer during the previous month. In a preferred embodiment of the present invention, the value stored in field 494 is used in step 285 in calculating the amount of the one-time bounty payment to be paid to the co-marketer. More particularly, a higher one-time bounty payment will be paid to a co-marketer in step 285 if the number of prior enrollees represented in field 494 exceeds a predetermined threshold.

When a user reaches OLS site 128 from a previous location on WWW 120, the user will typically be initially

10

directed to the home page at web site 128. In a first embodiment of the present invention described above in connection with FIG. 2, the user may enroll on OLS 140 directly from the home page of site 128 upon reaching site 128. In alternate preferred embodiments described below, the user may browse through the home web page of site 128, and then through various further web pages at site 128, prior to reaching an enrollment page at site 128 (e.g., WWW.OLS.COM . . . \UNROLL\ENROLL.P1) from which the user then enrolls onto OLS 140. These alternate preferred embodiments are described respectively in connection with FIGS. 5 and 6. Since the system described in connection with FIGS. 5 and 6 permit a user to traverse multiple pages at site 128 prior to enrolling on OLS 140, these systems function to preserve the UNIX symbolic link information originally passed to OLS site 128 from a prior web site as the user moves between web pages at site 128.

Referring now to FIG. 5, there is shown a schematic diagram illustrating the use of UNIX symbolic links and relative URL addressing for moving between page locations at OLS site 128, in accordance with a preferred embodiment of the present invention. URL 503 points to the home page address of OLS site 128 on the WWW. URLs 594, 596, 598 also point to the home page address of OLS site 128 on the WWW; however, URLs 594, 596, 598 each include a UNIX symbolic link (/CM1/CM2/CM3) appended thereto. As described above, in the present invention, each UNIX symbolic link appended to a URL represents the identity of a co-marketer that directed a user to the home page address of OLS site 128. When the user arrives at the home page of OLS site 128, the user may then browse through various pages provided by OLS site 128 on the WWW. For example, the user may view pages providing information about OLS 140 by clicking on a "table of contents" entry on the home page of OLS site 128. Upon clicking on this "table of contents" entry on the home page, the user is directed to a Table of Contents Page represented by URL 510. From this Table of Contents Page, the user may click on individual pages (e.g., Info.P1, Info.P2, etc.) listed on the Table of Contents Page. Upon clicking on an individual page such as, for example, Information Page 1, the user is directed to a first information page represented by URL 512.

As described above in the background section, when relative URL addressing is used to move between pages on WWW 124, a user may only move between pages in the user's current directory or to a subdirectory located below the user's current directory in a directory tree such as that shown in FIG. 5. Thus, when standard relative URL addressing is used, it is not possible for a user to move from the page represented by URL 514 to the page represented by URL 518 and still preserve the UNIX symbolic link/CMID information described above. In the example shown in FIG. 5, the page 514a represented by URL 514 contains a box giving the user an option to enroll on OLS 140. In accordance with the present invention, if the user clicks on the "Enroll on OLS box" on page 514a, a special redirecting program (redirect.cgi) is triggered on web server 142 for redirecting the user from the page represented by URL 514 to the OLS enrollment page represented by URL 518. A pseudo-code version of the redirect.cgi program is shown in Table I below:

5,712,979

11

12

TABLE I

```
main( input lexums)
{
    /link_url will hold the URL for the user was on
    //when they wanted to redirect upward. (for example
    //"http://www.ols.com/cat/linkdir/linkdir2/subdir/info2.html")
    link_url = input_parameter[0];
    //destination will hold the page they want to redirect to.
    //It contains one or more "../" substrings.
    //(example: "../subdir/enroll.htm")
    destination = input_parameter[1];
    //count_substrings() counts the number of substrings ("../")
    //within the given string of characters (destination).
    //In this example it would return the number "2".
    number_of_levels_up = count_substrings("../", destination);
    //remove_n_levels() takes a fully specified URL such as
    //"http://www.ols.com/cat/linkdir/linkdir2/subdir/page.htm"
    //and removes a given number of directories and the page name.
    //For example if number_of_levels_up is 2, the output from
    //remove_n_levels(link_url, 2) would be
    //"http://www.ols.com/cat/linkdir/"
    new_directory = remove_n_levels(link_url, number_of_levels_up);
    //get_relative_url() takes the given string and returns the portion
    //after all of the "../" substrings. Thus in this example it returns
    //"subdir/enroll.htm"
    subdir_url = get_relative_url(destination);
    //concatenate() takes 2 strings and splices the second one
    //onto the back of the first. (In this example this yields
    //"http://www.ols.com/cat/linkdir/subdir/enroll.htm")
    new_absolute_url = concatenate(new_directory, relative_url);
    //redirect_browser() sends a "Hyper-Text Transfer Protocol" (http)"
    //message back to the user's web browser telling it to get the given URL.
    redirect_browser(new_absolute_url);
}
```

Thus, the redirect.cgi program accepts as arguments the current URL of the user (e.g., URL 514) and a destination URL representing the location to which the user desires to move (e.g., URL 518). The program then strips the "... /info/info.P1" portion off of the current URL 514, and replaces the striped portion with the "... /Enroll/Enroll.P1" portion of destination URL 518 to form a new URL which is then used for redirecting the user to the page represented by URL 518. The redirect.cgi program is significant to the operation of the present invention because, among other things, this program allows the UNIX symbolic link information that was originally passed when the user arrived at the home page of OLS site 128 to be retained as the user moves between pages at OLS site 128. Thus, the redirecting.cgi program insures that the UNIX symbolic link information provided by a co-marketer will be present when the enrollment means 145 attempts to enroll the user on OLS 140.

The redirect.cgi program discussed in connection with FIG. 5 and Table I above represents a first preferred system for retaining at site 128 the UNIX symbolic link information (that was originally passed when the user originally arrived at OLS site 128 from a previous site) as the user moves between web pages at OLS site 128. In accordance with an alternative preferred embodiment of the present invention, a further system (described in connection with FIG. 6 and Table II below) may alternatively be used to store and transmit the UNIX symbolic link information that was originally passed when the user arrived at the home page of OLS site 128. In this alternate embodiment, the URL used to direct a user from a previous site (e.g., 122a, 122b, 122c) to OLS site 128 includes a string which functions to call a special page_link.cgi program which runs on web server 142. The string passed to OLS site 128 also contains (1) a destination page identifier (or filename) representing the particular web page at site 128 to which the user has been directed by the previous web site, and (II) a UNIX symbolic

link or CMID code associated with the previous web site. More particularly, the destination page identifier and the UNIX symbol link information/CMID code are included in the string as arguments to the page_link.cgi program. An exemplary URL which invokes the page_link.cgi program and that could be used by co-marketer site 122a for directing a web user from a site 122a to the home page of site 128 is shown below:

WWW.OLS.COM/page_link.cgi? index/CM1

The first portion (i.e., WWW.OLS.COM) of this exemplary URL identifies the web site 128 as the web site to which the user is being directed. The remaining portion (i.e., page_link.cgi? index or CM1) of the URL represents a call to the page_link.cgi program. The program call includes two arguments, namely, a destination page identifier (i.e., index) representing the particular page at site 128 to which the user has been directed, and a UNIX symbolic link/CMID code (i.e., CM1) representing the identity of the web site 122a that directed the user to site 128.

Referring now to FIG. 6, there is shown a flow diagram of a system 600 for implementing the page_link.cgi program. In step 610, when web server 142 receives a URL which includes a string containing a call to the page_link.cgi program, the page_link.cgi program is invoked on the web server 142. Next, in step 620, the page_link.cgi program extracts the destination page identifier (e.g., index) and UNIX symbolic link/CMID code (e.g., CM1) that were contained as arguments in the page_link.cgi program call. Next, the page at web site 128 represented by the destination page identifier is retrieved. Each page at web site 128 is represented by a file which includes one or more fields containing further URLs representing links to other pages at web site 128 (internal page links) or to pages at web sites other than site 128 (external page links). Each URL in the destination page is then selected and tested (in steps 630 and

5,712,979

**13**

640) in order to determine whether the URL includes a string for calling the page_link.cgi program. If the URL does include the "page_link.cgi" string, a further determination is made (in step 650) whether the URL represents an internal or external page link. In this step, the URL will be determined as representing an internal page link if the first portion of the URL represents OLS site 128 (i.e., "WWW.OLS.COM") or if there is no site name portion in the URL; otherwise the URL will be determined as representing an external page link. Next, in step 660, for each internal URL in the destination page which includes a string for calling the page_link.cgi program, the page_link.cgi program appends the UNIX symbolic link/CMID code (i.e.,

**14**

then repeated from step 630 for each URL on the destination page. The destination page, which includes URLs having the appended codes described above is then passed back to the user in step 690. Thereafter, when the user desires to move off of the destination page (passed to the user in step 690), the user will select one of the URL page links on the user's page as a new destination page. If the URL corresponding to this new destination page contains a call to the page_link.cgi program described above, the process described above is repeated from step 610 using the URL of the new destination. A pseudo-code listing of an exemplary web page file and of the page_link.cgi program are shown below in Table II:

TABLE II

```
**WEB PAGE FILE PSEUDO CODE**
<HTML>
<HEAD>
<TITLE>Online Service Home Page</TITLE>
</HEAD>
<BODY>
<A HREF="http://www.ols.com/cgi-bin/page_link.cgi?Enroll&CMI">Enroll page ss OLS
140</A>
<A HREF="http://www.othercom">Visit another company's web pages</A>
<A HREF="http://www.other.com/cgi-bin/page_link.cgi?Index&CMI&OLS">Maintain
connection info and visit another site</A>
</BODY>
</HTML>
**PAGE LINK CGI PSUEDO CODE**
PageLink (URL) {
    get destinationPageName and CMID_string from URL
    //assuming the following URL:
    //"http://www.ols.com/cgi-bin/page_link.cgi?Index&CMI1"
    //destinationPageName is index, as it follows "page_link.cgi?"
    //and the CMID_string is "CMI", as it follows the
    //destinationPageName (and is separated by a "&"),
    //
    //CMID_string consists of one or more consistent codes
    //separated by "&" characters, and records the path taken
    //by the user though web sites which employ this tracking
    //system
    get contents of page named destinationPageName into destinationPage
    for each URL in destinationPage
    {
        if URL contains page_link.cgi call and refers to an internal URL
        {
            //if there is no site name or if the site name matches
            //this on-line service's, the URL is internal
            append CMID_string to URL
        }
        else if URL contains page_link.cgi call and is an external URL
        {
            //if there is a site name and it does not match that of OLS 140,
            //the URL is external
            append CMID_string to URL
            append OLS_string to URL
            //OLS_string refers to the CMID code of
            //the site running this instance of the page_link.cgi
            //application, and is unique among all sites participating.
        }
        //note that nothing is done to URLs which do not refer to
        //the page_link.cgi application, since no consistent code
        //tracking is done when users follow those links
    }
    send page
}
```

**60**

CMI) originally passed as an argument to the program to the end of the URL. In addition, in step 670, for each external URL in the destination page which includes the "page_link.cgi" string, the page_link.cgi program appends the UNIX symbolic link/CMID originally passed to the program followed by a UNIX symbolic link/CMID representing OLS site 128 (e.g., /OLS) to the end of the URL. The process is

In the embodiment shown in FIG. 6 and described above, each page link URL on a web page at site 128 will preferably include a call to the page_link.cgi program if the page link points to either (i) a further web page at site 128, or (ii) a further web site which is adapted to recognize UNIX symbolic links that have been inserted into a URL by a previous web site during a user session. By inserting the page_

5,712,979

15

link.cgi program call and UNIX symbolic link information into each page link that points to a further web page at site 128, the system insures that the UNIX symbolic link information originally passed to site 128 by a previous web site will be available when OLS 140 attempts to enroll the user into OLS 140. In addition, by inserting the UNIX symbolic link information associated with both a previous web site 122a, b, c and OLS 140 into page links associated with different web sites (other than site 128), the system permits the user to carry UNIX symbolic link information representing previous location(s) traversed during a user session to further web sites.

Referring now to FIG. 7, there is shown a flow diagram illustrating the operation of a system 700 for generating recurring bounty payment records of the present invention. In addition to providing each co-marketer with a one-time bounty payment each time a user directed to OLS 140 by the co-marketer enrolls in OLS 140, billing means 143 also generates "recurring" bounty payment records for certain selected co-marketers that have secured a preferred status with OLS 140. Information representing whether or not a particular co-marketer has such preferred status (and is thus eligible to receive a recurring bounty payment) is stored in field 490 of records 480. As shown in system 700, a recurring bounty payment is determined for each preferred co-marketer on a periodic basis based on the number of users that were referred to OLS 140 by the co-marketer (at anytime) and which are still active subscribers on OLS 140.

Referring still to FIG. 7, in step 710 a counter used for determining the total number of active users associated with each co-marketer is initialized, preferably to zero. Next, in step 720 a co-marketer record 480 having a preferred status (as indicated by field 490) is selected for processing. Next, a user record 450 having the same CM ID (as indicated by field 454) as that of the selected co-marketer is selected for processing. If field 470 of the selected user record indicates that the selected user is still an active user and the user has been an active user on OLS 140 for at least 90 days (as indicated by field 476), then processing proceeds to step 750 where the recurring user counter is incremented. Next, in step 760, the process is repeated from step 730 until each user record 450 having the same CM ID as the selected co-marketer has been processed. Thereafter, in step 770, the billing means 143 generates a recurring bounty payment for the selected co-marketer by multiplying a value represented by the recurring user counter with a per user bounty amount. Finally, in step 780, the process is repeated from step 710 until each co-marketer having a preferred status has been processed.

In an alternate preferred embodiment of the present invention (not shown), the value stored in field 492 may be used by system 700 (at step 770) in calculating the rate of each recurring bounty payment to be paid to each preferred co-marketer. More particularly, a higher recurring bounty payment rate may be paid to a co-marketer if the value of enrollees represented in field 492 exceeds a predetermined threshold.

Furthermore, it is to be understood that although the present invention has been described with reference to a preferred embodiment, various modifications, known to those skilled in the art, may be made to the structures and process steps presented herein without departing from the invention as recited in the several claims appended hereto.

What is claimed is:

1. A method for tracking the navigation path of a user operating on a user station, said user having been directed to a second site on a world wide web (WWW) from a first site on said WWW, said first WWW site having a universal resource locator (URL) for uniquely identifying an address

16

of said first WWW site on said WWW, said first WWW site including means for directing said user from said first WWW site to said second WWW site, comprising the steps of:

(A) receiving a URL at said second WWW site when said user is directed from said first WWW site to said second site, said user having been site being different from said user station, said second WWW site being different from said user station;

(B) capturing, at said second WWW site, information representative of an identity of said first WWW site by identifying a first code in said URL received in step (A);

(C) determining a destination web page for said user;

(D) forming, at said second WWW site, a revised destination web page by inserting a second code representative of said identity of said first WWW site into at least one selected web page link associated with said destination web page; and

(E) transmitting said revised destination web page to said user.

2. The method of claim 1, wherein said first code is represented by a UNIX symbolic link in said URL received in step (A).

3. The method of claim 2, wherein said URL received in step (A) is representative era home page of said second site on said WWW.

4. The method of claim 3, wherein said first code identified in step (B) is the same as said second code attached to said at least one selected page link in step (D).

5. The method of claim 4, wherein said first site represents a co-marketer of on-line services on said WWW and said second site represents an on-line service on said WWW.

6. The method of claim 5, further comprising the step of:

(F) using, at said second WWW site, said information representative of said identity of said first WWW site to pay a bounty to said co-marketer.

7. The method of claim 6, wherein said URL is generated at said first WWW site prior to when said user is directed from said first site to said second site.

8. An apparatus for tracking the navigation path of a user operating on a user station, said user having been directed to a second site on a world wide web (WWW) from a first site on said WWW, said first WWW site having a universal resource locator (URL) for uniquely identifying an address of said first WWW site on said WWW, said first WWW site including means for directing said user from said first WWW site to said second WWW site, comprising a web server formed of:

(A) means for receiving a URL at said second WWW site when said user is directed from said first WWW site to said second WWW site, said first WWW site being different from said user station, said second WWW site being different from said user station;

(B) means for capturing, at said second WWW site, information representative of an identity of said first WWW site by identifying a first code in said URL;

(C) means for determining a destination web page for said user;

(D) means for forming, at said second WWW site, a revised destination web page by inserting a second code representative of said identity of said first WWW site into at least one selected web page link associated with said destination web page; and

5,712,979

<table>
<tr><td>

**17**

(B) means for transmitting said revised destination web page to said user.

9. The apparatus of claim 8, wherein said first code is represented by a UNIX symbolic link in said URL.

10. The apparatus of claim 9, wherein said URL is representative of a home page of said second site on said WWW.

11. The apparatus of claim 10, wherein said first code is the same as said second code attached to said at least one selected page link.

</td><td>

**18**

12. The apparatus of claim 11, wherein said first site represents a co-marketer of on-line services on said WWW and said second site represents an on-line service on said WWW.

13. The apparatus of claim 12, further comprising accounting means, at said second WWW site, for using said information representative of said identity of said first WWW site to pay a bounty to said co-marketer.

* * * * *

</td></tr>
</table>

Exhibit B

US005717860A

# United States Patent [19]

## Graber et al.

[11] Patent Number: 5,717,860

[45] Date of Patent: *Feb. 10, 1998

[54] **METHOD AND APPARATUS FOR TRACKING THE NAVIGATION PATH OF A USER ON THE WORLD WIDE WEB**

[75] Inventors: Terry E. Graber, Downingtown; Joshua Kopelman, Malvern; Edwin Howell Watkeys, III, North Wales; Marvin L. Weinberger, Havertown, all of Pa.

[73] Assignee: Infonautics Corporation, Wayne, Pa.

[*] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,712,979.

[21] Appl. No.: 534,370

[22] Filed: Sep. 26, 1995

[51] Int. Cl.⁶ .................... G06F 13/14; G06F 13/42; H04L 12/46; H04L 29/02

[52] U.S. Cl. ................. 395/200.12; 395/200.09; 395/200.16; 395/214; 395/762

[58] Field of Search .............. 395/200.06, 200.09, 395/200.11, 200.12, 200.15, 200.16, 214, 240, 244, 187.01, 741, 762, 615, 774; 340/825.34, 825.35; 380/23, 24, 25, 49; 379/118, 127, 142; 364/225.1, 225.4, 227.3, 286.5, 918.1, 918.9, DIG. 1, DIG. 2

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,726,014 | 2/1988 | Goleman et al. |
| 4,845,749 | 12/1989 | Barper et al. |
| 5,095,440 | 3/1992 | Fenner |
| 5,159,669 | 10/1992 | Tdgg |
| 5,210,820 | 5/1993 | Kenyon |
| 5,220,655 | 6/1993 | Tsutsui .................. 395/200.11 |
| 5,255,472 | 10/1994 | Lewis |
| 5,359,508 | 10/1994 | Rossides |
| 5,416,842 | 5/1995 | Aziz |
| 5,442,342 | 8/1995 | Kung |
| 5,491,820 | 2/1996 | Belova et al. |
| 5,499,297 | 3/1996 | Boebert |
| 5,530,952 | 6/1996 | Medca, Jr. et al. ......... 395/200.09 |
| 5,537,314 | 7/1996 | Kantec ................... 395/214 |
| 5,537,546 | 7/1996 | Sauter ................... 395/762 |
| 5,537,586 | 7/1996 | Amram et al. |
| 5,544,322 | 8/1996 | Cheng et al. |
| 5,557,721 | 9/1996 | File et al. |
| 5,561,706 | 10/1996 | Fenner |
| 5,572,643 | 11/1996 | Judson |
| 5,590,180 | 12/1996 | Tosomwra et al. |
| 5,603,025 | 2/1997 | Tabb |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 648113 | 11/1992 | Australia |
| 4213393 | 10/1993 | Australia |

### OTHER PUBLICATIONS

Que Corporation, Using the World Wide Web, ISBN 0-7897-0016-5, USA, pp. 59-109, 1994.

(List continued on next page.)

Primary Examiner—Eric Coleman
Assistant Examiner—Mark H. Rinehart
Attorney, Agent, or Firm—Reed Smith Shaw & McClay LLP

[57] **ABSTRACT**

A method and apparatus for tracking the navigation path of a user that has been directed to a second site on the World Wide Web (WWW) from a first site on the WWW. The first site has a universal resource locator (URL) symbol for uniquely identifying an address of the first site on the WWW, and the second site has a URL symbol for uniquely identifying an address of the second site on the WWW. A composite URL symbol is received at the second WWW site when the user is directed from the first site to the second site. The composite URL symbol has a first portion corresponding to the URL symbol of the second site, and a second portion that includes information corresponding to the identity of the first site. Information representative of the identity of the first WWW site is captured at the second WWW site from the second portion of the composite URL. The identity of the first WWW site is then determined at the second WWW site by comparing information from the second portion of the composite URL to a table having a plurality of entries each of which is representative of a known WWW site.

13 Claims, 7 Drawing Sheets



5,717,860
Page 2

## OTHER PUBLICATIONS

Press Release, "Streams Readies Release of Breakthrough Internet Media Planning and Assessment", Chicago, USA, retrieved from Internet http://streams.com/press_release.html, pp. 1–2, Aug. 31, 1995.

W3 Organization, "HTTP Request fields", retrieved from Internet http://www.w3.org/pub/WWW/Protocols/HTTP/HTRQ_Headers.html, pp. 1–5, May 3, 1994.

Heylighen F., "World–Wide Web a distributed hypermedia paradigm for global networking," Proceedings, SHARE Europe Spring Conference, pp. 355–368, Apr. 18, 1994.

Brody H, "<Internet@crossroads.$$$>", Technology Review, vol. 98 Iss. 4, pp. 24–31, May 1995.

Moore, Steve "Internet Security Split: Let the Browser Beware," Abstract, Computerworld, v29, N35, P59(2), Aug. 28, 1995.

Wimer, W., "Clarifications and Extensions for the Bootstrap Protocol," RFC1532 pp. 1–19, Oct. 1993.

Baden, Rich "Electronic Publishing with Mosaic," PC Letter, v10, N14, P4(1), Aug. 15, 1994.

"Biznet Technologies Announces Release of Versatile Virtual Vending," PR Newswire, p0913DC028, Oct. 1994.

"An Exclusive EMR Series–Part Three Strategies Diverge Among Web Service Providers," Electronic Marketplace Report, v9, n14, p6(1), Jul. 18, 1995.

Frook, John Evan "Web vs. Other Media Outlets," Interactive Age, n216, p5, Jun. 5, 1995.

Uiry, Jill "Delahaye Group to Offer NetBench," Business Wire, p1, May 31, 1995.

Foster, Marilyn S. "Hardcopy to Online Publications—It Can Be Done," IEEE, pp. 51–57, 1990.

"HotWired Gets Star from Nielsen," Advertising Age, v66, n25, p18, Jun. 19, 1995.

Little, Thomas "Commerce on the Internet," IEEE Multimedia, v1, n4, pp.74–78, 1994.

"Research Firms Strive for Web Tracking That Counts," Interactive Marketing News, v2, n13, Jan. 23, 1995.

Kranz, Michael "Keeping an Eye on I/Pro," Mediaweek, v5, n15, p. 12, Apr. 10, 1995.

Lau, Teresa "Building a Hypermedia Information System on the Internet," Professional Communication Conference, 1994, pp. 192–196.

Resnick, Rosalind "Tread Lightly on the Internet," Home Office Computing, v12, n4, p.80(2), Apr. 1994.

Rothschild, Michael "Stagecoach Days on the Infohighway," Forbes, v153, n5, pS25(2), Feb. 28, 1994.

LaPlante, Alice "Does Your Corporate Data Have Value?" InfoWorld, v15, n43, p60(1), Oct. 1993.

Product Description: "Doctor HTML . . . No more bugs on your web site, Commission Program"; retrieved from internet http://www.smartbiz.com/doctor.htm, Mar. 13,1997.

Agreement Form; "Doctor HTML Commission Program, Sign–Up Form & Agreement"; retrieved from internet http://dchtml.imagiware.com/sbss/agreement.html, Mar. 13, 1997.

Promotional Description; "Start Making Some Serious Bucks On The Internet"; retrieved from internet http://www.mymail.net/advertising/BannerBounty.htm, Jul. 28, 1997.



Exhibit E
Page 73



FIG. 2



FIG. 3

Exhibit E
Page 75

400

| USER ID NUMBER | ~402 |
| CM ID NUMBER | ~404 |
| USER NAME | ~406 |
| USER ADDRESS | ~408 |
| USER TELEPHONE # | ~410 |
| GRADE LEVEL | ~412 |
| GENDER | ~414 |
| OCCUPATION PAR-1 | ~416 |
| OCCUPATION PAR-2 | ~418 |
| BROTHERS/SISTERS | ~420 |
| COMPUTER TYPE | ~422 |
| MODEM SPEED | ~424 |
| DISPLAY CAPACITY | ~426 |
| MEMORY SIZE | ~428 |
| COMM LINK | ~430 |
| ENROLLMENT DATE | ~432 |

450

| USER ID NUMBER | ~452 |
| CM ID NUMBER | ~454 |
| USER NAME | ~456 |
| USER ADDRESS | ~458 |
| USER TELEPHONE # | ~460 |
| ENROLLMENT PLAN | ~462 |
| STATEMENT CYCLE | ~464 |
| TAX INFORMATION | ~466 |
| DISCOUNT INFORMATION | ~468 |
| ACCOUNT STATE | ~470 |
| ACCOUNT HISTORY | ~472 |
| CREDIT CARD INFO. | ~474 |
| ENROLLMENT DATE | ~476 |

440

| CM ID NUMBER | ~442 |
| CM NAME | ~444 |
| ALLOWED ENROLLMENT PLANS | ~446 |

480

| CM ID NUMBER | ~482 |
| CM NAME | ~484 |
| CM ADDRESS | ~486 |
| CM TELEPHONE # | ~488 |
| PREFERRED STATUS | ~490 |
| TOTAL ENROLLEES | ~492 |
| ENROLLEES LAST MONTH | ~494 |
| ENROLLEES THIS MONTH | ~496 |

*FIG. 4*



FIG. 5

U.S. Patent    Feb. 10, 1998    Sheet 6 of 7    5,717,860



FIG. 6



FIG. 7

5,717,860

1

## METHOD AND APPARATUS FOR TRACKING THE NAVIGATION PATH OF A USER ON THE WORLD WIDE WEB

### FIELD OF THE INVENTION

The present invention is directed to on-line computer systems for delivering information and computer services to users coupled to such systems. More particularly, the present invention is directed to an automated system for capturing information representing the identity of an entity that has directed a user to an on-line system. Still more particularly, the present invention is directed to a system for tracking user paths on the world wide web (WWW).

### BACKGROUND OF THE INVENTION

On-line computer services such as, for example, on-line information retrieval services, on-line travel reservation services, or on-line stock trading services, receive new subscribers from various sources. New subscribers are typically directed to an on-line service by advertisements placed by the on-line service itself, through word-of-mouth referrals given by existing system subscribers, or by third party computer system marketers (referred to hereinafter as co-marketers) of the on-line service. Different co-marketers may typically use different media for promoting a particular on-line computer service. For example, a magazine acting as a co-marketer for an on-line service might use a magazine advertisement, which includes a free software disk for accessing the on-line service, to promote the on-line service. Alternatively, various directory services available on the WWW such as, for example, the Yahoo® or Web Crawler® directory services, might use a listing on their directory pages and a link to a WWW page associated with an on-line service, to direct potential new subscribers to an on-line service. Thus, new subscribers can be directed to the same on-line service from different co-marketers and through different marketing channels. It would be desirable to be able to capture and track the co-marketing source which directed each new subscriber to an on-line service. In addition, it would be desirable to capture and track the co-marketing source which directed a new subscriber to an on-line service in a manner which required no participation or intervention from the new subscriber.

When a user navigates through various sites during a session on the WWW, the navigational history reflecting the past locations traversed by the user during the session is typically lost as the user moves from one site to the next site. Thus, unless the user were to manually track the various sites traversed during a world wide web session, it would be difficult for the user, or for any service monitoring the user, to know the identity of any previous world wide web site traversed by the user during a session. It would be desirable to have a system for attaching navigational history information to a user traversing the WWW so that a current web site could determine electronically at least the previous WWW site visited by the user.

Universal resource locators are often used to direct users through various pages at a site on the world wide web. There are two different techniques for specifying addresses using universal resource locators. In a first technique, known as fully specified addressing, the full string associated with a universal resource locator is specified each time a user moves from one web page to the next web page. In the second technique, known as relative addressing, only information representing the root directory or the current directory (or subdirectory) of the user is specified as a user moves

2

from one web page to the next web page. One drawback of using relative universal resource locator addressing is that it is impossible to move "up a directory tree" using such addressing, without specifying the root directory. UNIX symbolic links may be used in specifying a particular root directory. However, when relative addressing is used, it is impossible to carry this UNIX symbolic link information forward as a user moves from page to page. It would be desirable if this limitation of relative universal resource locator addressing could be ameliorated, such that the UNIX symbolic link information could be retained during the relative addressing of web pages.

It is therefore an object of the present invention to provide a unified system for capturing and tracking a co-marketing source which directed a new subscriber to an on-line service.

It is a further object of the present invention to provide a system for capturing and tracking information identifying a co-marketing source which directed a new subscriber to an on-line service, which requires no participation or intervention from the new subscriber.

It is a still further object of the present invention to provide a system for attaching navigational history information to a user traversing the world wide web so that a current web site could determine electronically at least the previous world wide web site visited by the user.

It is a still further object of the present invention to provide a system which could be used in conjunction with relative universal resource locator addressing, which permitted a user in a particular directory at a web site to move up a directory tree.

These and other objects of the invention will become apparent from the description of the invention which follows.

### SUMMARY OF THE INVENTION

The present invention is directed to an apparatus for capturing and storing a co-marketer identification symbol representing an identity of an entity that has referred a user on a user station to a computer service, wherein the user station is coupled to the computer service by a communications path. A database is provided for storing a plurality of user records. Each of the user records includes a user identification field for storing information uniquely associating each of the user records with a user, and a co-marketer identification field for storing identity information representing the identity of an entity that directed the user to the computer service. An enrollment means is coupled to the communications path and the database, and is provided for enrolling a user on the computer service. The enrollment means includes means for determining a co-marketer that directed the user to the computer service, and means for assigning a unique user identification number to the user. The enrollment means further includes means for storing a co-marketer identification symbol representative of a co-marketer and the unique user identification number of a user in the co-marketer identification and user identification fields, respectively, of one of the user records.

In accordance with a further aspect, the present invention is directed to a method and apparatus for tracking the navigation path of a user that has been directed to a second site on the WWW from a first site on the WWW. The first site has a universal resource locator (URL) symbol for uniquely identifying an address of the first site on the WWW, and the second site has a URL symbol for uniquely identifying an address of the second site on the WWW. A composite URL symbol is received at the second WWW site

5,717,860

3

when the user is directed from the first site to the second site. The composite URL symbol has a first portion corresponding to the URL symbol of the second site, and a second portion that includes information corresponding to the identity of the first site. The information representative of the identity of the first site is captured at the second WWW site from the second portion of the composite URL. The identity of the first WWW site is then determined at the second WWW site by comparing information from the second portion of the composite URL to a table having a plurality of entries each of which is representative of a known WWW site.

In accordance with a still further aspect, the present invention is directed to a method and apparatus for redirecting a user from a first location on the WWW to a second location on the WWW, wherein relative URL addressing is used during the redirecting process. A signal is received from the first location indicating that the user wishes to move from the first location on the WWW to the second location on said WWW. In response to the signal, a current URL representing an address of the first location on the WWW and a destination URL portion representative of an address of the second location on the WWW are passed to a redirecting means. The current URL includes first and second portions. A destination URL is formed with redirecting means by substituting the destination URL portion in place of the second portion in the current URL, wherein the destination URL represents a relative address of the second location on the WWW. The user is then moved from the first location on the WWW to the second location on the WWW in accordance with the destination URL formed by the redirecting means.

In accordance with a still further aspect, the present invention is directed to a method and apparatus for tracking the navigation path of a user that has been directed to a second site on the WWW from a first site on the WWW. A URL is received at the second WWW site when the user is directed from the first site to the second site. At the second WWW site, information representative of an identity of the first WWW site is captured by identifying a first code in the URL. A destination web page is determined for the user, and a revised destination web page is formed by inserting a second code representative of the identity of the first WWW site into at least one selected web page link associated with the destination web page. The revised destination web page is then transmitted to the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

In order that the manner in which the above-recited and other advantages and objects of the invention are obtained and can be appreciated, a more particular description of the invention briefly described above will be rendered by reference to a specific embodiment thereof which is illustrated in the appended drawings. Understanding that these drawings depict only a typical embodiment of the invention and are not therefore to be considered limiting of its scope, the invention and the presently understood best mode thereof will be described and explained with additional specificity and detail through the use of the accompanying drawings.

FIG. 1 is a block diagram showing a system for enrolling new users on an on-line system and capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention.

FIG. 2 is a flow diagram illustrating the operation of a system for enrolling new users on an on-line system and capturing co-marketing information associated with such

4

new users, in accordance with a preferred embodiment of the present invention.

FIG. 3 is a diagram of a look-up table for associating UNIX symbolic link information with co-marketers, in accordance with a preferred embodiment of the present invention.

FIG. 4 is a diagram illustrating preferred data structures for storing a Subscriber Information Directory Table, a Customer Information Directory Table, and first and second Co-Marketer Information Directory Tables, in accordance with a preferred embodiment of the present invention.

FIG. 5 is a schematic diagram illustrating the use of UNIX symbolic links and relative URL addressing for moving between locations on the WWW, in accordance with a preferred embodiment of the present invention.

FIG. 6 is a flow diagram illustrating the operation of a system for attaching a code representing the navigational history of a user on the WWW onto selected URL page links on a destination web page of a user, in accordance with an alternative preferred embodiment of the present invention.

FIG. 7 is a flow diagram illustrating the operation of a system for generating recurring bounty payment records, in accordance with a preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to FIG. 1, there is shown a block diagram of a system 100 for enrolling new users on an on-line system and capturing co-marketing information associated with such new users, in accordance with a preferred embodiment of the present invention. System 100 includes a first type of user station 102. The user station 102 includes a personal computer (PC) 104 and user software 106 which resides on PC 104. User software 106 includes a graphical user interface (not shown) for facilitating communications between user station 102 and On-Line Service (OLS) 140. OLS 140 represents a computer service such as, for example, an information retrieval service, a travel reservation service, or a stock trading service, which is available on-line to a user of user station 102. User station 102 is coupled to a Fiber Distributed Data Interface (FDDI) 141 in OLS 140 by a communications channel 108. In alternate embodiments, a standard communications line or a local area network may be substituted for FDDI 141. Communications channel 108 may consist of a communications link formed over a public network such as the Internet. Alternatively, communications channel 108 may consist of a communications link formed between PC 104 and FDDI 141 over a commercial network. Thus, commercial networks such as, for example, the Prodigy® network, the CompuServe® network, or the Microsoft® network, may be used to establish a communications channel 108 for linking PC 104 and FDDI 141. Although in the preferred embodiment of the present invention, element 140 is shown as being an on-line computer service, it will be understood by those skilled in the art that element 140 may alternatively represent any computer service, regardless of whether the service is available on-line.

As explained more fully below, user software 106 is preferably provided to a user of user station 102 by an on-line service co-marketer (CM) and loaded onto PC 104 prior to the time the user of user station 102 attempts to enroll on OLS 140. User software is preferably provided to the user of user station 102 from the CM via a floppy disk, CD-ROM disk, magnetic tape or through a File Transfer

5,717,860

**5**

Protocol (FTP) site on the Internet. User software 106 preferably includes an embedded co-marketer symbol or code which can be recognized by OLS 140 whenever the user of user station 102 connects to OLS 140. The co-marketer symbol embedded in the user software uniquely represents the identity of the co-marketer that provided user software 106 to the user of user station 102. An example of a co-marketer that might provide user software 106 to a user of user station 102 might include, for example, a magazine publisher that advertises OLS 140 in its magazine and includes a floppy disk with user software 106 together with the magazine advertisement.

System 100 also includes a second type of user station 102a. The user station 102a includes a PC 104a and user software 106a which resides on PC 104a. Like user software 106, user software 106a includes a graphical user interface (not shown) for facilitating communications between user station 102a and On-Line Service (OLS) 140. However, unlike user station 102, user station 102a is coupled to OLS 140 through the WWW 120. More particularly, user station 102a is coupled to an OLS web server 142 at OLS 140 through the WWW site 128 associated with OLS 140 on the WWW 120.

The navigation history of the user of user station 102a on WWW 120 is shown generally by dotted lines 124, 125 and solid line 126. As shown by dotted line 124, user station 102a was initially coupled to site 122a of a first co-marketer on WWW 120. In the preferred embodiment of the present invention, a page at site 122a includes an advertisement (not shown) for OLS 140. In addition, the advertisement at co-marketer site 122a is preferably such that a user of user station 102a may chose to connect to OLS site 128 simply by "clicking" on the advertisement at WWW site 122a. As explained more fully below in connection with FIG. 5, when the user of user station 102a clicks on the advertisement for OLS 140 at WWW site 122a, WWW site 122a forms a special destination URL having two parts. The first part of the destination URL is formed of the URL associated with OLS site 128 (e.g., WWW.OLS.COMM). The second part of the destination URL is formed of a destination filename (e.g., INDEX.HTML) and a UNIX symbolic link (e.g., \CM1) that is prepended to the beginning of the destination filename by the co-marketer (co-marketer #1) associated with WWW site 122a. The symbolic link (e.g., \CM1) inserted by co-marketer #1 at site 122a is uniquely associated with co-marketer #1 in system 100. This complete destination URL is used to route the user (along dotted line 125) from WWW site 122a of co-marketer #1 to OLS WWW site 128. Upon reaching OLS site 128, the user station 102a is coupled to OLS WWW site 128 by solid line 126, and the complete destination URL formed at site 122a (including the UNIX symbolic link portion of such destination URL) is passed to OLS 140 through OLS web server 142.

In addition to the co-marketer represented by site 122a (co-marketer #1), users may be directed to OLS site 128 on WWW 120 through advertisements (not shown) on pages at the sites of other co-marketers represented on the WWW 120 such as, for example, through an advertisement at WWW site 122b (representing co-marketer #2), or an advertisement at WWW site 122c (representing co-marketer #3). Like the situation described above wherein a user of user station 102a clicks on the advertisement for OLS 140 at WWW site 122a, when the user of user station 102a clicks on the advertisement for OLS 140 at WWW site 122b or site 122c, WWW site 122b forms a special destination URL having two parts. The first part of the destination URL is

**6**

again formed of the URL associated with OLS site 128 (e.g., WWW.OLS.COMM), and the second part of the destination URL is again formed of a UNIX symbolic link that is prepended to a destination filename. However, if the user has clicked on an advertisement for OLS 140 at site 122b, the UNIX symbolic link (e.g., \CM2) inserted by the co-marketer (co-marketer #2) will be uniquely associates in system 100 with co-marketer #2 and site 122b. Similarly, if the user has clicked on an advertisement for OLS 140 at site 122c, the UNIX symbolic link (e.g., \CM3) inserted by the co-marketer (co-marketer #3) will be uniquely associated in system 100 with co-marketer #3 and site 122c. A complete destination URL formed at either site 122b or 122c may be used as described above in connection with site 122a to route the user from site 122b or 122c to OLS' WWW site 128. Although only three co-marketers are shown in FIG. 1 for directing users from the WWW sites of such co-marketers to OLS site 128, it will be understood by those skilled in the art that more than three co-marketing sites may be used in conjunction with the present invention for directing users to OLS site 128 on WWW 120.

In the preferred embodiment of system 100, OLS 140 will accept a user that has been routed to OLS site 128 by a co-marketer only if the co-marketer that has done the routing is an authorized co-marketer for OLS 140. In system 100, a co-marketer will be authorized to route users to site 128 only after the co-marketer has been assigned and has received a unique UNIX symbolic link associated with the co-marketer from OLS 140. First and second Co-Marketer Identification Tables are stored respectively on enrollment database 146 and accounting database 144 at OLS 140. As described more fully below in conjunction with FIG. 4, each Co-Marketer Identification Table includes a separate record for storing a co-marketer identification code associated with each co-marketer (e.g., co-marketer #1, co-marketer #2, co-marketer #3) that has been authorized by OLS 140 to route users to OLS site 128.

System 100 includes an enrollment server 145 for enrolling new users on OLS 140, and a billing server 143 for generating bounty payment records for issuing bounty payments to authorized co-marketers that have referred users of user stations 102, 102a to OLS 140. For purposes of the present application, the term "server", when used in conjunction with "enrollment" or "billing", is used to refer to a physical machine formed from at least one computer processor having associated memory and software installed thereon for executing the functions to be performed by the server. In the preferred embodiment of the present invention, the hardware platform used for implementing enrollment server 145 consists of a Tandem Model 4412 computer having 2 processors, 200 MB of memory, a 1 GB system disk, and a 4 GB RAID disk; a flow diagram illustrating the enrollment server 145 on this hardware platform is shown in FIG. 2 and discussed below. In the preferred embodiment of the present invention, the hardware platform used for implementing billing server 143 consists of a Tandem Model 4412 computer having 2 processors, 200 MB of memory, a 1 GB system disk, and a 4 GB RAID disk; a flow diagram illustrating the operation of a preferred software system 700 for implementing billing server 143 on this hardware platform is shown in FIG. 7 and discussed below. Although specific hardware is disclosed herein for implementing enrollment server 145 and billing server 143, it will be understood by those skilled in the art that other suitable hardware platforms may alternatively be used to implement servers 143, 145. However, the two hardware systems

5,717,860

7

described above for implementing servers 143, 145 are preferred because these systems allow servers 143, 145 to be hardware-scalable. This "hardware scalability" allows OLS 140 to handle an increasing number of user stations 102, 102a simply by adding further processors to the existing hardware used for servers 143, 145, without modification of the software running on such hardware. In the embodiment shown in FIG. 1, enrollment server 145 and billing server 143 are implemented in software on separate machines which are physically distinct from the processor(s) used for implementing OLS session server 147. In alternative embodiments (not shown), enrollment server 145 and billing server 143 may be implemented in software together on a single server or as part of OLS session server 147.

Referring now to FIG. 2, there is shown a flow diagram illustrating the operation of a system 200 for enrolling new users associated with user stations 102, 102a onto OLS 140, and capturing co-marketing information associated with each new users, in accordance with a preferred embodiment of the present invention. In step 205, a user station 102 or 102a connects to OLS 140. In the case of a user station 102, the connection to OLS 140 is made by the user station via communications channel 108 directly to FDDI 141; in the case of a user station 102a, the connection is made via OLS site 128 to OLS web server 142. Next, in step 210, the enrollment means 145 determines whether the user which just connected to OLS 140 is a new subscriber to OLS 140. In a preferred embodiment, step 210 is performed either (i) by waiting for the user to issue an enrollment request (from page 514a described below) to OLS 140, or (ii) by prompting the user to enter a login name and comparing the login name entered by the user to a list of valid login names maintained in enrollment database 146. If the user is a new subscriber to OLS 140, processing proceeds to step 220, where the enrollment means 145 determines how the user connected to OLS 140 through web server 142, the enrollment means 145 determines that the user is operating on a user station 102a which is connected to OLS 140 via WWW 120; otherwise, enrollment means 145 determines that the user is operating on a user station 102 which is connected to OLS 140 via communications channel 108.

If a determination is made in step 220 that the user is operating on a user station 102a that connected to OLS 140 through WWW 120, then processing proceeds to step 230 where enrollment means 145 determines a co-marketer identification symbol or code (CM ID) associated with the user station 102a. In this step, the complete destination URL which was passed to OLS web server 142 when the user was directed from a co-marketer site 122a, 122b, 122c to OLS site 128 is retrieved by OLS web server 142, and the second portion of the destination URL, which contains both a UNIX symbolic link and a destination filename (which may be specified implicitly), is then extracted from the complete destination URL. As mentioned above, the UNIX symbolic link embedded in the destination URL uniquely identifies a co-marketer which directed the user from its WWW site to OLS site 128. Next, in step 244, enrollment means 145 attempts to enroll the user in OLS 140. In this step, the enrollment means 145 obtains a co-marketer identification code (CMID) associated with the destination URL using look-up table 300 (shown in FIG. 3). For each valid co-marketer in system 100, table 300 has one or more entries representing the second portion of a potential destination URL, that might be generated by such a co-marketer. Thus, each entry in table 300 has a record 310 representing a UNIX symbolic link (310a) and destination filename (310b)

8

that may be provided by a valid co-marketer, and a corresponding record 320 representing a CMID associated with the co-marketer assigned to UNIX symbolic link 310a in system 100. If the second portion of the destination URL is not recognized as corresponding to a valid CMID, the enrollment session is terminated. A list of valid (or authorized) CMID's is preferably stored in a Co-Marketer Information Directory Table on enrollment database 146 shown in FIG. 4. The Co-Marketer Information Directory Table on enrollment database 146 is formed of a plurality of individual records 440, each of which contains a field 442 for storing the CMID of a system authorized co-marketer.

Referring still to step 240, if the enrollment means 145 determines that the user has been directed to OLS 140 from an authorized co-marketer, the enrollment means attempts to enroll the user in OLS 140 by assigning the user a unique user identification number and then asking the user to enter various personal information which is then stored in a Subscriber Information Directory Table on enrollment database 146. As shown in FIG. 4, the Subscriber Information Directory Table on enrollment database 146 is formed of a plurality of individual records 400, each of which contains several fields for storing information about a particular user. More particularly, for each user enrolled on OLS 140 there is a record 400 with a field 402 for storing the unique user identification number assigned to the user, a field 404 for storing the CM ID of the co-marketer that directed the user to OLS 140, fields 406, 408, 410 for respectively storing the name, address and telephone number of the user, fields 412, 414 for respectively storing the grade level and gender of the user, fields 416, 418 for storing information representing the composition of the user's parents, field 420 for storing the user's number of siblings, and fields 422, 424, 426, 428 and 430 for respectively storing information representing the type of computer used by the user, the user's modem speed, the display capabilities of the user's display, the size of the memory of the user's PC, and the identity of the communications link (e.g., the Internet, the Prodigy® network, the CompuServe® network, or the Microsoft® network) used for accessing OLS 140.

In addition to storing information about the user in the Subscriber Information Directory Table on enrollment database 146, information about the user being enrolled in step 240 is also stored on a separate Customer Information Directory located on accounting database 144. As shown in FIG. 4, the Customer Information Directory Table on accounting database 144 is formed of a plurality of individual records 450, each of which contains several fields for storing information about a particular user. Fields 452, 454, 456, 458 and 460 store substantially the same information as that which is stored respectively in fields 402, 404, 406, 408 and 410, respectively, described above. However, in step 240 the user is also prompted by the enrollment means 145 to choose an enrollment plan and enter certain personal financial information which is then stored in records 450. In a preferred embodiment, the user may select either a free trial membership or one of several active membership plans, and a code representing the enrollment plan selected by the user is then stored in field 462. If the user has selected either an active or free trial membership plan, the user is prompted to enter credit card information for paying for the selected enrollment plan. This credit card information is stored in field 474 and used by billing means 143 to verify that the user is credit worthy.

Referring again to FIG. 2, following the entry of the user information into records 400, 450, processing proceeds to step 250, where enrollment means 145 downloads a copy of

5,717,860

9

user software 106a onto user station 102a. Unlike the user software 106 described above, user software 106a does not include any embedded CM ID information, or, to state it another way, user software 106a contains a "null" CM ID field embedded therein.

Referring still to FIG. 2, if a determination is made in step 220 that the user is operating on a user station 102 that connected to OLS site 140 through channel 108, then processing proceeds to step 260 where enrollment means 145 determines a CM ID associated with the user station 102a. In contrast to step 230, the CM ID is determined in step 260 from an embedded CM ID stored on user software 106 which was previously loaded (in step 282) on user station 102. Next, in step 270, enrollment means 145 attempts to enroll the user in OLS site 140. Step 270 is substantially the same as step 240 described above, except in step 270 the CM ID used for creating and updating the records 400 and 450 represents the CM ID embedded in software 106, as opposed to a CM ID determined from a UNIX symbolic link passed to OLS site 140 over WWW 120.

Following either step 250 or 270, processing proceeds to step 280, where enrollment means 145 communicates with billing means 143 to determine whether the user is credit worthy. In addition, enrollment means 145 determines (based on the information stored in field 462) whether the user has enrolled as an active (i.e., non-trial) user. If the user is credit worthy and has enrolled as an active user, processing proceeds to step 285, where a payment record for paying a one-time bounty (or referral fee) to the co-marketer that directed the user to OLS 140 is created.

As explained more fully below, the amount of the one-time bounty payment created in step 285 is preferably dependent on the number of users previously directed to OLS 140 by the co-marketer during a previous period (month or quarter). A Co-Marketer Information Directory located on accounting database 144 is provided for storing information about each authorized co-marketer on OLS 140. As shown in FIG. 4, the Co-Marketer Information Directory Table on accounting database 144 is formed of a plurality of records 480, each of which contains several fields for storing information about a particular authorized co-marketer. More particularly, a field 482 is provided for storing the CM ID associated with a co-marketer, and fields 484, 486 and 488 are respectively provided for storing name, address and telephone number information representing the co-marketer. In addition, each time a user is enrolled on OLS 140, the values in fields 492 and 496, which respectively represent the total number of users directed to OLS 140 by the co-marketer and the number of users directed to OLS 140 during the current month are incremented. Each record 480 also contains a field 494 representing the number of users that were directed to OLS by the co-marketer during the previous month. In a preferred embodiment of the present invention, the value stored in field 494 is used in step 285 in calculating the amount of the one time bounty payment to be paid to the co-marketer. More particularly, a higher one-time bounty payment will be paid to a co-marketer in step 285 if the number of prior enrollees represented in field 494 exceeds a predetermined threshold.

When a user reaches OLS site 128 from a previous location on WWW 120, the user will typically be initially directed to the home page at web site 128. In a first embodiment of the present invention described above in connection with FIG. 2, the user may enroll on OLS 140 directly from the home page of the site 128 upon reaching site 128. In alternate preferred embodiments described below, the user may browse through the home web page of site 128,

10

and then through various further web pages at site 128, prior to reaching an enrollment page at site 128 (e.g., WWW.OLS.COM . . . \ENROLL\ENROLL.P1) from which the user then enrolls onto OLS 140. These alternate preferred embodiments are described respectively in connection with FIGS. 5 and 6. Since the system described in connection with FIGS. 5 and 6 permit a user to traverse multiple pages at site 128 prior to enrolling on OLS 140, these systems function to preserve the UNIX symbolic link information originally passed to OLS site 128 from a prior web site as the user moves between web pages at site 128.

Referring now to FIG. 5, there is shown a schematic diagram illustrating the use of UNIX symbolic links and relative URL addressing for moving between page locations at OLS site 128, in accordance with a preferred embodiment of the present invention. URL 502 points to the home page address of OLS site 128 on the WWW. URLs 504, 506, 508 also point to the home page address of OLS site 128 on the WWW; however, URLs 504, 506, 508 each include a UNIX symbolic link (/CM1,/CM2,/CM3) appended thereto. As described above, in the present invention, each UNIX symbolic link appended to a URL represents the identity of a co-marketer that directed a user to the home page address of OLS site 128. When the user arrives at the home page of OLS site 128, the user may then browse through various pages provided by OLS site 128 on the WWW. For example, the user may view pages providing information about OLS 140 by clicking on a "table of contents" entry on the home page of OLS site 128. Upon clicking on this "table of contents" entry on the home page, the user is directed to a Table of Contents Page represented by URL 510. From this Table of Contents Page, the user may click on individual pages (e.g., Info.P1, Info.P2, etc.) listed on the Table of Contents Page. Upon clicking on an individual page such as, for example, Information Page 1, the user is directed to a first information page represented by URL 514.

As described above in the background section, when relative URL addressing is used to move between pages on WWW 126, a user may only move between pages in the user's current directory or to a subdirectory located below the user's current directory. As a directory tree such as that shown in FIG. 5. Thus, when standard relative URL addressing is used, it is not possible for a user to move from the page represented by URL 514 to the page represented by URL 518 and still preserve the UNIX symbolic link/CMID information described above. In the example shown in FIG. 5, the page 514a represented by URL 514 contains a box giving the user an option to enroll on OLS 140. In accordance with the present invention, if the user clicks on the "Enroll on OLS" box on page 514a, a special redirecting program (redirect.cgi) is triggered on web server 142 for redirecting the user from the page represented by URL 514 to the OLS enrollment page represented by URL 518. A pseudo-code version of the redirect.cgi program is shown in Table I below:

TABLE I

```
main(input_parameters)
    // last_url will hold the URL for the page the user was on
    // when they wanted to redirect upward. (for example
    // "http://www.ols.com/subdir/subdir2/subdir3/ipdir2.html")
    last_url = input_parameter(x);
    // destination will hold the page they want to redirect to.
    // It contains one or more "." substrings.
    // (example "../../subdir/anotherURL.htm")
    destination = input_parameter(y);
```

5,717,860

11

TABLE I-continued

```
// count_substring( ) counts the number of substrings("./")
// within the given string of characters (destination).
// In this example it would return the number "2".
number_of_levels_up = count_substrings(".I", destination);
// remove_n_levels( ) takes a DLFp specified URL such as
// "http://www.ols.com/cm1/subdir1/subdir2/subdir3/page.htm"
// and removes a given number of directories and the page name.
// For example if number_of_levels_up is 2, the output from
// remove_n_levels(last_url,2) would be
// "http://www.ols.com/cm1/subdir1"
new_directory = remove_n_levels( last_url,
number_of_levels_up );
// get_relative_url( ) takes the given string and returns the portion
// after all of the "./" substrings. Thus in this example it returns
// "subdir3/page.html.htm"
relative_url = get_relative_url( destination );
// concatenate( ) takes 2 strings and splices the second one
// onto the back of the first. (In the example this yields:
// "http://www.ols.com/cm1/subdir1/subdir3/page.html.htm")
new_absolute_url = concatenate( new_directory,relative_url);
// redirect_browser( ) sends a "Hyper-Text Transfer Protocol(http)"
// message back to the user's web browser telling it to get the
// given URL.
redirect_browser( new_absolute_url );

}
```

Thus, the redirect.cgi program accepts as arguments the current URL of the user (e.g., URL 514) and a destination URL representing the location to which the user desires to move (e.g., URL 518). The program then strips the ". . . /info/info.P1" portion off of the current URL 514, and replaces the stripped portion with the ". . ./Enroll/Enroll.P1" portion of destination URL 518 to form a new URL which is then used for redirecting the user to the page represented by URL 518. The redirect.cgi program is significant to the operation of the present invention because, among other things, this program allows the UNIX symbolic link information that was originally passed when the user arrived at the home page of OLS site 128 to be retained as the user moves between pages at OLS site 128. Thus, the redirecting.cgi program insures that the UNIX symbolic link information provided by a co-marketer when 143 attempts to enroll the user on OLS 140.

The redirect.cgi program discussed in connection with FIG. 5 and Table I above represents a first preferred system for retaining at site 128 the UNIX symbolic link information (that was originally passed when the user originally arrived at OLS site 128 from a previous site) as the user moves between web pages at OLS site 128. In accordance with an alternative preferred embodiment of the present invention, a further system (described in connection with FIG. 6 and Table II below) may alternatively be used to store and transmit the UNIX symbolic link information that was originally passed when the user arrived at the home page of OLS site 128. In this alternate embodiment, the URL used to direct a user from a previous site (e.g., 122a, 122b, 122c) to OLS site 128 includes a string which functions to call a special page_link.cgi program which runs on web server 142. The string passed to OLS site 128 also contains (I) a destination page identifier (or filename) representing the particular web page at site 128 to which the user has been directed by the previous web site, and (II) a UNIX symbolic link or CMID code associated with the previous web site. More particularly, the destination page identifier and the UNIX symbol link information/CMID code are included in the string as arguments to the page_link.cgi program. An

12

exemplary URL which invokes the page_link.cgi program and that could be used by co-marketer site 122a for directing a web user from a site 122a to the home page of site 128 is shown below:

WWW.OLS.COM/page_link.cgi?index@CM1

The first portion (i.e., WWW.OLS.COM) of this exemplary URL identifies web site 128 as the web site to which the user is being directed. The remaining portion (i.e., page_link.cgi?index@CM1) of the URL represents a call to the page_link.cgi program. The program call includes two arguments, namely, a destination page identifier (i.e., index) representing the particular page at site 128 to which the user has been directed, and a UNIX symbolic link/CMID code (i.e., CM1) representing the identity of the web site 122a that directed the user to site 128.

Referring now to FIG. 6, there is shown a flow diagram of a system 600 for implementing the page_link.cgi program. In step 610, when web server 142 receives a URL which includes a string containing a call to the page_link.cgi program, the page_link.cgi program is invoked on the web server 142. Next, in step 620, the page_link.cgi program extracts the destination page identifier (e.g., index) and UNIX symbolic link/CMID code (e.g., CM1) that were contained as arguments in the page_link.cgi program call. Next, the page at web site 128 represented by the destination page identifier is retrieved. Each page at web site 128 is represented by a file which includes one or more fields containing further URLs representing links to other pages at web site 128 (internal page links) or to pages at web sites other than site 128 (external page links). Each URL in the destination page is then selected and tested (in steps 630 and 640) in order to determine whether the URL includes a string for calling the page_link.cgi program. If the URL does include the "page_link.cgi" string, a further determination is made (in step 650) whether the URL represents an internal or external page link. In this step, the URL will be determined as representing an internal page link if the first portion of the URL represents OLS site 128 (i.e., "WWW.OLS.COM") or if there is no site name portion in the URL; otherwise the URL will be determined as representing an external page link. Next, in step 660, for each internal URL in the destination page which includes a string for calling the page_link.cgi program, the page_link.cgi program appends the UNIX symbolic link/CMID code (i.e., CM1) originally passed as an argument to the program to the end of the URL. In addition, in step 670, for each external URL in the destination page which includes the "page_link.cgi" string, the page_link.cgi program appends the UNIX symbolic link/CMID originally passed to the program followed by a UNIX symbolic link/CMID representing OLS site 128 (e.g., /OLS) to the end of the URL. The process is then repeated from step 630 for each URL on the destination page. The destination page, which includes URLs having the appended codes described above is then passed back to the user in step 690. Thereafter, when the user desires to move off of the destination page (passed to the user in step 690), the user will select one of the URL page links on the user's page as a new destination page. If the URL corresponding to this new destination page contains a call to the page_link.cgi program described above, the process described above is repeated from step 610 using the URL of the new destination. A pseudo-code listing of an exemplary web page file and of the page_link.cgi program are shown below in Table II:

5,717,860

13

14

**TABLE II**

```
**WEB PAGE FILE PSEUDO CODE**
<HTML>
<HEAD>
<TITLE>Online Service Home Page</TITLE>
</HEAD>
<BODY>
<A HREF="http://www.ols.com/cgi-bin/page_link.cgi?InrollACMI">Enroll page on OLS
140</A>
<A HREF="http://www.othcocom">Visit another company's web page</A>
<A HREF="http://www.em.com/cgi-bin/page_link.cgi?IndexItACMI&OLS">Maintain
consulster info and visit another site</A>
</BODY>
</HTML>
**PAGE LINK CGI PSEUDO CODE**
PageLink (URL) {
    get destinationPageName and CMID_string from URL
    // assuming the following URL:
    // "http://www.ols.com/cgi-bin/page_link.cgi?IndexItACMI"
    // destinationPageName is index, as it follows "page_link.cgi?"
    // and the CMID_string is "CMI", as it follows the
    // destinationPageName (and is separated by a "&").
    //
    // CMID_string consists of one or more consultants codes
    // separated by "&" thereafter, and records the path taken
    // by the user through web sites which employ this tracking
    // system
    put contents of page named destinationPageName into destinationPage
    for each URL in destinationPage
    {
        if URL contains page_link.cgi call and refers to an internal URL
        {
            // if there is no site name or if the site name matches
            // this on-line service's, the URL is internal
            append CMID_string to URL
        }
        else if URL contains page_link.cgi call and is an external URL
        {
            // if there is a site name and it does not match that of OLS 140,
            // the URL is external
            append CMID_string to URL
            append OLS_string to URL
            // OLS_string refers to the CMID code of
            // the site running this instance of the page_link.cgi
            // application, and is unique among all sites participating
        }
        // note that nothing is done to URLs which do not refer to
        // the page_link.cgi application, since no consultants code
        // tracking is done when users follow these links
    }
    send page
}
```

In the embodiment shown in FIG. 6 and described above, each page link URL on a web page at site 128 will preferably include a call to the page_link.cgi program if the page link points to either (I) a further web page at site 128, or (II) a further web site which is adapted to recognize UNIX symbolic links that have been inserted into a URL by a previous web site during a user session. By inserting the page_link.cgi program call and UNIX symbolic link information into each page link that points to a further web page at site 128, the system insures that the UNIX symbolic link information originally passed to site 128 by a previous web site will be available when OLS 140 attempts to enroll the user into OLS 140. In addition, by inserting the UNIX symbolic link information associated with both a previous web site 122a, b, c and OLS site 140 into page links associated with different web sites (other than site 128), the system permits the user to carry UNIX symbolic link information representing previous location(s) traversed during a user session to further web sites.

Referring now to FIG. 7, there is shown a flow diagram illustrating the operation of a system 700 for generating recurring bounty payment records, in accordance with a preferred embodiment of the present invention. In addition to providing each co-marketer with a one-time bounty payment each time a user directed to OLS 140 by the co-marketer enrolls on OLS 140, billing means 143 also generates "recurring" bounty payment records for certain selected co-marketers that have accrued a preferred status with OLS 140. Information representing whether or not a particular co-marketer has such preferred status (and is thus eligible to receive a recurring bounty payment) is stored in field 490 of records 486. As shown in system 700, a recurring bounty payment is determined for each preferred co-marketer on a periodic basis based on the number of users that were referred to OLS 140 by the co-marketer (at any time) and which are still active subscribers on OLS 140.

Referring still to FIG. 7, in step 710 a counter used for determining the total number of active users associated with each co-marketer is initialized, preferably to zero. Next, in step 720 a co-marketer record 480 having a preferred status (as indicated by field 490) is selected for processing. Next, a user record 450 having the same CM ID (as indicated by field 454) as that of the selected co-marketer is selected for processing. If field 470 of the selected user record indicates

5,717,860

15

that the selected user is still an active user and the user has been an active user on OLS 140 for at least 90 days (as indicated by field 476), then processing proceeds to step 750 where the recurring user counter is incremented. Next, in step 760, the process is repeated from step 730 until each user record 450 having the same CM ID as the selected co-marketer has been processed. Thereafter, in step 770, the billing means 143 generates a recurring bounty payment for the selected co-marketer by multiplying a value represented by the recurring user counter with a per user bounty amount. Finally, in step 780, the process is repeated from step 710 until each co-marketer having a preferred status has been processed.

In an alternate preferred embodiment of the present invention (not shown), the value stored in field 492 maybe used by system 700 (at step 770) in calculating the rate of each recurring bounty payment to be paid to each preferred co-marketer. More particularly, a higher recurring bounty payment rate may be paid to a co-marketer if the value of enrollees represented in field 492 exceeds a predetermined threshold.

Furthermore, it is to be understood that although the present invention has been described with reference to a preferred embodiment, various modifications, known to those skilled in the art, may be made to the structures and process steps recited in the several claims appended hereto. What is claimed is:

1. A method for tracking the navigation path of a user operating on a user station, said user having been directed to a second site on a world wide web (WWW) from a first site on said WWW, said first WWW site having a universal resource locator (URL) for uniquely identifying an address of said first WWW site on said WWW, said second WWW site having a URL for uniquely identifying an address of said second WWW site on said WWW, said first WWW site including means for directing said user from said first WWW site to said second WWW site, comprising the steps of:

(A) receiving a composite URL at said second WWW site when said user is directed from said first WWW site to said second WWW site, said composite URL having a first portion corresponding to said URL of said second WWW site, said composite URL having a second portion, said second portion including information corresponding to said identity of said first WWW site, said first WWW site being different from said user station, said second WWW site being different from said user station;

(B) capturing, at said second WWW site, said information representative of said identity of said first WWW site from said second portion of said composite URL; and

(C) determining, at said second WWW site, said identity of said first WWW site by comparing information from said second portion of said composite URL to a table having a plurality of entries each of which is representative of a known WWW site; wherein said first WWW web site has a first plurality of web pages, said second WWW site has a second plurality of web pages, said first plurality of web pages being different from said second plurality of web pages.

2. The method of claim 1, wherein said second portion of said composite URL is formed of a UNIX symbolic link representing said first site and a destination filename representing a destination page of said user at said second site.

16

3. The method of claim 2, wherein said URL of said first site represents a web page of said first WWW.

4. The method of claim 3, wherein said first portion of said composite URL represents a home page of said second site on said WWW.

5. The method of claim 4, wherein said first site represents a co-marketer of on-line services on said WWW and said second site represents an on-line service on said WWW.

6. The method of claim 5, further comprising the step of:

(R) sending, at said second WWW site, said identity of said first WWW site determined in step (D) to pay a bounty to said co-marketer.

7. The method of claim 6, wherein said composite URL is generated at said first WWW site when said user is directed from said first site to said second site.

8. An apparatus for tracking the navigation path of a user operating on a user station, said user having been directed to a second site on a world wide web (WWW) from a first site on said WWW, said first WWW site having a universal resource locator (URL) for uniquely identifying an address of said first WWW site on said WWW, said second WWW site having a URL for uniquely identifying an address of said second WWW site on said WWW, said second WWW site including means for directing said user from said first WWW site to said second WWW site, comprising:

(A) means, at said second WWW site, for receiving a composite URL at said second WWW site when said user is directed from said first WWW site to said second WWW site, said composite URL having a first portion corresponding to said URL of said second WWW site, said composite URL having a second portion corresponding to said identity of said first WWW site;

(B) means for capturing, at said second WWW site, said information representative of said identity of said first WWW site from said second portion of said composite URL; and

(C) means for determining, at said second WWW site, said identity of said first WWW site by comparing information from said second portion of said composite URL to a table having a plurality of entries each of which is representative of a known WWW site; wherein said first WWW web site has a first plurality of web pages, said second WWW site has a second plurality of web pages, said first plurality of web pages being different from said second plurality of web pages.

9. The apparatus of claim 8, wherein said second portion of said composite URL is formed of a UNIX symbolic link representing said first site and a destination filename representing a destination page of said user at said second site.

10. The apparatus of claim 9, wherein said URL of said first site represents a web page of said first site on said WWW.

11. The apparatus of claim 10, wherein said first portion of said composite URL represents a home page of said second site on said WWW.

12. The apparatus of claim 11, wherein said first site represents a co-marketer of on-line services on said WWW and said second site represents an on-line service on said WWW.

13. The apparatus of claim 12, further comprising:

(E) bounty payment means, coupled to said means for determining, for generating a payment record for paying a bounty to said co-marketer.

* * * * *

Table C.
U.S. District Courts—Civil Cases Commenced, Terminated, and Pending
During the 12-Month Periods Ending September 30, 2003 and 2004

| Circuit | | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2003 | 2004 | Percent Change | 2003 | 2004 | Percent Change | 2003[1] | 2004 | Percent Change |
| TOTAL | | 252,962 | 281,338 | 11.2 | 253,015 | 252,761 | -0.1 | 257,476 | 286,053 | 11.1 |
| DC | | 2,756 | 2,449 | -11.1 | 2,503 | 2,699 | 7.8 | 3,450 | 3,200 | -7.3 |
| 1ST | | 6,516 | 6,604 | 1.4 | 6,583 | 6,551 | -0.5 | 7,230 | 7,283 | 1.1 |
| | ME | 583 | 492 | -15.6 | 561 | 540 | -3.8 | 381 | 333 | -12.6 |
| | MA | 3,202 | 3,312 | 3.4 | 3,057 | 3,180 | 4.0 | 3,629 | 3,761 | 3.6 |
| | NH | 635 | 522 | -17.8 | 566 | 563 | -0.5 | 559 | 518 | -7.3 |
| | RI | 590 | 826 | 40.0 | 569 | 667 | 17.2 | 618 | 777 | 25.7 |
| | PR | 1,506 | 1,452 | -3.6 | 1,830 | 1,601 | -12.5 | 2,043 | 1,894 | -7.3 |
| 2ND | | 23,431 | 22,804 | -2.7 | 21,920 | 22,475 | 2.5 | 30,159 | 30,488 | 1.1 |
| | CT | 2,349 | 2,341 | -0.4 | 2,184 | 2,310 | 5.8 | 3,004 | 3,035 | 1.0 |
| | NY,N | 1,607 | 1,545 | -3.9 | 1,617 | 1,558 | -3.7 | 2,540 | 2,527 | -0.5 |
| | NY,E | 6,742 | 5,956 | -11.7 | 6,907 | 6,690 | -3.3 | 8,301 | 7,577 | -8.7 |
| | NY,S | 10,654 | 10,859 | 1.9 | 9,289 | 10,141 | 9.2 | 13,588 | 14,306 | 5.3 |
| | NY,W | 1,707 | 1,741 | 2.0 | 1,558 | 1,469 | -5.7 | 2,431 | 2,703 | 11.2 |
| | VT | 372 | 362 | -2.7 | 365 | 317 | -13.2 | 295 | 340 | 15.3 |
| 3RD | | 24,541 | 25,686 | 21.0 | 25,561 | 25,789 | 0.9 | 19,011 | 22,908 | 20.5 |
| | DE | 1,225 | 1,655 | 35.1 | 1,344 | 1,400 | 4.2 | 1,676 | 1,931 | 15.2 |
| | NJ | 6,292 | 6,624 | 5.3 | 6,114 | 6,501 | 6.3 | 5,904 | 6,027 | 2.1 |
| | PA,E | 11,261 | 15,263 | 35.5 | 11,948 | 11,839 | -0.9 | 5,560 | 8,984 | 61.6 |
| | PA,M | 2,499 | 2,993 | 19.8 | 2,582 | 2,741 | 6.2 | 1,987 | 2,239 | 12.7 |
| | PA,W | 2,843 | 2,835 | -0.3 | 3,200 | 3,046 | -4.8 | 2,980 | 2,769 | -7.1 |
| | VI | 421 | 316 | -25.0 | 373 | 262 | -29.8 | 904 | 958 | 6.0 |
| 4TH | | 21,593 | 39,653 | 83.6 | 19,683 | 19,716 | 0.2 | 17,825 | 37,762 | 111.8 |
| | MD | 3,953 | 4,146 | 4.9 | 3,780 | 3,707 | -1.9 | 3,288 | 3,727 | 13.4 |
| | NC,E | 1,516 | 1,498 | -1.2 | 1,353 | 1,436 | 6.1 | 1,316 | 1,378 | 4.7 |
| | NC,M | 1,230 | 1,231 | 0.1 | 1,130 | 1,199 | 6.1 | 1,063 | 1,095 | 3.0 |
| | NC,W | 1,080 | 1,114 | 3.1 | 944 | 1,003 | 6.3 | 1,070 | 1,181 | 10.4 |
| | SC | 4,280 | 23,599 | 451.4 | 4,156 | 4,434 | 6.7 | 4,316 | 23,481 | 444.0 |
| | VA,E | 4,332 | 4,498 | 3.8 | 4,494 | 4,291 | -4.5 | 2,232 | 2,439 | 9.3 |
| | VA,W | 1,857 | 1,492 | -19.7 | 2,012 | 1,712 | -14.9 | 1,312 | 1,092 | -16.8 |
| | WV,N | 752 | 667 | -11.3 | 647 | 693 | 7.1 | 725 | 699 | -3.6 |
| | WV,S | 2,593 | 1,408 | -45.7 | 1,167 | 1,241 | 6.3 | 2,563 | 2,670 | 6.7 |

Table C. (September 30, 2004—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | Percent Change | 2003 | 2004 | Percent Change | 2003[1] | 2004 | Percent Change |
| **5TH** | 33,366 | 32,093 | -3.9 | 31,682 | 33,576 | 6.0 | 35,925 | 34,432 | -4.2 |
| LA,E | 3,564 | 3,393 | -4.8 | 3,477 | 3,228 | -7.2 | 3,103 | 3,268 | 5.3 |
| LA,M | 1,018 | 1,078 | 5.9 | 1,131 | 1,006 | -10.9 | 8,780 | 8,850 | 0.8 |
| LA,W | 2,506 | 2,690 | 7.3 | 2,628 | 2,542 | -3.3 | 2,498 | 2,644 | 5.9 |
| MS,N | 1,841 | 1,452 | -21.1 | 1,507 | 1,398 | -7.2 | 1,545 | 1,599 | 3.5 |
| MS,S | 4,146 | 3,264 | -21.3 | 4,173 | 4,121 | -1.3 | 4,582 | 3,725 | -18.7 |
| TX,N | 5,752 | 5,427 | -5.7 | 4,997 | 6,040 | 20.9 | 4,414 | 3,601 | -13.9 |
| TX,E | 3,449 | 3,285 | -4.8 | 2,975 | 3,684 | 23.8 | 2,921 | 2,522 | -13.7 |
| TX,S | 7,756 | 8,233 | 6.2 | 7,382 | 8,310 | 12.6 | 5,594 | 5,517 | -1.4 |
| TX,W | 3,534 | 3,261 | -2.2 | 3,412 | 3,245 | -4.9 | 2,490 | 2,506 | 0.6 |
| **6TH** | 21,633 | 27,441 | 26.8 | 31,074 | 24,104 | -22.4 | 35,531 | 38,868 | 9.4 |
| KY,E | 2,396 | 2,301 | -4.0 | 2,328 | 2,548 | 9.5 | 2,062 | 1,815 | -12.0 |
| KY,W | 1,601 | 1,422 | -11.2 | 1,463 | 1,572 | 7.5 | 1,562 | 1,412 | -9.6 |
| MI,E | 4,836 | 4,871 | -1.4 | 4,599 | 4,764 | 3.6 | 19,155 | 19,282 | 0.6 |
| MI,W | 1,600 | 1,762 | 10.1 | 1,667 | 1,652 | -0.9 | 1,173 | 1,283 | 9.4 |
| OH,N | 3,740 | 9,558 | 155.6 | 13,906 | 6,377 | -54.2 | 3,698 | 6,879 | 86.0 |
| OH,S | 2,704 | 2,862 | 5.8 | 2,727 | 2,657 | -2.6 | 3,127 | 3,332 | 6.6 |
| TN,E | 1,720 | 1,685 | -2.0 | 1,546 | 1,698 | 9.8 | 1,846 | 1,833 | -0.7 |
| TN,M | 1,590 | 1,573 | -1.1 | 1,709 | 1,641 | -4.0 | 1,667 | 1,599 | -4.1 |
| TN,W | 1,344 | 1,407 | 4.7 | 1,129 | 1,195 | 5.8 | 1,241 | 1,453 | 17.1 |
| **7TH** | 19,515 | 19,736 | 1.1 | 19,099 | 20,423 | 6.9 | 16,113 | 15,426 | -4.3 |
| IL,N | 10,145 | 9,615 | -5.2 | 9,941 | 10,549 | 6.1 | 7,736 | 6,802 | -12.1 |
| IL,C | 1,134 | 1,142 | 0.7 | 1,191 | 1,103 | -7.4 | 994 | 1,023 | 4.0 |
| IL,S | 1,141 | 1,268 | 11.1 | 1,105 | 1,164 | 5.3 | 1,229 | 1,333 | 8.5 |
| IN,N | 2,073 | 2,097 | 1.2 | 1,916 | 2,107 | 10.0 | 1,749 | 1,739 | -0.6 |
| IN,S | 2,984 | 3,142 | 6.0 | 2,992 | 3,203 | 7.1 | 2,874 | 2,813 | -2.1 |
| WI,E | 1,323 | 1,550 | 17.2 | 1,259 | 1,424 | 13.1 | 1,251 | 1,377 | 10.1 |
| WI,W | 735 | 922 | 25.4 | 695 | 873 | 25.6 | 280 | 339 | 16.9 |
| **8TH** | 17,883 | 17,370 | -2.9 | 14,868 | 15,986 | 7.5 | 17,179 | 18,563 | 8.1 |
| AR,E | 2,236 | 2,662 | 19.1 | 2,124 | 2,359 | 11.1 | 2,114 | 2,417 | 14.3 |
| AR,W | 1,205 | 1,264 | 4.5 | 1,178 | 1,304 | 10.7 | 1,060 | 1,020 | -3.8 |
| IA,N | 569 | 607 | 6.7 | 639 | 614 | -3.9 | 555 | 548 | -1.3 |
| IA,S | 950 | 1,022 | 7.6 | 880 | 1,014 | 15.2 | 940 | 948 | 0.9 |
| MN | 6,731 | 5,603 | -16.8 | 3,586 | 4,340 | 21.0 | 6,940 | 8,203 | 18.2 |
| MO,E | 2,170 | 2,143 | -1.3 | 2,316 | 2,106 | -9.1 | 1,976 | 2,013 | 1.9 |
| MO,W | 2,177 | 2,314 | 6.3 | 2,360 | 2,367 | 0.3 | 1,896 | 1,843 | -2.8 |
| NE | 1,060 | 1,063 | 0.3 | 1,011 | 1,158 | 14.5 | 990 | 695 | -0.6 |
| ND | 288 | 289 | 0.3 | 270 | 312 | 15.6 | 250 | 227 | -9.2 |
| SD | 493 | 403 | -18.3 | 504 | 412 | -18.3 | 458 | 449 | -2.0 |

127

Exhibit F
Page 89

## Table C. (September 30, 2004—Continued)

| Circuit | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | Percent Change | 2003 | 2004 | Percent Change | 2003[1] | 2004 | Percent Change |
| **9TH** | 41,828 | 43,944 | 5.1 | 41,441 | 41,245 | -0.5 | 39,953 | 42,652 | 6.8 |
| AK | 394 | 374 | -5.1 | 528 | 377 | -28.6 | 383 | 380 | -0.8 |
| AZ | 3,333 | 3,530 | 5.9 | 3,469 | 3,286 | -5.3 | 3,440 | 3,684 | 7.1 |
| CA,N | 5,831 | 5,765 | -2.5 | 6,211 | 5,654 | -9.0 | 6,114 | 6,245 | 2.1 |
| CA,E | 4,508 | 4,631 | 2.7 | 4,101 | 4,255 | 3.8 | 5,106 | 5,481 | 7.4 |
| CA,C | 12,633 | 14,415 | 14.1 | 13,735 | 13,059 | -4.9 | 11,233 | 12,589 | 12.1 |
| CA,S | 2,817 | 2,845 | 1.0 | 2,780 | 2,925 | 5.2 | 2,125 | 2,045 | -3.8 |
| HI | 769 | 772 | 0.4 | 1,003 | 812 | -19.1 | 791 | 751 | -5.1 |
| ID | 574 | 659 | 14.8 | 593 | 650 | 9.6 | 727 | 736 | 1.2 |
| MT | 721 | 725 | 0.6 | 729 | 647 | -11.3 | 770 | 848 | 10.1 |
| NV | 2,488 | 2,557 | 2.8 | 2,414 | 2,497 | 3.4 | 2,468 | 2,528 | 2.4 |
| OR | 2,406 | 2,537 | 5.4 | 2,242 | 2,351 | 4.8 | 2,267 | 2,453 | 8.2 |
| WA,E | 850 | 956 | 12.5 | 723 | 966 | 33.6 | 701 | 691 | -1.4 |
| WA,W | 4,312 | 4,075 | -5.5 | 2,829 | 3,687 | 30.3 | 3,697 | 4,085 | 10.5 |
| GUAM | 44 | 52 | 18.2 | 36 | 54 | 50.0 | 80 | 78 | -2.5 |
| NMI | 48 | 31 | -35.4 | 48 | 25 | -47.9 | 52 | 58 | 11.5 |
| **10TH** | 11,540 | 11,177 | -3.2 | 11,425 | 12,049 | 5.5 | 10,871 | 9,999 | -8.0 |
| CO | 2,680 | 2,847 | 6.2 | 2,590 | 2,959 | 14.7 | 2,544 | 2,432 | -4.4 |
| KS | 1,894 | 1,744 | -7.9 | 1,770 | 1,968 | 11.2 | 1,863 | 1,639 | -12.0 |
| NM | 1,614 | 1,486 | -7.9 | 1,590 | 1,586 | -0.3 | 1,494 | 1,394 | -6.7 |
| OK,N | 942 | 963 | 5.4 | 952 | 1,021 | 7.2 | 1,024 | 995 | -2.7 |
| OK,E | 749 | 638 | -14.8 | 648 | 736 | 13.6 | 627 | 529 | -15.6 |
| OK,W | 1,974 | 1,713 | -13.2 | 1,950 | 1,956 | 0.3 | 1,418 | 1,165 | -17.9 |
| UT | 1,358 | 1,402 | 3.2 | 1,620 | 1,429 | -11.8 | 1,520 | 1,493 | -1.8 |
| WY | 329 | 354 | 7.6 | 305 | 384 | 25.9 | 381 | 351 | -7.9 |
| **11TH** | 28,360 | 28,391 | 0.1 | 27,176 | 28,148 | 3.6 | 24,229 | 24,472 | 1.0 |
| AL,N | 3,559 | 3,694 | 3.8 | 3,236 | 3,454 | 6.8 | 3,351 | 3,591 | 7.2 |
| AL,M | 1,345 | 1,252 | -6.9 | 1,356 | 1,265 | -6.7 | 1,343 | 1,230 | -1.1 |
| AL,S | 992 | 899 | -9.4 | 974 | 955 | -2.0 | 781 | 765 | -7.4 |
| FL,N | 1,502 | 1,495 | -0.5 | 1,409 | 1,423 | 1.0 | 1,198 | 1,270 | 6.0 |
| FL,M | 6,990 | 7,253 | -5.3 | 6,162 | 6,970 | 12.7 | 5,233 | 5,516 | 5.4 |
| FL,S | 7,127 | 6,720 | -5.7 | 7,383 | 7,129 | -3.5 | 6,677 | 6,268 | -6.1 |
| GA,N | 4,642 | 4,822 | 3.9 | 4,322 | 4,676 | 8.2 | 3,831 | 3,977 | 3.8 |
| GA,M | 1,171 | 1,169 | 1.5 | 1,267 | 1,192 | -5.9 | 1,114 | 1,111 | -0.3 |
| GA,S | 1,132 | 1,087 | -5.8 | 1,048 | 1,084 | 3.4 | 821 | 804 | -2.1 |

NOTE: PENDING CASES EXCLUDE ASBESTOS CASES TRANSFERRED TO PA,E UNDER ORDER 875 OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
[1]REVISED.

Exhibit F
Page 90

Table X-1A.
U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship
During the 12-Month Period Ending September 30, 2004

| District | Judgeships | Weighted Filings per Judgeship | | | | Unweighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Civil | Criminal | Supervised Release Hearings | Total | Civil | Criminal | Supervised Release Hearings | Total |
| TOTAL | 675 | 414 | 111 | 4.14 | 529 | 379 | 137 | 28.76 | 545 |
| DC | 15 | 213 | 46 | 2.03 | 261 | 154 | 48 | 14.53 | 216 |
| **1ST** | | | | | | | | | |
| ME | 3 | 172 | 90 | 4.36 | 267 | 158 | 91 | 30.00 | 279 |
| MA | 13 | 307 | 40 | 1.92 | 349 | 241 | 41 | 13.31 | 295 |
| NH | 3 | 190 | 87 | 1.57 | 279 | 164 | 88 | 11.00 | 263 |
| RI | 3 | 304 | 42 | 1.26 | 347 | 270 | 45 | 9.00 | 324 |
| PR | 7 | 224 | 102 | 1.48 | 327 | 195 | 114 | 10.57 | 320 |
| **2ND** | | | | | | | | | |
| CT | 8 | 345 | 62 | 2.16 | 409 | 274 | 62 | 15.25 | 351 |
| NY,N | 5 | 293 | 94 | 6.79 | 394 | 293 | 116 | 48.40 | 457 |
| NY,E | 15 | 433 | 99 | 4.66 | 536 | 376 | 105 | 32.80 | 514 |
| NY,S | 28 | 448 | 77 | 1.95 | 527 | 336 | 77 | 13.93 | 427 |
| NY,W | 4 | 429 | 155 | 20.01 | 603 | 418 | 178 | 142.25 | 739 |
| VT | 2 | 170 | 144 | 2.87 | 317 | 168 | 160 | 20.50 | 349 |
| **3RD** | | | | | | | | | |
| DE | 4 | 499 | 34 | .88 | 534 | 391 | 44 | 6.25 | 441 |
| NJ | 17 | 442 | 56 | 1.64 | 500 | 370 | 70 | 11.65 | 452 |
| PA,E | 22 | 449 | 44 | 1.88 | 495 | 461 | 45 | 13.14 | 519 |
| PA,M | 6 | 418 | 109 | 2.04 | 530 | 475 | 113 | 12.17 | 600 |
| PA,W | 10 | 295 | 48 | 1.05 | 344 | 273 | 51 | 6.80 | 331 |

Exhibit F
Page 91

Table X-1A. (September 30, 2004—Continued)

| District | Judgeships | Weighted Filings per Judgeship | | | | Unweighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Civil | Criminal | Supervised Release Hearings | Total | Civil | Criminal | Supervised Release Hearings | Total |
| **4TH** | | | | | | | | | |
| MD | 10 | 397 | 91 | 1.72 | 490 | 362 | 167 | 11.70 | 540 |
| NC,E | 4 | 370 | 208 | 4.34 | 582 | 365 | 305 | 31.00 | 701 |
| NC,M | 4 | 320 | 112 | 5.10 | 437 | 304 | 122 | 33.00 | 459 |
| NC,W | 5 | 247 | 166 | 2.71 | 416 | 214 | 175 | 19.00 | 407 |
| SC | 10 | 2,328 | 123 | 2.66 | 2,454 | 2,346 | 128 | 18.50 | 2,492 |
| VA,E | 11 | 349 | 188 | 6.85 | 544 | 401 | 372 | 46.73 | 820 |
| VA,W | 4 | 314 | 179 | 3.01 | 496 | 357 | 172 | 21.25 | 550 |
| WV,N | 3 | 196 | 105 | 2.33 | 304 | 217 | 100 | 16.67 | 333 |
| WV,S | 5 | 233 | 63 | 3.70 | 300 | 259 | 63 | 23.00 | 344 |
| **5TH** | | | | | | | | | |
| LA,E | 12 | 269 | 44 | 1.29 | 314 | 262 | 49 | 8.92 | 320 |
| LA,M | 3 | 344 | 70 | 2.12 | 416 | 339 | 74 | 12.67 | 425 |
| LA,W | 7 | 332 | 77 | 1.84 | 410 | 365 | 87 | 10.71 | 462 |
| MS,N | 3 | 492 | 73 | 2.16 | 567 | 462 | 70 | 14.67 | 547 |
| MS,S | 6 | 506 | 92 | 2.91 | 600 | 488 | 95 | 20.50 | 614 |
| TX,N | 12 | 456 | 87 | 5.21 | 548 | 433 | 97 | 32.58 | 563 |
| TX,E | 8 | 400 | 118 | .35 | 518 | 398 | 120 | 2.00 | 520 |
| TX,S | 19 | 375 | 243 | 10.80 | 629 | 414 | 349 | 72.42 | 835 |
| TX,W | 13 | 260 | 364 | 8.93 | 632 | 244 | 481 | 62.31 | 788 |
| **6TH** | | | | | | | | | |
| KY,E | 5.50 | 356 | 96 | 3.34 | 455 | 401 | 97 | 23.45 | 521 |
| KY,W | 4.50 | 316 | 68 | 2.10 | 386 | 304 | 144 | 13.33 | 461 |
| MI,E | 15 | 343 | 61 | 2.17 | 406 | 317 | 64 | 15.47 | 397 |
| MI,W | 4 | 415 | 95 | 4.28 | 514 | 425 | 104 | 28.75 | 558 |
| OH,N | 12 | 362 | 87 | 3.11 | 452 | 331 | 89 | 21.92 | 442 |
| OH,S | 8 | 432 | 81 | 3.29 | 516 | 339 | 88 | 23.13 | 450 |
| TN,E | 5 | 353 | 140 | 2.58 | 496 | 326 | 145 | 17.40 | 488 |
| TN,M | 4 | 445 | 92 | 3.30 | 541 | 371 | 93 | 22.75 | 486 |
| TN,W | 5 | 306 | 164 | 6.37 | 476 | 272 | 169 | 45.40 | 486 |

397

Table X-1A. (September 30, 2004—Continued)

| District | Judgeships | Weighted Filings per Judgeship | | | | Unweighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Civil | Criminal | Supervised Release Hearings | Total | Civil | Criminal | Supervised Release Hearings | Total |
| **7TH** | | | | | | | | | |
| IL,N | 22 | 451 | 59 | 1.87 | 512 | 410 | 62 | 13.36 | 485 |
| IL,C | 4 | 296 | 77 | 3.63 | 377 | 279 | 100 | 25.50 | 404 |
| IL,S | 4 | 308 | 77 | 4.66 | 390 | 303 | 77 | 32.00 | 413 |
| IN,N | 5 | 434 | 77 | 2.28 | 513 | 401 | 76 | 15.80 | 492 |
| IN,S | 5 | 656 | 71 | 1.59 | 729 | 605 | 74 | 8.60 | 688 |
| WI,E | 5 | 353 | 81 | 2.61 | 437 | 298 | 84 | 18.40 | 400 |
| WI,W | 2 | 488 | 113 | 1.93 | 602 | 450 | 119 | 13.50 | 582 |
| **8TH** | | | | | | | | | |
| AR,E | 5 | 458 | 77 | 2.24 | 538 | 516 | 80 | 15.20 | 611 |
| AR,W | 3 | 356 | 65 | 1.66 | 423 | 402 | 77 | 11.67 | 491 |
| IA,N | 2 | 272 | 214 | 4.71 | 491 | 270 | 225 | 32.50 | 528 |
| IA,S | 3 | 349 | 154 | 2.90 | 506 | 328 | 163 | 19.00 | 510 |
| MN | 7 | 583 | 94 | 2.48 | 679 | 492 | 94 | 17.71 | 603 |
| MO,E | 8 | 297 | 139 | 3.39 | 439 | 259 | 152 | 23.13 | 435 |
| MO,W | 6 | 389 | 156 | 4.13 | 550 | 364 | 160 | 28.83 | 552 |
| NE | 3 | 358 | 301 | 6.64 | 666 | 317 | 303 | 46.67 | 667 |
| ND | 2 | 145 | 135 | 4.39 | 284 | 142 | 152 | 30.50 | 325 |
| SD | 3 | 133 | 193 | 7.21 | 333 | 129 | 190 | 51.33 | 370 |
| **9TH** | | | | | | | | | |
| AK | 3 | 137 | 67 | 2.39 | 206 | 123 | 81 | 16.67 | 221 |
| AZ | 13 | 300 | 298 | 16.09 | 615 | 264 | 436 | 114.38 | 814 |
| CA,N | 14 | 519 | 58 | 3.87 | 581 | 405 | 75 | 27.57 | 508 |
| CA,E | 7 | 642 | 138 | 7.16 | 787 | 642 | 159 | 51.00 | 852 |
| CA,C | 28 | 577 | 69 | 4.55 | 651 | 493 | 90 | 32.43 | 615 |
| CA,S | 13 | 275 | 187 | 18.97 | 481 | 202 | 296 | 134.23 | 632 |
| HI | 4 | 256 | 130 | 5.53 | 392 | 190 | 167 | 39.25 | 395 |
| ID | 2 | 403 | 134 | 2.53 | 539 | 317 | 152 | 17.50 | 487 |
| MT | 3 | 249 | 169 | 5.99 | 424 | 235 | 186 | 40.33 | 461 |
| NV | 7 | 435 | 120 | 4.11 | 560 | 351 | 129 | 28.86 | 509 |
| OR | 6 | 462 | 115 | 7.93 | 585 | 407 | 135 | 56.33 | 598 |
| WA,E | 4 | 209 | 114 | 5.97 | 330 | 200 | 134 | 41.25 | 375 |
| WA,W | 7 | 463 | 143 | 4.96 | 611 | 400 | 220 | 35.00 | 655 |

Exhibit F
Page 93

Table X-1A. (September 30, 2004—Continued)

| District | Judgeships | Weighted Filings per Judgeship | | | | Unweighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Civil | Criminal | Supervised Release Hearings | Total | Civil | Criminal | Supervised Release Hearings | Total |
| **10TH** | | | | | | | | | |
| CO | 7 | 469 | 106 | 3.30 | 579 | 393 | 128 | 23.57 | 545 |
| KS | 6 | 314 | 147 | 2.67 | 463 | 281 | 174 | 18.33 | 473 |
| NM | 7 | 245 | 326 | 8.08 | 579 | 207 | 433 | 57.71 | 697 |
| OK,N | 3.50 | 283 | 64 | 2.12 | 349 | 275 | 67 | 15.14 | 357 |
| OK,E | 1.50 | 388 | 118 | 2.07 | 508 | 402 | 115 | 14.00 | 531 |
| OK,W | 6 | 286 | 57 | 1.82 | 344 | 270 | 140 | 12.83 | 423 |
| UT | 5 | 343 | 181 | 6.38 | 531 | 268 | 244 | 45.60 | 557 |
| WY | 3 | 122 | 123 | 2.13 | 248 | 115 | 133 | 13.67 | 262 |
| **11TH** | | | | | | | | | |
| AL,N | 8 | 465 | 71 | 2.31 | 538 | 447 | 80 | 13.63 | 541 |
| AL,M | 3 | 430 | 73 | 1.97 | 505 | 408 | 87 | 12.33 | 507 |
| AL,S | 3 | 308 | 107 | 3.71 | 419 | 288 | 110 | 25.53 | 423 |
| FL,N | 4 | 412 | 113 | 3.89 | 528 | 288 | 168 | 24.50 | 560 |
| FL,M | 15 | 516 | 115 | 3.38 | 634 | 468 | 121 | 23.33 | 612 |
| FL,S | 18 | 388 | 122 | 2.88 | 513 | 360 | 133 | 20.44 | 513 |
| GA,N | 11 | 535 | 88 | 2.74 | 625 | 425 | 104 | 18.73 | 548 |
| GA,M | 4 | 292 | 111 | 1.93 | 405 | 288 | 207 | 13.50 | 508 |
| GA,S | 3 | 302 | 137 | 3.93 | 442 | 335 | 221 | 24.67 | 581 |

NOTE. CASE WEIGHTS ARE BASED ON THE 2003-2004 DISTRICT COURT CASE WEIGHTING STUDY CONDUCTED BY THE FEDERAL JUDICIAL CENTER. THIS TABLE EXCLUDES CIVIL CASES ARISING BY REOPENING, REMAND, OR TRANSFER TO THE DISTRICT BY THE ORDER OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION. THIS TABLE INCLUDES DEFENDANTS IN ALL FELONY AND CLASS A MISDEMEANOR CASES, BUT INCLUDES ONLY THOSE PETTY OFFENSE DEFENDANTS WHOSE CASES HAVE BEEN ASSIGNED TO DISTRICT JUDGES. REMANDS AND REOPENINGS FOR CRIMINAL DEFENDANTS ARE EXCLUDED. THIS TABLE EXCLUDES DATA FOR THE TERRITORIAL COURTS. DATA ARE REPORTED FOR SUPERVISED RELEASE AND PROBATION HEARINGS (BOTH EVIDENTIARY AND NON-EVIDENTIARY) PREVIOUSLY NOT PRESENTED IN THIS TABLE. DATA ARE OBTAINED FROM THE MONTHLY REPORTS OF TRIALS AND OTHER COURT ACTIVITIES CONDUCTED BY RESIDENT AND VISITING JUDGES. DUE TO ROUNDING, SUBTOTALS FOR WEIGHTED CIVIL, CRIMINAL, AND REVOCATION FILINGS MAY NOT EQUAL TOTALS FOR WEIGHTED AND UNWEIGHTED FILINGS.

Exhibit F
Page 94

Driving Directions from 9 W 57th St, New York, NY to 844 N King St, Wilmington, DE    Page 1 of 3



**Start:**   **9 W 57th St**
             New York, NY 10019-2701, US

**End:**     **844 N King St**
             Wilmington, DE 19801-3519, US

Colorado Technical
University Online

**Graduate in 15 Months:**
*CTU Online makes it possible*

Click anywhere on this ad to view program information.

■■■ Undergraduate Programs
• Bachelor's (BSBA) in Information Technology
• Bachelor's (BSBA) in Management
• Bachelor's (BSBA) in Human Resource Management
• Bachelor's (BSBA) in Marketing
• Bachelor's (BSCJ) in Criminal Justice

■■■ Graduate Programs
• Executive Master of Business Administration (MBA)
• Master's (MSM) in Information Systems Security
• Master's (MSM) in Information Technology Management
• Master's (MSM) in Project Management

LEARN MORE

| Directions | Distance |
|---|---|
| **1:** Start out going NORTHWEST on W 57TH ST toward AVENUE OF THE AMERICAS / 6TH AVE. | 0.6 miles |
| **2:** Turn LEFT onto 9TH AVE. | 1.0 miles |
| **3:** Take the LINCOLN TUNNEL ramp toward NEW JERSEY. | 0.1 miles |
| **4:** Merge onto I-495 W. | 0.9 miles |
| **5:** I-495 W becomes NJ-495 W. | 3.2 miles |
| **6:** Merge onto NEW JERSEY TURNPIKE S via the exit on the LEFT toward I-280 / NEWARK / I-78 (Portions toll). | 112.6 miles |
| **7:** NEW JERSEY TURNPIKE S becomes I-295 S / US-40 W (Portions toll). | 3.5 miles |
| **8:** Merge onto NEW CASTLE AVE / DE-9 N. | 1.1 miles |
| **9:** Turn LEFT onto ROGERS RD. | 0.7 miles |
| **10:** Turn SLIGHT RIGHT onto S MARKET ST / US-13 BR N. Continue to follow US-13 BR N. | 1.8 miles |
| **11:** Turn LEFT onto E 10TH ST. | 0.1 miles |
| **12:** Turn LEFT onto N KING ST / US-13 BR S. | 0.1 miles |

http://www.mapquest.com/directions/main.adp?do=prt&mo=ma&2si=navt&1gi=0&un=m&    8/9/2005

Driving Directions from 9 W 57th St, New York, NY to 844 N King St, Wilmington, DE      Page 2 of 3



**13:** End at **844 N King St**
Wilmington, DE 19801-3519, US

**Total Est. Time: 2 hours, 13 minutes      Total Est. Distance: 126.20 miles**



**Start:**
9 W 57th St
New York, NY 10019-2701, US

**End:**
844 N King St
Wilmington, DE 19801-3519, US





Exhibit G.
Page 96

Driving Directions from 9 W 57th St, New York, NY to 844 N King St, Wilmington, DE    Page 3 of 3

All rights reserved. Use Subject to
License/Copyright

These directions are informational only. No
representation is made or warranty given as to
their content, road conditions or route usability
or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting
from such use.

Exhibit G
Page 97

1 ... //------ ----------- ---/dinestians/main adn2da--nr&mo--ma&2si--now&1gi=0&um=m&    8/0/2005

Driving Directions from 6 Sylvan Way, Parsippany, NJ to 844 N King St, Wilmington, DE    Page 1 of 3



**Start:** 6 Sylvan Way
Parsippany, NJ 07054-3826, US

**End:** 844 N King St
Wilmington, DE 19801-3519, US

Colorado Technical
University Online

**Graduate in 15 Months;**
*CTU Online makes it possible*

Click anywhere on this ad for view program information.

■■■ Undergraduate Programs
• Bachelor's (BSBA) in Information Technology
• Bachelor's (BSBA) in Management
• Bachelor's (BSBA) in Human Resource Management
• Bachelor's (BSBA) in Marketing
• Bachelor's (BSCJ) in Criminal Justice

■■■ Graduate Programs
• Executive Master of Business Administration (MBA)
• Master's (MSM) in Information Systems Security
• Master's (MSM) in Information Technology Management
• Master's (MSM) in Project Management

**LEARN MORE**

| Directions | | Distance |
|---|---|---|
| | **1:** Start out going EAST on SYLVAN WAY toward DRYDEN WAY. | 0.1 miles |
| | **2:** Turn RIGHT onto DRYDEN WAY. | 0.6 miles |
| | **3:** Merge onto NJ-10 E. | 0.8 miles |
| | **4:** Merge onto I-287 S toward MORRISTOWN. | 1.3 miles |
| | **5:** Merge onto NJ-24 E via EXIT 37 toward I-78 E / SPRINGFIELD. | 10.3 miles |
| | **6:** Merge onto I-78 E toward LOCAL LANES / GARDEN STATE PARKWAY / NEWARK. | 3.6 miles |
| | **7:** Take the GARDEN STATE PARKWAY exit- EXIT 52. | 0.4 miles |
| | **8:** Take the PARKWAY SOUTH exit. | 0.4 miles |
| | **9:** Merge onto GARDEN STATE PKWY S (Portions toll). | 12.8 miles |
| | **10:** Take the I-95 S / NJ TURNPIKE SOUTH exit- EXIT 129. | 1.1 miles |
| | **11:** Take the exit toward CARS / TRUCKS-BUSES. | 0.4 miles |
| | **12:** Merge onto NEW JERSEY TURNPIKE S (Portions toll). | 90.5 miles |

http://www.mapquest.com/directions/main.adp?do=prt&mo=ma&2si=navt&1oi=0&un=m&    8/9/2005

Driving Directions from 6 Sylvan Way, Parsippany, NJ to 844 N King St, Wilmington, DE    Page 2 of 3

**13:** NEW JERSEY TURNPIKE S becomes I-295 S / US-40 W    3.5 miles
(Portions toll).

**14:** Merge onto NEW CASTLE AVE / DE-9 N.    1.1 miles

**15:** Turn LEFT onto ROGERS RD.    0.7 miles

**16:** Turn SLIGHT RIGHT onto S MARKET ST / US-13 BR N.    1.8 miles
Continue to follow US-13 BR N.

**17:** Turn LEFT onto E 10TH ST.    0.1 miles

**18:** Turn LEFT onto N KING ST / US-13 BR S.    0.1 miles

**19:** End at **844 N King St**
Wilmington, DE 19801-3519, US

**Total Est. Time: 2 hours, 15 minutes      Total Est. Distance: 130.34 miles**



**Start:**
**6 Sylvan Way**
Parsippany, NJ 07054-3826, US

**End:**
**844 N King St**
Wilmington, DE 19801-3519, US

Exhibit H
Page 99

Driving Directions from 6 Sylvan Way, Parsippany, NJ to 844 N King St, Wilmington, DE    Page 3 of 3





**Notes:**

All rights reserved. Use Subject to
License/Copyright

These directions are informational only. No
representation is made or warranty given as to
their content, road conditions or route usability
or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting
from such use.

http://www.mapquest.com/directions/main.adp?do=prt&mo=ma&2si=navt&1gi=0&un=m&...    8/9/2005

Driving Directions from 100 Connecticut Ave, Norwalk, CT to 844 N King St, Wilmingt...    Page 1 of 3





**Start:**  **100 Connecticut Ave**
Norwalk, CT 06850-3541, US

**End:**  **844 N King St**
Wilmington, DE 19801-3519, US

| Directions | Distance |
|---|---|
| **1:** Start out going SOUTHWEST on CONNECTICUT AVE / US-1 toward CLINTON AVE. | 0.4 miles |
| **2:** Merge onto I-95 S via the ramp on the LEFT toward N.Y. CITY (Portions toll). | 31.6 miles |
| **3:** Merge onto I-95 S via EXIT 6A toward GEO WASHINGTON BR / WHITESTONE BR. | 7.9 miles |
| **4:** Take NEW JERSEY TURNPIKE S toward I-80 / GARDEN STATE PARKWAY / PATERSON (Portions toll). | 121.3 miles |
| **5:** Merge onto I-295 S / US-40 W (Portions toll). | 3.5 miles |
| **6:** Merge onto NEW CASTLE AVE / DE-9 N. | 1.1 miles |
| **7:** Turn LEFT onto ROGERS RD. | 0.7 miles |
| **8:** Turn SLIGHT RIGHT onto S MARKET ST / US-13 BR N. Continue to follow US-13 BR N. | 1.8 miles |
| **9:** Turn LEFT onto E 10TH ST. | 0.1 miles |
| **10:** Turn LEFT onto N KING ST / US-13 BR S. | 0.1 miles |
| **11:** End at **844 N King St** Wilmington, DE 19801-3519, US | |

Exhibit I
Page 101

Driving Directions from 100 Connecticut Ave, Norwalk, CT to 844 N King St, Wilmingt...    Page 2 of 3

**Total Est. Time: 2 hours, 59 minutes miles**          **Total Est. Distance: 168.83**



**Start:**
**100 Connecticut Ave**
Norwalk, CT 06850-3541, US

**End:**
**844 N King St**
Wilmington, DE 19801-3519, US



**Notes:**

All rights reserved. Use Subject to License/Copyright

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability

Exhibit I
Page 102

use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting
from such use.

Exhibit I
Page 103

Driving Directions from 200 S Wacker Dr, Chicago, IL to 844 N King St, Wilmington, DE    Page 1 of 3



**Start:** 200 S Wacker Dr
Chicago, IL 60606-5829, US

**End:** 844 N King St
Wilmington, DE 19801-3519, US



Colorado Technical
University Online

**Graduate in 15 Months;**
*CTU Online makes it possible*

Click anywhere on this ad to view program information.

▪▫▪▪ Undergraduate Programs
- Bachelor's (BSBA) in Information Technology
- Bachelor's (BSBA) in Management
- Bachelor's (BSBA) in Human Resource Management
- Bachelor's (BSBA) in Marketing
- Bachelor's (BSCJ) in Criminal Justice

▪▫▪▪ Graduate Programs
- Executive Master of Business Administration (MBA)
- Master's (MSM) in Information Systems Security
- Master's (MSM) in Information Technology Management
- Master's (MSM) in Project Management

**LEARN MORE**

| Directions | Distance |
|---|---|
| **1:** Start out going SOUTH on S UPPER WACKER DR / S WACKER DR toward W JACKSON BLVD. | 0.1 miles |
| **2:** Turn RIGHT onto W VAN BUREN ST. | 0.1 miles |
| **3:** Turn LEFT onto S CANAL ST. | <0.1 miles |
| **4:** Merge onto DAN RYAN EXPY E / I-90 E / I-94 E toward INDIANA. | 2.8 miles |
| **5:** Take DAN RYAN EXP E / I-90 EXP E / I-94 EXP E toward 51ST ST. | 4.0 miles |
| **6:** Merge onto I-90 E toward EXIT 59A / INDIANA TOLL RD (Portions toll). | 306.8 miles |
| **7:** Merge onto I-80 E (Portions toll). | 76.2 miles |
| **8:** Merge onto I-76 E via the exit on the LEFT (Portions toll). | 335.8 miles |
| **9:** Take the PA-100 exit- EXIT 312- toward POTTSTOWN / WEST CHESTER. | 0.4 miles |
| **10:** Merge onto PA-100 S toward DOWNINGTOWN. | 7.6 miles |
| **11:** Take US-202 S. | 16.4 miles |
| **12:** US-202 S becomes DE-202 S. | 1.2 miles |

Exhibit J
Page 104

Driving Directions from 200 S Wacker Dr, Chicago, IL to 844 N King St, Wilmington, DE    Page 2 of 3

 **13:** Turn RIGHT onto N MARKET ST / US-13 BR. Continue    0.7 miles
to follow US-13 BR S.

 **14:** End at 844 N King St
Wilmington, DE 19801-3519, US

**Total Est. Time: 12 hours, 19 minutes        Total Est. Distance: 752.76 miles**



© 2005 MapQuest.com, Inc.

**Start:**
**200 S Wacker Dr**
Chicago, IL 60606-5829, US

**End:**
**844 N King St**
Wilmington, DE 19801-3519, US



© 2005 MapQuest.com, Inc.          ©2005 NAVTEQ



© 2005 MapQuest.com, Inc.          ©2005 NAVTEQ

Exhibit J
Page 105

Driving Directions from 200 S Wacker Dr, Chicago, IL to 844 N King St, Wilmington, DE    Page 3 of 3

NAVTEQ
ON BOARD

All rights reserved. Use Subject to
License/Copyright

These directions are informational only. No
representation is made or warranty given as to
their content, road conditions or route usability
or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting
from such use.

Exhibit J
Page 106

Driving Directions from 200 S Wacker Dr, Chicago, IL to 700 Stewart St, Seattle, WA        Page 1 of 3



**Start:**  **200 S Wacker Dr**
Chicago, IL 60606-5829, US

**End:**  **700 Stewart St**
Seattle, WA 98101-1271, US



| **Directions** | **Distance** |
|---|---|
| **1:** Start out going SOUTH on S UPPER WACKER DR / S WACKER DR. | <0.1 miles |
| **2:** Make a U-TURN onto S UPPER WACKER DR / S WACKER DR. | <0.1 miles |
| **3:** Turn LEFT onto W ADAMS ST. | 0.4 miles |
| **4:** Merge onto KENNEDY EXPY W / I-90 W / I-94 W. | 1.0 miles |
| **5:** Take the EXPRESS LANES exit on the LEFT toward ADDISON ST. | 0.1 miles |
| **6:** Merge onto I-90 EXP / I-94 EXP / KENNEDY EXP. | 6.1 miles |
| **7:** Merge onto I-90 W toward O'HARE / ROCKFORD (Portions toll). | 1266.8 miles |
| **8:** Merge onto I-90 E via the exit on the LEFT toward BILLINGS. | 824.4 miles |
| **9:** Take the I-5 N exit- EXIT 2C- toward MADISON ST / CONVENTION CENTER / VANCOUVER BC. | 0.8 miles |
| **10:** Take the exit toward MADISON ST. / CONVENTION PLACE. | 0.2 miles |
| **11:** Stay STRAIGHT to go onto 7TH AVE. | <0.1 miles |
| **12:** Turn RIGHT onto MADISON ST. | <0.1 miles |

Exhibit K
Page 107

Driving Directions from 200 S Wacker Dr, Chicago, IL to 700 Stewart St, Seattle, WA    Page 2 of 3

**13:** Turn LEFT onto 8TH AVE.    0.5 miles

**14:** Turn LEFT onto STEWART ST.    <0.1 miles

**15:** End at **700 Stewart St**
Seattle, WA 98101-1271, US

**Total Est. Time: 29 hours, 58 minutes    Total Est. Distance: 2101.23 miles**



**Start:**
200 S Wacker Dr
Chicago, IL 60606-5829, US

**End:**
700 Stewart St
Seattle, WA 98101-1271, US

© 2005 MapQuest.com, Inc.

Exhibit K
Page 108

**Notes:**

NAVTEQ
ON BOARD

All rights reserved. Use Subject to
License/Copyright

These directions are informational only. No
representation is made or warranty given as to
their content, road conditions or route usability
or expeditiousness. User assumes all risk of
use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting
from such use.

Westlaw.

30 U.S.P.Q.2d 1553
1993 WL 653027 (D.Ariz.), 30 U.S.P.Q.2d 1553
(Cite as: 30 U.S.P.Q.2d 1553)

Page 1

C

Advanced Semiconductor Materials America Inc.

v.

Applied Materials Inc.

District Court, D. Arizona

No. CIV 93-0066-PHX-SMM

Decided September 15, 1993
United States Patents Quarterly Headnotes

## JUDICIAL PRACTICE AND PROCEDURE

[1] Jurisdiction -- Venue; transfer of action -- In patent actions (Section 405.1907)

Transfer, from federal district court in Arizona to federal district court in California, is warranted of patent infringement action filed by Arizona corporation against California corporation, since action is related to two other patent cases involving same parties currently pending in California, even though same patents are not at issue, since convenience of witnesses is neutral factor, since parties' counsel are located in California, not Arizona, and since patents at issue were researched and developed in California, not Arizona, and thus evidence is likely to be found in California.

## JUDICIAL PRACTICE AND PROCEDURE

Particular patents -- General and mechanical -- Silicon chips

4,798,165, deBoer, Jensen, Johnson, Read, and Robinson, apparatus for chemical vapor deposition using an axially symmetric gas flow, infringement defendant's motion for change of venue granted. 4,874,464, Goodwin, Hawkins, Johnson, Olsen, and Robinson, process for epitaxial deposition of silicon, infringement defendant's motion for change of venue granted.

*1553 Action by Advanced Semiconductor Materials America Inc. against Applied Materials Inc., for patent infringement. On defendant's motion for change of venue. Motion granted.

Don W. Martens and Vito A. Canuso III, of Knobbe, Martens, Olson & Bear, Newport Beach, Calif., for plaintiff.

Matthew D. Powers and Edward R. Reines, of Weil, Gotshal & Manges, Menlo Park, Calif., for defendant.

McNamee, J.

Defendant Applied Materials, Inc. filed a motion for change of venue which is opposed by Plaintiff Advanced Semiconductor Materials America, Inc. ("ASMA").

### BACKGROUND

The present lawsuit involves allegations of infringement of two of the Plaintiff's patents. The Defendant-movant is based in Santa Clara, California. It makes and sells capital equipment for the global semiconductor industry. Plaintiff ASMA is also involved in the global semiconductor industry and is based in Tempe, Arizona.

### STANDARD OF REVIEW

The decision to transfer a case on venue grounds is largely a discretionary issue. 28 U.S.C. Section 1404(a); Hatch v. Reliance Ins. Co., 758 F.2d 409, 414 (9th Cir.), cert. denied, 474 U.S. 1021 (1985). The Court exercises its discretion within the guidelines of sections 1400(b) and 1404(a) of Title 28 of the United States Code.

Section 1400(b) of Title 28 governs the venue for patent infringement actions. It provides that "any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Id. Factors to be considered by a court in exercising its discretion in a change of venue motion include the convenience of the parties, the convenience of the witnesses, and the interests of justice, such as judicial economy. Hatch v. Reliance Ins. Co., 758 F.2d at 414.

### ANALYSIS

A defendant "resides" in any judicial district in which it is subject to personal jurisdiction. 28 U.S.C. Section 1391(b)-(c); VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1576-77, 16 U.S.P.Q.2d 1614 (Fed. Cir. 1990), cert. denied, 111 S.Ct. 1315 (1991). Since Defendant Applied Materials is based in Santa Clara, it is subject to personal jurisdiction in the Northern District of

California. Venue is therefore proper in the Northern District of California. Thus, this action could have originally been brought in that District.

Venue, however, is also proper in the District of Arizona, as the Plaintiff resides in Arizona, and the Defendant is a corporation who does not contest that it is subject to personal jurisdiction in Arizona. Still, in the interest of justice, the Court may, in its discretion, transfer this case to another district where it might have been brought, " [f]or the convenience of parties and witnesses" or if "in the interest of justice." 28 U.S.C. Section 1404(a); *Hatch v. Reliance Ins. Co.*, 758 F.2d at 414.

### Factors to be Considered

1. The Parties are Involved in Pending Related Cases

\*1554 The present case is related to two other patent cases between the same two parties currently before the United States District Court in the Northern District of California. "As a general rule, cases should be transferred to districts where related actions are pending."*Impra Inc. v. Quinton Instruments Co.*, 17 U.S.P.Q.2d 1890, 1891 , 1990 W.L. 284713 (D. Ariz. 1990). While the dispute in this case does involve different patents from those at issue in the two cases now pending between the parties in California, all three lawsuits involve the same parties, the same technology, and competing products in the same relevant markets. Since "the patents involved in this case arose out of the development program for the accused device in the California cases," there will likely be much overlap of issues, witnesses, prior art, and documents. Defendant's Reply Memorandum In Support of Defendant's Motion for Transfer of Venue at 5 [hereinafter "Defendant's Reply Memo"].

Defendant argues that the Court should adopt the reasoning applied in a District Court case from the District of Columbia, *Smith Industries Medical Systems v. Ballard Medical Products, Inc.*, 728 F.Supp. 6 (D.D.C. 1989). In *Smith*, the Court transferred a trademark action from one district to another where the same parties had been litigating a patent dispute for over two years. In this case, the facts are more compelling for transfer as the three cases at issue all regard infringement of related patents; *Smith* dealt with one patent case and one trademark case. The interrelatedness of the three patent actions strongly indicates that it is in the interest of judicial economy to grant the Defendant's motion for transfer of venue to the Northern District of California where the Court has greater experience

with the parties' dispute. *Cf. Pacesetter Systems. Inc. v. Medtronic, Inc.*, 678 F.2d 93 [ 217 USPQ 36 ] (9th Cir. 1982) (upholding dismissal of patent suit on grounds of forum non conveniens when another suit involving same parties and issues was pending in another jurisdiction).

### 2. Convenience of the Witnesses

The Plaintiffs contend that "the moving party cannot rely on vague generalizations and is obligated to identify key witnesses and to present a generalized statement of their expected testimony." Plaintiff's Memorandum in Opposition to Defendant's Motion to Transfer at 5 [hereinafter "Plaintiff's Memo"] (citing *Heller Financial Inc., v. MidWhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989)). *Heller* concerned a motion for change of venue in which (1) the suit had been filed in the district contractually agreed upon in a valid forum selection clause; and (2) the subject matter of the lawsuit dealt with a dispute of leased property located within the district in which the suit was originally filed. To overcome such burdensome facts that weighed against transfer of venue, the movant had to establish who their witnesses would be and the materiality of their testimony. *Id.* Such factors are clearly not at issue in the present case. Given the early stage of this litigation and the stay of discovery in the case due to the pending California cases, it is unreasonable to require that the Defendants produce a list of witnesses and summaries of said witnesses' expected testimony.

It is clear that there will be witnesses from both the state of California and the state of Arizona. Five of the eight inventors of the patents involved in the present case reside in Arizona; a sixth resides in both Arizona and California. Plaintiff's Memo at 8. The two attorneys who prosecuted the ASMA patents in question in the suit also reside in Arizona. On the other hand, seven of eight experts in the two cases now before the Northern District of California are from California. Defendant's Memo at 6. While the Plaintiff challenges whether all seven of the expert witnesses will be needed in the present case, the Defendant has stated it plans to use some of these same experts in the present case. Defendant's Reply Memo at 4-5. Moreover, the Plaintiff has not expressed an expectation to retain any Arizona expert witnesses. Since the patents at issue in the case at bar were researched and developed in California, it is likely that other percipient witnesses will come from California.

In addition to the witnesses from California and

Exhibit L
Page 111

Arizona, there are many other people who are likely to be witnesses in the present case. Such individuals are spread out across the country (i.e., Utah, Pennsylvania, Ohio, New Jersey, and Minnesota), and at least one does not reside in the United States. It therefore appears that the overall inconvenience to the witnesses of testifying in either district is roughly comparable; even ASMA concedes this point by stating, "just as many percipient witnesses will be inconvenienced by a trial in California as may be inconvenienced by a trial [in Arizona]." Plaintiff's Memo at 9. The convenience of the witnesses is therefore an equally neutral factor in deciding the motion for change of venue.

*1555 3. Convenience to Parties

The Plaintiff and the Defendant in both the present case and the two cases now before the Court in the Northern District of California are and have been represented by legal counsel located in California, not Arizona. Because this goes directly to the cost borne by the parties, such as attorney time and travel, it is directly in the interest of both parties to have the case litigated in California.

4. Situs of Alleged Infringement

The patents at issue in this case were researched and developed in California. Much of the activity that goes to the heart of infringement, therefore, probably took place in California, not Arizona. Given this fact, evidence regarding the development of the patents in question is likely to be found in California, not Arizona. As the costs of conducting interstate discovery and transferring documents between California and Arizona may be minimized by litigating the case in California, it is in the interest of the parties that the motion to transfer venue to California be granted.

CONCLUSION AND ORDER

[1] The Northern District of California is already familiar with the parties and many of the facts and circumstances surrounding the patents at issue in the present case by way of the two patent suits now pending between the parties in that District. For this reason, and for those stated above, the Court finds the requirements of 28 U.S.C. Sections 1400(b) and 1404(a) to have been satisfied, and that it would serve the interests of justice to transfer the case to the Northern District of California.

IT IS THEREFORE ORDERED that the Defendant Applied Material's Motion for Change of Venue be GRANTED.

IT IS FURTHER ORDERED that the oral argument set for September 27, 1993 at 4:00 p.m. be VACATED.

D.Ariz.

30 U.S.P.Q.2d 1553

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

Page 1

# H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
AGILENT TECHNOLOGIES, INC., Plaintiff,
v.
MICROMUSE, INC., Defendant.
No. 04 Civ. 3090(RWS).

Oct. 19, 2004.

Christian & Barton, Richmond, VA, By: Michael W. Smith, Craig T. Merritt, R. Braxton Hill, for Plaintiff, of counsel.

Gray Cary Ware & Freidenrich, San Diego, CA, By: Edward H. Sikorski, John Allcock, Sean C. Cunningham, Megan Whyman Olesek, for Plaintiff.

Brown Raysman Millstein Felder & Steiner, New York, NY, By: Seth Ostrow, Jeffrey P. Weingart, Eric C. Osterberg, for Defendant, of counsel.

Willcox & Savage, Norfolk, VA, By: Michael R. Katchmark, Gary A. Bryant, for Defendant, of counsel.

*OPINION*

SWEET, J.

*1 Defendant Micromuse, Inc. ("Micromuse") has moved pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of plaintiff Agilent Technologies, Inc. ("Agilent") alleging patent infringement, and, in the alternative, for a more definite statement pursuant to Rule 12(e), and to add Hewlett Packard Company ("H-P") as a necessary party under Rules 12(b)(7) and 19(a) of those same Rules. Micromuse has also moved to disqualify Gray Cary Ware & Freidenrich, LLP ("Gray Cary") from representing Agilent in this action, Gray Cary having previously represented NetWork Harmoni, Inc. ("Network Harmoni"), an entity acquired by Micromuse prior to the filing of this action. Agilent has cross-moved for leave to file a supplemental declaration in opposition to Micromuse's motion to

disqualify Gray Cary. For the reasons set forth below, Micromuse's motion to dismiss is denied, the motion for a more definite statement is granted, the motion to add H-P as a party is denied at this time with leave granted to renew, and the motion to disqualify is denied at this time with leave granted to renew. Agilent's cross-motion for leave to file a supplemental declaration is granted.

*Prior Proceedings*

The complaint in this patent infringement action was filed in the United States District Court for the Eastern District of Virginia, Norfolk Division, on November 10, 2003.

On December 17, 2003, Micromuse filed the instant motions in the Eastern District of Virginia as well as a motion to transfer the action to this district, which latter motion was granted by order of the Honorable Raymond A. Jackson filed on April 16, 2004. The action was transferred to this district on April 22, 2004.

The remaining motions were argued and marked fully submitted on May 19, 2004.

*The Complaint*

The following facts are drawn from Agilent's complaint and do not constitute findings of fact by the Court.

According to the complaint, Agilent is a Delaware corporation having its headquarters in Palo Alto, California, and significant operations in Fort Collins, Colorado. It is alleged that Micromuse is a Delaware Corporation with headquarters in San Francisco, California, and significant operations in Northern Virginia, Georgia, Illinois, Texas, New York, London, and other overseas destinations. Subject matter jurisdiction is alleged under 28 U.S.C. § § 1331 and 1338.

With regard to the factual background of the complaint, it is alleged that:

6. Agilent is a leading provider of components, test, measurement, monitoring and management solutions for the communications industry. Agilent's broad set of solutions and services includes, among other technologies, optical,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

Page 2

wireless, Internet and broadband technologies that span the entire communications life cycle. Having invested substantial resources in the development of these technologies, Agilent maintains a portfolio of patents covering its inventions, including the patents at issue.

\*2 7. On October 24, 2000, United States Patent No. 6,138,122 ("the '122 Patent"), entitled "Modeling of Internet Services," was duly and legally issued to Mark D. Smith, Deborah L. Caswell and Srinivas Ramanathan. All rights, title and interest in the '122 Patent were assigned to Agilent, which remains the sole owner of the '122 Patent....

8. On January 1, 2002, United States Patent No. 6,336,138 ("the '138 Patent"), entitled "Template-Driven Approach For Generating Models On Network Services," was duly and legally issued to Deborah L. Caswell, Srinivas Ramanathan, James D. Hunter, Scott S. Neal, Frederick A. Sicker and Mark D. Smith. All rights, title and interest in the '138 Patent were assigned to Hewlett-Packard Company. Agilent and Hewlett-Packard Company now jointly own the '138 Patent, and Agilent has the exclusive right to enforce the '138 Patent against Micromuse....

(Compl. at ¶¶ 6-8.) It is further alleged that Micromuse "makes, sells, or offers products for sale in this district that infringe Agilent's patents." (Compl. at ¶ 4.)

The complaint contains two counts and Micronmuse's liability is alleged as follows:

### COUNT ONE
Infringement of U.S. Patent No. 6,138,122

9. Agilent realleges the foregoing paragraphs.

10. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '122 Patent.

11. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

12. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

13. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on their behalf from infringing the '122 Patent, Agilent will be greatly and irreparably harmed.

### COUNT TWO
Infringement of U.S. Patent No. 6,336,138

14. Agilent realleges the foregoing paragraphs.

15. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '138 Patent.

16. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

17. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

18. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '138 Patent, Agilent will be greatly and irreparably harmed.

\*3 (Compl. at ¶¶ 9-18.)

### Discussion

#### I. Micromuse's Motion To Dismiss Is Denied

Micromuse has moved to dismiss Agilent's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint fails to meet the notice requirements of Rule 8(a) of those same Rules.

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

No: Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

Page 5

(quoting _Geisler v. Petrocelli_, 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." _Sweet v. Sheahan_, 235 F.3d 80, 83 (2d Cir.2000); accord _Eternity Global Master Fund_, 375 F.3d at 176-77.

"The indulgent standard evident in these precedents is codified in Rule 8, which requires no more than 'a short and plain statement of [a] claim showing that the pleader is entitled to relief.' " _Id_., at 177 (quoting Fed.R.Civ.P. 8(a)(2)) (alteration in original); _see also Wynder v. McMahon_, 360 F.3d 73, 76-77 & n. 5 (2d Cir.2004) (referring to the "bare-bones standards of Rule 8" and noting that "Rule 8 pleading is extremely permissive"). The Supreme Court has interpreted Rule 8 "not to require a claimant to set out in detail the facts upon which he bases his claim." _Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit_, 507 U.S. 163, 168 (1993) (quoting _Conley v. Gibson_, 355 U.S. 41, 47 (1957)). Indeed,

> The federal rules require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid.... All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.

_Higgs v. Carver_, 286 F.3d 437, 439 (7th Cir.2002); _see also Scutti Enters., LLC v. Park Place Entm't Corp._, 322 F.3d 211, 215 (2d Cir.2003) ( " 'More extensive pleading of fact is not required because the Federal Rules of Procedure provide other devices besides pleadings that will serve to define the facts and issues and to dispose of unmeritorious claims.' ") (quoting 2 James Wm. Moore, _et al._, _Moore's Federal Practice_ § 8.04[1] (3d ed.1999) (citation omitted)). Whether a complaint satisfies Rule 8(a)(2) is determined by whether the pleading provides fair notice to the opposing party. _See Conley_, 355 U.S. at 47; _see also Wynder_, 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given."). Accordingly, dismissal for failure to comply with the requirements of Rule 8 " 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " _Simmons v. Abruzzo_, 49 F.3d 83, 86 (2d Cir.1995) (quoting _Salahuddin v. Cuomo_, 861 F.2d 40, 42 (2d Cir.1988)).

*4 Here, Agilent's complaint establishes the jurisdiction of this Court, sets forth the ownership of the patents in suit and alleges that Micromuse makes, sells, or offers for sale that infringe Agilent's patents. The complaint further alleges that Micromuse is liable for direct infringement, contributory infringement and infringement by inducement. Agilent has provided a "short and plain statement" of its claims against Micromuse and the nature of those claims is discernible. Fed.R.Civ.P. 8(a)(2). Indeed, it would be difficult to frame a more skeletal pleading.

Micromuse nonetheless argues that dismissal of Agilent's complaint is appropriate because the complaint fails to specify any allegedly infringing product, fails to identify any allegedly infringing conduct, and fails to set forth any of the other actors implicated by the allegations that Micromuse has contributed to and induced patent infringement. The absence of allegations such as those described does not demonstrate that the harsh sanction of dismissal is appropriate here, as this absence does not make it "appear[ ] beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief," _Sweet_, 235 F.3d at 83, nor that the complaint is " 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised.' " _Simmons_, 49 F.3d at 86 (quoting _Salahuddin_, 861 F.2d at 42); _see generally Glus v. Brooklyn E. Dist. Terminal_, 359 U.S. 231, 235 (1959) ("It may well be that petitioner's complaint as now drawn is too vague, but that is no ground for dismissing his action.").

Where, as here, a pleading is sufficient to provide notice of the claim but does not contain sufficient information to allow a responsive pleading to be framed without risk of prejudice, the proper remedy is a motion for a more definite statement under Rule 12(e). Fed.R.Civ.P. _See, e.g._, _Scott v. City of Chicago_, 195 F.3d 950, 952 (7th Cir.1999); _Sisk v. Texas Parks & Wildlife Dep't_, 644 F.2d 1056, 1059 (5th Cir.1981); _Harman v. Nat'l Bank of Arizona_, 339 F.2d 564, 567 (9th Cir.1964); _but compare Ondeo Nalco Co. v. Eka Chems., Inc._, No. 01 Civ. 537(SLR), 2002 WL 1458853, at *1-2 (D. Del. June 10, 2002) (dismissing defendant's counterclaims where it was unclear which products were being accused, concluding that the pleading was "too vague to provide plaintiff with fair notice," and granting leave to amend).

II. _Micromuse's Motion For A More Definite Statement Is Granted_

Rule 12(e) of the Federal Rules of Civil Procedure

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides in pertinent part that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed.R.Civ.P. 12(e). Rule 12(e) applies only in limited circumstances:

*5 [T]he pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Rule 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1376 at 311 (3d ed.2004) (footnote omitted); *see Humphreys v. Nager,* 962 F.Supp. 347, 352-53 (E.D.N.Y.1997) ("A 12(b)(6) motion is one made for a failure to state a claim, while a 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint."); *but compare Home & Nature Inc. v. Sherman Specialty Co.,* 322 F.Supp.2d 260, 265 (E.D.N.Y.2004) ("Rule 12(e) motion should be denied if a complaint comports with the liberal pleading requirements of Rule 8(a).") (collecting cases).

Although motions pursuant to Rule 12(e) are generally disfavored where prompt resort to discovery may provide an adequate means for ascertaining relevant facts, *see id.,* courts have considered Rule 12(e) relief appropriate in patent infringement cases where a plaintiff has failed to identify any allegedly infringing product or products. *See, e.g., In re Papst Licensing GmbH Patent Litig.,* Nos. MDL 1298 & 99 Civ. 3118, 2001 WL 179926, at *2 (E.D.La. Feb. 22, 2001) (concluding that the plaintiff's complaint must be amended to specifically identify which of the defendant's products are alleged to have infringed the plaintiff's patents); *cf. In re Independent Serv. Org. Antitrust Litig.,* 85 F.Supp.2d 1130, 1169 (D.Kan.2000) (denying the plaintiff's motion for summary judgment on a defendant's counterclaim where the plaintiff argued that it did not have adequate notice of which of its devices allegedly infringed the defendant's patents, observing that the plaintiff had already answered the counterclaim and that, if the plaintiff "did not truly

know which parts were covered by the patents identified, it could have filed a motion for a more definite statement under Rule 12(e)"). The cases cited by Agilent in opposition to Micromuse's motion do not suggest that a contrary result is required here, as they stand for the propositions that a pleading need not identify every infringing product where some other limiting parameter has been set forth or at least one purportedly infringing product has been identified. *See Symbol Tech., Inc. v. Hand Held Prods., Inc.,* No. 03 Civ. 102(SLR), 2003 WL 22750145, at *3 (D.Del. Nov. 14, 2003) (denying a Rule 12(e) motion where there was a "finite" set of potentially infringing products under identified patents held by the defendant); *Oki Elec. Indus. Co. v. LG Semicon Co.,* No. 97 Civ. 20310(SW), 1998 WL 101737, at *3 (N.D.Cal. Feb. 25, 1998) (denying a motion to dismiss where the plaintiff identified infringing products by specifying that the products concerned were "devices that embody the patented methods, including 4 megabit and higher density DRAMs") (internal quotation marks omitted), *aff'd,* 243 F.3d 559 (Fed.Cir.2000).

*6 Agilent's complaint does not specify which products infringed plaintiff's patents; it merely states that the alleged infringements occurred as a result of the fact that Micromuse "makes, sells, or offers products for sale ... that infringe Agilent's patents." (Compl. at ¶ 4.) Although Agilent's papers submitted in opposition to Micromuse's various motions suggest that Micromuse possesses at least four infringing products, those products have not been formally accused. Under these circumstances, Micromuse is entitled to know which of its products or services are alleged to have infringed Agilent's patents and a more definite statement setting forth that information is appropriate.

Micromuse has also argued that Agilent's complaint fails to identify the primary infringer with respect to the contributory and inducement claims. Micromuse has cited to a single unpublished authority in support of its argument that such identification is required to render a pleading answerable, and this authority, *Net Moneyin, Inc. v. Mellon Fin. Corp.,* No. 01 Civ. 441(TUC)(RCC), slip op. (D.Ariz. July 30, 2003), itself cites no other case law directly on point. Micromuse has accordingly failed to establish that relief under Rule 12(e) with respect to the identity of any primary infringers is appropriate.

Where a motion made under Rule 12(e) has been granted, the order of the court to provide a more definite statement must be obeyed within ten days

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

after notice of the order "or within such other time as the court may fix." Fed.R.Civ.P. 12(e). Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion.

## III. H-P Will Not Be Deemed A Necessary Party At This Time

Micromuse argues that, if Agilent's complaint is not dismissed, H-P, as co-owner of the '138 Patent, should be joined as a necessary party to this lawsuit, pursuant to Rule 19(a) of the Federal Rules of Civil Procedure. In addition, Micromuse asserts that if H-P is not so joined, the case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7).

"Fed.R.Civ.P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, i.e., whether the party qualifies as a 'necessary' party under Rule 19(a)." Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 724 (2d. Cir.2000). Rule 19(a) provides in relevant part that,

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

*7 Fed.R.Civ.P. 19(a). Second, if a party is deemed necessary, it then must be determined whether the party's absence warrants dismissal pursuant to Rule 19(b). Fed.R.Civ.P. See Viacom Int'l, 212 F.3d at 725. "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." Id. at 724 (citing Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1123 (2d Cir.1990)).

As a general matter, "United States patent law ... requires that all co-owners normally must join as plaintiffs in an infringement suit." Int'l Nutrition Co.

v. Horphag Research Ltd., 257 F.3d 1324, 1331 (Fed.Cir.2001); see also Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1468 (Fed.Cir.1998) (stating that, "as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiff in an infringement suit") (footnote omitted); see generally Waterman v. MacKenzie, 138 U.S. 252, 255- 56 (1891). As one court has explained, since " 'all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits." ' E.Z. Bowz, L.L.C. v. Prof'l Prod. Research Co., No. 00 Civ. 8670(LTS)(GWG), 2003 WL 22064257, at *3 (S.D.N.Y. Sept. 5, 2003) (quoting Int'l Bus. Machs. Corp. v. Conner Peripherals, Inc., No. 93 Civ. 20591(RMW), 1994 WL 409493, at *3 (N.D.Cal. Jan. 28, 1994)); see also Union Trust Nat'l Bank v. Audio Devices, Inc., 295 F.Supp. 25, 27 (S.D.N.Y.1969) ("That all co-owners be parties to a suit is a necessary requirement if conflicting decisions about the same patent (for example, its validity) are to be avoided."); cf. Vaupel Textilmaschinen KG v. Meccanico Euro Italia S.P.A., 944 F.2d 870, 875 (Fed.Cir.1991) ("The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer.").

"Since the introduction of Fed.R.Civ.P. 19 and the 1966 amendments to the rule, however, 'courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner." ' E.Z. Bowz, 2003 WL 22064257, at *3 (quoting Michaels of Oregon Co. v. Mil-Tech, Inc., No. 95 Civ. 908(MA), 1995 WL 852122, at *1 (D.Or. Oct. 17, 1995)); cf. Howes v. Med. Components, Inc., 698 F.Supp. 574, 576 (E.D.Pa.1988) ("[T]he adoption of the 1966 amendments to Rule 19 'makes inappropriate any contention that patent co-owners are per se indispensable in infringement suits." ') (quoting Catanzaro v., Int'l Tel. & Tel. Corp., 378 F.Supp. 203, 205 (D.Del.1974)).

Thus, where the co-owner of a patent or other entity or individual whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has brought the suit, courts have held that joinder of the co-owner or other entity or individual is not necessary. See Vaupel Textilmaschinen, 944 F.2d at 875-76 (concluding that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

the policy to join an owner when an exclusive licensee bring suit in order to preclude the possibility of duplicative lawsuits was not undercut where, pursuant to express agreements, the right to sue rested solely with the licensee and denying the defendant's Rule 19 motion); *E-Z Bowz*, 2003 WL 22064257, at *4-5 (holding that the defendant would not be subject to a substantial risk of incurring inconsistent obligations where the former co-owner of certain patents had relinquished her interest in the patents as well as any rights of action relating to the patents and concluding that the rights of the parties could be fairly adjudicated without joinder of the absent former co-owner); *Michaels of Oregon*, 1995 WL 852122, at *2-3 (determining that an absent co-owner of certain patents was not a necessary party where that absent co-owner had entered into an agreement with the plaintiff providing that only the plaintiff might file actions for patent infringement); *compare Parkson Corp. v. Andritz Sprout-Bauer, Inc.*, 866 F.Supp. 773, 775 (S.D.N.Y.1995) (concluding that it was not possible to determine whether an owner was a necessary party to an action brought by an exclusive licensee where the licensing agreement did not unambiguously give the licensee control over whether infringement claims should be brought); *Hawes*, 698 F.Supp. at 577 (concluding that an absent patent co-owner was a necessary party where the defendants might face the risk of relitigation by that co-owner).

*8 Although the complaint alleges that Agilent and H-P jointly own the '138 Patent, it further alleges that Agilent enjoys the exclusive right to enforce the '138 Patent against Micromuse. In opposition to Micromuse's motion, Agilent has submitted a redacted version of an August 22, 2003 agreement between Agilent and H-P (the "August Agreement") regarding their respective rights concerning the enforcement of the '138 Patent. According to the August Agreement, H-P grants to Agilent "the exclusive right to license the ['138] Patent to Micromuse." (Declaration of Megan Whyman Olesek, dated Jan. 15, 2004 ("Olesek Decl."), Exh. X at ¶ 1.) H-P further grants to Agilent "the exclusive right to enforce the ['138] Patent to and against Micromuse" including by "filing and prosecuting the Agilent Patent Suit to final judgment, including appeals." [FN1] (*Id.*) H-P has also agreed that

> FN1. The "Agilent Patent Suit" is defined as "a patent infringement lawsuit against Micromuse." (Olesek Decl., Exh. X, preamble.)

[A]s between the parties, Agilent shall have the full power and authority to control the Agilent Patent Suit and any settlement thereof and shall retain one hundred percent (100%) of any damages or compensation received in connection with the Agilent Patent Suit or settlement thereof.
(*Id.* at ¶ 3.)

Based on the terms of the August Agreement, it does not appear that H-P's absence from this lawsuit will subject Micromuse to any "substantial risk of incurring double, multiple, or otherwise inconsistent obligations," Fed.R.Civ.P. 19(a), because H-P has no independent capacity to file a patent infringement action against Micromuse based on the '138 Patent, having expressly disclaimed any interest in pursuing a claim against Micromuse with respect to the '138 Patent. In light of the broad contractual language by which H-P has granted Agilent the exclusive right to enforce the '138 Patent against Micromuse, the absence of any provision in the August Agreement stating that H-P agrees to be bound by the outcome of this litigation is not determinative here. Likewise, the absence of an affirmative representation that H-P has relinquished its right to sue Micromuse for any purported past infringement does not, contrary to the argument advanced by Micromuse, require joinder of H-P. On the facts now available, it thus appears that complete relief can be accorded among those already parties.

Micromuse has noted, however, that the August Agreement makes explicit reference to the existence of a Master Patent Ownership and License Agreement and that the August Agreement is an agreement among Agilent and H-P "together with Hewlett Packard Development Company, L.P." (Olesek Decl., Exh. X, preamble), an entity that, according to Micromuse, may also have an interest in the '138 Patent. Micromuse has further observed that the redacted form of the August Agreement does not set forth its effective term or termination provisions and suggests that the absence of such provisions raises questions of whether H-P enjoys a reversion, termination, or expiration interest in the ' 138 Patent, questions which may, in turn, affect any determination as to whether H-P is a necessary party here. *See, e.g., Moore U.S.A. Inc. v. Standard Register Co.*, 60 F.Supp.2d 104, 109-110 (W.D.N.Y.1999) (concluding that a licensor was a necessary party to a patent infringement action despite the existence of an agreement with the plaintiff licensee granting the licensee sole and exclusive rights to sue for infringement where the agreement was of fixed term and where the licensor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

Page 7

retained a reversionary interest in the patent).

*9 Although the facts presently available do not establish that H-P is a necessary party, Micromuse's observations suggest that developments resulting from discovery may cause the issue of H-P's joinder to be revisited. Accordingly, Micromuse's motion to join H-P is denied at this time and leave is hereby granted to renew the motion after further discovery.

*IV. Gray Cary Will Not Be Disqualified At This Time*

Micromuse has moved to disqualify Gray Cary from representing Agilent in this matter on the grounds that, for many years, Gray Cary provided extensive legal representation to Network Harmoni, a company acquired by Micromuse in August 2003. Micromuse argues that Network Harmoni's suite of proprietary intelligent software agents is now part of Micromuse's product offerings and, under the current complaint, potentially the target of Agilent's patent infringement claims. Micromuse asserts that Gray Cary thus formerly represented Network Harmoni in matters substantially related to the subject matter of this action and must be disqualified from representing Agilent as a result. Agilent opposes Micromuse's motion, arguing that in its representation of Network Harmoni Gray Cary was at all times in an adverse relationship to Micromuse and that Gray Cary's prior representation of Network Harmoni involved no confidential information about the product or products at issue in the present action. [FN2]

> FN2. Following briefing on Micromuse's motion, Agilent moved for leave to submit a supplemental declaration, claiming the need to respond to certain contentions in Micromuse's reply papers, and Micromuse opposed the motion. Agilent's motion for leave to submit the supplemental declaration is granted. Although submission of supplemental papers is often more of a hindrance than a help, the issues addressed in the supplemental papers presented here are carefully cabined and respond to arguably new contentions contained in reply papers on the underlying motion. Where this is true, and where, as here, the opposing party has disclaimed any prejudice resulting from the submission of the supplemental papers, there is no evidence of bad faith by the party seeking to submit the supplemental papers, and "the parties will be best served by the Court's deciding the ... issue presented to it on the most complete factual

basis possible," *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.,* No. 03 Civ. 200(GEL), 2003 WL 1618534, at *1 (S.D.N .Y. Mar. 27, 2003), leave to submit supplemental papers is appropriately granted.

Motions to disqualify counsel have long been disfavored in this Circuit. *See, e.g., Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791-92 (2d Cir.1983) (enumerating the reasons for which disqualification motions are disfavored); *Bennett Silvershein Assoc. v. Furman,* 776 F.Supp. 800, 802 (S.D.N.Y.1991) ("The Second Circuit has indeed been loathe to separate a client from his chosen attorney ....") (collecting cases). "Disqualification motions are often made for tactical reasons, and thereby unduly interfere with a party's right to employ counsel of his choice." *Skidmore v. Warburg Dillon Read LLC,* No. 99 Civ. 10525(NRB), 2001 WL· 504876, at *2 (S.D.N.Y. May 11, 2001) (citing *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979)). Moreover, disqualification motions, "even when made in the best of faith ... inevitably cause delay." *Evans,* 715 F.2d at 792 (quoting *Nyquist,* 590 F.2d at 1246). A "high standard of proof" is therefore required from one who moves to disqualify counsel. *Id.* at 791 (quoting *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978)). The appearance of impropriety alone does not warrant disqualification. *See Nyquist,* 590 F.2d at 1246-47.

In determining whether an attorney can oppose his former client, courts evaluate whether the new matter is substantially related to the subject matter of the prior representation. An attorney may be disqualified from representing a client in a particular case if:

(1) the moving party is a former client of the adverse party's counsel;

*10 (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Id.* at 791. "Under this standard, proof of substantial similarity must be 'patently clear' to warrant disqualification." *Decora Inc. v. DW Wallcovering, Inc.,* 899 F.Supp. 132, 136 (S.D .N.Y.1995) (quoting *Government of India,* 569 F.2d at 739-40) (additional citations omitted). A "substantial relationship" exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation. *See U.S. Football League v. Nat'l*

Exhibit M
Page 119

Page 8

_Football League_, 605 F.Supp. 1448, 1459-60 & n. 25 (S.D.N.Y.1985) ("It is the congruence of _factual_ matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes.") (emphasis in original).

According to Micromuse, Network Harmoni evolved from a research project in network visualization software conducted at Curtin University in Perth, Australia. In 1996, the founders of the project formed NDG Software, Inc., and in November 1998 the company received its first venture funding and moved its headquarters from Australia to San Diego, California. It is alleged that Gray Cary initially provided advice, counsel and representation in establishing and structuring this U.S.-based company and its operations, and served as outside counsel. Subsequently, NDG Software, Inc., changed its name to Network Harmoni, Inc.

During the time of Gray Cary's representation, Network Harmoni developed and licensed to its customers, including Agilent and Micromuse, proprietary intelligent software agents designed to provide users with information on the status and security of computer networks, systems and applications. Micromuse contends that Gray Cary, during its five-year relationship with Network Harmoni, represented Network Harmoni in its corporate affairs, employment issues, in prosecuting its patents and trademarks and handling other patent and trademark-related matters, in evaluating third-party patents, and in drafting and negotiating licensing agreements, financing instruments and other corporate-related documents.

Over the course of its representation of Network Harmoni, Gray Cary is alleged to have drafted and filed several patent applications with the United States Patent and Trademark Office relating to certain aspects of Network Harmoni's software products and was informed of virtually all attributes and potential uses of Network Harmoni's suite of proprietary intelligent software agents, as well as the company's plans for future software applications and services.

According to Micromuse, Gray Cary represented Network Harmoni in its negotiations to be purchased by Micromuse, and Network Harmoni and Micromuse executed a non-disclosure agreement to assure that the parties could have full and complete discussions without the use of such information for non-acquisition purposes.

*11 It is further alleged that in three rounds of

financing, Gray Cary was allowed to participate on the same basis as the initial preferred investors and became a shareholder of Network Harmoni, and until September 1999, one of its lawyers served as a member of its board of directors. Gray Cary sold its stock in connection with Network Harmoni's acquisition by Micromuse.

In opposition to Micromuse's motion it is alleged that Gray Cary first became aware of a potential claim against Micromuse by Agilent on September 19, 2003, when Agilent approached Gray Cary about the possibility of Gray Cary handling the matter for Agilent. It is also alleged that on December 8, 2003, an ethical wall was established to isolate all attorneys working on Agilent matters from any and all information related to any matter in which Network Harmoni had been a client for the firm.

Agilent asserts that Gray Cary never had an attorney-client relationship with Micromuse and that such a relationship may not be inferred from Micromuse's disclosure of confidential business information to Network Harmoni and its then-counsel Gray Cary during negotiations for the acquisition of Network Harmoni. At present, however, there appears to be no dispute that Micromuse is entitled to seek Gray Cary's disqualification based on Gray Cary's prior representation of Micromuse's wholly owned subsidiary, Network Harmoni. _See generally Harford Accident & Indem. Co. v. RJR Nabisco, Inc._, 721 F.Supp. 534, 539-40 (S.D.N.Y.1989) (concluding that the plaintiff's law firm would be deemed to have previously represented the defendant where the plaintiff's law firm had previously represented the defendant corporation's subsidiary and the defendant corporation had taken in active role with regard to the law firm's representation of its subsidiary); cf. _Decora_, 899 F.Supp. at 137 (concluding that the plaintiff could properly seek disqualification of the defendant's attorney in a patent infringement action where the attorney had previously represented the plaintiff's parent corporation, thereby learning certain of the plaintiff's trade secrets).

Assuming without deciding that the first prong of the test set forth in _Evans_ has therefore been satisfied, Micromuse's motion for disqualification is denied nonetheless, since, to date, Micromuse has not met its burden of proof with respect to establishing a "substantial relationship" between Gray Cary's former representation of Network Harmoni and its current representation of Agilent. It has not been shown that Gray Cary gave Network Harmoni advice on the validity of the patents in suit, including

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2346152 (S.D.N.Y.)
(Cite as: 2004 WL 2346152 (S.D.N.Y.))

whether there was infringement by Network Harmoni of the patents in suit. All that has been established is that Gray Cary advised Network Harmoni on corporate governance issues, employment matters, original equipment manufacturer ("OEM") agreements, patent and trademark filings, and financing instruments. Prior general business representation by the plaintiff's law firm of an entity related to the defendant on matters unrelated to the lawsuit at issue does not meet the high burden of establishing a conflict. *See, e.g., In re Maritima Aragua, S.A.,* 847 F.Supp. 1177, 1182-83 (S.D.N.Y.1994).

*12 The Micromuse products and services alleged to be violative of the Agilent patent will be identified as a consequence of the granting of Micromuse's motion for a more definite statement. Thereafter, discovery may be sought with respect to the knowledge and participation of Gray Cary in the development of any such accused products or services. Should this discovery yield additional facts establishing that the prior representation of Network Harmoni by Gray Cary dealt with issues presented in this action, leave is granted to Micromuse to renew its disqualification motion, which motion is denied at this time.

*Conclusion*

For the reasons set forth above, Micromuse's motion to dismiss the complaint is denied and its motion for a more definite statement is granted. Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion. In addition, Micromuse's motions to add HP as a party and to disqualify Gray Cary are denied at this time with leave to renew. Agilent's motion to file a supplemental declaration is granted.

It is so ordered.

2004 WL 2346152 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

·       1:04CV03090_____(Docket)
(Apr. 22, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926
(Cite as: 2000 WL 516378 (N.D.Cal.))

Page 1

C

Motions, Pleadings and Filings

United States District Court, N.D. California.
Charles BAIRD, et al., Plaintiffs,
v.
CALIFORNIA FACULTY ASSOCIATION, et al.,
Defendants.
No. C-00-0628-VRW.

April 24, 2000.

ORDER.

WALKER, J.

*1 In this action plaintiffs challenge the
constitutional validity of California Government
Code § 3583.5, a recent amendment to the Higher
Education Employer-Employee Relations Act that
permits the collection of "fair share" fees from
represented employees who are not union members.
Cal Gov Code § 3583.5. Before the court are
motions by defendants California Faculty Association
and the California Public Employment Relations
Board to transfer this action to the Eastern District of
California pursuant to 28 USC § 1404(a). For the
reasons stated below, the motion to transfer is
GRANTED.

"For the convenience of the parties and witnesses, in
the interests of justice, a district court may transfer
any civil action to any other district or division where
it might have been brought." 28 USC § 1404(a). It is
undisputed that this action could have been filed in
the Eastern District. The court has broad discretion to
assess the remaining factors (convenience of the
parties, convenience of witnesses and the interests of
justice) within the facts of the particular case. E. & J.
Gallo Winery v. F. & P. S.P.A., 899 F Supp 465, 466
(ED Cal 1994).

Defendants' primary argument for transfer is judicial
economy. An earlier action, in which plaintiffs'
counsel also purports to represent a class of state
university employees challenging section 3583.5, is
pending before Judge Shubb in the Eastern District.
See Friedman, et al. v California State Employees
Association, et al., C-00-0101-WBS (Friedman

Compl) (attached as Exh 1 to Def PERB's Mtn for
Transfer). The constitutional claims under the Equal
Protection Clause and the First Amendment appear
almost verbatim in the complaints of both cases.
Compare Friedman Compl ¶ 67 with Baird Compl ¶
45 (Equal Protection claim) and Friedman Compl ¶
70 with Baird Compl ¶ 48 (First Amendment claim).

The existence of the Friedman case weighs in favor
of transfer in two important respects. First, a major
consideration in the interests of justice analysis is the
desire to avoid duplicative litigation and prevent
waste of time and money. 1 Schwarzer et al., Federal
Civil Procedure Before Trial § 4:271 (citing Van
Dusen v. Barrack, 376 U.S. 612, 616 (1964).
Resolution of related claims in the same forum can
also avoid inconsistent results. See Nieves v.
American Airlines, 700 F Supp 769, 773 (SDNY
1988). Therefore, "[r]elated litigation pending in the
proposed transferee forum is a factor that weighs
heavily in favor of transfer." Coultman v National RR
Passenger Corp., 857 F Supp 231, 235
(E.D.N.Y.1994).

Second, and on a related note, transfer is desirable to
facilitate consolidation with another action pending
elsewhere. See Schwarzer at ¶ 4:274 (citing In re
Eastern Dist Repetitive Stress Injury Litigation, 850
F Supp 188, 196 (E.D.N.Y.1994). Defendants seek
consolidation of this action with Friedman, and while
the court expresses no opinion whether consolidation
is appropriate, transfer will provide the transferee
court the opportunity to consider consolidation as
further enhancement of judicial economy.

*2 In addition, the court concludes that the
convenience of the parties and expected witnesses
favors transfer to the Eastern District. All three of the
defendants are headquartered in Sacramento. And to
the extent that evidence about the legislative process
that led to the enactment of the challenged provision
is required, such evidence will be most easily
accessible to a court located in same district as the
seat of state government.

Plaintiffs' opposition relies almost entirely on the
traditional rule that plaintiff's choice of forum should
be granted substantial deference. See, for example,
Securities Investor Protection Corp. v Vigman, 764
F.2d 1309, 1317 (9th Cir1985). But mechanistic
adherence to this rule is inappropriate in a class

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit N
Page 122

Not Reported in F.Supp.2d
2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926
(Cite as: 2000 WL 516378 (N.D.Cal.))

action in which plaintiffs are dispersed throughout the state. See *IBJ Schroder Bank & Trust Co. v Mellon Bank,* 730 F Supp 1278, 1282 (SDNY 1990).

Finally, the relationship between the forum and the underlying cause of action is tenuous, a fact that further reduces the importance of plaintiffs' choice of forum. See *Chrysler Capital Corp. v. Woehling,* 663 F Supp 478 (D Del 1987).

It is therefore the judgment of the court that the convenience of parties and witnesses and the interests of justice will be served by transfer of this action to the Eastern District of California pursuant to 28 USC § 1404(a). Defendants' motion is GRANTED. All matters presently scheduled for hearing are VACATED and must be renoticed in the Eastern District. The clerk shall transmit the file to the clerk in that district pursuant to Civil LR 3-15.

IT IS SO ORDERED.

2000 WL 516378 (N.D.Cal.), 140 Lab.Cas. P 58,926

Motions, Pleadings and Filings (Back to top)

·          3:00CV00628             (Docket)
(Feb. 24, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit N
Page 123

LEXSEE 2003 US DIST LEXIS 6293

DANIEL B. BOTKIN, SARAH BURNET, in her capacity as Executor on behalf of
the ESTATE OF JANE O'BRIEN, Decedent, Plaintiffs, v. SAFECO INSURANCE
COMPANY OF AMERICA, INC., and Does 1-100, inclusive, Defendants.

No. C 03-0246 WHA 31a

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

*2003 U.S. Dist. LEXIS 6293*

April 14, 2003, Decided
April 14, 2003, Filed; April 16, 2003, Entered in Civil Docket

DISPOSITION: Motion to transfer case granted.

LexisNexis(R) Headnotes

COUNSEL: [*1] For Daniel B. Botkin, Sarah Burnet,
Plaintiffs: Chesterfield Adams Spahr, Law Offices of
Mark L. Webb, San Francisco, CA. Mark L. Webb, Law
Offices of Mark L. Webb, Mill Valley, CA.

For Safeco Insurance Company of America, Inc., Defen-
dant: Mary H. Kim, LaTorraca and Goettsch, Long
Beach, CA. Raymond H. Goettsch, LaTorraca and
Goettsch, Long Beach, CA.

JUDGES: WILLIAM ALSUP, UNITED STATES
DISTRICT JUDGE.

OPINIONBY: William H. Alsup

OPINION:

ORDER TRANSFERRING ACTION TO THE
DISTRICT COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA

INTRODUCTION

In this insurance-coverage dispute, defendant Safeco
Insurance Company of America, Inc. argues that the case
should be transferred to the district court for the Central
District of California. Because this order finds that all of
the material witnesses except plaintiff Botkin are located
in the Central District of California or out-of-state en-
tirely, it finds that convenience to witnesses requires
transfer in the interest of justice. Accordingly, the Clerk

shall TRANSFER this case to the DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA.

STATEMENT

This action arises from a dispute between plaintiff
Daniel B. Botkin and Safeco over coverage [*2] under
his automobile-insurance policy. Since 1983 and until
four months before the filing of this suit, Mr. Botkin was
a resident of Santa Barbara, California, which is in the
Central District. Mr. Botkin purchased a Safeco automo-
bile-insurance policy for the period January 19 through
July 19, 2002. He bought it through Manchester Insur-
ance Agency, Inc., which is also located in Santa Bar-
bara, California. Mr. Botkin's life partner, Jane M.
O'Brien, was listed as a driving member of his household
on the policy. Glenn Estabrook, the Manchester em-
ployee who sold Mr. Botkin the policy, allegedly told
him that both he and Ms. O'Brien were equally and fully
covered by the policy.

In February 2002, Ms. O'Brien was tragically killed
by an uninsured drunk motorist. Mr. Botkin sought cov-
erage from Safeco for Ms. O'Brien's death under the pol-
icy. Ms. O'Brien was not a named insured on the policy.
Furthermore, Ms. O'Brien and Mr. Botkin were not le-
gally married, nor had they filed a notice of domestic
partnership. On these grounds, Safeco denied coverage.
Mr. Botkin's uninsured-motorist claim was handled by
various Safeco employees working in Safeco's offices in
Fountain Valley, Orange County [*3] and in Glendale,
Los Angeles County, California -- both counties within
the Central District.

Plaintiff Sarah Burnett is the executrix of the estate
of Ms. O'Brien. She is a resident of the state of Florida.
On December 17, 2002, Ms. Burnett and Mr. Botkin
filed suit against defendant Safeco in San Francisco Su-

perior Court. Safeco was served on December 19, 2002. On January 17, 2003, Safeco removed the instant action here and on January 22, filed an answer.

In response to Safeco's removal, on January 29, plaintiffs filed a second action in San Francisco Superior Court. This second action was the same as the first action, but in an apparent effort to defeat removal, it added non-diverse defendants Manchester Insurance Agency, Inc. and Glenn Estabrook. n1

> n1 On February 24, Safeco filed a motion to dismiss this second complaint on the grounds that there is an identical action pending in federal court. On March 28, 2003, the state court denied the motion without prejudice.

On February 14, Safeco filed the instant [*4] motion to transfer this case to the United State District Court for the Central District of California, noticing a hearing for March 27. On March 3, plaintiffs filed a notice of voluntary dismissal under *Rule 41(a)*, which notice was improper since an answer had already been filed. Plaintiffs did not file the opposition to defendants' motion to transfer due on March 13, and Safeco did not file the reply due March 20. On March 21, this Court struck plaintiff's notice of dismissal and continued the hearing on the motion to transfer. Oral argument was heard on April 10.

For the benefit of the transferee court, this order highlights two other motions which currently are pending in this Court in this case. On March 27, plaintiffs filed a motion to dismiss this action on the grounds that it is identical to the second state-court action. Additionally, on March 28, Safeco filed a motion for leave to file a third-party complaint against Manchester Insurance Agency, Inc. and Glenn Estabrook.

## ANALYSIS

### General Standards for Transfer.

*28 U.S.C 1404(a)* provides for transfer by a district court. It states, in pertinent part:

> For the convenience of the [*5] parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

First, the party seeking the transfer has the burden to establish that the transferee court would have had sub-. ject-matter jurisdiction, defendants would have been subject to personal jurisdiction, and venue would have been proper. *Hoffman v. Blaski, 363 U.S. 335, 343-44, 4 L. Ed. 2d 1254, 80 S. Ct. 1084 (1960)*.

Here, the subject-matter jurisdiction requirement is met based on diversity of citizenship. *28 U.S.C. 1332.* Safeco is a resident of the state of Washington, with its principal place of business in Seattle. The personal-jurisdiction requirement is met since Safeco consents to jurisdiction. Proper venue is dictated by *28 U.S.C. 1391(a)*, which provides that: "A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . ." Here, Safeco transacts [*6] business in Los Angeles and Orange counties within the Central District of California, and the employees who handled Mr. Botkin's claim work in those counties. The insurance agency and agent from whom Mr. Bokin purchased the policy are located in Santa Barbara county within the Central District of California. Furthermore, at the time the parties entered into the insurance contract at issue in this case, Mr. Botkin resided in Santa Barbara county. Accordingly, venue would be proper in the Central District of California.

Having found these initial requirements are met, this order must explore whether defendant Safeco has provided a rationale sufficient to defeat the presumption in favor of plaintiffs' chosen forum. In judging the weight to be given to a plaintiffs' choice of forum, "consideration must be given to the extent both of the defendant's business contacts with the chosen forum and of the plaintiffs' contacts, including those relating to [plaintiff's] cause of action." *Pac. Car and Foundry Co. v. Pence, 403 F.2d 949; 954 (9th Cir. 1968)*. "If the operative facts have not occurred within the forum of original selection and that forum has no particular interest [*7] in the parties or the subject matter, the plaintiff's choice is only entitled to minimal consideration." *Ibid.* In determining which district is more convenient for witnesses, the identity of the witnesses, the location of the witnesses' residences and the substance of their testimony are factors to be considered. *A. J. Indus., Inc. v. United States Dist. Ct., 503 F.2d 384, 389 (9th Cir. 1974)*.

### Convenience of the Witnesses.

As noted above, a court can transfer an action based upon the convenience of the parties and the witnesses in the case. Here, all of the actions at issue in this case occurred within Santa Barbara County, Orange County or Los Angeles County. All of these counties are within the Central District. The subject policy was sold in Santa Barbara, the premiums were paid in Santa Barbara, and

Exhibit O
Page 125

plaintiff Botkin resided in Santa Barbara until shortly before initiating this action. The claim was handled by Safeco employees located in counties in the central district and both defendant insurance agents still reside in Santa Barbara.

Safeco noted, and plaintiffs did not dispute, that the following witnesses, all of whom reside within the Central District [*8] of California, are anticipated to testify at trial: (1) Dawn Jeworski, regional claims analyst for Safeco, works in Fountain Valley office; (2) Karen Perrin, underwriter for Safeco, works in Fountain Valley office; (3) Brent French, supervisor in Safeco's Glendale office which sent Mr. Botkin's denial letter; (4) Glen Estabrook, and his assistant (5) Karen Guije, who are employed with Manchester Insurance Agency in Santa Barbara.

The only significant persons who do not reside in the Central District are Mr. Botkin, Ms. Burnett and Mick Pagach. Mr. Pagach worked in Safeco's Glendale office and sent Mr. Botkin denial letter. He currently lives in Idaho and no longer works for Safeco. Ms. Burnett, the executrix of Ms. O'Brien's estate, resides in Florida. Accordingly, the convenience for these two individuals is not affected by whether or not transfer is granted.

Mr. Botkin resided in the Central District until a few months before filing suit, including when he obtained the policy at issue and when he initiated the claim against Safeco. It is true that Mr. Botkin has relocated to San Francisco. All of the activities alleged in the complaint, however, occurred in the Central District. [*9] This order acknowledges that plaintiff Botkin's deposition was taken by Safeco in San Francisco before he filed this suit, but finds this is not dispositive. That Safeco choose not to inconvenience Botkin (and his attorneys) on that single occasion holds little weight against the clear concern

regarding convenience of all the other witnesses in the case. While the Court is sympathetic to Mr. Botkin's situation, it finds that the maintenance of this action in the Northern District of California would not be in the interest of justice.

* * *

Plaintiffs' opposition centers almost entirely on the appropriateness of California as a forum for their dispute. Defendants, however, do not request transfer to a forum outside California. Plaintiffs appear to be arguing that the California state court in the County of San Francisco should handle this action. This argument, while perhaps appropriate for a proper motion to dismiss, does not go to the considerations at issue in this motion for transfer.

Additionally, plaintiffs' contention that this motion to transfer is moot based on lack of diversity is completely with merit. Plaintiffs have yet to join in any defendants whose residence would [*10] destroy diversity in this case. The fact that such defendants have been named in plaintiffs' state-court action is inapposite.

Accordingly, this order finds that the Central District is the more appropriate forum to handle this action.

### CONCLUSION

For the foregoing reasons, a transfer to the district court for the Central District of California is required in the interest of justice and efficiency. Accordingly, the Clerk shall TRANSFER this action.

IT IS SO ORDERED.

Dated: April 14, 2003.

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

LEXSEE 2004 US DIST LEXIS 14907

TONY COLIDA, a citizen of Canada, Plaintiff, -against- SONY CORPORATION
OF AMERICA and SONY ERICSSON COMMUNICATION (USA) INC., Defen-
dants.

04 Civ. 2093 (RJH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2004 U.S. Dist. LEXIS 14907*

July 29, 2004, Decided
August 2, 2004, Filed

SUBSEQUENT HISTORY: Summary judgment
granted by, Complaint dismissed at, Sanctions disal-
lowed by *Colida v. Sony Corp. of Am., 2005 U.S. Dist.
LEXIS 1545 (S.D.N.Y., Feb. 2, 2005)*

DISPOSITION: Defendant's motion to dismiss was
granted. All claims against SCA were dismissed.

LexisNexis(R) Headnotes

COUNSEL: [*1] Tony Colida, Plaintiff, Pro se, Kirk-
land, Quebec Canada.

JUDGES: Richard J. Holwell, United States District
Judge.

OPINIONBY: Richard J. Holwell

OPINION:  ·

MEMORANDUM OPINION AND ORDER

*Pro se* plaintiff Tony Colida ("Colida" or "plaintiff")
filed the above-captioned complaint seeking damages
and injunctive relief against defendant corporations, who
he alleges infringed two United States design patents for
cellular telephones by manufacturing, selling, or offering
to sell the "Sony Ericsson Z-600 cellular phone." Defen-
dant Sony Corporation of America ("SCA") has moved
to dismiss all claims against it pursuant to *Rules 12(b)(1)
and 12(b)(6)* on the grounds that it is not a proper party
because it does not manufacture, sell, or offer to sell the
allegedly infringing product. Based on the submissions
of both parties, the Court concludes that SCA has made a
sufficient showing that it is not a proper party to justify
dismissal of all claims against this defendant.

In support of its motion to dismiss, SCA has submit-
ted the sworn declaration of the Jaime A. Siegel, Senior
Director of Licensing and Intellectual Property of SCA
("Siegel Decl."). That declaration states that the allegedly
infringing [*2] phone is sold by Sony Ericsson Mobile
Communications (USA) Inc. ("Sony Ericsson"), not
SCA, and that SCA is a separate corporate entity that has
only an attenuated, indirect relationship to Sony Ericsson
in that "SCA's ultimate corporate parent, Sony Corpora-
tion, a Japanese corporation, and Ericsson AB, a Swiss
corporation, are partners in a joint venture, Sony Erics-
son Mobile Communications AB, a Swedish corporation,
which is the parent company of Sony Ericsson." Siegel
Decl. P2. The declaration further states that "SCA does
not manufacture, market, sell, offer for sale, repair or
support" the allegedly infringing product. *Id.* Siegel fur-
ther declares that prior to the commencement of this ac-
tion, Colida contacted SCA to warn them of his intention
to file suit, whereupon Siegel informed Colida in writing
of SCA's lack of involvement in manufacturing or selling
the allegedly infringing phone and provided Colida with
contact information for the intellectual property general
counsel at Sony Ericsson. *Id.* at P4 & Ex. A. In response,
Colida wrote to inform SCA that he had commenced an
action against SCA. *Id.* at P5 & Ex. B. SCA contacted
Colida, offering to provide him with a [*3] sworn affi-
davit stating that SCA was in no way involved with the
allegedly infringing product. In that conversation, Colida
adverted to a newspaper article he had seen that had
characterized Sony Ericsson as a joint venture between
"Sony" and Ericsson and cited it as the basis for his nam-
ing SCA as a party in this action. *Id.* at P6 & Ex. C.
Colida stated that he would not drop SCA as a party
unless SCA paid him a settlement. *Id.*

In opposition to this motion, Colida has submitted a copy of an order issued by the Hon. William A. Webb, Magistrate Judge for the Eastern District of North Carolina, Western Division, in an unrelated matter entitled *Tony Colida v. Ericsson, Inc.* In that order, apropos of a potential recusal issue arising from Judge Webb's social acquaintanceship with the Vice President for Human Relations at Sony Ericsson, Inc., the court wrote: "Addressing the Court's inquiry regarding the corporate relationship between Defendant and Sony-Ericsson, Mr. Bennett [counsel for defendant] explained that Sony-Ericsson was a joint venture between Sony Corp. and Ericsson, Inc., that manufactured the mobile phones which are sold by Sony and for which Ericsson develops [*4] the micro-chip technology." Enclosure to letter from Colida to the Court dated June 24, 2004, at 2. Colida argues in effect that this statement memorializes an admission that "Sony" sells cell phones, and therefore that SCA is the proper party. In reply, SCA submitted a declaration from David E. Bennett, counsel for defendant in the North Carolina case, stating that he had told the judge during a telephone conference that "Sony was a seller of cellular phones," but that he had been referring to Sony's business activities prior to the joint venture between Sony Corporation and Ericsson, Inc. that had formed Sony Ericsson. Sur-Reply [*sic*] Mem. of Law in Further Support of Mot. to Dismiss Claims Against Def. SCA, Bennett Decl. P3. Bennett declared that he did not represent to the court that SCA sells mobile phones made by Sony Ericsson, and that the North Carolina court misconstrued his statements during the telephone conference. *Id.* Attached to Bennett's declaration is a transcript of the telephone conference, which bears out the representations contained in the declaration. Bennett Decl. Ex. A.

The evidence submitted by plaintiff fails to demonstrate that SCA is involved [*5] in cellular phone manufacture, marketing, or sale. The ambiguous statement in the North Carolina court's Order appears to be an imprecise or inaccurate interpretation of a statement made by counsel before that court, and does not constitute an admission or evidence that SCA is a proper party to this action. SCA's submissions amply demonstrate that SCA is not involved in the manufacture or sale of the allegedly infringing cellular phone. As defendant points out, Mem. of Law in Support of Mot. to Dismiss Claims Against Def. SCA at 7-8, liability for infringing pursuant to *35 U.S.C. § 271* requires a showing that the defendant makes, uses, offers to sell, sells, or imports without authority any patented invention, or actively induces or contributes to the infringement of a patented invention. *35 U.S.C. § 271*. Because it does not appear that plaintiff can make such a showing as to SCA, defendant SCA's motion [5-1] is granted, and all claims against SCA are hereby dismissed for failure to state a claim upon which relief may be granted.

Plaintiff shall have sixty (60) days to serve summons and complaint upon the other defendant named in the [*6] action. If plaintiff amends his complaint, service of the amended complaint must be made upon all defendants named in the action within this period. If proper service is not effected within this period, this action shall be dismissed in its entirety.

A pretrial conference shall be held in this matter on Tuesday, September 28, 2004, at 11:00 a.m. in Room 17B, 500 Pearl Street.

SO ORDERED.

Dated: New York, New York ·

July 29, 2004

Richard J. Holwell

United States District Judge

LEXSEE 1991 US DIST LEXIS 7463

JAMES D. DRUCKER v. BEN FERNANDEZ; KEVIN W. KRAUSE; ELI
JACOBSON; RON MINEGAR; TOM McMILLAN; JOHN SAMUELSEN; JERRY
FRANK; MARTIN I. FRIEDMAN; STEVEN V. LESNIK, LARRY M. STONE;
STEVE BAXTER; CAPITAL DISTRICT BASKETBALL CORPORATION d/b/a
ALBANY PATROONS; KG HOOPS, INC. d/b/a CEDAR RAPIDS SILVER
BULLETS; COLUMBUS BASKETBALL, INC. d/b/a COLUMBUS HORIZON;
THE LA CROSS CATBIRDS, INC. d/b/a LA CROSSE CATBIRDS; KEEP
BASKETBALL IN PENSACOLA, INC. d/b/a PENSACOLA TORNADOS; RAPID
CITY PROFESSIONAL SPORTS, INC. d/b/a RAPID CITY THRILLERS;
ROCKFORD LIGHTNING, INC. d/b/a ROCKFORD LIGHTNING; KEMPER-
LESNIK BASKETBALL, INC. d/b/a SIOUX FALLS SKYFORCE;
PROFESSIONAL SPORTS AFFILIATES, INC. d/b/a TULSA FAST BREAKERS;
and SOUTHERN RECREATION GROUP, INC. d/b/a WICHITA FALLS TEXANS

Civil Action No. 90-5797

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1991 U.S. Dist. LEXIS 7463*

June 3, 1991, Decided
June 3, 1991, Filed

LexisNexis(R) Headnotes

COUNSEL: [*1]

JOSEPH F. RODA, JOSEPH F. RODA, P.C.,
LANCASTER, Pennsylvania, for Plaintiff.

ELIZABETH E. UTZ, FRUMKIN, SHRALOW &
CERULLO, P.C., M. MELVIN SHRALOW, FRUMKIN
SHRALOW & CERULLO, PHILADELPHIA, Pennsyl-
vania, for Defendants.

JUDGES:

Jay C. Waldman, United States District Judge.

OPINIONBY:

WALDMAN

OPINION:

MEMORANDUM

Plaintiff alleges that defendants, members of the
Continental Basketball Association ("CBA") and its

board of directors, acted to defraud him in his sale of an
inactive CBA franchise. Presently before the court are
defendants' motions to dismiss for lack of personal juris-
diction, for failure to state a claim and for lack of subject
matter jurisdiction. Oral argument was held on May 22,
1991.

### I. BACKGROUND

The CBA is a joint venture among the member
clubs, incorporated as a non-profit association under the
laws of Pennsylvania. See Letter from Eric R. Jacobsen
to Judy L. Hartley, at 2, 8 (April 27, 1990). The CBA is
managed by a board of directors with each club selecting
one director. Id. at 2. The CBA, as agent for the member
clubs, contracts for, collects and distributes revenues
from radio and television broadcasting contracts. Id. at
10-11.

In 1988 and 1989, plaintiff owned an [*2] inactive
franchise in the CBA. He had the option to begin operat-
ing his franchise at any time up to the start of the 1991-
92 basketball season. From the summer of 1988, plaintiff
was trying to sell his franchise. Defendants, through the
CBA organization, were attempting to market additional
CBA expansion franchises. The CBA had the power to

approve or disapprove any sale which plaintiff might propose.

Plaintiff alleges that his ongoing negotiations with prospective purchasers threatened defendants' ability to fix the prices for new expansion franchises. He alleges that defendants devised a scheme to induce him to sell his franchise as quickly as possible at a rate substantially below its market value. At the heart of the alleged scheme was a vote by the CBA directors to reduce the expansion franchise fee from $ 500,000 to $ 350,000 with the hidden intent not to sell any new franchise at that rate. Plaintiff alleges that this action induced him to sell at $ 385,000, and that thereafter the defendants immediately returned the expansion fee to $ 500,000.

Plaintiff alleges that defendants engaged in fraud, negligent misrepresentation, conspiracy and a breach of the duty of good faith. [*3] n1

> n1 On May 28, 1991, plaintiff filed a motion for leave to amend his complaint by adding RICO and antitrust claims.

## II. LACK OF PERSONAL JURISDICTION

In deciding a motion to dismiss for lack of personal jurisdiction the allegations of the complaint are taken as true, however, the burden of proof remains with the plaintiff to demonstrate a jurisdictional predicate by competent proof. See *Time Share Vacation Club, 735 F.2d at 65; Jaffe v. Julien, 754 F. Supp. 49, 51 (E.D. Pa. 1991); Packard Press Corp. v. Com Vu Corp., 584 F. Supp. 73, 76 (E.D. Pa. 1984); Strick Corp. v. A.J.F. Warehouse Distributors, Inc., 532 F. Supp. 951, 953 (E.D. Pa. 1982).*

Under Rule 4(e), federal district courts may assert personal jurisdiction over a nonresident to the extent permissible under the law of the state in which the district court sits. See *Fed. R. Civ. P. 4(e); Rees v. Mosaic Technologies, Inc., 742 F.2d 765, 767 (3d Cir. 1984).* [*4] The applicable Pennsylvania statute extends jurisdiction over nonresidents to the fullest extent permitted by the federal due process clause. See *42 Pa. Cons. Stat. Ann. § 5322; Dollar Savings Bank v. First Security Bank, 746 F.2d 208, 211 (3d Cir. 1984); Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984).*

Under the due process clause, a court may not exercise jurisdiction over a nonresident defendant unless the defendant has established certain minimum contacts, ties or relations with the forum state. *International Shoe Co. v. Washington, 326 U.S. 310, 319 (1945).* A two-part test is employed to determine whether a defendant's contacts

are sufficient to sustain jurisdiction. See *Gehling v. St. George's School of Medicine, Ltd., 773 F.2d 539, 540-42 (3d Cir. 1985); Dollar Savings Bank v. First Securities Bank of Utah, 746 F.2d 208, 211-214 (3d Cir. 1984)*

The first step is to determine whether the cause of action arose from defendants' forum-related activity. *Gehling, 773 F.2d at 541.* If it did, plaintiff must show that defendants [*5] "purposely availed themselves of the privileges of conducting activities within the forum state, thus invoking the benefits and protection of its laws," *Hanson v. Denckla, 357 U.S. 235, 253 (1958),* such that they should reasonably "anticipate being haled into court here," *World-wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980);* and, that jurisdiction in Pennsylvania does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington, 362 U.S. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457 (1940)).*

If the claim arose from a nonforum-related activity, plaintiff must show that in some respect defendants maintained "continuous and substantial" forum affiliations. See *Gehling, 773 F.2d at 541; Reliance Steel Products v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 588-89 (3d Cir. 1982).* The latter ("general jurisdiction") requires a substantially stronger showing of forum contact than the former ("specific jurisdiction"). *Id. at 589.*

There is little doubt that the court could constitutionally [*6] exercise jurisdiction over the CBA. n2 To support jurisdiction over the defendants in question, plaintiff principally relies on the so-called "tort-out/harm-in" provision of the Pennsylvania long-arm statute. *42 Pa. Cons. Stat. Ann. § 5322(a)(4).* Where jurisdiction is premised upon an out-of-state tort allegedly resulting in in-state harm, "the task of determining whether a plaintiff's cause of action arose out of a defendant's forum-related activities is often perplexing." *Simkins Corp. v. Gourmet Resources Intern., 601 F. Supp. 1336, 1340 (E.D. Pa. 1985).* Because § 5322(a)(4) provides for jurisdiction by "creating either a fictional contact with, or a fictional presence within the forum," it does not fit well with the jurisdictional analysis set forth in Gehling and Dollar Savings. *Id. at 1340-41.*

> n2 "It has long been assumed that general jurisdiction over a corporation is always available in the state of incorporation." George, In Search of General Jurisdiction, *64 Tul. L. Rev. 1097 (1990);* Twitchell The Myth of General Jurisdiction, *101 Harv. L. Rev. 610, 633 n.111 (1988).* There is, however, surprisingly little primary authority for the proposition. See George, supra, at n.31. One commentator has suggested that "this

form of jurisdiction is so well accepted that it is never challenged." Twitchell, supra, at 633 n.111. The usual justification for this assertion is that the state of incorporation is the equivalent of a corporation's domicile. George, supra. See also Bane v. Netlink, Inc., 925 F.2d 637, 640 (3d Cir. 1991).

[*7]

In Simkins, the plaintiff argued that the court had jurisdiction because it was "reasonably foreseeable" that the defendants' out-of-state tortious conduct would cause harm in Pennsylvania. The Court made it clear, however, that regardless of how far the language of § 5322(a)(4) may reach, the minimum contacts analysis must be adhered to.

Foreseeability alone is not sufficient to confer personal jurisdiction, but rather, in the jurisdictional context, "foreseeability is limited to ascertaining whether 'the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.'" Id. at 1341 (quoting World-Wide Volkswagen, 444 U.S. 286, 297 (1980)). n3 The "sine qua non of in personam jurisdiction is not foreseeability alone. It is the lack of forum affiliation to the transaction giving rise to [a] claim that precludes assertion of jurisdiction." Emery Corp. v. Century Bancorp., Inc., No. 82-1204, slip op. at 5 (E.D. Pa. Dec. 23, 1982) (refusing to distinguish intentional tortious conduct from negligent conduct). n4

n3 As a general proposition, the satisfaction of a statutory long arm standard does not obviate the need for a due process inquiry. See Moran v. Metropolitan District Council of Philadelphia, 640 F. Supp. 430, 435 (E.D. Pa. 1986).

[*8]

n4 Plaintiff relies on Calder v. Jones, 465 U.S. 783 (1984). In Calder, however, the defendant had caused the allegedly defamatory publication on which plaintiff's claim was based to be circulated in the forum state.

In his verified statement, plaintiff alleges that the conduct complained of occurred when defendants met several times at CBA board meetings and through conference telephone calls in which expansion franchise fees were discussed. The CBA maintains its offices and conducts its business in Denver. Plaintiff has not alleged or submitted evidence to show that any of the corporate defendants had any contact with Pennsylvania other than the general allegation that the defendants committed a tort which was reasonably calculated to cause economic loss to someone who lived in Pennsylvania. n5

n5 Plaintiff made no specific allegation or showing as to what particular act each defendant undertook. The acts of one alleged co-conspirator cannot be attributed to the others for jurisdictional purposes in the absence of the performance of "substantial" acts in furtherance of the conspiracy within the forum state. In re Arthur Treacher's Franchise Litigation, 92 F.R.D. 398, 411 (E.D. Pa. 1981) (finding jurisdiction only as to alleged conspiring association members who acted within the forum state). In his proposed amended complaint, plaintiff alleges that the commissioner of the CBA, appointed by and presumably acting at the behest of the board of directors, telephoned and directed correspondence to plaintiff in Pennsylvania. This would not be sufficient to establish jurisdiction over the commissioner, let alone those at whose behest he may have acted. See Coleman Financial Services v. Charter Equipment Leasing Corp., 708 F. Supp. 664, 668 (E.D. Pa. 1989); Bucks County Playhouse v. Bradshaw, 577 F. Supp. 1203, 1209 (E.D. Pa. 1983); Emery Corp., supra; Rogers v. Icelandair/Flugleider International, 522 F. Supp. 670 (E.D. Pa. 1981); Baron & Company. Inc. v. Bank of New Jersey, 497 F. Supp. 534, 538 (E.D. Pa. 1980).

[*9]

Plaintiff never operated a franchise in Pennsylvania (or anywhere else), and what showing has been made suggests that he was negotiating to sell his option to operate a team in states other than Pennsylvania. The franchise was in fact sold to a non-resident for use in Grand Rapids, Michigan. Defendants could reasonably anticipate being haled into court in a jurisdiction where they regularly meet and where they met to make the decisions complained of here. The Court finds, however, that there is a lack of requisite contacts between the corporate defendants and the Commonwealth and that they reasonably should not have anticipated being haled into court in Pennsylvania.

Two of the corporate defendants, Capital District Basketball Corporation and Southern Recreation Group, Inc., have not filed any responsive pleading. Thus, they have not waived their rights to contest personal jurisdiction. See Fed. R. Civ. P. 12(h)(1). Because they have not filed a Rule 12(b)(2) motion to dismiss or joined in the

motion filed by their co-defendants; however, the court cannot dismiss the action as to these defendants.

In resisting jurisdiction, the individual defendant directors rely primarily on [*10] the holding in Simkins that "a plaintiff seeking to establish personal jurisdiction over an individual corporate officer or director on the basis of tortious conduct committed in the exercise of his corporate duties must prove, by a preponderance of the evidence, that the non-resident officer or director independently has sufficient forum-related contacts." *Simkins, 601 F. Supp. at 1345.*

Decisions in this circuit vary as to whether in personam jurisdiction may be asserted over a non-resident corporate officer or director for his role in tortious conduct based solely on acts taken in his corporate capacity. Compare Hough/Lowe Associates, Inc. v. CLX Realty Company, No. 90-5859 (E.D. Pa. Mar. 29, 1991); In re Arthur Treacher's Franchisee *Litigation, 92 F.R.D. at 421 n.34; Donner v. Tams-Witmark Music Library, 480 F. Supp. 1229, 1234 (E.D. Pa. 1979); Lightning Systems v. International Merchandising Assoc., Inc., 464 F. Supp. 601 (W.D. Pa. 1979); Vespe Contracting Company v. Anvan Corporation, 433 F. Supp. 1226 (E.D. Pa. 1979)* (personal involvement in tortious conduct is sufficient) [*11] with *Simkins, supra; Simpson v. Lifespring, Inc., 572 F. Supp. 1251 (E.D. Pa. 1983); PSC Professional Serv. Group, Inc. v. American Digital Systems, Inc. 555 F. Supp. 788 (E.D. Pa. 1983)* (additional independent contacts are necessary).

Some of the more recent decisions suggest that a hard-line rule is inappropriate. In *Moran v. Metropolitan Dist. Council of Philadelphia and Vicinity, 640 F. Supp. 430, 434 (E.D. Pa. 1986),* the Court declined to follow any "hard and fast" rule and concluded that consideration of an individual's corporate contacts for jurisdictional purposes may be appropriate under certain circumstances, such as where he personally engaged in egregious activity on behalf of the corporation. Id.

Following this flexible approach, the Court in *Rittenhouse & Lee v. Dollars & Sense, Inc., No. 83-5996 (E.D. Pa. April 15, 1987) (1987 Westlaw 9663)* and Minigraph, Inc. v. Qualitech Computer Centers, Inc., No. 86-5869 (E.D. Pa. July 1, 1987) (1987 Lexis 5951) concluded that under certain circumstances, jurisdiction over corporate officers in their personal capacities may be based on acts performed [*12] in their corporate capacity. The factors relevant in the jurisdictional analysis include the officer's role in the corporate structure; the nature and quality of the officer's forum contacts; and, the extent and nature of the officer's personal participation in the tortious conduct. Minigraph, 1987 Lexis 5951, at 7; *Rittenhouse & Lee. 1987 Westlaw 9665, at 5 n.6.* When personal jurisdiction is asserted on the basis of a

director's corporate activities; however, only those actions taken within the forum are to be considered. Minigraph, 1987 Lexis 5951, at 7.

These lines of cases, however, involve directors or officers of foreign corporations. In this case, the individual defendants are directors of a Pennsylvania corporation.

The Pennsylvania long-arm statute provides for the exercise of jurisdiction over any person, "accepting election or appointment or exercising powers under the authority of this Commonwealth as a: . . . (iv) Director or officer of a corporation." *42 Pa. Cons. Stat. Ann. § 5322(7)* (Purdon 1981). There are no cases directly addressing this provision and none of the parties focused on the issue in their briefs or oral arguments. Courts in Delaware, however, [*13] interpreting a similar provision, have refused to extend jurisdiction to individuals based solely on their status as directors or officers of Delaware corporations. See *Pestolite, Inc. v. Cordura Corporation. 449 A.2d 263 (Del. Super. 1982).* The court in Pestolite stated:

The mere status as director of a Delaware corporation, standing alone, is not a significant basis for the individual Defendants to reasonably anticipate being haled into this Court. To rest jurisdiction solely on that basis would violate "traditional notions of fair play and substantial justice."

*Id. at 267.* See also *Rollins Environmental Services (FS) v. Wright, 738 F. Supp. 150 (D. Del. 1990).*

In the instant case, however, the very conduct complained of was undertaken by the individual defendants in their capacity as directors and made possible only by virtue of their corporate positions. By accepting and exercising the powers of directorships of a Pennsylvania corporation, these defendants purposely invoked the benefits and protection of Pennsylvania law. Wherever they act, when the defendant directors act in their official capacities as a board, [*14] they are acting pursuant to and by virtue of powers conferred by the laws of Pennsylvania. When they commit wrongful acts in exercising their duties as directors, they fairly and reasonably should anticipate being called to answer for such conduct in Pennsylvania. See *Pittsburgh Terminal Corp. v. Mid Allegheny Corp., 831 F.2d 522, 527-30 (4th Cir. 1987).*

### III. DEFENDANTS' OTHER MOTIONS

Defendants' motion to dismiss for failure to state a claim is intertwined with their motion to dismiss for lack of subject matter jurisdiction. Defendants contend that because the actions complained of were taken on behalf of the CBA, no cause of action is stated against the CBA

members and directors, and diversity is destroyed because the CBA is the real party in interest. n6

> n6 Since the CBA is incorporated in Pennsylvania and plaintiff is a citizen of Pennsylvania, joinder of the CBA as a defendant would destroy diversity.

An individual, including a director, officer or agent of a corporation, may be liable for [*15] injuries suffered by third parties because of his torts, regardless of whether he acted on his own account or on behalf of a corporation. *Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986); Donosco, Inc. v. Casper Corporation, 587 F.2d 602, 606 (3d Cir. 1978).* The fact that an officer or director is acting for a corporation also may make the corporation vicariously or secondarily liable, but it does not relieve the individual of his liability. *Donosco, 587 F.2d at 606; Zubik v. Zubik, 384 F.2d 267, 275 (3d Cir. 1967),* cert. denied, *390 U.S. 988 (1968).* Plaintiff has sufficiently alleged actionable conduct by the individual defendants.

As to defendants' motion to dismiss for lack of subject matter jurisdiction, their reliance on *McSparran v. Weist, 402 F.2d 867 (3d Cir. 1968)* is misplaced. In McSparran, an out-of-state "straw" guardian was chosen to represent a minor who was injured in an automobile accident. The Court held that it did not have jurisdiction over the case because diversity was "manufactured" in violation of *28 U.S.C. § 1359.* [*16] Section 1359 provides:

> A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

Section 1359 says nothing about a plaintiff who chooses to sue fewer than all potential defendants, the situation in the present case.

It is well-established that a federal court, in its determination of whether there is diversity of citizenship between the parties, must disregard nominal or formal parties and determine jurisdiction based only upon the citizenship of the real parties to the controversy. *Navarro Savings Ass'n. v. Lee, 446 U.S. 458 (1980):*

Early in its history, [the Supreme Court] established that the 'citizens' upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy. *McNutt v. Bland, 2 How. 9, 15 (1844);* see *Marshall v. Baltimore & Ohio R. Co., 16 How. 314, 328-329 (1854); Coal Co. v. Blatchford, 11 Wall. 172, 177*

*(1871).* Thus a federal court must disregard nominal or formal parties and rest jurisdiction only [*17] upon the citizenship of real parties to the controversy. E.g., *McNutt v. Bland, supra, at 14;* see 6 C. Wright & A. Miller, Federal Practice & Procedure § 1556, pp. 710-711 (1971)

Id. at 460-61.

A real party defendant in interest is one who has the duty sought to be enforced or enjoined. *Sun Oil Co. of Pennsylvania v. Pennsylvania Dept. of Labor & Industry, 365 F. Supp. 1403, 1406 (E.D. Pa. 1973).* In contrast to a "real party in interest," a formal or nominal party is one who, in a genuine legal sense, has no interest in the result of the suit, *Grant County Deposit Bank v. McCampbell, 194 F.2d 469, 472 (6th Cir.: 1952); Bedell v. H.R.C. Ltd., 522 F. Supp. 732, 736 (E.D. Ky. 1981),* or no actual interest or control over the subject matter of the litigation. *Stonybrook Tenants Ass'n. Inc. v. Alpert, 194 F. Supp. 552, 556 (D. Conn. 1961).* See also *Rose v. Giamatti, 721 F. Supp. 906, 914-22 (S.D. Ohio 1989).*

Plaintiff is not seeking to enjoin the CBA. He seeks affirmative relief from the individual and corporate defendants. Based on the present record, the [*18] Court could not find that the CBA is the real party in interest. See 3A J. Moore, Moore's Federal Practice para. 17.04, at 17-21 (1990) (corporation is real party in interest for diversity purposes where plaintiff does not seek affirmative relief from individual officer or director). n7

> n7 See also *National Association of Realtors v. National Real Estate Association, Inc., 894 F.2d 937, 940 (7th Cir. 1990).*

The court also must consider all indispensable parties in determining whether jurisdiction is present. See *Moore v. Ashland Oil, Inc., 901 F.2d 1445 (7th Cir. 1990); Camden Securities Company v. Lupowitz, 500 F. Supp. 653 (E.D. Pa. 1980);* C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3606 (1984 & Supp. 1991). None of the parties addressed the issue of whether the CBA is an indispensable party and, on the present record, it does not appear to be such. n8

> n8 See *Fed. R. Civ. P. 19; Bank of America National Trust and Savings Association v. Hotel Rittenhouse Associates, 844 F.2d 1050 (3d Cir. 1988); Nottingham v. General American Communications Corp., 811 F.2d 873 (5th Cir.),* cert. denied, *484 U.S. 854 (1987); Gold v. Johns-Mansville Sales Corp., 723 F.2d 1068 (3d Cir. 1983); United States v. Price, 523 F. Supp. 1055*

Exhibit Q
Page 133

1991 U.S. Dist. LEXIS 7463, *

*(D.N.J. 1981)*, affirmed, *688 F.2d 204 (3d Cir. 1982)*.

[*19]

Accordingly, defendants' motions to dismiss for failure to state a claim and lack of subject matter jurisdiction will be denied.

Appropriate Orders will be entered.

*ORDER* - June 3, 1991, Filed

*AND NOW*, this 3rd day of June, 1991, upon consideration of defendants' Motion to Dismiss for Failure to State a Claim and plaintiff's response thereto, *IT IS HEREBY ORDERED* that said Motion is *DENIED*.

*ORDER* - June 3, 1991, Filed

*AND NOW*, this 3rd day of June, 1991, upon consideration of defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and plaintiff's response thereto, *IT IS HEREBY ORDERED* that said Motion is *DENIED*.

*ORDER* - June 3, 1991, Filed

*AND NOW*, this 3rd day of June, 1991, upon consideration of defendants' Motion to Dismiss for Lack of Personal Jurisdiction and plaintiff's response thereto, *IT*

*IS HEREBY ORDERED* that said Motion is *GRANTED* in part and *DENIED* in part, in that plaintiff's Complaint against the individual defendants will not be dismissed while the Complaint as to the moving corporate defendants, KG Hoops, Inc. d/b/a Cedar Rapids Silver Bullets; Columbus Basketball, Inc. d/b/a Columbus Horizon; [*20] the La Cross Catbirds, Inc. d/b/a/ La Crosse Catbirds; Keep Basketball in Pensacola, Inc. d/b/a Pensacola Tornados; Rapid City Professional Sports, Inc. d/b/a Rapid City Thrillers; Rockford Lightning, Inc. d/b/a Rockford Lightning; Kemper-Lesnik Basketball, Inc. d/b/a Sioux Falls Skyforce; Professional Sports Affiliates, Inc. d/b/a Tulsa Fast Breakers, will be dismissed unless plaintiff elects to move within ten (10) days hereof to transfer his case to the District of Colorado. See *Jaffe v. Julien, 754 F. Supp. 49, 53 (E.D. Pa. 1991)*.

*ORDER*

*AND NOW*, this 3rd day of June, 1991, upon consideration of plaintiff's Motion for Leave to Amend his Complaint, *IT IS HEREBY ORDERED* that said Motion is *GRANTED* insofar as plaintiff seeks to assert additional allegations and claims against the individual defendants. Plaintiff shall have twenty (20) days to file such an Amended Complaint.

Exhibit Q
Page 134

LEXSEE 2004 US DIST LEXIS 27601

GOOGLE INC., Plaintiff, v. AMERICAN BLIND & WALLPAPER FACTORY, INC., Defendant.

Case Number C 03-05340 JF, [Docket # 5]

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

*2004 U.S. Dist. LEXIS 27601*

April 8, 2004, Decided

SUBSEQUENT HISTORY: Dismissed by, in part *Google Inc. v. Am. Blind & Wallpaper Factory, Inc., 2005 U.S. Dist. LEXIS 6228 (N.D. Cal., Mar. 30, 2005)*

DISPOSITION: The Defendant's motion to dismiss or to stay the instant proceedings was denied.

LexisNexis(R) Headnotes

COUNSEL: [*1] For Google Inc., a Delaware corporation, Plaintiff: Michael H. Page, Mark A. Lemley, Ravind Singh Grewal, Keker & Van Nest LLP, San Francisco, CA.

For American Blind & Wallpaper Factory, Inc., a Delaware corporation doing business as Decoratetoday.com, Inc., Defendant: David A. Rammelt, Dawn Beery, Susan Greenspon, Kelley Drye & Warren LLP, Chicago, IL; Robert Nathan Phillips, Howrey Simon Arnold & White, LLP, San Francisco, CA.

For Earthlink, Inc., Ask Jeeves, Inc., 3rd party defendants: Michael H. Page, Ravind Singh Grewal, Keker & Van Nest LLP, San Francisco, CA.

For Compuserve Interactive Services, Inc., Netscape Communications Corporation, America Online, Inc., 3rd party defendants: Stephen E. Taylor, Taylor & Company Law Offices, Inc., San Francisco, CA.

For American Blind & Wallpaper Factory, Inc., a Delaware corporation, Counter-claimant: Robert Nathan Phillips, Howrey Simon Arnold & White, LLP, San Francisco, CA.

For Google Inc., a Delaware corporation, Counter-defendant: Michael H. Page, Ravind Singh Grewal, Keker & Van Nest LLP, San Francisco, CA.

JUDGES: JEREMY FOGEL, United States District Judge.

OPINIONBY: JEREMY FOGEL

OPINION:

ORDER DENYING MOTION TO DISMISS [*2] OR STAY

Defendant moves to dismiss, or alternatively, to stay the instant action for declaratory relief. The Court has considered the moving and opposing papers and the oral arguments presented at the hearing on April 5, 2004. For the reasons set forth below, the motion will be denied.

I. BACKGROUND

Plaintiff Google Inc. ("Google") is a Delaware corporation with its principal place of business in Mountain View, California. It provides Internet "search engine" services to Internet users and advertising services to businesses and others involved in Internet sales and marketing. Defendant American Blind & Wallpaper Factory, Inc. ("ABWF") is a Delaware corporation that operates Internet websites through which it sells blinds, home decorating products, and related services. This action arises from a dispute as to whether ABWF's trademarks are infringed by Google's "AdWords" advertising program.

Internet users seeking a specific retailer or product often do not know the website address at which the retailer or product may be found. Such users may search for the website address by entering into Google's search engine textual terms related to the retailer's name or the

product [*3] being sought. After such terms, known as "keywords," are entered, the search engine displays a list of websites in order of relevancy to the keywords. Also displayed are advertised websites denoted as "Sponsored Links," which are part of Google's AdWords service. The keywords entered determine the advertised websites that are displayed. Individuals and businesses bid on particular keywords that will lead to their advertisement being displayed as a Sponsored Link. They then compensate Google based on the number of users who click on their advertisement.

ABWF asserts that Internet users often enter keywords that are identical or similar to marks adopted or registered by ABWF, such as AMERICAN BLIND, AMERICAN BLINDS, AMERICAN BLIND & WALLPAPER FACTORY, AMERICAN BLIND FACTORY, and DECORATETODAY. When an Internet user intending to find ABWF's website enters such keywords, Google's search engine allegedly displays as Sponsored Links the websites of ABWF's direct competitors. According to ABWF, this occurs because Google has allowed ABWF's competitors to bid on keywords identical to or similar to ABWF's marks.

On July 23, 2002, Susan Greenspon, ABWF's trademark counsel, informed Google [*4] by letter that "use of the following similar marks by Google's advertisers constitutes infringement of ABWF's registered marks . . ." Hagan Decl., Ex. A. Among the similar marks listed were "american blind" and "american wallpaper," and other combinations of the words "american," "blind," "wallpaper," "factory," and "company." Id. Greenspon noted that ABWF had obtained a permanent injunction enjoining a competitor from using "the word American' in any variation or combination with the word Blinds' either singular or plural." Id. See Rammelt Decl., Ex. I (Permanent Injunction Order). Greenspon requested that Google "immediately (a) cease selling ABWF's proprietary marks and marks similar thereto . . . (b) remove such marks from all campaigns, and (c) remove all advertisers who have purchased such marks (including . . . USA Wallpaper . . .)." Hagan Decl., Ex. A.

In September 2002, after some discussion between Google and ABWF, Rose Hagan, Google's senior trademark counsel, sent an email to Bill Smith, ABWF's e-commerce advisor, indicating that Google "would be able to prevent others from using as keywords [ABWF's] trademarks American Blind and Wallpaper Factory,' American [*5] Blind Factory' and DecorateToday,'" but that Google "could not prevent people from using the descriptive terms American blind, American wallpaper, or other formatives." Id., Ex. B.

On January 3, 2003, Smith sent an email to Google requesting that USA Wallpaper be "blocked" on ABWF's

"branded keywords." Greenspon Decl., Ex. A. A client specialist from Google replied by email, stating that "I've sent an email to our trademark group to have USA Wallpaper taken off those words." Id. On January 10, 2003, Glenn Manishin, ABWF's counsel, notified Google that he was informed that "Google is still selling sponsored links to eBay and USA Wallpaper.com using the keywords American Blind and Wallpaper Factory,' which are registered trademarks of ABFW." Hagan Decl., Ex. C. Manishin also indicated that he "hope[d] this can be resolved . . . without the need for any formal cease-and-desist demands or other unpleasantness." Id.

On July 11, 2003, Joe Charno, ABWF's vice president of marketing, advertising and e-commerce, sent a cease-and-desist letter informing Google that ABWF believed that "The Blind Factory has purchased advertising keywords from [Google] that are identical or [*6] substantially similar to American Blinds, Wallpaper & More ('ABWM') registered trademarks" and that Google "immediately cease selling ABWM's proprietary marks and marks similar thereto . . . to The Blind Factory and immediately remove the referenced keywords from their program." Id., Ex. D. Charno indicated that he would "involve our legal department" if his request was not complied with in seven days. Id. On August, 27, 2003, the Google AdWords Team responded by email as follows:

> We searched with your trademark, American Blind Factory' and determined that the ad in question does not use your trademark as a keyword trigger. Rather, this ad appears when Blind Factory' is entered as a search query. This ad is not using your trademarked term as a keyword trigger; but using Blind Factory' as a keyword trigger.

Id., Ex. E. In concluding that it would not take further action, Google explained that "[w]e believe it is appropriate for this ad to be triggered if the non-trademarked term Blind Factory' is entered as part of a search query." Id.

On November 12, 2003, Manishin informed Google that "[o]ur client [ABWF] is quite upset about the matter, [*7] which has been at issue for more than a year without progress, and has asked us to prepare a Vuitton-type lawsuit if the matter cannot be resolved. I of course would like to avoid that . . ." n1 Id., Ex. F. Thereafter on November 17, 2003 and again on November 23, 2003, Google's representatives spoke with ABWF's representatives by telephone informing them that Google would not

Exhibit R
Page 136

modify its AdWords program and that Google would not comply with ABWF's demands. Hagan Decl., P 10.

> n1 Google explains that the "Vuitton-type" lawsuit was a reference to an action filed in France on August 6, 2003, by Luis Vuitton SA against Google and its French subsidiary for trademark infringement arising out of similar advertising practices at issue here. Compl., p. 5.

On November 26, 2003, Google filed the instant action against ABWF, seeking a declaratory judgment "that its current policy regarding the sale of keyword-triggered advertising does not constitute trademark infringement." Compl., p. 22. On January 27, 2004, ABWF filed [*8] suit in the Southern District of New York against Google, America Online, Inc., Netscape Communications Corp., Compuserve Interactive Services, Inc., Askjeeves, Inc., and Earthlink, Inc. for trademark infringement and dilution, unfair competition, and tortious interference with prospective economic advantage. *See* Rammelt Decl., Ex. 1 (Complaint, 04 CV 00642). Now before the Court is ABWF's motion to dismiss or, alternatively, to stay proceedings based on equitable exceptions to the "first-to-file" rule.

## II. APPLICABLE LAW

A lawsuit seeking federal declaratory relief must present an actual case or controversy regarding a matter within the federal court's jurisdiction. *28 U.S.C. § 2201 (a); Gov't Employees Ins. Co. v. Dizol, 133 F.3d 1220, 1222-23 (9th Cir. 1998).* Such relief is discretionary, however, and a district court may abstain from hearing a declaratory relief action. *Id. at 1223; Huth v. Hartford Ins. Co. of the Midwest, 298 F.3d 800, 802 (9th Cir. 2002).*

When two cases involving the same or substantially similar parties and issues have been filed in two different federal courts, the court [*9] that received the latter filing has discretion to stay, transfer, or dismiss the second action, and the first action filed generally should proceed to judgment. *Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622, 628 (9th Cir. 1991); Pacesetter Systems, Inc. v. Medtronic, Inc., 678 F.2d 93, 95 (9th Cir. 1982).* This so-called first-to-file rule was developed to "serve[] the purpose of promoting efficiency well and should not be disregarded lightly." *Alltrade, 946 F.2d at 625* (citing *Church of Scientology v. United States Dep't of the Army, 611 F.2d 738, 750 (9th Cir. 1979)).* Nonetheless, it "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *Pacesetter, 678 F.2d at 95.* "The circumstances under which an ex-

ception to the first-to-file rule typically will be made include bad faith [citation], anticipatory suit, and forum shopping [citations]." *Alltrade, 946 F.2d at 628.* In any event, "it is clear that the first-to-file rule is applied at the discretion of the district court. [*10] " *Biosite, Inc. v. XOMA Ltd., 168 F. Supp. 2d 1161, 1164 (N.D. Cal. 2001).*

Furthermore, "[t]he *Declaratory Judgment Act* is not to be invoked to deprive a plaintiff of his conventional choice of forum and timing, precipitating a disorderly race to the courthouse." *DeFeo v. Procter & Gamble Co., 831 F. Supp. 776, 778 (N.D. Cal. 1993).* "Application of the first to file rule in such situations would thwart settlement negotiations, encouraging intellectual property holders to file suit rather than communicate with an alleged infringer." *Z-Line Designs, Inc. v. Bell O Int'l, LLC, 218 F.R.D. 663, 665 (N.D. Cal. 2003)* (citing *Charles Schwab & Co. v. Duffy, 49 U.S.P.Q.2d 1862, 1864 (N.D. Cal. 1998)).* "Potential plaintiffs should be encouraged to attempt settlement discussions . . . prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before the plaintiff files a complaint." *Id. at 666-67* (quoting *Capitol Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350, 1354 (S.D.N.Y. 1992)).* [*11]

## III. DISCUSSION

As an initial matter, the Court concludes that the present action satisfies the requirement of the Declaratory Judgment Act that there be an actual case or controversy within the Court's jurisdiction. A justiciable controversy arose, at the latest, with ABWF cease-and-desist letters, stating that use of certain keywords in Google's AdWords program was deemed to infringe ABWF's registered marks.

### A. First-to-File Rule

In applying the first-to-file rule, "a court looks at three threshold factors: (1) the chronology of the two actions; (2) the *similarity* of the parties, and (3) the *similarity* of the issues." *Id. at 665* (emphasis added). ABWF argues that the instant action fails to satisfy each of these factors, and that priority should thus be given to the later-filed action in New York. The Court concludes otherwise.

First, ABWF contends that the eight week gap between Google's filing on November 26, 2003 and ABWF's filing on January 27, 2004 is insignificant given the fact that the parties were engaged in active settlement discussions even through the year-end holidays. However, ABWF cites no authority for its contention that the Court [*12] should disregard the undisputed chronology of filings simply because the parties were engaged in

settlement discussions. *See Ward v. Follett Corp.*, *158 F.R.D. 645, 647 (N.D. Cal. 1994)* (settlement discussions over several months did not preclude giving priority to the first-filed action).

As to the second factor, ABWF emphasizes that the parties in the two actions are not identical. However, strict identity of parties is not an absolute requirement of the first-to-file rule. *See British Telecomm. plc v. McDonnell Douglas Corp.*, *1993 U.S. Dist. LEXIS 6345, No. C-93-0677 MHP, 1993 WL 149860, at *4 (N.D. Cal. May 3, 1993)* (holding that the absence of strict identity of parties "does not mandate this court to disregard the first-to-file rule, rather it is another of the factors this court must consider in exercising its discretion"). The first-to-file rule may be applied if there is similarity or "substantial overlap" of the parties in the two actions. *See Dumas v. Major League Baseball Props., Inc.*, *52 F. Supp. 2d 1183, 1189 (S.D. Cal. 1999)*, *vacated on other grounds*, *104 F. Supp. 2d 1220 (S.D. Cal. 2000)*. The New York action includes five additional [*13] parties that allegedly profit from Google's search engine and AdWords program, which they incorporate in their own websites' search function. n2 It is undisputed that the liability of these additional parties depends entirely upon whether Google's AdWords program is found to infringe ABWF's trademarks. Given this dependency and the fact that Google is a party in both actions, there clearly is a substantial overlap of the parties in the two actions.

n2 The Court is unaware of any reason why the five additional parties could not be joined as counterclaim defendants in the instant action, or why the Southern District of New York is a more appropriate venue than this judicial district. With regard to convenience, ABWF notes that some of the additional defendants are not located in this judicial district. Google argues that this judicial district is more appropriate since it is where its headquarters and primary place of business are located, while ABWF is located in Michigan and allegedly has no significant connection to New York.

[*14]

Finally, ABWF urges the court not to apply the first-to-file rule because the issues presented in the two actions are not identical. ABWF contends that since more parties are involved in the New York action, more issues and legal claims arise that are not present in the instant action and that will require different proof. Although the two actions obviously are not mirror images of one another, it is clear that the fundamental issue in both ac-

tions-whether Google's AdWords program infringes ABWF's trademarks-is identical.

Having found that the first-to-file rule may be applied to the instant action, the Court now must address the question of whether application of the rule comports with sound judicial administration.

**B. Alleged Anticipatory Action and Forum Shopping**

In support of its contention that Google should not receive the benefit of the first-to-file rule here, ABWF relies on *Z-Line Designs*, emphasizing that where "a declaratory judgment action has been triggered by a cease and desist letter, equity militates in favor of allowing the second-filed action to proceed to judgment rather than the first." *218 F.R.D. at 667*. ABFW contends that it had [*15] been in settlement discussions for almost a year and that Google quickly filed suit only after it was informed on November 12, 2003 that a Vuitton-type lawsuit was imminent. ABWF also contends that Google admitted publicly that the instant action was anticipatory. In a January 22, 2004 report by Business Week Online, a Google representative was quoted as saying that "Google filed this action because we were being threatened with an imminent lawsuit by American Blind & Wallpaper Factory." Greenspon Decl., Ex. B. Although there is evidence supporting ABWF's position, the Court nonetheless concludes that the totality of the circumstances suggests that Google's decision to file suit did not have an inappropriate purpose.

While its statement of January 22, 2004 shows that Google was concerned about the threat of imminent litigation when it filed its own suit, it does not follow that Google's decision to file suit resulted solely from Manishin's threat of a Vuitton-type lawsuit. Indeed, Google reasonably could have believed that a lawsuit was imminent as early as July 11, 2003, when Charno sent his cease-and-desist letter threatening to involve his legal department if his demands were not [*16] met within seven days. In that letter, Charno alluded specifically to the permanent injunction that ABWF had obtained in a similar lawsuit against another party. Forum shopping certainly might have been suspected had Google filed suit within the seven day period fixed by Charno or even immediately thereafter, and it is significant that Google did not do so. Google also reasonably could have believed a lawsuit was imminent on August 27, 2003, when its AdWords Team finally informed Charno that it would not comply with his demands, yet it did not file suit until almost three months later.

In light of this history, the Court is not persuaded that Manashin's email of November 12, 2003 threatening a Vuitton-type lawsuit precipitated an improper anticipatory action. If anything, the email is less threatening than

Charno's cease-and-desist letter in that it did not set a deadline after which legal action ostensibly would be taken.

Nor is there any persuasive evidence that Google attempted to lull ABWF into a false sense of security through its responses to ABWF's demands. Beginning with its first cease-and-desist letter on July 23, 2002, ABWF demanded that Google prevent advertisers from [*17] using as keywords the term "American blind," and other variations and combinations of its registered marks. Nothing in the record suggests that Google led ABWF to believe that it might change its policy of allowing advertisers to use as keywords terms it believed were descriptive, such as "American blind" and "Blind Factory," as opposed to ABWF's registered marks, such as "American Blind Factory." *See* Hagan Decl, Ex. B & E. Google's stated willingness to prevent ABWF's competitor from using keywords identical to ABWF's registered marks was consistent with Google's previously stated position. *See* Greenspon Decl., Ex. A & C.

ABWF also contends that Google acted in bad faith, claiming that Google never intended to prevent others from using ABWF's registered marks as keywords. In support of its claim, ABWF proffers a copy of a screen depicting Google's Ad Words Keyword Suggestions, which includes "american wallpaper and blinds factory," and "american blinds factory." n3 Greenspon Decl., Ex. D. Although ABWF's trademark counsel states that the "'AdWords Keyword Suggestions' feature is not available to, or even viewable by the public," *id.*, P 6, there is no indication that ABWF, [*18] as a business and potential Google AdWords advertiser, lacked access to the screen at all relevant times. Nor is there any indication that the AdWords Keyword Suggestions changed during negotiations, a fact that might have dissuaded ABWF from filing suit.

> n3 It is worth noting that the AdWords Keyword Suggestions include the plural word "blinds" as opposed to the singular word "blind" in ABWF's registered trademarks.

Considerations of sound judicial administration discourage anticipatory actions so as to encourage owners of intellectual property to engage in settlement prior to filing suit, but such considerations do not require that a party in continuous apprehension of a lawsuit be precluded from seeking declaratory relief in light of repeated threats. While the present case presents a close question, the Court concludes that the first-to-file rule should be applied.

C. Alleged Improper Declaratory Judgment

In support of its motion to dismiss, ABWF argues that Google seeks a determination that exceeds [*19] this Court's jurisdiction to the extent that the relief sought is not restricted to ABWF and its trademarks. ABWF points out that Google seeks to validate its entire keyword advertising program as to every trademark holder in the United States. However, the Declaratory Judgment Act itself imposes no such jurisdictional limitation. n4 Declaratory relief should be denied when it "will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington, 759 F.2d 1353, 1357 (9th Cir. 1985).* If granted, Google's requested declaratory judgment-that its current policy regarding the sale of keyword-triggered advertising does not constitute trademark infringement-would resolve the controversy between it and ABWF. As such, the instant action warrants consideration of the merits even though the relief sought is not limited to ABWF. "[T]he Court may, after a full consideration of the merits, exercise its discretion to refuse to grant declaratory relief because the state of the record is inadequate to support the extent of [*20] relief sought." *Id., at 1356.*

> n4 *Section 2201 of Title 28 of the United States Code* provides, in relevant part: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

ABWF also argues that the instant action is improper because it does not resolve all the issues presented in the later-filed New York action. ABWF relies on *First Fishery Dev. Serv., Inc. v. Lane Labs USA, Inc., 1997 U.S. Dist. LEXIS 11231, No. CIV. 97-1069-R, 1997 WL 579165 (S.D. Cal. July 21, 1997),* in which the plaintiff filed a declaratory relief action the day after the defendant threatened to file suit in three days if the plaintiff did not make further concessions. In dismissing the declaratory relief action, the court noted that: "Because no relevant uncertainty existed here, and the [later-filed] [*21] litigation effectively could settle the legal relations at issue, it appears that granting declaratory relief would serve no useful purpose. This makes such relief inappropriate even in the absence of forum shopping." *1997 U.S. Dist. LEXIS 11231, at *10. n. 2.* In the present case, however, a relevant uncertainty existed when Google filed the instant action on November 26, 2003. As discussed above, ABWF took no legal action after the seven day deadline in Charno's July 11, 2003 letter had passed.

or after Google notified Charno forty-seven days later on August 27, 2003 that it would not comply with his demands. Because uncertainty existed as to whether ABWF would carry out its threat, the Court concludes that Google's request for declaratory relief is proper.

### D. Motion to Stay

In the event the Court decides not to dismiss the instant action, ABWF urges the Court to stay proceedings until the New York action is resolved. ABWF contends that there is a possibility of inconsistent judgments on the same issues. It is because of this possibility that the first-to-file rule exists. Furthermore, it is appropriate for the instant action to proceed under the first-to-file rule, as discussed above.

### [*22] IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that Defendant's motion to dismiss or alternatively to stay the instant proceedings is DENIED.

DATED: April 8, 2004

JEREMY FOGEL

United States District Judge

Westlaw.

Not Reported in F.Supp.2d
2003 WL 23884794 (N.D.Cal.)
(Cite as: 2003 WL 23884794 (N.D.Cal.))

Page 1

# H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
HEWLETT-PACKARD COMPANY, Plaintiff,
v.
INTERGRAPH CORPORATION, Defendant.
No. C 03-2517 MJJ.

Sept. 6, 2003.

Morgan Chu, David Isaac Gindler, Elliot Brown, Jason Dean Linder, Rachel Marie Capoccia, Irell & Manella LLP, Los Angeles, CA, Peter P. Chen, McDermott, Will & Emery, Palo Alto, CA, for Plaintiffs.

Bureden J. Warren, McDermott Will & Emery, Eric S. Namrow, James R. Burdett, Peter Curtin, William D. Coston, Venable LLP, Washington, DC, Cole M. Fauver, Inge Larish, William H. Manning, Robins Kaplan Miller & Ciresi, Minneapolis, MN, David V. Lucas, Todd P. Guthrie, Intergraph Corporation, Huntsville, AL, Bijal V. Vakil, McDermott, James E. Glore, Stephen J. Akerley, McDermott Will & Emery, Palo Alto, CA, Jeffrey G. Knowles, Coblentz, Patch, Duffy & Bass, Jennifer Lynn Polse, Martin D. Bern, Munger Tolles & Olson LLP, San Francisco, CA, George F. Pappas, Venable LLP, Baltimore, MD, Michael W. Robinson, Venable LLP, Vienna, VA, for Defendants.

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS

JENKINS, J.

*1 On May 28, 2003, Plaintiff Hewlett-Packard Company ("Plaintiff") filed a complaint against Defendant Intergraph Corporation ("Defendant") alleging direct patent infringement, contributorily infringement, and inducing infringement of four United States patents ("patents-in-suit") in violation of 35 U.S.C. § 271. [FN1] Defendant now moves to dismiss Plaintiff's complaint or, in the alternative, for a more definite statement. See FRCP 12(b), (e). Specifically, Defendant argues that Plaintiff's

allegations are cursory and fail satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure. Having considered the briefing in this matter, the Court GRANTS Defendant's motion.

> FN1. The specific patents-in-suit are United States patents (1) 5,297,241; (2) 4,649,499; (3) 6,105,028; and (4) 4,635,208. See Complaint ¶ ¶ 7-10. Plaintiff is the owner by assignment of all rights, title, and interest in each of these patents.

A. Infringement Generally

According to Rule 8(a)(2) "a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has found that this provision is satisfied so long as the factual allegations give "defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).* In the context of patent litigation, the Federal Circuit has noted that "[t]his requirement ensures that an accused infringer has sufficient knowledge of the facts alleged to enable it to answer the complaint and defend itself." *Phonometrics v. Hospitality Franchise Systems, Inc., 203 F.3d 790, 794 (Fed.Cir.2000).* In addition, Form 16 of the Federal Rules of Civil Procedure provides the following as an example of a direct patent infringement claim that is sufficient under Rule 8(a)(2):

Defendant has for a long time past been and still is infringing [the patent-in-suit] by making, selling, and using electric motors embodying the patented invention, and will continue to do so unless enjoined by this court.

*See also* FRCP 84 ("[t]he forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate").

Here, the complaint simply alleges:

[Defendant], in violation of 35 U.S.C. § 271, has been and is currently infringing, contributorily infringing, or inducing infringement of [the patents-in-suit] by, among other things, *making, using, offering to sell and/or selling infringing software and hardware products* without authority or license from [Plaintiff].

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit S
Page 141

Complaint ¶ ¶ 11 (emphasis added).

However, Defendant "produces some 150 core technology platforms which are implemented in over 4000 end-user application products." *See* Motion to Dismiss or For a More Definite Statement ("Motion") at 7:15-17. In light of these facts, Plaintiff's claim must be read as follows: one or more of Defendant's 4000-plus products directly infringes, contributorily infringes, or induces infringement of at least one claim in each of the patents-in-suit. Form 16 simply does not address a factual scenario of this sort. Not only is the example in Form 16 limited to a single "type" of product (*i.e.*, electric motors) there is no indication as to the number of different electric motors the hypothetical defendant made, sold, or used. In this case, there are at least 150 different "types" of products (*i.e.* core technology platforms) with more than 4000 end-user applications. Based on these facts, the Court finds that Plaintiff's allegations do not provide Defendant with "fair notice" of what Plaintiff's claim or claims are and, therefore, fail to satisfy Rule 8(a)(2). *See Conley, 355 U.S. at 47-48 (1957).* [FN2]

> FN2. The Court acknowledges Defendant's citation to several district court opinions, including one from this district, which seem to interpret Rule 8(a)(2) and Form 16 more liberally. *See, e.g., OKI Electric Industry Co. v. LG Semicon Co., Ltd., 1998 WL 101737, *3 (N.D.Cal.1998)* ( "[t]he phrase 'devices that embody the patented methods' from [plaintiff's] allegation is substantially similar to the phrase 'electric motors embodying the patents' invention' found in Form 16"). However, Plaintiff cites an equal number of decisions that reach the opposite conclusion based on similar facts. *See, e.g., Gen-Probe, Inc. v. Amoco Corporation, Inc., 926 F.Supp. 948, 961 (S.D.Cal.1996)* ("Rule 8(a)(2) eliminates the needless distinctions and technicalities of code pleading, but still 'envisages the statement of circumstances, occurrences, and events in support of the claim ...' ") (quoting Advisory Committee's 1955 Report). None of these decisions are binding on this Court.

B.   Specific   Requirements   for   Contributory Infringement and Inducement

*2 Defendant also argues that Plaintiff's complaint fails to sufficiently allege particular elements necessary to state claims for contributory infringement and inducing infringement. The Court will address each of these claims in turn.

1. Contributory Infringement

In order to state a claim for contributory infringement pursuant to § 271(c), Plaintiff must allege that Defendant offered to sell or sold a "*component* of a patented machine ... constituting a material part of the invention, *knowing* the same to be especially made or especially adapted for use in an infringement of such patent...." *Id.* (emphasis added); *see* also *Aro Manufacturing Co. v. Convertible Top Replacement Co., 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964).* Although Plaintiff alleges that Defendant's conduct was "willful," which implies knowledge, Plaintiff fails to allege that Defendant offered to sell or sold any particular component or that such component was a material part of an infringing device. Plaintiff merely alleges that Defendant "committed acts of infringement in this District, for example, by selling infringing products to Calpine Corporation, which is headquartered in this District." Complaint ¶ 5. This is not sufficient to state a claim for contributory infringement.

2. Inducing Infringement

An inducement claim requires allegations of (1) specific intent and (2) direct infringement by someone other than the inducer. *See Hewlett-Packard Co. v. Bausch & Lomb, 909 F.2d 1464, 1449 (Fed.Cir.1990)*("proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement"); *Met-Coil Systems v. Korners Unlimited, Inc. 803 F.2d 684, 687 (Fed.Cir.1987).* As stated above, although the allegation of willfulness is sufficient to satisfy the state of mind requirement necessary for inducement-- in this case specific intent--there are no allegations of direct infringement by a third-party. Again, the alleged sales of "infringing products" to Calpine Corporation is insufficient to state a claim for inducing infringement.

Therefore, Defendant's motion to dismiss is GRANTED without prejudice; Plaintiff may file an amended complaint within twenty (20) days of this order.

IT IS SO ORDERED.

2003 WL 23884794 (N.D.Cal.)

Motions, Pleadings and Filings (Back to top)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 23384794 (N.D.Cal.)
(Cite as: 2003 WL 23384794 (N.D.Cal.))

Page 3

.        3:03cv02517_____(Docket)
(May. 28, 2003)

.        4:03cv02517_____(Docket)
(May. 28, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1999 WL 910131 (N.D.Cal.)
(Cite as: 1999 WL 910131 (N.D.Cal.))

## C

### Motions. Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
HYUNDAI SPACE & AIRCRAFT CO., LTD.,
Plaintiff,
v.
THE BOEING COMPANY, and McDonnell Douglas
Corporation, Defendants.
No. C 99-3255 SI.

Oct. 12, 1999.

ORDER GRANTING DEFENDANTS' MOTION
TO TRANSFER VENUE AND TRANSFERRING
CASE TO
CENTRAL DISTRICT OF CALIFORNIA

### ILLSTON, J.

*1 On October 8, 1999, the Court heard argument on
Defendants' 28 U.S.C. § 1404(a) motion to transfer
venue. Having carefully considered the arguments of
the parties and the papers submitted, the Court
GRANTS Defendants' motion and TRANSFERS this
case to the Central District of California.

### BACKGROUND

Plaintiff Hyundai Space and Aircraft Co., Ltd.
("HYSA") is a Korean-based manufacturer of aircraft
and aerospace products. See Complaint, ¶ 6.
Defendants The Boeing Company ("Boeing"), a
Delaware corporation based in Seattle, and
McDonnell Douglas Corporation ("MDC"), a
Maryland corporation based in Missouri, merged on
August 1, 1997. See id., ¶ ¶ 7-8; Counterclaim, ¶ ¶
1-2. Boeing and MDC (collectively "Defendants")
are both leading manufacturers of commercial
aircraft. See Counterclaim, ¶ ¶ 6-7. Among other
locations, Defendants conduct activities in both the
Northern and Central Districts of California,
specifically at Long Beach. See Ryan Decl., ¶ ¶ 4-7.
Although HYSA has no branch office in the United
States, it maintains shared office space with Boeing
at Boeing's Long Beach facility. See Chung Decl., ¶ ¶
3-4.

In February of 1996, HYSA and MDC entered into a
Novation Agreement whereby HYSA assumed the
rights and duties of third party Halla Engineering and
Heavy Industries, Ltd., a Korean corporation
("Halla"). See Complaint, ¶ ¶ 10-13; Counterclaim, ¶
¶ 7-12. Under a "Basic Agreement" and related
contracts, Halla was to provide aircraft wings and
related products and services to MDC for the MD-95-
30 jet aircraft. See id. The term of this relationship
was for the life of the MD-95-30 program. See
Murphy Decl., Exh. A (Basic Agreement), § 4. The
Novation Agreement was discussed and negotiated
by HYSA and MDC representatives during meetings
in Long Beach and Korea in January and February of
1996. See Counterclaim, ¶ 13; Min Decl., ¶ 3.
HYSA's performance is guaranteed by its parent
company, Hyundai Precision & Industry Co ., Ltd.,
also a Korean corporation ("Hyundai Precision"). See
C. Kim Decl., ¶ ¶ 1-2.

After Boeing and MDC merged, the MD-95-30 was
redesignated as the Boeing 717- 200 aircraft. See
Complaint, ¶ 14; Counterclaim, ¶ 14. The Boeing
717-200 Program is headquartered at Boeing's
facilities in Long Beach, California. See Ryan Decl.,
¶ 5. Approximately 1,900 Boeing employees work
on the 717-200 Program in the Central District of
California, and no Boeing employee works on this
program in the Northern District of California. See
id., ¶ ¶ 6-7. All of HYSA's principal contacts with
Defendants' employees have been in Long Beach,
and HYSA stations several of its own employees at
Boeing's Long Beach facility. See Murphy Decl., ¶
9-10. These stationed employees inspect and oversee
the operations of HYSA's subcontractors on the 717-
200 project and serve to facilitate communication
between HYSA and Boeing. See id., ¶ 10; Chung
Decl., ¶ ¶ 3, 7. Because its employees are stationed
only at Boeing's facility, HYSA has no private office
space in Long Beach. See Chung Decl., ¶ 4.
Defendants claim that HYSA has no employees or
facilities in the Northern District of California. See
Murphy Decl., ¶ 21. HYSA does not refute this
claim. Hyundai Precision, however, does have an
office in San Francisco, and has no offices in the
Central District. See Chung Decl., ¶ 2.

*2 For the 717-200 project, HYSA produces wing
halves in Korea and delivers them to Tracor, Inc. in
Palmdale, California. See Murphy Decl., ¶ 11. These
wing halves are joined at Tracor and delivered to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Boeing's Long Beach facility for final assembly and installation into the aircraft. *See id.* For this project, HYSA utilizes subcontractors in many parts of the world, including the Central District. *See id.,* ¶ 12. Under the Basic Agreement, HYSA agrees to deliver all notices to MDC's Long Beach facilities. *See id.,* ¶ 8, Exh. A, § 36. In the event of a dispute, both parties expressly consent to jurisdiction of the courts of the United States sitting in the city and county of Los Angeles. *See id.,* ¶¶ 6-7, Exh. A, § 18.E.

Per the Basic Agreement, the price for the first 400 wing shipsets is fixed. *See* Murphy Decl., Exh. A, § 5. On March 1, 1996, MDC issued a purchase order to HYSA for 50 wing shipsets under the terms of the Basic Agreement. *See id.,* ¶ 11. HYSA had delivered nine sets of wing halves as of the filing of the instant motion. *See id.* On January 29, 1999, Boeing issued an Advance Notice of Award ("ANA") to HYSA for an additional 30 wing shipsets under the terms of the Basic Agreement. *See* Murphy Decl., ¶ 14, Exh. B(ANA). On February 5, 1999, HYSA replied that it would not build any wing shipsets after the initial 50 without a price increase. *See id.,* ¶ 15, Exh. C. Boeing responded claiming reasonable grounds for insecurity and requesting that HYSA provide written assurance of its acceptance of the ANA. *See id.,* ¶ 16, Exh. D. After a meeting regarding this dispute, HYSA formally affirmed its position not to accept the ANA without a price increase. *See id.,* ¶¶ 17-18, Exh. E. Boeing then notified HYSA that it was exercising its rights to partially terminate the Basic Agreement. *See id.,* ¶ 19, Exh. F.

On July 6, 1999, HYSA filed the instant action in this district alleging eight causes of action [FN1] and seeking $750,000,000 in damages. HYSA accuses Defendants of acting in a consistent pattern of bad faith and unfair conduct, and claims that Defendants frustrated HYSA's performance of their contracts. *See* Complaint, ¶ 1. On August 4, 1999, Defendants submitted their Answer and Counterclaim, [FN2] alleging several similar claims for relief [FN3] and seeking $850,000,000 in damages. Defendants allege that HYSA anticipated losses before entering the contracts, that Defendants have fully performed under the contracts, and that HYSA's actions constitute anticipatory repudiation and breach of contract. *See* Counterclaim, ¶¶ 13-17, 28. On July 30, 1999, Defendants filed this motion to transfer venue to the Central District of California.

FN1. Breach of contract and of the covenant of good faith and fair dealing, intentional and negligent interference with economic

advantage, intentional and negligent misrepresentation, and statutory and common law unfair competition.

FN2. Counterclaims as required under F.R.C.P. Rule 13(a).

FN3. Anticipatory breach of contract, breach of contract and of the covenant of good faith and fair dealing, and intentional and negligent misrepresentation.

## DISCUSSION

The parties dispute whether this action should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a). "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil matter to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of § 1404(a) is to "prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense." ' *Van Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 809 (1964) (quoting *Continental Grain Co. v. The FBL-585,* 364 U.S. 19, 26-27, 80 S.Ct. 1470, 1474-75 (1960)).

\*3 Section 1404(a) essentially is a codification of the common law doctrine of forum non conveniens that allows transfer, rather than requiring dismissal, when the alternative forum is another federal district. *See Norwood v. Kirkpatrick,* 349 U.S. 29, 31, 75 S.Ct. 544, 546 (1955) ( section 1404(a) "revis[ed] as well as codif[ied]" the doctrine of forum non conveniens). While the relevant factors are the same, the district court's discretion to transfer under § 1404(a) is broader than its discretion to dismiss for forum non conveniens. *See id.,* at 32, 75 S.Ct. at 546-47 ("Congress ... intended to permit courts to grant transfers upon a lesser showing of inconvenience. This is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader."); *see, e.g., Creative Technology, Ltd. v. Aztech Sys. Pte, Ltd.,* 61 F.3d 696, 699 (9th Cir.1995) ( "The forum non conveniens determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.") (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266 (1981)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

To support a motion for transfer, the moving party must establish (1) that venue is proper in the transferor district, (2) that the transferee district is one where the action might have been brought, and (3) that the transfer will serve the convenience of the parties and witnesses and will promote the interest of justice. *See Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp.*, 820 F.Supp. 503, 506 (C.D.Cal.1992). Where jurisdiction is founded only on diversity of citizenship, venue is proper "in a judicial district where any defendant resides, if all defendants reside in the same state." *See* 28 U.S.C. § 1391(a)(1). Venue is also proper "in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." § 1391(a)(2). Since Boeing resides in the Northern District, venue in this district is proper pursuant to § 1391(a)(1). Venue would also be proper in the Central District under § § 1391(a)(1) or (2), since Boeing also resides in that district and a substantial part of the events giving rise to the current dispute occurred in that district. Thus, venue is proper in the transferor district, and the transferee district is one where the action might have been brought.

Having addressed these threshold questions, the Court turns to the central inquiry of a § 1404(a) motion: the convenience of the parties and witnesses and the interests of justice. The Ninth Circuit has outlined several factors to be considered in analysis of a motion to transfer venue. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986). Factors relevant to this case include: (1) plaintiff's choice of forum, (2) availability of compulsory process, (3) burdening citizens in an unrelated forum with jury duty, (4) relative ease of access to sources of proof, and (5) convenience to the parties and witnesses. *See id.* Ultimately, the court "must balance the preference accorded plaintiff's choice of forum with the burden of litigating in an inconvenient forum." *Id.*

1. Plaintiff's Choice of Forum

\*4 HYSA has chosen the Northern District as its preferred forum. Courts should generally afford considerable weight to a plaintiff's choice in determining a motion to transfer. *See id.* A plaintiff's choice of forum, however, is not dispositive, and must be balanced against other factors. *See id.* If the transactions giving rise to the action lack a significant connection to the plaintiff's chosen forum, then the plaintiff's choice of forum is given considerably less weight. *See* Schwarzer, Tashima & Wagstaffe,

Federal Civil Procedure Before Trial (TRG, 1985), § 4:284 (citing *Chrysler Capital Corp. v. Woehling*, 663 F.Supp. 478 (D.De.1987) and *Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 990 (E.D.N.Y.1991)). Also, a "plaintiff's choice of forum commands only minimal consideration where he is not a resident of the district where he instituted suit, the operative facts have not occurred within the forum, and the forum has no particular interest in the parties or subject matter." *Allegiance Healthcare Corp. v. London Int'l Group*, 1998 U.S. Dist. LEXIS 8953,\*5 (N.D. Cal. June 16, 1998) (citing *Pacific Car And Foundry Co. v. Pence*, 403 F.2d 949, 954 (9th Cir.1968)).

Defendants assert that HYSA's choice of the Northern District is entitled to no deference, while HYSA suggests that its choice of forum is entitled to substantial deference. Defendants argue that this action has no connection with this district. Indeed, HYSA is not a resident nor does it allege any significant nexus to this forum. Discussions and negotiations between the parties took place in Long Beach and Korea. Communications between the parties occurred between Defendants' Long Beach facility and HYSA's offices in Korea. Deliveries of components took place only in Korea and the Central District, ultimately at Defendants' Long Beach facility. Nothing in the course of the parties' business took place in the Northern District. The nexus of this action is clearly in Korea and Long Beach.

Since HYSA is not a resident of this district, the operative facts are not alleged to have occurred within this forum, and this forum has no particular interest in the resolution of the pending 717-200 litigation, HYSA's choice of forum weighs against transfer, but is given minimal consideration.

2. Availability of Compulsory Process

The availability of compulsory process is significant for any non-party witnesses that may be unwilling to testify. HYSA anticipates calling non-party witnesses, including employees of Halla (Korea) and HYSA's subcontractors. HYSA's subcontractors include: Fleet Industries, Ltd. (Canada), Andalucia Aeroespacial, S.A. (Spain), Daewoo (Korea), the Flight Systems Division of Parker Hannifin Corporation's Aerospace Group (Orange County), and High Tech West, Inc. (Long Beach). *See* Kim Decl., ¶ 5; Murphy Decl., ¶ 12. Five of HYSA's listed non-party witnesses are located in the Central District, while none are located in the Northern District. *See* Defendants' Reply, 6:1-5. Defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.
Exhibit T
Page 146

Not Reported in F.Supp.2d
1999 WL 910131 (N.D.Cal.)
(Cite as: 1999 WL 910131 (N.D.Cal.))

have identified another five non-party witnesses located in the Central District, and none in the Northern District. *See id.*

\*5 Defendants argue that there are no Northern District witnesses and that this Court would not have subpoena power over the Central District witnesses. Thus, argue Defendants, this factor weighs in favor of transfer to a court that would have such power. HYSA replies that this Court would have subpoena power under Rule 45 of the Federal Rules of Civil Procedure. "[A] subpoena may be served ... at any place within the state where a state statute ... permits service of a subpoena issued by a state court of general jurisdiction sitting in the place of the [trial]." F.R.C.P. Rule 45(b)(2). Because the California state courts in this district would have the power to subpoena the Central District witnesses, HYSA is correct that this Court does have the power to subpoena these witnesses. Accordingly, the factor of availability of compulsory process weighs neither for nor against transfer.

### 3. Burden of Jury Duty

Although it was not argued in the briefs, Defendants referred to the burden of jury duty at oral argument. The Court agrees that this is a factor to be considered. Given that plaintiff HYSA neither resides nor has any presence in this district, [FN4] that Defendants' presence in this district is entirely unrelated to this dispute, that no witnesses or evidence exist in this district, and that none of the events related to this dispute occurred in this district, the Court finds the imposition of jury duty on the citizens of this district to be an unnecessary burden. Such a burden is better left to the citizens and courts of the district where plaintiff contracted to do business, where the subject of the dispute is headquartered, where most of the witnesses and evidence are located, and where many of the events related to this dispute occurred. This factor thus weighs in favor of transfer.

> FN4. The Court does not find Hyundai Precision's 1080 square foot office to constitute a significant HYSA presence.

### 4. Access to Sources of Proof

HYSA asserts that relevant documents are located throughout the world, while Defendants maintain that many relevant documents are located at Boeing's Long Beach facility and elsewhere within the Central District. Although Defendants object, HYSA alleges that other relevant documents can be found at

Defendants' Washington and Missouri offices. [FN5] Both parties agree that relevant documents exist at HYSA's Korean offices. Third parties claimed to have relevant documents are located in Korea, Canada, Spain, Long Beach, and Orange County. No documents or other sources of proof are alleged to be in the Northern District.

> FN5. Because neither result bears on this analysis, resolution of this dispute is unnecessary.

While many documents and sources of proof are scattered, the disparity between what is located in each district is glaring. Nothing is located in the Northern District, but a substantial amount of evidence is located in the Central District. The Court finds it obvious that access to sources of proof only within these districts would be much easier if this action were tried in the Central District. This Court also sees no reason to find either district more convenient for access to documents located elsewhere. Accordingly, this factor weighs in favor of transfer.

### 5. Convenience to the Parties and Witnesses

\*6 Defendants argue that the Northern District is an entirely inconvenient forum, largely due to the 717-200 program being headquartered, directed, and administered from its Long Beach facilities. Many material party and non-party witnesses thus work and reside in the Long Beach area. Furthermore, a substantial number of relevant documents are kept at the Long Beach facility. Comparing conveniences, Defendants argue that no documents or witnesses exist in the Northern District, and that transfer would therefore not inconvenience HYSA.

HYSA argues that Defendants simply prefer to litigate on their home turf, that litigating here would not inconvenience Defendants, and that the Northern District is the only district HYSA finds to be convenient. Despite its lack of presence, HYSA claims that its motive in desiring a more neutral forum is legitimate. HYSA also asserts that the Northern District is the California home of Hyundai Precision, which HYSA anticipates will be an important witness and potential party to this litigation. HYSA claims that Hyundai Precision's San Francisco office will be its litigation headquarters and also provide temporary work space for HYSA employees. Significantly, HYSA employees brought over from Korea for this litigation would not have such a readily available place to work in the Central

Not Reported in F.Supp.2d
1999 WL 910131 (N.D.Cal.)
(Cite as: 1999 WL 910131 (N.D.Cal.))

District. HYSA claims that it thus stands to save a substantial amount by proceeding in this district.

Defendants reply that this office space is only 1,080 square feet, rendering suspect HYSA's claims to depend on this space. Defendants point out that no case law supports the proposition that access to office space outweighs the inconvenience placed on other parties and witnesses forced to travel to another forum. Defendants also assert that HYSA and Hyundai Precision belong to the Hyundai Group, a worldwide conglomerate with offices in many cities, including Los Angeles. Additionally, Defendants reference that HYSA's counsel has a 50,000 square foot office in the Central District, and that a substantial amount of additional space is available in the building housing this office.

Defendants also argue that the 717-200 program and virtually all United States witnesses are located in the Central District. [FN6] while no witness is located in the Northern District, demonstrating that the Central District is the most convenient forum. HYSA responds that most witnesses are not located in the Central District and that Defendants have not shown that the Northern District is inconvenient to Central District witnesses. [FN7] Although HYSA cites to several cases in support of these arguments, Defendants factually distinguish each case. Primarily, Defendants point out that these cases involve situations where evidence or witnesses also exist in the transferor forum.

> FN6. The Court notes that HYSA has listed 23 witnesses from the Central District, with five of them being non-party, and that Defendants claim another five non-party Central District witnesses.

> FN7. HYSA simply asserts that Central District witnesses would not be inconvenienced by being forced to travel to San Francisco rather than remain in the Central District.

Finally, Defendants assert that the parties expressly consented to jurisdiction of the courts of the United States sitting in the city and county of Los Angeles. HYSA counters that this is a non sequitur since this "consent" was neither a forum selection clause nor exclusive. Defendants reply that while this consent clause is not binding, it served advance notice to the parties as to where any disputes should be litigated. Because their claims are related and therefore compelled, Defendants also claim that their right to

pursue claims in the Central District has been preempted by HYSA's filing in the Northern District, thus eviscerating this express consent to jurisdiction.

\*7 The Court finds HYSA's claim that Hyundai Precision's office space in San Francisco provides a significant Northern District connection to be dubious. In reality, HYSA has no significant or convenient presence in either the Northern or Central Districts. Although witnesses are scattered throughout the world, several dozen are located within the Central District and none is located in the Northern District. As in the access to documents section above, witnesses located only within these two districts would find it more convenient if this action were tried in the Central District. Of heightened concern are the significant number of non-party witnesses residing in the Central District who need not be unreasonably burdened. The Court also finds that HYSA has long been on notice of the likely location for litigation regarding this matter. Thus, the factor of convenience to the parties and witnesses weighs heavily in favor of transfer.

6. Remaining factors

Although *Decker Coal*, recited several other transfer analysis factors, these are negligible. The possibility for view of premises does not appear relevant to this case, and neither party has addressed this factor. Congestion and delay in court dockets do not appear to favor either party. Because both districts are in California, comparable familiarities with applicable state law and potential conflicts of law are not apparent. Accordingly, the remaining factors cited in *Decker Coal* have no bearing on this analysis.

CONCLUSION

In balancing the above factors, the Court is mindful that HYSA's choice of forum should be afforded some deference. It cannot, however, be the only factor. No party, witness, or document is located in the Northern District. None of the negotiations, transactions, or events that form the basis of this dispute occurred in this district. Instead, a significant number of material events occurred in Long Beach and elsewhere in the Central District. Although witnesses and relevant documents are scattered, many documents and party and non-party witnesses reside in the Central District. Tellingly, litigating in this district would incur inconveniences in procuring many witnesses and documents located in the Central District, while litigating in the Central District would impact nothing in the Northern District. Finally, the parties expressly consented to jurisdiction in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6

Central District, which served notice as to where any
disputes should be litigated. Except for plaintiff's
original choice of forum, all factors are either neutral
or point away from this district. Under these
circumstances, the most appropriate forum for the
parties' dispute is not the Northern District, but the
Central District. Defendants' motion to transfer venue
is therefore GRANTED, and this case is hereby
TRANSFERRED to the Central District of
California.

IT IS SO ORDERED.

1999 WL 910131 (N.D.Cai.)

**Motions, Pleadings and Filings (Back to top)**

•        3:99CV03255           (Docket)
(Jul. 06, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit T
Pg 149

LEXSEE 1996 US DIST LEXIS 2385

IBM CREDIT CORPORATION, Plaintiff, v. DEFINITIVE COMPUTER
SERVICES, Inc., HENRY GARLAND, and MARY ROSALIND GARLAND, De-
fendants.

No. C-95-3927 SI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

*1996 U.S. Dist. LEXIS 2385*

February 27, 1996, Dated
February 28, 1996, FILED; February 29, 1996, ENTERED

LexlsNexis(R) Headnotes

COUNSEL: [*1] For IBM CREDIT CORPORATION,
a Delaware corporation, Plaintiff: Richard A. Lapping,
[COR LD NTC], Thelen Marrin Johnson & Bridges, San
Francisco, CA.

JUDGES: SUSAN ILLSTON, United States District
Judge

OPINIONBY: SUSAN ILLSTON

OPINION:

ORDER TRANSFERRING VENUE

This Court issued an order to show cause in this
matter regarding venue and/or personal jurisdiction. The
parties filed responses to the Court's Order, and the mat-
ter was deemed submitted on the papers. Having consid-
ered the papers submitted by counsel, and in the interests
of justice, the Court hereby TRANSFERS this case to the
Northern District of Texas pursuant to *28 U.S.C. §
1404*(a).

BACKGROUND

This action was filed by IBM Credit Corporation
(IBMCC) on November 2, 1995, seeking recovery of
amounts that are allegedly owed under a financing
agreement and guaranties executed by defendants. The
present dispute regarding venue centers around the
Wholesale Financing Agreement (Financing Agreement)
entered into between the parties to this action in April of
1993, pursuant to which defendant Definitive Computer
Services, Inc. ("DCS") requested financing for the pur-
chase of certain inventory from IBM. The Financing

Agreement drafted [*2] by IBMCC and signed by DCS
provides:

> The laws of the State of Texas will govern
> this Agreement. We [DCS] agree that
> venue for any lawsuit will be in the State
> or Federal Court within the county, par-
> ish, or district where your [IBMCC's]
> branch office, who provides the financial
> accommodations, is located. We [DCS]
> hereby waive any right to change the
> venue of any action brought against us by
> you. n1

> n1 The word "Texas" was hand-written on a
> blank provided in the form. The balance of the
> paragraph is typed or printed.

IBMCC provided and administered the requested fi-
nancing through its branch office in San Ramon, Califor-
nia. In addition to the Financing Agreement, individual
defendants Henry and Mary Garland signed separate
individual guaranties, in which they independently guar-
anteed the payment of DCS's indebtedness under the
Financing Agreement. The guaranties contained a similar
venue selection clause.

In late December, 1994, DCS sued IBM Corp. in
state court in Texas, Definitive [*3]  Computer Ser-
vices, Inc. v. IBM Corporation, No. 94-1383-K (District
Court, 192nd Judicial District, Dallas County, Texas),
alleging various tort, contract and unfair business prac-
tices causes of action under Texas state law. In May,

1996 U.S. Dist. LEXIS 2385, *

1995, DCS informed IBMCC of the Texas lawsuit, and indicated that DCS would not make any further payments to IBMCC under the Financing Agreement until the Texas action was resolved. In September, 1995, after Mr. Garland's deposition had been taken by IBM, the Texas lawsuit was amended to add Mr. Garland as a plaintiff and IBMCC as a defendant. This lawsuit was filed by IBMCC against DCS and the Garlands in the Northern District of California on November 2, 1995.

## DISCUSSION

### 1. Legal Standard

The Court may in its discretion transfer this action to any other district where it might have been brought, for the convenience of the parties or witnesses, or in the interests of justice. *28 U.S.C. § 1404*(a). Where the Court or a party transfers the action in "the interests of justice," governing factors include: (1) avoidance of multiple actions, (2) sending the action to the state most familiar with governing law, and (3) feasibility of [*4] consolidation with other actions. 15 C. Wright & A. Miller, Federal Practice & Procedure, Civil § 3854 (1973 & Supp. 1992); *A.J. Industries, Inc. v. United States Dist. Ct., 503 F.2d 384 (9th Cir. 1974)*.

The parties may designate a particular forum in which any litigation between them is to take place. Forum selection clauses are presumptively valid. *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S. Ct. 1907, 1913, 32 L. Ed. 2d 513 (1972)*. Absent a showing of fundamental unfairness, the fact that the forum selection clause is found in a standard form agreement is not sufficient grounds to find the clause unenforceable. *Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 111 S. Ct. 1522, 1527,* n2, *113 L. Ed. 2d 622*

> n2  The parties have devoted a significant amount of their argument to whether federal or Texas state law should be applied to the forum selection clause in this case. DCS contends that under Texas state law, which concededly applies to the Financing Agreement, a venue selection provision which would "usurp venue or jurisdiction from a Texas court" is invalid. In light of this Court's determination that a transfer of venue is required for the convenience of witnesses and in interests of justice under § 1404(a), it is not necessary to resolve the federal vs. state law argument. However, it is worth noting that in the Ninth Circuit, the validity of forum selection clauses is governed by federal law. *Spradlin v. Lear Siegler Management Services, 926 F.2d 865, 867 (9th Cir. 1991); Manetti-Farrow, Inc. v.*

*Gucci America, Inc., 853 F.2d 509, 513 (9th Cir. 1988)*.

[*5]

However, even where a valid forum selection clause exists, the Court may still evaluate the factors set out in *28 U.S.C. § 1404*(a), to determine whether "the interests of justice" or the "convenience of witnesses" mandates transfer under § 1404(a). As was noted by the Supreme Court in *Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 108 S. Ct. 2239, 2244, 101 L. Ed. 2d 22 (1988)*:

> Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 812, 11 L. Ed. 2d 945 (1964)*. A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors. The presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus.

In considering the "interests of justice" the court considers such factors as "ensuring speedy trials, trying related litigation together, and having a judge who is familiar with the applicable law try the case." [*6] *Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989)*. Ordinarily, where the forum lacks any significant contact with the activities alleged in the complaint, plaintiff's choice of forum is given considerably less weight, even if the plaintiff is a resident of the forum. Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (TRG, 1985), § 4:284, citing *Chrysler Capital Corp. v. Woehling, 663 F. Supp. 478 (D.De. 1987)* and *Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 990 (E.D.N.Y. 1991)*.

### 2. Analysis

Plaintiff IBMCC argues not only that its choice of forum entitled to great weight, but also that this district is the forum in which the parties expressly agreed to litigate all claims arising out of the financing agreements executed between the parties in April of 1993, because the financing to DCS was provided through IBMCC's branch office in San Ramon, California.

For the following reasons, this Court finds that a transfer of venue to Texas under § 1404(a) would best serve the interests of justice and the convenience of witnesses.

The complaint in this action involves a dispute over a series of agreements [*7] executed in Texas with a Texas corporation, DCS, and with two individual residents of Texas. The Financing Agreement and the Guaranties were executed in and were to be performed in Texas, and concerned the extension of credit for goods to be delivered in Texas. IBMCC does not dispute that virtually all of the witnesses are in Texas. n3 Thus, the Court finds that the presence witnesses in Texas -- and IBMCC's failure to demonstrate the presence of any witnesses in California -- favors transfer. *Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1293 (7th Cir. 1989).*

> n3 DCS states, and IBMCC does not dispute, that "all the witnesses who would be called by the Garlands or DCS relating to the causes of action brought against IBMCC are citizens of Texas."

Furthermore, IBMCC is a defendant in the state court action, which is currently pending in Texas state court and which had been pending there against IBM Corp. for almost a year before this case was filed. IBMCC has already participated in the Texas [*8] state court action from its Dallas office, e.g., it has filed an answer, a motion to dismiss and has participated in taking the deposition of Henry Garland. Thus, IBMCC, itself a Delaware corporation doing business in Dallas County, Texas, would not be unduly burdened by the additional litigation in that state. n4

> n4 While it is not essential to this decision, the Court notes that defendants DCS and Mr. and Mrs. Garland have submitted a declaration stating that they are financially unable to litigate this matter in California; that they have already retained Texas counsel who are substantially involved in the litigation of the Texas lawsuit; and that they could not afford to pay for attorneys' fees in California beyond initial motions.

The forum selection clause is the main argument upon which IBMCC relies in support of its position that California is the only appropriate venue. IBMCC makes

no specific arguments regarding the convenience of non-party witnesses and access to sources of proof other than its vague [*9] statement that it is "extremely likely that there will be no witnesses other than the parties themselves." While such venue clauses are "significant factors," in this case virtually nothing else connects this case to this forum.

The Court also notes that the particular clause that is at issue in this case does not actually mention California. It merely states that venue will be in the district where "the branch office who provides the financial accommodations is located." In all of the cases cited by IBMCC, the forum selection clause at issue designated a particular geographic location, lending some support to the proposition that the parties in those cases had actually agreed to the specified forum. Nothing in this form agreement provides such support, particularly since the immediately preceeding sentence stated clearly that Texas law would govern the agreement. However, because the Court finds that transfer is clearly in the interests of justice and will substantially enhance the convenience of witnesses, the Court need not resolve the enforceability of this particular venue provision.

Finally, it is undisputed that Texas law controls at least a portion of this action. The Financing [*10] Agreement provides that "the laws of the state of Texas will govern this Agreement." In considering whether a transfer of venue is "in the interests of justice," courts look to the district most familiar with the governing law. Wright & Miller at § 3854. Although not dispositive, this is significant.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby finds that under all the circumstances of this case, transfer of this matter from this district to the Northern District of Texas will promote the convenience of witnesses and is in the interests of justice, and therefore hereby TRANSFERS this action to the Northern District of Texas.

IT IS SO ORDERED.

Dated: February 27, 1996.

SUSAN ILLSTON

United States District Judge

LEXSEE 2003 US DIST LEXIS 20338

ITALIAN COLORS RESTAURANT, on behalf of itself and all similarly situated persons, Plaintiffs, v. AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., Defendants.

No. C 03-3719 SI

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2003 U.S. Dist. LEXIS 20338*

November 7, 2003, Decided
November 10, 2003, Filed; November 10, 2003, Entered in Civil Docket

**DISPOSITION:** [*1] . Defendants' motion to transfer venue GRANTED. Plaintiffs' motion to consolidate and appoint lead counsel denied.

LexisNexis(R) Headnotes

**COUNSEL:** For Italian Colors Restaurant, PLAINTIFF: Blaine H Bortnick, Liddle & Robinson, LLP, New York, NY USA. Christopher William Hellmich, Esq, Patton Boggs, LLP, Washington, DC USA. David S Markun, Markun Zusman & Compton LLP, San Francisco, CA USA. Edward Zusman, Markun Zusman & Compton LLP, San Francisco, CA USA. Gary B Friedman, Friedman & Shube, New York, NY USA. Kevin K ENG, Markun Zusman & Compton LLP, San Francisco, CA USA. Read K McCaffrey, Patton Boggs, LLP, Washington, DC USA.

For American Express Travel Related Services Company, Inc, American Express Company, DEFENDANTS: Bruce Schneider, Stroock & Stroock & Lavan LLP, New York, NY USA. D Wayne Jeffries, Stroock & Stroock & Lavan LLP, Los Angels, CA USA. Heidi Balk, Esq, Stroock & Stroock & Lavan LLP, New York, NY USA. Stephen J Newman, Stroock & Stroock & Lavan LLP, Los Angeles, CA USA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINIONBY:** SUSAN ILLSTON

**OPINION:**

ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF NEW YORK AND DENYING PLAINTIFFS' MOTION TO CONSOLIDATE AND APPOINT LEAD [*2] COUNSEL

On November 7, 2003, this Court heard oral argument on defendants' motion to transfer venue and plaintiffs' motion to consolidate and appoint lead counsel. Having considered the arguments of counsel and the papers submitted, the Court hereby TRANSFERS venue to the Southern District of New York, and DENIES plaintiffs' motion as premature.

**BACKGROUND**

This action was filed in this Court on August 8, 2003. Months earlier, however, in June, 2003, a virtually identical action, based on a nearly verbatim complaint, was filed in the Eastern District of New York, on behalf of New York-based merchants and small business owners representing a proposed nationwide class ("Phuong Complaint"). Mot. to Transfer, Ex. A. The Phuong complaint was voluntarily dismissed at plaintiffs' behest on July 16, 2003, after defendants filed notice of their intent to file a motion to dismiss. Decl. of Schneider at 2. One day before the dismissal notice in the Phuong action, plaintiffs' counsel filed the same complaint in the Central District of California using a different local business as the named plaintiff ("Il Forno Complaint"). Id. The Il Forno complaint was filed [*3] but never served on defendants. Id. Roughly three weeks later, the instant complaint was filed in the Northern District of California. All three actions, including the complaint currently before this Court, allege violations by defendants American Express Co. and American Express Travel Related Services (hereinafter collectively referred to as "American

Exhibit V
Page 153

Express," unless required by context) of *Sections 4 and 16* of the Clayton Act, *15 U.S.C. § § 15, 26,* and *Section 1 of the Sherman Act, 15 U.S.C. § 1.* Compl. P4.

Plaintiffs allege that certain provisions of the standard contract executed by all merchants who agree to accept American Express cards constitute anticompetitive tying arrangements. Id. at P45. The standard contract requires merchants who accept the American Express charge card to accept the American Express credit card. Id. Unlike a credit card, a charge card is not a means of financing, but a "method of payment." Id. at P18. Charge card users must pay their balance in full each month, as opposed to credit card users, who use their cards to access revolving credit based on a predetermined interest rate. Id. at PP18, [*4] 28. Merchants are willing to pay higher fees to access the American Express charge card member base, based on perceptions that charge card users are more affluent. Id. at P23. These perceptions are supported by data indicating that the average purchase on an American Express charge card is 17% higher than the average credit card purchase. Id. at P24.

For every purchase made on a credit or charge card, merchants pay a "discount rate" to the credit or charge card company. The discount rate for competitor credit cards such as Visa and MasterCard is usually between 0.85 and 1.8%. Id. at PP22, 43. According to plaintiffs, American Express unlawfully leverages its charge card member base to force merchants to accept its credit card at a "grossly supracompetitive" discount rate of 3.0%. Id. at PP2, 21. Similar tying arrangements formerly employed by Visa and MasterCard were discontinued as part of a settlement agreement in a similar antitrust action. Id. at P43, citing *In re Visa Check/Mastermoney Antitrust Litigation, 2003 U.S. Dist. LEXIS 4965, 2003 WL 1712368 (E.D.N.Y. Apr. 1, 2003).* Plaintiffs allege that the American Express tying arrangement is an unlawful restraint of trade [*5] under federal antitrust laws. Compl. P3. Now before the Court are defendants' motion to transfer venue to the Southern District of New York, and plaintiffs' motion to consolidate cases and appoint lead counsel.

## LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil matter to any other district or division where it might have been brought." *28 U.S.C. § 1404(a).* The purpose of *§ 1404(a)* is to "'prevent the waste of time, energy, and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack, 376 U.S. 612, 616, 84 S. Ct. 805, 809, 11 L. Ed. 2d 945 (1964),* citing *Continental Grain Co. v. The FBL-585, 364 U.S. 19, 26-27, 80 S. Ct. 1470, 1474-75, 4 L. Ed. 2d 1540 (1960).* A motion for transfer

lies within the broad discretion of the district court, and must be determined on an individualized basis. See *Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000),* citing *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 2244, 101 L. Ed. 2d 22 (1988).* [*6]

To support a motion for transfer, the moving party must establish: (1) that venue is proper in the transferor district; (2) that the transferee district is one where the action might have been brought; and (3) that the transfer will serve the convenience of the parties and witnesses and will promote the interests of justice. See *Goodyear Tire & Rubber Co. v. McDonnell Douglas Corp., 820 F. Supp. 503, 506 (C.D. Cal. 1992).* In determining the convenience of the parties and witnesses and the interests of justice, the Ninth Circuit considers "multiple factors" including:

> (1) location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the contacts relating to the plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and (8) the ease of access to sources of proof.

*Jones, 211 F.3d at 498-99.* The existence of a forum selection [*7] clause, along with the forum state's relevant public policy, may also comprise "significant factor[s] in the court's *§ 1404(a)* analysis." *Id.*

## DISCUSSION

### I. Defendants' motion to transfer venue

On a motion to transfer, the moving party must first demonstrate that venue is proper in both the transferor and transferee courts, as required by the first two components of the *Goodyear* test. Thereafter, the Court uses the multi-factor determination set forth in Jones to establish the third element of Goodyear: convenience to the parties and witnesses, and the interests of justice. In this case, venue is proper in both the transferor and transferee courts under *15 U.S.C. § 22,* which provides for the filing of an antitrust suit against a corporation in any district where it conducts business. Accordingly, the dispute centers on which party is favored by application of the

Exhibit V
Page 154

ten Jones factors. As explained infra, this balance weighs heavily in favor of transferring the action to the Southern District of New York.

**A. Location where the relevant agreements were negotiated and executed**

The parties do not dispute that the individual [*8] named plaintiff in this action executed the agreement from its place of business in California. Plaintiffs argue that more of the relevant tying agreements were executed by merchants in California than in any other state. Opp'n. at 5. Plaintiffs support this statement with state-by-state analyses of credit card receivables and overall retail sales. Decl. of Zusman, Ex. A, B. Neither of these statistics, however, is broken down by creditor, making it impossible to tell how much of the share belongs to American Express. Moreover, as the most populous state in the country, California has a disproportionate share of many economic activities. By this logic, as defendants illustrate, "virtually every significant class action case would need to be litigated in California," a logic that has been repeatedly rejected. See, e.g., *Ho v. Ikon Office Solutions, Inc., 143 F. Supp. 2d 1163, 1167-68 (N.D.Cal. 2001).*

Many merchants throughout every state in the nation negotiated and executed identical agreements. If the named plaintiff purports to act on behalf of a nationwide class of merchants, there is nothing unique or probative about the location of its place of business. Furthermore, [*9] while the agreements with respect to defendant TRS may have been mailed from its offices in Phoenix, Arizona, the New York office, as the principal place of business, is likely to have drafted the original agreement and developed the business policy behind it. Neither party alleges that every agreement was negotiated in person. The very nature of this type of agreement, which is transmitted through the mail and executed by merchants at thousands of individual businesses throughout the country, deprives this factor of any weight in the analysis of proper venue.

**B. Forum state most familiar with the governing law**

Plaintiffs correctly state that where federal law governs all claims raised, "either forum is equally capable of hearing and deciding those questions." *DealTime.com Ltd. v. McNulty, 123 F. Supp. 2d 750, 757 (S.D.N.Y. 2000).* Although the merchant agreements at issue contain a New York choice of law clause, such a provision alone does not demonstrate that federal courts sitting in New York have a more well-developed body of antitrust law than those in California. Accordingly, this factor, like the last, weighs in favor of neither party.

**C. Plaintiffs' [*10] choice of forum**

Generally, courts afford considerable weight to a plaintiff's choice of forum in determining a motion to transfer, subject to various conditions. See *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419 (1981).* The plaintiff's choice is given less deference where, as here, the action is brought on behalf of a nationwide class. See *Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987); Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524, 67 S. Ct. 828, 832, 91 L. Ed. 1067 (1947)* ("where there are hundreds of potential plaintiffs . . . the claim of any one plaintiff that a forum is appropriate merely because it is his home is considerably weakened.").

The complaint admits that all potential class members "have been damaged in precisely the same fashion, by precisely the same conduct." Compl. P16. Interchangeable plaintiffs could be and have been found in several districts, including the Eastern District of New York, where the first cause of action was filed. Decl. of Schneider, Ex. A. Notably, in that case, the same counsel representing plaintiffs in the present action asserted [*11] that venue was proper in the Eastern District of New York because the defendants "may be found or transact business" there, and "have marketed their charge card services . . . to thousands of merchants within [the Eastern District]." Mot. to Transfer, Ex. A, Phuong Compl. P5. Here, the only contact between the proposed plaintiff class and this district is the individual named plaintiff's place of business. This contact is no more forceful than the link between the thousands of potential class members and their respective districts, a roster which surely includes every district court in the nation.

Furthermore, the Ninth Circuit has established that courts should disregard a plaintiff's forum choice where the suit is a result of forum-shopping. See *Alltrade, Inc., v. Uniweld Products, Inc., 946 F.2d 622, 628 (9th Cir. 1991).* One could rationally infer forum shopping here, based on plaintiffs' repeat filing and plaintiffs' admitted perceptions that California provides a more favorable rule of decision, as discussed below. Plaintiffs voluntarily dismissed the Phuong action one day before filing the first California case. Decl. of Schneider at 2. The first California [*12] case, in the Central District, was filed but never served on defendants. *Id.* Throughout this "odyssey," as defendants put it, the roster of plaintiffs' counsel has remained substantially the same. n1

> n1 One member of plaintiffs' local counsel was employed at a different firm in New York when the New York case was filed. Id. at Ex. A.

At oral argument, plaintiffs stated that they brought suit in California so as to avail themselves of the Ninth

Exhibit V
Page 155

Circuit's disfavor of arbitration clauses within adhesion contracts. According to plaintiffs, the relocation became necessary after it came to their attention during the Phuong action that not all potential class members had signed identical merchant agreements. Merchants who signed on after a certain year were bound by a compulsory arbitration clause, while others were not bound. Plaintiffs stated that in order to serve their entire proposed class equitably, they sought a venue where the two groups of merchants would be treated identically as a matter of law, [*13] assuming a negation of the arbitration clause.

Pursuit of a venue where a class can be maintained without bifurcation is not a disfavored strategy per se, but this does not explain plaintiffs' forum shopping within California. Plaintiffs secured the perceived tactical gain they purportedly seek when they first filed suit in the Central District. If plaintiffs' sole objective in repeat filing was to accrue perceived benefits for their class as a whole, this does not explain why they filed complaints in both the Central and Northern Districts. The Court's forum shopping concerns persist. Accordingly, plaintiffs' choice of forum is disregarded.

### D. Respective parties' contacts with the forum

Plaintiffs' contacts with the forum, as previously discussed, are of minimal value in a class action, especially in view of plaintiffs' forum shopping. In addition to their demographic analyses of credit card receivables as described in subsection (A) supra, which this Court rejects, plaintiffs also urge the Court to consider other lawsuits as contacts between the defendants and this forum. Opp'n. to Mot. to Transfer at 7. According to plaintiffs, one or more of the defendants is a party [*14] in 225 civil cases and more than 25,000 bankruptcy proceedings currently pending in California courts. Decl. of Zusman at 2. However, plaintiffs offer no source of law which instructs the Court to count unrelated lawsuits as contacts for the purposes of determining venue. Neither party has substantial contacts with the present forum.

### E. Contacts relating to the plaintiff's cause of action in the chosen forum

Here, again, plaintiffs argue that this district is the most appropriate forum because Californians have more small businesses and hence have executed more American Express merchant contracts than any other state. Opp'n. to Mot. to Transfer at 7. Plaintiffs offer no evidence to show that per capita, California is significantly more affected by the contracts than other states, including New York. As in subsection (A), this argument finds no place here.

### F. Difference in the cost of litigation

Litigation costs weigh heavily in favor of transfer to the Southern District of New York, with regard to both documentary and testamentary evidence. Documents pertaining to defendants' business practices are most likely to be found at their principal place of business. Although [*15] developments in electronic conveyance have reduced the cost of document transfer somewhat, the cost of litigation will be substantially lessened if the action is venued in the same district where most of the documentary evidence is found. A reduction in document sharing and litigation costs serves both parties as well as the public interest. Plaintiff Italian Colors, on the other hand, can be expected to contribute comparatively little documentary evidence to the action. As explained above, its interests are entirely fungible with those of a potential class member in the Southern District of New York.

Generally, litigation costs are reduced when venue is located near most of the witnesses expected to testify or give depositions. Beyond merely having a principal place of business in New York, defendants specifically name at least two individual American Express officers based in New York whose expertise and expected testimony is directly relevant to the claims. Mot. to Transfer at 9, citing *Maxon v. Jefferson Pilot Securities Corp., 2002 U.S. Dist. LEXIS 5888, 2002 WL 523575, *4 (N.D.Cal. Apr 2, 2002)* (relevant expertise of potential witnesses dispositive when transferring venue based on relative [*16] location of witnesses). Since the claims arise solely out of defendants' business practices, the parties would expect that most of the witnesses will be the defendants' employees. Accordingly, this factor weighs heavily in favor of transfer.

### G. Availability of non-party witnesses

Plaintiffs predict that the most "important" non-party witnesses are likely to be employees and officers of Visa U.S.A., which plaintiffs characterize as defendants' largest competitor. Opp'n to Mot. to Transfer at 1. Visa maintains offices within this district in San Francisco and Foster City. Id. As defendants point out, this approach comprises "an entirely different logic to [plaintiffs'] original choice of venue [New York]," which was premised on defendants' place of business. Reply in Supp. of Mot. to Transfer at 4. Further, plaintiffs appear to understate the value of non-party witnesses from MasterCard, another credit card competitor with its principal place of business in the Southern District of New York. Id. at 4; Supp. Schneider Decl. at Ex. 1. Plaintiffs do not attempt to explain how non-party witnesses from Visa would provide more probative information about the relevant market [*17] share and competitive business practices than those from MasterCard or any other non-party. This factor does not weigh in plaintiffs' favor.

### H. Ease of access to sources of proof

Exhibit V
Page 156

This factor derives from the same operative facts as subsection (F) supra, and weighs heavily in favor of venue transfer.

**I. Forum selection clause**

As stated in Jones, the presence of a forum selection clause functions as a ninth factor weighing in favor of venue transfer. See *211 F.3d at 499*. In the instant case, the individual plaintiff signed a merchant agreement in 1993 that had a New York choice of law clause, but did not have a forum selection clause. Decl. of Alterman at 1, Ex. E. The most recent merchant agreement, dated May 2003, does contain a New York forum selection clause. Id., Ex. F. It is unclear what year the forum selection clause first appeared on the merchant agreement. Plaintiffs argue that if the clause first appeared in 2003, the percentage of the potential class bound to it is a relatively small fraction, as most potential class members will have signed an earlier agreement. Even in the light most favorable to the plaintiff, assuming that [*18] the clause made its debut in 2003, and thereby applies to only a part of the proposed plaintiff class, this factor still leans in favor of venue transfer, since the clause never mentioned California or any other state.

**J. Public policy**

Lastly, plaintiffs urge the Court to consider the forum state's public policy interest in declining to enforce the merchant agreement's collective action waiver and compelled arbitration provisions. Opp'n. to Mot. to Transfer at 2-3. Plaintiffs rely on Jones, wherein the Ninth Circuit held that the forum selection clause of a franchise agreement, which would otherwise be honored under federal law, was precluded by California's strong public policy interest against such provisions. See *211 F.3d at 499*. Jones, however, is distinguishable from the instant action because the public policy at issue there concerned venue itself, rather than the merits of the claim. Id.

Plaintiffs cite *Ting v. AT&T, 319 F.3d 1126 (9th Cir. 2003)* and *Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101 (9th Cir. 2003)* as a source of California's public policy against anti-class action and compelled arbitration [*19] clauses. However, this is but one possible interpretation of public policy. As defendants point out, an equally plausible interpretation is that arbitration clauses do not offend the public policy of either New York, California, or federal common law - each of which has its own "well-developed body of law regarding arbitration." Id. More importantly, the question of arbitration is not presently before the court; its invocation as a source of public policy is premature on a motion to transfer. In short, plaintiffs fail to illustrate how transfer will offend the public policy of this Court's forum state.

Plaintiffs' argument concerning California public policy is further weakened by the fact that plaintiffs filed, but did not serve and apparently did not intend to pursue, a claim in the Central District. In sum, all factors not neutral in disposition weigh in favor of venue transfer. Accordingly, defendants' motion to transfer venue is GRANTED and venue is hereby TRANSFERRED to the Southern District of New York.

**II. Consolidation and appointment of lead counsel**

Even in the absence of venue transfer, consolidation under *Federal Rule of Civil Procedure 42(a)* [*20] is a device constricted in scope to multiple cases pending in the same district. Plaintiffs cite no authority by which this Court could divest other Article III courts of jurisdiction over matters pending before them. Only the presiding court can order transfer of venue. See 15 Fed. Prac. & Proc. Juris. 2d § 3844. Moreover, appointment of lead counsel is premature before other counsel file cases on behalf of other clients. No competition exists among counsel that requires refereeing by the Court, and no class has yet been certified, or even proposed. If and when this becomes problematic, the Judicial Panel on Multi-District Litigation is the appropriate arbiter.

Having granted defendants' motion to transfer venue, however, plaintiffs' motion to consolidate and appoint lead counsel is DENIED as premature. This motion is not proper before the transferor court, and should be reserved for the transferee court.

**CONCLUSION**

For the foregoing reasons and for good cause shown:

(1) Defendants' motion to transfer venue is GRANTED and this action is TRANSFERRED to the Southern District of New York; and

(2) Plaintiffs' motion to consolidate and appoint lead counsel is denied. [*21]

IT IS SO ORDERED.

Dated: November 7, 2003

SUSAN ILLSTON

United States District Judge

Exhibit V
Page 157

Westlaw.

Not Reported in F.Supp.
1995 WL 396848 (N.D.Cal.)
(Cite as: 1995 WL 396848 (N.D.Cal.))

Page 1

**C**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
Bradley K. TOY, Plaintiff,
v.
GENERAL ELECTRIC CO. and Does 1-100,
Defendant.
Civ. No. C 95-20060 RPA.

June 27, 1995.
Bradley K. Toy, in pro. per.

Ulrico S. Rosales, Carissa Smith, McCutchen,
Doyle, Brown & Enersen, Menlo Park, CA.

ORDER GRANTING DEFENDANT'S MOTION
TO TRANSFER VENUE

AGUILAR, District Judge.

*1 Plaintiff Bradley Toy brings this action against
his former employer, Defendant General Electric Co.
("G.E."), alleging claims for wrongful termination in
violation of public policy, breach of contract and
breach of the implied covenant of good faith and fair
dealing. The parties are diverse. Toy is a citizen of
Georgia. G.E. is a New York corporation, with its
principal place of business in Connecticut.
Accordingly, this court has subject matter jurisdiction
pursuant to 28 U.S.C. § 1391(a). G.E. now moves to
transfer venue to the Northern District of Georgia.
Based on the following, G.E.'s motion is GRANTED.

BACKGROUND

Toy began working for G.E. in May of 1984. In July
of 1988, G.E. assigned Toy to the Technical Service
Operation of the General Electric Nuclear Energy
("GENE") in Norcross, Georgia.

In 1992, while at G.E., Toy alleges that he informed
GENE's legal staff in San Jose, California that certain
in-house vendors appeared to be fraudulently billing
false charges to certain of G.E.'s clients. Toy claims
that G.E. refused to take any action to compensate its
clients for these false billings, and that G.E.
terminated his employment to cover up the whole

matter.

G.E. presents a different reason for terminating Toy.
According to G.E., during 1992 Toy was accused by
several co-workers of sexual harassment. G.E.
investigated these allegations and ultimately found
them to be without merit. However, the investigation
allegedly revealed that Toy had engaged in otherwise
unacceptable behavior in the workplace.

In any event, it is undisputed that G.E. terminated
Toy's employment on November 9, 1992.

Toy brought suit in Santa Clara County Superior
Court on October 28, 1994 alleging three causes of
action: 1) wrongful termination in violation of public
policy; 2) breach of contract; and 3) breach of the
implied covenant of good faith and fair dealing. G.E.
removed this action to federal court on January 26,
1995. Now G.E. moves to transfer venue to the
Northern District of Georgia.

DISCUSSION

Title 28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the
interest of justice, a district court may transfer any
civil action to any other district or division where it
might have been brought.

Section 1404(a) grants the district court broad
discretion to consider case-specific circumstances in
adjudicating a motion to transfer venue. Chrysler
Credit Corp. v. Country Chrysler, Inc., 928 F.2d
1509, 1516 (10th Cir. 1991). Among the factors a
court should consider in determining whether to grant
a transfer are 1) the place where the operative facts
occurred; 2) the plaintiff's choice of forum; 3) the
accessibility of witnesses and other sources of proof;
4) the cost to parties; 5) the availability of
compulsory service of process for unwilling
witnesses; 6) the forum's familiarity with the
governing law; and 7) trial efficiency and the
interests of justice. Decker Coal Co. v.
Commonwealth Edison Co., 805 F.2d 834, 843 (9th
Cir. 1986); Oxford Transp. Serv., Inc. v. MAB
Refrigerated Transp., Inc., 792 F. Supp. 710, 713-14
(D. Kan. 1992); Viacom Int'l, Inc. v. Melvin Simon
Prod., Inc., 774 F. Supp. 858, 867-68 (S.D. N.Y.
1991). Courts generally frown upon transfers unless
the convenience and justice factors strongly favor
venue elsewhere. Decker Coal, 805 F.2d at 843.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00041-JJF   Document 37-6   Filed 01/23/2006   Page 36 of 63

Page 2

### A. Venue in the Transferee Court

\*2 This action could have been brought in the Northern District of Georgia since there is subject matter jurisdiction over the claim, personal jurisdiction over the defendant, and venue is proper.

### 1. Subject Matter Jurisdiction

The federal courts have original jurisdiction over actions in which the parties are diverse. 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Georgia. Defendant G.E. is a New York Corporation, with its principal place of business in Connecticut. There is complete diversity among the parties. Accordingly, the district court in Georgia would have subject matter jurisdiction over the case.

### 2. Personal Jurisdiction

G.E. acknowledges that the Northern District of Georgia has personal jurisdiction over it in this matter.

### 3. Venue

In an action founded on diversity of citizenship, venue is proper in a district in which a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(a). In this case, Toy resides in Georgia. Further, he was employed in Georgia, and received his termination notice in Georgia. All events and circumstances concerning the basis for termination occurred in Georgia. Toy's only nexus to California is some correspondence with G.E.'s Human Resources and Legal departments, and a supervisor in San Jose. This contact is insignificant when weighed against the events occurring in Georgia. Accordingly, venue is proper in the Northern District of Georgia.

Since the U.S. District Court for the Northern District of Georgia has subject matter jurisdiction over the claim, personal jurisdiction over the defendant, and venue is proper, the action could have properly been brought there.

### B. The Interests of Justice

### 1. Operative Facts

G.E. contends the operative facts took place in Georgia. Toy contends the claim arose in California since he was terminated in California and his personnel documents are maintained there. The operative facts occurred in the Northern District of Georgia. As stated above, Toy is a resident of Georgia, worked in Georgia and received his termination notice in Georgia. Additionally, the sexual harassment investigation was conducted in Georgia and the fraudulent billing was practiced and detected in Georgia. The connection to California is based solely on correspondence and records maintained there. Therefore, the operative facts occurred in the Northern District of Georgia.

### 2. Plaintiff's Choice of Forum

Toy's choice of forum is a factor to be considered in determining a question of transfer pursuant to 28 U.S.C. § 1404(a). Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955). A plaintiff's choice however, has minimal value, or should be given less consideration, where plaintiff is not a resident of the judicial district in which he has instituted the suit. Pacific Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir. 1968), Reyno v. Piper Aircraft Co., 454 U.S. 235, 255 (1981).

Toy is not a resident of California. Therefore, his choice of forum should be given little consideration.

### 3. Witnesses and Other Sources of Proof

\*3 The convenience to both the movant's witnesses and his opponent's must be balanced when considering a motion to transfer venue. Can-Base Prod., Ltd. v. Portrait Records, 445 F. Supp. 777, 779 (S.D. N.Y. 1978). The court will not transfer venue where inconvenience merely shifts from one party to the other. Harris Trust & Sav. Bank v. SLT Warehouse Co., Inc., 605 F. Supp. 225, 227 (N.D. Ill. 1985). Here, it is not inconvenient for Toy to prosecute this case in Georgia because he lives there.

Toy argues that the material witnesses are exclusively in the Northern District of California. G.E. contends that the material witnesses are in the Northern District of Georgia. Since the facts giving rise to the claim occurred in Georgia, it is more likely that the majority of the key witnesses are also in Georgia.

Toy relies on California primarily as a source of documents and correspondence. Documents, as opposed to witnesses, may be produced with considerably less burden. Hartford Accident & Indem. Co. v. Dalgarno Transp., Inc., 618 F. Supp. 1450, 1452 (S.D. Miss. 1985) (While location of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.
Exhibit W
~ Page 159

Not Reported in F.Supp.
1995 WL 396848 (N.D.Cal.)
(Cite as: 1995 WL 396848 (N.D.Cal.))

Page 3

documents is a factor to consider, allegations that transfer is needed because of such records is not enough), *Bianco v. Texas Instruments, Inc. 627 F. Supp. 154, 165 (N.D. Ill. 1985)* (Arguments concerning locations of documents are not compelling under § 1404(a) given relative ease of photocopying and shipping). All documents required by Toy are in the possession of G.E. and are thus required disclosures under *Fed. R. Civ. P. 26 (a)(1)(B)* or alternatively may be requested pursuant to *Fed. R. Civ. P. 34(a)*. Since the material witnesses will primarily be found in Georgia, and relevant documents may still be accessed, there will be no inconvenience to Toy. Transfer therefore, will provide greater access to the sources of proof.

*4. The Cost to Parties*

The relative ability of litigants to bear the expenses of trial in a particular forum is a factor to be considered in ruling on a motion to transfer. *Gen. Portland Cement Co. v. Perry, 204 F.2d 316, 320 (7th Cir. 1953)*. Toy is an individual suing a large corporation. Arguably, this factor weighs against transfer. However, the parties' relative financial ability is not entitled to great weight, and this factor alone cannot prevent transfer where convenience of the parties' and witnesses clearly favor transfer. *Bolton v. Tesoro Petroleum Corp., 549 F. Supp. 1312 (E.D. Pa. 1982)*.

*5. Compulsory Service*

The district court may serve a subpoena at any place within the district of the court in which it is issued, or at any place outside the district that is within 100 miles of the place of the trial. *Fed. R. Civ. P. 45(b)(2)*.

Toy argues that if venue is transferred to Georgia he will be unable to reach necessary witnesses in California. G.E. presumably will encourage and support the travel of employee witnesses who reside outside the Georgia court's jurisdiction. Toy will also be able to reach these employee's through G.E. Third parties who are beyond the reach of the district court may not be compelled to attend and testify at trial for either side. However, *Fed. R. Civ. P. 30(a)* permits any party to take the oral deposition of any person or party. Depositions are an available means of procuring their testimony. Therefore, the availability of compulsory service of process is entitled to minimal consideration.

*6. Georgia law will be applied*

*4 A federal court sitting in a diversity action must apply the substantive law that a state court in the same jurisdiction would apply, including the forum state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-497 (1941)*. When an action is subsequently transferred to another district court pursuant to *28 U.S.C. § 1404(a)*, the transferee court must apply the same law as the original court would have applied. *Ferens v. John Deere Co., 494 U.S. 516 (1990)*. "A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Van Dusen v. Barrack, 376 U.S. 612, 639 (1964)*.

California follows the Second Restatement when resolving a choice of law problem. 1 Witkin, *Contracts, § 40 (9th ed. 1987)*. The Restatement advocates flexibility without the application of mechanical rules. *Id.* Instead, a case by case evaluation is made considering the significant interests of the litigants and the involved states. *Reich v. Purcell, 67 Cal.2d 551, 553 (1967)*.

Both California and Georgia have significant interests. California has an interest in ensuring that G.E., a resident employer, does not act in violation of state law. Georgia on the other hand, has an interest in protecting its citizens from harm by a foreign corporation, as well as in regulating corporate conduct within its borders.

Despite the strong competing interests, it appears that Georgia law must be applied to this case. Failure to apply Georgia's wrongful termination law would produce "an unprincipled exception to Georgia's ability to govern the affairs of foreign corporations operating within the state." *Thomason v. Mitsubishi Elec. Sales Am., Inc., 701 F.Supp. 1563, 1567 (N.D. Ga. 1988)*.

*Thomason* is on all fours with this case. In that case, the plaintiff, a former employee of a corporate resident of California, resided in, and was employed in Georgia. The plaintiff filed suit in the Northern District of California, alleging wrongful termination, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. The court granted the defendant's motion to transfer the case to the Northern District of Georgia. Applying California's choice of law rules, the Georgia court concluded that Georgia's interests would be most impaired by failure to apply its laws. The court reasoned that Georgia law governed the defendant's conduct within the state and would apply

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 396848 (N.D.Cal.)
(Cite as: 1995 WL 396848 (N.D.Cal.))

Page 4

to all other aspects of the defendant's relations with its employees. Similarly, in this case Toy resides in Georgia and was employed in Georgia. Since, again, Georgia's interests would be most impaired, it appears the court must apply Georgia law.

A United States District Court in the State of Georgia is better equipped to preside over a diversity case that involves entirely Georgia law. When this is coupled with the fact that Toy resides in Georgia and all operative facts occurred there we must transfer venue.

### CONCLUSION

*5 The action could have been properly brought in the Northern District Court of Georgia. Since the convenience of the parties and the interest of justice favor transfer, this case is ORDERED transferred to the U.S. District Court for the Northern District of Georgia.

IT IS SO ORDERED.

1995 WL 396848 (N.D.Cal.)

Motions, Pleadings and Filings (Back to top)

•       5:95CV20060            (Docket)
(Jan. 26, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

Knits 'N' Tweeds, Inc.
v.
Jones New York et al.

District Court, E. D. New York

No. 77 C 2428

Decided Jan. 25, 1979
United States Patents Quarterly Headnotes

### TRADEMARKS

[1] Pleading and practice in courts -- Transfer to another district (§ 53.77)

Equitable considerations weigh in favor of transferring action to district in which defendant has filed action against plaintiff for trademark infringement, even though that action was later filed, where defendant's attorney sent letter to plaintiff requesting that it cease infringing defendant's trademark rights, plaintiff's counsel replied 20 days later denying infringement, defendant's counsel replied 3 days later repeating demand, and plaintiff filed suit 3 days later, since one circumstance which justifies giving priority to second suit filed is where initial suit has been filed as retaliation in apparent anticipation of second suit.

*966 Action by Knits 'N' Tweeds, Inc., against Jones New York, and Jones Apparel Group, Inc., for money owed, in which defendants counterclaim for trademark infringement. On defendants' motion to transfer. Motion granted.

Sol Horenstein, New York, N.Y., for plaintiff.

*967 Howard Justvig, and Becker Ross & Stone, both of New York, N.Y., and Manny D. Pokotilow, and Caesar, Rivise, Bernstein & Cohen, Ltd., both of Philadelphia, Pa., for defendants.

Nickerson, District Judge.

This action was commenced on November 22, 1977 in the Supreme Court of the State of New York, County of Suffolk to recover sums allegedly owed by defendants to plaintiff for labor and services. The action was subsequently removed to this court, and defendants counterclaimed for trademark infringement and various common law liabilities.

On November 29, 1977, Jones Apparel Group, Inc. ("Jones") filed a trademark infringement action and an action for an accounting against Knits 'N' Tweeds in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 77-4078). Knits 'N' Tweeds' motion to transfer that action to this court was denied on May 1, 1978 on the ground that it had not shown the "... balance of convenience to the parties and the other proper factors [to] tip so strongly in its favor as to warrant transfer . . . ."

Jones now moves, pursuant to 28 U.S.C. § 1404(a), to transfer this action to the Eastern District of Pennsylvania where it would move to consolidate it with Civil Action No. 77-4078.

[1] The rule in this circuit is that the first suit filed should have priority, "'absent the showing of balance of convenience in favor of the second action' . . . or unless there are special circumstances which justify giving priority to the second." William Gluckin & Co. v. International Playtex Corp., 407 F.2d 117, 178, 160 USPQ 513-514 (2d Cir. 1969) quoting Remington Products Corp. v. American Aerovap Inc., 192 F.2d 872, 91 USPQ 312 (2d Cir. 1951). One such "special circumstance" is where the initial suit has been filed in "apparent anticipation" of the second suit. Cf. Factors, Etc. Inc. v. Pro Arts Inc., et al., 579 F.2d 215, 219 (2d Cir. 1978) citing Amerada Petroleum Corp. v. Marshall, 381 F.2d 661, 663 (5th Cir. 1967); Columbia Pictures Industries, Inc. v. Schneider, 435 F.Supp. 742, 747 (S.D.N.Y. 1977) (declaratory judgment action triggered by a notice letter). In the case of such retaliatory action, "equitable consideration[s] may be a factor in the decision to allow the later filed action to proceed . . . ." Id.

The present action by Knits 'N' Tweeds appears to be just such a retaliatory action. On October 21, 1977, Jones' attorney sent a letter to Knits 'N' Tweeds requesting that it cease infringing Jones' trademark rights and account for all proceeds from the sale of garments bearing the Jones New York label. Knits 'N' Tweeds' counsel replied on November 11, 1977, denying that Jones merchandise with Jones New York labels had been intentionally sold by Knits 'N' Tweeds. On November 14, 1977, Jones' counsel replied and repeated the demand that Knits 'N'

COPR. © 2005 The Bureau of National Affairs, Inc.

Exhibit X
Page 162

Tweeds refrain from any further sale of Jones New York goods with or without the Jones New York label. On November 22, 1977, Knits 'N' Tweeds brought the present action. Thus, equitable considerations weigh in favor of allowing the second action brought in the Eastern District of Pennsylvania to proceed.

Furthermore, the "balance of convenience" clearly tips in favor of the second action. The two actions are substantially alike, and Jones' records relating to the transactions in question are located at its principal offices in Bristol, Pennsylvania.

Moreover, Jones points out that transfer is warranted for the convenience of witnesses. In this regard it has submitted a letter, dated January 19, 1979, specifying the key witnesses to be called and the substance of their testimony. See Factors, Etc., supra at 218. All of the employees Jones presently plans to call -- Donald B. McGinnis, Stanley Levin, John Sammartino, Carmen Parr -- live in or near Bristol, Pennsylvania and are employed at Jones' Bristol facility.

In addition, the yarn shortages referred to in Jones' counterclaim were determined by Radnor Yarns which is located in Philadelphia, Pennsylvania. Jones intends to call Jules Satinsky, the principal of Radnor, to testify on this matter.

Finally, Jones submits that transfer of this action would foster judicial economy since the action in the Eastern District of Pennsylvania is now substantially advanced and ready for trial.

In view of these factors, and the refusal of the United States District Court for the Eastern District of Pennsylvania to transfer the case presently before it to this district, it is in the interest of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation . . .," Kerotest Mfr. Co. v. C-O-Two Fire Equipment Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200, 92 USPQ 1, (1952), to transfer this action to the Eastern District of Pennsylvania. The motion is granted. So ordered.

E.D.N.Y.

205 U.S.P.Q. 966

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

Exhibit X
Page 163

LEXSEE 2000 US DIST LEXIS 22525

LEAR CORPORATION, a Delaware corporation, Plaintiff, vs. BERTRAND AND
FAURE TECHNICAL CENTER, a Delaware corporation, Defendant.

Case No. 00-CV-72895

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*2000 U.S. Dist. LEXIS 22525*

October 10, 2000, Decided
October 10, 2000, Filed

SUBSEQUENT HISTORY: Motion granted by, Stay
granted by *Lear Corp. v. Bertrand Faure Tech. Ctr.,
2001 U.S. Dist. LEXIS 25479 (E.D. Mich., Sept. 4, 2001)*

DISPOSITION: [*1] Defendant BFTC's motion to
dismiss DENIED, without prejudice. Defendant BFTC's
motion for more definitive statement GRANTED.

LexisNexis(R) Headnotes

COUNSEL: For Lear Corporation, PLAINTIFF: John M
Halan, Ginta D Kukainis, Brooks & Kushman, South-
field, MI USA.

For Lear Corporation, PLAINTIFF: Kevin D Hogg, Mar-
shall, Gerstein, Chicago, IL USA.

For Bertrand Faure Technical Center, Incorporated,
DEFENDANT: Stewart L Mandell, Dykema Gossett,
Ann Arbor, MI USA.

JUDGES: GEORGE CARAM STEEH, United States
District Judge.

OPINIONBY: GEORGE CARAM STEEH

OPINION:

OPINION,    AND    ORDER    DENYING
DEFENDANT'S  MOTION ,  TO  DISMISS,  AND
GRANTING DEFENDANT'S MOTION FOR A MORE
DEFINITIVE STATEMENT

Defendant Bertrand and Faure Technical Center
("BFTC") moves to dismiss plaintiff Lear Corporation's
patent infringement claims or, in the alternative, for a
more definitive statement. The facts and legal arguments

presented in the parties' briefs are sufficient to adjudicate
the motion. Oral argument would not significantly aid
the decisional process. Pursuant to E.D. Mich. Local R.
7.1(e)(2), it is ORDERED that the motion be resolved
without oral argument. The motion hearing scheduled for
October 16, 2000 at 2:00 p.m. in Ann Arbor, Michigan
[*2] is hereby ADJOURNED. For the reasons set forth
below, defendant BFTC's motion to dismiss will be
DENIED. Defendant's motion for a more definitive
statement will be GRANTED.

Lear filed its complaint on June 27, 2000 alleging it
owns patent number 5,795,019 ("the 019 Patent") cover-
ing a motor vehicle seat and headrest arrangement. In the
one count complaint, Lear alleges BFTC "has been, is, is
engaged in an activity directed toward, and/or is making
meaningful preparation for, inducing the infringement of
and/or contributorily infringing, the '019 patent." Com-
plaint, P 13, at 3. Plaintiff Lear further alleges BFTC's
infringement "has been and/or is willful", that defendant
has "indicated a refusal to change the course of its ac-
tions in the face of acts by [plaintiff] Lear sufficient to
create a reasonable apprehension that a suit would be
forthcoming", and that defendant BFTC "will continue
directly, contributorily, and/or by inducement, to infringe
the '019 patent, and/or will continue to be engaged in an
activity directed toward, and/or making meaningful
preparation for, directly, contributorily, and/or by in-
ducement infringing the '019 patent, unless and until
enjoined by this [*3] Court." Complaint, PP 14-16, at 4.
Lear seeks damages, and declaratory and injunctive relief
relative to their claim that defendant BFTC "has been, is,
is engaged in an activity directed toward, and/or is mak-
ing meaningful preparation for, infringing the '019 patent
directly, contributorily, and/or by inducement." Com-
plaint, at 4-5.

BFTC moves to dismiss plaintiff Lear's claims or for a more definitive statement arguing at the outset that Lear has failed to allege a third-party infringer requisite to sustaining an actionable claim of contributory infringement or inducing infringement. BFTC continues that Lear cannot sustain a patent infringement claim premised on alleged preparatory conduct short of actual infringement. BFTC urges that, to prepare a proper defense, it must be notified whether Lear's claims are based upon an actual or threatened infringement, as well as the specific conduct and products that underlie plaintiff's infringement claims.

Pursuant to Title *35 U.S.C. § 271*:

> (a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports [*4] into the United States any patented invention during the term of the patent therefor, infringes the patent.
>
> (b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> (c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

*35 U.S.C. § 271(a-c)*. Indirect infringement by inducement or contribution requires a showing that the defendant caused others to use the patented product in an infringing way, and actively and knowingly aided or encouraged another's direct infringement. *Ducimate Industries, Inc. v. Famous Supply Corp., 55 F. Supp.2d 777, 786, 786 n.10 (N.D. Ohio 1999)* (citing *Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 [*5] (Fed.Cir.), cert. denied, 488 U.S. 963, 102 L. Ed. 2d 534, 109 S. Ct. 498 (1988))*. It must also be proven that the accused inducer actually intended to encourage the patent infringement. *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 488, 12 L. Ed. 2d*

*457, 84 S. Ct. 1526, 1964 Dec. Comm'r Pat. 760(1964); Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed.Cir.1990))*. Both infringement by inducement and infringement by contribution require proof that the defendant had actual knowledge of the plaintiff's patents. Id.

Procedurally, a complaint must contain a short plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for relief the pleader seeks. See *Fed. R. Civ. P. 8(a)*. If the complaint is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the defendant may move for a more definitive statement before filing the answer. See *Fed. R. Civ. P. 12(e)*. While a complaint need only give "fair notice" of what the plaintiff's claim is and [*6] the grounds upon which it rests, the "fair notice" standard requires more than the bare pleading of legal conclusions. *DeLorean Motor Co. v. Weitzman, 991 F.2d 1236, 1240 (6th Cir. 1993)* (citing *Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990)* and *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988))*. Federal Rule of Civil Procedure *12(b)(6)* authorizes a court to dismiss a claim as a matter of law if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

Defendant's argument that no set of facts could support the plaintiff's claims of direct patent infringement, infringement by inducement, or infringement by contribution, is impossible to assess at this juncture because the complaint merely sets forth legal conclusions without any factual grounds upon these conclusions rest. *DeLorean, 991 F.2d at 1240*. Plaintiff Lear has alleged it owns the rights to the 019 Patent, and that defendant [*7] BFTC has directly and indirectly infringed upon the patent. Plaintiff Lear's allegations are vague, giving no hint how BFTC has allegedly infringed the 019 Patent - the grounds for alleging patent infringement. Without adequate notice, BFTC is left to speculate what it is accused of doing that infringes the '019 patent. As the complaint stands, BFTC is left only to answer whether it agrees that the '019 Patent is owned by Lear, and whether it believes it has in any way infringed the '019 Patent since it was issued on August 18, 1998. The court finds defendant BFTC is entitled to "fair notice" of the grounds of plaintiff Lear's legal claims before filing a meaningful answer. Lear is entitled to provide such notice to defendant BFTC in an amended complaint in which Lear will have the opportunity to provide a more definitive statement of the grounds for its claims. Dismissal at this early juncture of the lawsuit would be inappropriate; it remains possible for plaintiff Lear to allege factual grounds under which it

Exhibit Y
Page 165

may be entitled to relief. *Conley, 355 U.S. at 45-46.* Accordingly,

Defendant BFTC's motion to dismiss is hereby DENIED, without prejudice. Defendant BFTC's motion [*8] for a more definitive statement is hereby GRANTED. Plaintiff Lear shall file a first amended complaint consistent with the analysis herein within 21 days of receipt of this Opinion and Order.

SO ORDERED.

GEORGE CARAM STEEH

United States District Judge

Dated: 10 OCT 2000

Detroit, Michigan.

Westlaw.

14 U.S.P.Q.2d 1064
1989 WL 205724 (D.N.J.), 14 U.S.P.Q.2d 1064
(Cite as: 14 U.S.P.Q.2d 1064)

Page 1

C

Levinson
v.
Regal Ware Inc.

District Court, D. New Jersey

No. 89-1298 (MTB)

Decided October 6, 1989 and December 1, 1989
United States Patents Quarterly Headnotes

## JUDICIAL PRACTICE AND PROCEDURE

[1] Jurisdiction - Venue; transfer of action - In patent actions (§ 405.1907)

Patent infringement action filed by pro se New Jersey resident against Wisconsin corporation is transferred, pursuant to 28 USC 1404(a), from federal district court in New Jersey to federal district court in Wisconsin, since balance of interests favors transfer, in view of evidence demonstrating that defendant's principal place of business is in Wisconsin, all documents relating to creation, manufacture, and design of disputed inventions, as well as those relating to marketing and total sales of defendant's products, are maintained there, all marketing and design decisions relating to products at issue were made there, all of defendant's employees and production designers are located either in Wisconsin or in Indiana, and it is less burdensome for plaintiff to travel to Wisconsin than it is for defendant and its witnesses to travel to New Jersey.

*1064 Action by Melvin L. Levinson against Regal Ware Inc. for patent infringement. On defendant's motion to transfer. Motion granted.

*1065 Melvin L. Levinson, pro se, for plaintiff.

Robert J. Schneider, Evan M. Kent, and Jane S. Berman, of McDermott, Will & Emery, Chicago, Ill. (Peter M. Laughlin of Ribis, Graham, Verdon & Curtin, Morristown, N.J., of counsel), for defendant.

Barry, J.

This matter having been opened to the Court on motion of defendant to transfer this action pursuant to 28 U.S.C. § 1404(a) to the Eastern District of Wisconsin, {FN1} and the Court having considered

the papers and affidavits submitted by the parties in support of and in opposition to the above motion, pursuant to Fed.R.Civ.P. 78; and

it appearing that plaintiff *pro se* is a resident of the State of New Jersey and that he has brought a patent infringement action against defendant relating to the manufacture and sale of microwave oven products; *see* Complaint, paras. 1, 4-9; and

it appearing that defendant is a Wisconsin corporation with its principal place of business in Kewaskum, Wisconsin, and that defendant there maintains all of the documents relating to the creation, manufacture and design of the disputed inventions; *see* Affidavit of James D. Reigle, sworn to August 16, 1989 (hereinafter "Reigle Affidavit") at para. 10; and

it being the opinion of the Court that transfer may be granted where such transfer would serve the interests of justice and present a more convenient forum for both the parties and witnesses, provided that the transferee forum is one in which the action might otherwise have been brought, 28 U.S.C. § 1404(a); and

it being the opinion of the Court that this action is one in which subject matter jurisdiction, personal jurisdiction, and venue would be proper in the Eastern District of Wisconsin; [FN2] and

it being the opinion of the Court that when a motion to transfer is made pursuant to Section 1404(a), the burden rests upon the moving party to establish that a balancing of interests weighs strongly in favor of transfer, *see Shutte v. Armco Steel Corporation*, 431 F.2d 22, 25 (3d Cir. 1970), *cert. den.*, 401 U.S. 910 (1970); and

it being the further opinion of the Court that, although the plaintiff's choice of forum is generally considered to be a paramount consideration in any determination of a transfer request, *Shutte*, 431 F.2d at 25, plaintiff's choice of forum need not be rigidly adhered to in a patent infringement case when it appears that the balance of convenience tips substantially in the direction of another forum. *See Stanley Works v. Globemaster, Inc.*, 400 F.Supp. 1325, 1339 [187 USPQ 80] (D.Mass. 1975). [FN3]; and

14 U.S.P.Q.2d 1064                                                                        Page 2
1989 WL 205724 (D.N.J.), 14 U.S.P.Q.2d 1064
(Cite as: 14 U.S.P.Q.2d 1064)

\*1066 it appearing that all of the marketing and
design decisions relating to the products at issue here
were made in the Eastern District of Wisconsin, and
that all of the defendant's employees and production
designers with knowledge of same are located in
either Wisconsin or Indiana, *see* Reigle Affidavit at
paras. 4-10; and

it further appearing that all of the pertinent
documents relating to the marketing and total sales of
defendant's products are also located in the Eastern
District of Wisconsin, *see* Reigle Affidavit at para.
10; and

it being the belief of the Court that it is less
burdensome on the plaintiff to travel to Wisconsin
than it is for the defendant and defendant's witnesses
to travel to New Jersey, [FN4]; and

[1] it therefore being the opinion of the Court that
the balance of interests in this case favor transfer to
the Eastern District of Wisconsin;

It is on this 5th day of October, 1989,

ORDERED, that defendant's Motion to Transfer this
action to the Eastern District of Wisconsin is hereby
granted.

### ORDER

December 1, 1989
This matter having been opened to the Court upon
the motion of plaintiff Melvin L. Levinson
(hereinafter "Levinson") for reconsideration of this
Court's order of October 6, 1989 transferring this case
to the United States District Court for the Eastern
District of Wisconsin, and the Court having
considered the submissions of the parties both in
support of and in opposition to the above motion
without oral argument, pursuant to Federal Rule of
Civil Procedure 78 [FN5]; and

it being the opinion of the Court that General Rule
12(I) of the General Rules of the District Court for
the District of New Jersey requires a litigant to file
with his or her motion for reconsideration "a
memorandum setting forth concisely the matters or
controlling decisions which [he or she] believes the
Court has overlooked" and

it being the further opinion of the Court that General
Rule 12(I) "does not ... contemplate a Court looking
to matters which were not originally presented for

consideration,"*see Florham Park Chevron, Inc. v.
Chevron U.S.A., Inc., 680 F.Supp. 159, 161-162
(D.N.J. 1988) (noting DeLong Corp. v. Raymond
International, Inc., 622 F.2d 1135, 1140 (3rd Cir.
1980),* and that a litigant seeking reconsideration
must therefore show that any new evidence presented
to the Court was unavailable or unknown at the time
of the original hearing, *DeLong, 622 F.2d at 1140;*
and

it being the opinion of the Court that Levinson has
failed to set out in a concise \*1067 manner the
controlling decisions which he believes the Court has
overlooked, and that Levinson has produced no new
material for consideration, let alone material which
was unavailable to him at the time of this Court's
previous decision;

It is on this 30th day of November, 1989,

ORDERED, that Levinson's motion to alter the
Court's order of October 27, 1989 is hereby denied.

> FN1 The Court notes as a preliminary matter
> that plaintiff's papers in opposition to the
> present motion have requested both an
> evidentiary hearing "to test the validity of
> defendant's affidavits" and a preliminary
> injunction barring defendant from producing
> certain products as to which plaintiff claims
> to hold valid patents. No reason has been
> stated as to why the validity of defendant's
> affidavits requires testing and no motion for
> a preliminary injunction has been made.
> Therefore, I will not consider either request.

> FN2 Subject matter jurisdiction would exist
> under 28 U.S.C. § 1338(a), which provides a
> district court with jurisdiction over patent
> infringement claims. Personal jurisdiction
> would exist over the defendant, whose place
> of incorporation and principal place of
> business are both located within the State of
> Wisconsin. *See International Shoe Co. v.
> Washington, 326 U.S. 310 (1945).* Venue
> would be proper under 28 U.S.C. § 1400(b),
> which provides: "Any civil action for patent
> infringement may be brought in the judicial
> district where the defendant resides, or
> where the defendant has committed acts of
> infringement and has a regular and
> established place of business". The
> defendant company is physically situated
> within the Eastern District of Wisconsin. *See*
> Defendant's Memorandum In Support of

COPR. © 2005 The Bureau of National Affairs, Inc.

Page 3

Motion to Transfer Action (hereinafter "Defendant's Brief") at 6; Reigle Affidavit at para. 1. Although plaintiff maintains that defendant has already agreed to litigate this matter in New Jersey, the Court does not find defendant to have made such a commitment. *See* Affidavit of Robert J. Schneider, sworn to September 15, 1989 (hereinafter "Schneider Affidavit") at paras. 6-9.

FN3 The Court notes that throughout the federal system, no clear rule has been applied regarding the quantum of weight to be assigned to the plaintiff's choice of forum. Thus, while some courts grant the plaintiff's selection "great weight", *see e.g., Ammon v. Kaplow,* 468 F.Supp. 1304, 1313 (D.C.Kan. 1979), or state that the plaintiff's selection should be "rarely disturbed", *see e.g., Arkansas-Best Freight Sys., Inc. v. Youngblood,* 359 F.Supp. 1125, 1129 (W.D.Ark. 1973), other courts simply treat the plaintiff's selection as one factor among many to be considered. *See, e.g., Artisan Development, Division of Kaiser Aetna v. Mountain States Development Corp.,* 402 F.Supp. 1312, 1316 (S.D.Ohio 1975); *Garner v. Wolfinbarger,* 433 F.2d 117 (5th Cir. 1970). *See generally,* 15 Wright, Miller & Cooper, Jurisdiction and Related Matters, § 3848.What is clear from the case law as a central tenet in the application of Section 1404(a), however, is a concern that litigation proceed in that place where the case finds its "center of gravity". *See Blender v. Sibley,* 396 F.Supp. 300, 302 (E.D.Pa. 1975); *Clopay v. Newell Companies, Inc.,* 527 F.Supp. 733, 736 [231 USPQ 636] (D.Del. 1981). As has been well summarized in *Blender,* the factors considered under this approach are 1) the location of the corporate defendant's principal offices; 2) the residence of the individual defendants; 3) the residence of potential witnesses; 4) the location of pertinent documents and records; and 5) the location where the challenged conduct was conceived, executed, and performed. *Blender,* 396 F.Supp. at 302, In patent infringement suits in particular, it has been noted that "The trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered on its production". *See AMP Incorporated v. Burndy of Midwest, Inc.,*

340 F.Supp. 21, 24-25 [172 USPQ 389] (N.D.Ill. 1971); *see also S.C. Johnson & Son. Inc. v. Gillette Co.,* 571 F.Supp. 1185, 1187-1188 (N.D.Ill. 1983) (forum where all testing, development, research and production of product took place is proper location for patent infringement).

FN4 Plaintiff has acknowledged that he would be required to travel to Wisconsin for the purpose of deposing witnesses regardless of whether or not this lawsuit remains in New Jersey. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Transfer (hereinafter "Defendant's Opposition Brief") at 5. While it might be said that this militates in favor of allowing the action to remain in New Jersey inasmuch as it cannot be said that the Wisconsin defendant and its witnesses would be inconvenienced if the plaintiff must travel to them for purposes of collecting discovery, the Court takes a longer view of the litigation and notes that, should this case proceed to trial, it will be far more convenient for the sole plaintiff to travel to Wisconsin than for the defendant and its staff to travel to New Jersey for trial. *See, e.g., Burbank Intern. Ltd. v. Gulf Con. Intern. Inc.,* 441 F.Supp. 819, 823 (N.D.Tex. 1977) (where corporation is sued in a district in which it does not have its principal place of business and · the transportation of witness/employees away from place of defendant's business for lengthy period of trial would be an undue disruption of defendant company's business, transfer will be granted).

FN5 As an initial matter, I note that defendant herein, Regal Ware, Inc. (hereinafter "Regal") suggests that this court lacks subject matter jurisdiction to decide the present motion. I cannot agree. While Regal correctly states as a general matter that a "transferror court ... loses all jurisdiction over a case once transfer has occurred", Defendant's Memorandum in Opposition To Motion For Reconsideration at 1, transfer has not yet occurred in this case. It is well settled that prior to the physical transfer of the record to the transferee forum, transfer has not occurred and the transferor court retains authority to review its order. *See e.g., Fisher v. United*

14 U.S.P.Q.2d 1064
1989 WL 205724 (D.N.J.), 14 U.S.P.Q.2d 1064
(Cite as: 14 U.S.P.Q.2d 1064)

Page 4

> *Air Lines, Inc.,* 218 F.Supp. 223, 224 (S.D.N.Y. 1963) (power to vacate a transfer order prior to delivery of papers to transferee court); *see also, In re Sosa,* 712 F.2d 1479, 1480 (CA DC 1983) (appellate jurisdiction after transfer).

D.N.J.

14 U.S.P.Q.2d 1064

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.2d
2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P 28,292, 2001 Copr.L.Dec. P 28,303
(Cite as: 2001 WL 637378 (S.D.N.Y.))

Page 1

C

Motions, Pleadings and Filings

United States District Court, S.D. New York.
Joseph MAHNKE, Plaintiff(s),
v.
MUNCHKIN PRODUCTS, INC., Defendant(s).
No. 99Civ.4684(LTS)(THK).

June 7, 2001.

*OPINION AND ORDER*

SWAIN, J.

*1 On March 29, 2001, Magistrate Judge Theodore H. Katz issued a Report and Recommendation ("Report") recommending that defendant's motion to dismiss the complaint in the above-captioned action be granted as to claims accruing earlier than the three years immediately prior to the filing of the complaint and that the motion be granted, with leave to replead in accordance with the Report, with regard to claims for infringement accruing within the three years immediately prior to the filing of the complaint. There were no objections interposed to the Report. The Court has thoroughly reviewed Judge Katz's comprehensive and well-reasoned Report and has determined that there is no clear error on the face of the record. The Court adopts the Report, which is reproduced below, for the reasons stated therein.

On April 27, 2001, the undersigned received in chambers a document denominated "Amended Complaint," from plaintiff Joseph Mahnke, appearing *pro se.* The document is not accompanied by a certificate of service although it is indicated that a copy was sent to counsel for the defendant. The Amended Complaint appears to be plaintiff's effort to replead in accordance with Judge Katz's Report.

On May 2, 2001, the parties signed a Stipulation of Adjournment granting defendant an extension of time to answer plaintiff's amended complaint. The stipulation was submitted to the Honorable Lewis A. Kaplan, who formerly presided over this matter. Judge Kaplan signed the stipulation, granting the request.

Plaintiff is hereby directed to file the Amended Complaint with a certificate of service within twenty (20) days of the date hereof. In accordance with the Order of Reference to a Magistrate Judge, dated August 2, 2000, Judge Katz supervises all pretrial matters in the case. All communications regarding pretrial matters should therefore be directed to his attention.

REPORT AND RECOMMENDATION

KATZ, Magistrate J.

This action was referred to me, pursuant to 28 U.S.C. § § 636(b) (1)(B) and (C), for general pretrial supervision and the resolution of dispositive motions requiring a Report and Recommendation. *Pro se* plaintiff, Joseph Mahnke, brings this action against defendant Munchkin, Inc., alleging that defendant, through the production of a baby soda bottle, infringed plaintiff's registered copyright in a drawing. Defendant now moves to dismiss this action for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), for a more definite statement, pursuant to Fed.R.Civ.P. 12(e), and to strike irrelevant and immaterial references to patent issues, pursuant to Fed.R.Civ.P. 12(f). For the following reasons, I respectfully recommend that: 1) defendant's motion to dismiss as to infringement claims accruing earlier than the three years immediately prior to the filing of the Complaint, be granted; and 2) defendant's motion to dismiss as to claims, if any, for infringement accruing within the three years immediately prior to the filing of the Complaint, be granted, but with leave to replead consistent with the following recommendations.

BACKGROUND

*2 Joseph Mahnke ("Mahnke"), through his sparse half-page Complaint filed March 23, 1999, ostensibly alleges that Munchkin Product's Inc. ("Munchkin"), beginning in 1993, infringed plaintiff's copyright-protected drawing through the production of a similar product. *See* Complaint.

On June 29, 1999, then Chief Judge Griesa issued an Order dismissing Mahnke's Complaint for failure to properly allege a copyright infringement claim. *See* Order to Dismiss, dated June 29, 1999. The Court, in making its determination, found that the Complaint failed to establish proof of copyright ownership,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proof of copyright registration certification, and failed to describe the work being infringed in sufficiently specific terms. *See id.* In response to the Order of Dismissal, Mahnke filed a Notice of Appeal, dated July 23, 1999, that was subsequently dismissed by the Court of Appeals on December 7, 1999. *See* Court of Appeals Mandate, *Mahnke v. Munchkin,* 99 Civ. 4684(LTS), Dkt. # 7.

Undeterred, Mahnke, on February 3, 2000, filed a motion to reconsider the June 29 dismissal Order. *See* Plaintiff's Motion for Reconsideration ("Mot. for Rec."). After consideration of Mahnke's motion, Judge Griesa vacated his previous order and determined that Mahnke had sufficiently supported his claim for copyright infringement by providing the Court with a photocopy of the statutory certificate of copyright registration for Mahnke's work entitled "Toys for Soda Beverage Bottle" (effective date September 3, 1991), copyright registration number VA 219 103 pertaining to the work, and a photocopy of the drawing to which the copyright protection applies. *See* Mot. for Rec.; Order granting Mot. for Rec., dated March 16, 2000 ("March 16 Order"). In detailing his copyright infringement allegations for the Court, Mahnke alleged that Munchkin's manufacture of a "decorated baby soda bottle," beginning some time in 1993, constituted an infringing copy of his copyright-protected drawing. *See* Mot. for Rec.; March 16 Order.

Defendant subsequently filed the instant motion seeking to dismiss the Complaint, or in the alternative, for a more definite statement and to strike certain immaterial or impertinent material from the Complaint. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss Complaint ("Def.Mem.").

## DISCUSSION

### I. *Standards under Rule 12(b)(6)*

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations of the Complaint in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 67 (2d Cir.1996); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). Dismissal is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45- 6, 78 S.Ct. 99, 102 (1957); *see also Harris v. City*

*of New York,* 186 F.3d 243, 250 (2d Cir.1999); *Automated Salvage,* 155 F.3d at 67; *Hernandez,* 18 F.3d at 136.

*3 Furthermore, "[t]he Supreme Court has long held that courts must construe *pro se* complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliot v. Bronson,* 872 F.2d 20, 21 (2d Cir.1989) (per curiam) (citing *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175 (1980) and *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595 (1972) (per curiam)). Accordingly, where the plaintiff is proceeding *pro se,* the Court must read plaintiff's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996); *see also Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

### II. *Copyright Infringement Claim*

#### A. *Statute of Limitations*

The applicable statutory limitations provision for copyright infringement actions provides in relevant part that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S .C. § 507(b); *see also Maurizio v. Goldsmith,* 84 F.Supp.2d 455, 461 (S.D.N.Y.2000); *Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 639-640 (S.D.N.Y.2000). A copyright infringement claim accrues, for purposes of § 507(b), when the plaintiff knows or should have known of the alleged infringement. *See Maurizio,* 84 F.Supp.2d at 461 (citing *Merchant v. Levy,* 92 F.3d 51, 56 (2d Cir.1996)); *Armstrong,* 91 F.Supp.2d at 640 (citing *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992)).

Even a cursory examination of Mahnke's initial pleading and subsequent motion for reconsideration reveals an express acknowledgment by Mahnke that he viewed Munchkin as infringing his copyright in 1993, a full six years prior to Mahnke's filing of the Complaint in this action. *See* Complaint; Mot. for Rec. On the face of his initial Complaint, plaintiff readily acknowledges that the instant copyright infringement action relates to "a product that was manufactured in 1993." Complaint. Similarly, the first paragraph of plaintiff's two page memorandum supporting his motion for reconsideration plainly states that the "potential infringement of the two dimensional toy started in 1993." Mot. for Rec. Moreover, plaintiff clearly knew of the alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit AA
Page 172

Page 3

infringement as of 1993, since he asserts that he contacted and subsequently submitted a copy of his drawing to Munchkin in 1993 in order to "resolve the matter amicably." Mot. for Rec.

Thus, Mahnke's Complaint, filed in 1999, seemingly comes three years after the expiration of the applicable statute of limitations for copyright infringement. *See* Mot. for Rec. Nonetheless, construing *pro se* plaintiff's Complaint and motion for reconsideration liberally, [FN1] plaintiff has potential claims for copyright infringement that accrued within three years of the filing of this action, thus preventing the dismissal of this action in its entirety.

> FN1. For purposes of this motion, the Court reads plaintiff's motion for reconsideration liberally as an amended pleading, given that it contains the gravamen of his allegations and was the basis for Judge Griesa's Order vacating his earlier dismissal of this action. *See* March 16 Order.

*4 The Second Circuit, although not endorsing a continuing violation approach to copyright infringement, permits recovery of damages for discrete acts of infringement occurring during the three-year period immediately prior to suit. *See Stone, 970 F.2d at 1049-50; see also Armstrong, 91 F.Supp.2d at 641* (citations omitted); *Byron v. Chevrolet Motor Div. Of General Motors Corp., No. 93 Civ. 1116(AJP), 1995 WL 465130,* at *3 (S.D.N.Y. Aug. 7, 1995). Every infringing act is considered a distinct harm, giving rise to an independent claim for relief; however, recovery is limited to those infringing acts occurring within the three years preceding suit. *See Stone, 970 F.2d at 1049-50; see also Armstrong, 91 F.Supp.2d at 642; Rosner v. Codata Corp., 917 F.Supp. 1009, 1017 (S.D.N.Y.1996); Byron, 1995 WL 465130,* at *3.

It cannot be discerned simply from the pleadings whether Munchkin's allegedly infringing product, identified by Mahnke as a "baby soda bottle," was in production within the three years prior to the filing of the instant action. If it was, a timely and distinct cause of action would exist at each instance plaintiff's copyright-protected drawing was allegedly copied or distributed. *See Armstrong, 91 F.Supp.2d at 642.* Although damage claims for alleged infringement accruing earlier than three years prior to plaintiff's filing of this Complaint are time-barred under § 507(b), it would be improper to dismiss this claim with respect to acts of infringement occurring within

three years of the filing of this suit. *See Byron, 1995 WL 465130,* at *3 (citing *Stone, 970 F.2d at 1049-50); see also Armstrong, 91 F.Supp.2d at 642.* Therefore, defendant's motion to dismiss, under § 507(b), should be granted only as to copyright infringement claims accruing earlier than March 23, 1996.

*B. Laches*

Munchkin's memorandum in support of its motion to dismiss raises, but ultimately fails to fully articulate or demonstrate, a laches defense. *See* Def. Mem. at 6, n. 5. In order to successfully invoke the equitable doctrine of laches, Munchkin must demonstrate both a "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Peyser v. Searle Blatt & Co., Ltd.,* No. 99 Civ. 10785(WK), 2000 WL 1071804, at *4-5 (S.D.N.Y. Aug. 2, 2000); *Armstrong, 91 F.Supp.2d at 643* (citing *Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 543 (1961)); see also Jose Armando Bermudez & Co. v. Bermudez Int'l.,* No. 99 Civ. 9346(AGS), 2000 WL 1225792, at *8 (S.D.N.Y. Aug. 29, 2000) (citing *Tri-Star Pictures Inc. v. Leisure Time Prods., BV, 17 F.3d 38, 44 (2d Cir.1994)).* Contrary to Munchkin's assertion, "mere delay is not, in and of itself, sufficient to bar a claim." *Armstrong, 91 F.Supp.2d at 643* (citing *Fort Knox Music Inc. v. Baptiste, 47 F.Supp.2d 481, 484 n. 1 (S.D.N.Y.1999).*

*5 Although it is evident that Mahnke waited over six years to file his Complaint, Munchkin fails to proffer any evidence suggesting that Mahnke's delay in filing suit resulted in prejudice. *See Byron 1995 WL 465130,* at *8 (requiring a showing of a "little prejudice," despite plaintiff's seven-year delay in bringing action, in order to prevail on a laches defense). Accordingly, this action cannot be dismissed on the basis of laches at this early stage of the proceedings. *Cf. Peyser, 2000 WL 1071804,* at *3 (noting that a consideration of laches requires a fact-based inquiry, often unsuited to dispositive motions before discovery has taken place); *Jose Armando Bermudez & Co., 2000 WL 1225792,* at *8 (same). This is not intended to suggest, however, that laches would not be a valid basis for dismissal upon a more fully developed record.

*C. Sufficiency of Plaintiff's Copyright Infringement Pleading*

A properly pled claim of copyright infringement must state 1) which specific original works are the

© 2005 Thomson/West. No Claim to Orig. U S Govt. Works..
**Exhibit AA**
Page 173

subject of the copyright claim, 2) that plaintiff owns the copyright in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts and during what time the defendant infringed the copyright. *See Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D .N.Y.1992), *aff'd,* 23 F.3d 398 (2d Cir.1994); *see also Plunket v. Doyle,* No. 99 Civ. 11006(KMW), 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001); *Lindsay v. R.M.S. Titanic,* 52 U .S.P.Q.2d 1609, 1612 (S.D.N.Y.1999); *DiMaggio v. Int'l Sports Ltd.,* 49 U.S.P.Q.2d 1215, 1216 (S.D.N.Y.1998). The Court finds that Mahnke's Complaint only addresses the first three of these elements, and fails to satisfy the fourth element necessary in order to sufficiently state a claim for copyright infringement.

Through his motion for reconsideration, Mahnke clearly demonstrates his drawing, "Toys for Soda Beverage Bottle," is the original work subject to copyright protection, and he properly establishes ownership of that work by presenting a certificate of registration from the United States Register of Copyrights. [FN2]

> FN2. A certificate of registration issued from the United States Register of Copyrights, aside from establishing one of the necessary criteria for stating a copyright infringement claim, concurrently "constitutes prima facie evidence" of copyright ownership, although that "presumption may be rebutted." *Carell v. The Shubert Org., Inc.,* 104 F.Supp.2d 236, 251 n. 10 (S.D.N.Y.2000) (citing *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992)).

Mahnke has not, however, properly alleged by what acts and during what period of time the defendant infringed his copyright. This Court accepts defendant's assertion that it is difficult to respond to plaintiff's generic references to an infringing "baby soda bottle," which fail to identify those specific Munchkin products, or particular elements of the products, that are allegedly infringing.. *See* Complaint; Mot. for Rec.; Def. Mem. For example, accepting that Munchkin has been manufacturing baby soda bottles since at least 1993, it cannot be discerned from the Complaint whether Mahnke alleges that all of Munchkin's bottle products infringe or whether defendant continues to produce these allegedly infringing bottles. Moreover, since Mahnke only has a copyright in an illustration, it is unclear if he is claiming that there is a pictorial element of Munchkin's bottles that infringes or that the bottles

themselves are infringing objects. These omissions leave plaintiff's Complaint lacking in detail sufficient to afford defendant the opportunity to draft a meaningful responsive pleading.

*6 For the foregoing reasons, plaintiff's copyright infringement claims should be dismissed without prejudice. Considering, however, that the pleading's deficiencies may be curable, the prudent course here is to afford the plaintiff an opportunity to replead. *See Plunket,* 2001 WL 175252, at * 6; *DiMaggio,* 49 U.S.P.Q.2d at 1218. If plaintiff chooses to replead, he should address, with sufficient specificity, the particular Munchkin product, products, or aspect of those products that allegedly infringes plaintiff's copyright, and he should further specify the dates or periods of time during which these particular products are alleged to have infringed plaintiff's copyright.

### D. Motion to Strike

Defendant has also moved, pursuant to Rule 12(f), to strike plaintiff's references to patent issues, as they are immaterial to the copyright infringement action. The Court agrees; however, in light of the dismissal of the present Complaint, the motion to strike is rendered moot. Nevertheless, the basis for defendant's motion is well-taken and should prompt plaintiff to avoid references to irrelevant patent matters in any amended complaint.

Plaintiff appears to suggest that defendant's alleged copyright infringement of his drawing obstructed or altogether prevented his ability to seek future patent protection of his idea. *See* Mot. for Rec. Nonetheless, Mahnke concedes that he does not possess patent protection, may or may not have a patent application pending, and that defendant's product has been in the public use for at least several years. *See* Mot. for Rec. On these facts it is clear that plaintiff is not arguing and cannot maintain a claim of patent infringement. [FN3] Moreover, plaintiff's mistaken conflation of patent and copyright issues creates confusion and further burdens defendant's ability to draft a responsive pleading as to the copyright infringement issue, which is the relevant subject matter of the instant litigation.

> FN3. In order to state a claim of patent infringement, the plaintiff must allege that a person (1) without authority of the patent holder, (2) makes, uses, offers to sell, sells, or imports any patented invention within the United States, (3) during the term of the

patent. *See* 35 U.S.C. § 271(a) (2000); *see
also Markman v. Westview Instruments,
Inc.,* 517 U.S. 370, 374, 116 S.Ct. 1384,
1388 (1996). Even construing *pro se*
plaintiff's Complaint and motion for
reconsideration liberally, plaintiff, as a
matter of law, cannot maintain a cognizable
claim for patent infringement, without first
being a patent owner.

Accordingly, any amended complaint filed by
plaintiff should exclude any and all references
regarding patent issues, as they are irrelevant and
create confusion regarding his copyright infringement
claim.

## CONCLUSION

For the reasons set forth above, I respectfully
recommend that defendant's motion to dismiss
pursuant to Rule 12(b)(6) be granted, subject to
certain conditions. First, as to any copyright
infringement claims accruing more than three years
prior to the filing of the Complaint, *i.e.* prior to
March 23, 1996, I recommend that defendant's
motion be granted and that these claims be dismissed
with prejudice. As to defendant's motion to dismiss
claims for copyright infringement accruing within the
three years immediately prior to the filing of the
Complaint, I recommend that defendant's motion be
granted with leave to replead within thirty (30) days
of the Court's decision with respect to this Report and
Recommendation. Any amended pleading plaintiff
files must be consistent with this Report and
Recommendation to the extent it is adopted by the
District Court. Specifically, plaintiff must identify the
specific acts of infringement for which he seeks to
hold defendant responsible (*i.e.* by what acts and/or
products plaintiff claims defendant infringed his
copyright), as well as the dates or time frame of such
acts of infringement. Finally, any amended pleading
should not contain irrelevant and confusing
references to plaintiff's attempt to secure a patent.

\*7 Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule
72 of the Federal Rules of Civil Procedure, the
parties shall have ten (10) days from service of this
report to file written objections. *See also*
Fed.R.Civ.P. 6(a) and (e). Such objections shall be
filed with the Clerk of the Court, with extra copies
delivered to the chambers of the Honorable Laura T.
Swain, District Judge, and to the chambers of the
undersigned, Room 1660. Any requests for an
extension of time for filing objections must be
directed to United States District Judge Swain.
Failure to file objections will result in a waiver of

those objections for purposes of appeal. *Thomas v
Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-
CIO Pension Fund V. Herrmann,* 9 F.3d 1049, 1054
(2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300
(2d Cir.); *Small v. Secretary of Health and Human
Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P
28,292, 2001 Copr.L.Dec. P 28,303

**Motions, Pleadings and Fllings (Back to top)**

•       1:99cv04684                    (Docket)
(Jun. 29, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.
Exhibit AA
Page 175

LEXSEE 2004 US DIST LEXIS 10906

MASTERCARD INTERNATIONAL INCORPORATED and MASTERCARD
INTERNATIONAL, LLC, Plaintiffs, -against- LEXCEL SOLUTIONS, INC., De-
fendant.

03 Civ. 7157 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2004 U.S. Dist. LEXIS 10906*

June 16, 2004, Decided
June 18, 2004, Filed

DISPOSITION: Defendant's motion to dismiss denied.
Defendant's motion to transfer venue granted.

LexisNexis(R) Headnotes

COUNSEL: [*1] Robert C. Scheinfeld, Esq., Eliot D.
Williams, Esq., Baker Botts LLP, New York, NY, Attor-
neys for plaintiffs.

Michael O. Sutton, Esq., Nathan Dunn, Esq., Locke,
Liddell & Sapp, LLP, Houston, TX, Attorneys for defen-
dant.

JUDGES: WILLIAM H. PAULEY III, U.S.D.J.

OPINIONBY: WILLIAM H. PAULEY III

OPINION:

MEMORANDUM and ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiffs MasterCard International Inc. and Master-
Card International, LLC (collectively, "MasterCard")
bring this action for a declaratory judgment of non-
infringement and invalidity of defendant Lexcel Solu-
tions Inc.'s ("Lexcel's") patents for an electronic funds
transfer network test system. *U.S. Patent No. 6,129,271,*
and *U.S. Patent No. 6,336,590.* Lexcel moves to dismiss
this action pursuant to *Fed. R. Civ. P. 12(b)(1)* for lack of
subject matter jurisdiction, and alternatively moves to
transfer this action to the District of Arizona, pursuant to
*28 U.S.C. § 1404(a).* For the reasons stated below, Lex-
cel's motion to dismiss is denied, and its motion to trans-
fer venue is granted.

BACKGROUND

This action stems from the deterioration of a rela-
tionship between [*2] parties to a software license
agreement. Lexcel sells and licenses software called "fi-
nancial transaction network testing and simulation soft-
ware" to test financial transaction systems, such as elec-
tronic funds transfer systems. (Compl. P 8.) MasterCard
operates financial transaction networks and supplies test-
ing and simulation software to its member financial insti-
tutions to allow them to verify that their systems will
operate with MasterCard's financial transaction net-
works. (Compl. PP 9-10.) Until April 2003, MasterCard
licensed this testing and simulation software from out-
side vendors, including Lexcel. (Compl. P 11.) In col-
laboration with another vendor, MasterCard is develop-
ing network testing and simulation software for distribu-
tion to its associated financial institutions. (Compl. P 15;
Supplemental Declaration of Simon Dix, dated Novem-
ber 24, 2003 ("Dix Decl. II.") PP 2-5.) As a result, Lex-
cel filed suit against MasterCard in the District of Ari-
zona on July 29, 2003, (the "Arizona Action") claiming
breach of contract, misappropriation of trade secrets,
unfair competition, copyright infringement and breach of
fiduciary duty. (Compl. P 12; Declaration of Nathan
Dunn, dated Oct. 30, 2002 ("Dunn [*3] Decl.") Ex. F:
Lexcel Arizona Complaint.) The Arizona Action con-
cerns the same technology and products at issue here.
(Transcript of Oral Argument, dated December 5, 2003
("Tr.") at 11; Compl. P 12; Dunn Decl. Ex. F.) Specifi-
cally, Lexcel alleges in the Arizona Action that Master-
Card improperly accessed the confidential source code of
Lexcel's financial network testing software. (Dunn Decl.
Ex. F PP 11-18, 23, 25, 34, 37, 40, 43.) On August 15,
2003, MasterCard answered and counterclaimed for

2004 U.S. Dist. LEXIS 10906, *

breach of a license agreement in that action. (Dunn Decl. Ex. C: MasterCard Arizona Answer and Counterclaim.)

On September 4, 2003, Lexcel's counsel advised MasterCard's counsel in the context of a compromise negotiation that Lexcel might have a claim for patent infringement against MasterCard for "infringement that may occur in the future or that may have already occurred." (Compl. P 13; Dunn Decl. Ex. B at 2.) Further, during an "in-person meeting between MasterCard and Lexcel personnel subsequent to the filing of the Arizona Action, Lexcel personnel allegedly told MasterCard that Lexcel owned at least two government-issued U.S. patents, and suggested that the existence of those patents would [*4] prevent MasterCard from pursuing alternate sourcing of network testing and/or simulator software other than from Lexcel without facing a lawsuit from Lexcel." (Compl. P 14.)

MasterCard filed this action on September 12, 2003, alleging that it is entitled to a declaratory judgment of patent non-infringement and invalidity, and a finding that Lexcel's patents are unenforceable because: (a) both MasterCard and Visa publically used their own versions of financial transaction network testing or simulation software before Lexcel applied for its patents; and (b) Lexcel intentionally failed to disclose prior art to the United States Patent and Trademark Office ("PTO") during prosecution. (Compl. PP 17-39.) The underlying facts of the parties' dispute are nearly identical to those of the Arizona Action. (Dunn Decl. Ex. F PP 11-18; Compl. PP 8-16.) On December 3, 2003, two days before oral argument on this motion, this Court received notice from Lexcel that it moved to amend its complaint in the Arizona Action to add, inter alia, a "conditional" patent infringement claim. (Lexcel Supplemental Submission, dated December 3, 2003; Joint Status Letter to the Court, dated May 14, 2004 ("Joint [*5] Letter") at 2.) On May 28, 2004, the Arizona federal district court denied Lexcel's motion to amend its complaint to include a "conditional proposed count" of patent infringement because: (1) Lexcel's conditional amendment failed to satisfy the standards of *Fed. R. Civ. P. Rule 8*; and (2) Lexcel's conditional request failed to demonstrate that an actual case or controversy existed. Lexcel Solutions, Inc. v. Master-Card, Inc., CV-03-1454-PHX-JAT (D. Ariz. May 28, 2004).

DISCUSSION

I. *Rule 12(b)(1)* Standards

On a *Rule 12(b)* motion to dismiss, this Court generally must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*; accord *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 1161, 122 L. Ed. 2d 517 (1993)* (noting that factual allegations [*6] in the complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir. 2000)* (same). In order to avoid dismissal, a plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim. *Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997)*.

Under a *Rule 12(b)(1)* challenge to a court's subject matter jurisdiction, the disputed jurisdictional fact issues may be resolved by referring to evidence outside of the pleadings, such as affidavits, and if necessary, an evidentiary hearing. See *Phifer v. City of New York, 289 F.3d 49, 55 (2d Cir. 2002)*; *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000)*.

II. *Declaratory Judgment Act*

MasterCard asserts subject matter jurisdiction pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201 (2003)* and the federal patent laws, pursuant to *28 U.S.C. § 1338(a) (2003)*. (Compl. P 5.) Lexcel argues that this Court should dismiss the complaint for lack of subject matter jurisdiction, pursuant to *Fed. R. Civ. P. 12(b)(1)* [*7] because an actual controversy does not exist. Interpreting the Declaratory Judgment Act, *28 U.S.C. § 2201*, the Federal Circuit has established a two-pronged test to determine if there is a justiciable controversy in a declaratory judgment action concerning patent law. A declaratory judgment plaintiff must show that, as of the time the complaint was filed: (1) the defendant's conduct "created on the part of plaintiff a reasonable apprehension that the defendant [would] initiate suit"; and (2) the plaintiff either produced or had taken steps to produce the accused device. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988)*; *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992)*.

A plaintiff may establish an objective reasonable apprehension of suit through evidence of a defendant's express charge of infringement or through a totality of the circumstances. *Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993)*; *Shell Oil, 270 F.2d at 888*; *Arrowhead, 846 F.2d at 734-36*. "To invoke the court's declaratory judgment [*8] jurisdiction, a plaintiff must show 'more than the nervous state of mind of a possible infringer,' but does not have to show that the patentee is 'poised on the courthouse steps.'" *Vanguard Research, Inc. v. PEAT, Inc., 304 F.3d 1249, 1255-56 (Fed. Cir. 2002)* (citations

2004 U.S. Dist. LEXIS 10906, *

omitted). Finally, even if there is an actual controversy, a court still retains discretion to decline jurisdiction. *E.M.C. v. Norand Corp., 89 F.3d 807, 813 (Fed. Cir. 1996).*

### A. Reasonable Apprehension

Lexcel contends that its conduct did not create a reasonable apprehension that it would initiate a patent suit against MasterCard because: (a) it did not make an express charge of infringement against MasterCard; (b) its complaint in the Arizona Action does not allege a patent claim that could have been easily included; (c) it had not begun an investigation into pursuing a patent infringement action; and (d) the statements to which MasterCard points in support of the existence of a reasonable apprehension were made in the context of settlement negotiations and do not indicate a threat of litigation. Lexcel does not dispute that it engaged in discussions with MasterCard concerning [*9] its patents, but instead characterizes those communications as "pure positional statements," "jawboning," or "a reservation of rights" in order to minimize the likelihood of a finding of reasonable apprehension of suit. (Def. Br. at 5-6.) As noted, however, when determining whether a reasonable apprehension exists, the test is an objective one, and the subjective intent of a plaintiff or defendant is irrelevant. *Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953 at 955-56; Vanguard Research, 304 F.3d at 1255.*

In opposition, MasterCard argues that Lexcel's conduct amounted to an express charge of infringement, and that even assuming it did not, jurisdiction is still proper because the totality of Lexcel's conduct created a reasonable apprehension of a future lawsuit. MasterCard points to a letter it received from Lexcel, dated September 4, 2003 (the "September 4 Letter"), in which Lexcel charged that it may have a claim for patent infringement against MasterCard and would consider such infringement to be willful. (Compl. P 14; Dunn Decl. Ex. B. at 2.) Additionally, MasterCard alleges that Lexcel asserted it owned two patents that would prevent MasterCard from "pursuing alternate [*10] sourcing of network testing and/or simulator software other than from Lexcel without facing a lawsuit from Lexcel." (Compl. P 15.) MasterCard argues that Lexcel's conduct placed it under a reasonable apprehension that Lexcel would file a patent infringement suit if MasterCard were to use another vendor's software. (Compl. P 16.)

This Court finds that Lexcel's conduct constituted an express charge of infringement that created a reasonable apprehension of suit by MasterCard. Specifically, in the September 4 Letter from Lexcel's counsel to MasterCard's counsel in the Arizona Action, Lexcel charged that it:

reserves all rights for any claim that Lexcel might have for patent infringement that may occur in the future or that may have already occurred. Indeed, we would consider any infringement to be willful, notwithstanding your suggestion that an action for patent infringement would be "ill advised." MasterCard should know, better than anyone, the process covered in Lexcel's patents for testing software readiness was not known previously. . . . In fact, it is my understanding that MasterCard had a failed effort at providing a testing and certification software system before it [*11] went to Lexcel. As you know, this is powerful evidence of patent validity, on top of the statutory presumption of validity. You should also see the brochures that MasterCard has distributed which tout the advantages and character of Lexcel's software. This, too, will be powerful evidence.

(Dunn Decl. Ex. B. at 2.) This is the paradigm of an express charge of infringement. See *Arrowhead, 846 F.2d at 737-38* (finding express charge of infringement where defendant's letter made "thinly veiled threats" to enforce its patent rights by litigation); *FindWhat.com v. Overture Servs., 2003 U.S. Dist. LEXIS 2450, 02 Civ. 447 (MBM), 2003 WL 403649, at *3-4 (S.D.N.Y. Feb. 21, 2003)* (finding express charge of infringement where defendant asserted to plaintiff twice in conversation that plaintiff was infringing its patent) (citing *Applexion S.A. v. Almalgamated Sugar Co., 1995 U.S. Dist. LEXIS 4957, No. 95 C 858, 1995 WL 229049 (N.D. Ill. Apr. 17, 1995)* (same)). Indeed, Lexcel expressly warns that it may pursue a patent infringement suit against MasterCard for past or future conduct, and cites to "powerful evidence" of its patents' validity. (Dunn Decl. Ex. B at 2.) "If [a] defendant has expressly [*12] charged a current activity of the plaintiff as an infringement, there is clearly an actual controversy, certainty has rendered apprehension irrelevant, and one need say no more." *Arrowhead Indus., 846 F.2d at 736.*

The facts of the present case are analogous to those in *Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953 (Fed. Cir. 1987).* In Goodyear Tire, the Federal Circuit reversed a district court's dismissal of a declaratory judgment action and held that plaintiff had an objectively reasonable apprehension that defendant would file a patent infringement suit because: (1) the defendant had filed a trade secret misappropriation claim

Exhibit BB
Page 178

against plaintiff in state court that related to the same technology; and (2) the defendant had made innuendos during negotiations over the state court action that could have reasonably led the plaintiff to believe defendant would bring a patent infringement action. See *Goodyear, 824 F.2d at 955-56* (finding "objective inference of an impending infringement suit" where defendant asserted patents and made "innuendoes" concerning possible litigation during settlement negotiations in a separate [*13] action).

That the parties were engaged in compromise negotiations when Lexcel advanced a charge of infringement is of no moment. *Goodyear, 824 F.2d at 955-56*. Further, the existence of Lexcel's suit against MasterCard for the same technology in another forum also favors a finding of a reasonable apprehension of suit because it demonstrates a "willingness to protect that technology." *Vanguard Research, 304 F.3d at 1255* (reversing district court dismissal, holding that plaintiff had a reasonable apprehension of suit where defendant had filed a previous misappropriation of trade secrets claim relating to the same technology). Accordingly, this Court finds that Lexcel's conduct created an objective reasonable apprehension of suit.

B. Production of the Accused Device

Lexcel argues for the first time in its reply brief that MasterCard cannot meet the requirements for initiating a declaratory judgment action because it has not actually produced or prepared to produce the accused device. (Def. Reply Br. at 12 .) MasterCard, however, avers in its complaint that it is preparing to release its competitive "Alternative Software" into the market shortly, [*14] and details "concrete steps" it has undertaken in preparation for that release. (Compl. P 15.) Indeed, MasterCard's supporting affidavits and exhibits support its assertion that it has developed the Alternative Software, that it will market to financial institutions in early 2004. (Dix Decl. I PP 9, 16, 18; Dix Decl. II PP 3-5, Ex. A.) Lexcel fails to raise anything other than its own conjecture to dispute Mastercard's position. Thus, Lexcel's argument that MasterCard fails to meet this second requirement of the *Declaratory Judgment Act* is without merit.

In conclusion, this Court finds that Lexcel's conduct created a reasonable apprehension that a lawsuit would be initiated and that MasterCard has already taken steps to produce the accused device. Accordingly, this Court has subject matter jurisdiction over this action because MasterCard has established an actionable case or controversy under the Declaratory Judgment Act. Lexcel's 12(b)(1) motion to dismiss is denied.

III. Motion to Transfer Venue

Lexcel also moves to transfer this action to the District of Arizona for consolidation with the parties' action currently pending there. *Section 1404(a)* states that "for the convenience [*15] of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a) (2004)*. The goal of *Section 1404(a)* "is to prevent waste of 'time, energy and money' and 'to protect litigants, witnesses and [the] public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)* (internal quotations omitted); accord *Citicorp Leasing, Inc. v. United Am. Funding, Inc., 2004 U.S. Dist. LEXIS 739, 03 Civ. 1586 (WHP). 2004 WL 102761, at *2 (S.D.N.Y. Jan. 21, 2004)*. In analyzing a motion to transfer venue, courts use "broad discretion" and must make their determinations "upon notions of convenience and fairness on a case-by-case basis." *In re Nematron Corp. Secs. Litig., 30 F. Supp. 2d 397, 399 (S.D.N.Y. 1998)*; accord *Bionx Implants, Inc. v. Biomet, Inc., 1999 U.S. Dist. LEXIS 8031, 99 Civ. 0740 (WHP), 1999 WL 342306, at *3 (S.D.N.Y. May 27, 1999)* (district court has "considerable discretion" in deciding whether to transfer venue).

In determining whether to transfer venue, courts examine: [*16] (1) whether the action could have been brought in the proposed transferee forum; and (2) whether the transfer would "promote the convenience of parties and witnesses and would be in the interests of justice." *Clarendon Nat'l Ins. Co. v. Pascual, 2000 U.S. Dist. LEXIS 2881, 99 Civ. 10840 (JGK)(AJP), 2000 WL 270862, at *2 (S.D.N.Y. Mar. 13, 2000)*. The parties do not dispute that this action could be brought in the District of Arizona. Instead, they focus on whether transfer would promote the interests of justice and convenience of the parties.

In analyzing whether transfer would promote such interests, courts consider several factors, including:

(1) the place where the operative facts occurred; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) the relative ease of access of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the forum's familiarity with the governing law; and (8) trial efficiency and the interests of justice.

*Clarendon Nat'l Ins., 2000 U.S. Dist. LEXIS 2881, 2000 WL 270862, at *3*; accord *J. Lyons Co. v. Republic of*

*Tea, Inc., 892 F. Supp. 486, 492 (S.D.N.Y. 1995).* [*17] "There is no rigid formula for balancing these factors and no single one of them is determinative." *Citigroup, Inc. v. City Holding Co., 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000).* "In performing the analysis the Court must, however, give due deference to the plaintiff's choice of forum which should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum." *Citigroup, 97 F. Supp. 2d at 561;* accord *Reliance Ins. Co. v. Six Star, Inc., 155 F. Supp. 2d 49, 57 (S.D.N.Y. 2001); NBA Props., Inc. v. Salvino, Inc., 2000 U.S. Dist. LEXIS 3799, 99 Civ. 11799 (AGS), 2000 WL 323257, at *3 (S.D.N.Y. Mar. 27, 2000).* Further, the balancing of these factors is an equitable task and an "ample degree of discretion is afforded to the district courts in determining a suitable forum." *First City Nat'l Bank & Trust Co. v. Simmons, 878 F.2d 76, 80 (2d Cir. 1989).* Finally, the moving party, Lexcel, bears the burden of establishing by clear and convincing evidence that transfer is appropriate. *Reliance, 155 F. Supp. 2d at 56.*

A. Balance of Conveniences

After conducting an analysis [*18] of the balance of conveniences, this Court finds that the factors weigh heavily in favor of transfer to the District of Arizona. First, the locus of operative facts favors transfer. "In determining the locus of operative facts a court must look to the site of events from which the claim arises." *Transatlantic Reinsurance Co. v. Cont'l Ins. Co., 2003 U.S. Dist. LEXIS 20933, 03 Civ. 3227 (CBM), 2003 WL 22743829, at *5 (Nov. 20, 2003)* (internal citations omitted). "In infringement cases the operative facts usually relate 'to the design, development and production of a patented product.'" *Findwhat.com, 2003 U.S. Dist. LEXIS 2450, 2003 WL 402649, ai *6* (quoting *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp., 119 F. Supp. 2d 433, 439 (S.D.N.Y. 2000));* accord *Bionx Implants, 1999 U.S. Dist. LEXIS 8031, 1999 WL 342306, at *4.* MasterCard's complaint alleging invalidity, uneforceability and noninfringment is largely focused on the contention that Lexcel failed to disclose prior art to the PTO during prosecution of the patents-insuit. (Compl. PP 17-21, 3039, Prayer for Relief at B-C.) Against that backdrop, the locus of operative facts strongly support transfer to Arizona, and do not weigh in [*19] favor of a New York forum. This action arose in Arizona, where Carl Kubitz, Lexcel's CEO, invented the patented systems. Additionally, the prosecution of the patent, which is essential to this action, took place in Arizona. (Declaration of Carl Kubitz, dated October 29, 2003 ("C. Kubitz Decl. I") P 5; Reply Declaration of Carl Kubitz, dated November 19, 2003 ("C. Kubitz Decl. II") P 2.) That the locus of operative facts concerning Lexcel's patents is in Arizona is further supported by the fact that all of Lexcel's employees with knowledge of Lex-

cel's products and patents continue to reside there, and all of Lexcel's records concerning the patented technology and its prosecution are maintained at Lexcel's headquarters in Scottsdale, Arizona. (Declaration of Flora Kubitz, dated October 29, 2003 ("F. Kubitz Decl.") P 10; C. Kubitz Decl. II P 2.) Since this action has only a gossamer connection to New York, this factor weighs strongly in favor of transfer. See *United States v. Nature's Farm Prods., 2004 U.S. Dist. LEXIS 8485, 00 Civ. 6593 (SHS). 2004 WL 1077968, at *5 (S.D.N.Y. May 13, 2004)* (transferring venue where locus of operative facts occurred mainly in transferee venue).

The convenience [*20] of witnesses is a neutral factor. Most, if not all, of the trial witnesses in this action will be party witnesses. All of Lexcel's employees and witnesses with knowledge of Lexcel's products and patents, including the inventor Carl Kubitz and the attorney who prosecuted the patents, reside in Arizona. (C. Kubitz Decl. I P 5; F. Kubitz Decl. P 10.) MasterCard's employees with knowledge of the development of the Alternative Software are located at its operations center in O'Fallon, Missouri. (F. Kubitz Decl. P 4; Dix Decl. I P 19.) MasterCard argues that two of its party witnesses reside in Purchase, New York and Miami, Florida, respectively. However, their testimony concerning prior use of simulation software will be presented in the Arizona Action in connection with Lexcel's copyright infringement claim. (C. Kubitz Decl. II PP 4-5; Declaration of Christopher Cosgrove, dated November 13, 2003 ("Cosgrove Decl.") P 2; Declaration of Raquel White, dated November 13, 2003 ("White Decl.") PP 2-3.) Thus, this factor is neutral as party witnesses are located in Missouri, Arizona, New York, and Florida.

MasterCard identifies a vendor located in Belgium that may be a non-party witness outside [*21] of this Court's subpoena power. At this stage, this Court cannot assess the relevance and availability of that non-party witness. Accordingly, this Court finds the process over unwilling witnesses factor to be neutral.

The location of documents factor favors transfer. All of Lexcel's documents concerning the patents in suit are located in Arizona and the technology at issue in both actions was developed in Arizona. (C. Kubitz Decl. I P 5; F. Kubitz Decl. P 10.) Most of MasterCard's documents are located in O'Fallon, Missouri, where it conducts primary oversight and development of the Alternative Software. (Dix Decl. I PP 19-20; F. Kubitz Decl. P 9.) Additional documents may be located in Belgium, where MasterCard's new, non-party vendor is located. (Dix Decl. P 20.) While MasterCard contends that some documents are located in Purchase, New York, at its global headquarters (Dix Decl. P 20), it does not explain how those documents are related to this action, much less how they relate to the development of the Alternative

Software. After a review of the parties' submissions, it is evident that most of the pertinent documents in this action will be found in Arizona and Missouri. Accordingly, [*22] this factor weighs in favor of transfer.

The relative means of parties factor also favors transfer. "A party arguing against or for transfer because of inadequate means must offer documentation to show that transfer (or lack thereof) would be unduly burdensome to his finances." *Federman Assocs. v. Paradigm Med. Indus., 1997 U.S. Dist. LEXIS 23685, 96 Civ. 8545 (BSJ), 1997 WL 811539, at *4 (S.D.N.Y. Apr. 8, 1997)*; accord *Orb Factory, Ltd. v. Design Sci. Toys, Ltd., 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998)*. Lexcel notes that the disparity in wealth between the parties is significant, and avers that it would be unable to sustain a viable business and litigate two actions against MasterCard in two fora. (F. Kubitz Decl. P 7; Declaration of Michael O. Sutton, Esq. ("Sutton Decl.") P 4.) Examining the relative means of the parties, Lexcel's net income was $ 489,000 in 2002, as opposed to MasterCard Inc.'s revenues of $ 1.89 billion and net income of $ 116 million in 2002. (F. Kubitz Decl. P 5; Dunn Decl. Ex. E at 5: MasterCard Income Statement.) Indeed, according to MasterCard's exhibits, Lexcel's highest credit line is $ 21,200, and it has a "moderate risk of severe payment delinquency [*23] over the next 12 months." (Def. Opp. Ex. 6: D&B Report at 2-4.) This vast disparity between the parties' relative means, along with the fact that dual litigation will likely hamper Lexcel's viability, weighs heavily in favor of transfer. See *Lynch v. Nat'l Prescription Adm'rs, 2004 U.S. Dist. LEXIS 3134, 03 Civ. 1303 (GBD), 2004 WL 385156, at *4 (S.D.N.Y. Mar. 1, 2004)* (relative means factor favors transfer where litigation would pose a greater financial burden on party with lesser resources); *Everest Capital Ltd. v. Everest Mgmt., L.L.C., 178 F. Supp. 2d 459, 467-68 (S.D.N.Y. 2002)* (same); see also *Mattel, Inc. v. Procount Bus. Servs. , 2004 U.S. Dist. LEXIS 3895, 03 Civ. 7234 (RWS), 2004 WL 502190, at *4 (S.D.N.Y. Mar. 10, 2004)* (transferring action due in part to vast disparity in relative means between parties).

The choice of forum factor also weighs in favor of transfer. While MasterCard's choice of forum is entitled to a heavy presumption, that presumption is rebutted by the application of the first-filed rule. The first-filed rule creates a presumption that the first suit should have priority between two similar actions filed in different fora. *Reliance, 155 F. Supp. 2d at 54*; [*24] *Findwhat.com, 2003 U.S. Dist. LEXIS 2450, 2003 WL 402649, at *4-5* (citing *Kahn v. Gen. Motors Corp., 889 F.2d 1078, 1081 (Fed. Cir. 1989))*. There are sufficient overlapping factual and legal issues between this action and the first-filed Arizona Action to trigger the first-filed rule. See *GT Plus, Ltd. v. Ja-Ru, Inc., 41 F. Supp. 2d 421, 423-24 (S.D.N.Y. 1998)* (noting that the first-filed rule "generally

applies where two actions involve same parties and embrace same issues"); *Mfrs. Hanover Trust Co. v. Palmer Corp., 798 F. Supp. 161, 166-67 (S.D.N.Y. 1991)* (findings cases related where they involved the same underlying facts, witnesses and parties and stating that "the interests of justice require that the cases be related, not identical."). Indeed, both actions involve identical technology, and arise out of the same dispute between the same parties. While this action involves patents, and the Arizona Action involves, inter alia, misappropriation of trade secrets, copyright infringement and unfair competition, both actions concern alleged misappropriation of either the source code or the structure of the same electronic funds transfer testing [*25] equipment. (Compl. PP 1-16; Dunn Decl. Ex. F PP 11-18; Tr. at 11.) Additionally, any facts supporting a claim of willfulness here would be identical to facts supporting Lexcel's claims in the Arizona Action, including those for exemplary damages and statutory damages for willful infringement. (Dunn Decl. Ex. F P 52, Prayer for Relief at P b.) Accordingly, this factor favors transfer of venue.

The forum's familiarity with the law is a neutral factor since "all federal district courts are assumed to be equally familiar with federal patent law." *Findwhat.com, 2003 U.S. Dist. LEXIS 2450, 2003 WL 402649, at *6* (citing *Recoton Corp. v. Allsop, Inc., 999 F. Supp. 574, 576 (S.D.N.Y. 1998))*.

Finally, judicial economy dictates that this action proceed in the District of Arizona. Judicial economy is "a separate component of the court's *[Section] 1404(a)* transfer analysis . . . and may be determinative in a particular ease." *Tucker Anthony, Inc. v. Bankers Trust Co., 1994 U.S. Dist. LEXIS 128, 93 Civ. 0257 (SWK), 1994 WL 9683, at *8 (S.D.N.Y. Jan. 10, 1994)* (citing *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220 (7th Cir. 1986))*. One of the goals of *Section 1404(a)* is to "prevent [*26] the waste of 'time, energy and money' and 'to protect litigants witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen, 376 U.S. at 616*. It would be inefficient and a waste of judicial resources to subject the same parties to suit over interconnected claims concerning identical technology and underlying disputes in two separate fora. See *Wyndham Assocs. v. Bintliff, 398 F.2d 614, 619 (2d Cir. 1968)* (noting the "strong policy favoring litigation of related claims" in the same forum). Indeed, the witnesses who may testify in this action are identical to the witnesses identified in the District of Arizona litigation. (See, e.g., C. Knbitz Decl. II PP 4-5; Cosgrove Decl. P 2; White Decl. PP 2-3; Dix Decl. I PP 2-15; Dix Decl. II PP 2-5; F. Kubitz Decl. P 10.) To compel such witnesses to travel to a second forum to give similar testimony on the same technology and dispute would be burdensome and inefficient for the parties, and would not promote judicial

efficiency. See 800- *Flowers, Inc. v. Intercontinental Florist, Inc., 860 F. Supp. 128, 135-36 (S.D.N.Y. 1994)* ("The interests of judicial economy dictate [*27] that the two identical actions not both proceed"); *Amersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp., 11 F. Supp. 2d 729, 730-31 (S.D.N.Y. 2003)* (transferring patent infringement action where trial efficiency factor weighed heavily in favor of transfer). Accordingly, this factor strongly favors transfer.

B. Aggregation of Factors

Analyzing the *Section 1404(a)* factors as a whole, Lexcel overcomes the heavy presumption that this action should remain in New York. Of the eight convenience factors, the locus of operative facts, location of documents, relative means of parties, choice of forum and judicial economy factors strongly favor transfer to the District of Arizona. The forum's familiarity with the governing law, convenience of witnesses, and availability of process factors are neutral, and thus favor litigation of this action in New York. Accordingly, this Court finds

that Lexcel has shown by clear and convincing evidence that transfer of this action to the District of Arizona would be in the interests of convenience and fairness.

CONCLUSION

For the reasons set forth in this Memorandum and Order, Lexcel's motion to dismiss the action is denied and [*28] its motion to transfer this action to the District of Arizona is granted. The Clerk of Court is directed to transfer this action to the District of Arizona, Phoenix Division, as related to case number CV 03 1454 (PHX)(JAT).

Dated: June 16, 2004

New York, New York

SO ORDERED:

/S/ WILLIAM H. PAULEY III /S/

U.S.D.J.

Westlaw.

Not Reported in F.Supp.2d
2002 WL 1458853 (D.Del.)
(Cite as: 2002 WL 1458853 (D.Del.))

# H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ONDEO NALCO COMPANY, a Delaware
Corporation, Plaintiff,
v.
EKA CHEMICALS, INC., a Delaware Corporation,
Defendant.
No. Civ.A.01-537-SLR.

June 10, 2002.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 10th day of June, 2002, having reviewed the briefs submitted by the parties with respect to plaintiff's pending motions;

IT IS ORDERED that plaintiff's motion to dismiss defendant's counterclaims (D.I.23) is granted; and plaintiff's motion for leave to filed an amended complaint (D.I.42) is granted, for the reasons that follow;

1. The court has jurisdiction over this action pursuant to 35 U.S .C. § § 271 and 281 and 28 U.S.C. § 1338(a).

2. Motion to Dismiss Counterclaims. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The moving party has the burden of

persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991).

3. Plaintiff argues that defendant's counterclaims, which allege that plaintiff's products infringe three of defendant's patents, [FN1] fail to provide fair notice of the claims and the grounds upon which they rest, as required by Federal Rule of Civil Procedure 8(a). Conley, 355 U.S. at 47 (Rule 8(a) requires that a claim provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests"). Plaintiff asserts that the counterclaims insufficiently identify which products are accused of infringement [FN2] and fail to adequately plead induced infringement. [FN3] Plaintiff also objects that the counterclaims do not specify when the alleged infringement occurred (the '961 and '150 patents are now expired) and they combine the direct, contributory, and induced infringement claims into one count for each patent.

> FN1. United States Patent No. 5,603,805 ("the '805 patent"); United States Patent No. 4,385,961 ("the '961 patent"); and United States Patent No. 4,388,150 ("the '150 patent").
>
> FN2. The infringing products are described as "Nalco's products, including the 8692 product." (D.I.22, ¶ ¶ 29,34,40) The only additional clue to the identity of the alleged infringing products is the averment "Nalco makes and sells products, including the product numbered 8692, ... that are used in paper-making processes ..." or "to make paper." (Id. at ¶ 24)
>
> FN3. Defendant simply avers that "[u]pon information and belief, Nalco has induced the infringement of the claims of the ... patent, in violation of 35 U.S.C. § 271(b), by selling its products, including the 8692 product, and in instructing and encouraging others in the use of its products, including the 8692 product." (D.I.22, ¶ ¶ 30,36,42)

4. The court agrees with plaintiff that the counterclaims do not satisfy Rule 8(a). With the exception of the description of the 8692 product, the pleadings are too vague to provide plaintiff with fair notice of which products are accused of infringing defendant's patents. See Conley, 355 U.S. at 47; Gen-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.
Exhibit CC
Page 183

Not Reported in F.Supp.2d
2002 WL 1458853 (D.Del.)
(Cite as: 2002 WL 1458853 (D.Del.))

*Probe, Inc. v. Amoco Corp.,* 926 F.Supp. 948, 961
(S.D.Cal.1996) (vague reference to "products and/or
kits" does not provide adequate notice). *Compare
Interdigital Technology Corp. v. OKI America, Inc.,*
845 F.Supp. 276, 283 (E.D.Pa.1994) (patent claim
need not identify specific products that are alleged to
infringe by name so long as they are "sufficiently
identified in some way"). In addition, the pleadings
fail to allege direct infringement by a party other than
ONDEO Nalco and, therefore, insufficiently plead
induced infringement. *See Met-Coil Systems Corp. v.
Korners Unlimited, Inc.,* 803 F.2d 684, 687
(Fed.Cir.1986) (direct infringement required element
of induced infringement); *Shearing v.. Optical
Radiation Corp.,* 30 U.S.P.Q. 1878, 1880
(D.Nev.1994) (complaint must allege direct
infringement by someone other than the inducer).

*2 5. Based on the above, the court dismisses
defendant's counterclaims with leave to amend.

6. Motion for Leave to File a First Amended
Complaint. Under Federal Rule of Civil Procedure
15(a), leave to file amended complaints "shall be
freely given when justice so requires." *See also
Gooding v. Warner-Lambert Co.,* 744 F.2d 354, 358
(3d Cir.1984). Plaintiff seeks leave to amend its
complaint (a) to remove two alien defendants whom
plaintiff and defendant have agreed to dismiss with
prejudice (see Stipulation and Order, D.I. 20, ¶ 1);
and (b) to add declaratory judgment counts related to
invalidity of the patents-in-suit. Defendant objected
that the proposed amended complaint would be
deficient for failure to plead with specificity
inequitable  conduct    and    for    asserting
"unenforceability" of the subject patents in
combination with invalidity. In response, plaintiff
added more specific allegations of inequitable
conduct with respect to the procurement of the '805
patent to a revised first amended complaint (D.I.45,
Ex. D, ¶ ¶ 22-54); plaintiff makes no inequitable
conduct allegations with respect to the '150 patent or
the '961 patent (*Id.* at 5-6; Ex. D, ¶ ¶ 55-65). Based
on the above, the court grants plaintiff leave to file a
first amended complaint.

2002 WL 1458853 (D.Del.)

Motions, Pleadings and Filings (Back to top)

•         1:01CV00537              (Docket)
(Aug. 10, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit CC
Page 184

Westlaw.

Not Reported in F.Supp.2d
2001 WL 179926 (E.D.La.)
(Cite as: 2001 WL 179926 (E.D.La.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In re PAPST LICENSING GmbH PATENT
LITIGATION
No. CIV. A. MDL 1298, CIV. A. 99-3118.

Feb. 22, 2001.

MEMORANDUM AND ORDER

SEAR, District J.

*Background*

*1 On December 26, 2000, Papst Licensing GmbH
& Co. KG ("Papst") filed its complaint for patent
infringement against International Business Machines
Corporation ("IBM"). Papst alleges that IBM "has
made, used, sold, or offered to sell to customers in
the United States or imported into the United States
products that embody the elements of at least one
claim" _[FN1] of the twenty patents specifically
identified in the complaint by patent number and
issue date. Papst does not identify the IBM products
which allegedly infringe the patents.

> FN1. *See* Paragraphs 26 and 27 of Papst's
> Complaint for Patent Infringement, filed
> Dec. 26, 2000.

In response to the complaint, IBM has filed under
FRCP 12(e) a motion requesting a more definite
statement of which IBM products are alleged to
infringe the patent claims asserted against it.

*Discussion*

FRCP 12(e) provides that if a pleading "...is so vague
or ambiguous that a party cannot reasonably be
required to frame a responsive pleading, the party
may move for a more definite statement before
interposing a responsive pleading."

IBM asserts and Papst does not contest that there are
a total of 503 patent claims in the twenty patents at
issue in this lawsuit. Whether a particular product
infringes a particular patent claim first requires the
interpretation of the claim, and then a comparison of

the interpreted claim to the allegedly infringing
product. *Markman v. Westview Instruments, Inc.,* 52
F.3d 967, 976, *aff'd,* 517 U.S. 370, 116 S.Ct. 1384,
134 L.Ed.2d 577 (1996). Under Papst's complaint,
IBM will be required to interpret 503 claims, and
then compare them to any IBM product that contains
a hard disk drive. IBM does not object to interpreting
503 claims. However, it does object to having to
compare those claims to all of its products containing
hard disk drives.

IBM filed its Rule 12(e) motion on January 31,
2001. On February 1, 2001, counsel for Papst wrote a
letter to counsel for IBM, forwarding a document that
lists on a patent-by-patent basis the IBM hard disk
drives that Papst alleges are infringed. Several
hundred IBM hard disk drives are described by
model and part numbers. There are as many as one
hundred allegedly infriuging products listed for some
patents, and only one listed for another patent. Papst
prefaces its list by informing IBM that it does not
consider the list to be exclusive:

> Papst Licensing's charges of infringement are not
> limited to the IBM hard disk drives that are
> specifically identified herein. Rather, Papst
> Licensing's charges of infringement are intended to
> include all IBM hard disk drives that have a
> construction that is similar from an infringement
> standpoint to that of the IBM hard disk drives that
> are specifically identified herein.

Upon receipt of this list, IBM offered to withdraw
its 12(e) motion if Papst would stipulate that its
infringement allegations would be limited to the
products specifically identified in the list. IBM and
Papst have apparently been unable to reach a
stipulation.

Papst argues that its complaint complies with the
sample patent infringement complaint provided in
Federal Form 16. It is apparent, however, that the
number of patents and products in the case before me
are far greater than those contemplated in the sample
complaint, which would justify a request for greater
specificity.

*2 Papst further contends that it filed a similar 12(e)
motion against Minebea in related action no. 99-
3118, which was denied. However, in that motion,
Papst sought to have Minebea identify the particular
claims of each patent which Minebea claims were
invalid. IBM is not making such a request. IBM is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 179926 (E.D.La.)
(Cite as: 2001 WL 179926 (E.D.La.))

Page 2

willing to interpret each of the 503 claims of the twenty patents, but it seeks to limit the number of comparisons it will have to make to IBM products by obtaining a more specific description of the alleged infringing products.

I find that Papst's complaint must be amended to specifically identify the IBM products which it alleges infringe upon one or more claims of each of the twenty patents.

Accordingly,

IT IS ORDERED, that IBM's FRCP 12(e) motion for a more definite statement is GRANTED;

IT IS FURTHER ORDERED, that Papst amend its complaint on or before March 20, 2001, in order to specifically identify on a patent-by-patent basis the IBM products which it alleges infringe upon one or more of the claims of each of the twenty patents.

2001 WL 179926 (E.D.La.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 1996 US DIST LEXIS 21651

QUANTEL LIMITED, Plaintiff, v. ADOBE SYSTEMS INCORPORATED, Defendant.

Civil Action No. 96-18-RRM

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1996 U.S. Dist. LEXIS 21651*

December 12, 1996, Decided

**DISPOSITION:** [*1] Adobe's motion to transfer (D.I. 12) denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For QUANTEL LIMITED, plaintiff: Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For ADOBE SYSTEMS, INC., defendant: William J. Marsden, Jr., Potter, Anderson & Corroon, Wilmington, DE.

For ADOBE SYSTEMS, INC., counter-claimant: William J. Marsden, Jr., Potter, Anderson & Corroon, Wilmington, DE.

For QUANTEL LIMITED, counter-defendant: Donald F. Parsons, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Roderick R. McKelvie, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Roderick R. McKelvie

**OPINION:**

### ORDER DENYING MOTION TO TRANSFER

This is a patent infringement case. Plaintiff Quantel Limited ("Quantel") is a United Kingdom corporation with its principal place of business in the United Kingdom. Defendant Adobe Systems Incorporated ("Adobe") is a California corporation with its principal place of business in Mountain View, California. Quantel filed this action on January 17, 1996, alleging that Adobe is infringing several of its U.S. patents by making, using, and selling Adobe "Photoshop" products. Pursuant to *28*

*U.S.C. § 1404*(a), Adobe has filed a motion to transfer this case to the Northern District [*2] of California. The parties have submitted briefing on this motion, and the court heard additional argument at a status conference on September 5, 1996. For the reasons set out below, the court will deny Adobe's motion.

*28 U.S.C. § 1404*(a) provides that "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no definitive list of factors that a court must consider in deciding whether to transfer a case to another district. *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*. Rather, a court should "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Id. A plaintiff's choice of forum is a paramount consideration in any determination of a motion to transfer, and its choice should not be lightly disturbed. Id.; *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)*, cert. denied, *401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971)*. Unless the party seeking transfer demonstrates [*3] that a balancing of relevant factors weighs strongly in favor of a transfer, the plaintiff's choice of forum should prevail. *Shutte, 431 F.2d at 25*.

Here, the parties do not dispute that this action could have been brought in the Northern District of California. See *28 U.S.C. § 1391*(b) (venue proper in district where defendant resides). Adobe argues that transfer to the Northern District of California is appropriate because 1) crucial third-party witnesses can be compelled to appear at trial in the Northern District of California but cannot be compelled by this court to appear at trial; 2) the costs of this action will be reduced and greater convenience to the parties and witnesses will result because most of Adobe's witnesses reside in the Northern District of California, whereas Quantel's witnesses reside in England

and must travel regardless of whether this action is trans-
ferred; and 3) Quantel's choice of forum is entitled little
deference because Quantel did not sue on its "home turf"
and because this action did not arise in Delaware. The
court will address each of Adobe's arguments, beginning
with its contention that Quantel's choice of forum is enti-
tled little deference. [*4]

### 1. Quantel's Choice of Forum

Adobe argues that little deference is due Quantel's
choice of forum because Quantel did not sue on its
"home turf" and because this action did not arise in
Delaware. As this court recently held, however, a plain-
tiff's choice of forum should be accorded significant
weight as long as its choice of forum relates to legitimate
and rational concerns. See *Joint Stock Society v.
Heublein, Inc., 936 F. Supp. 177, 187 (D. Del. 1996).*

Quantel chose to file suit in this district for a number
of reasons. As Delaware is located midway between
England and California, where Quantel and Adobe are
respectively based, the parties will share the burden of
travel and expense. The time difference between England
and Delaware will permit both parties to contact their
home offices for trial support during business hours,
whereas Quantel would not be able to do so if trial took
place in California. Quantel's sole U.S. subsidiary is lo-
cated on the East Coast, in Connecticut, and incorporated
in Delaware. Some of the equipment that Quantel plans
to use at trial is located at its U.S. subsidiary, and thus is
easier to transport to Delaware than to California. Courts
[*5] in the District of Delaware have considerable ex-
perience with patent cases. The median length of time
between the filing of a civil action and the commence-
ment of trial is shorter in this district than in many dis-
tricts, including the Northern District of California. See
generally Administrative Office of the United States
Courts, Federal Court Management Statistics (May
1996). These are all legitimate and rational reasons for
choosing to litigate this action in the District of Dela-
ware. Accordingly, the court will accord Quantel's choice
of forum significant weight.

### 2. Cost and Convenience

Adobe argues that transfer of this action to the
Northern District of California would result in greater
convenience to the parties and witnesses and would re-
duce the costs of this action for a number of reasons.
First, most of the witnesses Adobe presently intends to
call reside in the Northern District of California. Second,
if this case is not transferred, Adobe's key employees
would be required to travel to Delaware to testify at trial,
a result which would have a detrimental economic effect
on Adobe's business. Under Adobe's current production
schedule, Adobe plans to introduce [*6] several new
products early next year. Adobe contends that if its key

employees must travel to Delaware to testify at trial near
the scheduled introduction deadlines, Adobe would
likely miss those deadlines, causing Adobe to suffer sub-
stantial economic losses. Finally, Adobe contends that
the Northern District of California is not an appreciably
more inconvenient forum than the District of Delaware
for Quantel and its witnesses because they will have to
travel a great distance even if trial takes place in Dela-
ware.

Adobe's arguments fail to persuade the court that
transfer of this action to the Northern District of Califor-
nia would result in greater convenience to the parties and
witnesses and would reduce the costs of this action. To
begin with, the court is not convinced that, if trial were
held in Delaware, the absence of key employees from
Adobe's operations would have the dire consequences
Adobe predicts. Adobe does not specify the exact dates
for the introduction of its new products, stating only that
some products are scheduled to be introduced "early next
year." Adobe's contention that it will not be able to meet
its deadlines if trial is held in Delaware is thus too vague
[*7] and speculative for the court to give it meaningful
consideration. Moreover, trial in this case is currently set
to begin on April 21, 1997, and the court is amenable to
rescheduling trial if proceeding as scheduled would pose
an extreme hardship to Adobe. In any event, Adobe's
employees would be required to spend some time away
from work even if trial were held in California. Although
they would miss more time from work if they were re-
quired to travel to Delaware to testify at trial, at most
they would probably miss only a few days of work, and
it is difficult to imagine that their absence from work for
a few days would throw Adobe's operations completely
off schedule.

Furthermore, though Adobe has shown the court that
the Northern District of California would certainly be
more convenient for Adobe and its witnesses, Adobe has
failed to demonstrate that the Northern District of Cali-
fornia is not appreciably more inconvenient than the Dis-
trict of Delaware for Quantel and its witnesses. As
Quantel points out, the District of Delaware is a consid-
erably more convenient forum than the Northern District
of California for Quantel and its witnesses. Although
Quantel and its witnesses located [*8] in England must
travel some distance even if trial occurs in Delaware,
they would be required to travel even farther -- five or
six hours by plane, to be specific -- if trial occurred in
California. Moreover, some of Quantel's witnesses and
technical support personnel are located in Connecticut,
and Delaware is more convenient for them than Califor-
nia. In addition, some of Quantel's records, physical evi-
dence, and equipment intended for use at trial are also
located in Connecticut, and can be more easily trans-
ported to Delaware than California. Delaware is also

much more convenient for Quantel because the time difference between England and Delaware would allow Quantel to communicate with its home office for trial support during business hours, whereas the time difference between England and California would not permit Quantel to do so. Finally, just as Adobe's employees would be required to spend more time away from work if trial were held in Delaware, Quantel's employees who will testify at trial would be required to miss more time from work if trial were held in California rather than Delaware.

Thus, Adobe has not demonstrate that, on balance, transfer of this case to the Northern [*9] District of California would result in greater convenience to both parties and their witnesses and would reduce the overall costs of this action.

### 3. Availability of Compulsory Process

Finally, Adobe argues that transfer would serve the interests of justice because the Northern District of California, unlike this court, is able to compel the attendance at trial of crucial third-party witnesses who have stated their refusal to travel voluntarily to Delaware to testify at trial.

Although the court understands Adobe's preference for live testimony at trial, Adobe has not shown that the use of videotaped deposition testimony would be an inadequate substitute. For example, Adobe contends that, in order to overcome the Government's "seal of approval" and prove that a patent is invalid, a prior art witness must "teach" the prior art to the jury. It is not apparent to the court why this could not be accomplished through the use of a videotaped deposition. And although Adobe contends that the presence of a witness is important to his or her credibility, the jury can gauge the credibility of a witness by observing bis or her demeanor on videotape. As a result, Adobe has failed to demonstrate [*10] that its need for compulsory process outweighs the

consideration due Quantel's choice of forum. See, e.g., *McEvily v. Sunbeam-Oster Co., Inc., 878 F. Supp. 337, 348 (D.R.I. 1994)* (finding that the need for compulsory process to procure testimony of witnesses was not of sufficient consequence to outweigh the convenience to witnesses in having trial in transferee forum where plaintiff could use videotaped deposition at trial); *Applied Resources, Inc. v. Electronic Display Sys., 763 F. Supp. 1561, 1561 (D. Kan. 1991)* (holding that where change of venue would simply shift inconvenience to plaintiff, fact that defendant could not compel a material witness to testify in plaintiff's chosen venue did not require transfer since defendant could use a videotaped deposition); *Houk v. Kimberly-Clark Corp., 613 F. Supp. 923, 931 (W.D. Mo. 1985)* (finding that unavailability of compulsory process was not a sufficient ground for transfer where defendant failed to show that use of videotaped depositions would be inadequate); *Micheel v. Haralson, 586 F. Supp. 169, 173 (E.D. Pa. 1983)* (finding that plaintiff's choice of forum was not defeated by defendant's claim of unavailability of compulsory [*11] process where defendant failed to show that use of videotaped deposition would be inadequate).

In sum, Adobe has failed to show that a balancing of factors such as the deference due Quantel's choice of forum, convenience to the parties and witnesses, costs incurred by this action, and the unavailability of compulsory process in this court strongly favors transfer of this action to the Northern District of California. Thus,

For the reasons set out above,

IT IS HEREBY ORDERED that Adobe's motion to transfer (D.I. 12) is denied.

Roderick R. McKelvie

UNITED STATES DISTRICT JUDGE

Dated: December 12, 1996

Westlaw.

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
RISTVEDT-JOHNSON, INC., a Tennessee
corporation, and Cummins-Allison
Corporation, an Indiana corporation, Plaintiffs,
v.
Nelson PELTZ, an individual, and Peter W. May, an
individual, Defendants.
No. 91 C 3273.

Nov. 18, 1991.

*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.

*1 Plaintiffs Ristvedt-Johnson, Inc. ("Ristvedt") and
Cummins-Allison Corp. ("Cummins") originally
brought a suit against Brandt, Inc. ("Brandt"), a
corporation owned by Nelson Peltz ("Peltz") and
Peter W. May ("May"), for patent infringement. *See
Ristvedt-Johnson, Inc. v. Brandt, Inc.,* No. 88 C 3834.
The plaintiffs now bring this action, claiming that the
defendants, based upon their status as directors and
sole shareholders of Brandt, induced Brandt to
infringe upon the plaintiffs' patent in violation of 35
U.S.C. § 271(b). Pursuant to Federal Rule of Civil
Procedure 12(b)(6), the defendants now move to
dismiss the complaint for lack of personal jurisdiction
and a failure to state a claim for which relief can be
granted. For the reasons stated below, the Court
grants the defendants' motion to dismiss.

*Background*
Based upon the allegations in the plaintiffs'
complaint, Ristvedt owns U.S. Patent Nos.
4,098,280; 4,234,003; 4,444,212; 4,531,531;
4,549,561; and 4,731,043. These patents were
issued to Ristvedt for their coin handling machines
and coin sorters. Ristvedt exclusively licenses the
rights to these patents to Cummins. The plaintiffs
already have brought an action against Brandt for
infringing upon these patents. [FN1] In the instant
case, the plaintiffs allege that Peltz and May induced

these infringements in violation of 35 U.S.C. §
271(b).

The plaintiffs allege that Peltz and May own 100%
of Brandt's outstanding stock and are two of the three
directors of the corporation. They further allege that
Peltz and May have been paid substantial
management fees by Brandt and that they "control the
business" by reviewing monthly business reports
summarizing monthly operations, pre-approving
capital expenditures greater than $25,000, and
occasionally meeting with Brandt's president to
discuss Brandt's budget, product development, sales
promotions, engineering projects, international
developments, and Brandt's patent infringement
litigation with Ristvedt.

The plaintiffs also allege that Peltz and May have
not left Brandt with sufficient assets to satisfy the
damages sought by the plaintiffs in this suit. Brandt
was sold in 1984 and, as noted above, Peltz and May
became its sole shareholders in 1988. The plaintiffs
allege that since Peltz and May began controlling
Brandt, the corporation has incurred losses of $1.1
million in 1986, $4.3 million in 1987, $2.5 million in
1988, and $1.0 million in 1990.

The plaintiffs claim that the defendants used their
positions and control as the owners and directors of
Brandt, to induce Brandt to infringe on Ristvedt's
patents. The plaintiffs also assert that Peltz and May
induced Brandt to infringe upon their patents by
directing officers of Brandt to copy plaintiffs'
patented products. The defendants now move to
dismiss this case, pursuant to Federal Rule of Civil
Procedure 12(b)(6), for lack of personal jurisdiction
and a failure to state a claim for which relief can be
granted.

*Discussion*
A. *The Motion to Dismiss for Lack of Personal
Jurisdiction*

*2 This court only has personal jurisdiction over an
out-of-state defendant if an Illinois court could assert
such jurisdiction. *Young v. Colgate-Palmolive Co.,*
790 F.2d 567, 569 (7th Cir.1986). In this case, the
plaintiffs claim that this court has personal
jurisdiction over the defendants under the Illinois
long-arm statute, 110 Ill.Rev.Stat. ¶ 2-209(1982).
Defendants argue that this Court does not have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00041-JJF    Document 37-7    Filed 01/23/2006    Page 5 of 63

Not Reported in F.Supp.
1991 WL 255691 (N.D.Ill.)
(Cite as: 1991 WL 255691 (N.D.Ill.))

Page 2

jurisdiction over them because they are protected by
the fiduciary shield doctrine, one of the limitations
placed upon the Illinois long-arm statute by the
Illinois Supreme Court.

The fiduciary shield doctrine prohibits personal
jurisdiction over an individual when that individual's
contact with the forum state is limited to acts
performed as a representative or fiduciary of a
corporation. *State Security Insurance Co. v. Frank B.
Hall & Co., Inc.,* 530 F.Supp. 94, 97 (N.D.Ill.1981);
*Olinski v. Duce,* 155 Ill.App.3d 441, 443-44, 508
N.E.2d 398, 400 (1st Dist.1987). This doctrine
protects the defendant from defending a suit brought
against him personally "in a forum in which his only
relevant contacts are acts performed not for his own
benefit but for the benefit of his employer." *Marine
Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d
Cir.1981); *Torco Oil Co. v. Innovative Thermal
Corp.,* 730 F.Supp. 126, 133 (N.D.Ill.1989). The
court's inquiry into the applicability of the fiduciary
shield doctrine thus focuses on whether the
defendant's actions advanced personal, rather than
employer, interests. *Torco Oil Co.,* 730 F.Supp. at
134.

This determination cannot be made mechanically. It
is well established that the fiduciary shield exception
is an equitable principle intended to be applied with
discretion. *Id.; Washburn v. Becker,* 186 Ill.App.3d
629, 542 N.E.2d 764 (1989). While the applicability
of the doctrine must be considered on a case-by-case
basis, Illinois Courts have carved out several standard
exceptions to the doctrine. In this case, the plaintiffs
respond to the defendant's invocation of the fiduciary
shield doctrine, citing the most common exception to
the doctrine--that the corporation is merely the "alter-
ego" of the defendants.

At this early stage of the litigation, the plaintiffs only
need to establish a prima facie case of jurisdiction in
the case. *Ameritech Mobile Communications, Inc. v.
Cellular Communications Corp.,* 664 F.Supp. 1175,
1177 (N.D.Ill.1987). As long as the plaintiffs'
allegations are not "patently without merit," the
plaintiff's claim of jurisdiction will stand. *Torco Oil
Co.,* 730 F.Supp. at 136. Application of the alter ego
exception can only be refused "where no facts are
alleged supporting a finding that the corporation is a
sham ... or where the supporting evidence is so
manifestly insufficient that the alter ego argument is
not even minimally viable." *Id.*

In *Kula v. J.K. Schofield & Co., Inc.,* the court found
that the evidence presented by the plaintiff did not

meet the minimum standard of viability required to
establish personal jurisdiction. 668 F.Supp. 1126
(N.D.Ill.1987). In that case, the plaintiff alleged that
the corporation at issue was the alter ego of the
defendant because the defendant was the chairman of
the board, chief executive officer, and sole
shareholder of the corporation. *Id.* at 1129. The
court determined, however, that these allegations did
not suffice to defeat the defendant's assertion of the
fiduciary shield doctrine. The court noted that being
a member of management or holding a controlling
position in a corporation did not nullify the protection
of the equitable doctrine. *Id.* The court further noted
that corporate officers, directors, and shareholders,
were "separate and distinct" from the corporation. *Id.*
The *Kula* court therefore refused to pierce the
fiduciary shield based upon these allegations since
the plaintiff had not alleged any other facts in his
complaint suggesting that the corporation was merely
a shell. *Id.* at 1130.

*3 Like *Kula,* the plaintiffs in this case allege that
the fiduciary shield doctrine should be pierced
because the defendants are the sole shareholders of
Brandt, and they actively engage in the management
and control of Brandt. As established in *Kula,* the
defendants' sole ownership of Brandt stock and their
involvement in the management of Brandt do not,
without additional evidence, suffice to establish that
the corporation is actually the alter ego of the
defendants. The plaintiffs' claims that the defendants
prepared business reports and met periodically with
Brandt's president to discuss the business of Brandt
do not provide the requisite additional evidence to
support the plaintiffs' alter ego argument. These
actions can be considered managerial tasks which, as
alleged, do not suggest that the defendants were
acting in their personal interest rather than in the
interests of the corporation.

The plaintiffs claim that their allegation that Brandt
lacked sufficient assets also provides sufficient proof
that Brandt was merely the alter ego of Ristvedt and
Cummins. This Court recognizes that inadequate
capitalization can provide a basis for piercing the
fiduciary shield, *see Torco Oil Co.,* 730 F.Supp. at
138, however, this allegation, is not sufficient here.
Even assuming this claim is true, the plaintiffs do not
suggest that Brandt's alleged undercapitalization
came about by the design of the defendants in an
attempt to benefit themselves personally. Given this
omission and the lack of allegations showing that the
defendants performed their managerial tasks or used
their positions as sole shareholders of the corporation
to directly benefit their interests rather than Brandt's,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit FF
Page 191

Not Reported in F.Supp.
1991 WL 255691 (N.D.Ill.)
(Cite as: 1991 WL 255691 (N.D.Ill.))

the Court finds that the plaintiffs have not met their burden of proving that this Court has personal jurisdiction over the defendants.

B. *The Motion to Dismiss for Failure to State a Claim*

The Court must also dismiss the case for a failure to state a claim for which relief could be granted. It is well settled that a complaint cannot be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Furthermore, the Federal Rules of Civil Procedure generally do not require the claimant to set out these facts in detail. *Id.* at 47. Rather, the plaintiff is only required to provide "a short and plain statement of the claim" that gives the defendant fair notice of that claim and the grounds upon which it rests. *Id.*

However, as the defendants suggest, the modern requirement of mere notice pleading does not affect the requirement that the plaintiff allege every essential element to show the violations of law claimed. As the Supreme Court stated in *United States v. Employing Plasterers Ass'n.,* it is when "a bona fide complaint is filed that charges *every element necessary to recover*" that summary dismissal for failure to state a claim cannot usually be justified. 347 U.S. 186, 189 (1953) (emphasis added).

*4 In § 271(b) actions, corporate officers who are found to have actively assisted in their corporation's infringement of a patent may be held personally liable for inducing infringement regardless of whether the circumstances require the court to disregard the corporate entity and consider the corporation the alter ego of the defendant corporate officers. *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 553 (Fed.Cir.1990). The defendants properly assert that to establish a § 271(b) claim, the plaintiffs must establish "that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Id.* (emphasis in original); *see Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.1988); *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1468-69 (Fed.Cir.1990). To properly allege that the infringer knowingly induced infringement, the plaintiffs must demonstrate that the defendants possessed specific intent to encourage their corporation's supposed infringement and not merely that the defendants had knowledge of the acts alleged

to constitute inducement. *Manville Sales Corp.,* 917 F.2d at 553.

Even construing the allegations in the complaint liberally, as Federal Rule of Civil Procedure 12(b)(6) requires, this Court finds that the allegations in the plaintiffs' complaint are so deficient that they fail to demonstrate that the plaintiffs could have a valid § 271(b) claim. For example, the plaintiffs fail to allege any facts showing how the defendants induced Brandt to infringe upon Ristvedt's patents as required under *Manville.* Instead, the plaintiffs merely assert that the defendants induced Brandt to infringe upon Ristvedt's patents. Plaintiff's Complaint at ¶ ¶ 6, 8. This bald assertion, without the allegation of any facts supporting it, plainly does not meet the pleading requirements of the Federal Rules of Civil Procedure. Moreover, the plaintiffs' reliance upon their allegations that the defendants owned and controlled Brandt are also factually insufficient to demonstrate a valid claim under § 271(b). The plaintiffs fail to allege any way in which the defendants used their supposed ownership and control over Brandt to induce the corporation to infringe upon Ristvedt's patents.

The plaintiffs also do not properly allege the second *Manville* requirement that the defendants intended to induce Brandt to infringe upon Ristvedt's patents. As already noted, regardless of the brevity of the assertion, the plaintiffs are nevertheless required to allege each element of their claim. In this case, the plaintiffs have failed to explicitly allege that the defendants had the requisite intent to induce Brandt. Furthermore, even if intent could be inferred from other allegations in the plaintiffs' complaint, *see Cannon v. University of Chicago,* 648 F.2d 1104, 1110 (7th Cir.1981), the plaintiffs' other allegations, such as that the defendants induced Brandt or that they owned and controlled Brandt, do not suggest the requisite intent on the part of the defendants to induce Brandt to infringe on Ristvedt's patents.

*5 As required under Federal Rule of Civil Procedure 12(b)(6), this Court recognizes that we must not dismiss a case for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot establish a valid claim for relief. *See Conley,* 355 U.S. at 45-46. In this case, the plaintiffs' allegations are so factually insufficient that they do not even suggest how or when the defendants induced Brandt or that the defendants intended to induce Brandt to infringe on the plaintiffs' patents as required to prove a § 271(b) violation. Because this Court does not have proper jurisdiction over the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 255691 (N.D.Ill.)
(Cite as: 1991 WL 255691 (N.D.Ill.))

Page 4

defendants and the plaintiffs present a claim for which no relief can be granted, the Court grants the defendants' motion to dismiss.

*Conclusion*

For the reasons stated above, the Court grants the defendants' motion to dismiss for lack of personal jurisdiction and failure to state an actionable claim.

> FN1. *Ristvedt-Johnson, Inc. v. Brandt, Inc.,* No. 88-3834.

1991 WL 255691 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

·       1:91CV03273_____(Docket)
(May. 28, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2004 US DIST LEXIS 16088

SAVAGE UNIVERSAL CORP., Plaintiff, v. GRAZIER CONSTRUCTION, INC., et al., Defendants.

04 Civ. 1089 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2004 U.S. Dist. LEXIS 16088*

August 12, 2004, Decided
August 13, 2004, Filed

DISPOSITION: [*1] Defendant Greg Grazier's motion to dismiss denied.

LexisNexis(R) Headnotes

COUNSEL: Barry G. Magidoff, Deepro R. Mukerjee, Greenberg Traurig LLP, New York, NY for plaintiff Savage Universal Corp.

Greg Grazier, defendant pro se.

JUDGES: GERARD E. LYNCH, United States District Judge.

OPINIONBY: GERARD E. LYNCH

OPINION:

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

This case involves allegations by plaintiff Savage Universal Corp. ("Savage Universal") that defendant Greg Grazier and various corporate defendants of which Grazier is principal (the "Grazier Corporations") infringed Savage Universal's trademark and trade name by using them to direct internet users to websites owned by Grazier or the Grazier Corporations, which sold competing products and also disparaged Savage Universal and its products. Defendant Grazier has moved to dismiss this action for insufficiency of service of process and for lack of personal jurisdiction. For the reasons that follow, the motion will be denied.

BACKGROUND

Plaintiff Savage Universal is a New York corporation which sells various photography supplies, including glassine envelopes. Savage Universal holds a [*2] registration for its trademark SAVAGE and accompanying logo design, for use in connection with glassine envelopes, photographic background paper, mat mounts for photos, and other types of photographic paper supplies. The trademark has been in continuous commercial use since 1937. (Declaration of Sylvester Hank PP 2-4, Ex. A.) Savage Universal sells its branded products primarily to specialty retailers and had sales of over $ 12 million in 2003, approximately 10% of which were in New York. (Hank Decl. PP 6-7.) Defendant Grazier is an Oregon resident who owns and operates a number of small businesses, including Panda Productions and Micro-Tech Industries, as well as serving as the sole officer, owner and employee of several Oregon corporations, including Grazier Construction, Inc., and Precision Landscapes and Yard Care, Inc. (Affidavit of Gregory P. Grazier 1-4.) One of the web-based businesses operated by Grazier through Micro-Tech Industries is located at www.theglassinewebshop.com and sells glassine paper sleeves, envelopes, and bags to internet customers. (See, e.g., Hank Decl. Ex. F.) Through the website, customers can email Grazier directly, place orders (including custom [*3] printing), and make payment through credit cards, Paypal, or direct cash deposits via wire transfer. (Id.)

In or around July 2003, Grazier began a commercial relationship with Savage Universal, placing several large orders for glassine envelopes on behalf of his company Micro-Tech Industries. (Hank Decl. P 11.) In the course of this relationship, the parties communicated by phone, fax, and e-mail. Although the parties dispute many of the specifics of the conflict, both sides agree that, over the course of the next several weeks, the dealings between

Case 1:06-cv-00041-JJF    Document 37-7    Filed 01/23/2006    Page 9 of 63

Grazier and Savage Universal were marked by arguments, complaints, mistakes and misunderstandings. The undisputed end result was one very dissatisfied customer in the person of defendant Grazier. (Hank Decl. PP 12-16; Grazier Aff. 3, Exs. C & E.)

In January 2004, Savage Universal became aware that, in early August 2003, defendant Grazier or the Grazier Corporations had purchased and registered six internet domain names that incorporated Savage Universal's trademarks or trade names: savagepaper.biz, savagepaper.info, savageuniversalcorp.com, savageuniversalcorp.net, savageuniversalcorporation.com, and savageuniversal.com (collectively, [*4] the "Grazier Websites"). (Hank Decl. P 17, Exs. E-1 - E-6.) Savage Universal first learned of these websites when employees in the sales and mail order departments received inquiries about the Grazier Websites from Savage Universal customers who had been directed to one or more of the Grazier Websites in the course of searching on the internet for Savage Universal's legitimate website. (Id. P 18.) At that time, both savageuniversal.com and savagepaper.info pointed to a website operated by Grazier at http://home.onemain.com/              [approximately] gpg/DiscontinuedItems.htm, which contained strong criticism of Savage Universal's business practices and pricing, and allowed viewers to click through to www.theglassinewebshop.com by selecting the phrase "Just visit our Glassine Home Page and SEE the SAVINGS." (Id. PP 18-21, Exs. F-G.) The savagepaper.biz domain name pointed directly to www.theglassinewebshop.com, where, as noted above, Grazier offered a substantial variety of glassine products for sale to internet customers via orders placed directly on the website. (Id. P 18.)

On January 28, 2004, Savage Universal's counsel sent a cease-and-desist letter via e-mail and express mail [*5] to Grazier, Micro-Tech Industries and Panda Productions. (Id. P 22, Ex. H.) Savage Universal did not receive any direct acknowledgment or response to these communications, but by February 2, 2004, all six of the Grazier Websites pointed to a website located at http://home.onemain.com/              [approximately] gpg/SavagePaperInfoSite.htm, where viewers were greeted with the words "Hello and Welcome to My Savage Paper Info Site About Scoundrels and Savages Who Sell Glassine Envelopes, Sleeves, Preservers & Paper at Unreasonable Prices and Questionable Authenticity." (Id. P 23, Ex. I.) The site goes on to inform viewers that "This Site is The One 'They' Don't want you to Know about ... There's no need for Cheating and Overpricing, but the fact is, There Is. You'll even find a few links to follow at the bottom of the page, for some better prices." (Id.) The links offered at the bottom of this webpage did not point directly to Grazier's theglassinewebshop page,

but rather allowed viewers to link to pre-programmed searches on sites such as Google and Yahoo!, which brought up lists of web-based glassine product suppliers, with theglassinewebshop typically listed at or near the top. [*6] (Id.)

On February 10, 2004, Savage Universal commenced this litigation, alleging trademark infringement, trademark dilution, unfair competition, false designation of origin, and cybersquatting under the Lanham Act, 15 U.S.C. § § 1051 et seq. and New York state law regarding trademarks, unfair competition, deceptive business practices, and defamation and trade libel. (May 13, 2004 Declaration of Barry Magidoff, Ex. A.) On February 24, 2004, Savage Universal made an ex parte application for a Temporary Restraining Order and an Order to Show Cause for a preliminary injunction, which was granted the same day.

Between February 25 and February 28, 2004, a process server hired by plaintiff made numerous attempts, including stake-outs at various times of day, to serve defendants at the address listed by Grazier with the Oregon Secretary of State - 93262 Bear Creek Ranch Road, Junction City, Oregon: (Magidoff Decl. P 4, Ex. B; Declaration of Tim McNamara, Exs. A-E.) Grazier has identified this address as his residence in numerous communications with the Court, including on the record at a hearing on July 27, 2004, although he has provided evidence that the [*7] address is not valid for U.S. Mail service. (Grazier Aff., Ex. A.) On February 27, 2004, plaintiff mailed copies, by both first class and express mail, of the Summons and Complaint and all papers associated with the Temporary Restraining Order and Order to Show Cause to both the Bear Creek Ranch Road address and another address that Grazier had provided to the Oregon Secretary of State: P.O. Box 724, Springfield, Oregon. (Magidoff Decl., P 5, Ex. C.) Although the original Order to Show Cause had specified personal service, on March 2, 2004, at the plaintiff's request and upon a showing that personal service was not feasible, the Order was amended nunc pro tunc to allow service by "any legally authorized means."

On March 8, 2004, having received no response from any defendant, the Court granted the preliminary injunction, enjoining defendants and anyone affiliated with them from, inter alia, (i) using plaintiff's trademark or trade name, or any reproduction, copy or colorable imitation thereof, as a domain name or in any other fashion that is intended to or is likely to cause others to believe that the defendants' websites are connected with plaintiff or supply plaintiff's [*8] genuine merchandise; (ii) making any transfer of the identified domain names; and (iii) directing defendants to deposit the registrations for any infringing domain names with the Court during the pendency of the lawsuit, and contact the relevant

search engine companies to remove any and all references to the infringing websites or domain names. (Magidoff Decl., Ex. D.) Following the entry of the Preliminary Injunction Order, plaintiff served copies of the Order on defendants at the two addresses noted above, by both first class mail and express mail. (Magidoff Decl. P 10.) Plaintiff also sent copies of the Order to Grazier's email address and fax number and left a phone message describing the Order at an answering machine connected to Grazier's last known phone number. (Id.) The express mail packages were all returned to plaintiff marked "refused by addressee," and the fax machine stopped receiving mid-way through the attempted transmission by plaintiff; the first class mail packages were not returned. (Id. PP 11, 15.)

By March 16, 2004, Grazier clearly had some actual notice of the pendency of this action, as Grazier's website at http://home.onemain.com/ [approximately] [*9] gpg/SavagePaperInfoSite.htm, still accessible by means of "savagepaper.info," had been updated to inform viewers that the Grazier Website domain names were now for sale for a total of $ 6.6 million, and that, in addition to any revenue from selling the domain names, Grazier was soliciting donations for his "legal defense fund." (Id., Ex. K.) The site also contained the following message: "Because Savage Universal Corp. has decided to destroy me and my small businesses with an excessive & unlawful use of legal process, taking advantage of my medical and financial hardships, as well as their filing legal action in a State (New York) far from where we even did any real business, deliberately and maliciously utilizing the disadvantage of distance by misleading the Court when all business with them was actually done here in Oregon, in their desperate attempt to eliminate my competition, I am left no choice but to liquidate these domain names ...." (Id.) By March 18, 2004, Grazier had added specific references to the lawsuit's pendency in the "United States District Court Southern District of New York," and to the affidavit of Sylvester Hank, which was submitted by plaintiff in support [*10] of its application for the order to show cause, and served on defendants as described above. (July 27, 2004 Declaration of Barry Magidoff, Ex. B.)

On April 7, 2004, the Clerk of this Court certified that none of the defendants in this action had filed an answer or otherwise moved in response to the complaint as provided in the Federal Rules of Civil Procedure, and were therefore in default. (Magidoff Decl. P 31, Ex. R.) On May 18, 2004, plaintiff moved for an order to show cause as to why a default judgment should not be entered against all defendants, which was granted the same day. On May 19, 2004, plaintiff moved for the entry of a contempt order. The papers for both the May 18 Order and the May 19 Motion were served on defendants by first class mail, express mail, and facsimile on May 19, 2004. (7/27 Magidoff Decl., Ex. A.) The May 18 Order directed defendants to respond by June 4, 2004.

On June 3, 2004, the Court received a letter by facsimile from Grazier, noting that he had "recently been informed by the plaintiff's attorney, Mr. Barry Magidoff, that a motion for default judgment and for contempt has been filed with the court." (7/27 Magidoff Decl., Ex. C.) Grazier claimed [*11] in this correspondence that he had "never received copies of any such motion and had no knowledge of it until Mr. Magidoff's letter." n1 (Id.) Grazier further noted that his "Oregon attorney" had complained to Magidoff that Grazier was never properly served, and that settlement discussions were ongoing. (Id.)

> n1 Grazier is apparently referring here to correspondence between Magidoff and an Oregon lawyer named James Coons, whom Grazier hired to represent him in negotiations with Savage Universal, and who apparently first communicated with plaintiff's counsel by letter dated May 24, 2004, in response to the order to show cause for default judgment.

In response to this correspondence, the Court issued an Order dated June 4, 2004, extending the defendants' time to answer or move in response to the Complaint, and to respond to plaintiff's motion for a contempt order, to June 28, 2004, and setting a hearing on both matters for July 1, 2004. The June 4 Order also directed plaintiff to provide an additional set [*12] of all relevant papers to Grazier by U.S. Postal Service Express Mail at the address provided by Grazier in his letter to the Court: P.O. Box 724, Springfield, OR 97477. Plaintiff complied with these instructions on June 10, 2004. (Id., Ex. E.) On June 23, 2004, the Court received a letter by facsimile from James Coons, the Oregon attorney acting on Grazier's behalf, informing the Court that settlement negotiations between the parties were ongoing, and respectfully requesting that the deadline for defendants' response to pending motions be further extended to July 23, 2004, to allow for additional time to reach a consensual resolution. Coons never formally entered an appearance in the case, but the request for additional time was granted and the date for the hearing was re-set to July 27, 2004 at 4:30 p.m.

On July 22, 2004, the Court received another letter from Coons, informing the Court that settlement negotiations had broken down, and that Grazier would like to represent himself at the July 27 Hearing, and requesting permission for Grazier to participate by phone. The Court granted that request, though with some reserva-

tions. As noted on the record at the July 27 Hearing, the [*13] telephone facilities available in the Courtroom are less than ideal for conducting a hearing, consisting simply of a standard speakerphone on the Judge's bench, amplified by microphones designed for live testimony. Requests for telephonic participation are granted rarely, as an exception to the normal rule of live attendance, and typically only as a courtesy to those litigants truly unable to be present in court, *e.g.* due to incarceration or serious physical illness or handicap. Nevertheless, this courtesy was extended to Grazier, and the hearing took place on July 27, with plaintiff's counsel physically present in the courtroom and Grazier present by telephone from Oregon. At the Hearing, Grazier again asserted that he had never been properly served with any papers in this action, although he admitted that he could receive mail at the address provided to the Court in his June 3 Letter, and that his attorney Coons had received certain papers from plaintiff's counsel and subsequently provided them to him.

### DISCUSSION

#### I. Corporate Defendants

As discussed above, the two corporate defendants in this action - Grazier Construction, Inc. and Precision Landscapes and Yard [*14] Care, Inc. - have defaulted by failing to appear or respond to any of plaintiff's numerous filings. Grazier attempted to make arguments on behalf of these corporate defendants, both in his June 3 letter and at the July 27 Hearing, asserting that as the sole owner, principal, and employee of these corporations, he is entitled to speak for them. n2 Regardless of his relationship with the corporate defendants, Grazier is not an attorney and "it has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel." *Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-202, 121 L. Ed. 2d 656, 113 S. Ct. 716 (1993)* (citing *Osborn v. President of Bank of United States, 22 U.S. 738, 9 Wheat. 738, 829, 6 L. Ed. 204 (1824)*).

> n2 Grazier repeated these assertions in an August 10, 2004, letter faxed to the Court - specifically that Oregon law allows a corporation's registered agent to appear on its behalf, and that the Court invited Grazier to appear pro se in its June 4 Order. However, Oregon corporate law does not alter the procedural requirements of the federal courts, and the Court's advice in its June 4 Order was specifically in response to a letter that Grazier, as an individual, sent to the Court re-

garding his inability to respond to plaintiff's filings without an attorney.

[*15]

Grazier's implicit assertion that the corporate defendants essentially are him, as he is the only person associated with them or empowered to speak for them, is unavailing. The corporate form is a creature of the state, and corporations are not necessarily entitled to the same rights as natural persons. Courts in every circuit have uniformly held that *28 U.S.C. § 1654*, which provides that "parties may plead and conduct their own cases personally or by counsel," does not allow corporations, partnerships, associations, or, indeed, any party other than a natural person, to appear in federal court other than through a licensed attorney. See, e.g., *Eagle Associates v. Bank of Montreal, 926 F.2d 1305 (2d Cir. 1991); Taylor v. Knapp, 871 F.2d 803, 806 (9th Cir. 1989); Jones v. Niagara Frontier Transp. Authority, 722 F.2d 20, 22 (2d Cir. 1983)*; see also *Turner v. American Bar Ass'n, 407 F. Supp. 451, 476 (ND Tex. 1975)* (citing the "long line of cases" from 1824 to the present holding that a corporation may only be represented by licensed counsel). Accordingly, as Grazier cannot represent the corporate defendants [*16] in this action, and as no attorney has appeared to speak on their behalf, the corporate defendants are in default, and a default judgment will be entered against them.

#### II. Service of Process

As to himself personally, Grazier has moved to dismiss this action under *Federal Rule of Civil Procedure 12(b)(5)*, challenging the adequacy of service of process as effected under *Federal Rule of Civil Procedure 4* and the New York and Oregon Rules of Civil Procedure. (D. Mem. 2-3.) The relevant provision of *Rule 4* provides that service may be effected on an individual within a judicial district of the United States "pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State," *Fed. R. Civ. P. 4(e)(1)*. Because plaintiff attempted to serve Grazier in Oregon, and because plaintiff does not claim that it has satisfied the New York rules for effecting service, the Court will look to the requirements of Oregon law [*17] to determine whether service was properly effected.

Oregon Rule of Civil Procedure 7(D)(1) states Oregon's general requirement for service of process: "Summons shall be served, either within or without this state, in any manner reasonably calculated, under all the circumstances, to apprise the defendant of the existence and pendency of the action and to afford a reasonable opportunity to appear and defend." The Oregon Supreme Court

2004 U.S. Dist. LEXIS 16088, *

has established a two-part test for determining the adequacy of service of process. *Baker v. Foy, 310 Or. 221, 228-29, 797 P.2d 349 (1990)*. If the plaintiff demonstrates that it has complied with one of the service methods described in ORCP 7, the service is presumptively adequate. Id. If the defendant comes forward with evidence to rebut the presumption of adequacy, or if the plaintiff does not use one of the methods described in the rule, then the court must determine whether service is nonetheless adequate because it provides "reasonable notice" to the defendant. *Id. at 229*. In making a determination of whether "reasonable notice" has been provided, a court looks to the totality of the circumstances. *Id. at 225.* [*18]

After attempting without success to service Grazier personally with the Order to Show Cause for Preliminary Injunction, plaintiff was granted permission by the Court to serve Grazier by "any legally authorized means." Plaintiff elected to serve Grazier by mail, pursuant to ORCP 7(D)(2)(d). Service by mail is proper under Oregon law, provided that service be made both by first class mail and by a means designed to provide proof of receipt - either certified or registered mail, return receipt requested, or express mail. ORCP 7(D)(2)(d)(i). As noted above, plaintiff delivered all of the papers it filed in this action to Grazier by both first class mail and express mail, which appears on its face to provide adequate service under Oregon rules. However, all of the express mail packages were returned "unclaimed," and Oregon courts have consistently held that where mail is returned "unclaimed," it cannot constitute adequate service. See, e.g., *Edwards v. Edwards, 310 Or. 672, 679, 801 P.2d 782 (1990)* ("No Oregon case upholds service by mail as adequate unless receipt is acknowledged by defendant"; where certified mail is returned "unclaimed," service was not adequate); *Davis Wright Tremaine LLP v. Menken, 181 Ore. App. 332, 45 P.3d 983, 989 (Or. App. 2002)* [*19] (certified mail returned "refused" cannot constitute adequate service; only mailing methods that provide for "particularized assurance or confirmation of delivery to defendant" are sufficient to satisfy ORCP 7(D) and constitute adequate service). Even evidence of actual notice, standing alone, does not make service adequate if it fails to comply with the requirements of ORCP 7, as the right to receive adequate service is treated by Oregon courts as a substantive right. *Id. at 989.*

Although Grazier thus may be correct that, at least prior to June 3, 2004, he may not have been adequately served with the pleadings and other papers in this action, he is not entitled to a dismissal. ORCP 7 provides that "upon a showing ... that service cannot be made by any method otherwise specified ... the court, at its discretion, may order service by any method or combination of methods which under the circumstances is most reasona-

bly calculated to apprise the defendant of the existence and pendency of the action." ORCP 7(D)(6)(a). Grazier's June 3 letter to the Court specifically identified P.O. Box 724, Springfield, OR 97477 as the address at which he could be reached, and made representations [*20] regarding ongoing discussions between Grazier, plaintiff's counsel, and an "Oregon attorney" (James Coons). After examining the totality of the record, including the declarations and affidavits of plaintiff's counsel regarding Grazier's apparent efforts to evade service, the representations made to the Court by both Grazier and plaintiff's counsel regarding James Coons and his receipt of a full set of papers from plaintiff's counsel, and the evidence from Grazier's own websites regarding his actual notice of this action, the Court in its June 4 Order directed plaintiff to provide an additional complete set of all papers in this action to Grazier by Express Mail to the address Grazier provided.

Under all the circumstances, the June 4 Order regarding alternative service was reasonably calculated to provide proper notice to Grazier. Moreover, although the package sent by plaintiff was again refused by Grazier and returned, the record at the July 27 Hearing established that Grazier, through a combination of first class mail and service on his former attorney Coons, does have actual notice of the existence and pendency of this action. This is sufficient to satisfy even the relatively high [*21] deference given to adequate service by the Oregon Rules of Civil Procedure, as interpreted by the Oregon courts. Litigants are not entitled to actively avoid service, up to and including defiance of Court orders regarding alternative service methods, and then seek dismissal of otherwise legally sufficient causes of action on grounds of insufficiency of service of process. See, e.g., *Stonebrook Hillsboro LLC v. Flavel, 187 Ore. App. 641, 69 P.3d 807, 810 (Or. App. 2003)*; *State Dep't of Human Resources ex rel. Johnson v. Bail, 140 Ore. App. 335, 915 P.2d 439, 443 (Or. App. 1996)*. Accordingly, defendant's motion to dismiss for insufficiency of service of process is denied.

III. Motion to Dismiss for Lack of Personal Jurisdiction

A. Legal Standard

On a motion to dismiss for lack of personal jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(2)*, the plaintiff bears the burden to establish jurisdiction. *In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003)*. Where no jurisdictional discovery has been conducted, allegations of jurisdictional fact must [*22] be construed in the light most favorable to the plaintiff, *CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)*, and the motion must be denied if those allegations suffice as a matter of law. *In re Magnetic Audiotape, 334 F.3d at 206; PDK Labs,*

*Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997)* ("A plaintiff facing a *Fed. R. Civ. P. 12(b)(2)* motion to dismiss made before any discovery need only allege facts constituting a prima facie showing of personal jurisdiction[,]" and courts must "construe the pleadings and affidavits in plaintiff's favor at this early stage."); see also *Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996)*.

B. Bases for Personal Jurisdiction Under New York Law

A federal court sitting in diversity may exercise jurisdiction over a foreign defendant if (i) the defendant is amenable to process under the law of the forum state, *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 105, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987); Metro. Life Ins. Co., 84 F.3d at 567,* and (ii) the exercise [*23] of personal jurisdiction comports with due process under *International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945),* and its progeny. See, e.g., *Clarendon Nat'l Ins. Co. v. Lan, 152 F. Supp. 2d 506, 515 (S.D.N.Y. 2001)*.

Plaintiff asserts two bases for personal jurisdiction over Grazier under New York law: *Civil Practice Law and Rules ("CPLR") § § 302(a)(1) and 302(a)(3). CPLR § 302(a)(1)* is New York's long-arm statute, which confers specific jurisdiction over "any non-domiciliary [who] transacts any business within the state or contracts anywhere to supply goods or services in the state." "A nondomiciliary 'transacts business' under *CPLR 302(a)(1)* when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo, 806 F.2d at 365* (alterations in original), quoting *McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 229 N.E.2d 604, 283 N.Y.S.2d 34 (1967)*. Furthermore, jurisdiction is only proper under this statutory provision where the cause of action "arises out of the subject matter of the business transacted." *Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000)*; [*24] *CutCo, 806 F.2d at 365* (same). "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Henderson v. I.N.S., 157 F.3d 106, 123 (2d Cir. 1998)* (internal quotations omitted).

Alternatively, under *CPLR § 302(a)(3)*, a foreign defendant may be subject to personal jurisdiction in New York if he "commits a tortious act without the state causing injury to person or property within the state ... if he ... (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." The Second

Circuit has held that, in order to be subject to jurisdiction under this "tortious injury" provision of the CPLR, the "first effect" of the tortious act must be felt by the plaintiff in New York. *DiStefano v. Carozzi North America, Inc., 286 F.3d 81, 84-85 (2d Cir. 2001)* (New York plaintiff fired by out-of-state employer satisfies "first effects" test; although tortious act of wrongful discharge took place outside New [*25] York, injury of job loss was felt by plaintiff in New York, where plaintiff lived and had performed job duties).

The question of personal jurisdiction over foreign defendants has become increasingly complex in the internet age, as the phenomenal reach of internet communications and web-based businesses has made traditional notions of "presence," "transacting business," or "contracting for delivery" in a forum state difficult to reconcile with a virtual world. Although Second Circuit case law provides little guidance through this territory, Judge Sweet has aptly summarized the state of the law as it has developed around the country:

> The courts have identified a spectrum of cases involving a defendant's use of the internet. At one end are cases where the defendant makes information available on what is essentially a 'passive' web site. This use of the internet has been analogized to an advertisement in a nationally-available magazine or newspaper, and does not without more justify the exercise of jurisdiction over the defendant. At the other end of the spectrum are cases in which the defendant clearly does business over the internet, such as where it know-inigly and repeatedly [*26] transmits computer files to customers in other states. Finally, occupying the middle ground are cases in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction.

*Citigroup, 97 F. Supp. 2d at 565* (citations omitted); see also *Zippo Mfg. Co. v. Zippo Dot Com, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)* (outlining framework for analyzing internet jurisdiction cases). Although this "sliding scale" model provides a useful guide to how courts have approached such claims in the recent past, it does not amount to a separate framework for analyzing internet-based jurisdiction, and traditional statutory and

constitutional principles continue to apply. See *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C., 297 F. Supp. 2d 1154, 1160-61 (W.D. Wisc. 2004)* (rejecting notion that sliding scale framework represents a "specialized test" for internet jurisdiction, but finding that "the website's level of interactivity may be one component of a determination whether a defendant [*27] has availed itself purposefully of the benefits or privileges of the forum state"); *Winfield Collection, Ltd. v. McCauley, 105 F. Supp. 2d 746, 750 (E.D. Mich. 2000)* ("The need for a special Internet-focused test for 'minimum contacts' has yet to be established ... The ultimate question can still as readily be answered by determining whether the defendant did, or did not, have sufficient 'minimum contacts' in the forum state.").

Here, Grazier's voluntary and deliberate actions clearly provide the "minimum contacts" with New York necessary to subject him to personal jurisdiction in a New York court, at least under *CPLR § 302(a)(3)*. n3 First, however, as to *CPLR § 302(a)(1)*, plaintiff has provided no evidence that any customer in New York saw any of the Grazier Websites or ordered products from Grazier, or that Grazier's choice to conduct business with Savage Universal's Arizona sales office, even if he knew that the company was located in New York, has a sufficient nexus to the creation and maintenance of the allegedly infringing websites that give rise to plaintiff's claims. Although the Grazier Websites were clearly in the third group identified by Judge Sweet, [*28] above, in that they were patently commercial enterprises n4, with multiple means of interaction between Grazier and customers, including the consummation of a transaction, and the Grazier Websites *could have* been viewed by New York residents, without some allegation that such commercial activity actually occurred in New York it is unclear whether plaintiff can meet its burden to establish a prima facie case of "transacting business" under *CPLR § 302(a)(1)*, It stretches the meaning of "transacting business" to subject defendants to personal jurisdiction in any state merely for operating a website, however commercial in nature, that is capable of reaching customers in that state, without some evidence or allegation that commercial activity in that state actually occurred. Cf. *Citigroup, 97 F. Supp. 2d at 566.*

n3 For purposes of jurisdiction, the actual ownership of the domain names, as between Grazier and the Grazier Corporations, is immaterial. Where an individual defendant acts through corporate entities within his control, the acts of those corporations can form the basis for jurisdiction over the individual. *Kreutter v McFadden Oil Corp., 71 N.Y.2d 460, 467, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988)*. Grazier himself admits

that he is the sole owner, employee, and agent of the Grazier Corporations.

[*29]

n4 Although Grazier subsequently altered the Grazier Websites so that they did not contain direct links to his own commercial websites, later actions cannot defeat personal jurisdiction. See *Indymac Mortgage Holdings, Inc. v. Reyad, 167 F. Supp. 2d 222, 232 (D. Conn. 2001)*; *Ball v. Metallurgie Hoboken-Overpelt, S.A., 1989 U.S. Dist. LEXIS 9107, No. 87-CV-191, 1989 WL 87418 (N.D.N.Y. July 31, 1989)*

However, where, as here, plaintiff has made sufficient allegations of tortious conduct through the operation of those commercial websites, the analysis changes. Taking plaintiff's allegations and affidavits as true, as the Court must on a motion to dismiss, Savage Universal has met its burden of making a prima facie case that Grazier is subject to personal jurisdiction in New York under *CPLR § 302(a)(3)*. The infringing use of Savage Universal's trademarks and trade name to "cybersquat" and otherwise direct Savage Universal's legitimate commercial traffic to websites operated by Grazier qualifies as a "tortious act" without the state, which has caused harm within the state. Although the mere operation [*30] of a website containing or using others' trademarks does not constitute a tort anywhere the site can be viewed, see *National Football League v. Miller, 2000 U.S. Dist. LEXIS 3929, 54 U.S.P.Q.2d 1574, 1575 (S.D.N.Y. 2000)*, Savage Universal has presented sufficient allegations that the alleged infringement caused injury within New York, as the "first effects" of trademark infringement or dilution are typically felt where the trademark owner resides and conducts business, and can include injury in the form of damage to goodwill, lost sales, or lost customers. *Citigroup, 97 F. Supp. 2d at 568.*

As to the second prong of *§ 302(a)(3)(ii)*, Grazier clearly expected or reasonably should have expected that his actions would have consequences in New York, where he knew Savage Universal was located. (Grazier Aff., Ex. C.) Indeed, the entire purpose of his activity at issue in this lawsuit appears to have been to damage Savage Universal's reputation and business. Whether his actions are an effort to publicize truthful anecdotes about unfair business practices, as Grazier claims, or merely a spiteful campaign of trademark infringement and defamation, as plaintiff [*31] claims, there can be no serious dispute that his actions were purposeful and intended to have consequences in New York (and, indeed, anywhere that potential customers might reside and view the Grazier Websites). Compare *Bensusan Restaurant Corp.*

Exhibit GG
Page 200

2004 U.S. Dist. LEXIS 16088, *

*v. King, 126 F.3d 25 (2d Cir. 1997)* (defendant who operated "Blue Note" club in Missouri and used website to advertise the club and its charge-by-phone service for will-call tickets, is not subject to jurisdiction in New York in suit by owner of "Blue Note" club in Manhattan, where defendant had not directed any activity at New York or at the New York-located plaintiff, and where the defendant's activities were entirely local).

Likewise, plaintiff has made sufficient allegations to satisfy the third prong of *§ 302(a)(3)(ii)*, that Grazier derives "substantial revenue from interstate or international commerce." Although Grazier claims that his businesses are purely local and only use the internet as a local advertising medium (Grazier Aff. 2), even a cursory review of his business websites indicates otherwise, and indeed Grazier's own statements about his glassine paper web business belie this claim (Grazier Aff. 3, noting [*32] that he has "been successful at establishing [his] Glassine Business in the TOP 10 Ranking with all Top Search Engines ... in fact my domain names are starting at No. 2, No. 3, No. 6 & No. 8, still today with the exception of Yahoo and MSN because of contact by the Plaintiff ... "). Grazier's websites offer a large variety of products and list prices for order volumes up to 50,000 units. (Hank Decl., Ex. F.) They indicate that the products advertised there are for sale to any customer viewing the site, they provide a means for calculating shipping costs from anywhere in the country, and further suggest that those customers in Canada, NAFTA, or other international locations contact Grazier directly to inquire about shipping rates. (Id.) The undisputed evidence is simply inconsistent with a claim that Grazier's commercial activities are merely local, or that his websites do little more than provide a local advertising medium for his businesses. Accordingly, plaintiff has met its burden of establishing a prima facie case that, through his voluntary and purposeful activities, Grazier is subject to personal jurisdiction in New York for claims related to his internet use of the plaintiff's [*33] trademark and trade name, and the other claims related thereto.

Finally, the exercise of personal jurisdiction over Grazier in this lawsuit is reasonable and consistent with constitutional principles of due process under the factors laid out by the Supreme Court in *Burger King v. Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)*. First, as described above, Grazier has "purposefully directed" his conduct at New York, such that he should "reasonably anticipate" litigation here. The interactive and commercial nature of the Grazier Websites, particularly when combined with Grazier's apparent campaign directed specifically at Savage Universal, after he was, by his own admission, aware that it was located in New York, clearly amount to "purposeful direction" of conduct. See, e.g., *Citigroup Inc., 97 F. Supp. 2d at 564;*

*Hsin Ten Enter. United States v. Clark Enters., 138 F. Supp. 2d 449, 455 (S.D.N.Y. 2000); Cello Holdings, L.L.C. v. Lawrence-Dahl Cos., 89 F. Supp. 2d 464, 471 (S.D.N.Y. 2000); see also Sports Auth. Mich., Inc. v. Justballs, Inc., 97 F. Supp. 2d 806, 814 (E.D. Mich. 2000); Christian Science Bd. of Dirs. v. Robinson, 123 F. Supp. 2d 965, 975 (W.D.N.C. 2000);* [*34] *American Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc., 106 F. Supp. 2d 895, 901 (N.D. Tex. 2000); Blumenthal v. Drudge, 992 F. Supp. 44, 56 (D.D.C. 1998); GTE New Media Servs. Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 38 (D.D.C. 1998); Inset Sys., Inc. v. Instruction Set, Inc., 937 F. Supp. 161, 165 (D. Conn. 1996).* See also, e.g., *Calder v. Jones, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984)* (libelous article regarding California plaintiff suffices for "purposeful direction," although written and edited entirely in Florida). Second, Savage Universal's claims plainly arise out of that purposeful conduct, and, third, the exercise of jurisdiction is reasonable and comports with principles of "fair play and substantial justice." *Burger King, 471 U.S. at 476-77.*

Grazier has purposefully interjected himself into New York through his operation of a nationwide (and apparently international) business through his commercial website - a website that formed an integral part of what the plaintiff has sufficiently alleged was a purposeful and deliberate campaign of trademark infringement [*35] and cybersquatting, directed at Savage Universal, a New York corporation. Although litigating in New York will undoubtedly be less convenient for Grazier than litigating in Oregon or in some other forum, Grazier has failed to present any evidence to demonstrate that, in this modern age and for a litigant with obvious familiarity with internet communication, litigation in New York would present so great an inconvenience as to constitute a deprivation of due process. Indeed, the statements that Grazier has offered regarding his rural location, his lack of financial resources, and his various injuries and disabilities (Grazier Aff. 1-2), if credited, would present a similar barrier to litigation even in the federal courts in Oregon, where Grazier would clearly have no claim for lack of personal jurisdiction. n5 The generalized inconvenience of litigating in a foreign forum is typically not sufficient to establish that the exercise of jurisdiction is constitutionally unreasonable. See, e.g., *Starmedia Network Inc. v. Star Media Inc., 2001 U.S. Dist. LEXIS 4870, 00 Civ. 4647, 64 U.S.P.Q.2d 1791, 2001 WL 417118, at *2 (S.D.N.Y. 2001).*

> n5 Although Grazier has asserted that he lives "far out in the countryside," and that it is an 80 mile round-trip to retrieve mail (Grazier Aff. 2), the Court takes judicial notice of the fact that readily available internet mapping services place

Exhibit GG
Page 201

Grazier's admitted residence approximately 25 miles from his post office box, and approximately 22 miles from the city of Eugene.

[*36]

Furthermore, litigating this case in New York presents no conflict with the sovereignty of Oregon, because it primarily concerns the *Lanham Act*, a federal statute. New York has an interest in adjudicating the dispute because Savage Universal has raised supplemental claims under New York law, and Grazier's activities clearly implicate New York's interest in enforcing its laws and providing a forum where its corporations may seek redress. From a judicial efficiency perspective, New York is as efficient as Oregon as a forum to resolve the controversy, because the bulk of the evidence concerns internet website printouts and federal court or agency records, which are accessible anywhere to parties with internet access (a group to which Grazier plainly belongs). Accordingly, the balance of the *Burger King* factors weighs in favor of the exercise of personal jurisdiction over Grazier in New York, as comporting with standards of fair play and substantial justice. As plaintiff has satisfied, at least for purposes of a motion to dismiss, its burden to show that Grazier is subject to personal jurisdiction both under the laws of New York and under constitutional notions of due process, Grazier's [*37] motion to dismiss for lack of jurisdiction is denied.

IV. Additional Observations

Although the Court does not address the substantive merits of this lawsuit, as no consideration of the merits is required on a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(2) or 12(b)(5)*, certain additional comments are in order. Defendant Grazier has sought to portray this lawsuit and the Court's actions concerning it as a kind of witchhunt or personal campaign intended to destroy his businesses and deprive him of his *First Amendment* rights to freedom of speech. (E.g., Grazier Aff. 2-5; June 3 Letter; August 10 Letter.) Without commenting on the motives of plaintiff in bringing this lawsuit, whatever they might be, the Court merely notes for Grazier's benefit, and in consideration of his pro se status, that nothing in this opinion or in the Court's prior orders in this action prevents Grazier from complaining about Savage Universal, on the internet or elsewhere, or operating a business that competes with them. However, under the laws of the United States, what Grazier is barred from doing [*38] is accomplishing those objectives by means of trademark infringement or dilution - including cybersquatting and other illegal uses of others' trademarks or trade dress to direct or misdirect commercial internet traffic. The Court further notes that Grazier's challenged speech was not directed at criticizing our

government or elected officials, or voicing unpopular positions on vital issues of the day - actions that have formed the heart of the courts' proud and vital tradition of protecting Americans' *First Amendment* rights. Rather, Grazier's speech was purely commercial - spreading the word about a negative customer experience with plaintiff and publicizing his beliefs about its unethical business practices, and using this commentary to point out the favorable and preferable aspects of his own competing business. Grazier is of course entitled to those beliefs and statements, within the limits of the applicable trademark, defamation, and trade practices laws, but purely commercial speech has long been accorded a much lower degree of *First Amendment* protection, see, e.g., *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 569, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980),* [*39] and cries of constitutional violation have little place in a suit of this type.

Finally, as to Grazier's claims of bias and mistreatment by this Court, raised both at the July 27 Hearing and in Grazier's August 10 Letter, and again in consideration of Grazier's pro se status and possible lack of familiarity with court procedures, the Court merely notes for the record that, as described fully above, this Court has extended Grazier every courtesy available to any litigant, and more. Grazier, whether acting for himself or through his former lawyer, has been granted numerous extensions of deadlines, even where requests were made after those deadlines had expired and where the documentary record cast fair doubt on Grazier's good faith. In addition, Grazier was permitted to participate in a default judgment hearing by telephone, an accommodation that is rarely requested and even more rarely granted in this Court.

CONCLUSION

For the reasons discussed above, Grazier's motion to dismiss for insufficiency of service of process and lack of personal jurisdiction is denied. As his motion to dismiss has been denied, Grazier is hereby directed to answer the Complaint in this action no [*40] later than September 17, 2004.

Grazier is again reminded that the Pro Se Office for this district, located at the Daniel P. Moynihan United States Courthouse, 500 Pearl Street, Room 203, New York, NY 10007, 212-805-0175, may be of assistance to him regarding court procedures and forms.

SO ORDERED:

Dated: New York, NY

August 12, 2004

GERARD E. LYNCH

Page 10

2004 U.S. Dist. LEXIS 16088, *

United States District Judge

LEXSEE 2002 US DIST LEXIS 27427

SEIKO EPSON CORPORATION; EPSON AMERICA, INC.; EPSON
PORTLAND, INC., Plaintiffs, v. PRINT-RITE HOLDINGS, LTD.; MULTI-UNION
TRADING CO., LTD.; PRINT-RITE MANAGEMENT SERVICES CO.;
DYNAMIC PRINT USA, INC.; AND DOES 1-10, Defendants.

CV 01-500-BR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON

*2002 U.S. Dist. LEXIS 27427*

April 30, 2002, Decided

**DISPOSITION:** [*1] Holdings' Motion to Dismiss for lack of personal jurisdiction and Management's Motion to Dismiss for lack of personal jurisdiction were granted. Plaintiffs' claims against Print-Rite Holdings, Ltd. and Print-Rite Management Services Co. were dismissed.

LexisNexis(R) Headnotes

**COUNSEL:** For Plaintiffs: DAVID AXELROD, REGINA HAUSER, Schwabe, Williamson & Wyatt, P.C., Portland, OR.

For Plaintiffs: HAROLD A. BARZA, STEVEN M. ANDERSON, KEITH A. MEYER, RYAN S. GOLDSTEIN, TIGRAN GULEDJIAN, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA.

For Defendants: RANDOLPH C. FOSTER, STEVEN T. LOVETT, Stoel Rives LLP, Portland, OR.

For Defendants: SCOTT D. BAKER, ADALINE J. HILGARD, Crosby, Heafey, Roach & May, San Francisco, CA.

**JUDGES:** Anna J. Brown, United States District Judge.

**OPINIONBY:** Anna J. Brown

**OPINION:**

AMENDED    OPINION    AND    ORDER
(REDACTED FOR PUBLIC REVIEW)

BROWN, Judge.

This is a redacted version of the Amended Opinion and Order issued under seal on April 11, 2002. The re-dacted form of the Amended Opinion and Order omits from the Court's Findings of Fact material of a proprietary nature. The legal analysis has not been redacted.

This matter comes before the Court on the Motion to [*2] Dismiss ( # 36) for lack of personal jurisdiction filed by Defendant Print-Rite Management Company, Ltd. (Management) n1 and the Motion to Dismiss ( # 39) for lack of personal jurisdiction filed by Defendant Print-Rite Holdings, Ltd. (Holdings). n2

> n1 Print-Rite Management Co., Ltd., apparently is the true name of Defendant Print-Rite Management Services Co. The Court refers to the two companies interchangeably as "Management."

> n2 During the evidentiary hearing held on March 8, 2002, the Court denied Plaintiffs' Motion to Strike ( # 75) certain evidence and argument in the Joint Reply Memorandum and overruled the Objections to Plaintiffs' Evidence ( # 95) filed by Holdings and Management. The Court took the Motions to Dismiss filed by Holdings and Management under advisement.

For the reasons that follow, the Court GRANTS Holdings' Motion to Dismiss ( # 39) for lack of personal jurisdiction and GRANTS Management's Motion to Dismiss ( # 36) for lack of personal jurisdiction. Accordingly, Plaintiffs' [*3] claims against Print-Rite Holdings, Ltd., and Print-Rite Management Services Co. are DISMISSED.

PROCEDURAL BACKGROUND

On April 10, 2001, Plaintiffs (Epson) filed a Complaint in which they alleged Defendants violated *35 U.S.C. § 271* by infringing on 28 patents held by Epson that relate to inkjet printer cartridges. Epson also asserted Defendants are a group of affiliated corporations with common ownership and control, and each Defendant infringed on Epson's patents as an agent and co-conspirator of the other Defendants subject to the supervision and control of the other Defendants.

On July 13, 2001, Holdings and Management filed Motions to Dismiss for lack of personal jurisdiction. The parties subsequently stipulated Epson could complete discovery on the jurisdictional issues before filing a response to the Motions, and the Court ordered the parties to conduct jurisdictional discovery. On November 6, 2001, Epson filed its Response to the Motions to Dismiss and asserted this Court had personal jurisdiction over Holdings and Management on the basis of alter ego jurisdiction or their contacts with the United States as a whole pursuant to *Fed. R. Civ. P. 4(k)(2)* [*4] . On November 26, 2001, Holdings and Management filed their joint Reply Memorandum.

During a telephone conference held on February 22, 2002, the parties agreed the jurisdictional issues were ripe for decision. The parties also agreed the Court should hold an evidentiary hearing pursuant to *Data Disc, Inc. v. Sys. Technology Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977),* to determine whether Epson had established by a preponderance of the evidence that Holdings and Management are subject to the jurisdiction of this Court.

On March 8, 2002, the Court held an evidentiary hearing. Although the parties were given the opportunity to call live witnesses, the parties only presented deposition testimony, written discovery materials, and exhibits.

FINDINGS OF FACT

Based on its review of the evidentiary record, the Court makes the following findings of fact:

1. In 1981, Arnald Ho (a.k.a. Ho Leung Mui) and his sister, Joyce, formed A&J Office Services (A&J) to sell office products. In 1985, Ho and several other investors formed Multi-Union Trading Co. to manufacture and to supply office products. In 1989, Ho formed a holding company named Sino-Expo Holdings to [*5] hold the stock of both A&J and Multi-Union Trading Co. Sino-Expo Holdings changed its name to Print-Rite Holdings, Ltd., in 1994. At this time, Multi-Union Trading Co, became a limited liability company and changed its name to Multi-Union Trading Co., Ltd. (Multi-Union). Ho Dep. at 24, 27.

2. Holdings was organized under the laws of Hong Kong. Ex. A at P 3. n3 Holdings now owns stock in many separate companies, including imaging supply manufacturers and distributors, stationary and paper product manufacturers, and companies engaged in management and consulting services and property investment. Ex. A at P 3. Holdings is engaged in the business of seeking and considering additional investment opportunities and managing its portfolio of investments. Ex. A at P 19. Holdings' subsidiaries are sometimes referred to collectively as the "Print-Rite Group." Ex. A at P 3.

> n3 All citations to exhibits refer to the parties' Joint Exhibits presented during oral argument. The parties' Joint Exhibits, Joint Deposition Excerpts, and print-out of the parties' Power Point presentations and visual aids are hereby made part of the record.

[*6]

3. The majority of Holdings' shares are owned by a company named Starbo Investment, Ltd. (Starbo). Starbo's controlling shareholders are Arnald Ho and his wife, Gayle Fung. Ho Dep. at 59. The second largest shareholder is Wong Kong King (Holdings) Ltd. Nectron, an American company located in Texas, owns 8.5% of Holdings' shares. Other companies and individuals own the remaining shares. Ex. 1.

4. Holdings owns all of the stock of Management and Dynamic Print USA, Inc. (Dynamic). Ex. A at P 19. Holdings also owns 599,999 of the 600,000 shares of Multi-Union. Arnald Ho holds the remaining share. Ex. 2.

5. The directors of Holdings are Arnald Ho; Ho's wife, Gayle Fung; Gayle Fung's sister, Fung Po Chun; Lai Hon Ming; and Edward Tsui. Mutual Victory, Ltd., an outside company, serves as secretary of Holdings. Holdings does not have any other officers. Ex. E.

6. Tian Wei, a Chinese company located in China, is also a subsidiary of Holdings. Tian Wei is the exclusive manufacturer of Print-Rite brand products, including the inkjet printer cartridges at issue in this matter. Wong Dep. at 148. Ho is a director of Tian Wei. Ho Dep. at 245.

7. Multi-Union is also a subsidiary of Holdings. [*7] Multi-Union is a Hong Kong company with its principal place of business in Hong Kong. Ex. A at P 19. Multi-Union is a manufacturer and supplier of imaging products, including inkjet printer cartridges, ribbons, laser toner kits, stationery items, and plastics. Wong Dep. at 108-09.

8. Multi-Union was in business before the patents at issue came into being. Multi-Union has operated con-

2002 U.S. Dist. LEXIS 27427, *

tinually since its formation as a limited liability company and joinder with Holdings in 1989. Ex. Q. Epson's earliest patent involved in this case was issued in 1992, several years after Holdings and Multi-Union began operating. Compl. at PP 20-21. Multi-Union did not begin any operations that relate to the products at issue until approximately 1994. Ex. R at P 10.

9. The directors of Multi-Union were selected by the shareholders of Multi-Union; i.e., the directors of Multi-Union were chosen by Holdings. Ho Dep. at 73-74. Multi-Union's directors are Arnald Ho's wife, Gayle Fung; Gayle Fung's brother, Fung Kam Ming; Arnald Ho's former secretary, Or Pui Chun; and Chan Yee Mui. Ex. 2. According to the general manager of Multi-Union, David Wong, Or Pui Chun, Chan Yee Mui, and Fung Kam Ming have no duties [*8] as directors of Multi-Union. Wong Dep. at 83, 86. Although Fung and Fung Kam Ming attend regular board meetings, Or Pui Chun and Chan Yee Mui do not. Wong Dep. at 77-78.

10. Multi-Union's officers were chosen by the Multi-Union board of directors. Ho Dep. at 77. The officers of Multi-Union are David Wong, Rita Kwok, and Donald Chan. Wong Dep. at 107. David Wong is the general manager of Multi-Union. Wong Dep. at 61. He reports directly to the board of directors of Multi-Union and, in particular, to Gayle Fung. Wong Dep. at 62. Rita Kwok's title at Multi-Union is General Manager (Administration). Her responsibilities include office management and personnel issues, logistics, and shipping and transportation. Wong Dep. at 108-09. Donald Chan is the Assistant General Manager for sales. Wong Dep. at 109.

11. Dynamic is also a subsidiary of Holdings. Holdings formed Dynamic in 1996. Dynamic is a California corporation with its principal place of business in San Jose, California. Ex. A at P 19. Dynamic purchases imaging supplies and stationery from suppliers, including but not limited to Multi-Union, and sells those products in the United States. Dynamic also sells products that do not [*9] carry the Print-Rite logo. Chan Dep. at 58-59.

12. Dynamic's directors also were chosen by Dynamic's shareholder, Holdings. Ex. 25; Ho Dep. at 74. Holdings' board appointed Dynamic's first board of directors in a written, "unanimous resolution" signed by Ho only. Ex. 25. The current directors of Dynamic were appointed by a unanimous resolution of the Holdings' board signed by Fung in May 2000. Ex. 26. Dynamic's directors are Gayle Fung's brother, Fung Kam Ming; Arnald Ho's sister, Louise Ho; Ernest Chu; and Lai Hon Ming.

13. The directors of Dynamic chose Dynamic's officers. All four directors signed a resolution appointing the current officers, James Chan, Wayne Cooper, and Ernest

Chu. Ernest Chu is the Chief Executive Officer (CEO) of Dynamic, and James Chan is the President. Ex. U.

14. Management also is a subsidiary of Holdings. Ex. A at P 19. Management was organized under the laws of the British Virgin Islands. Its principal and only place of business is in Hong Kong. Ex. B at P 2.

15. Holdings created Management in 1997 for two reasons: Holdings perceived a need in the marketplace for an outside management and consulting service company, and Holdings believed its subsidiaries [*10] needed assistance with their "internal management procedures." Wong Dep. at 41. Basically, Holdings determined it would be "better" to create a company within the Print-Rite Group to manage the internal management of the subsidiaries rather than outsourcing those management services to an outside company. Wong Dep. at 42-43.

16. Management's services include accounting assistance, information technology, insurance procurement, human resources, investment services, and policy documentation assistance. Ex. B at P 3. Management provides services to Holdings and some of its subsidiaries, including Dynamic and Multi-Union. Management also provides services to companies that are not affiliated with the Print-Rite Group. Ex. B at P 3; Lee Dep. at 59.

17. Management's directors were selected by the shareholders of Management; i.e., the directors were selected by Holdings. Ho Dep. at 75-76. Management's directors are Arnald Ho; Ho's former assistant, Zheng Yu Xia; and David Wong. Ho Dep. at 19. Zheng Yu Xia is an inactive member of the board of directors with no duties. Wong Dep. at 88.

18. Management's officers were selected by Ho personally in his capacity as the Managing Director, but [*11] the directors of Management were ultimately responsible for appointing its officers. Ho Dep. at 76. The officers of Management are Arnald Ho; his wife's brother, Fung Kam Ming; David Wong; and Alice Lee. David Wong is currently the deputy general manager of Management. Ho promoted Wong to his current position. Wong Dep. at 60. Wong reports directly to Ho, the Managing Director of Management. Wong Dep. at 61-62.

19. In summary, five of Defendants' directors hold titles in at least two of Defendants' organizations. Arnald Ho is both a member of the board of directors of Holdings, and the Managing Director and a member of the board of Management. He also is the former Managing Director of Multi-Union. Ho Dep. at 41. Gayle Fung is a member of the boards of directors of Holdings and Multi-Union. David Wong is the Deputy General Manager and a member of the boards of directors of Management and the General Manager of Multi-Union. Fung

Kam Ming is a member of the board of directors of Holdings, Multi-Union, and Dynamic. Lai Hon Ming is a member of the boards of directors of both Holdings and Dynamic.

20. The offices of Holdings, Management, and Multi-Union all are located on the same floor [*12] of the same building in Hong Kong. Lee Dep. at 39-40.

21. Management allows Multi-Union to use part of its facilities, but the two companies operate in separate units of the floor. Lee Dep. at 40. Management uses Unit E and Multi-Union uses Unit A and part of Unit B. Lee Dep. at 40; Wong Dep. at 66-67. Unit B also contains employees of another Holdings subsidiary, May-May Company. Wong Dep. at 66-67. This arrangement is memorialized in a service agreement between Management and Multi-Union. Lee Dep. at 40. Management and Multi-Union have separate entrances to their units, each with a different digital lock. Lee Dep. at 142.

22. As noted above, Fung is a director of Multi-Union and the direct supervisor of Multi-Union's general manager, David Wong. Pursuant to Management's service agreement with Holdings, Fung occupies an office within Management's suite in her capacity as director of Holdings. Lee Dep. at 84. Arnald Ho, Managing Director of Management and a member of the Holdings board, also has an office in Management's Unit E. Lee Dep. at 182. David Wong, deputy general manager and a member of the board of directors of Management and an officer of Multi-Union, has an office in [*13] Multi-Union's Unit A. Lee Dep. at 182-83. Fung Kam Ming, director for Multi-Union and Dynamic and officer of Management, has an office in either Unit C or D. Wong Dep. at 64.

24. Wong receives telephone calls regarding Management's business in his office in Multi-Union's Unit A every day. Wong Dep. at 68-69. Wong also has received telephone calls regarding Multi-Union's business while located within Management's suite. Wong Dep. at 72-73. Wong has access on his computer to files for both companies. Wong Dep. at 69. Wong also visits Management's offices on a daily basis. Wong Dep. at 68.

25. Wong has two secretaries: One secretary is employed by Multi-Union and is located in Multi-Union's Unit, and one secretary is employed by Management and located in Management's unit. Wong Dep. at 71-72.

26. Holdings, Management, and Multi-Union share a common receptionist who is an employee of Management. Lee Dep. at 42-43. The receptionist directs visitors for other companies to the appropriate employees of those companies. Multi-Union has its own receptionist within its offices. Wong Dep. at 73.

27. Management and Multi-Union also share a common server. Pursuant to the services agreement between [*14] Management and Multi-Union, Management provides certain computer services to Multi-Union, including use and maintenance of Management's server. Lee Dep. at 59. The documents, however, are partitioned so that employees of one company cannot access documents from another company. Lee Dep. at 44, 60; Wong Dep. at 315. Wong, as an officer of both companies, has access on his computer to the files of both Management and Multi-Union.

28. The three Hong Kong Defendants share a telephone system that enables employees of one company to reach employees of another company by dialing an extension. Lee Dep. at 57.

29. Before Holdings formed Management in 1997, Holdings' board reviewed at its annual meetings the operating performance of the Group as a whole. Ex. 15. At that time, Holdings received an annual financial report from each subsidiary's accounting department. Ho Dep. at 167-71. The record does not reveal whether these reports were distributed to the directors. The directors, however, were not interested in the details of the subsidiaries' businesses and primarily looked at "the bottom line." Ho Dep. at 170-71.

30. Management provides services to its clients, including collateral accounting [*15]  support, policy documentation assistance, information technology services, insurance procurement, supplemental human resources services, and investment services. Ex. B at PP 3-4.

31. Pursuant to Management's service contract with Holdings, Management collects monthly profit-and-loss statements and balance sheets from Holdings' subsidiaries, consolidates that information into financial reports that assess the performance of Holdings' subsidiaries as a whole, and forwards those financial reports to Holdings. Lee Dep. at 49-51. Management also collects annual budgets from Holdings' subsidiaries and determines whether the subsidiaries are performing within their budget estimates. Ex. GG; Ho Dep. at 264. Management provides comments on Holdings' monthly reports regarding the profit and expense trends of the Holdings subsidiaries as a whole. Lee Dep. at 200. Both Dynamic and Multi-Union provide these monthly profit-and-loss statements and annual budgets to Management. Wong Dep. at 215-16; Chan Dep. at 103.

32. As part of their services, Management occasionally reviews the daily invoices and verifies that the information of Holdings' subsidiaries is correct. Lee Dep. at 188-89. Management [*16]  has contacted individual subsidiaries in the past when it discovered discrepancies in the reports. Lee Dep. at 77. Management has never

made any suggestions to Dynamic regarding this financial information. Chan Dep. at 87, 104.

33. Management sends the financial reports to Arnald Ho first. After Ho reviews the reports, they are passed to Gayle Fung. The reports are then hand-delivered to Holdings' other directors. Lee Dep. at 81.

34. Holdings' directors, including Tsui and Ho, occasionally called Management to discuss the contents of the financial reports. Lee Dep. at 51.

35. Management provides Holdings with investment advice and looks for new investment opportunities for Holdings. Ex. GG.

36. Management entered into a service agreement with Dynamic in 1998. Chan Dep. at 101. Pursuant to that agreement, Dynamic pays Management a portion of its annual sales turnover or revenue. Lee Dep. at 131. In exchange, Management serves as a consultant for Dynamic's business and accounting affairs. The agreement provides specifically that Management "shall devote such of its time attention and abilities to the business of" Dynamic as Dynamic's board of directors requests. The scope of the [*17] consulting agreement includes "strategic development, marketing and accounting matters." Ex. 36.

37. Under Management's service agreement with Multi-Union, Management "shall provide Multi-Union with full support on professional management consultancy." Multi-Union pays Management a monthly fee for this service. Ex. FF.

38. In April 2000, Management and Multi-Union entered into an agreement that provides Management will furnish Multi-Union "with full support on professional IT services such as system & technical support, trouble shooting, software and hardware installation and enhancement." Again, Multi-Union pays Management a monthly fee for this service. Ex. FF.

39. Management's services are limited generally to responding to clients' specific requests for assistance. Wong Dep. at 301-03; Lee Dep. at 89-90, 138.

40. Management's human resources services to Dynamic and Multi-Union are limited to finding and to recommending staff and management training courses offered by outside companies. Lee Dep. at 65-66. Dynamic's President, Chu, and Vice President, Chan, attended two training courses/seminars in China recommended by Management. Chan Dep. at 141. Those courses pertained to [*18] team building and management skills. Chan Dep. at 142.

41. In the past, two Management officers, David Wong and Ricky Wong, visited Dynamic in California at the request of Chan, Dynamic's Vice President. Chan asked Wong to assist him with matching Dynamic's accounting practices to its warehouse operations. Dynamic did not pay Management an additional fee for this service, but the cost of these services may have been included in Dynamic's normal consultation fee. Chan Dep. at 87-90.

42. Management helps Multi-Union's bookkeepers finalize their accounts and recommends insurance agents. Lee Dep. at 113. Management also provides aging reports for accounts receivable to Multi-Union on a monthly basis. Lee Dep. at 209.

43. Management does not help Multi-Union or Dynamic to prepare their annual budgets and has never been consulted by the subsidiaries for budgetary advice. Lee Dep. at 93-94; Chan Dep. at 87; Wong Dep. at 152. Management also does not assist Multi-Union or Dynamic to prepare their monthly profit-and-loss statements or balance sheets. Chan Dep. at 104; Wong Dep. at 215-16. Multi-Union's budget, however, must be approved by its Managing Director, Gayle Fung, who is also a [*19] director of Holdings, and by Wong, who is also the deputy general manager of Management. Wong Dep. at 152.

44. The accounting departments of Multi-Union and Dynamic perform the daily accounting tasks for those companies, including receiving purchase orders and accounts receivable without Management's assistance. Chan Dep. at 103.

45. Management has no expertise in sales and marketing and offers no advice on those topics. Lee Dep. at 84-85. Management does not provide pricing advice to Multi-Union or Dynamic. Lee Dep. at 122-23; Chan Dep. at 157; Wong Dep. at 123, 125.

46. Management prepares memoranda on market practices and procedures at the request of its customers. Lee Dep. at 89-90; Ex. 7, 8, 9. Essentially, Management gives recommendations to its clients, including Dynamic and Multi-Union, based on its experience and public information about other companies in similar markets. Lee Dep. at 90-91. Management distributes its memoranda to all of its clients that might benefit from the information. Wong Dep. at 319-21. Management intended these memoranda to be merely suggestions or recommendations, and both Dynamic and Multi-Union understood the recommendations in the memoranda [*20] were not mandatory. Lee Dep. at 89-91; Chan Dep. at 243; Wong Dep. at 301-02. In fact, Dynamic did not implement many of Management's suggestions. Lee Dep. at 153; Chan Dep. at 241-50.

47. Dynamic purchases inkjet cartridges from suppliers other than Multi-Union. Dynamic does not have to obtain the approval of Management or Holdings before choosing its suppliers nor does it consult with Holdings

or Management before choosing its customers. Chan Dep. at 155-57.

48. Multi-Union purchases printer supplies from companies other than Holdings' subsidiary, Tian Wei. Wong Dep. at 112-13. Holdings has never approved or disapproved of any of Multi-Union's suppliers or customers. Wong Dep. at 122.

49. Management obtained credit insurance on behalf of Multi-Union and Dynamic. Ex. 30; Wong Dep. at 227-28. Four of Holdings' subsidiaries requested Management consolidate their requests in order to obtain lower premiums for insurance. Wong Dep. at 230-31.

50. Although Management serves clients that are not associated with the Print-Rite Group, thirty to sixty percent of Management's income is derived solely from its contract with Multi-Union. Lee Dep. at 88. Management's service contract with Multi-Union [*21] generated [REDACTED] in 2000 and 2001. Lee Dep. at 141. In addition, Management's IT agreement with Multi-Union generates an additional [REDACTED] per month. Lee Dep. at 144-45. Management's total income for the year 2000 was between [REDACTED]. Lee Dep. at 88.

51. Management, Multi-Union, and Dynamic all maintain separate bank accounts. Ex. X; Lee Dep. at 44-45.

52. Multi-Union holds annual general directors' meetings. Wong Dep. at 77.

53. Management holds its own annual general directors' meetings. Lee Dep. at 25. These meetings are separate from Holdings' meetings. Lee Dep. at 25.

54. Dynamic purchases its own advertising for Print-Rite inkjet cartridges. Chan Dep. at 176-77. Neither Holdings nor Management pays for the advertisements purchased by Dynamic. Chan Dep. at 177; Wong Dep. at 77.

55. Dynamic owns and operates the following website: printriteusa.com. Chan Dep. at 177. Dynamic is solely in charge of the information on the site. Chan Dep. at 177-78. The information on the website is adapted from Multi-Union's catalog or from the print-rite.com website that is owned by Multi-Union. Chan Dep. at 180; Wong Dep. at 162.

56. Dynamic has never borrowed money from Management [*22] or Holdings. Chan Dep. at 214.

57. Dynamic prepares its own federal and state tax returns. Neither Holdings nor Management reviews Dynamic's tax returns before they are filed. Chan Dep. at 167-68.

58. Dynamic has never defaulted on any of its obligations to Multi-Union. Wong Dep. at 259.

59. Multi-Union sells products to American customers other than Dynamic. Ho Dep. at 99-100.

60. Management was originally capitalized through Holdings. Ho Dep. at 79; Wong Dep. at 44. Holdings has made additional capital infusions [REDACTED] into Management over the years. Wong Dep. at 46. Holdings has loaned Management [REDACTED] since the company was initially formed. Ho Dep. at 79-80. Holdings does not charge Management interest on those loans. Ho Dep. at 80. It is unclear, however, whether these interest-free "loans" are, in fact, distinguishable from the capital infusions.

61. Multi-Union has annual sales of approximately HK$ 350 million. Ex. Q.

62. In 1998 and 1999, Dynamic's revenues from United States sales totaled approximately US$ 1.6 million. Ex. T. Dynamic has never defaulted on its payments to Multi-Union for supplies. Wong Dep. at 259.

63. Defendants do not always maintain [*23] strict corporate formalities. On two separate occasions, David Wong, as general manager of Management, gave Chan, President of Dynamic, "special authorization" to sign two confidentiality agreements on behalf of Management acting as the "Vice President of Management's American Operations." Ex. 10, 12; Wong Dep. at 266-67, 278-79. Chan was given this special authorization for "the sake of convenience" because he was in California and the agreements physically were located there. Wong Dep. at 269. Management does not, in fact, have any "American Operations." Wong Dep. at 268.

64. Defendants did not maintain strict corporate formalities when Ernest Chu, CEO and a member of Dynamic's board of directors, signed a document on behalf of Holdings as the sole shareholder of Dynamic even though Chu was never a director or officer of Holdings. Ho Dep. at 251-52.

65. Multi-Union produces brochures and product catalogs describing the products it sells. Wong Dep. at 284. Holdings does not approve the brochures before Multi-Union publishes them. Wong Dep. at 286-87.

66. Multi-Union's marketing brochures refer generally to the "Print-Rite Group" and contain the Print-Rite logo. Arnald Ho is referred [*24] to as the Managing Director of the Group. Ex. 4, 5, 6, 11. In these brochures, Multi-Union touts the Group's "extensive international sales and distribution network that provides [the Group] with a truly global reach." Ex. 6. One of the brochures also states the Group is "an advanced, well organized and totally vertically integrated corporation that has the com-

Exhibit HH
Page 209

petence of functioning all the way from design, molding, injection, chemical engineering and production engineering to sales and marketing." Ex. 5. Many of these brochures contain a "Message from Managing Director" accompanied by a picture of Arnald Ho and his stamped signature. The message discusses the "group's" many achievements. Ex. 5, 6, 11. Ho signed this statement as Managing Director of Holdings. Ho Dep. at 236.

67. Some of Multi-Union's brochures also refer to Dynamic's officers, Chu and Chan, as the President and Vice-President of American Operations of Management. Ex. 5, 6, 11.

68. Some of Multi-Union's brochures also contain a flow chart that explains the corporate structure and indicates Multi-Union's place in that structure. Ex. 5, 6, 11. The relationships between the companies, however, are not always clear. [*25] In one of the brochures, the corporate flow chart appears to indicate Holdings and Management are affiliates or sister companies rather than a parent and its subsidiary. The brochure also appears to indicate that Management is the parent corporation of Dynamic and Multi-Union rather than being a sister company. Ex. 11.

69. All Print-Rite brand products share a common logo. Wong Dep. at 148. The trademarks have been used by several Holdings' subsidiaries throughout the years, including A&J; its predecessor Cardic Limited; and, most recently, Hana Company Limited. Ex. 16-19. Ho and Fung have signed various applications with the Patent and Trademark Office as officers of these subsidiaries. They also have signed several powers of attorney to enable attorneys in Seattle to assist these companies with the trademark applications. Ex. 18-19.

70. The same Print-Rite logo is used by Management and Holdings. Wong Dep. at 148. Neither Dynamic nor Multi-Union pays anyone for the right to use the Print-Rite logo. Chan Dep. at 176; Wong Dep. at 175.

71. Nectron receives dividends once or twice a year as a shareholder of Holdings. Ho Dep. at 91, 93. Ho visited Nectron's Houston facility on one [*26] or two occasions as a representative of Multi-Union. Ho Dep. at 90-91, 197-99.

72. In 1990, Holdings, Multi-Union, and Nectron's predecessor corporation, National Eagle, entered into an agreement in which Sino-Expo Holdings agreed to link the sale of Sino-Expo's stock to National Eagle with National Eagle's purchase of Multi-Union products. Ex. 20; Ho Dep. at 175-77. At the time this agreement was signed by Ho, he was also the Managing Director of Multi-Union. Ho Dep. at 176. Ho, however, did not sign the agreement in both capacities; instead, the general

manager of Multi-Union signed on behalf of that corporation. Ex. 20; Ho Dep. at 176.

73. A second sales and stock purchase agreement between the three companies was signed in 1993. Ho Dep. at 185. Ho again signed on behalf of Sino-Expo Holdings only. Ex. 21.

74. Finally, a settlement agreement between the companies was signed in 1993. Ex. 22; Ho Dep. at 188-89. The final document was signed by Ho both as Managing Director of Multi-Union and as director of Sino-Expo Holdings because the general manager from Multi-Union had to leave before the negotiations were completed. Ex. 22; Ho Dep. at 191, 194.

75. Ho once traveled to New [*27] York as director of Holdings to meet with [REDACTED] officials and to discuss a business opportunity in the digital products market. Ho Dep. at 208. Ho signed a Confidentiality Agreement with respect to those negotiations. Ho Dep. at 205-06. This meeting did not generate any business for Holdings. Ex. E.

76. WKK America (Holdings) Inc., is a subsidiary of Wong Kong King (Holdings), Ltd., one of the shareholders of Holdings. WKK America (Holdings) Inc., guaranteed Dynamic's lease in San Jose, California. Ex. 1, 27.

77. Management communicates with Dynamic in California in regard to Dynamic's monthly financial reports via electronic mail and fax. These contacts occur at least once a month. The monthly reports from Dynamic arrive at Management as file attachments to electronic mail messages. Lee Dep. at 79-80.

78. Representatives of Management, including Ho and Fung Kam Ming, have appeared annually at two trade shows in Las Vegas, Nevada, since 1998. Wong Dep. at 185-87, 189, 191.

79. Management is a party to two nondisclosure or confidentiality agreements with companies based in the United States. Lee Dep. at 99, 101. Apparently, these two agreements are the same two agreements [*28] signed by Chan as "Vice President of American Operations." Neither of those confidentiality agreements led to a viable investment opportunity, and no investments materialized from those contacts. Wong Dep. at 283-84.

80. Management has never advertised in the United States and provides no services to any customers in the United States except Dynamic. Lee Dep. at 94.

### STANDARDS

A district court must apply the law of the Federal Circuit rather than the law of regional circuits to determine personal jurisdiction in a patent infringement case.

*Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1358 (Fed. Cir. 1998).*

Personal jurisdiction over a foreign defendant is appropriate if a statute permits the assertion of jurisdiction and maintenance of the action would not offend the "traditional notions of fair play and substantial justice" of federal due process. *Id. See also 3D Sys., Inc. v. Aarotech Lab., Inc., 160 F.3d 1373, 1376 (Fed. Cir. 1998).* The statutory authorization may derive from a state long-arm statute, a federal statute that provides for worldwide process, or the so-called "federal long-arm statute" at *Fed. R. Civ. P. 4(k)(2)* [*29] . *United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 36 (1st Cir. 1999).*

"Oregon's long-arm statute confers jurisdiction to the extent permitted by due process." *Gray & Co. v. Firstenberg Mach. Co., 913 F.2d 758, 760 (9th Cir. 1990). See* ORCP 4L. Consequently, the only inquiry is whether the exercise of jurisdiction over Holdings and Management comports with constitutional requirements. *See 3D Systems, 160 F.3d at 1377. See also Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1484 (9th Cir. 1993).*

*Fed. R. Civ. P. 4(k)(2)* provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

The Federal Circuit has not interpreted the reach of *Rule 4(k)(2)* and has never applied this Rule to assert jurisdiction over a foreign defendant. Thus, the Court [*30] turns to regional circuit and district court cases that interpret and apply *Rule 4(k)(2).*

Jurisdiction over a foreign defendant is proper under *Rule 4(k)(2)* if: 1) the plaintiff's claim arises under federal law, 2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and 3) the federal court's exercise of personal jurisdiction over the defendant does not offend the Constitution or other federal law. *Swiss American, 191 F.3d at 38. See also Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 589-90 (9th Cir.), supplemented by 95 F.3d 1156 (1996).* "The constitutional requirements are the same" under *Rule 4(k)(2)* as the minimum contacts analysis applied in normal jurisdictional inquiries, "but the analytic exercises are performed with reference to the

United States as a whole, rather than the reference to a particular state." *Swiss American, 191 F.3d at 36.*

Although the *Due Process Clause of the Fifth Amendment* provides the constitutional personal jurisdiction limitations for an action based on federal question subject matter jurisdiction, the Federal Circuit has [*31] held the "minimum contacts" analysis under the *Fourteenth Amendment* applies to jurisdictional issues under the *Fifth Amendment. Akro Corp. v. Luker, 45 F.3d 1541, 1544-45 (Fed. Cir.), cert. denied, 515 U.S. 1122, 132 L. Ed. 2d 281, 115 S. Ct. 2277 (1995).* In other words, the district court must examine whether the foreign defendant has established sufficient minimum contacts with the forum "'such that it should reasonably anticipate being haled into court there.'" *Red Wing, 148 F.3d at 1358-59* (citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)).* If the district court determines the defendant purposefully established such minimum contacts with the forum state, those contacts "may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id. at 1359* (internal quotations and citations omitted).

The plaintiff has the burden of establishing personal jurisdiction. *Ziegler v. Indian River County, 64 F.3d 470, 473 (9th Cir. 1995).* When pertinent facts bearing on the question of jurisdiction [*32] are controverted or a more satisfactory showing of the facts is necessary, the trial court may permit discovery to aid in determining whether personal jurisdiction exists. *Data Disc, 557 F.2d at 1285 n.1.* In addition, the district court has the discretion to take evidence at a preliminary hearing if issues of credibility or disputed questions of fact with regard to jurisdiction are present. *Id. at 1285.* At such a hearing, the plaintiff has the burden to show jurisdictional facts by a preponderance of the evidence. *Id.*

## DISCUSSION AND CONCLUSIONS OF LAW

The parties agree neither Holdings nor Management has sufficient minimum contacts with the State of Oregon to support the exercise of traditional personal jurisdiction over those entities. The parties, however, also agree Dynamic and Multi-Union are subject to this Court's specific jurisdiction for Epson's claims that arise out of or relate to their Oregon contacts. n4 Epson asserts this Court may exercise personal jurisdiction over Holdings and Management because Dynamic and Multi-Union are the alter egos of Holdings and Management and, therefore, the Oregon contacts of Dynamic and Multi-Union [*33] may be imputed to Holdings and Management for jurisdictional purposes.

n4 Epson does not allege Multi-Union or Dynamic is subject to personal jurisdiction in Oregon based on general jurisdiction.

In addition, the parties further agree the national contacts of Holdings and Management do not support this Court's exercise of specific jurisdiction because Epson's claims against those entities do not arise out of or relate to the national contacts of Holdings or Management. Epson contends, however, Holdings and Management have sufficient national contacts to support this Court's exercise of general jurisdiction over those entities pursuant to *Rule 4(k)(2)*. n5

n5 Management and Holdings argue Epson waived its alter ego argument because Epson "certified" pursuant to *Rule 4(k)(2)* that Management and Holdings are not subject to the jurisdiction of the court of any state, including this Court. *See Swiss American, 191 F.3d at 41-42* (plaintiff need not prove the defendant is not subject to personal jurisdiction in any state, but must at least certify that, based on the information available to plaintiff, defendant is not subject to the personal jurisdiction in the courts of any state).

As the Court explained during oral argument, the Court will not require Epson to choose between these two alternative and exclusive jurisdictional theories at this stage in the litigation. The Court, therefore, assumes Epson's certification pursuant to *Rule 4(k)(2)* is only effective if this Court first determines it lacks jurisdiction over Holdings and Management under Epson's alter ego theory. The Court concludes, therefore, Epson's certification does not act as a waiver of Epson's alter ego argument.

[*34]

**I. Alter Ego Jurisdiction**

**A. Standards**

The parties agree this Court must apply federal common law as interpreted by the Federal Circuit on the issue of piercing the corporate veil for jurisdictional purposes. The Federal Circuit has held "a court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc., 757 F.2d 1256, 1265 (Fed. Cir. 1985)*. The district court's power to pierce the corporate veil for purposes of exercising personal jurisdiction over a foreign defendant that lacks minimum contacts with the forum is an equita-

ble power that is limited by the reasonableness and fairness requirements of due process. *Id.*

The court, however, "must 'start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception, [or] unless there is at least 'specific intent to escape liability for a specific tort . . . .'" *3D Systems, 160 F.3d at 1380* (quoting *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 552 (Fed. Cir. 1990))*. In the past, the Federal Circuit has [*35] referred to state and regional circuit law to determine the "specific, unusual circumstances" that justify piercing the corporate veil for jurisdictional purposes. *See, e.g., Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F.3d 1455, 1459-60 (Fed. Cir. 1997)* (applies Washington alter ego law); *Minnesota Mining, 757 F.2d at 1264-65* (examines Tenth, Eighth, and Second Circuit opinions on veil piercing).

A review of federal cases reveals courts have pierced the corporate veil to assert jurisdiction over foreign defendants in three separate but overlapping factual situations. First, some courts hold the corporate veil should be pierced and alter ego jurisdiction should be asserted over affiliated foreign corporations only if the plaintiff shows the defendant disregarded strict corporate formalities in such a manner and degree that the independence of the two companies, in fact, was breached. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 335-37, 69 L. Ed. 634, 45 S. Ct. 250 (1925)*. In addition, courts exercise their equitable powers to assert alter ego jurisdiction over foreign defendants that exert total control over the affairs [*36] and activities of the local defendant so that the two defendants are in reality a single entity. *See, e.g., Doe v. Unocal Corp., 248 F.3d 915 at 926, 928 (9th Cir. 2001)*. Finally, some courts have pierced the corporate veil and exercised personal jurisdiction over foreign companies because the local defendant was engaged in activities the foreign company would have been required to undertake itself if the local defendant did not exist. *See, e.g., Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994), cert. denied, 514 U.S. 1004, 131 L. Ed. 2d 196, 115 S. Ct. 1314 (1995)*. n6 The same proof supports all of these jurisdictional theories. *See Arch v. Am. Tobacco Co., Inc., 984 F. Supp. 830, 837 (E.D. Pa. 1997)*. *See also Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 426*. As the Ninth Circuit has noted, "questions of personal jurisdiction admit of no simple solutions and . . . ultimately due process issues of reasonableness and fairness must be decided on a case-by-case basis." *Wells Fargo, 556 F.2d at 426*.

n6 This theory occasionally is referred to as the general agency theory of jurisdiction. General agency theory is different than pure agency theory. A plaintiff that wants to hold a parent corporation liable under a pure agency theory must show the parent directed the subsidiary agent to take actions related to the plaintiff's cause of action. *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 419-20 (9th Cir. 1977).* A pure agency theory does not require any sort of alter ego analysis and, in fact, does not even require a parent-subsidiary relationship. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir.), cert. denied, 488 U.S. 908, 102 L. Ed. 2d 247, 109 S. Ct. 259 (1988).* A general agency theory, on the other hand, is premised on the parent's domination of the subsidiary and the overall relationship between the parent and subsidiary without reference to the plaintiff's claims. *Id.*

Epson does not argue and, in any event, has not shown, any facts that support this Court's exercise of jurisdiction over Holdings or Management pursuant to a pure agency theory. Epson, however, has raised issues that pertain to a general agency theory as part of its alter ego argument. The Court, therefore, will address Epson's general agency arguments.

[*37]

This Court, therefore, must examine all relevant factors that relate to the intimacy and interrelatedness between Holdings and Management and to the parties over which the Court has jurisdiction, Dynamic and Multi-Union. This Court, in the exercise of its equitable power, must assess whether "specific, unusual circumstances" require the Court to disregard the general rule of corporate separateness and to impute the contacts of Dynamic and Multi-Union to Holdings and/or Management for purposes of the jurisdictional analysis. n7 Because of the strong presumption in favor of protecting the corporate form, the Court may exercise its equitable power and assert jurisdiction over Holdings and Management only if the failure to do so would result in fraud, injustice, or inequity. *Manville, 917 F.2d at 552.*

n7 The Court need not address and offers no opinion regarding the appropriate test for alter ego liability in this matter.

**B. Holdings' Motion to Dismiss**

Epson contends Holdings is subject to [*38] the personal jurisdiction of this Court because it is the alter ego of Dynamic and/or Multi-Union and those companies have conceded this Court has specific personal jurisdiction over them.

In the alternative, Epson contends Management is the alter ego of Holdings and also the alter ego of Dynamic and/or Multi-Union. Holdings, therefore, must also be the alter ego of Dynamic and/or Multi-Union, and, as a result, subject to the jurisdiction of this Court. In other words, Epson contends Management is the mere instrumentality or vehicle through which Holdings exerts undue influence and improper control over Dynamic and/or Multi-Union.

The Court first considers whether Epson has shown that Management is the alter ego of Holdings.

**1. Management as the vehicle through which Holdings controls Dynamic and/or Multi-Union**

**a. Holdings is not the alter ego of Management**

The touchstone of the alter ego or agency analyses is whether the parent actually controls the subsidiary's "internal affairs or daily operations." *Doe, 248 F.3d at 926* (citing *Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir.), cert. denied, 449 U.S. 1062, 66 L. Ed. 2d 604, 101 S. Ct. 785 (1980)).* [*39] "Activities . . . which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decision, and articulation of general policies and procedures" are evidence of a normal parent-subsidiary relationship and do not justify piercing the corporate veil. *Id.* at 72 (internal quotation and citation omitted). Thus, the Court may disregard the corporate separateness of the parties only if Epson shows Holdings "controlled virtually every phase of the subsidiary's operation." *A. Stucki Co. v. Worthington Indus., Inc., 849 F.2d 593, 596 (Fed. Cir. 1988).*

Epson essentially argues Defendants are part of a common enterprise known as Print-Rite Group that is headed and controlled by a single figure, Arnald Ho. Epson contends the members of the Print-Rite Group, including Management and Holdings, portray themselves to the public as a single operating unit and, in fact, fail to maintain separate corporate identities or to follow all corporate formalities. Epson contends these factors are evidence that Holdings in fact controls Management's internal operations and is Management's [*40] alter ego for jurisdictional purposes.

**1) Common Marketing Image**

Affiliated companies that "hold themselves out to the public as a single entity that is conveniently depart-

mentalized" may be the alter egos of one another for jurisdictional purposes. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 402 F. Supp. 262, 328 (E.D. Pa. 1975). See also Cascade Steel Rolling Mills, Inc. v. C. Itoh and Co. (America) Inc., 499 F. Supp. 829, 839 (D. Or. 1980)* (relies in part on parent companies' efforts to create an image of a single entity with numerous offices around the world to pierce the corporate veil). Epson argues the Print-Rite Group's public image as a single, integrated global entity leads to the reasonable conclusion that Holdings is the Group's alter ego because Holdings, in fact, controls the Group's subsidiaries, including Management.

Epson supports its argument as follows: Management and Holdings share a common trademark and public marketing image. The Print-Rite Group markets itself as a seamlessly integrated force with a global reach. While the Group's marketing materials were not produced by either Management or Holdings, they [*41] consistently have contained statements allegedly made by Ho, Managing Director of the Group, in which he touts the Group's global capacities and integrated network of corporations. Ho reviewed the brochures after they were produced and apparently did not suggest the Managing Director's statements or the Group's image as portrayed were incorrect.

Some of these marketing materials contain "corporate structure" charts that indicate Holdings and Management are actually affiliates or sister companies rather than a parent and subsidiary. Notably, the other Holdings subsidiaries are portrayed as offshoots of Management rather than Holdings. These offshoots include companies with various purposes, including purchasing, manufacturing (Tian Wet), local trading (Multi-Union), and overseas trading (Dynamic). Thus, this brochure supports Epson's contention that Management is the conduit through which Holdings controls its subsidiaries, Multi-Union and Dynamic.

The brochures also support Epson's argument that Ho has ultimate control over the Print-Rite subsidiaries, including the other Defendants. The Court, therefore, finds the Group's public image offers some evidence of the parties' true relationships [*42] with one another and weighs in favor of piercing the corporate veil between Holdings and Management. The Group's marketing image, however, is only probative insofar as it is proof of the actual relationship between the parties. This evidence alone is insufficient to justify disregarding the general rule of corporate distinctions to pierce the corporate veil.

2) Common directors and officers

Epson also argues the presence of Ho on the boards of both Holdings and Management supports its contention that Ho completely controls both of those entities

and that they are, in fact, mere alter egos of one another. Overlapping directors and officers alone, however, do not establish an alter ego relationship.

The Supreme Court has noted, it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *United States v. Bestfoods, 524 U.S. 51, 69, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998)* (internal quotation and citations omitted). In fact, a complete overlap of directors and officers does not necessarily indicate improper control or undue influence. *Id.* Corporate directors and officers often "change hats" to represent the parent and the subsidiary [*43] separately, and courts generally presume the directors are wearing their subsidiary hats rather than their parent hats when acting on behalf of the subsidiary. *Id.* Nonetheless, the extent to which directors overlap, and, perhaps more importantly, the extent to which active officers who participate in the daily operations of the two companies overlap, are factors that establish the parent corporation's ability to control the subsidiary's internal operations. Actual control, however, still must be shown.

Here the only overlap in the management teams and boards of Holdings and Management is Ho's presence. Ho, the apparently self-proclaimed "Managing Director" of the Print-Rite Group, is actively involved in the operation of Management and the investment strategy and oversight of Holdings. In fact, Ho and his wife, Gayle Fung, own most of the shares of Holdings' majority shareholder, Starbo, and Holdings is the sole shareholder of Management.

Ho is one of five members of Holdings' board of directors. Ho is also a member of Management's board. Holdings' board of directors selected the directors of Management, including Ho. Ho, as Managing Director of Management, chose the officers [*44] of Management himself even though Management's board of directors as a whole had to approve those appointments. Management's officers and employees ultimately report to Ho. He, however, must report to the full board of Management.

Epson argues Ho is the only active director of each of these companies and, therefore, he exerts undue and complete control over both companies. In support of this argument, Epson relies on the fact that the majority of the directors of Management and Holdings are Ho's relatives and former "assistants" or secretaries. There is no evidence in the record, however, that indicates Ho controls any of these relatives or former assistants. Many businesses are family-owned, and the Court will not infer from this fact alone that Ho exerts improper control.

Moreover, the record shows the directors who are not related to Ho (and over whom Epson does not assert Ho has "presumptive" control) actively participate in the

business. David Wong, who is neither related to nor a former employee of Ho, is actively involved in the management and oversight of Management. He has signed several documents on behalf of Management and handles many of its day-to-day activities. In [*45] addition, Edward Tsui, one of Holdings' directors who is not related to Ho, receives the same monthly and annual financial information regarding the Holdings' subsidiaries that Ho and Fung receive. Tsui also has made inquiries to Management about this information in the past. Furthermore, the record contains minutes of a Holdings' board meeting that indicate many of Holdings' board members in addition to Ho and Fung, including Edward Tsui and Fung Kam Ming, attended a Holdings' board meeting in 1997. Although the Court finds Ho and Fung are indeed the most active members of the boards of Holdings and Management, Epson has not established the remaining directors are "sham" directors who do not participate in corporate functions.

Moreover, Ho's dual roles are not improper as long as Ho is not acting on behalf of one corporation based on his role with the other corporation. There is no evidence in the record that supports a finding that Ho failed to "change hats" before acting on behalf of Management. In addition, there is no evidence in the record that indicates Holdings' board or Ho himself exerts undue influence or control over Management's day-to-day activities beyond. Ho's mere presence [*46] on the boards of both companies. The record does not reflect Management's daily operations are controlled either by Ho or Holdings as an entity. Management has a separate and independent set of officers, including Alice Lee, Ricky Wong, and David Wong, who oversee the "micro-management" of the company. Epson points to no decisions by these officers that were dictated by Holdings or Ho personally. The Court, therefore, finds Epson has failed to establish that Holdings exerts undue influence or control over Management's internal operations.

### 3) General Agency

Epson also contends Management is Holdings' alter ego because it operates as a mere division or department of Holdings that "performs services that are sufficiently important to [Holdings] that if it did not have a representative to perform them the corporation's own officials would undertake to perform substantially similar services." *See Doe, 248 F.3d at 928* (internal quotation and citations omitted). In other words, Epson contends Management was "'either established for, or is engaged in, activities that, but for [its] existence . . . [Holdings] would have to undertake itself.'" *See Chan, 39 F.3d at 1405* [*47] (quoting *Gallagher v. Mazda Motor of America, Inc., 781 F. Supp. 1079, 1083 (E.D. Pa. 1992)).* Generally, the subsidiaries of a holding company do not act as its "general agents." *Gallagher, 781 F. Supp. at*

*1085.* A holding company is in the business of locating investment opportunities and holding the stock of other companies. A holding company itself does not make or sell anything. A holding company is not necessarily engaged in any particular business; therefore, its subsidiaries do not engage in activities that the holding company would otherwise be required to undertake. *Id.* (a holding company can always choose simply to hold a different type of subsidiary).

Holdings' relationship with Management, however, is not a typical holding company-subsidiary relationship because Management actually provides services to Holdings. Pursuant to Management's service agreement with Holdings, Management collects financial information from the Print-Rite subsidiaries on a monthly basis, compares that information to the past monthly financial documents and annual budgets supplied by the subsidiaries, consolidates that information into financial reports that [*48] assess the performance of the Holdings subsidiaries as a whole, and forwards those reports to Holdings. In addition, Management provides investment advice and searches for new investment opportunities for Holdings.

These tasks are the type of activities one would expect an investment or holding company to undertake itself. In fact, before Holdings formed Management in 1997, Holdings' subsidiaries sent their annual financial reports directly to Holdings so that it could review the operating performance of the Print-Rite Group as a whole at its annual board meetings. Thus, it appears Management is performing at least some of the tasks that Holdings used to perform and presumably would have continued to perform for itself had it not formed Management to handle those tasks.

Nonetheless, Management also provides additional services that Holdings was not performing itself, including consolidation of the subsidiaries' monthly financial reports and recommendations regarding the interim monthly reports. In addition, the record indicates Management was not established solely to perform tasks for Holdings. *See Gallagher, 781 F. Supp. at 1085 n.10* (the most persuasive evidence [*49] of a general agency relationship is that the subsidiary does all of its business with the parent corporation and, therefore, is merely a front for the parent). Holdings formed Management, in part, to provide outsourced management services to companies in the market at large, and Management provides services to clients other than Holdings. Management's clients include companies not associated with Holdings or the Print-Rite Group. Although Epson argues Management's services to the Holdings subsidiaries are tasks that Holdings itself would otherwise undertake, there is no evidence that Holdings provided human resources, accounting, and insurance services to its subsidiaries before

Management was formed. In addition, the bulk of Management's business and revenue is generated through its agreement with Multi-Union rather than its service agreement with Holdings. Management, therefore, is more than a mere division of Holdings that performs tasks the holding company otherwise would have to undertake itself.

#### 4) Corporate Formalities

The failure to comply strictly with the formalities of corporate organization is another factor that weighs in favor of piercing the corporate veil. [*50] *See Hoover Group, Inc. v. Custom Metalcraft, Inc., 84 F.3d 1408, 1411 (Fed. Cir. 1996). See also Doe, 248 F.3d at 926.* Epson argues Holdings and Management have failed to adhere to strict corporate formalities when interacting with each other.

The record shows Management and Holdings are individually incorporated entities with functioning boards of directors. Contrary to Epson's contentions, there is no evidence that indicates those boards are filled with sham directors. Holdings has only one officer, an outside company that acts as its secretary. Management has its own officers, each with independent duties and areas of expertise. Management holds its own general directors' meetings separate from Holdings board meetings. In addition, Management maintains its own bank account. Moreover, the relationship between Holdings and Management is memorialized in a formal, written service agreement that details the consulting services Management provides to Holdings. The agreement was signed by Ho on behalf of Holdings and David Wong, one of Management's directors who is not related to Ho, on behalf of Management. Holdings pays Management a fee for those services [*51] just as it would to any other outside consultant.

Nonetheless, Epson argues there are no true distinctions between Management and Holdings because those companies share many common resources that independent corporations normally would provide for themselves. For example, Holdings' offices consist of a single cubicle within Management's offices in Hong Kong. That office is occupied by Gayle Fung, the wife of Ho. Pursuant to the services agreement between Holdings and Management, Management also shares with Holdings a receptionist, a telephone system, a conference room, a domain name, and an email system.

Epson further argues Holdings failed to maintain strict corporate formalities when it made several interest-free loans to Management. The mere provision of interest-free loans is not indicative of a breach of corporate formalities; however, the failure to document such interest-free loans with promissory notes suggests the absence of corporate formalities. *See Doe, 248 F.3d at 928* (citing

*Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524 (9th Cir. 1984)).* There is no evidence in the record, however, that [*52] Holdings' loans to Management were not properly documented.

The Court also notes it is unclear from the record whether the interest-free loans were different from the capital infusions that Holdings made to Management throughout the years. Capital infusions in contrast to interest-free loans are not repaid. Moreover, capital infusions from a parent to a subsidiary are a normal, and, indeed, a necessary part of the parent-subsidiary relationship and do not in and of themselves indicate an alter ego relationship. In fact, Holdings' infusion of capital into Management actually defeats an alter ego finding because it is proof that Holdings is not siphoning assets from Management and is not improperly or unjustly trying to shield its assets by undercapitalizing its subsidiary and hiding behind the corporate veil.

#### 5) Fraud, Injustice, or Inequity

The Federal Circuit has held piercing the corporate veil is an equitable power of the court that should only be used to disregard the corporate form in order to prevent fraud, injustice, or inequity. *Manville, 917 F.2d at 552.* Few courts, however, have examined the meaning of fraud or injustice in this context. Most courts [*53] that have addressed this issue have held injustice would occur if the parent company either created a corporation with the fraudulent intent of shielding itself from liability or the parent depleted the resources of the subsidiary in order to make the subsidiary judgment-proof. *See, e.g., Minnesota Mining, 757 F.2d at 1264* (post-tort undercapitalization); *Laborers, 736 F.2d at 523* (undercapitalization at time of incorporation).

A corporation is considered to be undercapitalized if it does not hold an adequate amount of assets to carry on its normal business and to pay its debts. *Laborers, 736 F.2d at 523.* Epson offers no evidence that Management was undercapitalized when it was formed or at any other time. There is no evidence in the record that indicates Holdings' loans or capital infusions to Management were used to pay Management's normal operating expenses rather than to expand the business.

In addition, Epson has not shown Management was incorporated for a fraudulent purpose or to protect Holdings from liability. The record shows Holdings created Management to assist the Holdings' subsidiaries with their internal management [*54] procedures and to provide an investment opportunity for Holdings in the area of outsourced management services. Management indeed has performed both of these tasks, and there is no evidence that it is or ever has been a sham corporation.

2002 U.S. Dist. LEXIS 27427, *

Epson also argues maintenance of the corporate form would lead to an inequitable result because no meaningful judgment would be available to Epson unless the parent, Holdings, is enjoined from creating new subsidiaries that would infringe on Epson's patents. Epson, however, has not shown it is prohibited from prosecuting such claims and obtaining the same injunctive relief against Holdings in another forum. The potential inconvenience of forcing Epson to litigate its patent infringement claims in another forum, such as Holdings' home of Hong Kong, is not the type of injustice or inequity that warrants piercing the corporate veil. n8 The possible inconvenience of dividing Epson's claims and forcing it to litigate two cases simultaneously also is not the type of inequity that would warrant piercing the corporate veil.

> n8 This is particularly true in this matter because one of the Epson Plaintiffs, the parent corporation of the other two Epson Plaintiffs, is a Japanese corporation.

[*55]

Although the Print-Rite Group portrays itself as a vertically-integrated unit and there is indeed substantial overlap in personnel and resources between Holdings and Management, the Court finds the companies are independently organized and consistently maintain almost all corporate formalities. The Court further finds Holdings does not exert the type or level of control over Management's daily operations or internal management necessary for alter ego jurisdiction. In addition, the Court finds Management is more than a mere subdivision of Holdings because it provides various services to companies both inside and outside of the Group. Moreover, Epson has not shown Holdings' use of the corporate form would result in injustice or fraud here.

Based on the foregoing, the Court concludes equity does not require it to disregard the corporate form or to find Holdings and Management are alter egos of one another. Accordingly, the Court will respect the corporate distinctions between Holdings and Management for purposes of this jurisdictional analysis.

**b. Management is not the alter ego of Dynamic or Multi-Union**

Even if the Court were to determine Management is the alter ego of Holdings, [*56] Epson still must show that Management also is the alter ego of Dynamic and/or Multi-Union in order for the Court to assert jurisdiction over Holdings based on Management's relationship with Dynamic and/or Multi-Union. Again, Epson contends all four Defendants are part of a larger enterprise, the Print-

Rite Group. Epson argues Holdings controls the distribution portion of this enterprise, including Multi-Union and Dynamic, through Management's undue influence over and improper control of those companies.

**1) Common Marketing Image**

As noted, the Group portrays itself publicly as a vertically-integrated enterprise with Holdings at the top and Ho as Managing Director of the entire Group. In Multi-Union's most recent brochure, which was published without Management's input, Management is portrayed as a sister company to Holdings, and the individual subsidiaries, including Dynamic and Multi-Union, are portrayed as offshoots or subsidiaries of Management. Thus, the brochure indicates Management has some level of control or oversight over Dynamic and Multi-Union.

In addition, the brochure identifies two of Dynamic's officers, James Chan and Ernest Chu, as officers of Management's "American [*57] Operations." Dynamic is Management's only American client, and Management does not have any American operations. Management, however, has authorized Chan to sign two documents on its behalf as the Vice President of its "American Operations." Thus, Management itself has held Chan out as one of its top officers.

The Court finds this evidence supports a finding that Management is the alter ego of Multi-Union and, in particular, of Dynamic. This evidence alone, however, is not sufficient to establish alter ego jurisdiction.

**2) Common directors and officers**

Epson argues the substantial overlap in the officers and directors of Management and Dynamic and Multi-Union demonstrates Management's control over these subsidiaries. It is not unusual, however, for affiliated companies to share officers and directors.

One of Management's officers, Fung Kam Ming, serves as a member of the boards of directors for both Dynamic and Multi-Union. There is no evidence that Fung Kam Ming exerts undue influence or control over Multi-Union or Dynamic as an officer of Management. In fact, the evidence in the record reveals Fung Kam Ming has no duties in the active, day-to-day management of Multi-Union [*58] or Dynamic. David Wong, who serves as one of Management's directors and the Deputy General Manager of Management, is also the General Manager of Multi-Union. As such, Wong takes an active role in the daily operations of both companies. Wong's office is in Multi-Union's suite; however, he visits Management's facilities on a daily basis. He also receives telephone calls regarding Management's business in his office within Multi-Union's suite. Wong has two secretaries, one employed by Management and located in Management's suite, and one employed by Multi-Union

and located in Multi-Union's suite. There is no evidence in the record, however, that shows Wong used his position to exert undue influence or control over Multi-Union on behalf of Management. There also is no evidence that Wong consulted with Ho or other members of Management's board before taking any action on behalf of Multi-Union. As the Supreme Court has stated, officers and directors may wear two hats in different corporations, and courts generally presume the officers and directors are wearing the appropriate hats at the appropriate times unless there is evidence to the contrary. *Bestfoods, 524 U.S. at 69.* [*59] Epson has not presented any evidence to the contrary.

As Deputy General Manager of Management, Wong reports directly to Ho, the Managing Director. As General Manager of Multi-Union, Wong reports to the board, and, more specifically, to Fung. Although Ho and Fung also are members of Holdings' board of directors, there is no evidence in the record that Ho or Fung improperly supervised Wong's actions outside of their positions as officers of Management and Multi-Union. The record shows Management's relationships with Dynamic and Multi-Union are limited relationships that have been memorialized in formal, written service agreements, and there is nothing in the record to suggest these are not arms-length agreements. Pursuant to these agreements, Management acts as a consultant to the subsidiaries and provides certain accounting, human resources, information technology, and insurance procurement services for them. Management only provides services directly requested by the clients. Moreover, both Management and its clients understand Management's advice is not mandatory. In fact, many of Management's past recommendations have never been adopted by the subsidiaries.

Pursuant to its agreement [*60] with Holdings, Management collects detailed financial information from the subsidiaries on a monthly basis. Management may contact the subsidiaries for additional information or to inquire about discrepancies. Management's comments regarding the financial status of the Print-Rite Group, however are transmitted only to Holdings' board for its review. Management does not make financial suggestions to the subsidiaries based on these monthly reports unless the clients requested specific advice.

Management provides more extensive services to Multi-Union than it does to Dynamic, in part because Multi-Union is located in Hong Kong, rents office space from Management, and shares many resources with Management as a result of their proximity to one another, including a common server, telephone system, receptionist, and domain name.

Contrary to Epson's contention, the record reveals Management does not control the internal management of Dynamic or Multi-Union. Its services are limited in nature and are paid for by Dynamic and Multi-Union. The two subsidiaries perform nearly all of the day-to-day, important decision-making regarding purchasing, pricing, distributing, accounting, and budgeting [*61] functions necessary to operate their respective businesses without consulting Management and without Management's prior approval.

Based on the foregoing, the Court finds Epson has not shown that Management exerts undue influence or control over "the internal affairs or daily operations" of Dynamic or Multi-Union. The Court also finds Management's assistance with peripheral or supplemental tasks does not justify piercing the corporate veil.

### 3) Corporate Formalities

As noted, Management authorized James Chan, President of Dynamic, to sign two confidentiality agreements on behalf of Management as its "Vice President of American Operations." In reality, Chan has never been an officer or director of Management, and Management does not have any American operations. Apparently, Chan was given special authorization to sign the documents to avoid the "inconvenience" of faxing or mailing the agreements from the United States to Hong Kong. The Court finds this "inconvenience" is not a sufficient reason to disregard corporate formalities or to deputize officers of sister corporations with nonexistent titles to sign documents on behalf of another corporation. While these two instances [*62] of failure to strictly observe corporate formalities are hardly pervasive, they do constitute some evidence that weighs in favor of an alter ego finding.

### 4) General Agency

Epson seems to argue that Management is a mere division or department of Dynamic and Multi-Union, and, at the same time, argues that Dynamic is a mere division or department of Management. In support of the latter argument, Epson points out Dynamic was referred to as Management's "American Operation" in Multi-Union's marketing brochures, and Chan signed two documents on behalf of Management as the "Vice President of American Operations." Beyond this evidence, Epson offers no proof that Dynamic is performing tasks that, absent Dynamic's existence, Management would be required to undertake. Management is a management services consultant, does not have any expertise in marketing or sales, and offers no advice on those topics. Dynamic, on the other hand, is a distributor of office products and printer supplies. Despite the fleeting references to Management's "American Operations," it is clear Management, a service company, would be unlikely to perform the same marketing and distributing functions as Dynamic even [*63] if Dynamic did not exist.

Whether Management can be considered a mere division or department of Dynamic and/or Multi-Union is a closer question. Management was formed, in part, "to manage the internal management" of Holdings' subsidiaries. Some of the services that Management provides to Multi-Union and Dynamic are the type of services one would expect an independent corporation to perform for itself, such as the procurement of insurance. It is not uncommon, however, for corporations, especially small corporations like these, to outsource certain accounting, human resources, and information technology functions. In fact, the market demand for these outsourced services was Holdings' other impetus for forming Management. Management provides these services to companies outside of the Group and to Multi-Union and Dynamic. Based on the foregoing, the Court finds Management is not a mere subdivision of Dynamic or Multi-Union.

### 5) Fraud, Injustice, or Inequity

Management is not the parent of Dynamic or Multi-Union and does not finance or capitalize them; therefore, the sufficiency of the capitalization of those companies is not relevant to this inquiry. In any event, Epson has provided [*64] no evidence to establish that Dynamic and Multi-Union were undercapitalized when they were formed or that their assets have been siphoned off since the alleged infringing activities began.

There also is no evidence that Holdings formed Dynamic or Multi-Union with a fraudulent intent or to escape liability in this action or any other lawsuit. Multi-Union operated many years before Epson's patents were issued. Multi-Union sells imaging and office products, including the alleged infringing goods, to companies around the world. It purchases products from and sells products to companies both inside and outside of the Group. Dynamic distributes printing supplies and office products in the United States, including but not limited to Print-Rite products. When it was formed for this purpose, Dynamic did not completely replace Multi-Union as a supplier of Print-Rite goods in the United States. Multi-Union continues to sell Print-Rite goods in America, and Dynamic buys products from Multi-Union and from companies outside of the Group.

There is no evidence in the record that Dynamic and/or Multi-Union are sham companies that were formed simply to shield Holdings' assets, let alone the assets [*65] of their sister company, Management. Epson offers no other basis for finding that fraud, injustice, or inequity will result from maintenance of the corporate distinctions between Management and Multi-Union and Dynamic.

Based on the foregoing, the Court finds Management, Multi-Union, and Dynamic are independently organized and perform distinctly separate functions even

though Management performs some functions on behalf of Multi-Union and Dynamic and some overlap of personnel and resources exists between these companies. Management does not exert the type or level of control over the daily operations or internal management of Multi-Union and Dynamic that is required for a finding of alter ego jurisdiction. The services that Management provides are minimal and are the type of services that are commonly outsourced by small corporations. In addition, Management is more than a mere subdivision of Dynamic and Multi-Union because it provides various services to other subsidiaries as well as to companies outside of the Group. Moreover, Epson has not shown maintenance of the corporate form would work any injustice or fraud in this case. Accordingly, the Court concludes there are no specific, [*66] unusual circumstances to justify disregarding the corporations' separate identities, and no injustice or fraud will occur because of maintenance of those separate corporate forms. As a result, the Court will not exercise its equitable powers to pierce the corporate veil between these companies.

In addition, the Court finds Epson has failed to show that Holdings is the alter ego of Management and that Management is the alter ego of Dynamic and/or Multi-Union. Thus, the Court concludes Holdings is not subject to this Court's jurisdiction based on Management's connection with Dynamic and/or Multi-Union.

### 2. Holdings' own relationship with Dynamic and/or Multi-Union

Epson also contends Holdings is the alter ego of Multi-Union and Dynamic based on Holdings' direct relationship with those subsidiaries.

#### a. Common Marketing Image

Once again, Epson argues the Print-Rite Group is actually a single entity headed by Holdings, or more exactly, by Ho himself. Epson contends the Group portrays itself publicly as a vertically-integrated "corporation" with Holdings at the top and Ho as the Managing Director of the Group. Although this marketing image is some evidence of the way the [*67] parties relate to one another, the Court finds this evidence is not sufficient by itself to prove that Holdings controls the subsidiaries or that the parties are mere alter egos of one another.

#### b. Common Directors and Officers

Epson contends Holdings actually controls Dynamic and Multi-Union by placing its board members on the boards of its subsidiaries and then filling the remaining board seats with sham directors. Gayle Fung, Ho's wife, is a member of the boards of directors of both Holdings and Multi-Union. Lai Hon Ming is a member of the boards of directors of both Holdings and Dynamic. Ho,

however, is not a member of the boards of either Multi-Union or Dynamic.

The Court previously noted there is no evidence in the record that the board of Holdings contains sham directors or that it is completely controlled by Ho himself. Holdings is the sole shareholder of Dynamic and Multi-Union. Holdings' board chose all of the directors of Dynamic and Multi-Union and placed one of their own board members on each subsidiary's board. In fact, those joint board members appear to be the most active members on the subsidiaries' boards. As General Manager of Multi-Union, David Wong reports [*68] to Multi-Union's board of directors and, more specifically, to Gayle Fung individually. Fung apparently is the equivalent of a Managing Director for Multi-Union. The three remaining directors of Multi-Union "do not have any duties" as directors or are "inactive." One of the allegedly inactive directors, Fung Kam Ming, however, attends Multi-Union's annual board meetings. Thus, only two of Multi-Union's directors, Gayle Fung and Fung Kam Ming, participate in the board's general meetings.

Again, the presence of overlapping directors and officers between a parent and subsidiary is not necessarily inappropriate unless there is some evidence that the Holdings' directors were acting in that capacity when they took some action on behalf of the subsidiaries. *Best-foods, 524 U.S. at 71.* In fact, the full overlap of directors and officers between a parent and a subsidiary is considered acceptable. *Id.* Thus, the fact that the only "active" members of Multi-Union's board are Fung, who is also a member of Holdings' board, and her brother, Fung Kam Ming, does not necessarily support an alter ego finding.

The record shows Multi-Union's board meetings were separate from Holdings' [*69] meetings. None of Holdings' board members attended Multi-Union's meetings except Fung in her capacity as Multi-Union's director. Moreover, Epson has presented no evidence that Gayle Fung improperly took any actions on behalf of Multi-Union in her capacity as a Holdings' board member.

Epson further argues Dynamic "does not appear to have a functioning board at all." In support of this argument, Epson offers Chan's testimony that he, as President of Dynamic, does not know all of the directors nor does he know whether the board of directors has ever met. In fact, the record reveals all four of Dynamic's directors participated in the decision to appoint and signed a resolution appointing Chan as President of Dynamic. The fact that several of the board members are related to Ho does not indicate Holdings controls Dynamic. The Court, therefore, finds Epson has failed to show that Dynamic's board is a sham.

The Court also finds Epson has failed to show Holdings otherwise controls the day-to-day operations of Dynamic and Multi-Union. The record reveals Dynamic and Multi-Union choose their own suppliers, price their own products, set their own budgets, choose their own customers, and enter [*70] into contracts with other companies without any input or prior approval from Holdings or from Holdings' alleged agent, Management. The subsidiaries maintain separate bank accounts and pay for their own expenses.

Holdings receives monthly reports from Management that summarize the financial well-being of Holdings' subsidiaries, including Multi-Union and Dynamic. Holdings also receives annual financial statements and budgets from the subsidiaries. Parental monitoring of a subsidiary's performance and supervision of the subsidiary's finance and capital budget decisions, however, is not sufficient to justify piercing the corporate veil. *Best-foods, 524 U.S. at 72.* Holdings is an investment company, and Multi-Union and Dynamic are two of its investments. Holdings necessarily must review the financial status of these companies, and that review does not constitute improper control or a specific, unusual circumstance that justifies piercing the corporate veil.

### c. Corporate Formalities

Epson also argues Holdings does not always strictly observe corporate formalities in its relationships with Dynamic and Multi-Union. Holdings shares some resources with Multi-Union: Holdings, [*71] like Multi-Union, rents office space from Management; Holdings' office (occupied by Gayle Fung) is on the same floor as Multi-Union's office; and Multi-Union and Holdings share a common receptionist, telephone system, domain name, and an email system. In addition, Dynamic also uses the same domain name as Multi-Union and Holdings. These facts, while indicative of a close parent-subsidiary relationship, are insufficient to establish alter ego jurisdiction absent any proof of actual control by Holdings over the daily operations or internal management of Dynamic or Multi-Union.

In addition, the Court has found only a single instance of Holdings' failure to maintain strict corporate formalities with Dynamic. Ernest Chu, CEO of Dynamic and a member of Dynamic's board of directors, once signed a document on behalf of Holdings even though he was never a director or officer of Holdings. No explanation for this isolated event has been presented. Nonetheless, the Court finds this single absence of corporate formalities is insufficient to justify piercing the corporate veil between Dynamic and Holdings.

### d. General Agency

As noted above, the subsidiary of a holding company is not necessarily [*72] performing a function that the parent otherwise would be required to perform for itself. A holding company always can simply form or procure another type of subsidiary in a different line of work. *Doe, 248 F.2d at 929* (citing *Gallagher, 781 F. Supp. at 1085*). Holdings is a holding company in the business of investing; Dynamic and Multi-Union are subsidiaries in the business of marketing and selling office and printing products. Holdings would not have to assume the functions of Dynamic and/or Multi-Union because it could simply procure or form different subsidiaries with different functions.

Epson attempts to paint a picture of the Group as a single "super-corporation" that designs, manufactures, distributes, markets, and sells office and printing supplies. Pursuant to Epson's theory, Holdings, or more exactly, Ho himself, is the Group's top level management. Tian Wei constitutes the manufacturing department of Print-Rite products. Multi-Union is the Hong Kong distribution department for Print-Rite products, and Dynamic is the American sales department for Print-Rite products. Epson contends this version of the Group's organization is supported by [*73] the marketing brochures produced by Multi-Union and the general public image that the companies exude.

In reality, both Multi-Union and Dynamic operate outside of the Group. Multi-Union purchases products from companies other than Tian Wei and sells products that do not bear the Print-Rite logo. Multi-Union also has continued to distribute products in the United States even after Holdings' formed Dynamic. Dynamic buys products from suppliers other than Multi-Union and also purchases products that do not carry the Print-Rite logo. Thus, neither Multi-Union nor Dynamic exclusively fulfill the roles identified by Epson.

In addition, Multi-Union actually pre-dates Holdings. Multi-Union was in operation for four years before Sino-Expo Holdings, Holdings' predecessor, was formed. Thus, Holdings did not form Multi-Union solely to be its Hong Kong distribution division because Multi-Union already existed.

Based on the foregoing, the Court concludes Epson has failed to show that Multi-Union or Dynamic are mere divisions or departments of their holding company parent.

e. Fraud, injustice, or inequity

The Court finds no evidence in the record to support a finding that Holdings formed [*74] Multi-Union or Dynamic with a fraudulent intent. Indeed, as noted above, Multi-Union pre-dates Holdings. There is no evidence that either company was inadequately capitalized

at the time of their formation or that Holdings siphoned off their assets after the alleged infringement or after Epson brought this action.

Epson's argument regarding the nonavailability of complete equitable relief also is not well taken. Epson has not shown that it is prohibited from pursuing its claims for equitable relief against Holdings in another forum. The mere inconvenience of pursuing its claims in another forum is not the type of inequity necessary to justify piercing the corporate veil.

Accordingly, the Court finds Holdings and its subsidiaries, Multi-Union and Dynamic, are independently organized and perform distinctly separate functions even though there is some overlap of directors and Holdings oversees some of its subsidiaries' functions and financial performance. The Court further finds Holdings does not exert, through its own actions or the actions of Management, the type or level of control over the daily operations or internal management of Multi-Union and Dynamic that is required for a [*75] finding of alter ego jurisdiction. Holdings' supervision of Multi-Union and Dynamic is well within the accepted norms of parental oversight of subsidiaries. In addition, Multi-Union and Dynamic are not mere subdivisions of Holdings because Holdings as a holding company is not required to perform any particular business functions, and Multi-Union and Dynamic operate outside of the Group. Moreover, Epson has not shown maintenance of the corporate form would result in injustice or fraud. The Court, therefore, concludes there are no specific, unusual circumstances to justify disregarding the corporations' separate identities, and no injustice or fraud will occur if those separate corporate forms are maintained. Consequently, the Court will not exercise its equitable powers to pierce the corporate veil between these companies.

In summary, the Court finds Epson has failed to show Holdings is the alter ego of either Dynamic or Multi-Union through proof of its direct relationship and control over those entities or through its conduit, Management. The Court, therefore, concludes this Courts lacks personal jurisdiction over Holdings on the basis of alter ego jurisdiction.

C. Management's [*76] Motion to Dismiss

As explained more fully above, the Court concludes there are no specific, unusual circumstances to justify disregarding the separate corporate identities of Management, Multi-Union, and Dynamic, and no injustice or fraud will occur if the corporate form is maintained. Accordingly, the Court will not exercise its equitable powers to pierce the corporate veil and to assert personal jurisdiction over Management as the alter ego of Dynamic and/or Multi-Union based on Dynamic and Multi-Union's contacts with this forum.

## II. National Contacts Jurisdiction

Even if this Court concludes it does not have alter ego jurisdiction over Holdings and/or Management, Epson contends those Defendants are still subject to this Court's jurisdiction based on their contacts with the nation as a whole. Epson asserts Management's aggregate national contacts and Holdings' aggregate national contacts are sufficient for this Court to assert general personal jurisdiction over these Defendants.

### A. General Jurisdiction Standards

A court may assert general personal jurisdiction over a defendant whose contacts with the forum are "continuous and systematic" even if those contacts [*77] are wholly unrelated to the plaintiff's claims. *Red Wing, 148 F.3d at 1359* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984))*. This "fairly high" standard requires the contacts to be the sort that approximate physical presence within the state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir. 2000)* (internal quotations and citations omitted). *See also North Am. Phillips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576, 1578 (Fed. Cir. 1994)* (appellate court need not address lower court's ruling on general jurisdiction because plaintiff concedes on appeal that defendants "lack the sort of substantial and continuing contacts that amount to physical presence in the forum."). Random, fortuitous, or attenuated contacts do not count. *Red Wing, 148 F.3d at 1359* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985))*. In addition, "contacts resulting from the 'unilateral activity' of others do not count." *Id.* (quoting *Burger King, 471 U.S. at 475 & n.17)*. [*78]

### B. Holding's Motion to Dismiss

Holdings concedes Epson's patent infringement claims arise under federal law. The Court accepts Epson's certification that, to the best of Epson's knowledge, Holdings is not subject to the jurisdiction of any state court of general jurisdiction if this Court determines Holdings is not subject to this Court's jurisdiction under an alter ego analysis. Such a certification is sufficient to satisfy the second element of the *Rule 4(k)(2)* jurisdictional analysis unless Holdings shows it is subject to the jurisdiction of another state n9 or Epson's own national contacts proof indicates Holdings would be subject to another state's jurisdiction. *See Swiss American, 191 F.3d at 41-42*.

> n9 Holdings has not asserted it is subject to the jurisdiction of any state court of general jurisdiction.

Holdings argues its contacts with the nation at large do not constitute sufficient minimum contacts to subject it to the jurisdiction of this Court. Holdings also contends it would [*79] not be reasonable for this Court to exercise jurisdiction even if Holdings' contacts met the minimum contacts standard. On the other hand, Epson contends Holdings has substantial and continuous contacts with the United States and is subject to this Court's jurisdiction based on the following contacts:

> 1. Holdings initially capitalized Dynamic, a California company, and is its sole shareholder;
>
> 2. two of Holdings' directors signed documents on file with the Patent and Trademark Office to register the Print-Rite logo, albeit in their capacities as directors of subsidiaries of Holdings rather than in their capacities as Holdings' directors;
>
> 3. two of Holdings' directors granted powers of attorney to Seattle attorneys to assist in the registration of the Print-Rite trademark, albeit in their capacities as directors of subsidiaries of Holdings rather than in their capacities as Holdings' directors;
>
> 4. Holdings entered into three agreements with Nectron, a Texas company, that involved the sale of shares of Holdings' stock to Nectron in exchange for Nectron's purchase of Multi-Union products;
>
> 5. Nectron currently owns 8.5% of Holdings' shares, and Holdings pays [*80] Nectron dividends at least once a year;
>
> 6. Holdings entered into a confidentiality agreement with Kodak during negotiations that did not result in any further business;
>
> 7. Holdings' directors "rely upon" the California Corporation Code when signing annual ratification documents for Dynamic's actions; and
>
> 8. a subsidiary of one of Holdings' shareholders guaranteed Dynamic's lease of property in San Jose, California.

Exhibit HH
Page 222

Many of these contacts, however, do not count in the jurisdictional analysis because they are contacts formed by or resulting from the "unilateral activity" of other entities rather than Holdings' own purposeful activity within the United States. Actions taken by Holdings' directors, Ho and Fung, on behalf of Holdings' subsidiaries have no bearing on Holdings' contacts with the United States. Doing business with a company that does business in the forum is not sufficient minimum contacts with the forum to establish general jurisdiction. *Red Wing, 148 F.3d at 1361.* Accordingly, the actions of Holdings' directors taken on behalf of other subsidiaries are irrelevant. In addition, the American contacts of a subsidiary of a Holdings' shareholder [*81] are too attenuated to be deemed the contacts of Holdings itself.

Mere ownership of an American subsidiary also is not sufficient to warrant general jurisdiction over the parent absent an alter ego finding. *Kramer, 628 F.2d at 1178.* Thus, the fact that Holdings owns Dynamic and incorporated it under California law does not justify this Court's exercise of general jurisdiction over Holdings. The Court extends this principle and concludes the mere presence of a shareholder of a corporation in the forum also is insufficient to warrant general jurisdiction over the foreign corporation absent an alter ego finding. Nectron is merely a shareholder of Holdings, and there is no evidence Nectron is Holdings' alter ego or controlled Holdings in any way. The Court, therefore, finds Nectron's partial ownership of Holdings is not an American contact attributable to Holdings.

Holdings' only remaining American contacts are the confidentiality agreement between Holdings and Kodak, Ho's ensuing trip to New York to negotiate with Kodak on behalf of Holdings; and Holdings' agreements with Nectron. None of these agreements resulted in ongoing business in the United States, and each contact [*82] was an isolated event. These nationwide contacts are not substantial, continuous, or systematic, and they do not approximate physical presence within the forum. Accordingly, the Court concludes it does not have general jurisdiction over Holdings pursuant to *Rule 4(k)(2).* n10

> n10 The Court need not address whether the exercise of jurisdiction over Holdings would be reasonable under the circumstances because the Court has found Holdings lacks minimum contacts with this nation; due process, therefore, requires dismissal of the claims against Holdings.

### C. Management's Motion to Dismiss

Management also concedes Epson's patent infringement case arises under federal law. The Court accepts

Epson's certification that, to the best of Epson's knowledge, Management is not subject to the jurisdiction of any state court of general jurisdiction if this Court determines Holdings is not subject to this Court's jurisdiction under an alter ego analysis. Such a certification is sufficient to satisfy the second element of [*83] the *Rule 4(k)(2)* jurisdictional analysis unless Management shows it is subject to the jurisdiction of another state n11 or Epson's own national contacts proof indicates Management would be subject to another state's jurisdiction. *See Swiss American, 191 F.3d at 41-42.*

> n11 Management has not asserted that it is subject to the jurisdiction of any state court of general jurisdiction.

Management also argues this Court may not exercise general personal jurisdiction over it because its contacts with the United States do not constitute minimum contacts as due process requires. Epson contends Management's United States contacts are continuous and substantial enough to satisfy due process standards. In particular, Epson relies on Management's following American contacts:

> 1. Management receives and reviews Dynamic's profit-and-loss statements and balance sheets every month in its Hong Kong offices;
>
> 2. Management contacts Dynamic in California at least once a month to discuss Dynamic's financial [*84] statements;
>
> 3. two of Management's officers traveled to California once to provide warehousing and accounting advice;
>
> 4. Management procured insurance on behalf of Dynamic;
>
> 5. Management provided Dynamic with various management memoranda;
>
> 6. Multi-Union's brochures identify Dynamic's officers as officers of Management's "American Operations";
>
> 7. Management entered into two confidentiality agreements with American companies that were signed in California by Dynamic's President, Chan; and

8. a representative of Management has at-
tended trade shows in Nevada every year
for the past three years.

Nearly all of Management's "nationwide" contacts
are, in fact, California contacts. The only exception ap-
pears to be Management's presence at three trade shows
in Nevada over the past three years. If the Court were to
accept Epson's argument that Management's contacts
with Dynamic and the state of California are sufficient to
confer general jurisdiction on this Court under a nation-
wide analysis, however, the Court necessarily would
have to find that Management also would be subject to
the jurisdiction of the California courts. In order for the
Court to exercise [*85] jurisdiction pursuant to *Rule
4(k)(2)*, however, the foreign defendant may not be sub-
ject to the jurisdiction of a court in any state. Manage-
ment, therefore, cannot be subject to this Court's jurisdic-
tion pursuant to *Rule 4(k)(2)*. *See AT&T, 94 F.3d at 590
n.6*. The Court finds the addition of Management's atten-
dance at three trade shows is insignificant and does not
change the Court's jurisdictional analysis.

Accordingly, the Court finds Epson has failed to
show both that Management has substantial and continu-
ous contacts with the nation at large and that Manage-
ment's contacts would not subject it to the jurisdiction of
any state. This Court, therefore, may not exercise general
personal jurisdiction over Management pursuant to *Rule
4(k)(2)*.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Hold-
ings' Motion to Dismiss ( # 39) for lack of personal juris-
diction and **GRANTS** Management's Motion to Dismiss
( # 36) for lack of personal jurisdiction. Accordingly,
Plaintiffs' claims against Print-Rite Holdings, Ltd., and
Print-Rite Management Services Co. are **DISMISSED.**

IT IS SO ORDERED.

Dated this 30th day of April, 2002.

/S/ Anna J. Brown [*86]

United States District Judge

LEXSEE 2005 US DIST LEXIS 6797

## SRI INTERNATIONAL, INC., Plaintiff, v. INTERNET SECURITY SYSTEMS, INC. and SYMANTEC CORPORATION, Defendants.

### Civ. No. 04-1199-SLR

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *2005 U.S. Dist. LEXIS 6797*

### April 13, 2005, Decided

**LexisNexis(R) Headnotes**

COUNSEL: [*1] For Timothy Devlin, Esquire of Fish & Richardson, Wilmington, Delaware. Howard G. Pollack, Esquire and Michael J. Curley, Esquire of Fish & Richardson, Redwood City, California, for Plaintiff.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon, Wilmington, Delaware, for Defendant Internet Security Systems, Inc.. Of Counsel: Holmes J. Hawkins, III, Esquire and Natasha H. Moffitt, Esquire of King & Spalding, Atlanta, Georgia.

Richard K. Herrmann, Esquire of Blank Rome, Wilmington, Delaware, for Defendant Symantec Corporation. Of Counsel: Lloyd R. Day, Jr., Esquire, Robert M. Galvin, Esquire and Paul S. Grewal, Esquire of Day Casebeer Madrid & Batchelder, Cupertino, California.

JUDGES: ROBINSON, Chief Judge.

OPINIONBY: Sue L. Robinson

### OPINION:

### MEMORANDUM OPINION

Dated: April 13, 2005
Wilmington, Delaware

ROBINSON, Chief Judge

### I. INTRODUCTION

On August 26, 2004, plaintiff SRI International, Inc. ("SRI") filed this suit against defendants Internet Security Systems, Inc. ("ISS-DE") and Symantec Corporation ("Symantec") alleging infringement of four of its patents by Symantec and two of its patents by ISS-DE. (D.I. 1)

This court [*2] has jurisdiction over this action pursuant to *28 U.S.C. § 1331*. Pending before this court are ISS-DE's motion to dismiss or sever and transfer the action to the Northern District of Georgia, and Symantec's motion to sever and transfer this action to the Northern District of California. (D.I. 10, 14)

### II. BACKGROUND

According to ISS-DE, it is a Delaware corporation and serves as the holding company for Internet Security Systems, Inc. ("ISS-GA"). (D.I. 12, Ex. C at P 4) SRI argues that ISS-DE is more than just a holding company because only one entity is listed with the Securities and Exchange Commission ("SEC"), Internet Security Systems INC/GA, and it is listed as incorporated in Delaware. (D.I. 19, Ex. B) ISS-GA is headquartered in Georgia. (Id. at P 1) ISS-GA researches and develops computer network security products, including the accused Proventia and SiteProtector products, at its engineering facilities in Georgia. (Id. at P 3)

ISS-DE asserts that it does not develop, manufacture or sell any products, it is strictly a holding company for ISS-GA. (Id. at P 4) SRI argues, however, that ISS-DE's Form 10-K, filed with the Securities [*3] and Exchange Commission ("SEC"), makes clear that it offers "a proactive line of security solutions that provide protection against a variety of ever-changing threats for gateways, networks, servers and desktops, and includes security software and appliances. (D.I. 19, Ex. B at 3) Furthermore, SRI contends that the Form 10-K indicates that ISS-DE grossed over $ 240 million in revenue in 2002 and employs over 1,100 people. (Id. at 18 and 27) The two companies allegedly maintain separate accounting records and have their own officers and employees. (Id. at PP 5, 6) ISS-DE admits that it has "regulatory and

Exhibit II
Page 225

oversight obligations" for ISS-GA, but asserts that the day-to-day production activities are controlled by ISS-GA. (Id. at P 6) Dun & Bradstreet, however, classifies ISS-DE as one operational entity, headquartered in Georgia, but incorporated in Delaware. (D.I. 18, Ex. D) Dun & Bradstreet does not classify ISS-DE as a holding company, but instead states that ISS-DE is in the business of "prepackaged software and custom computer programming." (Id.)

Symantec is a Delaware corporation with its principal place of business in Cupertino, California. (D.I 15 at 3) Symantec [*4] offers software and services to help businesses secure and manage computer networks. (Id.) Symantec is the maker of the accused product, ManHunt. (Id. at 4)

SRI is a California non-profit research institute. (D.I. 18 at 3) SRI developed a system to detect and stop certain activity on computer networks and to identify network security breaches. (Id. at 4) SRI received numerous patents on its systems.

In January of 2004, SRI initiated licensing negotiations with Symantec. (D.I. 19, Ex. J at P 5; D.I. 15 at 5) SRI and Symantec negotiated via letter, telephone and met at SRI's headquarters in Menlo Park, California. (D.I. 15 at 3) The negotiations were unsuccessful and no agreement was reached between the parties. (Id.)

SRI then contacted Symantec's competitor ISS via letter stating that it believed ISS's products infringed some of SRI's patents and that SRI was undergoing negotiations with a number of companies and would be "open to discussing license terms with ISS." n1 (D.I. 12, Ex. C at P 7; D.I. 19, Ex. H at P 2) After numerous communications, including a second letter from SRI indicating that it "takes intellectual property matters seriously," the two companies [*5] began license negotiations. (D.I. 12, Ex. C at P 8; D.I. 19, Ex. H at PP 3-10)

n1 It is unclear whether the letter was intended for ISS-GA or ISS-DE.

On August 17, 2004, ISS-GA filed a declaratory judgment action against SRI in the Northern District of Georgia seeking a declaration that its products do not infringe SRI's *United States Patents Nos. 6,321,338* ("the '338 patent"), *6,484,203* ("the '203 patent"), 6,704,874 ("the '874 patent"), *6,708,212* ("the '212 patent") and *6,711,615* ("the '615 patent"). n2 (D.I. 12, Ex. C at P 10) On August 20, 2004, there was a telephone conference between SRI and ISS-GA, in which ISS-GA's engineers asked SRI engineers questions regarding SRI's technology. (D.I. 19, Ex. H at P 24) At the close of the conversation, ISS-GA's engineers asked for copies of various technical papers written by SRI scientists on the technology, which were sent to ISS-GA on August 20.

n2 According to SRI, license negotiations between ISS-GA and SRI were still ongoing at the time the declaratory judgment action was filed. (D.I. 19, Ex. H at P 26)

[*6]

On August 26, 2004, SRI filed this action against ISS-DE and Symantec. (D.I. 1) SRI states that Symantec's ManHunt product infringes the '338, '203, '212 and '615 patents. SRI further alleges that ISS-DE's Site Protector and Proventia products infringe the '615 and '203 patents. SRI alleges that it filed its claims against Symantec and ISS-DE in one case in order to enforce its patent rights in an efficient manner. (D.I 18 at 6)

## III. ISS-DE'S MOTION TO DISMISS

### A. Standard of Review

Because the parties have referred to matters outside the pleadings, Idd-DE's motion to dismiss shall be treated as a motion for summary judgment. See *Fed. R. Civ. P. 12(b)(6)*. A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. [*7] "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct.*

Exhibit II
Page 226

2505 (1986). [*8] If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

### B. Discussion

SRI asserts that ISS-DE is liable for any alleged patent infringement. ISS-DE claims it is not liable because it does not directly manufacture or sell the accused products and is merely ISS-GA's sole shareholder.

A parent company is not liable for the actions of a subsidiary solely because it is a subsidiary. See *United States v. Bestfoods, 524 U.S. 51, 61, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998).* A finding of liability requires piercing the corporate veil. Id. Prior case law establishes two distinct tests for determining when piercing the corporate veil is appropriate: (1) the alter ego test; or (2) agency test. See, e.g., *Pearson v. Component Tech. Corp., 247 F.3d 471, 484-486 (3d Cir. 2001); C.R. Bard Inc. v. Guidant Corp., 997 F. Supp. 556, 559-560 (D. Del. 1998); Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 265-272 (D. Del. 1989).* [*9]

#### 1. Alter Ego Test

A corporate subsidiary can be considered the alter ego of its parent corporation where there is a lack of attention to corporate formalities or complete domination and control by the parent corporation. See *Mobil Oil Corp., 718 F. Supp. at 266.* Under Delaware law, however, a close connection alone is not sufficient, there must be a showing that the parent/subsidiary relationship would work a fraud, injustice or inequity. See *C.R. Bard, Inc., 997 F. Supp. at 559; Mobil Oil Corp., 718 F. Supp. at 267.*

Based on the record, it is unclear whether ISS-GA is ISS-DE's alter ego. ISS-DE is listed by the SEC and Dunn & Bradstreet as headquartered in Atlanta. ISS-DE is described as being in the business of producing network security products, as opposed to being listed as a holding company. From the facts of record, it is unclear what the relationship is between ISS-DE and ISS-GA; therefore, it is unclear whether their relationship will work an injustice on the parent system.

#### 2. Agency Test

If a parent corporation directs the allegedly infringing activity, it can be liable for its subsidiary's infringement. [*10] The focus of this test is on "the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." *C.R. Bard, Inc., 997 F. Supp. at 560.* In order for the parent corporation to be liable under this test, there must be "a close connection between the relationship of the corporations and the cause of action." *Id.*

Because it is unclear what the relationship is between ISS-DE and ISS-GA, it is unclear how much control ISS-DE has over ISS-GA. It is undisputed that ISS-DE has some control over ISS-GA because it has oversight and regulatory obligations for ISS-GA. At some point, it must be able to direct ISS-GA's activities to fulfill these obligations. However, it is unclear whether it directed the alleged infringing activities at issue.

Therefore, ISS-DE's motion to dismiss is denied without prejudice to renew if, as discovery proceeds, it becomes evident that ISS-DE cannot be liable either independently or under the alter ego or agency tests.

### IV. MOTIONS TO SEVER

*Federal Rule of Civil Procedure 21* gives courts discretion to [*11] sever parties due to misjoinder. Under *Federal Rule of Civil Procedure 20(a),* defendants can be joined together if

> there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

*Fed. R. Civ. Proc. 20(a)* (2005) (emphasis added). This court finds that there are common transactions or occurrences, and questions of fact or law that warrant joinder of the defendants.

Plaintiff alleges patent infringement, which will require this court to hold Markman hearings and construe the asserted claims. Plaintiff has asserted four patents against Symantec and only two of those patents against ISS-DE. Nonetheless, all of the patents asserted arise out of computer network protection systems. It is the experience of this court that patents over the same technology often give rise to the same questions of law and fact (e.g., same prior art references, same level of ordinary skill [*12] in the art).

Both ISS-DE and Symantec have asserted invalidity defenses that will require this court to consider the validity of the asserted patents. These defenses will require the court to determine the date of conception and reduction to practice, the relevance of prior art and the level of ordinary skill in the art. It would be an inefficient use of judicial resources for this court to perform all of these

Exhibit II
Page 227

tasks twice, once for ISS-DE and once for Symantec. Therefore, ISS-DE's and Symantec's motions to sever are denied at this stage of the proceedings.

## V. MOTIONS TO TRANSFER

Under *28 U.S.C. § 1404(a)*, a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended *§ 1404* to give district courts discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)* (quoting *Van Dusen v. Barrack, 376 U.S. 612, 622, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)*); *Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 208 (D. Del. 1998)*. [*13]

The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)*. "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp., 138 F.Supp.2d 565, 567 (D. Del. 2001)*; *Shutte, 431 F.2d at 25*.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998)*; *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, 2001 WL 1617186 (D. Del. Nov. 28, 2001)*; *Continental Cas. Co. v. Am. Home Assurance Co., 61 F.Supp.2d 128, 131 (D. Del. 1999)*. Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity [*14] occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993)*.

Here, the plaintiff chose Delaware because both defendants are Delaware corporations and Delaware is the only forum with jurisdiction over both ISS-DE and Symantec. As already stated by this court, defendants are properly joined in order to conserve judicial resources and ensure a uniform evaluation of the patents in suit. In the interest of efficiency and justice, this court declines

to transfer their respective cases, as neither forum would have jurisdiction over both defendants. n3

n3 ISS-DE argues that SRI's claims against it should be transferred to the District of Georgia because ISS-GA filed a declaratory judgment action against SRI in that district before SRI filed the suit at bar, "When a declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action." *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 938 (Fed. Cir. 1993)*, abrogated on other grounds, *Wilton v. Seven Falls Co., 515 U.S. 277, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995)*. As the court has already stated, the relationship between ISS-DE and ISS-GA is unclear; therefore, it is also unclear whether the Georgia suit will adjudicate the issue facing this court (i.e., whether ISS-DE infringed the asserted patents). If ISS-DE and ISS-GA are in fact two distinct companies, as ISS-DE argues, then the first to file rule would not apply.

[*15]

## VI. CONCLUSION

For the reasons stated, ISS-DE's motion to dismiss is denied without prejudice. ISS-DE's and Symantec's motions to sever are denied, as are their motions to transfer. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 13th day of April, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant ISS-DE's motion to dismiss (D.I. 10) is denied without prejudice;

2. Defendant ISS-DE's motion to sever and transfer (D.I. 10) is denied; and

3. Defendant Symantec's motion to sever and transfer (D.I. 14) is denied.

Sue L. Robinson

United States District Judge

Exhibit II
Page 228

LEXSEE 1996 US DIST LEXIS 20674

STEELCASE INC., Plaintiff, v. HAWORTH, INC., Defendant.

CASE NO. CV 96-1964 JGD (AJWx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

*1996 U.S. Dist. LEXIS 20674; 41 U.S.P.Q.2D (BNA) 1468*

May 15, 1996, Decided
May 15, 1996, FILED; May 17, 1996, ENTERED

DISPOSITION: [*1] Haworth's motion to transfer GRANTED.

LexisNexis(R) Headnotes

COUNSEL: For STEELCASE, INC., a Michigan Corporation, pltf: David J. Gass, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI. George Pazuniak, Connolly, Bove, Lodge & Hutz, Wilmington, DE. Mark A. Flagel, Latham & Watkins, Los Angeles, CA.

For HAWORTH, INC., a Michigan Corporation, deft: Michael J. Hodge, Miller, Canfield, Paddock & Stone, Lansing, MI. Dale H. Thiel, Flynn, Thiel, Boutell & Tanis, Kalamazoo, MI. Barry Paul Golob, Adam R. Hess, Cushman, Darby & Cushman, Washington, DC. William K. West, Jr., Pillsbury, Madison & Sutro, LLP, Washington, DC. Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

For TRENDWAY CORPORATION, movant: Jon Marc Bylsma, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI.

For AMERICAN SEATING CO, movant: Rock A. Wood, Dickinson, Wright, Moon, Van Dusen, et al, Grand Rapids, MI.

For HAWORTH, INC., counter-claimant: Adam R. Hess, Barry Paul Golob, Cushman, Darby & Cushman, Washington, DC. Dale H. Thiel, Flynn, Thiel, Boutell & Tanis, Kalamazoo, MI. William K. West, Jr., Pillsbury, Madison & Sutro, LLP, Washington, DC. Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, [*2] NY.

For STEELCASE, INC., counter-deft: Jon G. March, David J. Gass, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI. Mark A. Flagel, Latham & Watkins, Los Angeles, CA. George Pazuniak, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

JUDGES: JOHN G. DAVIES, United States District Judge

OPINIONBY: JOHN G. DAVIES

OPINION:

ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER UNDER *28 U.S.C. § 1404*(a)

On May 10, 1996, Defendant Haworth, Inc.'s Motion to Transfer Under *28 U.S.C. § 1404*(a), and Plaintiff Steelcase Inc.'s Motion for Preliminary Injunction came on for hearing. The Court, having considered the written submissions of the parties, and the oral argument of counsel, hereby GRANTS the Motion to Transfer Under *28 U.S.C. § 1404*(a). In light of the ruling on the motion to transfer, the Court will not reach the Motion for Preliminary Injunction. The Clerk of the Court is hereby ORDERED to transfer this action to the United States District Court for the Western District of Michigan.

Background

This is a patent infringement action. Plaintiff Steelcase Inc. ("Steelcase") is a Michigan corporation, with its principal place of business and corporate headquarters in Grand Rapids, Michigan. Defendant [*3] Haworth, Inc. ("Haworth") is a Michigan corporation with its principal place of business and corporate headquarters in Holland, Michigan. Steelcase and Haworth are competing manufacturers of office furniture.

Steelcase filed the complaint in the instant action on March 20, 1996. The complaint alleges that Steelcase is the owner of U.S. Patent No. *4,744,603*, entitled "Chair Shell With Selective Back Stiffening," and U.S. Patent No. *5,487,591*, entitled "Back Shell With Selective Stiffening." These patents are directed to an office chair sold by Steelcase under the trade names Sensor and Rally. Haworth allegedly infringed the patents by making, using and selling a competing line of office chairs under the trademarks or trade names Accolade and Improv.

The operative events giving rise to this cause of action occurred in Michigan. The Steelcase chairs that are the subject of the patents at issue were invented in Michigan. The design, development, manufacture, and distribution of the Haworth's allegedly infringing chairs occurred exclusively in the Western District of Michigan.

Both Steelcase and Haworth sell office furniture nationwide, and maintain offices and showrooms in several states. [*4] Steelcase manufactures the Sensor chair, the commercial embodiment of the patents at issue, in both Michigan and California.

California is a "target market" for both Steelcase and Haworth. Steelcase asserts that it filed this action in California because it is likely that Southern California witnesses will be important. Steelcase intends to call Haworth employees as well as customers of Haworth in the Southern California area at trial. These witnesses will testify to the commercial success of the claimed invention, the importance to the purchaser of the features patented by Steelcase and that Steelcase has lost sales because of Haworth's infringement. Botsford Decl. P 12. Steelcase also contends that it wanted to avoid the Western District of Michigan because it will be more difficult to obtain an impartial jury in that venue.

Discussion

I. Title *28 U.S.C. § 1404* Standard

Haworth moves to transfer venue to the Western District of Michigan. A change of venue for convenience is governed by *28 U.S.C. § 1404*, which provides, in relevant part:

> (a) For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action [*5] to any other district or division where it might have been brought.

Title *28 U.S.C. § 1404*(a). It is undisputed that this action could have been brought in the Western District of Michigan. Thus, the issue before the Court is whether the convenience of the parties and witnesses, and the interests of justice warrant a transfer of the action.

Section 1404(a) rulings generally turn on the court's evaluation of the following, relevant considerations: (1) convenience of witnesses; (2) judicial economy; (3) relative ease of access to proof; (4) availability of compulsory process; and (5) relative docket congestion. The convenience of counsel and claims of local prejudice are usually not weighed in the balance. Schwarzer, Tashima & Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial PP 4:269 - 4:280 (1996).

A plaintiff's choice of forum is accorded substantial weight in section 1404(a) proceedings. Courts generally will not order a transfer unless the "convenience" and "justice" factors enumerated above strongly favor venue elsewhere. *Ragold, Inc. v. Ferrero, 506 F. Supp. 117 (N.D. Ill. 1980); Securities Investor Protection Corp. v. Vigman, 764* [*6] *F.2d 1309, 1317 (9th Cir. 1985).* The plaintiff's choice of forum, however, is not the final word. *Pacific Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir. 1968).* "If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration." Id; See also *Oscar Mayer Foods Corp. v. Bryan Foods Inc., 1989 U.S. Dist. LEXIS 16373, 13 U.S.P.Q.2D (BNA) 1078 (N.D. Ga. 1989)* (plaintiff's choice of forum "significantly weakened when the forum chosen is not the primary residence of the plaintiff or the defendant and the subject matter of the litigation is not substantially connected to the forum").

II. Convenience of Parties and Witnesses

1. Plaintiff's Choice of Forum

California lacks a substantial connection with parties. Haworth and Steelcase are both Michigan corporations, and their principal places of business are located in the Western District of Michigan. California is not the domicile of either party. Steelcase contends that California is its "home turf" because it maintains a manufacturing facility, as well as an office [*7] and showroom in California. It is clear, however, that both Steelcase and Haworth have substantially greater connections with the Western District of Michigan where their principal places of business are located.

Additionally, California lacks a substantial connection with the subject matter of the action. The operative facts giving rise to the instant action occurred in the Western District of Michigan. The chairs patented by Steelcase were invented in Michigan. n1 The design,

Case 1:06-cv-00041-JJF    Document 37-7    Filed 01/23/2006    Page 45 of 63

Page 3

'1996 U.S. Dist. LEXIS 20674, *; 41 U.S.P.Q.2D (BNA) 1468

development, manufacture, and distribution of the allegedly infringing chairs occurred in the Western District of Michigan. None of the facts relating to the development of the patent or the allegedly infringing chairs occurred in California. California's only connection with the action is that both Steelcase and Haworth sell the office chairs at issue in California. However, the parties also sell office chairs throughout the country.

> n1 The named inventor is listed on the patent
> as a resident of Kentwood, Michigan.

In sum, no particular [*8] interest is served by the selection of this particular forum. See e.g., *Haworth v. Herman Miller, Inc., 821 F. Supp. 1476, 1479 (N.D. Ga. 1992).* The Court finds that the selection of this forum is not entitled to great weight. The convenience of the parties weighs in favor of transfer of this action to the Western District of Michigan.

2. Location of Witnesses and Documentary Evidence

The convenience of the witnesses is often the most important factor considered by the court when deciding a motion to transfer for convenience. To demonstrate inconvenience the movant should produce information regarding the identity and location of the witnesses, the content of their testimony, and why such testimony is relevant to the action. *A.J. Industries, Inc. v. United States District Court, 503 F.2d 384 (9th Cir. 1974);* Schwarzer, Tashima & Wagstaffe, P 4:270. The court will consider not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony in relationship to the issues in the case. *Waites v. First Energy Leasing Corp., 605 F. Supp. 219, 222 (N.D. Ill. 1985).*

Haworth contends that all its potential witnesses, including [*9] those individuals involved in the design, development, marketing, and sale of Haworth's allegedly infringing chairs, live and work in Michigan. Memo. in Support of Motion, p. 6. These witnesses include a Haworth engineer involved in the origin and development of the accused chairs, Haworth's Director of Seating, who will testify regarding the manufacturing, marketing, and sales of the accused chairs, as well as to the dynamics of the seating market Haworth's Director of Accounting, and Haworth's patent attorney. Reply, Exhibit 7. Further, the named inventor of the patents at issue, and the patent attorneys involved in the prosecution of the patents at issue, are apparently residents of the Western District of Michigan.

In opposition Steelcase asserts that it intends to subpoena several witnesses located in Los Angeles. These

witnesses include two Steelcase employees, Haworth's Los Angeles-based employees, and several unidentified customers of Haworth in the Southern California area. These witnesses will testify as to the competition between Haworth and Steelcase in the California market. Steelcase asserts that this testimony will be important on the issue of damages caused by Haworth's [*10] allegedly infringing chairs. In oral argument, however, Steelcase conceded that Los Angeles is only one of several important markets where Steelcase and Haworth compete. Both parties sell office furniture nationwide. Although the witnesses identified by Steelcase can testify as to damages caused by the allegedly infringing chairs in California, it does not appear that these witnesses could testify as to national sales figures. It is likely that expert testimony will be necessary to quantify the damages allegedly caused by sales of Haworth's chairs.

Finally, it is significant that of the eleven declarations filed in connection with the Motion for Preliminary Injunction, eight of the declarants appear to reside in Michigan. Two of the remaining declarants are Steelcase patent attorneys who reside in Washington D.C., and one is Steelcase's patent expert who resides near Seattle, Washington. The location of these declarants also favors a transfer to the Western District of Michigan. In sum, the number and the importance of the witnesses located in the Western District of Michigan strongly favors transfer of this action to that venue.

Another factor considered by the court when deciding [*11] whether to transfer a case under Section 1404(a) is the relative ease of access to proof. The majority of the documentary evidence in this case is located at the parties' corporate headquarters in Michigan. Thus, this factor also favors transfer to the Western District of Michigan.

III. Interests of Justice

Steelcase argues that it will be more difficult to empanel an impartial jury in the Western District of Michigan because Haworth and Steelcase employ a significant number of persons in the Western District of Michigan. This argument was considered and rejected by Judge Forrester in *Haworth, Inc. v. Herman Miller, Inc., 821 F. Supp. 1476 (N.D. Georgia 1992).* Although that decision is not binding on this Court, Judge Forrester's decision is persuasive on this issue. In Haworth, Inc. v. Herman Miller, Inc. Haworth filed an action in the Northern District of Georgia against another office furniture manufacturer, Herman Miller, Inc. Herman Miller, Inc. subsequently moved to transfer the action pursuant to Section 1404(a) to the Western District of Michigan where both parties were incorporated and maintained their principal places of business. In opposition to the motion, [*12] Haworth argued that the extensive presence of the furni-

Page 4

1996 U.S. Dist. LEXIS 20674, *; 41 U.S.P.Q.2D (BNA) 1468

ture industry in the Western District of Michigan, as well as extensive publicity surrounding patent litigation between Haworth, Steelcase, and Herman Miller, would prevent Haworth from obtaining a fair trial in that venue.

Judge Forrester rejected this argument. The Court found that there was not a sufficient number of potentially interested jurors in comparison with the size of the overall jury pool in the Western District of Michigan to preclude the parties from receiving an impartial jury and a fair-trial. *Haworth, Inc. v. Herman Miller, Inc., 821 F. Supp. at 1481.* Judge Forrester also found that the publicity in the Western District of Michigan was "in no way sufficiently 'prejudicial and inflammatory' as to saturate the community in such a way as to prevent prospective jurors from impartially adjudicating this dispute." *Id. at 1480.*

In this action, Steelcase offers no evidence that it could not obtain a fair trial in the Western District of Michigan. Steelcase only asserts that it would be easier to obtain an impartial jury in the Central District of Cali-

fornia. Botsford Decl. P 19. There is no evidence that the [*13] juror pool in the Western District of Michigan is so biased that Steelcase would be unable to obtain a fair trial.

III. Conclusion

For the forgoing reasons the Court finds that the convenience of the parties and witnesses, and the interests of justice favor a transfer of this action to the Western District of Michigan. Accordingly, the Court hereby GRANTS Haworth's Motion to Transfer Under *28 U.S.C. § 1404*(a). The Clerk of the Court is ordered to transfer this action to the United States District Court for the Western District of Michigan.

IT IS SO ORDERED.

Dated: May 15, 1996

JOHN G. DAVIES

United States District Judge

LEXSEE 1996 US DIST LEXIS 20674

STEELCASE INC., Plaintiff, v. HAWORTH, INC., Defendant.

CASE NO. CV 96-1964 JGD (AJWx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA, WESTERN DIVISION

*1996 U.S. Dist. LEXIS 20674; 41 U.S.P.Q.2D (BNA) 1468*

May 15, 1996, Decided
May 15, 1996, FILED; May 17, 1996, ENTERED

DISPOSITION: [*1] Haworth's motion to transfer
GRANTED.

LexisNexis(R) Headnotes

COUNSEL: For STEELCASE, INC., a Michigan Cor-
poration, pltf: David J. Gass, Miller, Johnson, Snell &
Cummiskey, Grand Rapids, MI. George Pazuniak, Con-
nolly, Bove, Lodge & Hutz, Wilmington, DE. Mark A.
Flagel, Latham & Watkins, Los Angeles, CA.

For HAWORTH, INC., a Michigan Corporation, deft:
Michael J. Hodge, Miller, Canfield, Paddock & Stone,
Lansing, MI. Dale H. Thiel, Flynn, Thiel, Boutell &
Tanis, Kalamazoo, MI. Barry Paul Golob, Adam R.
Hess, Cushman, Darby & Cushman, Washington, DC.
William K. West, Jr., Pillsbury, Madison & Sutro, LLP,
Washington, DC. Stuart I. Friedman, Friedman, Witten-
stein & Höchman, New York, NY.

For TRENDWAY CORPORATION, movant: Jon Marc
Bylsma, Varnum, Riddering, Schmidt & Howlett, Grand
Rapids, MI.

For AMERICAN SEATING CO, movant: Rock A.
Wood, Dickinson, Wright, Moon, Van Dusen, et al,
Grand Rapids, MI.

For HAWORTH, INC., counter-claimant: Adam R.
Hess, Barry Paul Golob, Cushman, Darby & Cushman,
Washington, DC. Dale H. Thiel, Flynn, Thiel, Boutell &
Tanis, Kalamazoo, MI. William K. West, Jr., Pillsbury,
Madison & Sutro, LLP, Washington, DC. Stuart I.
Friedman, Friedman, Wittenstein & Hochman, New
York, [*2] NY.

For STEELCASE, INC., counter-deft: Jon G. March,
David J. Gass, Miller, Johnson, Snell & Cummiskey,
Grand Rapids, MI. Mark A. Flagel, Latham & Watkins,
Los Angeles, CA. George Pazuniak, Connolly, Bove,
Lodge & Hutz, Wilmington, DE.

JUDGES: JOHN G. DAVIES, United States District
Judge

OPINIONBY: JOHN G. DAVIES

OPINION:

ORDER GRANTING DEFENDANT'S MOTION
TO TRANSFER UNDER *28 U.S.C. § 1404*(a)

On May 10, 1996, Defendant Haworth, Inc.'s Mo-
tion to Transfer Under *28 U.S.C. § 1404*(a), and Plaintiff
Steelcase Inc.'s Motion for Preliminary Injunction came
on for hearing. The Court, having considered the written
submissions of the parties, and the oral argument of
counsel, hereby GRANTS the Motion to Transfer Under
*28 U.S.C. § 1404*(a). In light of the ruling on the motion
to transfer, the Court will not reach the Motion for Pre-
liminary Injunction. The Clerk of the Court is hereby
ORDERED to transfer this action to the United States
District Court for the Western District of Michigan.

Background

This is a patent infringement action. Plaintiff Steel-
case Inc. ("Steelcase") is a Michigan corporation, with its
principal place of business and corporate headquarters in
Grand Rapids, Michigan. Defendant [*3] Haworth, Inc.
("Haworth") is a Michigan corporation with its principal
place of business and corporate headquarters in Holland,
Michigau. Steelcase and Haworth are competing manu-
facturers of office furniture.

1996 U.S. Dist. LEXIS 20674, *; 41 U.S.P.Q.2D (BNA) 1468

Steelcase filed the complaint in the instant action on March 20, 1996. The complaint alleges that Steelcase is the owner of U.S. Patent No. 4,744,603, entitled "Chair Shell With Selective Back Stiffening," and U.S. Patent No. 5,487,591, entitled "Back Shell With Selective Stiffening." These patents are directed to an office chair sold by Steelcase under the trade names Sensor and Rally. Haworth allegedly infringed the patents by making, using and selling a competing line of office chairs under the trademarks or trade names Accolade and Improv.

The operative events giving rise to this cause of action occurred in Michigan. The Steelcase chairs that are the subject of the patents at issue were invented in Michigan. The design, development, manufacture, and distribution of the Haworth's allegedly infringing chairs occurred exclusively in the Western District of Michigan.

Both Steelcase and Haworth sell office furniture nationwide, and maintain offices and showrooms in several states. [*4] Steelcase manufactures the Sensor chair, the commercial embodiment of the patents at issue, in both Michigan and California.

California is a "target market" for both Steelcase and Haworth. Steelcase asserts that it filed this action in California because it is likely that Southern California witnesses will be important. Steelcase intends to call Haworth employees as well as customers of Haworth in the Southern California area at trial. These witnesses will testify to the commercial success of the claimed invention, the importance to the purchaser of the features patented by Steelcase and that Steelcase has lost sales because of Haworth's infringement. Botsford Decl. P 12. Steelcase also contends that it wanted to avoid the Western District of Michigan because it will be more difficult to obtain an impartial jury in that venue.

Discussion

I. Title 28 U.S.C. § 1404 Standard

Haworth moves to transfer venue to the Western District of Michigan. A change of venue for convenience is governed by 28 U.S.C. § 1404, which provides, in relevant part:

> (a) For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action [*5] to any other district or division where it might have been brought.

Title 28 U.S.C. § 1404(a). It is undisputed that this action could have been brought in the Western District of Michigan. Thus, the issue before the Court is whether the convenience of the parties and witnesses, and the interests of justice warrant a transfer of the action.

Section 1404(a) rulings generally turn on the court's evaluation of the following, relevant considerations: (1) convenience of witnesses; (2) judicial economy; (3) relative ease of access to proof; (4) availability of compulsory process; and (5) relative docket congestion. The convenience of counsel and claims of local prejudice are usually not weighed in the balance. Schwarzer, Tashima & Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial PP 4:269 - 4:280 (1996).

A plaintiff's choice of forum is accorded substantial weight in section 1404(a) proceedings. Courts generally will not order a transfer unless the "convenience" and "justice" factors enumerated above strongly favor venue elsewhere. Ragold, Inc. v. Ferrero, 506 F. Supp. 117 (N.D. Ill. 1980); Securities Investor Protection Corp. v. Vigman, 764 [*6] F.2d 1309, 1317 (9th Cir. 1985). The plaintiff's choice of forum, however, is not the final word. Pacific Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir. 1968). "If the operative facts have not occurred within the forum of original selection and that forum has no particular interest in the parties or the subject matter, the plaintiff's choice is entitled only to minimal consideration." Id; See also Oscar Mayer Foods Corp. v. Bryan Foods Inc., 1989 U.S. Dist. LEXIS 16373, 13 U.S.P.Q.2D (BNA) 1078 (N.D. Ga. 1989) (plaintiff's choice of forum "significantly weakened when the forum chosen is not the primary residence of the plaintiff or the defendant and the subject matter of the litigation is not substantially connected to the forum").

II. Convenience of Parties and Witnesses

1. Plaintiff's Choice of Forum

California lacks a substantial connection with parties. Haworth and Steelcase are both Michigan corporations, and their principal places of business are located in the Western District of Michigan. California is not the domicile of either party. Steelcase contends that California is its "home turf" because it maintains a manufacturing facility, as well as an office [*7] and showroom in California. It is clear, however, that both Steelcase and Haworth have substantially greater connections with the Western District of Michigan where their principal places of business are located.

Additionally, California lacks a substantial connection with the subject matter of the action. The operative facts giving rise to the instant action occurred in the Western District of Michigan. The chairs patented by Steelcase were invented in Michigan. n1 The design,

Case 1:06-cv-00041-JJF    Document 37-7    Filed 01/23/2006    Page 49 of 63

Page 3

'1996 U.S. Dist. LEXIS 20674, *; 41 U.S.P.Q.2D (BNA) 1468

development, manufacture, and distribution of the allegedly infringing chairs occurred in the Western District of Michigan. None of the facts relating to the development of the patent or the allegedly infringing chairs occurred in California. California's only connection with the action is that both Steelcase and Haworth sell the office chairs at issue in California. However, the parties also sell office chairs throughout the country,

> n1 The named inventor is listed on the patent as a resident of Kentwood, Michigan.

In sum, no particular [*8] interest is served by the selection of this particular forum. See e.g., *Haworth v. Herman Miller, Inc., 821 F. Supp. 1476, 1479 (N.D. Ga. 1992)*. The Court finds that the selection of this forum is not entitled to great weight. The convenience of the parties weighs in favor of transfer of this action to the Western District of Michigan.

2. Location of Witnesses and Documentary Evidence

The convenience of the witnesses is often the most important factor considered by the court when deciding a motion to transfer for convenience. To demonstrate inconvenience the movant should produce information regarding the identity and location of the witnesses, the content of their testimony, and why such testimony is relevant to the action. *A.J. Industries, Inc. v. United States District Court, 503 F.2d 384 (9th Cir. 1974);* Schwarzer, Tashima & Wagstaffe, P 4:270. The court will consider not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony in relationship to the issues in the case. *Waites v. First Energy Leasing Corp., 605 F. Supp. 219, 222 (N.D. Ill. 1985)*.

Haworth contends that all its potential witnesses, including [*9] those individuals involved in the design, development, marketing, and sale of Haworth's allegedly infringing chairs, live and work in Michigan. Memo. in Support of Motion, p. 6. These witnesses include a Haworth engineer involved in the origin and development of the accused chairs, Haworth's Director of Seating, who will testify regarding the manufacturing, marketing, and sales of the accused chairs, as well as to the dynamics of the seating market Haworth's Director of Accounting, and Haworth's patent attorney. Reply, Exhibit 7. Further, the named inventor of the patents at issue, and the patent attorneys involved in the prosecution of the patents at issue, are apparently residents of the Western District of Michigan.

In opposition Steelcase asserts that it intends to subpoena several witnesses located in Los Angeles. These witnesses include two Steelcase employees, Haworth's Los Angeles-based employees, and several unidentified customers of Haworth in the Southern California area. These witnesses will testify as to the competition between Haworth and Steelcase in the California market. Steelcase asserts that this testimony will be important on the issue of damages caused by Haworth's [*10] allegedly infringing chairs. In oral argument, however, Steelcase conceded that Los Angeles is only one of several important markets where Steelcase and Haworth compete. Both parties sell office furniture nationwide. Although the witnesses identified by Steelcase can testify as to damages caused by the allegedly infringing chairs in California, it does not appear that these witnesses could testify as to national sales figures. It is likely that expert testimony will be necessary to quantify the damages allegedly caused by sales of Haworth's chairs.

Finally, it is significant that of the eleven declarations filed in connection with the Motion for Preliminary Injunction, eight of the declarants appear to reside in Michigan. Two of the remaining declarants are Steelcase patent attorneys who reside in Washington D.C., and one is Steelcase's patent expert who resides near Seattle, Washington. The location of these declarants also favors a transfer to the Western District of Michigan. In sum, the number and the importance of the witnesses located in the Western District of Michigan strongly favors transfer of this action to that venue.

Another factor considered by the court when deciding [*11] whether to transfer a case under Section 1404(a) is the relative ease of access to proof. The majority of the documentary evidence in this case is located at the parties' corporate headquarters in Michigan. Thus, this factor also favors transfer to the Western District of Michigan.

III. Interests of Justice

Steelcase argues that it will be more difficult to empanel an impartial jury in the Western District of Michigan because Haworth and Steelcase employ a significant number of persons in the Western District of Michigan. This argument was considered and rejected by Judge Forrester in *Haworth, Inc. v. Herman Miller, Inc., 821 F. Supp. 1476 (N.D. Georgia 1992)*. Although that decision is not binding on this Court, Judge Forrester's decision is persuasive on this issue. In Haworth, Inc. v. Herman Miller, Inc. Haworth filed an action in the Northern District of Georgia against another office furniture manufacturer, Herman Miller, Inc. Herman Miller, Inc. subsequently moved to transfer the action pursuant to Section 1404(a) to the Western District of Michigan where both parties were incorporated and maintained their principal places of business. In opposition to the motion, [*12] Haworth argued that the extensive presence of the furni-

ture industry in the Western District of Michigan, as well as extensive publicity surrounding patent litigation between Haworth, Steelcase, and Herman Miller, would prevent Haworth from obtaining a fair trial in that venue.

Judge Forrester rejected this argument. The Court found that there was not a sufficient number of potentially interested jurors in comparison with the size of the overall jury pool in the Western District of Michigan to preclude the parties from receiving an impartial jury and a fair-trial. *Haworth, Inc. v. Herman Miller, Inc., 821 F. Supp. at 1481.* Judge Forrester also found that the publicity in the Western District of Michigan was "in no way sufficiently 'prejudicial and inflammatory' as to saturate the community in such a way as to prevent prospective jurors from impartially adjudicating this dispute." *Id. at 1480.*

In this action, Steelcase offers no evidence that it could not obtain a fair trial in the Western District of Michigan. Steelcase only asserts that it would be easier to obtain an impartial jury in the Central District of Cali-

fornia. Botsford Decl. P 19. There is no evidence that the [*13] juror pool in the Western District of Michigan is so biased that Steelcase would be unable to obtain a fair trial.

III. Conclusion

For the forgoing reasons the Court finds that the convenience of the parties and witnesses, and the interests of justice favor a transfer of this action to the Western District of Michigan. Accordingly, the Court hereby GRANTS Haworth's Motion to Transfer Under *28 U.S.C. § 1404*(a). The Clerk of the Court is ordered to transfer this action to the United States District Court for the Western District of Michigan.

IT IS SO ORDERED.

Dated: May 15, 1996

JOHN G. DAVIES

United States District Judge

LEXSEE 2005 US DIST LEXIS 14415

SYMBOL TECHNOLOGIES, INC., Plaintiff, v. INTERMEC TECHNOLOGIES
CORP., Defendant.

05-C-256-C

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
WISCONSIN

*2005 U.S. Dist. LEXIS 14415*

July 14, 2005, Decided

**LexisNexis(R) Headnotes**

COUNSEL: [*1] For SYMBOL TECHNOLOGIES,
INC., Plaintiff: JEFFREY S. WARD, ERIC J.
LOBENFELD.

For INTERMEC TECHNOLOGIES CORP., Defendant:
EUGENIA G. CARTER, WHYTE HIRSCHBOECK
DUDEK S.C., MADISON, WI.

JUDGES: BARBARA B. CRABB, District Judge.

OPINIONBY: BARBARA B. CRABB

**OPINION:**

OPINION AND ORDER

Plaintiff Symbol Technologies, Inc. seeks declara-
tory, injunctive and monetary relief against defendant
Intermec Technologies Corp. for infringing U.S. Patents
Nos. *5,243,655* and *5,457,308*, relating to bar code tech-
nology. The case is before the court on defendant's mo-
tion to transfer the case under *28 U.S.C. § 1404(a)* and
plaintiff's motion to file a sur-reply declaration in re-
sponse to defendant's reply brief in support of its motion
to transfer. Subject matter jurisdiction is present under *28
U.S.C. §§ 1331* and *1338*.

I will grant plaintiff's motion to file a sur-reply and
consider the parties' arguments concerning the applica-
bility of a purchasing agreement between them and
whether the need for a consistent interpretation of that
agreement warrants a transfer. Although I am not con-
vinced that the patents in dispute overlap those pending
in suits filed in the District [*2] Court for the District of
Delaware, it does appear that it will be necessary in this
case and in the Delaware cases to interpret the parties'

purchasing agreement in order to determine whether and
to what extent the parties agreed to forgo infringement
suits against each other. I conclude therefore that the
interests of justice would be served by transferring this
case to the district court in Delaware.

From the facts alleged in the complaint, the exhibits
attached to defendant's reply brief in support of its mo-
tion to transfer venue and the facts averred in the affida-
vits submitted by the parties, I find for the sole purpose
of deciding this motion that the following facts are un-
disputed and material.

FACTS

Plaintiff Symbol Technologies, Inc. is a Delaware
corporation with its headquarters in Holtsville, New
York. Plaintiff is a global leader in secure mobile infor-
mation systems that integrate application-specific hand-
held computers with wireless networks for data, voice
and bar code data capture. Plaintiff's product lines in-
clude items such as bar code scanners, advanced data
capture products, radio frequency identification technol-
ogy, hand-held and fixed mount mobile computers [*3]
and wireless local and wide-area networks. Plaintiff is
registered to do business in the state of Wisconsin.

Defendant Intermec Technologies Corp. is incorpo-
rated in the state of Washington and has its principal
place of business in Everett, Washington. Defendant
designs, manufactures and sells portable data collection
equipment, including bar code scanning and reading de-
vices. Defendant is registered to do business in Wiscon-
sin and regularly transacts business in Wisconsin.

In addition to suing defendant in this court, plaintiff
has sued defendant for infringement of four different
patents in the District of Delaware, U.S. Patent Nos.
*5,029,183, 5,479,441, 5,157,687*, and *6,473,449*, all of
which relate to power saving modes of operation for

Exhibit KK
Page 233

wireless local area networks and techniques developed for sending data from point to point in a wireless network. Although the technologies that are the subject of the lawsuits in both Wisconsin and Delaware may be used together, as for example, by incorporating a bar code reader in a wireless network, they are distinct, just as a car radio's technology is wholly different from a car engine's technology, notwithstanding the fact that they are [*4] both used in a car.

Plaintiff and defendant entered into a purchasing agreement regarding plaintiff's bar code reader and scanner products. The agreement includes a forum selection clause under which the parties agree to try all disputes relating to the agreement in Delaware. For purposes of this decision, the crucial section is § 18(k), which reads:

> Covenants. During the Term of the Agreement each Party shall not sue (or bring a counterclaim against) the other party for any claim of infringement . . . of any patent, whether now or hereinafter in existence, against or relating to any product except for (i) bar code readers to the extent that they use CCD sensor technology, and (ii) RFID Reader Products and RFID Tags except to the extent that they read bar codes.

The parties' agreement is specified to last from January 1, 2004 to December 31, 2006. In § 9(d), it provides that accrued rights and obligations survive termination.

OPINION

A. Plaintiff's Motion for Leave to File Sur-reply

As a general rule, arguments not raised until the reply brief are deemed waived. *Carter v. Tennant Co., 383 F.3d 673, 679 (7th Cir. 2004)* (arguments presented [*5] for first time in reply brief are deemed waived) (citing *Aps Sports Collectibles, Inc. v. Sports Time, Inc., 299 F.3d 624, 631 (7th Cir. 2002))*. In this case, however, I can consider the new arguments raised by defendant, because I am granting plaintiff's request to file a sur-reply brief, giving plaintiff an opportunity to explain why it believes that the new arguments are without merit.

B. Defendant's Motion for Change of Venue

Defendant has moved to transfer this case to the District of Delaware because plaintiff has suits pending in that district against defendant for infringement of four different patents. Plaintiff has asked the court in Delaware to declare that plaintiff was entitled to terminate the purchasing agreement between the parties, thus permitting it to file suits for patent infringement despite the covenant in the agreement not to sue; defendant has filed

a counterclaim in that suit for breach of contract. According to defendant, the products at issue in the Delaware action overlap the products at issue in this action and both cases will involve certain provisions of the purchasing agreement, such as the provisions addressing immunity from infringement [*6] suits and the forum selection clause. Defendant argues that transfer is justified to obtain consistent determinations regarding the applicability of the purchasing agreement and of the covenant not to sue in particular. Plaintiff agrees that the purchasing agreement provides defendant immunity from infringement for products that use scan engines purchased from plaintiff. Decl. of Aaron Bernstein, dkt. # 17, at P5. However, plaintiff contends that such products are not at issue in this case, so the purchasing agreement and its forum selection clause do not apply.

In a motion to transfer venue brought pursuant to *28 U.S.C. § 1404(a)*, the moving party bears the burden of establishing that the transferee forum is "clearly more convenient." *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219-20 (7th Cir. 1986)*. In weighing the motion, a court must decide whether the transfer serves the convenience of the parties and witnesses and will promote the interest of justice. *28 U.S.C. 1404(a); Coffey, 796 F.2d at 219-20; Roberts & Schaefer Co. v. Merit Contracting, Inc., 99 F.3d 248, 254 (7th Cir. 1996)* [*7] (question is whether plaintiff's interest in choosing forum is outweighed by either convenience concerns of parties and witnesses or interest of justice). The court should view these factors as placeholders among a broader set of considerations and evaluate them in light of all the circumstances of the case. *Coffey, 796 F.2d at 219 n.3.* Other courts have found that such broader considerations include the situs of material events, ease of access to sources of proof and plaintiff's choice of forum. *Harley-Davidson, Inc. v. Columbia Tristar Home Video, 851 F. Supp. 1265, 1269 (E.D. Wis. 1994); Kinney v. Anchorlock Corp., 736 F. Supp. 818, 829 (N.D. Ill. 1990).* "Factors traditionally considered in an 'interest of justice' analysis relate to the efficient administration of the court system," *Coffey, 796 F.2d at 221*, such as whether a transfer would help the litigants receive a speedy trial and whether a transfer would facilitate consolidation of related cases. Id.

It is unclear why Wisconsin would be more convenient to try this case than Delaware; defendant contends that Delaware is geographically closer to plaintiff's [*8] New York headquarters, witnesses and documents. Plaintiff points out that its choice of forum is entitled to great deference. However, courts have held that if plaintiff's chosen forum is not the situs of material events, a plaintiff's choice has weight equal to the other factors and will not receive deference. *Chicago, Rock Island & Pacific Railroad Co. v. Igoe, 220 F.2d 299, 304 (7th Cir.*

*1955)* (plaintiff's choice of forum given less deference if few operative facts occurred in that forum); see also *Carillo v. Darden, 992 F. Supp. 1024, 1026 (N.D. Ill. 1998); Sanders v. Franklin, 25 F. Supp. 2d 855, 858 (N.D. Ill. 1998).* Nothing in the record suggests that material events occurred in Wisconsin. Because it is questionable that Wisconsin is particularly convenient to either party, I will focus on the interest of justice factor exclusively in deciding whether to transfer this case to the District of Delaware.

It is undisputed that plaintiff has sued defendant for infringement of U.S. Patent Nos. *5,029,183, 5,479,441, 5,157,687,* and *6,473,449* in the District of Delaware. Defendant is adamant about the possibility of overlap between [*9] the technologies at issue in both the Wisconsin and Delaware actions. It suggests, for example that a bar code reader (the technology at issue in Wisconsin) may be incorporated into a wireless network (the technology at issue in Delaware). Given this overlap, the court in the Delaware action will most likely have to address the importance of the bar code technology in that action and in doing so, decide whether the terms of the purchasing agreement apply. I find this argument dubious, given plaintiff's statement that it is not suing defendant on any of defendant's products using plaintiff's scan engines but I need not decide whether it is correct because the deciding factor is the need to construe the purchasing agreement. Some court will have to determine whether the agreement has been terminated validly, whether the covenant between the parties survives termination and if it does, whether the covenant applies to the technology at issue in this case. It would be best for the parties and for the resources of the federal courts, con-

sidered as a whole, to have one construction applicable to all the disputes between the parties. Thus, I conclude that the interests of justice weigh heavily [*10] in favor of a transfer, particularly because the agreement contains a forum selection clause. See, e.g., *Stephan v. Goldinger, 325 F.3d 874, 878-79 (7th Cir. 2003)* (contractual venue clauses generally are valid) (citing *Carnival Cruise Lines v. Shute, 499 U.S. 585, 593-95, 113 L. Ed. 2d 622, 111 S. Ct. 1522 (1991)); Heller Financial, Inc. v. Midwhey Powder Co., 883 F.2d 1286, 1290-91 (7th Cir. 1989)* (forum selection clause does not offend due process so long as it is freely negotiated and is not unreasonable and unjust). Although the Delaware court will be free to consolidate the cases or not, a transfer of the case to that court will would allow consolidation if the court should deem it appropriate. *Coffey, 796 F.2d at 221* ("related litigation should be transferred to a forum where consolidation is feasible").

ORDER

IT IS ORDERED that

1. Plaintiff Symbol Technologies, Inc.'s motion to file a sur-reply is GRANTED;

2. Defendant Intermec Technologies Corp.'s motion to transfer the case to the United States District Court for the District of Delaware is GRANTED.

Entered this 14th day of July, 2005.

BY THE COURT: [*11]

BARBARA B. CRABB

District Judge

LEXSEE 1993 US DIST LEXIS 21337

TEKNEKRON SOFTWARE SYSTEMS, INC., Plaintiff, v. CORNELL
UNIVERSITY and ISIS DISTRIBUTED SYSTEMS, INC., Defendants.

CIVIL NO. 93-20122 SW

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

*1993 U.S. Dist. LEXIS 21337*

June 14, 1993, Decided
June 14, 1993, Filed

DISPOSITION: [*1] Isis' motion to dismiss for lack of personal jurisdiction DENIED and motion to transfer to Northern District of New York GRANTED.

LexisNexis(R) Headnotes

COUNSEL: For TEKNEKRON SOFTWARE SYSTEMS, INC., Plaintiff: Michael A. Jacobs, Morrison & Foerster, San Francisco, CA.

For TEKNEKRON SOFTWARE SYSTEMS, INC., Plaintiff: Ronald Craig Fish, Falk Vestal & Fish, San Jose, CA.

For TEKNEKRON SOFTWARE SYSTEMS, INC., Plaintiff: Robert Hardy Falk, Paul Dezenberg, Falk Vestal & Fish, Dallas, TX.

For ISIS DISTRIBUTED SYSTEMS, INC., defendant: M. P. Thayer, Howard Rice Nemerovski Canady Robertson Falk & Rabin, San Francisco, CA.

JUDGES: Spencer Williams, U.S. DISTRICT COURT JUDGE.

OPINIONBY: Spencer Williams

OPINION:

ORDER DENYING DEFENDANT ISIS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION; GRANTING DEFENDANT ISIS' MOTION TO TRANSFER TO THE NORTHERN DISTRICT OF NEW YORK

Plaintiff Teknekron Software Systems, Inc. brought this action for patent infringement against defendants Cornell University and Isis Distributed Systems, Inc. Defendant Isis Systems now moves to dismiss the action for lack of personal jurisdiction, or, in the alternative, to transfer it to the Northern District of New York. For the reasons expressed [*2] below, Isis' motion to dismiss for lack of personal jurisdiction is DENIED and its motion to transfer to the Northern District of New York is GRANTED.

BACKGROUND

Plaintiff Teknekron Software Systems, Inc. is a Palo Alto-based computer software developer. In the late 1980s, the company developed a networking software package and on February 16, 1993, it was awarded United States Letters Patent Number *5,187,787* (the " '787 patent") for that product.

In the mid-1980s, the Computer Science Department at Cornell University developed the "Isis Toolkit," a networking program which permits many computers to be linked together and to exchange data simultaneously. The program contains a number of components or "modules" which allow users to perform different networking functions. In accordance with the federal grant that funded the development of the Isis Toolkit, the software was made freely available to the public beginning in 1987, and it continues to be publicly available today.

In 1988, defendant Isis Distributed Systems, Inc. was formed in Ithaca, New York to render consulting advice to Isis software users. In the second half of 1991, Isis began to market an enhanced version of the [*3] Isis Toolkit, a product called "Isis Distributed Toolkit," which it licensed primarily to users in the financial services industry on the East Coast. However, six of the licensees are in California, three of which are licensed to resell Isis' products or embed them in their own products.

Exhibit LL
Page 236

Teknekron brought this action claiming that one of the modules in the Isis Distributed Toolkit infringes its '787 patent. In its answer, Isis claims that the module in question remains essentially unchanged from the public domain versions first released by Cornell in 1987. After Teknekron filed suit here, Isis brought an action for declaratory relief in the Northern District of New York, which has been stayed pending this Court's action on Isis' motions.

Isis now moves to dismiss for lack of personal jurisdiction, *Fed. R. Civ. P. 12(b)*, or, in the alternative, to transfer venue to the Northern District of New York, pursuant to *28 U.S.C. § 1404*(a).

I. ISIS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

A. Legal Standard

Although *Fed. R. Civ. P. 12(b)(2)* governs a motion to dismiss for lack of personal jurisdiction, the Rule does not prescribe the procedure for [*4] resolving such a motion. Case law indicates that a court has two options: (1) it can decide the motion on the basis of the plaintiff's affidavits submitted in response to the motion, or (2) it can delay a decision pending further discovery and hold an evidentiary hearing. 5A Wright & Miller, Federal Practice and Procedure: Civil § 1351 at 253-56 & n.27.

No matter which procedure is used, the plaintiff has the burden of establishing the court's jurisdiction. However, if the court decides to rule on the basis of affidavits alone, plaintiff's burden is met with a simple prima facie showing of personal jurisdiction. *Fields v. Sedgwick Associated Risks, Ltd., 796 F.2d 299, 301 (9th Cir. 1986)*.

In diversity cases, a federal district court is bound by the personal jurisdiction statute of the state in which it sits. *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1396 (9th Cir. 1986)*. Beyond this, however, the court must ensure that its exercise of jurisdiction under that statute comports with the Constitution's due process requirements. Id.

In this case, California's long-arm statute extends jurisdiction to the very limits [*5] of constitutional due process (*Cal. Civ. Proc. Code § 410.10*), so this Court need only determine whether the exercise of jurisdiction would comport with due process. See *Haisten, 784 F.2d at 1396*.

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant who has had "certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. "If

the defendant's activities in the [forum] state are 'substantial' or 'continuous and systematic,' general jurisdiction may be asserted even if the cause of action is unrelated to those activities." *Haisten, 784 F.2d at 1396*. If the defendant's activities are not "substantial" or "continuous and systematic," the court may not exercise jurisdiction unless the following three criteria are met:

> 1. The nonresident purposefully directed his actions toward the forum state, or purposefully availed himself of the privilege of conducting activities in the [*6] forum state;
>
> 2. The claim arose out of or resulted from the defendant's forum-related activities; and
>
> 3. An exercise of jurisdiction would be reasonable.

*Haisten, 784 F.2d at 1397*. This latter type of jurisdiction is sometimes labeled specific jurisdiction, to distinguish it from the former, which is labeled general jurisdiction. R. Casad, Jurisdiction in Civil Actions, P 1.02[1] (1983); see Von Mehren & Trautman, "Jurisdiction to Adjudicate: A Suggested Analysis," *79 Harv. L. Rev. 1121 (1966)*. Teknekron concedes that this Court may not assert general jurisdiction over Isis, but the company argues that Isis is subject to this Court's jurisdiction based on the three-part test for specific jurisdiction.

B. Analysis

1. Purposeful Availment

Purposeful availment requires "affirmative conduct which allows or promotes the transaction of business within the forum." *Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990)*. A defendant can satisfy the purposeful availment standard either by taking "deliberate actions within the forum state or by creating continuing obligations to forum residents." *Hirsch v. Blue Cross, Blue Shield of Kansas, 800 F.2d 1474, 1478 (9th Cir. 1986)*. [*7] However, a defendant does not establish the minimum contacts sufficient for jurisdiction merely by entering a contract with a party in the forum state. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478-79, 105 S. Ct. 2174, 2185, 85 L. Ed. 2d 528 (1985)*. Rather, the defendant's contacts with the forum state must be "substantial" and not merely "random, fortuitous or attenuated" - a determination which turns on "prior negotiations and contemplated future consequences, along with the terms

Exhibit LL
Page 237

of the contract and the parties' actual course of dealing." *Id. at 479, 105 S. Ct. at 2185, 2186.*

In this case, Isis entered licensing agreements with six California customers. Teknekron argues that these agreements constitute the minimum contact necessary for personal jurisdiction because they are in the nature of substantial, ongoing and reciprocal obligations between Isis and its licensees. This argument is based solely on certain provisions that comprise some of the agreements. For example, Teknekron notes that the licenses require Isis to service and maintain the software in California, Weil Decl., Exh. 3 at 7; Cooper Dep. at 109:8-10, to indemnify Isis' California [*8] licensees from suits arising from their use of the software, Weil Decl., Exh. 2 at 16, and to litigate disagreements in California. Id. at 18. In addition, the agreements give Isis royalty rights, Id. at 5-6, and the right to audit the books and records of a California licensee. Weil Decl., Exh. 4 at 8. Teknekron also maintains that the licensees who embed or resell Isis' software to other end users are, in effect, Isis distributors. According to Teknekron, these obligations, which Isis deliberately created with California residents, demonstrate that Isis has purposefully availed itself of the benefits and protection of California law.

Isis disagrees, arguing that the few licensing agreements at issue are precisely the sort of "random, fortuitous, and attenuated" activities that do not rise to the level of constitutionally sufficient "minimum contacts." In support of this claim, Isis contends that it has concentrated its marketing efforts on the New York City financial community, Cooper Decl. P 21, that the California agreements were unsolicited and insignificant, Id. at P 11, that all of the negotiations concerning the California contracts took place using long distance [*9] communication, Id., that no Isis representative has ever visited California for purposes related to the software at issue, Id., and that all of the performance under the agreements took place in New York. Id. at PP 8, 11. Isis further argues that Teknekron has overstated the nature of the reciprocal licensing terms, which, in Isis' opinion, require little or no action on its part and are unlikely to be invoked. In Isis' opinion, the contact it had with California was the result of the unilateral activity of the California licensees and is not the type of contact that constitutes "purposeful availment."

Were the extent of Isis' contact with California limited to that initiated by its customers, there would be no purposeful availment. See *Gray & Co. v. Firstenberg Machinery Co, Inc., 913 F.2d 758, 760-61 (9th Cir. 1990)* (no purposeful availment where contact initiated by forum resident and contract negotiated by telephone). However, this case is distinguishable from Gray, which involved a one time sale. Here, the licenses contemplate future consequences and continuing relationships be-

tween Isis and its licensees, Isis' argument as to the unlikelihood [*10] of its having to take future action notwithstanding.

Although the continuing obligations at issue here are not as extensive as those arising out of the franchise agreement that was at issue in Burger King, they need not be to constitute purposeful availment. For example, in Hirsch, the Ninth Circuit considered whether an insurer which had agreed to provide worker's compensation insurance to a Kansas employer was subject to personal jurisdiction in California where one of the covered employees worked. Even though the insurer was unaware of the California employee at the time the contract was executed, the Hirsch Court held that the insurer was subject to personal jurisdiction in California, reasoning that the insurer had both knowingly and voluntarily entered the contract, which had contemplated out of state employees. *Id., 800 F.2d at 1480.* That the insurer was physically absent from California and conducted none of the negotiations in California was held not to be determinative. Id. Here, Isis entered into six agreements with California customers and, unlike the insurer in Hirsch, knew the residence of the parties with which it was negotiating. [*11] It stretches the imagination to believe that Isis was a helpless bystander in these transactions and could not foresee that the agreements it entered would have effects in California. After all, it not only was bargaining with California customers but the agreements are clear that certain aspects of Isis' performance under the agreements would be rendered here. Thus, Isis' connection with California is such that it "should reasonably [have] anticipated being haled into court" here. *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980).*

### 2. Arising Out Of

Isis argues that none of the California contacts upon which Teknekron predicates its complaint can be used as the basis for an infringement action because they all occurred before the Teknekron patent was issued. According to Isis, Teknekron can point to no acts of infringement occurring in the ten-day period between February 16, 1993, when the patent issued, and February 26, 1993, when Teknekron filed this suit.

In response, Teknekron argues that Isis' view of the relevant window for cognizable acts of infringement is too narrow. Teknekron does not stop there, [*12] however, contending that even if the Court accepts Isis' view, Isis negotiated a license agreement with Petrovision, Inc., a California company, within the ten-day window Isis claims is relevant. Weil Decl., Exh. 4 at 15. This one act is sufficient to satisfy the second prong of the test. In addition, by promising a license, ongoing technical support and indemnity from suit for patent infringement, Isis

Exhibit LL
Page 238

induced its licensees to infringe the '787 patent after it was issued.

Isis' reply is that Teknekron is ignoring a serious dilemma in its pleading. According to Isis, the dilemma stems from the fact that Teknekron is pursuing infringement claims against Cornell for the module it released to the public more than a year prior to the patent application and against Isis for its enhanced version of the module. Isis argues that all of the contacts on which Teknekron is basing its argument for limited jurisdiction are related to its infringement claim as to the Cornell module, which Isis claims is barred by *35 U.S.C. § 102(b)*. Isis concludes that if Teknekron concedes that only the licensing and use of the Isis module is relevant to this litigation, Teknekron can point [*13] to no Isis activity in California giving rise to its claim. Isis then launches into an eight page attack on the underlying merits of Teknekron's infringement claims.

In reality, however, Isis' entire reply on this issue is nothing more than a misplaced and poorly disguised argument for summary judgment, which is inappropriate here. At this stage, Teknekron need only make a prima facie showing that jurisdiction is proper. *Fields, 796 F.2d at 301*. This Court is aware of no authority and Isis cites to none which would allow the Court at this stage to engage in an analysis of the legal and factual issues Isis raises.

Given its showing that Isis negotiated a license agreement with a California company and had license agreements in force when the '787 patent issued, Teknekron has satisfied the second prong of the test for limited jurisdiction.

3. Whether the Exercise of Jurisdiction Would be Reasonable

In the Ninth Circuit, there are a number of factors that are relevant in determining whether the exercise of jurisdiction would be reasonable: (1) The extent of purposeful interjection into the forum state; (2) The burden on the defendant of defending in the forum; (3) [*14] The extent of conflict with the sovereignty of defendant's state; (4) The forum state's interest in adjudicating the dispute; (5) The most efficient judicial resolution of the controversy; (6) The importance of the forum to plaintiff's interest in convenient and effective relief; (7) The existence of an alternative forum. *Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 840 (9th Cir. 1986)*.

Isis argues that it never purposefully interjected itself into California affairs. However, the Ninth Circuit has held that once it is established that the defendant purposefully directed its efforts to the forum state, the District Court is to give the purposeful interjectment fac-

tor no weight. *Sinatra v. National Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir. 1988)*. Therefore, because the Court has already concluded that Isis purposefully availed itself of the privilege of conducting business in California, this prong cannot be used to defeat jurisdiction here.

Isis further contends that California has no interest in Teknekron because Teknekron is a Nevada corporation. This argument has little merit. Teknekron is a California-based company with headquarters [*15] in Palo Alto. Many corporations are based in states outside of those where they are registered. In addition, California has an interest in protecting local companies against patent infringement regardless of where the infringement takes place.

This forum is also important to Teknekron's interest in convenient and effective relief; all of its records and witnesses are here as well as several Isis users. Siegler Decl. PP 8, 9.

Isis also maintains that since it is a company of limited size and resources, litigating in California would be extremely burdensome; having to do so would require it to retain the services of a California law firm in addition to its New York law firm and to incur the high costs of flying witnesses to trial here. Cooper Decl. PP 21, 22. Although Isis is a somewhat smaller company than Teknekron, minor size differences are not sufficient to justify a finding of lack of jurisdiction. A defendant who has "purposely derived commercial benefit from his contacts in a state may not defeat jurisdiction there simply because of his adversary's greater net wealth." *Burger King, 471 U.S. at 483 n.25, 105 S. Ct. at 2188.*

In addition, Isis argues that the [*16] brunt of its allegedly wrongful conduct occurred in New York and since many of the witnesses are located there, the Northern District of New York will probably be a more efficient forum. See *Raffaele v. Compagnie Generale Maritime, 707 F.2d 395, 399 (9th Cir. 1983)*. Isis further maintains that most of the physical evidence is in New York, Cooper Decl., PP 17, 18, and many of its New York witnesses are not within this Court's subpoena power. Id., PP 19, 20; *Fed. R. Civ. P. 45(e)*. Isis also notes that Teknekron has a sales office in New York, Id. at P 23, which would reduce Teknekron's relative burden of litigating there.

The Northern District of New York does provide and alternative forum and, on the whole, is a more reasonable and efficient forum than this district. However, it is not enough that the defendant demonstrate that some other forum is more reasonable than California, it must show a due process violation; it must show that jurisdiction in California would make the litigation "'so gravely difficult and inconvenient' that a party unfairly is at a

Exhibit LL
Page 239

'severe disadvantage' in comparison to his opponent." *Burger King, 471 U.S. at 478, 105 S. Ct. at 2185.* [*17] This it has not done. Requiring Isis to defend locally is not constitutionally unreasonable "in this era of fax machines and discount air travel." *Sher, 911 F.2d at 1365.* Isis has purposefully interjected itself into California, and the facts it alleges show no more than inconvenience, not a "severe disadvantage." Furthermore, it is more appropriate to resolve disputes about the inconvenience of a California trial through a motion for change of venue, rather than through dismissal for lack of jurisdiction." *Sher, 911 F.2d at 1365, n.5,* citing *Burger King, 471 U.S. at 477, 105 S. Ct. at.2185.* This option will be discussed below.

Since the Court has concluded that Isis purposefully established contacts within California, Isis cannot defeat this Court's jurisdiction without a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King, 471 U.S. at 477, 105 S. Ct. at 2185.* Although Isis has valid arguments against this Court's exercise of jurisdiction, it has not demonstrated that jurisdiction would be so unreasonable as to violate due process.

Teknekron has satisfied [*18] the three-prong test for limited jurisdiction. Therefore, Isis' motion to dismiss for lack of personal jurisdiction is DENIED.

## II. ISIS' MOTION TO TRANSFER VENUE

Section 1404(a) of Title 28 of the United States Code provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." There is no question that Teknekron could have filed this action in the Northern District of New York. See *28 U.S.C. § 1400*(b). Thus, the Court need only consider the convenience and interest of justice factors.

There are a number of considerations that go into the convenience calculus: (1) Teknekron's choice of forum; (2) relative ease of access to sources of proof; (3) the availability of compulsory process for attendance of unwilling witnesses; (4) the costs of securing witness attendance; (6) relative expense of trial; (7) location where the events at issue took place; (8) administrative difficulties and delay of forum court; and (9) local interest of controversy. *Skill-Craft Enterprises, Inc., v. Astro Mfg., Inc., 1990 U.S. Dist. LEXIS 18929, 18 U.S.P.Q.2D (BNA) 1555, 1558 (N.D. Ind. 1990).* [*19]

A plaintiff's choice of forum is accorded substantial weight in proceedings under section 1404(a). *STX, Inc. v. Trik Stik, Inc., 708 F. Supp. 1551, 1555-56 (N.D. Cal. 1988),* citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3rd Cir. 1970),* cert. denied, *401 U.S. 910, 27 L. Ed.*

*2d 808, 91 S. Ct. 871 (1971).* Thus, a transfer is not appropriate merely to shift the inconvenience from one party to another, *Harris Trust & Savings Bank v. SLT Warehouse, Co., Inc., 605 F. Supp. 225, 227 (N.D. Ill. 1985),* and courts generally frown upon transfers unless the convenience and justice factors strongly favor venue elsewhere. *Decker Coal, 805 F.2d at 843.*

Isis makes the threshold argument that the Court should accord little deference to Teknekron's choice of forum because Teknekron's claims bear little relation to California. A fundamental principle guiding section 1404(a) analysis is that litigation should proceed "in that place where the case finds its 'center of gravity.' *Levinson v. Regal Ware, Inc., 1989 U.S. Dist. LEXIS 17455, 14 U.S.P.Q.2D (BNA) 1064, 1065 n.3 (D.N.J. 1989)* (citing cases). [*20] This principle is particularly important in patent infringement suits. See *S.C. Johnson & Son, Inc. v. Gillette Co., 571 F. Supp. 1185, 1187-88 (N.D. Ill. 1983).* In this case, the allegedly infringing products were designed in Ithaca, New York. Cooper Decl. P 5. In addition, almost all of the allegedly infringing conduct took place in New York. Id. at PP 7, 21. Given these facts, the center of gravity for this action is in New York, not California. Consequently, Teknekron's choice of forum is only entitled to limited deference.

Even if the center of gravity were not in New York, the convenience factors and the interests of justice alone weigh in favor of transfer. For example, New York is Teknekron's largest market and Teknekron maintains a sales office in close proximity to the Northern District of New York, which is visited regularly by Teknekron officers and other personnel from here. Siegler Decl. P 8; Mohan Dep., 35-38, 70-71 76-78, 92-104. In contrast, Isis has no office or employee in California, Cooper Decl. P 21, and has few customers here in comparison to Teknekron's customer base in New York. Mohan Dep. 55, 57-59, 62-63, 70-71.

In addition, it would [*21] be significantly more convenient for the witnesses if this action were transferred to New York. All of Isis' material witnesses, many of which are nonparties, are located in New York, along with most of the users of the Isis software package Isis intends to have testify. Teknekron, on the other hand, has identified only a handful of witnesses who will testify on its behalf, several of whom regularly travel to New York. Moreover, the merits of Teknekron's claims of infringement will focus on the defendants' design, development, manufacture, marketing and distribution of their software and almost all of the material events surrounding these activities took place in New York.

The interests of justice also weigh in favor of transfer. In evaluating the interests of justice, courts typically examine four criteria: 1) judicial economy, 2) the effect

Exhibit LL
Page 240

Case 1:06-cv-00041-JJF   Document 37-7   Filed 01/23/2006   Page 59 of 63

Page 6

1993 U.S. Dist. LEXIS 21337, *

the transfer would have on the cost of the litigation to the parties, 3) access to proof and 4) the availability of compulsory process. *Willemijn Houdstermaatschaapij v. Apollo Computer, Inc., 707 F. Supp. 1429, 1438 (D.Del. 1989).* It is not clear that a transfer would promote judicial economy. While this Court has invested little [*22] time and energy in the case, the same holds true for the Northern District of New York. In addition, neither party has presented evidence concerning the relative caseloads pending in each district. However, many of the nonparty witnesses are beyond the subpoena power of this Court, a problem which will be exacerbated by the dismissal of Cornell University. Although Isis could have those witnesses testify by deposition, federal courts strongly favor live testimony. *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 89 F.R.D. 497, 501 (C.D. Cal. 1981).* In addition, most of the documentary evidence with respect to Teknekron's infringement claims is

located at Isis' offices in New York. All of these factors suggest that a transfer would reduce the overall cost of the litigation and promote the interests of justice.

For the foregoing reasons, Isis' motion to transfer under *28 U.S.C. § 1404*(a) is GRANTED. The action shall be transferred to the District Court for the Northern District of New York. In accordance with Local Rule 205-4, this Order shall not become effective until ten days after it has been filed.

IT IS SO ORDERED.

DATED: [*23] 6/14/93

Spencer Williams

U.S. DISTRICT COURT JUDGE

Exhibit LL
Page 241

LEXSEE 2002 US DIST LEXIS 4671

## TI GROUP AUTOMOTIVE SYSTEMS, (NORTH AMERICA), INC., Plaintiff, v. VDO NORTH AMERICA L.L.C. et al., Defendant.

### C.A. No. 00-432-GMS

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2002 U.S. Dist. LEXIS 4671; 62 U.S.P.Q.2D (BNA) 1599*

March 7, 2002, Decided

DISPOSITION: [*1] Defendants Atecs' and Mannesmann's motion to dismiss GRANTED.

LexisNexis(R) Headnotes

COUNSEL: For TI GROUP AUTOMOTIVE SYSTEMS (NORTH AMERICA), INCORPORATED, plaintiff: Douglas E. Whitney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For VDO NORTH AMERICA L.L.C., MANNESMANN AG, ATECS MANNESMANN AG, VODAFONE AIRTOUCH PLC, ROBERT BOSCH GMBH, SIEMENS AG, MANNESMANN VDO AG, defendants: Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For TI GROUP AUTOMOTIVE SYSTEMS (NORTH AMERICA), INC., counter-claimant: Douglas E. Whitney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For VDO NORTH AMERICA L.L.C., counterdefendant: Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Gregory M. Sleet

OPINION:

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On August 18, 2000, the plaintiff, TI Group Automotive Systems, NA, Inc. ("TI") filed the above-captioned action. In that action, TI charges the defendants, VDO NA ("VDO"), Mannesmann AG ("Mannesmann"), Siemens AG, Robert Bosch GMBH, Atecs Mannesmann AG ("Atecs") and Vodafone Group PLC ("Vodafone") n1 with infringement of its '714 patent. n2

> n1 The parties have agreed to voluntarily dismiss Vodafone AG as a defendant.

[*2]

> n2 Atecs is Mannesmann's subsidiary holding company for its non-telecommunications businesses. Prior to September 1999, Mannesmann was VDO AG's parent corporation. However, when Atecs was formed in September 1999, it became the parent company of VDO AG.

Presently before the court is Atecs' and Mannesmann's motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*. n3 In particular, they claim that TI cannot maintain a claim against them because they did not design, manufacture, use, or sell any of the fuel pump modules which are the subject matter of the '714 patent. They further argue that there is no evidence that they induced actual infringement or that they should be held liable on an agency theory of liability. For the reasons that follow, the court will grant this motion.

> n3 As the parties rely on material outside the pleadings, the court will treat this motion as a motion for summary judgment. *See FED. R. CIV. P. 12(b)*.

[*3]

## II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998).* Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle, 139 F.3d at 392.* A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).* An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999).* [*4]

## III. DISCUSSION

### A. Direct Infringement

TI alleges that the defendants violated Section 271(a) of the U.S. Patent Laws. *35 U.S.C. § 271(a).* This Section provides that, "whoever without authority makes, uses, offers to sell or sells any patented invention . . . infringes the patent." *Id.* In support of this allegation, TI argues that Mannesmann exercises "control and authority" over VDO which extends far beyond "mere economic approval" of VDO's transactions. Specifically, TI group contends that Mannesmann must approve transactions "which may involve infringement of protective rights of third parties." TI also points to the fact that Mannesmann and VDO have several common members on their respective Board of Directors. Notably, TI offers no evidence that Mannesmann itself made, used, or sold the fuel pump assemblies.

The court finds that these facts do not give rise to a genuine issue of material fact with regard to whether Mannesmann itself made, sold, or used fuel pump assemblies in violation of TI's patent rights.

### B. Active Inducement

Section 271(b) of the Patent Act provides that "whoever actively induces infringement of a patent shall [*5] be liable as an infringer." In order to establish active inducement, the following elements must be proven by a preponderance of the evidence: (1) an inducer's knowledge of the asserted patent; (2) the presence of infringe-

ment by the third party allegedly induced; (3) an inducer's actual intent to cause the acts which he knew or should have known would induce actual infringements; and (4) the commission of an act that constitutes inducement, not merely the power to act or the failure to act. *See Black & Decker (US) Inc. v. Catalina Lighting, Inc., 953 F. Supp. 134, 138 (E.D. Va. 1997).*

In support of its theory, TI alleges the following facts: (1) Mannesmann approved the making and selling of the accused devices, (2) Mannesmann financed VDO, (3) Herbert Koenekamp's ("Koenekamp") knowledge of the '714 patent and its infringement must be imputed to Mannesmann and Atecs, n4 and (4) that, because VDO and Mannesmann shared board members, Mannesmann knew or should have known of the infringement. n5

> n4 TI maintains that Koenkamp's knowledge must be imputed because he is the general counsel for VDO AG, he is also the board's secretary, and he corresponded with TI Group about this lawsuit in early 1999.

[*6]

> n5 The board member issue will be more fully discussed below in Section III.C.

Viewing these statements in the light most favorable to TI, as the court must at this stage, the court concludes that they do not sufficiently address each of the elements necessary to establish an active inducement claim. n6 While the court does not dispute that a reasonable factfinder could conclude that TI's allegations demonstrate that Mannesmann and Atecs knew or should have known about the alleged infringement, TI has failed to adequately set forth facts to meet the intent element. *See Manville Sales Corp. v. Paramount Sys., Inc. 917 F.2d 544, 553 (Fed. Cir. 1990)* (stating that "it must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the specific acts alleged to constitute inducement.") Further, it has failed to demonstrate that Mannesmann's approval requirement and financing of VDO were anything more than routine business practices between a parent and subsidiary.

> n6 For purposes of this motion only, the court assumes that a reasonable factfinder would find actual infringement.

[*7]

Exhibit MM
Page 243

Page 3

2002 U.S. Dist. LEXIS 4671, *; 62 U.S.P.Q.2D (BNA) 1599

## C. Agency

TI next argues that a parent corporation may be liable for the acts of its subsidiary corporation under an agency theory. n7 In support of this theory, TI relies upon Koenekamp's failure to deny an agency relationship in his deposition. Specifically, it argues, "Mr. Koenekamp does not state that Atecs had no role in the design activity of the accused fuel pump module." (emphasis in original). Based on this statement, TI argues that the court must infer that some design and development activity was ongoing at the time Atecs became VDO's parent. With regard to Mannesmann, TI argues that Koenekamp "does not deny that Mannesmann controlled the activity of VDO AG." (emphasis in original)

> n7 The defendants do not deny that a general agency theory may be used to impute liability.

The court finds that, based on these allegations, TI is merely attempting to rely on what Koenekamp did not say, rather than what he did say. Koenekamp clearly stated that Mannesmann did not participate in the [*8] design or development of the VDO NA fuel pumps. He also stated that Atecs had no input into the design and development activity of VDO AG or VDO NA. Thus, TI's argument is effectively that the court should read negative inferences into Koenekamp's statements. This bare argument is unsupported by any factual basis. n8 *See Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996)* (noting that, "in order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.")

> n8 TI urges the court to adopt the court's reasoning in *Manchack*, where the court declined to dismiss the action for want of more discovery or to "inconsistent and unclear" statements in an affidavit. *Manchak v. Rollins, 1996 U.S. Dist. LEXIS 20542,* at *7-8, (D. Del. Dec. 18, 1996). There are no inconsistent and unclear statements in the present case. Koenekamp unequivocally states that Mannesmann and Atecs did not participate in the design of the fuel pumps. To the extent that TI desires explicit language regarding agency principles, it had the opportunity to ask such direct questions at Koenekamp's deposition.

[*9]

Additionally, TI alleges that there is a "direct link of [Mannesmann's and VDO AG's] controlling boards" as

support for its claim that VDO AG's knowledge may be imputed to Mannesmann. Courts have consistently held that more than what TI terms a "direct link" is required to hold a parent liable for its subsidiary. *See Upjohn Co. v. Syntro Corp., 1990 U.S. Dist. LEXIS 11512, 14 U.S.P.Q.2D (BNA) 1469, 1472 (D. Del. 1990); see also Akzona Inc. v. E.I. duPont de Nemours & Co., 607 F. Supp. 227 (D. Del. 1984).* Indeed, on the following facts, a court declined to hold a parent liable for its subsidiary:

> "the relationship between the parent and subsidiary was that the parent had 100% ownership of the subsidiary, the parent referred to the subsidiary as a division of the parent, the subsidiary's board reported to the parent, the parent approved substantial capital expenditures, the parent referred to the subsidiary's business as its project and took credit for the project in its annual report and the parent guaranteed loans for the subsidiary." *Akzona, 607 F. Supp. at 237.*

As TI offers nothing more than allegations of a "direct link, [*10] " the court declines to find a genuine issue of material fact with regard to liability on this basis. *See Upjohn Co. v. Syntro Corp., 1990 U.S. Dist. LEXIS 11512, 14 U.S.P.Q.2D (BNA) 1469, 1472 (D. Del. 1990)* (noting the "significant" degree of control necessary to warrant holding a parent liable for its subsidiary.)

Next, TI asserts that, because Mannesmann included financial information related to VDO in its annual report, Mannesmann is a proper defendant in the present suit. It offers no further evidence on this issue. However, Mannesmann is the ultimate parent corporation of VDO. Its annual report would necessarily include financial information about its subsidiaries. Thus, on this basis alone, the court cannot find a genuine issue of material fact.

Finally, as discussed above with regard to the issue of direct infringement, TI argues that Mannesmann requires its subsidiaries to obtain approval prior to entering into certain business arrangements, including transactions that may involve patent infringement issues. However, it has adduced no evidence that this approval is anything more than a parent corporation's normal and necessary exercise of control over its subsidiary. [*11] *See Akzona, 607 F. Supp. at 238* (noting that a subsidiary is not the parent's agent where the parent, among other things, must oversee and approve major capital expenditures.) Thus, TI's allegation cannot justify establishing liability against Mannesmann for the alleged patent infringement of its subsidiary.

## D. Ability to Pay

Exhibit MM
Page 244

Page 4

2002 U.S. Dist. LEXIS 4671, *; 62 U.S.P.Q.2D (BNA) 1599

TI group candidly admits that, "from a deep pocket point of view, [it has] named the appropriate foreign parties." It further alleges that Mannesmann is "siphoning off assets" from VDO AG and VDO NA. Thus, in the absence of Mannesmann, its potential judgment will not be satisfied. The court finds this argument to be without merit. It is undisputed that VDO AG transfers its profits at year-end to Atecs, as it did to Mannesmann prior to the formation of Atecs. However, at his deposition, Koenekamp stated that this is a routine business practice in Germany. TI has offered no contradictory evidence. Further, to the extent that damages are awarded in this litigation, such damages will be paid from VDO AG's profits. The profits transferred to Atecs that year would be correspondingly less.

### E. Contributory Infringement

TI makes a passing [*12] reference to contributory infringement claims in its opposition brief. However, it fails to offer any evidence that either Mannesmann or Atecs has supplied any components to VDO AG or VDO NA. Accordingly, to the extent that TI makes such a claim, the court will reject this argument.

### IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Atecs' and Mannesmann's motion to dismiss (D.I. 25 in 01-3-GMS) is GRANTED.

Date: March 7, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

### ORDER

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. VDO's renewed motion for judgment as a matter of law on non-fringement (D.I. 261) is GRANTED.

2. Judgment BE AND IS HEREBY ENTERED in favor of VDO.

3. TI's motion for prejudgment and post-judgment interest (D.I. 264) is declared MOOT.

4. TI's motion to alter or amend the judgment (D.I. 266) is declared MOOT.

5. TI's motin for an injunction (D.I. 268) is declared MOOT.

6. TI's motion for enhanced damages, attorneys' fees, and expenses (D.I. 270) is declared MOOT.

7. TI's amended motion for an injunction (D.I. 292) is declared MOOT.

Dated: [*13] September 4, 2002

/s/

UNITED STATES DISTRICT JUDGE

The Honorable R. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AMAZON.COM, INC. and A9.COM, INC., | No. 05-01137RSM |
| Plaintiffs, | RE-NOTE FOR DEFENDANTS' MOTION TO TRANSFER VENUE PURSUANT TO 28 |
| vs. | U.S.C. § 1404(A) OR, IN THE ALTERNATIVE, TO DISMISS, STAY OR |
| CENDANT CORPORATION; TRILEGIANT CORPORATION; ORBITZ, LLC; ORBITZ, INC.; BUDGET RENT A CAR SYSTEM, INC.; and AVIS RENT A CAR SYSTEM, INC, | TRANSFER THIS ACTION PURSUANT TO THE FIRST-TO-FILE RULE |
| Defendants. | **ORAL ARGUMENT REQUESTED** |
| | **RE-NOTED ON MOTION CALENDAR:** |
| | **September 16, 2005** |

RE-NOTE FOR MOTION TO TRANSFER -- 1

No. 05-01137RSM

M32273-634167

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington  98121-1128
(206) 624-8300/Fax: (206) 340-9599

1   DATED this 31st day of August, 2005.

2                                   Paul Hastings, Janofsky & Walker LLP

3

4
                                    By:/s/ Douglas E. Olson
5                                   Douglas E. Olson
                                    James Fazio,III
6                                   Attorneys for Defendants,
                                    CENDANT CORPORATION;
7                                   TRILEGIANT CORPORATION;
                                    ORBITZ LLC; ORBITZ, INC.;
8                                   BUDGET RENT A CAR SYSTEM, INC.;
                                    AND AVIS RENT A CAR SYSTEM, INC.
9                                   *Admitted Pro Hac Vice*

10                                  and

11                                  GRAHAM & DUNN PC

12                                  K. Michael Fandel
                                    WSBA# 16281
13                                  Email:  mfandel@grahamdunn.com
                                    Attorneys for Defendants
14

15

16

17

18

19

20

21

22

23

24

25

26
RE-NOTE FOR MOTION TO TRANSFER --          **GRAHAM & DUNN** PC
2                                          Pier 70, 2801 Alaskan Way ~ Suite 300
                                           Seattle, Washington  98121-1128
                                           (206) 624-8300/Fax: (206) 340-9599
No. 05-01137RSM
M32273-634167

**CERTIFICATE OF SERVICE**

1.    I hereby certify that on the 31st day of August, 2005, I electronically filed **Re-Note for Defendants' Motion to Transfer**, with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

●David T. McDonald
davidm@prestongates.com

DATED this 31st day of August 2005, at Seattle, King County, Washington.


                                        s/ K. Michael Fandel
                                        K. Michael Fandel

RE-NOTE FOR MOTION TO TRANSFER --
3

No. 05-01137RSM

M32273-634167

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington  98121-1128
(206) 624-8300/Fax: (206) 340-9599

The Honorable R. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| AMAZON.COM, INC. and A9.COM, INC., | ) | No. 05-01137RSM |
| | ) | |
| Plaintiffs, | ) | RE-NOTE FOR MOTION FOR |
| | ) | DEFENDANTS' (1) MOTION TO DISMISS |
| vs. | ) | ALL CLAIMS AGAINST CENDANT |
| | ) | CORPORATION; (2) MOTION TO |
| CENDANT CORPORATION; TRILEGIANT | ) | DISMISS THE COMPLAINT FOR |
| CORPORATION; ORBITZ, LLC; ORBITZ, | ) | FAILURE TO STATE A CLAIM |
| INC.; BUDGET RENT A CAR SYSTEM, INC.; | ) | PURSUANT TO FED.R.CIV.P.12(B)(6) OR, |
| and AVIS RENT A CAR SYSTEM, INC, | ) | IN THE ALTERNATIVE, FOR MORE |
| | ) | DEFINITE STATEMENT PURSUANT TO |
| Defendants. | ) | FED.R.CIV.P.12(E); AND (3) MOTION TO |
| | ) | STAY DISCOVERY PENDING |
| | ) | RESOLUTION OF THE MOTIONS |
| | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | **RE-NOTED ON MOTION CALENDAR:** |
| | ) | **September 16, 2005** |
| | ) | |
| | ) | |
| _____ | ) | |

RE-NOTE FOR MOTION FOR
DEFENDANTS' MOTION TO DISMISS -- 1

No. 05-01137RSM

M32273-634162

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington  98121-1128
(206) 624-8300/Fax: (206) 340-9599

1

DATED this 31st day of August, 2005.

2

Paul Hastings, Janofsky & Walker LLP

3

4

By:/s/ Douglas E. Olson

5

Douglas E. Olson
James Fazio,III

6

Attorneys for Defendants,
CENDANT CORPORATION;

7

TRILEGIANT CORPORATION;
ORBITZ LLC; ORBITZ, INC.;

8

BUDGET RENT A CAR SYSTEM, INC.;
AND AVIS RENT A CAR SYSTEM, INC.

9

*Admitted Pro Hac Vice*

10

and

11

GRAHAM & DUNN PC

12

K. Michael Fandel

13

WSBA# 16281
Email:  mfandel@grahamdunn.com

14

Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

RE-NOTE FOR MOTION FOR
DEFENDANTS' MOTION TO DISMISS -- 2

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington  98121-1128
(206) 624-8300/Fax: (206) 340-9599

No. 05-01137RSM

M32273-634162

**CERTIFICATE OF SERVICE**

1.    I hereby certify that on the 31st day of August, 2005, I electronically filed **Re-Note for Defendants' Motion to Dismiss**, with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

●David T. McDonald
davidm@prestongates.com

DATED this 31st day of August 2005, at Seattle, King County, Washington.

s/ K. Michael Fandel
K. Michael Fandel

RE-NOTE FOR MOTION FOR
DEFENDANTS' MOTION TO DISMISS -- 3

No. 05-01137RSM

M32273-634162

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

1                                                 The Honorable R. Martinez

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                 WESTERN DISTRICT OF WASHINGTON

10                           AT SEATTLE

11

| | |
|---|---|
| 12   AMAZON.COM, INC., and<br>A9.COM, INC., | Case No. 05-01137 (RSM) |
| 13 | **PLAINTIFFS AMAZON.COM, INC.** |
|                Plaintiffs, | **AND A9.COM, INC.'S OPPOSITION TO** |
| 14 | **DEFENDANTS' MOTION TO DISMISS**<br>**ALL CLAIMS AGAINST CENDANT** |
|      v. | **CORPORATION; MOTION TO** |
| 15 | **DISMISS THE COMPLAINT FOR** |
|  CENDANT CORPORATION, | **FAILURE TO STATE A CLAIM** |
| 16   TRILEGIANT CORPORATION, ORBITZ,<br>LLC, ORBITZ, INC., BUDGET RENT A | **PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br>**OR, IN THE ALTERNATIVE, FOR A** |
| 17   CAR SYSTEM, INC., and AVIS RENT A<br>CAR SYSTEM, INC., | **MORE DEFINITE STATEMENT**<br>**PURSUANT TO FED. R. CIV. P. 12(e);** |
| 18 | **AND MOTION TO STAY DISCOVERY** |
|              Defendants. | **PENDING RESOLUTION OF THE** |
| 19 | **MOTIONS** |
| 20 | Noted for consideration September 16, 2005 |

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

I.    PLAINTIFFS' COMPLAINT ................................................................................. 2

II.   ACTIVITIES OF CENDANT CORPORATION AND ITS SUBSIDIARIES ................. 3

ARGUMENT .................................................................................................................. 6

I.    PLAINTIFFS HAVE PROPERLY STATED CLAIMS
      FOR DIRECT, CONTRIBUTORY, AND INDUCEMENT OF
      INFRINGEMENT AGAINST EACH AND EVERY DEFENDANT .............................. 6

      A.   The Complaint Adequately States a Claim for Patent Infringement...................... 6

      B.   Plaintiffs May Assert Both Direct and
           Indirect Infringement Against Each Defendant ................................................... 10

      C.   Plaintiffs' Complaint Adequately
           States a Claim for Inducement of Patent Infringement......................................... 13

II.   DEFENDANTS' ALTERNATIVE MOTION FOR A
      MORE DEFINITE STATEMENT ALSO SHOULD BE
      DENIED BECAUSE THE COMPLAINT PROPERLY STATES
      CLAIMS FOR INFRINGEMENT OF THE PATENTS IN SUIT .................................. 15

III.  CENDANT'S REQUEST TO CONVERT ITS MOTION TO  DISMISS INTO
      ONE FOR SUMMARY JUDGMENT, SHOULD BE DENIED .................................... 17

      A.   Cendant's Infringement Should Not Be Decided on Summary Judgment ........... 17

      B.   Plaintiffs Have Properly Stated Claims Against Cendant..................................... 18

IV.   DISCOVERY SHOULD NOT BE STAYED
      PENDING RESOLUTION OF DEFENDANTS' MOTIONS ........................................ 20

CONCLUSION ................................................................................................................ 21

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY                    -i-
CASE NO. 05-01137 (RSM)

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Agilent Techs., Inc. v. Micromuse, Inc.*,
   2004 U.S. Dist. LEXIS 20723 (S.D.N.Y. Oct. 19, 2004) .................................................. 11, 16

5

*Allen Organ Co. v. Kimball Int'l, Inc.*,
   839 F. 2d 1556 (Fed. Cir. 1988)........................................................................................... 14

6

7

*Asip v. Nielsen Media Research, Inc.*,
   2004 U.S. Dist. LEXIS 2350 (S.D.N.Y. Feb. 17, 2004) ............................................ 16, 18, 19

8

*Beery v. Hitachi Home Elecs.*,
   157 F.R.D. 477 (C.D. Cal. 1993) .......................................................................................... 16

9

*Blankenship v. Hearst Corp.*,
   519 F.2d 418 (9th Cir. 1975)................................................................................................. 20

10

11

*Braintree Labs., Inc. v. Nephro-Tech, Inc.*,
   31 F. Supp. 2d 921 (D. Kan. 1998) ................................................................................. 13, 14

12

*Carrasco v. City of Monterey Park*,
   18 F. Supp. 2d 1072 (C.D. Cal. 1998) .................................................................................. 17

13

14

*Conley v. Gibson*,
   355 U.S. 41 (1957)................................................................................................... 6, 8, 15

15

*First Chicago Int'l v. United Exchange Co.*,
   836 F.2d 1375 (D.C. Cir. 1988) .................................................................................. 17, 18, 20

16

17

*Gauvin v. Trombatore*,
   682 F. Supp. 1067 (N.D. Cal. 1988) ....................................................................................... 9

18

*Gen-Probe, Inc. v. Amoco Corp.*,
   926 F. Supp. 948 (S.D. Cal. 1996)...................................................................................... 8, 9

19

20

*Gilligan v. Jamco. Dev. Corp.*,
   108 F.3d 246 (9th Cir. 1997)................................................................................................... 6

21

*Hart v. Gaioni*,
   354 F. Supp. 2d 1127 (C.D. Cal. 2005) ............................................................................... 20

22

23

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
   909 F.2d 1464 (Fed. Cir. 1990)............................................................................................. 14

24

*Hewlett-Packard Co. v. Intergraph Corp.*,
   2003 U.S. Dist. LEXIS 26092 (D. Cal. Sept. 6, 2003) ........................................................ 16

25

26

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-ii-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3    *Home & Nature, Inc. v. Sherman Specialty Co.*,
     322 F. Supp. 2d 260 (E.D.N.Y. 2004) .................................................................................. 16

4

5    *In re Papst Licensing GmbH Patent Litigation*,
     2001 U.S. Dist. LEXIS 2255 (E.D. La. Feb. 22, 2001) ........................................................ 16

6    *In re Rivastigmine Patent Litigation*,
     2005 U.S. Dist. LEXIS 7167 (S.D.N.Y. 2005) .............................................................. 13, 14

7

8    *Intel v. Hyundai Elecs. Am., Inc.*,
     1987 U.S. Dist. LEXIS 14727 (N.D. Cal. Nov. 23, 1987)................................................... 8, 9

9    *Jervis B. Webb Co. v. Southern Sys., Inc.*,
     495 F. Supp. 145 (E.D. Mich. 1980)..................................................................................... 12

10

11   *Landry v. Specialty Diving of La.*,
     2002 U.S. Dist. LEXIS 21483 (E.D. La. Nov. 4, 2002) ....................................................... 17

12   *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
     244 F.3d 1365 (Fed. Cir. 2001)............................................................................................. 11

13

14   *Mezzetti v. State Farm Mut. Ins. Co.*,
     346 F. Supp. 2d 1058 (N.D. Cal. 2004) .................................................................................. 6

15   *Mixing Equip. Co. v. Innova-Tech, Inc.*,
     228 U.S.P.Q. 221 (E.D. Pa. 1985) .......................................................................................... 8

16

17   *Moba, B.V. v. Diamond Automation*,
     325 F.3d 1306 (Fed. Cir. 2003)............................................................................................. 13

18   *N.Y. Islanders Hockey Club, LLP v. Comerica Bank-Texas*,
     115 F. Supp. 2d 348 (E.D.N.Y. 2000) ................................................................................... 18

19

20   *Navarro v. Block*,
     250 F.3d 729 (9th Cir. 2001)............................................................................................ 6, 15

21   *NTP, Inc. v. Research in Motion, Ltd.*,
     2005 U.S. App. LEXIS 15920 (Fed. Cir. 2005).................................................................... 11

22

23   *Oki Elec. Indus. Co. v. LG Semicon Co. Ltd.*,
     1998 U.S. Dist. LEXIS 22507 (N.D. Cal. Feb. 25, 1998)........................................... 6, 7, 8, 9

24   *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc.*,
     203 F.3d 790 (Fed. Cir. 2000)............................................................................................... 10

25

26   *Picker Int'l v. Varian Assoc.*,
     661 F. Supp. 347 (N.D. Ohio 1987) ...................................................................................... 12

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY            -iii-
CASE NO. 05-01137 (RSM)

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1

**TABLE OF AUTHORITIES**
(continued)

2
                                                                                          **Page**

3    *Pickholtz v. Rainbow Techs., Inc.*,
       260 F. Supp. 2d 980 (N.D. Cal. 2003) ................................................................ 11, 12
4
     *Procter & Gamble Co. v. Nabisco Brands, Inc.*,
5      604 F. Supp. 1485 (D. Del. 1985) ....................................................................... 11, 12

6    *R2 Tech., Inc. v. Intelligent Sys. Software, Inc.*,
       2002 U.S. Dist. LEXIS 19110 (D. Del., Oct. 9, 2002) ............................................. 9
7
     *Ristvedt-Johnson, Inc. v. Peltz*,
8      1991 U.S. Dist. LEXIS 17233 (N.D. Ill. Nov. 18, 1991) ......................................... 14

9    *Russell v. Lazar*,
       300 F. Supp. 2d 716 (E.D. Wis. 2004) ...................................................................... 20
10
     *Sagana v. Tenorio*,
11     384 F.3d 731 (9th Cir. 2004) ...................................................................................... 7

12   *Self v. Fisher Controls Co.*,
       566 F.2d 62 (9th Cir. 1977) ........................................................................................ 12
13
     *Snap-On Inc. v. Hunter Eng'g Co.*,
14     29 F. Supp. 2d 965 (E.D. Wis. 1998) ................................................................... 13, 14

15   *Sony Elecs., Inc. v. Soundview Techs., Inc.*,
       157 F. Supp. 2d 190 (D. Conn. 2001) .................................................................. 13, 14
16
     *Suresafe Industries, Inc. v. C&R Pier Manufacturing*,
17     850 F. Supp. 869 (S.D. Cal. 1993) ....................................................................... 11, 12

18   *Takeda Chem. Indus., Ltd. v. Watson Pharms., Inc.*,
       329 F. Supp. 2d 394 (S.D.N.Y. 2004) .................................................................... 9, 18
19
     *Turner Broad. Sys. v. Tracinda Corp.*,
20     175 F.R.D. 554 (D. Nev. 1997) .................................................................................. 20

21   *Twin City Fire Ins. Co. v. Employers Ins. of Wausau*,
       124 F.R.D. 652 (D. Nev. 1989) .................................................................................. 20
22
     *U.S. Fid. & Guar. Co. v. Star Techs., Inc.*,
23     935 F. Supp. 1110 (D. Or. 1996) ............................................................................... 12

24   *Van Dyke Ford, Inc. v. Ford Motor Co.*,
       399 F. Supp. 277 (E.D. Wis. 1975) .............................................................................. 9
25
     *Windy City Innovations, LLC v. America Online, Inc.*,
26     227 F.R.D. 278 (N.D. Ill. 2005) .................................................................................. 9

1

## TABLE OF AUTHORITIES
(continued)

2

**Page**

3

S<small>TATUTES</small>

4

Federal Rules of Civil Procedure 12(b) ........................................................................ 17

5

Federal Rules of Civil Procedure 12(b)(6) ............................................................... passim

6

Federal Rules of Civil Procedure 12(e) .............................................................. 1, 15, 17

7

Federal Rules of Civil Procedure 8(a)(2) ...................................................................... 7

8

Federal Rules of Civil Procedure 84 ............................................................................ 7

9

Federal Rules of Civil Procedure Appendix of Forms, Form 16 ......................... 7, 8, 15

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

P<small>LTFS</small>' O<small>PPOSITION TO</small> D<small>EFTS</small>' M<small>TNS TO</small> D<small>ISMISS</small>, F<small>OR</small> M<small>ORE</small>
D<small>EFINITE</small> S<small>TATEMENT</small> & T<small>O</small> S<small>TAY</small> D<small>ISCOVERY</small>
C<small>ASE</small> N<small>O</small>. 05-01137 (RSM)

-v-

P<small>RESTON</small> G<small>ATES</small> & E<small>LLIS</small>, LLP
925 F<small>OURTH</small> A<small>VE</small>., S<small>UITE</small> 2900
S<small>EATTLE</small>, W<small>ASHINGTON</small> 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

**INTRODUCTION**

Plaintiffs Amazon.com, Inc. ("Amazon.com") and A9.com, Inc., ("A9.com") brought this action against defendants Cendant Corporation ("Cendant"), Trilegiant Corporation ("Trilegiant"), Orbitz, LLC and Orbitz, Inc. (collectively "Orbitz"), Budget Rent A Car System, Inc. ("Budget"), and Avis Rent A Car System, Inc. ("Avis"), for infringement of U.S. Patent Nos. 5,715,399 ("the '399 patent"), 6,029,141 ("the '141 patent"), 6,629,079 ("the '079 patent"), and 6,625,609 ("the '609 patent"). The patents cover innovations relating to electronic commerce. Defendants operate businesses that practice the inventions claimed in the patents.

Defendants move to dismiss plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, for a more definite statement under Rule 12(e). The complaint, however, fully satisfies the standard for notice pleading against all defendants, including Cendant. The complaint follows the form pleading approved by the Judicial Conference Advisory Committee for patent infringement cases, and even includes additional detail beyond what the Rules require. The complaint identifies separately which defendants directly or indirectly infringe each patent and the infringing activities of each defendant. The complaint also separately alleges for each patent that the infringing defendants knew of the patent and that their activities were infringing. Nothing more is required to give defendants fair notice under Rule 8.

Implicitly conceding the sufficiency of plaintiffs' complaint, defendants ask the Court to consider evidence outside the pleadings and to decide a summary judgment motion on the issue of Cendant's infringement. Dispositive action on the merits of plaintiffs' infringement claim against Cendant is premature. Cendant has not yet answered the complaint or provided any discovery. In fact, defendants have requested a *stay* of all discovery, which would deprive plaintiffs of the opportunity to test the representations Cendant has made in support of its motion.

The Court should deny defendants' motions.

/ / /

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-1-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

**STATEMENT OF FACTS**

## I.    PLAINTIFFS' COMPLAINT

Plaintiffs' complaint contains four separate claims for relief, in which Amazon.com and A9.com allege ownership and infringement of each of the patents in suit, separating the claims by patent. *See* Compl. ¶¶ 11-32.

The first claim alleges infringement of the '399 patent, which covers methods and systems for securely communicating credit card numbers over non-secure networks. Compl. ¶¶ 12, 14, Ex. 1. The complaint alleges that Cendant, Trilegiant, Orbitz and Avis infringe, or induce others to infringe, the '399 patent by "using or causing to be used plaintiffs' patented credit card number transmission methods and systems in the operation of their businesses." Compl. ¶ 14. The complaint further alleges that the infringement is accomplished by defendants alone or jointly with others. Compl. ¶ 14. The complaint specifically identifies as infringing activities "the operation of the www.orbitz.com, www.avis.com, and www.avgautostore.com websites." Compl. ¶ 14. It further alleges that these acts of infringement are willful due to defendants' knowledge of the '399 patent and their knowledge that the operation of their businesses infringed the '399 patent. Compl. ¶ 15.

The second claim alleges infringement of the '141 patent, which covers Internet-based customer referral systems. *See* Compl. ¶¶ 18, 20, Ex. 2. The complaint alleges that Cendant, Trilegiant, Orbitz, and Budget infringe, or induce others to infringe, the '141 patent by "using or causing to be used plaintiff's patented Internet-based customer referral methods and systems in the operation their online e-commerce businesses." Compl. ¶ 20. The complaint further alleges that the infringement is accomplished by defendants alone or jointly with others. Compl. ¶ 20. The complaint specifically identifies as infringing activities "the operation of the www.trilegiantaffiliates.com, www.orbitz.com and www.budget.com websites." Compl. ¶ 20. It further alleges that these acts of infringement are willful due to Cendant, Trilegiant, Orbitz, and/or Budget's knowledge of the '141 patent and their knowledge that the operation of their

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-2-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    businesses infringed the '141 patent.  Compl. ¶ 21.

2          The third claim alleges infringement of the '079 patent, which covers methods and

3    systems for conducting e-commerce using multiple roles or "shopping carts" for each user.  *See*

4    Compl. ¶¶ 24-25, Ex. 3.  The complaint alleges that Cendant and Orbitz infringe, or induce others

5    to infringe, the '079 patent by "using or causing to be used plaintiffs' patented multiple roles e-

6    commerce methods and systems in the operation of their online e-commerce businesses."

7    Compl. ¶ 25.  The complaint further alleges that the infringement is accomplished by defendants

8    alone or jointly with others.  Compl. ¶ 25.  The complaint specifically identifies as an infringing

9    activity "the operation of the www.orbitz.com website."  Compl. ¶ 25.  It further alleges that

10   these acts of infringement are willful due to Cendant's and Orbitz's knowledge of the '079 patent

11   and their knowledge that the operation of their businesses infringed the '079 patent.  Compl. ¶ 26.

12         The fourth claim alleges infringement of the '609 patent, which covers methods and

13   systems for browse-graph-based navigation within a body of data.  *See* Compl. ¶¶ 29-30, Ex. 4.

14   The complaint alleges that Cendant and Orbitz infringe, or induce others to infringe, the '609

15   patent by "using or causing to be used plaintiff's patented browse-graph-based navigation

16   methods and systems in the operation of their online e-commerce businesses."  Compl. ¶ 30.  The

17   complaint further alleges that the infringement is accomplished by defendants alone or jointly

18   with others.  Compl. ¶ 30.  The complaint specifically identifies as an infringing activity "the

19   operation of the www.orbitz.com website."  Compl. ¶ 30.  It further alleges that these acts of

20   infringement are willful due to Cendant and Orbitz's knowledge of the '609 patent and their

21   knowledge that the operation of their businesses infringed the '609 patent.  Compl. ¶ 31.

22   **II.    ACTIVITIES OF CENDANT CORPORATION AND ITS SUBSIDIARIES**

23         Cendant is a world-wide provider of travel and marketing services, among other services.

24   Cendant owns subsidiaries in various business segments, including Cendant's Travel Distribution

25   Services, Vehicle Services and Marketing Services, and actively manages and cross-markets them

26   to optimize business opportunities within the Cendant organization.  *See* Declaration of C. J.

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY                    -3-
CASE NO. 05-01137 (RSM)

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    Alice Chen in Support of Plaintiffs' Opposition (hereinafter "Chen Decl.") ¶ 2, Ex. A at p. 5.

2    Cendant's subsidiaries include Trilegiant, which operates www.trilegiantaffiliates.com and

3    www.avgautostore.com as part of Cendant's Marketing Services; Orbitz, which operates

4    www.orbitz.com as part of Cendant's Travel Distribution Services; Budget, which operates

5    www.budget.com as part of Cendant's Vehicle Services; and Avis, which operates www.avis.com

6    also as part of Cendant's Vehicle Services. *See id.* at pp. 18-29.

7        Although Cendant claims no control over the management of the accused websites, Avis,

8    Budget and Trilegiant list "Cendant DNS Administrator" as the Administrative Contact for

9    www.avis.com, www.budget.com, www.trilegiantaffiliates.com, and www.avgautostore.com.

10   *See* Chen Decl. ¶ 5, Ex. D. The registration information for Avis' and Budget's websites also

11   indicates that www.avis.com and www.budget.com use cendant.com domain servers, and Avis

12   lists "Cendant DNS Technical Support" as the technical contact for its domain. *See id.* Thus, at

13   the very least, Cendant administers the domains for almost all of the accused websites and houses

14   Avis and Budget's websites on their servers.

15       Cendant's involvement in the operation of the accused websites and businesses does not

16   end there. Cendant's public filings with the U.S. Securities and Exchange Commission ("SEC")

17   indicate that it performs certain operational functions for its subsidiaries and provides them with

18   essential operating and marketing services to reduce costs and maximize synergies. Cendant

19   purports to "perform certain administrative and operational functions for both Avis and Budget,

20   such as tax planning and financing, as well as voice reservation services through our contact

21   centers. Furthermore, we provide Avis and Budget locations with access to the Wizard System,

22   our online computer system which is used by these locations for (i) global reservations

23   processing, (ii) rental agreement generation and administration, and (iii) fleet accounting and

24   control." Chen Decl. ¶ 2, Ex. A at p. 25. Many of Avis' and Budget's reservations are received

25   and processed from their websites, www.avis.com and www.budget.com, respectively, both of

26   which offer car rental reservation services on the homepage. *See* Chen Decl. ¶ 6, Ex. E. In

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-4-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1  connection with its acquisition of Budget, Cendant relocated Budget's corporate headquarters,

2  relocated or terminated some Budget employees, and directed the disposition of other Budget

3  facilities related to reservation processing and administrative functions.  Chen Decl. ¶ 3, Ex. B

4  at p. 51.  Cendant also integrated Budget's information technology systems with Cendant's

5  platform.  *Id.*  Cendant performed similar technology consolidation efforts in connection with its

6  more recent acquisition of Orbitz.  *See* Chen Decl. ¶ 4, Ex. C at pp. 76-77; *see also* Chen Decl.

7  ¶ 7, Ex. F ("Initiatives have been undertaken to effectively leverage Orbitz.com,

8  CheapTickets.com and Lodging.com under the Travel Distribution umbrella including the

9  migration of the CheapTickets and Lodging sites onto the Orbitz platform and the ongoing

10  utilization of Cendant's legacy strengths such as technology, customer service and supplier

11  relations.").  Cendant's own website at www.cendant.com promotes and facilitates access to the

12  websites operated by Orbitz, Avis and Budget by providing links directly to these sites.  *See* Chen

13  Decl. ¶¶ 7-8, Exs. F-G.

14         As for Trilegiant, Cendant has essentially taken over Trilegiant's operations.  *See* Chen

15  Decl. ¶ 2, Ex. A at pp. 38-39.  In 2004, Cendant changed Trilegiant's name to TRL Group, Inc.,

16  and altered its contractual relationship with Trilegiant so that Cendant "now has managerial

17  control of TRL Group through its majority representation on the TRL Group board of

18  directors . . . .  TRL Group no longer has the ability to market to new members; rather, Cendant

19  now markets to new members under the Trilegiant tradename."  *Id.*  Cendant "offered

20  employment to substantially all of TRL Group's employees," and now "performs fulfillment

21  services for TRL Group."  *Id.* at p. 39; *see also* Chen Decl. ¶ 7, Ex. F ("Cendant Travel, a travel

22  agency operation with six contact centers, provides reservation sales, customer service and order

23  fulfillment to travel membership groups on behalf of Trilegiant and RCI, Lodging.com and Cheap

24  Tickets.").

25  / / /

26  / / /

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-5-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1

**ARGUMENT**

2

**I.     PLAINTIFFS HAVE PROPERLY STATED CLAIMS
FOR DIRECT, CONTRIBUTORY, AND INDUCEMENT OF
INFRINGEMENT AGAINST EACH AND EVERY DEFENDANT**

3

4

Defendants ask the Court to judge plaintiffs' complaint by a heightened pleading standard

5

contrary to the notice pleading requirements adopted by the Federal Rules of Civil Procedure.  As

6

described below, plaintiffs have met the requirements of the Federal Rules.

7

**A.     The Complaint Adequately States a Claim for Patent Infringement**

8

The U.S. Supreme Court has established a strict standard for Rule 12(b)(6) motions to

9

dismiss, which should not be granted "unless it appears beyond doubt that the plaintiff can prove

10

no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355

11

U.S. 41, 45-46 (1957); *see Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (quoting *Conley*,

12

355 U.S. at 45-46); *Mezzetti v. State Farm Mut. Ins. Co.*, 346 F. Supp. 2d 1058, 1064 (N.D. Cal.

13

2004) (citing *Conley* for the "strict standard for granting a Rule 12(b)(6) motion").  The Ninth

14

Circuit disfavors Rule 12(b)(6) motions to dismiss.  *Gilligan v. Jamco. Dev. Corp.*, 108 F.3d 246,

15

249 (9th Cir. 1997) ("The motion to dismiss for failure to state a claim is viewed with disfavor

16

and is rarely granted"); *Mezzetti*, 346 F. Supp. 2d at 1064 (citing *Gilligan*, 108 F.3d at 249).  In

17

considering this motion, the Court must accept all material allegations of the complaint, and any

18

reasonable inferences that may be drawn from them, as true; thus "[d]ismissal is proper only

19

where there is no cognizable legal theory or an absence of sufficient facts alleged to support a

20

cognizable legal theory."  *Navarro*, 250 F.3d at 732; *Oki Elec. Indus. Co. v. LG Semicon Co. Ltd.*,

21

1998 U.S. Dist. LEXIS 22507, at *9-10 (N.D. Cal. Feb. 25, 1998) ("A complaint should only be

22

dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure where it appears beyond

23

doubt that no set of facts could support plaintiff's claim for relief.").

24

The Federal Rules of Civil Procedure adopt a simple, notice pleading standard, which

25

requires only "a short and plain statement of the claim showing that the pleader is entitled to

26

relief," to give the defendant fair notice of the plaintiff's claim and its basis.  *See Sagana v.*

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-6-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    *Tenorio*, 384 F.3d 731, 736 (9th Cir. 2004); *see also* Fed. R. Civ. P. 8(a)(2).  "The forms

2    contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the

3    simplicity and brevity of statement which the rules contemplate."  Fed. R. Civ. P. 84.  Form 16

4    sets forth an illustrative complaint for patent infringement in four paragraphs, followed by a

5    demand for relief.  Fed. R. Civ. P. Appendix of Forms, Form 16; *Oki Elec. Indus.*, 1998 U.S. Dist.

6    LEXIS 22507, at *9-10.  A complaint that meets Rule 8(a)'s notice pleading requirements is

7    sufficient to withstand a Rule 12(b)(6) challenge.  *Id.* at *12 (denying Rule 12(b)(6) motion where

8    the complaint met the notice pleading requirements of Rule 8(a), as exemplified in Form 16 of the

9    Appendix of Forms).

10       The first and second paragraphs of Form 16 require allegations of jurisdiction and of

11   ownership or rights in the patents in suit.  *See* Form 16.  Plaintiffs have alleged jurisdiction and

12   ownership of the patents in suit, the sufficiency of which is not challenged by defendants.  *See*

13   Compl. ¶¶ 2-3, 9, 12, 18, 24, 29.  The fourth paragraph of Form 16 requires an allegation of

14   notice of the infringement.  *See* Form 16.  The complaint alleges both that "Plaintiffs have

15   provided statutory notice of" the '399 and '141 patents "via a listing of the patent number on one

16   or more of their websites" and that defendants "know or should have known of" each patent

17   asserted in each claim for relief.  Compl. ¶¶ 13, 15, 19, 21, 26, 31.  Defendants also do not

18   challenge the sufficiency of the notice allegations.

19       The third paragraph of Form 16 contains a concise statement of the infringing acts, which

20   reads in its entirety:  "Defendant has for a long time past been and still is infringing those Letters

21   Patent by making, selling, and using electric motors embodying the patented invention, and will

22   continue to do so unless enjoined by this court."  Form 16.

23       Defendants complain that plaintiffs' allegations of infringement are "confusing" and

24   "convoluted."  Defs. Motion at 14.  However, as in Form 16, the complaint identifies in each

25   claim for relief the particular defendants infringing the patent, the asserted patent, and the

26   infringing activities:

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-7-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

- "defendants Cendant, Trilegiant, Orbitz, and Avis" directly or indirectly infringe "or induce others to infringe one or more claims of the '399 Patent by . . . using or causing to be used plaintiffs' patented credit card number transmission methods and systems in the operation of their businesses, including but not limited to the operation of the ww.orbitz.com, www.avis.com, and www.avgautostore.com websites" (Compl. ¶ 14);

- "defendants Cendant, Trilegiant, Orbitz, and Budget" directly or indirectly infringe "or induce others to infringe one or more claims of the '141 Patent by . . . using or causing to be used plaintiff's patented Internet-based customer referral methods and systems in the operation their online e-commerce businesses, including but not limited to the operation of the www.trilegiantaffiliates.com, www.orbitz.com, and www.budget.com websites" (Compl. ¶ 20);

- "defendants Cendant and Orbitz" directly or indirectly infringe "or induce others to infringe one or more claims of the '079 Patent by . . . using or causing to be used plaintiffs' patented multiple roles e-commerce methods and systems in the operation of their online e-commerce businesses, including but not limited to the operation of the www.orbitz.com website" (Compl. ¶ 25);

- "defendants Cendant and Orbitz" directly or indirectly infringe "or induce others to infringe one or more claims of the '609 Patent by . . . using or causing to be used plaintiff's patented browse-graph-based navigation methods and systems in the operation of their online e-commerce businesses, including but not limited to the operation of the www.orbitz.com website" (Compl. ¶ 30).

Rule 8(a)'s notice pleading standard does not require any more specificity than what has been alleged already in the complaint. The complaint includes all of the allegations present in Form 16, and thereby provides sufficient notice of plaintiffs' claims and the basis for those claims. *See* Rule 84; *Oki Elec. Indus.*, 1998 U.S. Dist. LEXIS 22507, at *9-10 (relying on Rule 84 in concluding, "No more specificity is required in a patent case at the pleading stage" than is set forth in Form 16).[1]

Defendants complain, however, that these allegations are "so convoluted" that they cannot discern which defendant is accused of infringing which patent. *See* Defs. Motion at 14. Defendants also protest that plaintiffs have "lumped . . . three theories of infringement together." *See id.* Defendants rely on *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948 (S.D. Cal. 1996), in support of their argument that different theories of liability for infringement should be pleaded

---

[1]   Defendants, of course, may request additional information in discovery. *Intel*, 1987 U.S. Dist. LEXIS 14727, at *5 (citing *Mixing Equip. Co. v. Innova-Tech, Inc.*, 228 U.S.P.Q. 221, 222 (E.D. Pa. 1985)); *see also Conley*, 355 U.S. at 47-48 ("Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.").

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)                                    -8-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

separately against each defendant.  The *Gen-Probe* case, however, involved an egregiously

disorganized complaint, and its decision represents only the minority view.  The majority of cases

on this issue find it entirely proper for plaintiffs to accuse multiple defendants of infringement

under multiple, applicable infringement theories.  *See, e.g., Intel v. Hyundai Elecs. Am., Inc.*,

1987 U.S. Dist. LEXIS 14727 (N.D. Cal., Nov. 23, 1987) at *4 ("Intel has the right to allege that

all the defendants, including ICT, are infringing all nine patents."); *Windy City Innovations, LLC

v. America Online, Inc.*, 227 F.R.D. 278, 282-83 (N.D. Ill. 2005) (finding plaintiff's allegation

"that AOL is responsible for certain infringement 'directly, contributorily, by inducement, or

otherwise. . . .'" sufficient and appropriate, and that it "merely indicates that after discovery

Windy will be able to state with more certainty the degree of involvement of AOL in the alleged

infringement"); *R2 Tech., Inc. v. Intelligent Sys. Software, Inc.*, 2002 U.S. Dist. LEXIS 19110, at

*9 (D. Del., Oct. 9, 2002) ("the complaint plainly and succinctly states that the defendants are

being sued for their alleged direct and contributory infringement and for having induced others to

infringe one or more of the claims"); *see also Takeda Chem. Indus., Ltd. v. Watson Pharms., Inc.*,

329 F. Supp. 2d 394, 401 (S.D.N.Y. 2004) (finding it appropriate for plaintiffs to separate the

claims by patent, addressing "both future and past activity" as well as willful infringement in each

claim).[2]  In fact, *Gen-Probe* has been restricted by other Ninth Circuit courts to its particular

facts.  *See Oki Elec. Indus.*, 1998 U.S. Dist. LEXIS 22507, at *8 ("Neither the *Gen-Probe* nor the

*Schlafly* case establishes a general rule that plaintiffs are required to plead each claim in their

complaints in a separate count.  Rather, in each case the court was addressing particular

organizational deficiencies of the respective pleadings.").

---

[2]    Defendants mistakenly rely on inapplicable cases involving non-patent infringement complaints to support their argument that plaintiffs' allegations in this case are insufficient to state a claim.  *Gauvin v. Trombatore*, 682 F. Supp. 1067 (N.D. Cal. 1988) (addressing pleading requirements specific to actions under particular Civil Rights statutes); *Van Dyke Ford, Inc. v. Ford Motor Co.*, 399 F. Supp. 277, 281-84 (E.D. Wis. 1975) (dismissing claims for violations of the Sherman Act and granting motion for more definite statement because "nothing is specifically alleged regarding two of the plaintiffs").

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)
-9-
PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    The Federal Circuit has had occasion recently to consider the dismissal under Rule

2  12(b)(6) of another patent infringement complaint involving Cendant.  In *Phonometrics, Inc. v.*

3  *Hospitality Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000), Cendant (then known as

4  Hospitality Franchise Systems, Inc.) was the beneficiary of the district court's decision to *sua*

5  *sponte* dismiss the complaint for failure to more specifically allege facts supporting the plaintiff's

6  allegations of infringement.  On appeal, the Federal Circuit found that the complaint, which

7  alleged "ownership of the asserted patent, name[d] each individual defendant, cite[d] the patent

8  that is allegedly infringed, describe[d] the means by which the defendants allegedly infringe, and

9  point[ed] to the specific sections of the patent law invoked," was sufficient under Rule 12(b)(6).

10  203 F.3d at 794.  The Federal Circuit declined to require the plaintiff to allege more than "facts

11  sufficient to place the alleged infringer on notice."  *Id.*  Here, as in *Phonometrics*, the complaint

12  alleges each of the elements of patent infringement and thereby sufficiently states claims for

13  infringement.

14    Although they may dispute the merits of the allegations, defendants can have no real

15  difficulty understanding what is alleged:  for each patent, plaintiffs assert that each defendant

16  named in the claim for relief has infringed the patent directly or indirectly, by contribution or

17  inducement, by means of the operation of the websites cited in the complaint.  Having each

18  theory of liability for infringement set out separately for each patent and each defendant, as

19  defendants advocate, would not contribute anything of substance to the complaint, but would

20  merely make it substantially longer.  Neither Rule 8 nor Rule 12 mandates such a useless pleading

21  exercise.

22    **B.    Plaintiffs May Assert Both Direct and**
      **Indirect Infringement Against Each Defendant**
23
    Defendants contend that plaintiffs "lack standing" to assert claims for both direct and
24
  indirect infringement against the same defendants.  Defs. Motion at 12-13.  However, the law is
25
  clear that plaintiffs may assert both direct and indirect infringement of a patent by the same
26

1    defendant if the defendant participates in activities that directly infringe the patent and different

2    activities that indirectly infringe the patent, whether by contribution or by inducement of others to

3    infringe.  *See Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 990 (N.D. Cal. 2003)

4    (explaining that defendant may be liable for direct infringement "based on the making and using

5    of its products in product development and testing," and also liable for indirect infringement

6    based on its "sales of its products to customers"); *Procter & Gamble Co. v. Nabisco Brands, Inc.*,

7    604 F. Supp. 1485, 1490 (D. Del. 1985) (holding it was proper for patent owner to assert direct

8    infringement for sales after patent issued as well as inducement of infringement for pre-issuance

9    activities); *Agilent Techs., Inc. v. Micromuse, Inc.*, 2004 U.S. Dist. LEXIS 20723, at *10-12

10   (S.D.N.Y. Oct. 19, 2004) (allowing allegations "that Micromuse is liable for direct infringement,

11   contributory infringement and infringement by inducement" and denying Micromuse's Rule

12   12(b)(6) motion).  In fact, in numerous patent infringement cases a single defendant has been

13   found liable for direct, induced and contributory infringement of a patent.  *See*, *e.g.*, *NTP, Inc. v.*

14   *Research in Motion, Ltd.*, 2005 U.S. App. LEXIS 15920 (Fed. Cir. 2005) ("The jury found direct,

15   induced, and contributory infringement by RIM on all asserted claims of the patents in suit.");

16   *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1369 (Fed. Cir. 2001)

17   (involving "a jury verdict of direct, contributory, and inducement of infringement").

18          None of the cases on which defendants rely address Rule 12(b)(6)'s standards for pleading

19   direct and indirect infringement.  Instead, *Suresafe Industries, Inc. v. C&R Pier Manufacturing*,

20   addressed, on the merits, whether a defendant could be liable for inducement of infringement or

21   contributory infringement based on *the same activities* that support a claim for direct

22   infringement.  850 F. Supp. 869, 870 (S.D. Cal. 1993) (granting summary judgment of not direct

23   infringement, and thus no indirect or induced infringement).  The remaining cases cited by

24   defendants also comment on the unavailability of the cause of action of induced infringement

25   only where the same acts supporting induced infringement are used to support direct infringement

26   by the same defendant.  *See Picker Int'l v. Varian Assoc.*, 661 F. Supp. 347, 350 (N.D. Ohio

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-11-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1  1987); *Jervis B. Webb Co. v. Southern Sys., Inc.*, 495 F. Supp. 145, 147 (E.D. Mich. 1980) ("In

2  this case, defendant's alleged inducement to infringe is actually a part of the direct infringement

3  that defendant would be liable for . . ."). Furthermore, these cases deal with motions to dismiss

4  for *lack of venue*, rejecting claims of induced infringement as an improper independent basis for

5  venue, not as improperly alleged alongside direct infringement. *Picker Int'l*, 661 F. Supp. at 348,

6  350 (holding "the facts of the instant case render § 271(b) unavailable to Picker as an alternate

7  avenue for the predication of venue in this District"); *Jervis*, 495 F. Supp. at 146 (deciding motion

8  to dismiss for improper venue after conduct of discovery); *Self v. Fisher Controls Co.*, 566 F.2d

9  62, 63 (9th Cir. 1977) (deciding motion to dismiss for improper venue, and not plaintiff's

10  "standing" to sue for induced or contributory infringement).

11      Those courts that have had occasion to consider whether plaintiffs could allege both direct

12  and indirect infringement have distinguished the cases defendants cite on precisely this ground,

13  finding it appropriate to allege both theories of infringement against a defendant where the accused

14  acts are different. *See Pickholtz*, 260 F. Supp. at 990 (distinguishing *Picker*, 661 F. Supp. at 350

15  and *Suresafe*, 850 F. Supp. at 873, both of which disallowed direct and indirect infringement

16  claims based on the same acts); *U.S. Fid. & Guar. Co. v. Star Techs., Inc.*, 935 F. Supp. 1110,

17  1115 (D. Or. 1996) (distinguishing *Jervis B. Webb*, 495 F. Supp. 145 and *Self*, 566 F.2d 62,

18  wherein direct and indirect infringement claims were premised on sale of same items); *Procter &

19  Gamble*, 604 F. Supp. at 1490 (distinguishing *Self* for same reasons). Plaintiffs' complaint

20  contains separate bases for its claims of direct and indirect infringement, alleging defendants' *use*

21  of the various technologies for direct infringement, and defendants' *causing others to use* the

22  patented technologies for indirect infringement. Compl. ¶ 14, 20, 25, 30. There is simply no rule

23  that a plaintiff accusing a defendant of direct infringement "lacks standing" to assert contributory

24  or inducement of infringement as well. Whether a plaintiff ultimately proves the indirect

25  infringement is a different matter that may not be properly raised at the pleading stage.

26

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)                    -12-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1

2

### C.    Plaintiffs' Complaint Adequately States a Claim for Inducement of Patent Infringement

3

4

Defendants argue that a claim for inducement of patent infringement is subject to a

5

heightened standard of specific fact pleading.  Defs. Motion at 15.  This is not the law.  "[U]nder

the notice pleading standard provided in Rule 8 of the Federal Rules of Civil Procedure, the

6

plaintiffs are not, at this stage in the litigation, required to plead with particularity specific acts of

7

inducement or encouragement of third parties."  *In re Rivastigmine Patent Litigation*, 2005 U.S.

8

Dist. LEXIS 7167, at *13 (S.D.N.Y. 2005); *see also Sony Elecs., Inc. v. Soundview Techs., Inc.*,

9

157 F. Supp. 2d 190, 196-97, 201 (D. Conn. 2001).  To state a claim for active inducement of

10

infringement, the complaint must allege (1) an underlying direct infringement, and (2) actual

11

intent to cause the acts which constitute infringement.  *Moba, B.V. v. Diamond Automation*, 325

12

F.3d 1306, 1318 (Fed. Cir. 2003); *Braintree Labs., Inc. v. Nephro-Tech, Inc.*, 31 F. Supp. 2d 921,

925 (D. Kan. 1998).

13

Plaintiffs have alleged direct infringement of each of the patents in suit, and thus satisfy

14

the first element of active inducement of others to infringe the patents in suit.  Compl. ¶¶ 14, 20,

15

25, 30.  As for the second element, the complaint alleges intent in the general manner required by

16

Rule 9(a).  *See Snap-On Inc. v. Hunter Eng'g Co.*, 29 F. Supp. 2d 965, 970 (E.D. Wis. 1998).  For

17

each separate patent, plaintiffs allege that defendants induce others to infringe by "causing to be

18

used plaintiffs' patented" invention.  Compl. ¶¶ 14, 20, 25, 30.  Plaintiffs further allege that

19

"Defendants' acts of infringement are willful," and defendants "know or should have known of"

20

the patent and that the operation of their businesses infringed the patent.  Compl. ¶¶ 15, 21, 26,

21

31.  These allegations more than meet the threshold requirement for generally alleging intent for

22

inducement of patent infringement, which requires no more than a statement that defendants'

23

actions are "willful and deliberate."  *Snap-On*, 29 F. Supp. 2d at 970 (finding the allegation "that

24

the defendant's actions were 'willful and deliberate'" sufficient to show intent for induced

25

infringement).  Furthermore, "a claim of active inducement is less susceptible to judgment on the

26

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-13-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    pleadings because 'intent is a factual determination particularly within the province of the trier of

2    fact.'"  *Braintree Labs.*, 31 F. Supp. 2d at 925 (citing *Allen Organ Co. v. Kimball Int'l, Inc.*, 839

3    F. 2d 1556, 1557 (Fed. Cir. 1988).

4         The allegations of the complaint far exceed the insufficient, conclusory statements made

5    by the plaintiff in *Ristvedt-Johnson, Inc. v. Peltz*, the case on which defendants rely.  In *Ristvedt-*

6    *Johnson v. Peltz*, corporate officers were accused of inducing their company to infringe the

7    asserted patents.  The complaint in that case alleged only "that the defendants induced Brandt to

8    infringe upon Ristvedt's patents."  1991 U.S. Dist. LEXIS 17233, at *11-12 (N.D. Ill. Nov. 18,

9    1991).  The *Ristvedt-Johnson* court criticized the plaintiff for not alleging "any facts showing how

10   the defendants induced" infringement.  *Id.* at *11.[3]  By contrast, plaintiffs here allege how

11   defendants induce infringement for the '399 patent by stating, "Cendant, Trilegiant, Orbitz, and

12   Avis have been, currently are, and will continue to . . . induce others to infringe one or more

13   claims of the '399 Patent by . . . causing to be used plaintiffs' patented credit card number

14   transmission methods and systems in the operation of their businesses, including but not limited

15   to the operation of the www.orbitz.com, www.avis.com, and www.avgautostore.com websites,"

16   and for each of the patents in suit in corresponding allegations.  Compl. ¶¶ 14, 20, 25, 30.

17   Plaintiffs further allege intent to induce infringement for each separate patent in stating that

18   defendants' infringing acts "are willful" as they had knowledge that their businesses infringed the

19   patents.  Compl. ¶¶ 15, 21, 26, 31.

20        Defendants also misplace their reliance on *Hewlett-Packard Co. v. Bausch & Lomb Inc.*,

21   which did not involve the standard for pleading inducement of infringement at all, but rather an

22   appeal to the Federal Circuit of a *final judgment on the merits* regarding whether defendant had

23   actively induced infringement.  909 F.2d 1464, 1470 (Fed. Cir. 1990) (analyzing a license

24   _____

25   [3]    To the extent *Ristvedt-Johnson* can be read as requiring the pleading with particularity of specific facts that
      support the intent element, the decision is plainly inconsistent with more recent authority.  *See In re Rivastigmine*,
26   2005 U.S. Dist. LEXIS 7167, at *13; *Sony Elecs.*, 157 F. Supp. 2d at 196-97, 201; *Snap-On*, 29 F. Supp. 2d at 970;
      *Braintree Labs.*, 31 F. Supp. 2d at 925.

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)
-14-
PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1   agreement to determine whether such evidence was sufficiently probative of intent to induce

2   infringement to reverse the lower court's judgment).  Plaintiffs need not plead with enough

3   specificity, or provide sufficient evidence, to *prove* their case at this early stage in the litigation.

4   The complaint adequately alleges inducement of infringement because it alleges the requisite

5   underlying direct infringement, and satisfies the requirements for generally alleging intent.

6       Defendants have not shown that "it is beyond doubt that" plaintiffs "can prove no set of

7   facts in support of [their] claim which would entitle [them] to relief" for direct or indirect

8   infringement.  *Conley*, 355 U.S. at 45-46; *Navarro*, 250 F.3d at 732.  The complaint contains

9   allegations that are more than sufficient to give defendants notice of the claims against them.  The

10  Court should deny defendants' Rule 12(b)(6) motion to dismiss the complaint for failure to state a

11  claim.

## II.    DEFENDANTS' ALTERNATIVE MOTION FOR A MORE DEFINITE STATEMENT ALSO SHOULD BE DENIED BECAUSE THE COMPLAINT PROPERLY STATES CLAIMS FOR INFRINGEMENT OF THE PATENTS IN SUIT

15      Defendants should only be granted their Rule 12(e) motion if the complaint "is so vague

16  or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Fed. R.

17  Civ. P. 12(e).  As described above, the complaint more than meets Rule 8(a)'s requirements for

18  notice pleading and clearly sets forth its claims for patent infringement.  As discussed above, the

19  complaint follows Form 16, specifying the particular defendants that are accused of infringing

20  each patent and the infringing activities that form the basis for plaintiffs' claims.  The description

21  of the infringing activities includes a description of the accused technology, *e.g.*, "credit card

22  number transmission methods and systems," and identifies the websites that employ the accused

23  technology, including www.orbitz.com, www.avis.com, and www.avgautostore.com.  Compl.

24  ¶ 14.  This is more than enough detail and exceeds what other courts have required.  *See OKI*

25  *Elec. Indus.*, 1998 U.S. Dist. LEXIS 22507, at *10, (finding the phrase "devices that embody the

26  patented methods" sufficient to put defendants on notice of infringement claim); *Asip v. Nielsen*

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-15-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    *Media Research, Inc.*, 2004 U.S. Dist. LEXIS 2350, at *13 (S.D.N.Y. Feb. 17, 2004) (denying

2    Rule 12(e) motion where complaint alleged infringement by "products which use and/or

3    encompass store and forward technology with the use of a telephone line for data transmission in

4    the television industries," and declining to order an amendment identifying specific products).

5         The further specificity defendants demand is not required by Rule 8(a) and is best sought

6    through the discovery process.  "Where the information sought is available through the discovery

7    process, a Rule 12(e) motion should be denied," because "Rule 12(e) attacks the unintelligibility

8    of the complaint, not simply the mere lack of detail."  *Beery v. Hitachi Home Elecs.*, 157 F.R.D.

9    477, 480 (C.D. Cal. 1993) (denying Rule 12(e) motion for more definite statement); *see Home &*

10   *Nature, Inc. v. Sherman Specialty Co.*, 322 F. Supp. 2d 260, 265 (E.D.N.Y. 2004) (stating that

11   "Rule 12(e) is designed to prevent unintelligibility in complaints"); *Asip*, 2004 U.S. Dist. LEXIS

12   2350, at *7 ("'the tendency under the Federal Rules is to discourage motions to compel more

13   definite complaints and to encourage the use of discovery procedures to apprise the parties of the

14   basis for the claims made in the pleadings'").

15        In identifying the infringing websites and the specific technology employed by those

16   websites, plaintiffs' complaint markedly differs from the complaints in the cases cited by

17   defendants.  In *Agilent Techs., Inc. v. Micromuse, Inc.*, the plaintiff failed to identify any

18   infringing product or technology, 2004 U.S. Dist. LEXIS 20723, at *14-16, and in *Hewlett-*

19   *Packard Co. v. Intergraph Corp.*, the plaintiff generally accused defendants' "software and

20   hardware products" without further identification of the infringing product or technology.  2003

21   U.S. Dist. LEXIS 26092 at *6 (D. Cal. Sept. 6, 2003).  The complaint here is also distinguishable

22   from the one in *In re Papst Licensing GmbH Patent Litigation*, which accused defendant's

23   "products that embody the elements of at least one claim" of the patents in suit, where the

24   defendant sold hundreds of products and the plaintiff had asserted infringement of over twenty

25   patents.  2001 U.S. Dist. LEXIS 2255, at *2-4 (E.D. La. Feb. 22, 2001).  Unlike these deficient

26   complaints, plaintiffs have not failed to identify the infringing methods and systems – the

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-16-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1  complaint distinctly describes the infringing technology and identifies the websites operated by

2  defendants that plaintiffs believe employ the infringing methods and systems.  These allegations

3  of infringement are sufficiently definite, and the Court should deny defendants' Rule 12(e)

4  motion for a more definite statement.

**III.    CENDANT'S REQUEST TO CONVERT ITS MOTION TO**
5         **DISMISS INTO ONE FOR SUMMARY JUDGMENT, SHOULD BE DENIED**

6
       **A.    Cendant's Infringement Should Not Be Decided on Summary Judgment**
7
          Cendant improperly asks the Court to look beyond the pleadings, prematurely seeking a
8
   judgment on the issue of infringement before the parties have commenced discovery.  It is
9
   inappropriate to convert a Rule 12(b)(6) motion to dismiss into one for summary judgment prior
10
   to the commencement of discovery because "all parties shall be given reasonable opportunity to
11
   present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b); *see*
12
   *Landry v. Specialty Diving of La.*, 2002 U.S. Dist. LEXIS 21483, at *6 (E.D. La. Nov. 4, 2002)
13
   ("the Court finds that converting Specialty Offshore's 12(b)(6) Motion to Dismiss into a Motion
14
   for Summary Judgment is inappropriate at this juncture because the parties have not had the
15
   opportunity to complete discovery."); *see also Carrasco v. City of Monterey Park*, 18 F. Supp. 2d
16
   1072, 1074 (C.D. Cal. 1998) (allowing further discovery before rehearing a motion to dismiss as a
17
   motion for summary judgment).  "[I]t is settled that the term 'reasonable opportunity' includes the
18
   opportunity 'to pursue reasonable discovery.'"  *First Chicago Int'l v. United Exchange Co.*, 836
19
   F.2d 1375, 1380 (D.C. Cir. 1988).  Plaintiffs certainly have not been afforded an opportunity to
20
   pursue "reasonable discovery" since defendants' motion precedes the commencement of
21
   discovery and simultaneously requests a stay of discovery.  *See* Defs. Motion at 17-18.
22
          In addition, since the issue defendants ask the Court to decide is infringement, the Court
23
   will need to consider evidence regarding Cendant's business operations, the technology that
24
   Cendant employs, and many other underlying factual inquiries for which plaintiffs cannot present
25
   proper evidence without considerable discovery.  When converting a Rule 12(b)(6) motion to a
26

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY                    -17-
CASE NO. 05-01137 (RSM)

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    summary judgment motion necessarily entails allowing parties further discovery, "the more

2    appropriate course of action is to . . . deny [the] motion without prejudice on this ground." *N.Y.*

3    *Islanders Hockey Club, LLP v. Comerica Bank-Texas*, 115 F. Supp. 2d 348, 351 (E.D.N.Y.

4    2000); *see First Chicago*, 836 F.2d at 1379 (holding "it was premature for the district court to

5    grant summary judgment without first permitting discovery on the merits"). The Court should

6    decline defendants' invitation to convert their Rule 12(b)(6) motion to dismiss all claims against

7    Cendant.

8            **B.        Plaintiffs Have Properly Stated Claims Against Cendant**

9            Defendants fail to meet their burden to show that plaintiffs have not stated a cognizable

10   claim against Cendant because they have "not demonstrated that plaintiffs cannot prove any set of

11   facts in support of their patent infringement claims." *Asip*, 2004 U.S. Dist. LEXIS 2350, at *11.

12   "The Rule 12(b)(6) inquiry is limited to an analysis of whether the plaintiff has stated a claim,"

13   *Takeda*, 329 F. Supp. 2d at 401, and does not extend to "assay[ing] the weight of the evidence

14   which might be offered in support thereof." *Asip*, 2004 U.S. Dist. LEXIS 2350, at *5. Thus

15   Cendant's representations regarding the nature of its business operations and its purported lack of

16   involvement with the operation of the accused websites are not relevant to this motion. Cendant's

17   contention that it lacks sufficient involvement with its subsidiaries to be held liable for their

18   actions "is merely a statement of its belief that it has not engaged in any direct infringement

19   which is more appropriately stated as a denial in the answer." *Id.* at *11-12.

20           The complaint claims that Cendant infringed, contributed to infringement of, or induced

21   others to infringe the patents in suit, and not that Cendant should be liable for the actions of its

22   subsidiaries. *See* Compl. ¶¶ 4, 14, 15, 20, 21, 25, 26, 30, 31. The defendant in *Asip* made the

23   same arguments Cendant does here, bringing a Rule 12(b)(6) motion to dismiss on the basis that it

24   had not engaged in any infringing activities and that, as a mere holding company, it had

25   insufficient control over its subsidiary to be held liable for the subsidiary's infringing acts. *See*

26   *Asip*, 2004 U.S. Dist. LEXIS 2350, at *10. The *Asip* court denied the parent company's Rule

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY                    -18-
CASE NO. 05-01137 (RSM)

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1    12(b)(6) motion because the plaintiff's complaint was sufficient to state a claim against the parent

2    company, VNU, who had "not demonstrated that plaintiffs cannot prove any set of facts in

3    support of their patent infringement claims." *Id.* at *11.  The court in *Asip* further held, in

4    declining to dismiss the claims against VNU, that "even if plaintiffs' infringement claims against

5    VNU are premised solely on its status as 'a holding company' for subsidiary Nielsen, whether

6    VNU is liable for Nielsen's actions turns on factual considerations (e.g., the degree of control that

7    VNU exercised over Nielsen) that are beyond the scope of the pleadings." *Id.* at *12 (noting that

8    VNU's motion was untimely).  A similar conclusion is warranted here.

9        Although defendants do not question whether plaintiffs had an adequate basis to assert the

10   patents in suit against Cendant, the facts available from the public documents that did form

11   plaintiffs' basis for asserting claims against Cendant belie Cendant's representations that it is

12   wholly dissociated from its subsidiaries and their operation of the infringing websites.  Cendant is

13   the registered administrator for all of the accused websites, including www.avis.com,

14   www.budget.com, www.trilegiantaffiliates.com and www.avgautostore.com.  *See* Chen Decl. ¶ 5,

15   Ex. D.  The only exception is the website operated by Orbitz, Cendant's more recent acquisition,

16   for which Cendant is still in the process of technology consolidation efforts.  *See* Chen Decl. ¶ 4,

17   Ex. C at p. 76; *see also* Chen Decl. ¶ 7, Ex. F.  Moreover, Cendant's 2004 Form 10-K and 10-Q

18   reports, filed with the SEC, are replete with representations regarding its provision of operating

19   and marketing services for Avis, Budget and Trilegiant, including integration of its subsidiaries'

20   information technology systems with Cendant's own platform, providing Avis and Budget with

21   access to Cendant's Wizard System for global reservations processing and rental agreement

22   generation and administration, performance of fulfillment services for Trilegiant, and conduct of

23   all of Trilegiant's marketing services.  *See* Chen Decl. ¶ 2, Ex. A at p. 25, pp. 38-39 (detailing

24   also Cendant's majority representation on Trilegiant's board of directors); *see also* Chen Decl.

25   ¶ 7, Ex. F.

26       If the Court chooses to consider facts beyond the pleadings even at this early stage, these

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-19-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1   public facts, showing Cendant's administration of the very websites accused in the complaint as

2   well as Cendant's further involvement in the operation of the accused businesses, provide ample

3   basis for claims for direct and indirect infringement of the patents in suit against Cendant, and

4   further argue against dismissing plaintiffs' claims against Cendant at this stage.  As discussed

5   above, plaintiffs have alleged adequately in the complaint their claims of direct, contributory and

6   inducement of infringement against Cendant.

7

8   **IV.    DISCOVERY SHOULD NOT BE STAYED
        PENDING RESOLUTION OF DEFENDANTS' MOTIONS**

9          Defendants' motion to stay discovery is moot if the Court declines to convert defendants'

10  motion to dismiss all claims against Cendant into a summary judgment motion and/or denies

11  defendants' motions to dismiss altogether.  *See Hart v. Gaioni*, 354 F. Supp. 2d 1127, 1132 (C.D.

12  Cal. 2005) (denying motion to stay discovery as moot in view of court's ruling on motions to

13  dismiss); *Russell v. Lazar*, 300 F. Supp. 2d 716, 725 (E.D. Wis. 2004).  Even if defendants'

14  motion to stay discovery is not mooted by the Court's disposition of their motions to dismiss,

15  defendants have failed to show why plaintiffs should be denied discovery.  *See Turner Broad.*

16  *Sys. v. Tracinda Corp.*, 175 F.R.D. 554, 556 (D. Nev. 1997) (citing *Blankenship v. Hearst Corp.*,

17  519 F.2d 418, 429 (9th Cir. 1975)).  Rule 12(b)(6) motions to dismiss address the actual claims at

18  issue, and thus are distinguishable from motions involving purely preliminary issues, such as

19  jurisdiction, venue or immunity.  *Twin City Fire Ins. Co. v. Employers Ins. of Wausau*, 124

20  F.R.D. 652, 653 (D. Nev. 1989) (denying motion to stay discovery, and noting "a pending Motion

21  to Dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery").  In

22  fact, defendants' desire to submit to the Court an early summary judgment motion on Cendant's

23  infringement argues in favor of discovery, as plaintiffs would need, and be entitled to, discovery

24  in order to gather evidence pertinent to such a motion on the merits.  *First Chicago*, 836 F.2d at

25  1380 ("[I]t is settled that the term 'reasonable opportunity' includes the opportunity 'to pursue

26  reasonable discovery.'").  Therefore, a stay of discovery pending a decision on defendants'

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)                                    -20-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022

1  motions would not conserve resources or promote efficiency because discovery would be

2  necessary for resolution of the summary judgment motion pressed by defendants.

3  <div align="center">**CONCLUSION**</div>

4        For the foregoing reasons, the Court should (1) deny defendants' motion to dismiss for

5  failure to state a claim, (2) deny defendants' alternative motion for a more definite statement, (3)

6  deny defendants' motion for summary judgment and dismissal of all claims against Cendant, and

7  (4) deny as moot defendants' motion to stay discovery.

8

9  Dated:  September 12, 2005

10                                      s/David T. McDonald

11                                      David T. McDonald, WSBA # 5260
     PRESTON GATES & ELLIS, LLP

12       925 Fourth Avenue, Suite 2900
     Seattle, WA  98104

13       Ph: (206) 623-7580; Fax: (206) 623-7022

14       Lynn H. Pasahow (appearing *pro hac vice*)
     J. David Hadden (appearing *pro hac vice*)

15       FENWICK & WEST LLP
     801 California Street

16       Mountain View, CA  94041
     Ph: (650) 988-8500; Fax: (650) 938-5200

17       Attorneys for Plaintiffs
     AMAZON.COM, INC. and A9.COM, INC.

18

19

20

21

22

23

24

25

26

PLTFS' OPPOSITION TO DEFTS' MTNS TO DISMISS, FOR MORE
DEFINITE STATEMENT & TO STAY DISCOVERY
CASE NO. 05-01137 (RSM)

-21-

PRESTON GATES & ELLIS, LLP
925 FOURTH AVE., SUITE 2900
SEATTLE, WASHINGTON 98104-1158
PH: 206.623.7580; FAX: 206.623.7022