# Exhibit A

(Part 2 of 2)

version of the AutoVantage service; Credit Card Guardian and Hot–Line, services which enable consumers to register their credit and debit cards to keep the account numbers securely in one place; PrivacyGuard and Credentials, services which provide monitoring of a member's credit history and access to driving records and medical files; Buyers Advantage, a service which extends manufacturer warranties; CompleteHome, a service designed to save members time and money in maintaining and improving their homes; National Home Protection Alliance, a service that provides insurance coverage for breakdowns of household systems and appliances; Great Fun, a program which provides the opportunity to purchase family travel services and other family related products at a discount; and HealthSaver, a program which provides discounts on prescription drugs, eyewear, eye care, dental care, selected health–related services and fitness equipment.

**Trilegiant Transaction.** From July 2001 to January 2004, the operations of our individual membership business, including marketing to prospective new members, were outsourced to Trilegiant Corporation. On January 30, 2004, we terminated Trilegiant's right to market membership programs that we had previously licensed to Trilegiant in July 2001, terminated Trilegiant's right to use the Trilegiant trademark and terminated our outsourcing arrangement whereby Trilegiant provided membership fulfillment services to our members. We are now responsible for providing fulfillment services to our members. In connection with this transaction, we hired substantially all Trilegiant employees, agreed to service Trilegiant's members and made a $13 million cash payment to Trilegiant as consideration for the early termination of the rights referred to above. Trilegiant has now changed its name to TRL Group, Inc. and we have renamed one of our subsidiaries Trilegiant Corporation. In connection with such transaction, we also acquired Trilegiant Loyalty Solutions, Inc., a wholly–owned subsidiary of TRL Group, for approximately $20 million in cash. Trilegiant Loyalty Solutions offers wholesale loyalty enhancement services primarily to credit card issuers who make such services available to their credit card holders to foster increased product usage and loyalty and serves as the administrator of our points database for our TripRewards Loyalty Program. We continue to own preferred stock of TRL Group, which is currently convertible, at any time at our option, into approximately 45% of TRL Group common stock (taken together with the shares of common stock currently held by us). As a result of this transaction, we now have managerial control of TRL Group through our majority representation on the TRL Group Board of Directors.

Upon completion of the Trilegiant Transaction, we began integrating our individual membership and our Progeny loyalty/insurance marketing businesses. The organizational structures of the two businesses have now been realigned to combine departments and eliminate redundant functions. We also reorganized the sales forces to be more closely aligned with the size of our clients and their needs and we have combined our marketing and procurement efforts to take advantage of the larger scale of the combined businesses. We intend to expand our integration efforts to our Cims loyalty marketing business.

**Growth.** Primary growth drivers include expanding our customer base to include a greater number of financial institutions and targeted non–financial partners. In addition, we are expanding the array of our products and services sold through the direct marketing channels to existing clients.

**Competition.** The membership services industry is highly competitive. Competitors include membership services companies, such as Vertrue Incorporated (formerly known as MemberWorks Incorporated), as well as large retailers, travel agencies, insurance companies and financial service institutions, some of which have financial resources, product availability, technological capabilities or customer bases that may be greater than ours.

*Loyalty/Insurance Marketing Business* (3%, 3% and 4% of our revenue for 2004, 2003 and 2002, respectively)

Our loyalty/insurance marketing business provides enhancement packages for financial institutions and marketing for accidental death and dismemberment insurance and certain other insurance products through our Progeny Marketing Innovations Inc. and Cims subsidiaries. With approximately 42.5 million insureds as of December 31, 2004, Progeny offers the following products and services:

**Enhancement Package Service.** We sell enhancement packages for financial institution consumer and business checking and deposit account holders primarily through our Progeny subsidiary. Progeny's financial institution clients select a customized package of our products and services and then usually add their own services (such as unlimited check writing privileges, personalized checks, cashiers' or travelers' checks without issue charge, or discounts on safe deposit box charges or installment loan interest rates). With our marketing and promotional

Table of Contents

assistance, the financial institution then offers the complete package of enhancements to its checking account holders as a special program for a monthly fee. Most of these financial institutions choose a standard enhancement package, which generally includes $10,000 of accidental death and dismemberment insurance and travel discounts. Other enhancements may include our shopping and credit card registration services, a travel newsletter or pharmacy, eyewear or entertainment discounts. The common carrier coverage is underwritten under group insurance policies with two third-party underwriters. We generally charge a financial institution client an initial fee to implement this program and monthly fees thereafter based on the number of customer accounts participating in that financial institution's program.

**AD&D Insurance.** Through our Progeny subsidiary, we serve as an agent and third-party administrator for marketing accidental death and dismemberment insurance throughout the country to the customers of financial institutions. Progeny's insurance products and other services are offered primarily to customers of banks, credit unions, credit card issuers and mortgage companies. These products are primarily marketed through direct mail solicitations and telemarketing which generally offer $1,000 of accidental death and dismemberment insurance at no cost to the customers and the opportunity to choose additional coverage of up to $250,000. The annual premium generally ranges from $10 to $250 and we derive revenue primarily from commissions based on premiums received pursuant to agreements with the insurance carriers that issue the policies we market. Progeny also acts as an administrator for, and markets, term life and hospital accident insurance as well as a number of other insurance products.

**Distribution Channels.** We market our Progeny products to consumers (i) of financial institutions or other associations through direct marketing; (ii) of financial institutions or other associations through a direct sales force, participating merchants or general advertising; and (iii) through companies and various other entities.

**Cims.** Our Cims subsidiary develops customer loyalty solutions and insurance products for the benefit of financial institutions and businesses in other industries. Cims clients include over 85 financial institutions throughout Europe and South Africa. The primary customer loyalty solution offered to Cims clients is the loyalty package. Loyalty packages provide targeted consumers of client organizations with a "package" of benefits and services for the purpose of improving customer retention, attracting consumers to become customers of the client organization and encouraging them to buy additional services. For example, packages include discounted travel services such as discounts on vacation rentals, car rentals, travel insurance, timeshare weeks, cruises, hotels and airlines. As of December 31, 2004, Cims has expanded its membership base to approximately 19.7 million individuals. Cims offers travel and real estate benefits and other services within its loyalty packages for the benefit of consumers. Cims also uses its internal insurance competencies and strategic relationships to provide insurance benefits to consumers. Cims derives fees from its financial institution and other corporate clients for its loyalty packages.

**Growth.** Primary growth drivers for Progeny include expanding our customer base to include a greater number of financial institutions and targeted non-financial partners. In addition, we are expanding the array of insurance products and services sold through the direct marketing channels to existing clients. The primary growth drivers for Cims are (i) to increase the number of consumers, from within our existing client base, who participate in loyalty programs for their particular financial institution, (ii) to increase the number of financial institutions we partner with for their respective loyalty marketing programs, (iii) to develop marketing relationships with clients in other industries (wireless providers for example) and (iv) to offer multiple loyalty solutions to our clients.

**Competition.** Our checking account enhancement packages and services compete with similar services offered by other companies, including insurance companies and other third-party marketers such as Sisk Company, Generations Gold and Econ-O-Check Corporation. In larger financial institutions, we may also compete with a financial institution's internal marketing staff. Competition for the offering of our insurance products through financial institutions is growing and intense. Our competitors include other third-party marketers and large national insurance companies with established reputations that offer products with rates, benefits and compensation similar to ours. Cims represents an outsourcing alternative to marketing departments of large retail organizations. Cims competes with certain other niche loyalty solution providers throughout Europe and internal marketing groups of large financial institutions.

**Table of Contents**

**Long Term Care Insurance.** In June 2003, our Long Term Preferred Care subsidiary discontinued the marketing and sale of long term care insurance policies. We continue to derive revenue from commissions based on premiums received pursuant to agreements with the insurance carriers that issued the policies we sold and LTPC continues to provide customer service and related services to the existing block of insurance policies and policyholders. On December 30, 2004, LTPC sold the majority of its long-term care insurance renewal commissions.

*Marketing Services Trademarks and Other Intellectual Property*

The service mark "Progeny Marketing Innovations" and its associated logo is material to Progeny's business. Progeny actively uses this mark which is registered in the United States Patent and Trademark Office. The individual membership business trademarks and service marks listed above and related logos, together with the "Trilegiant" trademark, are material to our individual membership business. The "Trilegiant" trademark and individual membership business trademarks and logos are registered (or have applications pending for registration) with the United States Patent and Trademark Office. With the exception of "National Home Protection Alliance" which is owned by TRL Group and licensed to us, we own the material marks used in the individual membership business.

*Marketing Services Seasonality*

The businesses that comprise our Marketing Services segment are not seasonal.

*Marketing Services Employees*

The businesses that comprise our Marketing Services segment employed approximately 3,200 people as of December 31, 2004.

## FINANCIAL DATA OF SEGMENTS AND GEOGRAPHIC AREAS

Financial data for our segments and geographic areas are reported in Note 25—Segment Information to our Consolidated Financial Statements included in Item 8 of this Form 10-K.

## REGULATION

**Franchise Regulation.** The sale of franchises is regulated by various state laws, as well as by the Federal Trade Commission (the "FTC"). The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. The FTC has proposed changes to its franchise rule that will affect the sales practices and procedures and the content of disclosure documents used by our franchising subsidiaries for selling franchises in the United States. The content of the final rule and its effective date have not been announced. Although no assurance can be given, proposed changes in the FTC's franchise rule should have no adverse impact on our franchised businesses. A number of states require registration or disclosure in connection with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of the franchisor to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements. While our franchising operations have not been materially adversely affected by such existing regulation, we cannot predict the effect of any future federal or state legislation or regulation. Our franchisors may engage in certain lending transactions common in their respective industries and provide loans to franchisees as part of the sale of the franchise. Such transactions may require the franchisor to register under state laws governing business lenders. We cannot predict the effect of the impact of those laws or any decision not to register under such laws and to cease offering such loans.

**Real Estate Regulation.** The federal Real Estate Settlement Procedures Act ("RESPA") and state real estate brokerage laws restrict payments which real estate and mortgage brokers and other parties may receive or pay in connection with the sales of residences and referral of settlement services (e.g., mortgages, homeowners insurance, title insurance). Such laws may to some extent restrict preferred alliance and other arrangements involving our real estate franchise, real estate brokerage, settlement services and relocation businesses. Our title insurance operations are subject to numerous state laws and regulations. Our settlement services business is subject to various federal and state regulations including those promulgated by state departments of insurance and

departments of corporations. Currently, there are local efforts in certain states, which could limit referral fees to our relocation business.

In addition, with respect to our real estate brokerage, relocation and settlement services businesses, RESPA and similar state laws require timely disclosure of certain relationships or financial interests with providers of real estate settlement services. Our real estate brokerage business is also subject to numerous federal, state and local laws and regulations that contain general standards for and prohibitions on the conduct of real estate brokers and sales associates, including those relating to licensing of brokers and sales associates, fiduciary and agency duties, administration of trust funds, collection of commissions, advertising and consumer disclosures and governing telephone practices under the Do Not Call legislation. Under state law, our real estate brokers have the duty to supervise and are responsible for the conduct of their brokerage business.

**Timeshare Exchange Regulation.** Our timeshare exchange business, which includes RCI exchange programs and other exchange programs operated by our timeshare sales and marketing business, is subject to foreign, federal, state and local laws and regulations including those relating to taxes, consumer credit, environmental protection and labor matters. In addition, we are subject to state statutes in those states regulating timeshare exchange services, and must prepare and file annually certain disclosure guides with regulators in states where required. While our timeshare exchange business is not subject to those state statutes governing the development of timeshare properties and the sale of timeshare interests, such statutes directly affect both our timeshare sales and marketing business as described below and the other members and resorts that participate in the RCI exchange programs and other exchange programs operated by our timeshare sales and marketing business. Therefore, the statutes indirectly impact our timeshare exchange business.

**Timeshare Sales and Marketing Regulation.** Our timeshare sales and marketing business, which includes our resort management business, is subject to extensive regulation by the states and countries in which our resorts are located and in which its vacation ownership interests are marketed and sold. In addition, we are subject to federal legislation, including without limitation, the Federal Trade Commission Act and rules promulgated by the FTC thereunder, including the federal Telemarketing Sales Rule with its Do Not Call provisions; the Fair Housing Act; the Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to borrowers regarding the terms of their loans; the Real Estate Settlement Procedures Act and Regulation X promulgated thereunder which require certain disclosures to borrowers regarding the settlement and servicing of loans; the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination in the extension of credit on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act; the Telemarketing and Fraud and Abuse Prevention Act; the Gramm-Leach-Bliley Act and the Fair Credit Reporting Act, which address privacy of consumer financial information; and the Civil Rights Acts of 1964, 1968 and 1991. In Australia, we are regulated by the Australian Securities and Investments Commission.

Many states have laws and regulations regarding the sale of vacation ownership interests. The laws of most states require a designated state authority to approve a timeshare public report, a detailed offering statement describing the resort operator and all material aspects of the resort and the sale of vacation ownership interests. In addition, the laws of most states in which we sell vacation ownership interests grant the purchaser of such an interest the right to rescind a contract of purchase at any time within a statutory rescission period, which generally ranges from three to ten days. Furthermore, most states have other laws that regulate our timeshare sales and marketing activities, such as real estate licensing laws, travel sales licensing laws, anti-fraud laws, telemarketing laws, telephone solicitation laws including Do Not Call legislation and restrictions on the use of predictive dialers, prize, gift and sweepstakes laws, labor laws and various regulations governing access and use of our resorts by disabled persons.

**Internet Regulation.** Although our business units' operations on the Internet are not currently regulated by any government agency in the United States beyond regulations discussed above and applicable to businesses generally, it is likely that a number of laws and regulations may be adopted governing the Internet. In addition, existing laws may be interpreted to apply to the Internet in ways not currently applied. Regulatory and legal requirements are subject to change and may become more restrictive, making our business units' compliance

Table of Contents

more difficult or expensive or otherwise restricting their ability to conduct their businesses as they are now conducted.

**Vehicle Rental Regulation.** We are subject to federal, state and local laws and regulations including those relating to taxing and licensing of vehicles, franchising, consumer credit, environmental protection and labor matters. The principal environmental regulatory requirements applicable to our vehicle and rental operations relate to the ownership or use of tanks for the storage of petroleum products, such as gasoline, diesel fuel and waste oils; the treatment or discharge of waste waters; and the generation, storage, transportation and off-site treatment or disposal of solid or liquid wastes. We operate 450 Avis and Budget locations at which petroleum products are stored in underground or above ground tanks. We have instituted an environmental compliance program designed to ensure that these tanks are in compliance with applicable technical and operational requirements, including the replacement and upgrade of underground tanks to comply with the December 1998 EPA upgrade mandate and periodic testing and leak monitoring of underground storage tanks. We believe that the locations where we currently operate are in compliance, in all material respects, with such regulatory requirements.

We may also be subject to requirements related to the remediation of, or the liability for remediation of, substances that have been released to the environment at properties owned or operated by us or at properties to which we send substances for treatment or disposal. Such remediation requirements may be imposed without regard to fault and liability for environmental remediation can be substantial.

We may be eligible for reimbursement or payment of remediation costs associated with future releases from regulated underground storage tanks and have established funds to assist in the payment of remediation costs for releases from certain registered underground tanks. Subject to certain deductibles, the availability of funds, compliance status of the tanks and the nature of the release, these tank funds may be available to us for use in remediating future releases from our tank systems.

A traditional revenue source for the vehicle rental industry has been the sale of loss damage waivers, by which rental companies agree to relieve a customer from financial responsibility arising from vehicle damage incurred during the rental period. Approximately 5% of our vehicle operations revenue during 2004 was generated by the sale of loss damage waivers. Approximately 40 states have considered legislation affecting the loss damage waivers. To date, 24 states have enacted legislation which requires disclosure to each customer at the time of rental that damage to the rented vehicle may be covered by the customer's personal automobile insurance and that loss damage waivers may not be necessary. In addition, New York permits the sale of loss damage waivers at a capped rate per day based on the vehicle manufacturer's suggested retail price. Illinois, Nevada and California have similar rules regarding fees for loss damage waivers.

We are also subject to regulation under the insurance statutes, including insurance holding company statutes, of the jurisdictions in which our insurance company subsidiaries are domiciled. These regulations vary from state to state, but generally require insurance holding companies and insurers that are subsidiaries of insurance holding companies to register and file certain reports including information concerning their capital structure, ownership, financial condition and general business operations with the state regulatory authority, and require prior regulatory agency approval of changes in control of an insurer and intercorporate transfers of assets within the holding company structure. Such insurance statutes also require that we obtain limited licenses to sell optional insurance coverage to our customers at the time of rental.

The payment of dividends to us by our insurance company subsidiaries is restricted by government regulations in Colorado, Bermuda and Barbados affecting insurance companies domiciled in those jurisdictions.

**Marketing Regulation.** The products and services offered by our various businesses, including our real estate brokerage, timeshare exchange, timeshare sales and marketing, loyalty/insurance marketing and individual membership businesses, are marketed via a number of distribution channels, including direct mail, telemarketing and online. These channels are regulated on the state and federal levels and we believe that these activities will increasingly be subject to such regulation. Such regulation, including anti-fraud laws, consumer protection laws, privacy laws, telemarketing laws and telephone solicitation laws, may limit our ability to solicit new customers or to offer one or more products or services to existing customers. In addition to direct marketing, our loyalty/

insurance marketing business is subject to various state and local regulations including, as applicable, those of state insurance departments. While we have not been materially adversely affected by existing regulations, we cannot predict the effect of any future foreign, federal, state or local legislation or regulation.

We are also aware of, and are actively monitoring the status of, certain proposed privacy-related state legislation that might be enacted in the future; it is unclear at this point what effect, if any, such state legislation might have on our businesses. A number of our businesses are significant users of email marketing to existing and prospective customers. It is unclear what effect, if any, legislation restricting such marketing practices would have on those businesses. California has enacted legislation requiring enhanced disclosure on Internet web sites regarding consumer privacy and information sharing among affiliated entities. We cannot predict whether these laws will inhibit customer information practices used in marketing our products and services or will be enacted in other states.

Some of our business units use sweepstakes and contests as part of their marketing and promotional programs. These activities are regulated primarily by state laws that require certain disclosures and providing certain assurances that the prizes will be available to the winners.

In Europe, legislation has recently been implemented which regulates the sale of general insurance. In addition, data protection legislation has also been implemented across Europe which restricts the use of personal data and cross-border flows of data outside the European Union. Each European Union country in which we operate must implement these directives through national laws. While we do not believe that the laws and regulations passed to date will have a material impact on our business, additional European or national laws, including subsequent amendments to existing laws, could cause a material adverse impact on our business.

**Global Distribution Services Regulation.** Our GDS business is subject to specific GDS regulations in the European Union ("EU") and Canada. In 2004, the U.S. government allowed its GDS regulations to expire in two stages. An abbreviated set of regulations was in effect from January 21, 2004 through July 31, 2004. After July 31, 2004, all GDS regulations in the United States expired.

In early 2004, the Canadian government published an amended set of regulations that eliminated several GDS regulations and modified several others. For example, the new regulations retain the prohibition against GDS display bias but eliminate the ban on discriminatory pricing. The Canadian government reasoned that changes in the travel industry warranted a more discrete set of regulations.

In Europe, the EU commission continues to examine the ongoing need for GDS regulations. An amended set of rules, if any, is expected to be issued in 2005. In 2002, the EU advised that it was considering the elimination of many rules, including the rules that require GDSs to treat all airlines and travel agents equally not only in terms of services offered but also with regard to fees charged. In addition, the EU has proposed the elimination of many rules relating to subscribers as well as the rule that requires an airline that owns a GDS to treat all GDSs equally.

**Travel Agency Regulation.** The products and services we provide are subject to various federal, state and local regulations. We must comply with laws and regulations relating to our sales and marketing activities, including those prohibiting unfair and deceptive advertising or practices. Our travel service is subject to laws governing the offer and/or sale of travel products and services, including laws requiring us to register as a "seller of travel," to comply with disclosure. In addition, many of our travel suppliers are heavily regulated by the United States and other governments and we are indirectly affected by such regulation.

## EMPLOYEES

As of December 31, 2004, we employed approximately 87,000 people, inclusive of approximately 8,000 people employed by our former mortgage, appraisal, fleet management and Wright Express fuel card businesses. We have approximately 7,300 employees covered under collective bargaining arrangements. Management considers our employee relations to be satisfactory and does not anticipate any material interruptions to operations from labor disputes.

Table of Contents

# INDEX TO FINANCIAL STATEMENTS

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F–2 |
| Consolidated Statements of Income for the years ended December 31, 2004, 2003 and 2002 | F–3 |
| Consolidated Balance Sheets as of December 31, 2004 and 2003 | F–4 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2003 and 2002 | F–5 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2004, 2003 and 2002 | F–7 |
| Notes to Consolidated Financial Statements | F–9 |

**Cendant Corporation and Subsidiaries**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(Unless otherwise noted, all amounts are in millions, except per share amounts)

1. **Basis of Presentation**

   Cendant Corporation is a global provider of a wide range of complementary consumer and business services, focusing primarily on travel and real estate services and operating in the following business segments:

   - **Real Estate Franchise and Operations**—franchises the real estate brokerage businesses of four residential and one commercial brands, provides real estate brokerage services and facilitates employee relocations.
   - **Mortgage Services**—provides home buyers with mortgage lending services and title, appraisal and closing services.
   - **Hospitality Services**—develops and sells vacation ownership interests, provides consumer financing to individuals purchasing these interests, facilitates the exchange of vacation ownership interests, franchises eight lodging brands and markets vacation rental properties.
   - **Travel Distribution Services**—provides global distribution services for the travel industry, corporate and consumer online travel services and travel agency services;
   - **Vehicle Services**—operates and franchises the Company's vehicle rental businesses and provides commercial fleet management and fuel card services.
   - **Marketing Services (formerly, Financial Services)**—provides insurance, membership, loyalty and enhancement products and services to financial institutions and other partners and their customers.

   The accompanying Consolidated Financial Statements include the accounts and transactions of Cendant Corporation and its subsidiaries ("Cendant"), as well as entities in which Cendant directly or indirectly has a controlling financial interest (collectively, the "Company"). For more detailed information regarding the Company's consolidation policy, refer to Note 2—Summary of Significant Accounting Policies. In presenting the Consolidated Financial Statements, management makes estimates and assumptions that affect the amounts reported and related disclosures. Estimates, by their nature, are based on judgment and available information. Accordingly, actual results could differ from those estimates. Certain reclassifications have been made to prior year amounts to conform to the current year presentation.

   *Management and Mortgage Programs.* The Company's Consolidated Financial Statements present separately the financial data of the Company's management and mortgage programs. These programs are distinct from the Company's other activities since the assets are generally funded through the issuance of debt that is collateralized by such assets. Specifically, in the Company's vehicle rental, fleet management, relocation, mortgage services and vacation ownership and rental businesses, assets under management and mortgage programs are funded largely through borrowings under asset–backed funding arrangements and unsecured borrowings at the Company's PHH subsidiary. Such borrowings are classified as debt under management and mortgage programs. The income generated by these assets is used, in part, to repay the principal and interest associated with the debt. Cash inflows and outflows relating to the generation or acquisition of such assets and the principal debt repayment or financing of such assets are classified as activities of the Company's management and mortgage programs. The Company believes it is appropriate to segregate the financial data of its management and mortgage programs because, ultimately, the source of repayment of such debt is the realization of such assets.

   On June 25, 2004, the Company completed an initial public offering ("IPO") for the sale of 100% of its ownership interest in Jackson Hewitt Tax Service Inc. ("Jackson Hewitt") and on May 22, 2002, the Company sold its car parking facility business, National Car Parks ("NCP"). Pursuant to Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal of Long–Lived Assets," the account balances and activities of Jackson Hewitt and NCP have been segregated and reported as a discontinued operation for all periods presented. See Note 3—Discontinued Operations for more detailed information regarding the disposition of these businesses.

F–9

*Employee Stock Purchase Plan*

The Company is also authorized to sell up to 8.5 million shares of its CD common stock to eligible employees under its current non-compensatory employee stock purchase plan ("ESPP"). Under the terms of the ESPP, employees may authorize the Company to withhold up to 10% of their compensation from each paycheck for the purchase of CD common stock. For amounts withheld during 2004 and 2003, the purchase price of the stock was calculated as 95% of the fair market value of CD common stock as of the first day of each month. For amounts withheld during 2002, the purchase price of the stock was calculated as 85% of the lower of the fair market value of CD common stock on the first or the last trade date of each calendar quarter. During 2004, the Company issued approximately 0.5 million shares under the ESPP, bringing the cumulative issuances to approximately 4.1 million shares. As of December 31, 2004, approximately 4.4 million shares were available for issuance under the ESPP.

21. **Two Flags Joint Venture LLC**

In 2002, the Company formed Two Flags Joint Venture LLC ("Two Flags") through the contribution of its domestic Days Inn trademark and related license agreements. The Company did not contribute any other assets to Two Flags. The Company then sold 49.9999% of Two Flags to Marriott in exchange for the contribution to Two Flags of the domestic Ramada trademark and related license agreements. The Company retained a 50.0001% controlling equity interest in Two Flags. Both Marriott and the Company had the right, but were not obligated, to cause the sale of Marriott's interest at any time after March 1, 2004 for approximately $200 million, which represented the projected fair market value of Marriott's interest at such time. On April 1, 2004, the Company exercised its right to purchase Marriott's interest in Two Flags for approximately $200 million. In connection with such transaction, the Company assumed a note payable of approximately $200 million, which was paid in September 2004. As a result, the Company now owns 100% of Two Flags and has exclusive rights to the domestic Ramada and Days Inn trademarks and the related license agreements.

Prior to April 1, 2004, the Company consolidated Two Flags and, as a result, Marriott's equity interest in Two Flags, which approximated $100 million as of December 31, 2003, was recorded as minority interest (within accounts payable and other current liabilities) on the Company's Consolidated Balance Sheet. Pursuant to the terms of the venture, the Company and Marriott shared income from Two Flags on a substantially equal basis. For the period January 1, 2004 through April 1, 2004 (the date on which the Company purchased Marriott's interest) and for the years ended December 31, 2003 and 2002, the Company recorded pre-tax minority interest expense of $6 million, $25 million and $20 million, respectively, in connection with Two Flags.

22. **TRL Group, Inc.**

On January 30, 2004, Trilegiant Corporation changed its legal name to TRL Group, Inc.

From July 2, 2001 to January 30, 2004, TRL Group operated membership-based clubs and programs and other incentive-based loyalty programs through an outsourcing arrangement with Cendant whereby Cendant licensed TRL Group the right to market products to new members utilizing certain assets of Cendant's individual membership business. Accordingly, Cendant collected membership fees from, and was obligated to provide services to, members of its individual membership business that existed as of July 2, 2001, including their renewals, and TRL Group provided fulfillment services for these members in exchange for a servicing fee paid by Cendant. Furthermore, TRL Group collected the membership fees from, and was obligated to provide membership benefits to, any members who joined the membership-based clubs and programs and all other incentive programs subsequent to July 2, 2001 and recognized the related revenue and expenses. Accordingly, similar to Cendant's franchise businesses, Cendant received a royalty from TRL Group on all revenue generated by TRL Group's new members (those who joined TRL's clubs as a result of TRL Group's marketing efforts occurring between July 2001 and January 2004). The assets licensed to TRL Group included various tradenames, trademarks, logos, service marks and other intellectual property relating to its membership business.

F-59

**Table of Contents**

During 2003, Cendant performed a strategic review of the TRL Group membership business, Cendant's existing membership business and Cendant's loyalty/insurance marketing business, which provides enhancement packages for financial institutions and marketing for accidental death and dismemberment insurance and certain other insurance products. Upon completion of such review, Cendant concluded that it could achieve certain revenue and expense synergies by combining its loyalty/insurance marketing business with the new-member marketing performed by TRL Group. Additionally, as a result of the adoption of FIN 46, the Company had been consolidating the results of TRL Group since July 1, 2003 even though it did not have managerial control of the entity. Therefore, in an effort to achieve the revenue and expense synergies identified in Cendant's strategic review and to obtain managerial control over an entity whose results were being consolidated, Cendant and TRL Group agreed to amend their contractual relationship by terminating the contractual rights, intellectual property license and third party administrator arrangements that Cendant had previously entered into with TRL Group in 2001.

In connection with this new relationship, Cendant (i) terminated leases of Cendant assets by TRL Group, (ii) terminated the original third party administration agreement, (iii) entered into a new third party administration agreement whereby Cendant performs fulfillment services for TRL Group, (iv) leased certain TRL Group fixed assets from TRL Group, (v) offered employment to substantially all of TRL Group's employees and (vi) entered into other incidental agreements. These contracts were negotiated on an arm's-length basis and have terms that Cendant's management believes are reasonable from an economic standpoint and consistent with what management would expect from similar arrangements with non-affiliated parties. None of these agreements had an impact on the Company's Consolidated Financial Statements as the Company continues to consolidate TRL Group subsequent to this transaction. In connection with the transaction, the parties agreed to liquidate and dissolve TRL Group in an orderly fashion when and if the number of TRL Group members decreases below 1.3 million, provided that such dissolution may not occur prior to January 2007. Cendant paid $13 million in cash on January 30, 2004 for the contract termination, regained exclusive access to the various tradenames, trademarks, logos, service marks and other intellectual property that it had previously licensed to TRL Group for its use in marketing to new members and now has managerial control of TRL Group through its majority representation on the TRL Group board of directors. TRL Group continues to service and collect membership fees from its members to whom it marketed through January 29, 2004, including their renewals. Cendant provides fulfillment services (including collecting cash, paying commissions, processing refunds, providing membership services and benefits and maintaining specified service level standards) for TRL Group's members in exchange for a servicing fee. TRL Group no longer has the ability to market to new members; rather, Cendant now markets to new members under the Trilegiant tradename. Immediately following consummation of this transaction, Cendant owned approximately 43% of TRL Group on a fully diluted basis and as of December 31, 2004, Cendant's equity ownership interest in TRL Group approximated 45% on a fully diluted basis.

On January 30, 2004, TRL Group had net deferred tax assets of approximately $121 million, which were mainly comprised of net operating loss carryforwards expiring in years 2021, 2022 and 2023. These deferred tax assets were fully reserved for by TRL Group through a valuation allowance, as TRL Group had not been able to demonstrate future profitability due to the large marketing expenditures it incurred (new member marketing has historically been TRL Group's single largest expenditure). However, given the fact that TRL Group would no longer incur marketing expenses (as they no longer have the ability to market to new members as a result of this transaction), TRL Group determined that it was more likely than not that it would generate sufficient taxable income (as it would continue to recognize revenue from TRL Group's existing membership base in the form of renewals and the lapsing of the refund privilege period) to utilize its net operating loss carryforwards within the statutory periods. Accordingly, TRL Group reversed the entire valuation allowance of $121 million in January 2004, which resulted in a reduction to the Company's consolidated tax provision during 2004 of $121 million, with a corresponding increase in consolidated net income. The $13 million cash payment the Company made to TRL Group was also recorded by the Company as a component of its provision for income taxes line item on the Consolidated Statement of Income for 2004 and partially offsets the $121 million reversal of TRL Group's valuation allowance.

During 2004, TRL Group contributed revenues of $468 million and expenses of $279 million (on a stand-alone basis before eliminations of intercompany entries in consolidation). Reflected within such amounts is $34 million of revenue recorded during third quarter 2004 relating to the early termination of a contractual relationship with a third party marketing partner, originally expected to extend beyond 2005. TRL Group had provided services for this marketing partner in 2002 in exchange for royalties related to the success of the marketing program. TRL Group and the marketing partner disputed certain aspects of the marketing agreement and a settlement was reached in September 2004 that provided for early termination of the agreement.

For the period July 1, 2003 through December 31, 2003 (post consolidation), TRL Group contributed revenues and expenses of $241 million and $256 million, respectively (on a stand-alone basis before eliminations of intercompany entries in consolidation). The consolidation of TRL Group resulted in a non-cash charge of $293 million ($0.27 per diluted share) recorded on July 1, 2003 as a cumulative effect of accounting change. The results for 2003 further reflect revenues and expenses recorded by the Company for the period January 1, 2003 through June 30, 2003 (prior to the consolidation of TRL Group) in connection with the outsourcing arrangement. The Company recorded revenues of $33 million (representing royalties, licensing and leasing fees and travel agency fees) and net expenses of $76 million (relating to fulfillment services and the amortization of the marketing advance made in 2001) for such period.

Cendant's maximum exposure to loss as of December 31, 2004 as a result of its involvement with TRL Group was substantially limited to the advances and loans made to TRL Group, as well as any receivables due from TRL Group (collectively aggregating $33 million as of December 31, 2004), as such amounts may not be recoverable if TRL Group were to cease operations. The creditors of TRL Group have no recourse to Cendant's credit and the assets of TRL Group are not available to pay Cendant's obligations. Cendant is not obligated or contingently liable for any debt incurred by TRL Group.

23. **Employee Benefit Plans**

*Defined Contribution Savings Plans*
The Company sponsors several defined contribution savings plans that provide certain eligible employees of the Company an opportunity to accumulate funds for retirement. The Company matches the contributions of participating employees on the basis specified by the plans. The Company's cost for contributions to these plans was $80 million, $71 million and $62 million during 2004, 2003 and 2002, respectively.

*Defined Benefit Pension Plans*
The Company sponsors domestic non-contributory defined benefit pension plans, which cover certain eligible employees. The majority of the employees participating in these plans are no longer accruing benefits. Additionally, the Company sponsors contributory defined benefit pension plans in certain foreign subsidiaries with participation in the plans at the employees' option. Under both the domestic and foreign plans, benefits are based on an employee's years of credited service and a percentage of final average compensation or as otherwise described by the plan. As of December 31, 2004 and 2003, the aggregate projected benefit obligation of these plans was $549 million and $499 million, respectively, and the aggregate fair value of the plans' assets was $383 million and $337 million, respectively. Accordingly, the plans were underfunded by $166 million and $162 million as of December 31, 2004 and 2003, respectively, primarily due to the downturn in the financial markets and a decline in interest rates. However, the net pension liability recorded by the Company (primarily as a component of other non-current liabilities) as of December 31, 2004 and 2003 approximated $160 million and $159 million, respectively, of which approximately $112 million and $94 million, as of December 31, 2004 and 2003, respectively, represents additional minimum pension liability recorded as a charge to other comprehensive income. The Company's policy is to contribute amounts sufficient to meet minimum funding requirements as set forth in employee benefit and tax laws plus such additional amounts the Company determines to be appropriate. During 2004, 2003 and 2002, the Company recorded pension expense of $9 million, $16 million and $9 million, respectively.

*Other Employee Benefit Plans*
The Company also maintains health and welfare plans for certain domestic subsidiaries. As of December 31, 2004 and 2003, the related projected benefit obligation, which was fully accrued for on the Company's

F-61

Exhibit A
Page 40