Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
**(Cite as: 1998 WL 699024 (N.D.Ill.))**

Page 3

continuation of a prior Johnson Products patent, U.S. Patent No. 5,060, 860 (" '860 patent"), which also related to hair relaxers. The '822 patent was directed to texturing and strengthening compositions for use in hair before or after using a relaxer like sodium hydroxide or calcium hydroxide. ('822 patent, col. 6, lns. 4-15.) The patent contains two independent claims: claims 1 and 12. Claim 1 reads:
> An aqueous hair texturing and strengthening composition for application to hair about to undergo a highly alkaline hair straightening procedure comprising an aqueous nonacidic cosmetic vehicle having dispersed therein about 0.1 to about 8 weight percent on a total composition weight basis of at least one water-dispersible quaternary nitrogen-containing compound having at least one alkyl group directly or indirectly bonded to a quaternary nitrogen group, each said alkyl group containing about 3 to about 22 carbon atoms, each said compound being selected from the group consisting of (a) non-proteinaceous, non-polymeric quaternary nitrogen containing compounds which are in the salt form and which contain said alkyl group and (b) hydrolyzed proteins which are in the salt form wherein at least one amino group therein is quaternized to include said alkyl group, each said compound being characterized by having a positive charge and being stable when in an aqueous medium at a pH of at least about 6.1.

*4 Claim 12 reads:

A method for straightening hair comprising the steps of:
> (a) first applying to the hair a composition of claim 1;
> (b) then applying to the resulting hair a highly alkaline hair straightener for a time sufficient to at least partially straighten said hair;
> (c) rinsing substantially all of said straightener from said so straightened hair; and
> (d) washing said so rinsed hair with a neutralizing shampoo having a neutral to acidic pH.

The '822 patent was granted on September 22, 1992. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 11.)

C. Pro-Line's Hair Relaxer Kits

In 1984 or 1985, Defendant Pro-Line developed its original "Soft & Beautiful" hair relaxer kit, which is aimed at African-American women consumers. (Pro-Line 12(M) of '572 Non-Infringement ¶ 8.) Pro-Line also sells a hair relaxer kit called "Just for Me," which is targeted at children. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 11.)

As part of an effort to respond to competition in the marketplace, Pro-Line, acting through its CEO and founder, Comer Cottrell, hired Tehsel Dhaliwal to head its research and development department in November 1992. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 12.) Dhaliwal had been working in the African-American hair care industry for approximately twenty-six years, fifteen of those years as an employee of Johnson Products. (Pro-Line's 12(M) of '572 Non-Infringement ¶ 10; Dhaliwal resume, Ex. 7 to Appendix to Johnson Products' Brief in Response to Pro-Line's Motions for Summary Judgment (hereinafter "Johnson Products' Response").) While at Johnson Products, he became familiar with the chemical formulations in the '572 patent. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 13; Dhaliwal Dep., at 124, Ex. 6 to Johnson Products' Response.)

At Pro-Line, Dhaliwal's work was directed at changing the process, improving the performance, and reformulating the "Just for Me" products. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 12.) Dhaliwal succeeded in developing new formulas; by April 1993, five months after beginning work at Pro-Line, Dhaliwal signed off on final formulas for the new relaxer cremes and the pre-relaxer treatment for "Soft & Beautiful" and "Just for Me." (Id. ¶ 17; Dhaliwal Dep. at 62-63.) Significantly, Pro-Line has little documentation concerning its development of the new formulas. (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 16.) In fact, Karen O'Neal, current head of Research & Development at Pro-Line, testified that she did not know how Dhaliwal came up with the formulas. (O'Neal Dep., at 152-53, Ex. 12 to Johnson Products' Response.)

After the reformulations, Pro-Line renamed the "Soft & Beautiful" product "New Advanced System Soft & Beautiful." (Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 18.) The name of "Just for Me" remained the same. (Id.) Each kit included:
> *5 (1) Pre-Relaxer Treatment, designed to "prevent overprocessing, repair split ends and strengthen damaged hair";
> (2) No-Lye Conditioning Relaxer Creme, designed to strengthen hair;
> (3) Liquid Activator, designed to generate or produce the straightening agent in the Relaxer Creme;
> (4) Neutralizing & Decalcifying Shampoo, designed to "clean and condition" the hair;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 16

Not Reported in F.Supp.2d     Page 4
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
**(Cite as: 1998 WL 699024 (N.D.Ill.))**

(5) Leave-In Conditioner, designed to "improve the overall health of the hair with conditioners that contain vitamins A & E";
(6) Hair Moisturizing Complex, designed to "remove excess residue resulting in cleaner, healthier softer hair."
(*Id.;* "Soft & Beautiful" Label, Ex. 13 to Johnson Products' Response; "Just for Me" Label, Ex. 14 to Johnson Products' Response.) The two products in the hair relaxer kits most relevant to Johnson Products' charges of patent infringement are the Pre-Relaxer Treatment and the Relaxer Creme.

Dhaliwal's reformulations of "Soft & Beautiful" and "Just for Me" entailed adding Polyquaternium-39, a quaternary polymer, to the non-alkaline pretreatment components of the hair relaxer kits. (Pro-Line's 12(M) of '572 Non-Infringement ¶ 18.) Dhaliwal also added Polyquaternium-39 with nonoxynol-10-carboxylic acid to the calcium hydroxide relaxer composition of the "Soft & Beautiful" product and Polyquaternium-39 or Polyquaterium-22 with nonoxynol-10- carboxylic acid to the calcium hydroxide relaxer component of the "Just for Me" product. (*Id.*) He found the resulting product prevented the dull appearance normally left on relaxed hair when using the mild relaxer used in Pro-Line's relaxer, calcium hydroxide. (*Id.*)

The instructions provided in the "Soft & Beautiful" hair relaxer kit [FN3] outline the use of the different products in the following way:

> FN3. The instructions for the "Just for Me" kit are on cassette tape and have not been submitted by the parties as part of the record. The court assumes that the same instructions apply for the two kits.

first, the consumer should apply the Pre-Relaxer Treatment over the hair; second, apply the mixture of No-Lye Relaxer Creme and the Liquid Activator to the hair and comb; third, smooth the hair with the back of the comb; fourth, rinse the hair with water; fifth, apply the Neutralizing and Decalcifying Shampoo to the hair and rinse; sixth, apply the Hair Moisturizing Complex to the hair and scalp, leave on 4-5 minutes, then rinse; and seventh, spray on the leave-in conditioner.
(Johnson Products' 12(N)(3)(b) of '572 Non-Infringement ¶ 21.)

Pro-Line started manufacturing and selling its "New Advanced System Soft & Beautiful" and "Just for Me" kits in November 1993. (*Id.* ¶ 23.) In February 1994, Thomas Polke, Chief Financial Officer of Johnson Products, called Comer Cottrell and warned him that, in Johnson Products' view, Pro-Line's products infringed the '572 and '822 patents. (*Id.*) Unable to resolve the dispute informally, Johnson Products filed this suit on June 8, 1994.

*DISCUSSION*
A. Claim Construction

Before addressing the summary judgment motions, the court turns to the scope of the claims in the two patents. Claim construction is a pivotal element in analysis of patent cases because "to decide what the claims mean is nearly always to decide the case." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 989 (Fed.Cir.1995) (en banc) (Mayer, J., concurring), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

*6 A patent is a grant of rights that permits the patentee to exclude others from making, using, or selling the invention as claimed. 35 U.S.C. § 154. Accordingly, a patent must describe the exact scope of an invention to define the limits of the patentee's rights and "apprise the public of what is still open to them." *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (quoting *McClain v. Ortmayer,* 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800 (1891)). A patent is composed of two distinct elements. The first contains a specification, describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." 35 U.S.C. § 112. The second consists of "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Id.*

In *Markman,* the Supreme Court held that the proper construction or interpretation of an asserted claim is strictly a question of law for the court. 517 U.S. at 372. A patent covers the invention that the court decides that it describes and claims. *Id.* In determining the proper construction of a claim, the court may consult both intrinsic and extrinsic evidence. *Vitronic Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The proper starting point is always the "words or claims themselves, both asserted and unasserted, to define the scope of the patented invention." *Id.* at 1582. The court may consider extrinsic evidence when the intrinsic evidence fails to "unambiguously describe the scope of the patented invention." *Id.* at 1584. In any case, the court must construe the words in a claim "as one

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 17

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)  
(Cite as: 1998 WL 699024 (N.D.Ill.))

Page 5

of skill in the art at the time of invention would understand them." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1555 (Fed.Cir.1997).

Accordingly, before considering the parties' arguments concerning non-infringement and invalidity of the two patents, the court must first decide disputes concerning the legal construction of the language of the claims in these patents. To do so, the court heard evidence in a *Markman* hearing on March 17 and 18, 1998, discussed below. The parties have identified three disputed issues with respect to the '572 patent and two disputes with respect to the '822 patent.

'572 Patent

1. Does "hair conditioning composition" refer to any part of the hair relaxer system that conditions the hair, or does it refer only to a separately bottled conditioner?

2. Would a chemist of ordinary skill in the art in 1977 have understood "recurring units of the formula" to be a graphic depiction of polymerized dimethyldiallyl ammonium chloride (DMDAAC)?

3. Does the ordinary meaning of "quaternary polymer" apply, or should the specification be read into the claim?

'822 Patent

1. Is the meaning of "being stable when in an aqueous medium at a pH of at least about 6.1" limited by the prosecution history of the '860 patent?

*7 2. Is the patent limited to compositions that simultaneously texturize and strengthen alkaline relaxed hair at a pH of 8 to 11, or does it also cover compositions outside that pH range?

1. '572 Patent

a. "Hair Conditioning Composition"

Claim 1 of the '572 patent covers a "hair conditioning composition for use under highly alkaline conditions comprising an aqueous dispersion." The parties first dispute whether "hair conditioning composition" refers only to a separately bottled conditioner, as argued by Pro-Line, or any part of the hair relaxer system, as asserted by Johnson Products.

According to the specification of the '572 patent, it is designed to cover hair conditioning compositions "premixed with the relaxer and applied at the same time" and also those applied "prior to the application of the relaxer" and "after application of the relaxer to the hair." In other words, the plain language of the patent itself provides for the formula to be used during any conditioning process of the hair relaxer system. Plaintiff's expert, Dr. Wolfram, testified that one of ordinary skill in the art would "definitely not be inclined to accept" that the hair conditioning composition is "limited to those situations only where there's a preconditioner rather than when [it is] mixed in with a relaxer." (Transcript of March 17-18, 1998 hearing (hereinafter "Tr."), at 22-23). He continued that the examples in the '572 patent would indicate to one of ordinary skill in the art that "the hair conditioning composition can be used in any step of the relaxation process." (*Id.* at 24.) Dr. Lochhead, Pro-Line's expert, did not present any contrary testimony.

Based on this intrinsic and extrinsic evidence, the court concludes that the expression "hair conditioning composition" in claim 1 of the '572 patent refers to any part of the relaxer kit that conditions hair and is not limited to a separate conditioner.

b. "Recurring Units of the Formula"

Claim 1 of the '572 patent also covers "from about 0.05 to about 20 weight percent of a quaternary polymer having recurring units of the formula." The parties dispute what this formula meant to a chemist of ordinary skill in the art at the time of the invention in 1977. The claims in the 1977 patent clearly depict polymerized dimethyldiallyl ammonium chloride (DMDAAC) as a chemical compound featuring a six-member carbon ring. Current understanding of the structure of the DMDAAC molecule is that it is actually a five-member ring. [FN4]

> FN4. Comparison of the graphic depositions readily demonstrates that the basic chemical composition of DMDAAC is the same regardless of whether it is viewed as a six-member or five-member ring. As recognized by the court, the number of molecules in both depictions is exactly the same; only the graphic portrayal of the molecular structure changes. In essence, the difference is one of form rather than substance. *See* figure below:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C  
Page 18

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
(Cite as: 1998 WL 699024 (N.D.Ill.))

Page 6

This revised understanding of the structure of the DMDAAC molecule makes no difference to the patent claim, however, according to Johnson Products. Johnson Products argues that a chemist in 1977 would have understood the formula to be a graphic depiction of DMDAAC. (Johnson Products' Post-*Markman* Hearing Brief (hereinafter "Johnson Products' *Markman* Brief"), at 3). Conversely, Pro-Line maintains that the court should read these claims with the requirement of a six-member ring, as found in the '572 patent. (Pro-Line's Post-*Markman* Hearing Brief (hereinafter "Pro-Line's *Markman* Brief"), at 3.) If the patent requires a six-member ring, Pro-Line argues that: (1) the '572 patent would be invalid because DMDAAC with a six-member ring does not exist and (2) Pro-Line's products could not infringe the '572 patent because no such chemical composition exists. (Pro-Line's '572 Invalidity Motion, at 4; Pro-Line's '572 Non-Infringement Motion, at 3.)

*8 Johnson Products points out that the specification itself explicitly identifies polymerized DMDAAC as the preferred quaternary polymer to be used in the conditioning relaxer composition. [FN5] Further, the other claims of the patent demonstrate that the formula in claim 1 was meant to cover a polymerized DMDAAC. For instance, claim 5 refers to "the hair conditioner composition of claim 2 [which is dependent on claim 1] wherein said quaternary polymer is polydiallyldimethylammonium chloride." Claim 5 thus contemplates that the quaternary polymer was a homopolymer made up solely of polymerized DMDAAC units.

> FN5. The claim repeatedly lists DMDAAC in the specification. For example, it states that the "preferred quaternary polymers have recurring units of diallyldimethylammonium salts" (DMDAAC) and that the "preferred polymer is a polydimethyldiallylammonium salt, such as chloride" (DMDAAC). ('572 patent 1, col. 3, lns. 30-34.) Additionally, examples of a conditioning composition in the specification of the patent list either the DMDAAC homopolymer or the DMDAAC acrylamide copolymer as the quaternary polymers that are part of the hair conditioning composition. ('572 patent, example I, col. 4, line 20; example III, col. 4, line 52; example IV, col. 4, lns. 68-69.)

Johnson Products presented substantial extrinsic evidence that a chemist of ordinary skill in the art in 1977 would have understood the formula in claim 1 of the patent as depicting polymerized DMDAAC. First, its expert witness, Dr. Wolfram, testified that "[t]here was no doubt in anybody's mind that it was DMDAAC." (Tr. at 60.) Dr. Lochhead offered no contrary evidence. [FN6]

> FN6. The court sustained Johnson Product's objection to Dr. Lochhead's testimony on this issue at the hearing because of his earlier deposition testimony that he had no opinion on the views of one of ordinary skill in the art in 1977 with respect to the meaning of the formula in claim 1.

In addition, the vast majority of sources available to a chemist of ordinary skill in the art in 1977 portray polymerized DMDAAC as containing a six-member ring similar to the one in claim 1. The most important source was the CTFA Cosmetic Ingredient Dictionary. [FN7] The second edition of the CTFA Dictionary was published in 1977 and also represented the chemical containing polymerized DMDAAC as having a six-member ring. (*Id.* at 52-53.) It was not until 1991 that the CTFA Dictionary showed DMDAAC as having a five-member ring. (*Id.* at 309-10.) Besides the CTFA Dictionary, numerous other articles and patents referred to polymerized DMDAAC as having a six-member ring. [FN8]

> FN7. The significance of the CTFA Dictionary was noted by James Akerson, chairman of the Nomenclature Committee of the CTFA for 20 years, who called the dictionary the "primary document used by the entire cosmetic industry not only in this country, but now around the world as a source of information for cosmetic ingredients." (Tr. at 292.) According to Akerson, the CTFA Dictionary is the first and most important source for chemists in the cosmetic and hair industry when looking for information about the structure of chemicals such as DMDAAC. (*Id.* at 304-05.) Similarly, Dr. Wolfram called the CTFA Dictionary the "bible of the formulating chemist in the cosmetic field." (*Id.* at 14.)

> FN8. For example, two chemists with Calgon, the manufacturer of DMDAAC, both portrayed DMDAAC with a six-member ring. (Johnson Products' *Markman* Brief, at 6.) One of the chemists was the first to synthesize the DMDAAC polymer. (*Id.*)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 19

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
**(Cite as: 1998 WL 699024 (N.D.Ill.))**

Also, the first person to use DMDAAC in hair conditioning referred to DMDAAC as having a six-member ring in all three of his patents in 1975, 1976, and 1977. (*Id.*)

Pro-Line urges the court to construe the claims as a matter of law to require a six-member ring, thereby finding that the '572 patent does not refer to DMDAAC, which actually has a five-member ring. The only evidence in support of such a construction was a 1976 publication by J.E. Lancaster that stated that ' 'poly(diallyldimethylammonium) chloride consists predominantly, if not exclusively, of five-membered rings." (J.E. LANCASTER, ET AL., POLYMER LETTERS 549 (1976).) Because the Lancaster article was available in 1977 when the application for the patent was filed, Pro-Line argues that the claim should not be read to refer to DMDAAC because Johnson Products chose to depict DMDAAC with a six-member ring.

Pro-Line's argument is unpersuasive for three reasons. First, Lancaster's view, though now commonly accepted, was apparently neither well-known nor well-accepted in 1977. (Tr. at 110.) His article was published in a technical journal not typically read by chemists in the cosmetics industry. (*Id.* at 109.) Indeed, a number of post-1977 patents for cosmetic products continued to represent polymerized DMDAAC as containing a six-member ring. (*See, e.g.,* U.S. Patent No. 4,213,960 to Grollier from the L'Oreal cosmetics company, issued in 1980; U.S. Patent No. 4,369,037 to Matsunaga from Kao Soap, a Japanese cosmetic company, issued in 1983.)

*9 In addition, accepting Pro-Line's position would mean that the formula in claim 1 of the '572 patent has no meaning at all merely because scientists later discovered that polymerized DMDAAC has a five-member rather than six-member ring. As Johnson Products notes, Pro-Line's interpretation would require that an entire patent be rendered meaningless whenever the graphic depiction of the structure of one of the chemical ingredients in a patent changed even though the patented composition did not change at all. (Johnson Products' *Markman* Brief, at 6.) Requiring inventors to be able to predict future discoveries in order to ensure a valid patent would be both unreasonable and illogical. Such an interpretation also conflicts with proper claim construction, which prohibits imposing a "post-filing date development" of a different understanding of the meaning of terms. *See W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1556-57 (Fed.Cir.1983).

Finally, the evidence supports the conclusion that a chemist of ordinary skill in the hair care industry in 1977 would have recognized that the formula in claim 1 of the '572 patent was polymerized DMDAAC, whether it was depicted with a six-member or five-member ring. Even if a chemist understood DMDAAC to have a five-member ring at that time, that chemist would look at the formula and almost certainly know what was being referred to in the formula. (Johnson Products' *Markman* Brief, at 6.)

In sum, the weight of the intrinsic and extrinsic evidence supports the finding that a chemist in 1977 would have understood the formula in claim 1 to be a graphic depiction of polymerized dimethyldiallyl ammonium chloride or DMDAAC.

c. "Quaternary Polymer"

A third dispute between the parties concerns the meaning of "quaternary polymer" as used in the '572 patent. Johnson Products argues for the ordinary meaning of the phrase and urges that the specification not be read into the claim. (Johnson Products *Markman* Brief, at 8.) In the alternative, Johnson Products claims that even if the specification could be read into the claim, "quaternary polymer" would still refer to chemicals such as Polyquaternium-22 and Polyquaternium-39. (*Id.*) On the other hand, Pro-Line asserts that the specification limits the definition of "quaternary polymer" such that the claims refer only to Polyquaternium-6 and Polyquaternium-7. (Pro-Line's *Markman* Brief, at 7.) Then, according to Pro-Line, its products, which contain Polyquaternium-22 and Polyquaternium-39, would not infringe the '572 patent. (Pro-Line's '572 Non-Infringement Motion, at 18.)

In construing claims, words are given their ordinary meaning unless a specific limitation is given in the specification. *See Transmatic, Inc. v. Fulton Indus., Inc.,* 53 F.3d 1270, 1277 (Fed.Cir.1995). This court simply finds no evidence of a limitation in the specification of the '572 patent. [FN9]

> FN9. The specification of the '572 patent states:
> The quaternary polymer can be either a homopolymer wherein all of the groups are substantially as shown above, or a copolymer wherein at least about 50% of the recurring groups are of the structure shown above. The remaining groups are moieties of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 20

> vinyl monomers such as acrylamide. The preferred quaternary polymers have recurring units of diallyldimethylammonium salts.
>
> ('572 patent, col. 3, lns. 25-31.) The language that a quaternary polymer "can be either a homopolymer ... or a copolymer" does not appear to be a limitation. This seems especially likely in light of other instances in the patent where the inventors provided a definition for the term when it differed from its ordinary meaning.

Pro-Line offered the testimony of Dr. Du Hsuing, the patent's co-inventor, in which Dr. Hsuing stated that Polyquaternium-6 and Polyquaternium-7 would work in the invention. (Confidential Letter of Dr. Hsuing, Tab 9 to Pro-Line's *Markman* Exhibit 32.) Based on that testimony, Pro-Line claims that the inventor did not consider conditioners other than Polyquaternium-6 and Polyquaternium-7 as part of the invention. (Pro-Line's *Markman* Brief, at 7.) Dr. Hsuing's testimony, however, need not be interpreted as urged by Pro-Line. Dr. Hsuing did not testify that other conditioners were not covered by the patent; he only stated that Polyquaternium-6 and Polyquaternium-7 were both covered by the patent.

*10 Additionally, the claims of a patent are not "limited by preferred embodiments." *CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146, 1158 (Fed.Cir.1997), cert. denied, 522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998). Moreover, "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed.Cir.1983). As such, the '572 patent is not necessarily limited to the particular quaternary polymers listed in the examples section of the patent.

In the alternative, Johnson Products argues that even if the specification is read into the claim, "quaternary polymer" would include chemicals such as Polyquaternium-22 and Polyquaternium-39 on the grounds that: (1) "copolymer" means a polymer with two or more monomers and (2) the measurement of "50% of the recurring groups" is based on weight.

Johnson Products presented substantial evidence that "copolymer" is commonly understood by chemists to mean two or more monomers. [FN10] Conversely, Pro-Line has not supported its position that "copolymer" is limited to just two monomers. Indeed, Pro-Line's own expert, Dr. Lochhead, testified consistently with Johnson Products' claim that "copolymer" means two or more monomers. (Tr. at 280.) The court concludes that the word "copolymer" refers to a polymer containing two or more monomers and that "quaternary polymer" does include chemicals like Polyquaternium-22 and Polyquaternium-39.

> FN10. Both Dr. Wolfram and Dr. Lochhead testified that this was the case. (Tr. at 131-33, 280.) Additionally, various reference materials affirmed Johnson Products' view, including the COMPENDIUM OF MACROMOLECULAR NOMENCLATURE ("copolymer" defined as a "polymer derived from more than one species of monomer" which includes "terpolymers," which are polymers derived from "three species of monomer"), the ENCYCLOPEDIA OF CHEMICAL TECHNOLOGY ("there are myriad ways in which two or more monomers can be bonded to form copolymers"), and STILLE, INTRODUCTION TO POLYMER CHEMISTRY (1962) ("polymers containing two or more structural units ... are copolymers").

Also at issue in the determination of whether the '572 patent covers Polyquaternium-22 and Polyquaternium-39 is the meaning of the phrase "a copolymer [with] ... at least about 50% of the recurring groups [ ] of the structure shown above." Johnson Products claims that the measurement of "50% of the recurring groups" is based on weight, while Pro-Line contends that it is based on mole fraction. (Johnson Products' *Markman* Brief, at 12.) Johnson Products argues that the specification must refer to "50% of the recurring groups" as based on weight and not mole fraction because otherwise, the example in the patent that describes a copolymer would not be included in the claim language. [FN11] This would be inconsistent with proper interpretation of claim language, which rarely finds correct an interpretation in which the preferred embodiment would not fall within the scope of the claim. *See Vitronics*, 90 F.3d at 1583. Pro-Line has failed to produce any counter evidence.

> FN11. Example IV of the specification includes ' 'diallyldimethylammonium chlorideacrylamide copolymer" as an ingredient in the "conditioning hair relaxer." ('572 patent, col. 4, lns. 55-69.) The only copolymer available at that time with those

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 21