*18 Contributory infringement is a broad equitable doctrine that developed to deal with circumstances in which an alleged infringer sold a component that was not itself technically covered by the claims of a product or process patent, but had no other use except with the claimed product or process. *Hewlett-Packard,* 909 F.2d at 1469. The doctrine was intended to prevent sellers from escaping liability for direct infringement by selling all but one element of the infringing product. *Proctor & Gamble,* 604 F.Supp. at 1489. Contributory infringement thus covers activities that do not constitute direct infringement, but intentionally contribute to direct infringement. *Id.* (citation omitted).

*Procter & Gamble,* for example, involved a patent for a method of manufacturing ready-to-serve cookies that remain crispy on the outside and chewy on the inside for an extended shelf life. *Id.* at 1486. The plaintiff alleged that the defendant-manufacturer, knowing that issuance of a patent to plaintiff was imminent, flooded the market with infringing products before the patent issued. *Id.* Thousands of retailers thus directly infringed the patent, but the court found that action against the retailers was an impractical remedy. *Id.* Because defendant's conduct posed the "same risk of harm to the patentee as the cases applying the common law doctrine of contributory infringement," *id.,* the court recognized an equitable claim for contributory infringement.

Pro-Line contends that there can be no contributory infringement because there is no direct infringement; Pro-Line then repeats the same arguments it made with respect to the direct infringement claim, urging that Pro-Line's hair conditioners in its hair relaxer kits do not contain the necessary elements recited in Johnson Products' claims. (Pro-Line's Motion of '572 Non-Infringement, at 19-20.) As discussed above, however, this court recognizes genuine issues of material fact precluding summary judgment of Johnson Products' claim of direct, literal infringement of claim 1 of the '572 patent. Assuming, as Johnson Products maintains, that the direct infringement at issue here is by the customers, who use the patented invention on their hair by mixing the Pre-Relaxer Treatment with the Creme Relaxer (Johnson Products' Response, at 30, n. 11), Pro-Line is not entitled to summary judgment on the contributory infringement claim.

Nor is the court persuaded by Pro-Line's argument that its products are staples of commerce with substantial noninfringing uses. In particular, Pro-Line claims that Polyquaternium-39, which is used in the conditioner and straightener of the "Soft & Beautiful" product, and Merquat-295, [FN16] which is found in the conditioner and straightener of the "Just for Me" product, have substantial noninfringing uses. (Pro-Line's '572 Non-Infringement Motion, at 20-21.)

> FN16. Merquat-295 is the quaternary polymer chemical found in the straightener of the "Just for Me" products. (Pro-Line's 12(M) of '572 Non-Infringement ¶ 61.)

Pro-Line, however, misconstrues the "staples of commerce" defense by failing to consider the whole device. *See Universal Electronics,* 846 F.Supp. at 651. In *Universal Electronics,* the court considered whether the "staples of commerce" defense should apply for alleged patent infringement by the defendant's remote control transmitter. *Id.* Indicating that the proper focus in the inquiry is on the "entire device," the court looked at the entire remote control unit rather than just the transmitter at issue. *Id.* Similarly, the appropriate inquiry here is whether the conditioner and straightener in the "Soft & Beautiful" and "Just for Me" products are "staples of commerce" rather than whether Polyquaternium-39 and Merquat-295 are staples of commerce. It is irrelevant that the individual chemicals have substantial noninfringing uses because the court must look to the entire device, namely the whole hair relaxer kit.

*19 Although the court is not persuaded by Pro-Line's challenge to the claim of contributory infringement, the court nevertheless notes its own concerns about whether the rationale behind an action for contributory infringement applies here. Contributory infringement was intended for situations where the defendant manufactured a product that did not directly violate the patent and then sold the product to another who assembled the final infringing product. *See Hewlett-Packard,* 909 F.2d at 1469; *Proctor & Gamble,* 604 F.Supp. at 1489. The present case differs in that Johnson Products alleges that Pro-Line's products themselves literally infringe the '572 patent. The infringement does not occur only once in the hands of the buyer. The fact that the Pre-Relaxer Treatment and Creme Relaxer are mixed together by the customer is irrelevant since the claim is that the products as a whole violate the patent, a violation that is arguably completed before it reaches the ultimate user of the product.

The court denies Pro-Line's motion for summary judgment on the contributory infringement claim, but invites further argument on the applicability of the theory to the facts presented here.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 28

3. Invalidity of the '572 Patent

A party seeking summary judgment of invalidity bears a heavy initial burden because an issued patent carries a statutory presumption of validity under 35 U.S.C. § 282. Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1467 (Fed.Cir.1990); Zumbro, Inc. v. Merck and Co., 819 F.Supp. 1387, 1405-06 (N.D.Ill.1993) (citation omitted). To satisfy the burden, courts have required the moving party to establish invalidity through clear and convincing evidence. Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362 (Fed.Cir.1998). "Clear and convincing evidence" means "evidence which produce [s] in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are highly probable." Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed.Cir.1988) (citations omitted).

Pro-Line makes a single argument in favor of its motion for summary judgment of the invalidity of the '572 patent: the quaternary polymer having a six-member recurring ring, as contemplated by claims 1 and 10, does not actually exist. (Pro-Line's '572 Invalidity Motion, at 4.) Consequently, according to Pro-Line, the '572 patent is invalid under 35 U.S.C. § 112 [FN17] because the claims are indefinite and the specification does not enable one skilled in the art to practice the claimed invention. (Id. at 5.) Johnson Products counters that when the '572 patent is construed as understood at the time of the invention in 1977, it meets the tests of enablement and definiteness. (Johnson Products' Response, at 46.)

> FN17. 35 U.S.C. § 112 requires:
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same....

a. Enablement

To be "enabling" under section 112, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation." ' Genetech, Inc. v. Novo Nordisk, 108 F.3d 1361, 1365 (Fed.Cir.1997), cert. denied, 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997). Experimentation is not fatal; some experimentation is permissible "if it is merely routine [ ] or if the specification in question provides a reasonable amount of guidance...." Johns Hopkins Univ. v. Cellpro, Inc., Nos. 97-1495, 98-1017, 1998 WL 466633, at *16 (Fed.Cir. Aug. 11, 1998). If the claim incorporates incorrect or questionable theories of operation and a limitation is thus impossible to meet, however, it may be invalid because "the impossible cannot be enabled." Raytheon Co. v. Roper Corp., 724 F.2d 951, 956 (Fed.Cir.1983). The issue of enablement is a question of law. Id. (citation omitted).

*20 Pro-Line's contention centers on the construction of "quaternary polymer" in the '572 patent. The claims must be interpreted at the time of the invention in 1977, however. See Eastman Kodak, 114 F.3d at 1555. As already determined from the evidence presented at the Markman hearing, one skilled in the art in 1977 would have understood the quaternary polymer with six-member rings to be a graphic depiction of DMDAAC. For the same reasons enumerated in the claim construction discussion, the court finds that a genuine issue of material fact as to patent enablement precludes the grant of summary judgment.

b. Definiteness

Pro-Line also argues that the '522 patent is invalid for indefiniteness. (Pro-Line's '572 Invalidity Motion, at 5.) The statute, 35 U.S.C. § 112, requires each patent to include "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The "distinctly claiming" requirement means that the claims must have a "clear and definite meaning when construed in the light of the complete patent document." Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 874-75 (Fed.Cir.1993), cert. denied, 510 U.S. 1100, 114 S.Ct. 943, 127 L.Ed.2d 232 (1994).

"Whether a claim is invalid for indefiniteness requires a determination whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." Morton Int'l, Inc. v. Cardinal Chem. Co., 5 F.3d 1464, 1470 (Fed.Cir.1993). To satisfy this requirement of section 112, the claims need only "reasonably apprise those skilled in the art of the scope of the invention." Miles Laboratories, 997 F.2d at 875. Compliance with section 112 is a question of law. Id.

Pro-Line's argument for invalidity of the '572 patent on the grounds of indefiniteness is identical to its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 29

contention on the basis of enablement; namely, that a person of ordinary skill in the art would not understand the reference to "quaternary polymer" in claim 1 because no six-member recurring ring units exist. (Pro-Line's '572 Invalidity Motion, at 5.) Pro-Line relies on *Morton International* for its position that claims are invalid for indefiniteness when the claimed compounds cannot be identified by testing and one skilled in the art cannot determine whether a given compound is within the scope of the claims. (*Id.*)

Again, the court is not persuaded. A 1977 chemist of ordinary skill in the art would have understood the six-member ring structure depicted in the claims to refer to a DMDAAC polymer. Indeed, *Morton International* is distinguishable from the situation here precisely because one skilled in the art in 1977 would most certainly have understood the graphic depiction of the quaternary polymer to represent DMDAAC even if the chemist believed DMDAAC to have five-member rings. Accordingly, the court denies summary judgment on the invalidity of the '572 patent.

4. Non-Infringement of the '822 Patent

*21 Pro-Line's arguments for summary judgment on the '822 patent infringement claims are the same ones directed against the '572 patent infringement claim: Pro-Line contends there are no disputes of fact concerning Johnson Products' claims of literal infringement, direct infringement under the doctrine of equivalents, inducement of infringement, and contributory infringement. The court addresses these arguments below.

a. Literal Infringement

Pro-Line argues that there is no direct infringement because its products lack the following elements from claim 1 of the '822 patent: (1) an aqueous nonacidic cosmetic vehicle and (2) hydrolyzed proteins that are in the salt form and characterized by a positive charge. (Pro-Line's Summary Judgment Motion on Non-Infringement of the '822 Patent (hereinafter "Pro-Line's '822 Non-Infringement Motion"), at 12.) To infringe claim 1 of the '822 patent, Pro-Line claims, its products must contain a non-acidic cosmetic vehicle with either a non-proteinaceous, non-polymeric quaternary nitrogen-containing compound in salt form or a hydrolyzed protein in salt form, wherein each compound is characterized by a positive charge. (*Id.* at 27.)

Pro-Line insists that the "Soft & Beautiful" and "Just for Me" hair relaxer kits are acidic and thus fall outside the scope of the claims of the '822 patent. Pro-Line offers the affidavits of the two experts, Dr. Lochhead and Dr. Wolfram, for support. For instance, measurements by Dr. Wolfram of the pH values in the "Soft & Beautiful" and "Just for Me" pre-relaxer treatments resulted in readings at 6.0 to 6.5. (Pro-Line's Reply Brief to Johnson Products' Brief in Response to Pro-Line's Motion for Summary Judgment on Non-Infringement of the '822 Patent (hereinafter "Pro-Line's '822 Non-Infringement Reply"), at 29.) For aqueous solutions, pH values greater than 7 indicate that there are more hydroxyl ions than hydrogen ions in the solution, making it non-acidic. (*Id.*) As such, Pro-Line argues, the '822 patent does not cover its products: claim 1 of the '822 patent requires a non-acidic composition, and Pro-Line's products are acidic. [FN18]

> FN18. Pro-Line also apparently contends that claim 1 of the '822 patent is scientifically unsound because the claim simultaneously covers non-acidic compositions, which would have a pH greater than 7, but are characterized as being stable when in an aqueous medium at a pH of at least about 6.1. (*See* Pro-Line's '822 Non-Infringement Reply, at 29.) This argument is more appropriately addressed under the summary judgment motion for invalidity of the '822 patent, and the court accordingly reserves discussion of this issue until then.

Johnson Products has presented evidence, including affidavits from experts and the two ingredient labels, suggesting that the "Soft & Beautiful" and "Just for Me" hair relaxer kits, in fact, contain every limitation of claims 1, 4, 10, and 11 of the '822 patent. (*See* Johnson Products' Response, at 32-43.) Specifically, Johnson Products counters that Pro-Line's products contain the aqueous nonacidic cosmetic vehicle required by claim 1 of the '822 patent because they contain deionized water, which is nonacidic under the '822 patent definition. (Johnson Products' Response, at 34.) The patent specification defines "nonacidic" as "vehicles containing no ionizable hydrogen-containing substances capable of neutralizing residual alkali on the hair from the hair straightener product." ('822 patent, col. 3, line 66-- col. 4, line 2.) Citing the expert testimony from both sides, Johnson Products explains that one of the ingredients in Pro-Line's Pre-Relaxer Treatment contains a monomer that is capable of neutralizing residual alkali, but that it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C  
Page 30

Case 1:06-cv-00041-JJF   Document 38-21   Filed 01/23/2006   Page 4 of 12

Not Reported in F.Supp.2d                                                                                              Page 18
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
(Cite as: 1998 WL 699024 (N.D.Ill.))

loses that capability when connected with DMDAAC and acrylamide as part of the Polyquaternium-39 polymer. (Johnson Products' Response, at 34-35.) For instance, Dr. Lochhead, Pro-Line's expert, testified that the Polyquaternium-39 found in the Pre-Relaxer Treatment contains acrylic acid, which is capable of neutralizing residual alkali on its own. (Lochhead Dep., at 111, Ex. 36 to Johnson Products' Response). Similarly, Dr. Wolfram confirmed that acrylic acid, though capable of neutralizing residual alkali on its own, is incapable of doing so when part of the Polyquaternium-39 polymer. (Wolfram Aff. ¶ 39, Ex. 17 to Johnson Products' Response).

*22 Pro-Line also attempts to read the prosecution history of the parent to the '822 patent (the '860 patent) into the specification of the claims of the '822 patent. In particular, Pro-Line notes that the rejected claim 33 of the '860 patent was amended to limit the pH to compositions in the range of 8 to 11 and argues that this amendment must also apply to the '822 patent. (Pro-Line's '822 Non-Infringement Motion, at 6-8.) For the reasons discussed above, however, this court has concluded that the '822 patent is not limited by the prosecution history of the '860 patent. Accordingly, a dispute exists over whether the claims in the '822 patent cover the chemical compositions in Pro-Line's hair relaxer kits.

Finally, Pro-Line claims that its hair relaxer kits prevent the "dull sheen" problem caused by calcium deposits from the use of calcium hydroxide to relax the hair, an issue that the '822 patent does not address. (Pro-Line's '822 Non-Infringement Motion, at 28-29 .) The apparent inference is that this additional feature precludes a determination that Pro-Line's products infringe the '822 patent. As the Federal Circuit has explicitly observed, however, the "addition of features does not avoid infringement, if all of the elements of the patent claims have been adopted." *Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed.Cir.1990)*. Pro-Line products' capacity to eliminate the "dull sheen" problem does not defeat a charge of infringement if the elements of the claim are also present.

Without a more complete understanding of the chemistry involved here, the court is unable to conclude that there are no disputes of fact as to whether Pro-Line's hair relaxer kits contain every limitation in the claims of the '822 patent. Summary judgment is therefore denied.

b. Doctrine of Equivalents

As before, because the court finds disputes of fact concerning Johnson Products' claim of literal infringement, the court need not reach the question of whether Pro-Line is entitled to summary judgment on a claim of infringement under the doctrine of equivalents.

c. Inducement of Infringement

For the same reasons Pro-Line sought summary judgment on the inducement claim with respect to the '572 patent, Pro-Line also argues it is entitled to summary judgment on the claim that it induced infringement of claims 12 and 13 of the '822 patent. Claims 12 and 13 cover the method that customers are to follow in using the hair relaxer. [FN19] Johnson Products argues that Pro-Line's instructions to customers to use the pre-treatment relaxer, the creme relaxer, and then the neutralizing shampoo on their heads induce infringement of claims 12 and 13 of the '822 patent. Pro-Line first contends that there is no direct infringement because its pre-relaxer treatment does not contain the composition of claim 1. (Pro-Line's '822 Non-Infringement Motion, at 29.) Next, Pro-Line claims that *Picker International* precludes Johnson Products from asserting an inducement of infringment claim because it is also making a direct infringement claim. (*Id.*)

> FN19. Claim 12 provides:
> A method for straightening hair comprising the steps of:
> (a) first applying to the hair a composition of claim 1; (b) then applying to the resulting hair a highly alkaline hair straightener for a time sufficient to at least partially straighten said hair;
> (c) rinsing substantially all of said straight hair with a neutralizing shampoo having a neutral to acidic pH.
> Claim 13 provides:
> A method of claim 12 wherein the applied composition in step (a) has a pH of at least about 6.1.

*23 As discussed above, Johnson Products has presented sufficient evidence to demonstrate that there is a genuine issue of material fact on whether Pro-Line's Pre-Relaxer Treatment contains each of the limitations in claim 1. (*See* Johnson Products' Response, at 43-45.) Pro-Line fails to respond to Johnson Products' specific claim that Pro-Line's written instructions induce infringement of the '822 patent. Furthermore, *Picker International* does not apply to the claims of inducement of infringement

Case 1:06-cv-00041-JJF   Document 38-21   Filed 01/23/2006   Page 5 of 12

Not Reported in F.Supp.2d                                                                 Page 19
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)
(Cite as: 1998 WL 699024 (N.D.Ill.))

here because Johnson Products has not alleged direct infringement of claims 12 and 13 of the '822 patent, which are the claims at issue in the inducement of infringement charge. (*Id.* at 45.) Accordingly, the court denies summary judgment on this basis.

d. Contributory Infringement

Pro-Line challenges Johnson Products' claim of contributory infringement of the '822 patent on the same grounds that it raised against the '572 contributory infringement claim. Specifically, Pro-Line argues again that there is no direct infringement, as required for liability under contributory infringement. (Pro-Line's '822 Non-Infringement Motion, at 30.) Additionally, Pro-Line contends that its products fall under the purview of the "staples of commerce" defense. (*Id.* at 31.)

As noted above, assuming Johnson Products' customers may be deemed third parties for purposes of contributory infringement, there is a genuine issue of material fact regarding direct infringement of the '822 patent by a third party. Further, the "staples of commerce" defense fails because it improperly focuses on the individual elements of Polyquaternium-39 and Merquat-295 rather than on the complete product of the Pre-Relaxer Treatment and Creme Relaxer of the hair relaxer kits. Although the court has reservations concerning the application of this theory to the facts here, Pro-Line's arguments do not support the grant of summary judgment to it.

4. Invalidity of the '822 Patent

Pro-Line argues that the '822 patent is invalid for three reasons: (1) lack of utility under 35 U.S.C. § 101, (2) indefiniteness under 35 U.S.C. § 112, or (3) prohibitive new matter under 35 U.S.C. § 112 or lack of enablement under 35 U.S.C. § 112. [FN20] (Pro-Line's Motion for Summary Judgment on Invalidity of the '822 Patent (hereinafter "Pro-Line's '822 Invalidity Motion"), at 2-3.)

> FN20. The court notes that Pro-Line's brief did not directly address the issue of enablement. Accordingly, the court considers only the first three grounds listed.

a. Utility

Only "useful" inventions may be patented. 35 U.S.C. § 101. To meet the utility requirement, a new product or process must be shown to be "operable," meaning that it must be "capable of being used to effect the object proposed." *Stiftung v. Renishaw PLC,* 945 F.2d 1173, 1180 (Fed.Cir.1991) (quoting *Mitchell v. Tilghman,* 86 U.S. (19 Wall.) 287, 396, 22 L.Ed. 125 (1873)). Utility only requires that the claimed invention meet at least one stated objective. *Raytheon,* 724 F.2d at 958. The utility determination is made as a matter of fact. *Id.* at 956.

Pro-Line's "no utility" argument rests on its assertion that the stated purpose of the composition in the '822 patent is to simultaneously texturize and strengthen straightened or relaxed hair. (Pro-Line's '822 Invalidity Motion, at 6.) Pro-Line draws the court's attention to one of the examples in the '822 patent, which states that "this study was unable to detect strengthening benefits from applying this particular non-acidic composition" when the pH of the hair texturing and strengthening composition was about 6.1. (*Id.*) Then, in a somewhat nonlinear display of logic, Pro-Line concludes that all claims of the patent were limited to a pH of at least 6.1 and hence cannot meet the supposed purpose of simultaneously texturing and strengthening. (*Id.*)

*24 Johnson Products counters that the pH limitation of 6.1 is only relevant to claims 11 and 13 of the '822 patent. Claims 1, 4, 10, and 12 merely require that the composition be "stable when in an aqueous medium at a pH of at least 6.1," not that the composition itself be limited to a pH of 6.1. (Johnson Products' Response, at 51 .) As for claims 11 and 13, which require that the composition have a pH of at least 6.1, Johnson Products contends that Pro-Line's sole source of authority is an out-of-context quote. (*Id.*) More specifically, each of the examples in the patent illustrates a different point; one may illustrate the texturing benefit while another may show the conditioning benefit. (*Id.*) Explaining the complete quote, Johnson Products contends that it only indicates that there were texturing benefits at a pH of 6.1, through the study did not find strengthening benefit. (*Id.* at 52.) The absence of a strengthening benefit finding in one study, Johnson Products argues, is not enough to establish a lack of utility; the test for utility demands that just one objective be met. (*Id.*)

If all claims in the '822 patent were limited to compositions at a pH of 6.1 and the stated objective were simultaneous texturing and conditioning, Pro-Line's position would have some force. In light of the determination from the *Markman* hearing that the compositions are not limited to a particular pH range, [FN21] however, and the further determination that the patent does not call for simultaneous texturing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 32

and conditioning, Pro-Line has not established the absence of disputes of fact concerning its "no utility" argument. Because there are genuine issues of material fact about the utility of the '822 patent with respect to claims 1, 4, 10, 11, 12, and 13, summary judgment on this basis is denied.

> FN21. The court notes that Pro-Line's claims have been somewhat inconsistent with regard to the pH range of the composition in the '822 patent. For example, during the *Markman* hearing, Pro-Line appeared to be urging the court to find that the patent only covers compositions at a pH of 8 to 11. In the present motion for summary judgment, however, Pro-Line seems to be advocating for a finding that all claims in the '822 patent are limited to a pH of at least 6.1.

b. Indefiniteness

As its second challenge to the validity of the '822 patent, Pro-Line argues that the patent is invalid for indefiniteness because its claims do not correspond in scope with what the patentee regarded as the invention. (Pro-Line's '822 Invalidity Motion, at 7.) Citing *In re Corkill*, 771 F.2d 1496, 1501 (Fed.Cir.1988), Pro-Line contends that the '822 patent is invalid for indefiniteness. The *In re Corkill* court affirmed the Patent Office's rejection of a patent for indefiniteness as it was unclear whether the particle sizes in the patent referred to single crystals or agglomerates comprised of smaller crystals. *Id.* at 1500. The patentee argued that simple experimentation would show which particles should not be used, and only those particles that worked would be covered by the claims. *Id.* at 1501. Rejecting that contention, the court found that the claims did not correspond in scope to what the patentee regarded as the claimed invention and were thus invalid under section 112. *Id.*

Pro-Line similarly notes the testimony of the inventor of the '822 patent, Mr. Akhtar, in which the inventor agreed that hair undergoing a highly alkaline straightening procedure is simultaneously textured and strengthened by compositions with a pH of at least 8 or greater. (Pro-Line's '822 Invalidity Motion, at 8; *see* Akhtar Dep., at 16-17, Ex. D to Pro-Line's Exhibits in Support of its Motions for Summary Judgment.) In other words, Pro-Line urges, the specification in the '822 patent calling for a pH of 6.1 would not provide the strengthening benefits that the inventor considered a component of the invention. (*Id.*) As further support for the proposition that the patent should include only compositions at a pH of 8 to 11, Pro-Line again relies on the file history of the parent application of the '860 patent, in which claim 33 was amended to cover compositions at a pH range of 8 to 11. (*Id.*) Lastly, Pro-Line summarily concludes that the claims are invalid for indefiniteness because the claimed compounds that would be stable when in an aqueous medium at a pH of at least about 6.1 cannot be identified by testing and that one skilled in the art could not determine whether a given compound was within the scope of the claims. (*Id.* at 10.)

*25 Johnson Products first responds that *In re Corkill* is inapposite because the case concerns a rejected patent claim which, unlike the '822 patent, does not carry a presumption of validity. (Johnson Products' Response, at 53-54, n. 21.) Courts have recognized that a valid patent may permit some experimentation. *See Johns Hopkins University*, 152 F.3d 1342, 1998 WL 466633, at *16. If there is a question of how much experimentation is allowable, there is a dispute that precludes summary judgment. As determined above, a genuine issue of material fact exists as to whether a composition at a pH of 6.1 is relevant to claims 11 and 13 and would provide strengthening benefits. Additionally, Johnson Products offers evidence that one skilled in the art would understand how to determine whether a compound is stable in an aqueous medium at a pH of "at least about 6.1." [FN22] Thus, Pro-Line's position is controverted by evidence on the record, and summary judgment is accordingly denied.

> FN22. According to Dr. Wolfram, the test would consist of placing the compound in an aqueous medium with a pH of at least 6.1 and then observing whether or not the compound changes. (Johnson Products' Response, at 55.) If it changes into another compound by losing or gaining certain molecules, the chemist will conclude that it is not stable. (*Id.*)

c. Prohibitive New Matter

Pro-Line's final validity challenge relates to the doctrine of prohibitive new matter. Under 35 U.S.C. § 132, "no amendment shall introduce new matter into the disclosure of the invention." The test for determining the sufficiency of support in a parent application is whether the disclosure of that parent application "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter...." *In re Kaslow*, 707 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 33

1366, 1375 (Fed.Cir.1983). Whether information is new matter depends on "the nature of the disclosure, the state of the art, and the nature of the added matter." *Brooktree Corp. v. Advanced Miro Devices, Inc.*, 977 F.2d 1555, 1574 (Fed.Cir.1992). Furthermore, claims to subject matter disclosed in the earlier patent specification cannot be considered new matter. *Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1539 (Fed.Cir.1997). A patent examiner's decision to allow an amendment without a rejection as to new matter "is entitled to an especially weighty presumption of correctness." *Brooktree*, 977 F.2d at 1574.

Pro-Line argues that the phrase "being stable when in an aqueous medium at a pH of at least about 6.1" in claim 1 of the '822 patent is "prohibitive new matter" because the '822 patent is a continuation patent and the parent patent (the '860 patent) did not describe this pH level. (Pro-Line's '822 Invalidity Motion, at 10.) By subsequently adding a pH range of at least about 6.1, the argument follows, Johnson Products added prohibitive new matter to the '822 continuation patent. (*Id.*)

As Johnson Products correctly notes, however, the earlier '860 patent reasonably conveys that the inventor knew of the effectiveness of hair straightening and texturing of compositions in an aqueous medium with a pH of about at least 6.1. Thus, claim 1 of the '822 patent does not contain prohibitive new matter. (Johnson Products' Response, at 56.) Moreover, the specifications of the '860 and the '822 patents both discuss the use of an aqueous medium that had an average pH of 6.18. (*Id.*) Most important, the specification of the '860 patent provides the support for claiming aqueous mediums with pHs of at least 6.1 in the continuation application. (*Id.*) Genuine issues of material fact about whether the '822 patent contains prohibitive new matter therefore preclude the granting of summary judgment.

CONCLUSION

*26 For the aforementioned reasons, the court denies Pro-Line's motions for summary judgment. The parties are urged to explore the possibility of settlement and directed to appear for a status conference on October 27, 1998, at 10:00 a.m.

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE
TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE
Not Reported in F.Supp.2d, 1998 WL 699024 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:94cv03555 (Docket) (Jun. 08, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C
Page 34



FOCUS™ Terms                                    Search Within  All Documents

View: Cite | **Full** | Custom                    1 of 2 NEXT        Print | [
More Like This | More Like Selected Text | Shepardize® | TOA
**31 U.S.P.Q.2D (BNA) 1697**  (Copy w/ Cite)

Service: **Get by LEXSEE®**
Citation: **31 U.S.P.Q.2d 1697**

Select for FOCUS™ or Delivery


*31 U.S.P.Q.2D (BNA) 1697, \*; USPQ Headnotes 1697, \*\**

Copyright (c) 1994 The Bureau of National Affairs, Inc.

UNITED STATES PATENTS QUARTERLY

The Laitram Corp. v. Morehouse Industries Inc.

No. 93-2809

U.S. District Court Eastern District of Louisiana

31 U.S.P.Q.2D (BNA) 1697

Decided March 21, 1994

**CASE HISTORY and DISPOSITION:** Action by The Laitram Corp. and Intralox Inc. against Morehouse Industries Inc., KVP Acquisition Corp., and KVP Systems Inc., for patent infringement. On defendants' motion to dismiss for lack of personal jurisdiction, or to transfer. Motion to transfer granted.

**HEADNOTES:**
JUDICIAL PRACTICE AND PROCEDURE

[\*\*1H] Jurisdiction -- Personal jurisdiction (405.11)

Jurisdiction -- Venue; transfer of action -- In patent actions (405.1907)

Federal district court in Louisiana has personal jurisdiction, in Louisiana corporations' patent infringement action, over California corporation that sold allegedly infringing plastic conveyor belts within Louisiana, even though those sales constituted less than .132 percent of its total sales, although court will not exercise jurisdiction over corporation's parent, in view of plaintiff's failure to show that subsidiary was not operated as distinct entity; transfer of action to federal district court in California is warranted, however, pursuant to 28 USC 1404, since allegedly infringing belts were designed, developed, and manufactured in California, since records and witnesses are located there, and since Louisiana, although district of plaintiffs' domicile, does not have overriding interest in having case tried there.

Particular patents -- General and mechanical -- Conveyor belts

4,886,158, Lapeyre, modular center drive conveyor belt, infringement defendants' motion to transfer granted.

4,934,518, Lapeyre, modular center drive conveyor belt, infringement defendants' motion to transfer granted.

**CLASS-NO:** 405.11, 405.1907

**COUNSEL:** William L. Geary, of Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La.; Barry L. LaCour, of Laitram Corp., Harahan, La.; D. David Hill, of McAndrews, Held & Malloy, Chicago, Ill., for plaintiffs.
Gene W. Lafitte, of Liskow & Lewis, New Orleans; R. Michael West, of Lothrop & West, Sacramento, Calif., for defendants.

**OPINIONBY:** Clement, J.

**OPINION:**
ORDER AND REASONS Defendants' motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer for convenience was decided this date on memoranda. For the reasons set forth below, defendants' motion is GRANTED.

I. BACKGROUND

Plaintiffs, The Laitram Corporation and Intralox, Inc. (hereinafter referred to collectively as "Laitram"), bring this action against defendants, Morehouse Industries, Inc., KVP Acquisition Corp., and KVP Systems, Inc., alleging patent infringement in violation of 35 U.S.C. Section 271. Defendants contend that they are not subject to personal jurisdiction in Louisiana and that, therefore, this suit should be dismissed. In the alternative, defendants aver that if the Court finds that they are subject to Louisiana's personal jurisdiction, then this action should be transferred, pursuant to 28 U.S.C. Section 1404, to the United States District Court for the Eastern District of California.

Laitram and Intralox are Louisiana corporations and are the holders of two patents, numbers 4,886,158 and 4,934,518 ("the Lapeyre patents"), covering J.M. Lapeyre's inventions in the field of plastic conveyor belts. Since 1972, plaintiffs have been in the business of manufacturing and selling plastic conveyor belts.

Morehouse Industries, Inc. ("Morehouse") n1 is a California Corporation with its principal place of business in Fullerton, California. KVP Acquisition Corp., is a California Corporation that is wholly owned by Morehouse. KVP Acquisition Corp. was incorporated, on July 29, 1993, to enable Morehouse to acquire KVP Systems, Inc. KVP Systems, Inc. was merged into KVP Acquisition Corp., on July 30, 1993. KVP Systems, Inc., thus, no longer exists as a distinct corporate entity; although the former KVP Acquisition Corp. assumed that name. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Morehouse Industries, Inc. has, since this action was instituted, changed its name to Summa Industries, Inc.

n2 For the purposes of this Order & Reasons, the Court will refer to KVP Systems, Inc. and KVP Acquisition Corp. collectively as KVP.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -In the two years preceding the merger, KVP sold two dozen plastic conveyor belts to Louisiana customers. Defendants

characterize these sales as insignificant on the grounds that all of KVP's sales to Louisiana customers, of which the sales of plastic conveyor belts were only a small portion, constituted less than .132 percent of KVP's total sales. n3 Defendants claim that this small percentage of their total sales is an inadequate basis for the exercise of personal jurisdiction. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Although the parties have not provided the court with the actual percentage of total sales represented by Louisiana sales, it is not disputed that KVP shipped twenty-nine conveyor belts into Louisiana.

n4 "If the nonresident defendant protests the exercise of personal jurisdiction, the burden falls on plaintiff to make a prima facie showing that personal jurisdiction exists." Rittenhouse v. Mabry , 832 F.2d 1380, 1382 (5th Cir. 1987).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -II. ANALYSIS

A. PERSONAL JURISDICTION

In order to determine whether defendants are subject to personal jurisdiction in Louisiana, the Court must engage in a two step analysis. First, the defendant must be amenable to service of process. Asarco, Inc. v. Glenara, Ltd. , 912 F.2d 784, 786 (5th Cir. 1990). Second, the defendant must have sufficient minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington , 326 U.S. 310, 316 (1945).

The Federal Rules of Civil Procedure provide that the rules for the service of process of the state in which the district court sits shall govern personal jurisdiction issues. Fed. R. Civ. Proc. 4(e) n5 . In addition to cases where the federal court's subject matter jurisdiction is grounded on diversity of citizenship, this rule also applies to claims founded **[\*1699]** on federal law when the statute in question does not specifically provide for service of process. Imagineering, Inc. v. Van Klassens, Inc. , 797 F.Supp. 329, 331 (S.D.N.Y. 1992); see also Amp, Inc. v. Methode Elecs. Inc. , 823 F.Supp. 259, 261 (M.D. Pa. 1993).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The Federal Rules of Civil Procedure were recently amended. These amendments extensively revamped the rules governing the service of process. See, e.g. , Fed. R. Civ. Proc. 4 (entitled Summons); Fed. R. Civ. Proc. 4.1 (entitled Service of Other Process). The rule changes took "effect on December 1, 1993, and [ ] govern all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending." Order of the Supreme Court of the United States Adopting and Amending Rules, April 22, 1993. This action was filed and the summons and complaint were served on defendants prior to the effective date of these amendments. Accordingly, this matter shall be governed by the Federal Rules of Civil Procedure pertaining to service of process as they existed prior to December 1, 1993.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -Louisiana's long-arm statute provides:

A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:

(1) Transacting any business in this state.

. . . .

(3) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission.

. . . .

B. In addition to the provisions of Subsection A, a court may exercise personal jurisdiction on any basis consistent with the constitution of this state and the Constitution of the United States.

La. Rev. Stat. Section 13:3201. Since Louisiana has empowered its courts to exercise personal jurisdiction to the fullest extent compatible with the Constitution's Due Process Clause, the Court's inquiry is, in essence, "one into the constitutional propriety of the exercise of jurisdiction." Amp, 823 F.Supp. at 262. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Because this case arises under the laws of the United States, the Fifth Amendment, rather than the Fourteenth Amendment, governs the due process inquiry. Nonetheless, the standards to be applied are identical. Amp , 823 F.Supp. at 262.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -Jurisdiction over the person is of two varieties. It may be based on the defendant's conduct that gave rise to the cause of action; in which case the court is exercising specific jurisdiction. A court may also exercise personal jurisdiction over a nonresident defendant on a cause of action unrelated to the defendant's contacts with the forum, if its contacts with the forum state are "continuous and systematic." Burger King Corp. v. Rudzewicz , 471 U.S. 462, 473 n.15 (1985). This latter variation being the exercise of general jurisdiction.

Laitram asserts that the defendants' allegedly infringing sales of plastic conveyor belts into Louisiana supports this Court's exercise of personal jurisdiction. As Laitram's cause of action is based on those same sales, this case involves questions of specific jurisdiction. n7 A court may properly exercise specific jurisdiction if the defendant has purposefully directed its activities at the forum state. Burger King , 471 U.S. at 472.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Plaintiff's cause of action for patent infringement "is deemed to arise where the allegedly infringing sales were made." Imagineering, 797 F.Supp. at 331.

Exhibit D
Page 38

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -In Imagineering , the court was presented with a similar dispute. n8 The plaintiff was alleging, inter alia , that the defendants' rocking chair had infringed its patent. Over a five year period, the defendant had sold "2 allegedly infringing chairs in New York, or 2% of defendants' total sales of rocking chairs." Imagineering , 797 F.Supp. at 330. That court held that despite the relative insignificance of defendants' sales into the forum state they were sufficient to provide a basis for personal jurisdiction. Id . at 331-32. given that the plaintiff's cause of action for patent infringement arose out of the same contacts that were alleged to provide a basis for personal jurisdiction, the Court held that "personal jurisdiction may be established over a defendant when New York sales constitute only a small percentage of the infringing activities." Id . at 331; see also Amp, 823 F.Supp. at 264 (holding that " [i]t is not a defense against jurisdiction to cite the fact that only a small percentage of the company's income is derived from products sold or services provided within the forum state").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 The Imagineering court analyzed the question of personal jurisdiction in the context of New York's long-arm statute. Imagineering , 797 F.Supp. at 331. Although this Court must apply the Louisiana long-arm statute the analysis is no different because Louisiana courts may exercise personal jurisdiction to the maximum extent consistent with due process. La. Rev. Stat. Section 13:3201.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -Go to Headnotes **[**1R]** It is, thus, clear that the Court may, based on the sale of the allegedly infringing plastic conveyor belts in Louisiana, exercise personal jurisdiction over KVP on plaintiffs' patent infringement claims. Whether the Court possesses personal jurisdiction over Morehouse presents a different question.

In the typical case, a subsidiary's contacts with the forum state will not be imputed to the parent corporation for purposes of asserting in personam jurisdiction over the parent. n9 "Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." Hargrave v. Fibreboard Corp. , 710 F.2d 1154, **[*1700]** 1159 (5th Cir. 1983). In certain limited circumstances, a court may find that the parent exercises such dominion and control over the subsidiary that the parent does business in the forum state through the local activities of the subsidiary. Id .

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Whether the subsidiary's actions may be imputed to the parent for the purpose of assessing liability is a question that is not presently before the Court.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -In order to impute the subsidiary's contacts to the parent, plaintiff must show that the subsidiary was not operated as a distinct entity. Bearry v. Beech Aircraft Corp. , 818 F.2d 370, 373 (5th Cir. 1983). Plaintiffs point out that Morehouse's directors direct the business of KVP and that there is no separate stock ownership of KVP. Plaintiffs fail, however, to demonstrate that the interlocking boards of