- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

B. Direct Infringement

As a plaintiff in a patent infringement action alleging direct infringement, Upjohn bears the burden of proving at trial that **[*7]** Syntro has directly infringed the patent or that Syntro makes, uses, or sells a product in violation of plaintiff's patent rights. The crux of defendant's argument is that Upjohn sued the wrong party. To the extent that any infringement of plaintiff's patent occurred, and Syntro does not concede that this is the case, Syntro argues that it was by SyntroVet, the Kansas subsidiary, and not by Syntro. Since SyntroVet is not a party, Syntro argues that plaintiff has failed to state a viable claim. Plaintiff vigorously argues that Syntro either directly infringed the patent by its own acts, or in the alternative, through the acts of its subsidiary.

1. Syntro's Acts

A cause of action for direct infringement is governed by the terms of 35 U.S.C. § 271(a) which provides:

HN2 Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

Syntro could be liable for direct infringement for interfering with any of the patentee's three **[*8]** basic rights (make, use, or sell) because, in enumerating these rights, section 271(a) employs the disjunctive.

In support of its motion, Syntro presented the affidavit of its president which explicitly states, "Syntro does not make, use or sell any pseudorabies virus vaccines, including particularly any pseudorabies vaccine called PRV/MARKER, as alleged in the Complaint." Affidavit of Cam L. Garner ("Garner affidavit"), para. 4. Further, the affidavit provides, "SyntroVet makes and sells . . . a pseudorabies virus vaccine sold under SyntroVet's registered trademark PRV/MARKER." Garner affidavit, para. 6.

In support of its position, Upjohn introduced an affidavit and exhibits thereto (the "Ingersoll affidavit") including various public filings of Syntro with the Securities and Exchange Commission, Syntro's annual and quarterly reports for 1987, and news articles. Plaintiff argues that these publicly available facts demonstrate that Syntro uses and sells the product. Plaintiff's arguments are typified by the following syllogism: Syntro developed PRV/MARKER in its research and development facility. Syntro must use the product in its laboratory in the course of product development. **[*9]** Therefore, Syntro uses the product. Plaintiff's Answering Brief in Opposition to Motion to Dismiss at 11.

The Court finds Upjohn's argument unpersuasive. Section 271(a) HN3 imposes temporal limits on a direct infringement claim with the explicit provision that the infringement must occur "during the term of the patent". Therefore, "[a]cts of making, using or selling prior to issuance give rise to no liability under the federal patent laws." 4 D. Chisum, Patents § 16.04 [3], at 16-53-54 (1990); see Powerlock Floors, Inc. v. Robbins Flooring Co., 327 F.Supp. 388, 390 (D. Del. 1971) (infringing acts must have been committed after the patent issued), aff'd, 464 F.2d 1022 (3d Cir. 1972).

Upjohn's '634 patent issued on March 7, 1989. There is no evidence of any use of the accused product, PRV/MARKER in the laboratory by Syntro since that date. All work done since 1988 when PRV/MARKER was licensed to SyntroVet is by SyntroVet in the Kansas facility. "PRV/Marker is, and additional vaccines developed by the Company will be, manufactured at SyntroVet's manufacturing, distribution and sales facility in Lenexa,

Exhibit K
Page 76

Kansas." Ingersoll affidavit, Exhibit C, **[*10]** p. 15. Therefore, the Court concludes that Upjohn has failed to make any colorable showing in support of its claim that Syntro uses the allegedly infringing product.

Second, Upjohn asserts that Syntro is liable for direct infringement because it publicly refers to PRV/MARKER as its only product, reports sales of the product in consolidated balance financial reports, and promotes the product, and thus, Upjohn concludes that Syntro sells the product.

The consolidated financial statements filed by the companies are entitled "Syntro Corporation and Subsidiary", and the notes to the financial statement provide that "the consolidated financial statements include the accounts of the Company and its wholly-owned subsidiary." Ingersoll affidavit, Exhibit C, F5-8. Thus, the financial statements apparently reflect aggregate sales of both companies and do not prove that Syntro sells the product. In addition, much of the evidence regarding promotion of the product points to SyntroVet. "SyntroVet has entered into agreements for the distribution of PRV/Marker with five regional distributors that service . . . swine producing states. SyntroVet sells PRV/Marker to these distributors in various **[*11]** dose sizes." Exhibit C, p. 18. While Syntro does refer to the product in a possessory manner, these references are not evidence that it sells the product.

On this record, the Court concludes that plaintiff has produced no evidence from which a reasonable fact-finder could find that the parent has used or sold the vaccine, thereby directly infringing the Upjohn patent by its own acts, and therefore, Syntro is entitled to summary judgment on plaintiff's claim for direct infringement.

2. Is Syntro Liable for SyntroVet's Acts?

Plaintiff also contends that Syntro should be liable for patent infringement actually perpetrated by its subsidiary, SyntroVet. Plaintiff asserts that Syntrovet is so closely controlled by and intertwined with Syntro that its acts may be imputed to Syntro. In effect, Upjohn argues that the two corporations are a single corporate entity, and Syntro is liable to Upjohn for direct infringement through SyntroVet's activities.

*HN4* "Where one corporation is so organized and controlled and its affairs are conducted so that it is, in fact, a . . . mere adjunct of the other" **[*12]** a court may disregard a corporation's identity. 1 W. Fletcher Cyclopedia of the Law of Private Corporations § 43.10, at 490 (rev. perm. ed. 1983). The precise nomenclature for theories that are used by courts holding parents liable for acts of the subsidiary is far from clear. See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476 (3d Cir.), cert. denied, 109 S.Ct. 259, cert. denied, 109 S.Ct. 273 (1988). Some courts focus on finding that the subsidiary is a "alter ego" or "mere instrumentality" or pursue a process called "piercing the corporate veil," while others apply general agency theory. Id. Since Upjohn's arguments are solely directed to demonstrating the degree of parental control over its subsidiary, the Court's focus will be on determining whether Syntro exercises such complete control over SyntroVet to warrant disregard of the separate corporate entities.

The Third Circuit has listed some of the factors to be considered by a court in determining whether two corporations are truly separate. These include: adequacy of capitalization, overlapping directors and officers, separate record keeping, payment **[*13]** of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and the subsidiary's control over day-to-day operations. Phoenix Canada, 842 F.2d at 1476; see also United States v. Pisani, 646 F.2d 83, 88 (3d Cir. l981). n4 Whether the parent exercises "complete domination" over the subsidiary is decisive. Phoenix Canada, 842 F.2d at 1477; Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227, 237 (D. Del. 1984) ("The parent must have actual, participatory and total control of the subsidiary.").

Exhibit K
Page 77

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Plaintiff cites eleven factors relevant to a determination of whether the parent exercises such control over its subsidiary to warrant disregard of corporate existence as set forth in Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 161 (7th Cir. 1963). These factors are adequately subsumed in subsequent Third Circuit cases that address this issue.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [*14]

Even the exercise of a significant degree of control by a parent over a subsidiary will not suffice to warrant the disregard of separate corporate entities. See Pisani, 646 F.2d at 88 (a number of factors must exist for court to disregard corporate entity). In Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227 (D. Del. 1984), the relationship between the parent and subsidiary was that the parent had l00% ownership of the subsidiary, the parent referred to the subsidiary as a division of the parent, the subsidiary's board reported to the parent, the parent approved substantial capital expenditures, the parent referred to the subsidiary's business as its project and took credit for the project in its annual report, and the parent guaranteed loans for the subsidiary. Id. at 237. Based on these facts, the court concluded that the record was insufficient to support a finding that the subsidiary was the alter ego of the parent. Id. at 240.

Here, plaintiff Upjohn has shown that: 1) Syntro owns the capital stock of the subsidiary and caused its incorporation; 2) directors are shared between the two corporations; [*15] 3) SyntroVet was capitalized with 1000 shares of $ 1.00 par stock; 4) Syntro guarantees the lease of SyntroVet's headquarters; 5) consolidated financial statements are filed; and 6) Syntro refers to the product as its own in various public filings. However, the following facts are also relevant: 1) SyntroVet has its own assets and liabilities; 2) it files a domestic corporation annual report and paid taxes in Kansas; 3) it is licensed to sell PRV/MARKER; 4) it manufactures PRV/MARKER; 4) it enters into distribution contracts for PRV/MARKER; and 5) it leases its building and entered a bond agreement with Lenexa wherein it has an option to purchase the building.

The Court concludes that plaintiff has adduced no evidence of SyntroVet's failure to keep separate records or accounts, or any lack of authority over its day-to-day operations. To a large degree, plaintiff establishes merely a normal, legitimate parent-subsidiary relationship and has not demonstrated that Syntro exercises such complete domination and control over SyntroVet that would warrant disregard of the separate corporate entities.

Accordingly, summary judgment will be granted to Syntro since Upjohn has failed to carry [*16] its burden to demonstrate that SyntroVet can be regarded as the alter ego or instrumentality of Syntro thus rendering Syntro liable for direct infringement.

C. Inducement

HN5 The patent statute provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b) (1982). Thus, inducement occurs by "actively and knowingly aiding and abetting another's direct infringement." Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed. Cir.), cert. denied, 109 S.Ct. 498 (1988). There can be no liability for inducement unless an actual infringement in violation of § 271(a) is induced. Stukenborg v. Teledyne, Inc., 441 F.2d 1069, 1071-72 (9th Cir.), cert. denied, 404 U.S. 852 (1971); Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp. 1485, 1487 (D. Del. 1985).

Exhibit K
Page 78

Syntro argues that there can be no inducement because no direct infringement is alleged and no direct infringer is identified by the complaint. Upjohn asserts **[*17]** that the direct infringers are identified as SyntroVet and its customers and that the direct infringers need not be named in the inducement suit.

Despite the rule that there can be no contributory infringement absent direct infringement, as is the case with inducement, courts have held that it is not necessary that the direct infringer be joined as a party to a suit against a contributory infringer. See Refac International, Ltd. v. IBM, 790 F.2d 79, 81 (Fed. Cir. 1986) (direct infringer need not be party to action for contributory infringement), modified, 798 F.2d 459 (Fed. Cir. 1986). Although contributory infringement and inducement are distinct forms of liability, the reasoning behind the rule is just as compelling in an inducement situation. See 4 D. Chisum, Patents § 17.04[3] at 17-46 (the two sections intended as complementary provisions); see also Stukenborg, 441 F.2d at 1071-72 (court concludes no contributory infringement exists absent direct infringement and finds the identical conclusion is compelled in the case of inducement of infringement).

The Court is therefore, unpersuaded by Syntro's arguments because **[*18]** Syntro concedes that PRV/MARKER is made, used and sold by SyntroVet. Garner affidavit, para. 4, 6. Thus, a direct infringer is identified. In addition, although the alleged direct infringer, SyntroVet, is not named by the complaint, Upjohn is not precluded from maintaining its inducement claim against Syntro in this Court and eliciting proof of the direct infringement through discovery.

Alternatively, Syntro argues that because it had no knowledge of the scope of the Upjohn patent there can be no knowing inducement of a patent which has not yet issued, or that there can be no liability for pre-issuance activities. Upjohn argues that pre-issuance activity culminating in post-issuance direct infringement is actionable and that Syntro is charged with knowledge of direct infringement after the issuance of the patent.

Upjohn argues that Syntro developed the vaccine, set up the manufacturing subsidiary, extols its benefits in the press and in annual reports, and otherwise encourages others to use the product and therefore, Upjohn declares that Syntro induces the direct infringement of the product. It cannot be denied that Syntro is an "active participant" in the infringing conduct of **[*19]** which SyntroVet may be guilty. See Sims v. Western Steel Co., 551 F.2d 811, 817 (10th Cir.), cert. denied, 434 U.S. 858 (1977). Syntro's continuous encouragement of SyntroVet's manufacture and sale of the product is exemplified by the fact that an agreement was entered into by Syntro on January 4, 1990, whereby a third party will also market and sell SyntroVet's PRV/MARKER line of products. Assuming that PRV/MARKER is an infringing product, such acts by Syntro will arguably cause yet another to infringe Upjohn's patent. This type of activity is the essence of any inducement claim, and therefore, exposes Syntro to defend the Upjohn allegation.

Similarly, Syntro's pre-issuance argument must fail. In Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp 1485 (D. Del. 1985), the court concluded that liability for inducement under section 271(b) could be based on pre-issuance activities. Id. at 1489-90. The court rejected the argument that temporal limits applied to the inducement claim and found that as long as a viable claim for direct infringement existed, there could be liability for inducement, regardless **[*20]** of the timing of the inducing acts. Id. at 1089. Although the defendant there allegedly rushed product to market with knowledge of the pending patent, there is no reason to conclude that the court specifically limited its holding to such a situation, and the Court concludes that there is no reason to apply such a limitation to the facts presented here. Indeed, the state of Syntro's knowledge of the application is in dispute. Syntro concedes that it knew of the pendency of Upjohn's application, but argues that this knowledge is insufficient to constitute knowing inducement. Defendant's Reply Brief in Support of Its Motion to Dismiss at 5. Upjohn argues that Syntro knew the exact nature of the patent because it had a copy of one of Upjohn's applications. Transcript of Oral Argument

Exhibit K
Page 79

at 14-15. This factual dispute regarding the extent of knowledge is one of several on the inducement issue that preclude summary judgment on behalf of defendant.

*III. CONCLUSION*

For the reasons stated above, Syntro's motion for summary judgment as it pertains to direct infringement will be granted, however, as that motion pertains to Upjohn's inducement claim, it will be denied.

An appropriate **[*21]** order will be entered.

*ORDER*

At Wilmington this 9th day of March, 1990, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS ORDERED that defendant's Motion for Summary Judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that:

1. The parties shall submit a Rule 16 Scheduling Order within ten days of the date of this Order.

2. Trial shall commence on November 13, 1990.

3. The time to respond to the complaint and discovery requests pursuant to the Federal Rules of Civil Procedure shall run from the date of this Order.

View: Cite | Full | Custom         1 of 2 NEXT        FAST Print    Print | Download | Fax | Email | Text Only
More Like This | More Like Selected Text | Shepardize® | TOA
Upjohn Co. v. Syntro Corp., 14 U.S.P.Q.2D (BNA) 1469  (Copy w/ Cite)    Pages:    11

Service: **Get by LEXSEE®**
Citation: **14 U.S.P.Q.2d 1469**
View: Full
Date/Time: Friday, September 16, 2005 - 12:58 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
[A] - Citing Refs. With Analysis Available
[i] - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.