IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMAZON.COM, INC. and A9.COM, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 06-041-JJF |
| v. | ) | |
| | ) | |
| CENDANT CORPORATION, TRILEGIANT | ) | |
| CORPORATION, ORBITZ, LLC, ORBITZ, INC., | ) | |
| BUDGET RENT A CAR SYSTEM, INC., | ) | |
| and AVIS RENT A CAR SYSTEM, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF DEFENDANTS' (1)
MOTION TO DISMISS ALL CLAIMS AGAINST CENDANT CORPORATION; (2)
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM OR,
IN THE ALTERNATIVE, FOR MORE DEFINITE STATEMENT; AND (3) MOTION
TO STAY DISCOVERY PENDING RESOLUTION OF THE MOTION**

I, James V. Fazio, III, declare as follows:

1.    I am an attorney with the law firm of Paul, Hastings, Janofsky & Walker LLP,

counsel for defendants in the above-referenced action. I have been admitted to practice in this

District *pro hac vice*. I have personal knowledge of the following facts and, if called upon to do

so, I could and would testify competently thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of the complaint filed on

June 20, 2005 by Cendant Publishing, Inc. against Amazon.com, Inc. in the United States

District Court for the District of Delaware entitled *Cendant Publishing Co., Inc. v.

Amazon.com, Inc.* (Civil Action No. 05-414-JJF).

3.    Attached hereto as Exhibit B is a true and correct copy of a July 18, 2005 news

article entitled "Amazon countersues Cendant" obtained from the www.news.com website.

- 1 -

4.    Attached hereto as Exhibit C is a true and correct copy of the original complaint filed on October 29, 2004 by Cendant Publishing, Inc. against Amazon.com, Inc. in the United States District Court for the District of Delaware entitled *Cendant Publishing Co., Inc. v. Amazon.com, Inc.* (Civil Action No. 04-1405-GMS).

5.    Attached hereto as Exhibit D is a true and correct copy of *Agilent Technologies, Inc. v. Micromuse, Inc.*, 2004 WL 2346152 (S.D.N.Y. Oct. 19, 2004).

6.    Attached hereto as Exhibit E is a true and correct copy of *Colida v. Sony Corp. of America*, 2004 U.S.Dist. LEXIS 14907 (S.D.N.Y. Aug. 2, 2004).

7.    Attached hereto as Exhibit F is a true and correct copy of *Hewlett-Packard Co. v. Intergraph Corp.*, 2003 WL 23884794 (N.D. Cal. Sep. 6, 2003).

8.    Attached hereto as Exhibit G is a true and correct copy of *In re Papst Licensing GmbH Patent Litig.*, 2001 WL 179926 (E.D. La. Feb. 22, 2001).

9.    Attached hereto as Exhibit H is a true and correct copy of *Lear Corp. v. Bertrand and Faure Technical Center*, 2000 U.S.Dist. LEXIS 22525 (E.D. Mich. Oct. 10, 2000).

10.    Attached hereto as Exhibit I is a true and correct copy of *Mahnke v. Munchkin Products, Inc.*, 2001 WL 637378 (S.D.N.Y. Jun. 7, 2001).

11.    Attached hereto as Exhibit J is a true and correct copy of *Ondeo Nalco Co. v. Eka Chemicals, Inc.*, 2002 WL 1458853 (D. Del. Jun. 10, 2002).

12.    Attached hereto as Exhibit K is a true and correct copy of *Ristvedt-Johnson, Inc. v. Peltz*, 1991 WL 255691 (N.D. Ill. Nov. 18, 1991).

13.    Attached hereto as Exhibit L is a true and correct copy of *Seiko Epson Corp. v. Print-Rite Holdings, Ltd.*, 2002 U.S.Dist. LEXIS 27427 (D. Or. Apr. 30, 2002).

14.    Attached hereto as Exhibit M is a true and correct copy of *SRI International, Inc. v. Internet Security Sys.*, 2005 U.S.Dist. LEXIS 6797 (D. Del. Apr. 13, 2005).

15.    Attached hereto as Exhibit N is a true and correct copy of *TI Group Automotive Sys., Inc. v. Vdo North America LLC*, 2002 U.S.Dist. LEXIS 4671 (D. Del. Mar. 7, 2002).

16.     Attached hereto as Exhibit O is a true and correct copy of *Upjohn Co. v. Syntro Corp.*, 1990 U.S.Dist. LEXIS 11512 (D. Del. Mar. 9, 1990).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this /1th day of February, 2006 at San Diego, California.


By: _____
                    JAMES V. FAZIO, III

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of February, 2006, the attached **DECLARATION OF JAMES V. FAZIO, III IN SUPPORT OF DEFENDANTS' (1) MOTION TO DISMISS ALL CLAIMS AGAINST CENDANT CORPORATION; (2) MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, FOR MORE DEFINITE STATEMENT; AND (3) MOTION TO STAY DISCOVERY PENDING RESOLUTION OF THE MOTION** was served upon the below-named counsel of record at the address and in the manner indicated:

John W. Shaw, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801

Lynn H. Pasahow, Esquire                           VIA FEDERAL EXPRESS
Fenwick & West, LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041


/s/ *John G. Day*
_____
John G. Day

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CENDANT PUBLISHING, INC.    )
            )
      Plaintiff,   )
            )  Civil Action No. _____
v.            )
            )
AMAZON.COM, INC.,     )
            )
      Defendant.  )

## COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff, Cendant Publishing, Inc. ("Cendant Publishing"), by and through counsel, respectfully submit this Complaint against Amazon.com, Inc. ("Amazon").   In support thereof, Plaintiff alleges as follows:

### THE PARTIES

1. Plaintiff Cendant Publishing, Inc. is a Delaware corporation with its principal place of business at 10750 West Charleston Blvd., Suite 130, Las Vegas, Nevada  89135.

**2.** Upon information and belief, Defendant Amazon.com, Inc. is a Delaware corporation with its principal executive offices at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98114. Amazon operates an Internet-based marketplace selling millions of items including books as shown by its website at <http://www.amazon.com>.  A key feature of Amazon's website includes web pages tailored to individual preferences, such as recommendations and notifications.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

4.     This Court has personal jurisdiction over defendant Amazon because of, inter alia, its incorporation in Delaware and its operation of its Internet website, amazon.com, which is accessible to and marketed to residents of Delaware.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).


## NATURE OF THE ACTION

6.     Cendant Publishing brings this action for infringement of United States Patent No. 6,782,370 ("'370 patent"). A copy of the '370 patent is attached as Exhibit **A** hereto.

7.     The '370 patent, entitled "System and Method for Providing Recommendation of Goods or Services Based on Recorded Purchasing History" was duly and properly issued by the United States Patent and Trademark Office ("PTO") on August 24, 2004. The '370 patent is valid and enforceable.

8.     Amazon operates an on-line marketplace through its amazon.com website. Amazon's online marketplace uses numerous features which recommend other goods to potential customers based on prior customer purchasing history. Amazon's recommendation features, including, inter alia, "Customers who bought this book also bought," infringe one or more claims of the '370 patent.

9.     Cendant Publishing was the assignee of the '370 patent at the time it was issued.

2

10.    Cendant Publishing is the owner of the '370 patent and has the right to sue for infringement of the '370 patent.

## CLAIM I
### Infringement of the '370 Patent

11.    Cendant Publishing realleges the allegations of Paragraphs 1 to 10 above as if set forth herein.

12.    Amazon has infringed the '370 patent and will continue to do so unless enjoined by this Court.

13.    Amazon's continuing acts of infringement after notice of the '370 patent constitute willful infringement of the '370 patent.

14.    Amazon's infringement of the '370 patent has damaged Cendant Publishing and will continue to cause Cendant Publishing harm unless enjoined by this Court.

## DEMAND FOR JURY TRIAL

15.    Pursuant to Fed. R. Civ. P. 38 and District of Delaware L.R. 38.1, Cendant Publishing respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Cendant Publishing prays for judgment as follows:

**A.**    That this Court adjudge and decree that the '370 patent is valid and infringed by Amazon;

3

B.     That this Court adjudge and decree that Amazon's infringement of the '370 patent has been willful;

C.     That this Court permanently enjoin Amazon, its agents, servants, employees, attorneys, and all others in active concert or participation with Amazon from infringing the '370 patent;

D.     That this Court award Cendant Publishing damages adequate to compensate for Amazon's infringement of the '370 patent;

E.     That this Court award Cendant Publishing its costs, disbursements, and attorneys' fees for this action, including those pursuant to 35 U.S.C. § 285;

F.     That Cendant Publishing be awarded such further relief as this Court may deem just and appropriate.

ASHBY & GEDDES

Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
222 Delaware Avenue, 17'' Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Plaintiff Cendant Publishing, Inc.*

*Of Counsel:*

Steven Lieberman
Elizabeth A. Leff
Brian Rosenbloom
C. Nichole Gifford
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 783-6040

Dated: June 20, 2005
158689

5

# EXHIBIT A

US006782370B1

(12) **United States Patent**        (10) **Patent No.:**    **US 6,782,370 B1**

Stack                                (45) **Date of Patent:**        **Aug. 24,2004**

(54) **SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY**

(75) Inventor:  **Charles Stack,** Cleveland, OH (US)

(73) Assignee:  **Cendant Publishing, Inc.,** Aurora, CO (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1030 days.

(21) Appl. No.: 081923,293

(22) Filed:  **Sep. 4,** 1997

(51) **Int. Cl.**[7] ............................................... **G06F** 17/60
(52) **U.S. Cl.** .............................. 705110; 705126; 705114
(58) **Field of Search** .............................. 705110, 26, 27, 705128, 29, 14; 2351376; 707110, 104.1

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,870,579 | A | * | 911989 | Hey ............................ | 705127 |
| 4,996,642 | A | * | 211991 | Hey ............................ | 705127 |
| 5,583,763 | A | * | 1211996 | Atcheson et al. .............. | 70713 |
| 5,749,081 | A | * | 511998 | Whiteis ..................... | 7071102 |
| 5,754,938 | A | * | 511998 | Herz et al. .................. | 7251116 |
| 5,774,868 | A | * | 611998 | Cragun et al. ................ | 705110 |
| 5,790,426 | A | * | 811998 | Robinson .................... | 7021179 |
| 5,790,935 | A | * | 811998 | Payton ...................... | 45515.1 |
| 5,832,457 | A | * | 1111998 | O'Brien et al. .............. | 705114 |
| 5,867,799 | A | * | 2/1999 | Lang et al. .................. | 707/1 |
| 6,041,311 | A | * | 312000 | Chislenko et al. ............ | 705127 |
| 6,049,777 | A | * | 412000 | Sheena et al. ............... | 705110 |
| 6,058,367 | A | * | 512000 | Sutcliffe et al. ............. | 70511 |
| 6,092,049 | A | * | 712000 | Chislenko et al. ............ | 705110 |
| 6,112,186 | A | * | 812000 | Bergh et al. ................. | 705110 |
| 6,266,669 | B1 | * | 712001 | Linden et al. ............... | 705126 |
| 6,507,872 | B1 | * | 112003 | Geshwind ................... | 7091236 |
| 200110013009 | A1 | * | 812001 | Greening et al. ............. | 705110 |

FOREIGN PATENT DOCUMENTS

WO        WO-97/02537  A1  *  1/1997

OTHER PUBLICATIONS

"How ICL Is Ensuring That Your Retailer Knows More About You Than You Know Yourself," Computergram International, Jun. 14, 1996.*
Wilder, Clinton, "E–Commerce Emerges," Information Week, Jun. 14, 1996.*
IBM press release, M2 Presswire, "Wide variety of retailers sign up for World Avenue, IBM's online shopping service.", Nov. 12, 1996.*
Tadjer, Rivka, "Giving Content a Push," Communications Week, Jun. 2, 1997.*
Broadvision press release, M2 Presswire, "Virgin Net teams with Broadvision to deliver personalised services on Virgin Online", May 15, 1996.*
Lach, Jennifer, "Reading your mind, reaching your wallet,", Nov. 1998.*
Hof et al., "Amazon.com: The Wide World of E–Commerce," Business Week, Dec. 14, 1998.*
PRNewswire, "Book Stacks Unlimited Announces Poetry Month Exhibit", Apr. 18, 1997.*
Business Wire, CUC International Inc. offers consumers customized book recommendations through its book stacks subsidiary, Apr. 22, 1997.*
Alexandria Digital Literature, www.alexlit.com, no date known.*
Amazon.com, www.amazon.com, no date known.*
"Amazon.com Catapults Electronic Commerce to Next Level With Powerful New Features", Sep. 23, 1997.*

* cited by examiner

Primary *Examiner*—Nicholas D. Rosen
(74) Attorney, Agent, or *Firm*—Rothwell, Figg, Ernst & Manbeck

(57)                    **ABSTRACT**

A computer-implemented method and system utilizing a distributed network for the recommendation of goods and/or services to potential costumers based on a potential customer's selection of goods and/or services and a database of previous customer purchasing history.

**16 Claims, 7 Drawing Sheets**





FIG. 1



FIG.2



FIG. **3A**



FIG. 3B

U.S. Patent

Aug. 24, 2004

Sheet 4 of 7

US 6,782,370 B1

## CLEAR  AND  PRESENT  DANGER

Search  Type: TITLE                    Number  of  Books: 6

| Title | Author | Date | Bind | Price |
|---|---|---|---|---|
| Clear and Present Danger | Clancy, Tom | 08/94 | PAP | $5.94 |
| Clear and Present Danger (Thorndike Large Print Series) | Clancy, Tom | 10/90 | TRD | $20.36 |
| Clear and Present Danger | Clancy, Tom | 08/89 | TRD | $21.21 |
| Clear and Present Danger | Clancy, Tom/ Stiers, David Ogden (Unk) | 07/94 | TRD | $17.00 |
| Clear and Present Danger | Clancy, Tom | 07/96 | PAP | $6.38 |
| Clear and Present Danger/Multi-Track Audio Cassettes | Clancy, Tom | 04/90 | TRD | $38.95 |

FIG. 3C                    100

U.S. Patent    Aug. 24, 2004    Sheet 5 of 7    US 6,782,370 B1

CLEAR  AND  PRESENT  DANGER

By

Clancy, Tom

How  Many  Copies ?

PUBLISHER: BRKP
CATEGORY: Movies
PUB  DATE:  08/94
BINDING: Paperback
PRICE:  US $6.99

ISBN: 0425144372
BOOKMARKS: 5
*YOU  SAVE:$1.05 (15%)*

YOUR  PRICE: $5.94
MEMBER  PRICE: $4.89

*AFFINITY* SM  BY  SAME  PEN

FIG. 3D

100

U.S. Patent

Aug. 24, 2004

Sheet 6 of 7

US 6,782,370 B1

af·fin·i|ty n. 1similarity 2close relationship; connection 3liking or inclination toward something

With <u>Affinity</u>, our own agent-based technology, you can explore the tastes of our other customers who've bought this same book. It's completely anonymous, and requires no effort. Finally, a helpful recommendation service based on *real people's real interests!* Based on *5* years of our customer's buying history, we think you might enjoy the book(s) listed below, purchased by customers who enjoyed <u>*Clear and Present Danger*</u>.

| Title | Author | Confidence In This Match |
|-------|--------|--------------------------|
| 📖 <u>*Eaters of the Dead*</u> | –Crichton, Michael | 100% |
| 📖 <u>*Disclosure*</u> | –Crichton, Michael | 100% |
| 📖 <u>*Red Storm Rising*</u> | –Clancy, Tom | 100% |
| 📖 <u>*Patriot Games*</u> | –Clancy, Tom | 100% |
| 📖 <u>*The Sum of All Fears*</u> | –Clancy, Tom | 100% |
| 📖 <u>*Debt of Honor*</u> | –Clancy, Tom | 100% |

📖 denotes additional information.

FIG. 3E

100



FIG.4

US 6,782,370 B1

**1**

# SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY

## BACKGROUND OF THE INVENTION

### 1. Field Of The Invention

The present invention relates to the use of computer systems to facilitate the recommendation of goods or services utilizing a distributed network such as the Internet, specifically to provide recommendations of goods or services that may be of interest to potential customers based on a potential customers' selection of goods or services and a database of previous customer history with respect to the selected goods or services.

### 2. Description Of The Background Art

Providing recommendations of goods or services of interest to customers in a computer system environment has been based on demographic profiles and usually requires extensive customer participation and divulgence of personal information (for example, the input of: age, profession, hobbies, gender, . . . ) to create a user profile, which is then compared against other user profiles to determine possible items of interest to the user. The need for extensive customer input limits the appeal of these feedback systems because they require the user to expend substantial time and effort in addition to revealing personal details in order to obtain the requested information.

The present invention allows potential customers to utilize a computer system interfaced with a distributed network to obtain recommendations of goods or services that may be of interest to them while substantially reducing the degree of customer input required in comparison to prior art systems. Instead of relying on the personal information provided by each potential customer as a basis for determining recommendations, the subject invention utilizes a customer activity history database to facilitate the determination of recommendations.

## SUMMARY OF THE INVENTION

A method for recommending goods or services is provided which allows the user of a computer system connected to a distributed network such as the Internet to receive recommendations of goods or services of potential interest based on a particular good or service selected by the user and previous customer buying history. The previous customer buying history is assembled by passively tracking and retaining or storing all purchasing decisions by previous customers.

The user first selects a particular good or service he may be interested in obtaining. This selection is treated as filter data input to a host computers' data processor. The data processor then compares this input data with a customer activity history database to determine if there are any possible goods or services that can be recommended to the user. If there are possible recommendations the user can choose to have those goods or services recommended to him by the system. The data processor then utilizes the filter data input and the customer history database to determine all of the customers who have purchased the particular good or service selected by the user and all the goods or services those customers-have purchased. The goods or services purchased in common by this group of customers are returned as filtered output data and displayed to the user as recommended goods or services.

**2**

According to another aspect of the invention, a confidence factor indicating the level of confidence in the strength of the recommendation may be provided.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram showing one preferred embodiment of the present invention.

FIG. 2 is a flow diagram showing one preferred embodiment of user interaction with a customer history database.

FIG. 3A is a depiction of the home page of the website as displayed to the user which provides the search option to the user.

FIG. 3B is a depiction of the search page as displayed to the user where the user can search by author, title, keyword, or ISBN.

FIG. 3C is a depiction of the search results page as displayed to the user where the user can select a particular book.

FIG. 3D is a depiction of the book selection page as displayed to the user where the user can select to have recommendations of potential interest returned to him.

FIG. 3E is a depiction of the recommendations result page as displayed to the user.

FIG. **4** is a flow diagram showing one preferred embodiment of the computer-implemented systems' structure and data flow.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the preferred embodiment, books are recommended over the Internet using World Wide Web technology although any communication medium could be used including distributed networks such as Local Area Networks (LANs), Wide Area Networks (WANs), or Electronic Bulletin Board Systems (BBSs). For purposes of illustration, the areferred embodiment will be described in the context where the goods or services are books; however, the invention may be practiced with respect to any good or service.

With reference to FIG. **1** a remote user utilizing an operator interface **1** accesses a distributed network communication medium 2, such as, for example, the Internet via the World Wide Web. The operator interface **1** may be any computer with a modem, network card or any other device including wireless devices utilized in computer systems to facilitate the transmission of data and may be found in personal computers used in households, business offices or schools. The computer can be any device capable of processing data such as computers based on technology from Apple Computer (e.g., The Macintosh, The Performa, the PowerMac series, etc.) or technology based on processors by Intel, AMD, Cyrix, etc. and commonly referred to as IBM comaatibles. It should be noted however that a user need not have a computer (i.e., a machine with processing power); a so-called "dummy terminal" being sufficient. Once logged onto the Internet, the user accesses a host computer **3** by specifying a website domain address, as is well known. The host computer **3** contains information regarding goods or services (such as books) for sale and also contains a customer purchasing history database **4** which stores data describing all purchases of previous customers.

One preferred method of retrieving recommendation information will be explained with reference to FIGS. **1**, **2** and 3A–3E, and will be described with particular reference to retrieving information regarding the purchase and recommendation of books.

**3**

At step **10,** a user logs onto the Internet network, such as by obtaining access through an Internet service provider, and at step **20,** the user enters the website by retrieving information from host computer 3.

A screen display **100** as shown in FIG. 3A provides various hypertext selections for various actions to be performed. **As** indicated, a user may choose to browse, search, order, retrieve account information, or request help.

The user can select a book by choosing the Search function in FIG. 3A. Once the search function has been selected, the user may search for the book by either author, title, keyword or a International Standard Book Number (ISBN) as shown in FIG. 3B.

The user may utilize any of these methods to select a particular title. In FIG. 3C, a user has selected the title Clear and Present Danger by author Tom Clancy. As shown in FIG. 3C, any particular title may be available in a number of different formats or editions. Once a specific title is selected from among the choices in FIG. 3C, the host computer 3 determines if there are any possible recommendations available for this particular book. If no other books are available as recommendations, the host computer will not give the user the option to request recommendations; the user can still purchase the selected title or request other information concerning this book. If other books are available as recommendations, the option to request recommendations is supplied to the user in the form of a hypertext display as shown in FIG. 3D as the Affinity™ service.

The system determines whether other books are available to be recommended by consulting the customer history database **4.** The customer history database includes three relational database tables consisting of Customers, Orders and Items. The tables are related to each by keying unique customer IDs in the Customer table to order numbers in the Orders table and product identification numbers in the Items table. For example, books may be identified by their unique ISBN in the Items table. When a user has selected a particular book, the system searches the database **4** to determine all previous customers who have purchased that book. If there exist in the database at least two other customers who have purchased the user-selected book and those at least two customers have also purchased other books (or other products) in common, then the Affinity™ hypertext link will appear in the display page for the selected book. If the search does not find at least two customers who have purchased the selected book and who have also purchased another book in common, the Affinity™ hypertext link will not appear in the display page. Once the user activates the Affinity™ hypertext link, the books purchased in common will be displayed, as shown in FIG. 3E.

Another aspect of the invention is the indication of a "confidence match" factor as shown in FIG. 3E. The confidence factor is calculated based on the frequency of appearance of the recommended books (or other items) in the histories of the customers who have purchased the selected book (or other item). For example, if ten customers who purchased book A also purchased book B, the confidence factor in the recommendation of book B to a user who selected book A would be 100%. If on the other hand only 7 of the ten customers who purchased book A also purchased book B, the confidence factor for book B would be 70%. **As** previously explained above, if none of the customers who purchased book A also purchased at least one other book in common, the Affinity™ hypertext link would not be displayed.

The user makes a request for recommended books by selecting the Affinity™ hypertext using a tracking device

**4**

such as a mouse. The request is then transmitted to the host computer 3 via the Internet **2** and is processed at the host computer 3. To facilitate the processing and storage of data each customer is assigned a unique customer ID and each book is identified by its unique ISBN. The host computer utilizes these elements to track and retain the identification of all customers and their purchases. The retained customer purchasing history is stored in the customer history database **4** and is accessed whenever a request for recommendations is submitted to the host computer.

Utilizing the customer history database **4,** the host computer **3** searches all the books purchased by all the customers who have purchased the particular book that was selected by the user. Titles which have been purchased in common among the customers are selected as recommendations for the user. This collaborative filter or intelligent agent is superior to other methods because it uses actual customer purchasing history to assemble recommendations. It does not require any customer effort nor impinge on customer privacy. The recommendations are then transmitted to the user via the Internet **2** and displayed on the user interface **1** as shown in FIG. 3E.

FIG. 4 illustrates one example of the system structure and data flow. An operator enters input data **21** consisting of a selected book. This input data **21** is transmitted from the operator to the processor **23** via a distributed network **22** similar to the distributed networks described earlier with reference to block **2** in FIG. **1.** The processor utilizes database selection rules 25 as explained above in conjunction with the input data **21** to determine the recommendations that will be accessed from the database **26** which contains data on previous customer purchasing history. The recommendations are then transmitted from the processor **23** to the operator as output data **24** via a distributed network as previously described with reference to FIG. **1** block **2.**

The invention having been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the following claims.

I claim:

**1.** A computer-implemented method for the recommendation of goods and/or services to potential customers over a distributed network based on customer buying history utilizing an information processing system containing processing means having transmission means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

receiving customer commands specifying a particular good or service to be used as filter data;

storing information pertaining to goods and/or services purchasing history of previous customers;

comparing said filter data with said stored information and determining whether, for said filter data, corresponding entries exist within the stored information; and

if corresponding entries exist, displaying the identity of other goods and/or services purchased by said previous customers who have purchased the good and/or service used as said filter data.

**2.** The method of claim **1** wherein said distributed network is the Internet.

3. The method of claim **1** wherein said distributed network is a Local Area Network.

**4.** The method of claim **1** wherein said distributed network is a Wide Area Network.

US 6,782,370 B1

**5**

**5.** The method of claim **1** wherein said distributed network is a Bulletin Board System.

**6.** The method of claim **1** wherein said goods are books.

7. A computer-implemented interactive system for assisting a potential customer in purchasing decisions from among a plurality of goods or services, the system comprising:

an operator interface for enabling potential customers to input requests to said computer, including requests for:
the purchase of goods or services,
information concerning goods or services,
recommendations of goods or services based on operator input;

a database maintained in said computer, containing information pertaining to goods and/or services purchasing history of previous customers;

means for processing inputted requests and for filtering relevant history information regarding said inputted requests from said database;

a distributed network for transmitting requests from said operator interface to said computer and for transmitting responsive information from said computer to said operator interface;

interface whereby goods and/or services identification information corresponding to goods and/or services purchased by previous customers who have purchased the goods and/or services requested by said potential customers are transmitted to said operator interface for use by said potential customers.

**6**

**8.** The system of claim 7 wherein said distributed network is the Internet.

**9.** The system of claim 7 wherein said distributed network is a Local Area Network.

**10.** The system of claim 7 wherein said distributed network is a Wide Area Network.

**11.** The system of claim 7 wherein said distributed network is a Bulletin Board System.

**12.** The system of claim 7 wherein said goods are books.

**13.** The system of claim 7 wherein said operator interface is a personal computer.

**14.** The system of claim 7 wherein said operator interface is a workstation.

**15.** The system of claim 7 wherein said operator interface is a dummy terminal.

**16. A** computer program product having a computer readable medium having computer readable code recorded thereon for the recommendation of goods or services in response to user input, comprising:

input means for receiving user commands specifying a particular good or service to be used as filter data;

database storage means for the retention of data concerning goods or services purchase decisions of prior users; and

means for filtering said database storage means using said specified particular rood or service to obtain recommendations of other goods or services to a user based on said inputted user commands.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,782,370 B1                                    Page 1 of  1
DATED          : August 24, 2004
INVENTOR(S)  : Charles Stack

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6,
Line 26, " rood should be -- good --.

Signed and Sealed this

Sixteenth Day of November, 2004

*JON W. DUDAS*
*Director of the United States Patent and Trademark Office*

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

05 41 4

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

CENDANT PUBLISHING, INC.
*

**DEFENDANTS**

AMAZON.COM, INC.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASE)

*Plaintiff is a Delaware corporation.

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Steven J. Balick
Ashby & Geddes
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801    (302) 654-1888

Attorneys (If Known)

Unknown

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**TORTS**
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury— Med. Malpractice
☐ 365 Personal Injury— Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☒ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of state Statutes
☐ 890 Other Statutory Actions

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
This is an action arising out of the patent law of the United States, Title 35 U.S. Code.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ monetary and injunctive relief
CHECK YES only if demanded in complaint.
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):
JUDGE _____
DOCKET NUMBER _____

DATE
June 20, 2005

SIGNATURE OF ATTORNEY OF RECORD
Steven J. Balick

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____0 5 - 4 1 4_____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___2___ COPIES OF AO FORM 85.

_6-20-05_____          _Joseph J. Saienni_____
(Date forms **issued**)              (Signature **of Party** or their Representative)

_Joseph J. Saienni_____
(Printed name of Party *or* their Representative)

Note: **Completed receipt** will **be filed** in **the Civil Action**

# EXHIBIT B



CNET tech sites: Product reviews | Shop | Tech news | Downloads | Site
m                                                                              News.com Mobile
Lo                                                                             for PDA or phone          Forgot password? | Sign
                                                                                                                               up

Corrections Blogs Extra Readers' Choice My News
Front Door Business Tech Cutting Edge Access Threats Media 2.0 Markets Digital Life

# Amazon countersues Cendant

By Paul Festa
Staff Writer, CNET News.com
Published: July 18, 2005, 12:18 PM PDT

| TalkBack |
| E-mail |
| Print |

**Amazon.com has accused Cendant of patent infringement in what it
described as a purely defensive countersuit.**

Amazon late last month filed the claims in the U.S. District Court for the Western
District of Washington, alleging that Cendant and subsidiaries Orbitz, Avis, Budget
and Trilegiant infringed four patents held by Amazon.

Cendant had sued Amazon for patent infringement in November. Following
unsuccessful settlement negotiations, the company refiled its suit in June. Amazon
subsequently filed its countersuit.

Amazon has walked a fine line between decrying the state of software and business
process patent litigiousness and building its own healthy patent portfolio. Amazon
CEO Jeff Bezos has advocated patent reform for years.

**In other news:**

- ENIAC: A computer is born - Stories, photos and video

- RSA confab: Boom times for security

- Intel's mantra: Let's make a deal

- Newsmaker: You've got (certified) mail!

Amazon said its current patent action came only in self-defense.

"The suit was filed in direct response to Cendant's refiling of their patent infringement suit," said Amazon spokeswoman Patty Smith. "This is the first time that we have asserted any of these four patents, and we would not have asserted them if Cendant had not filed against us. It's purely a defensive measure."

Cendant did not immediately return calls seeking comment.

The four patents in question are U.S. Patent No. 5,715,399: secure method and system for communicating a list of credit card numbers over a nonsecure network; No. 6,029,141: Internet-based customer referral system; No. 6,625,609: method and system for navigating within a body of data using one of a number of alternative browse graphs; and No. 6,629,079: method and system for electronic commerce using multiple roles.

| | |
|---|---|
| ⬜ **TalkBack** | |
| ✉ **E-mail** | |
| 🖨 **Print** | |

**Read more on this story's topics and companies**

- Add to My News | Create an alert **Patents**
- Add to My News | Create an alert **E-commerce**
- Add to My News | Create an alert **Legal**
- Add to My News | Create an alert **Amazon.com Inc**

**TrackBack**

See links from elsewhere to this story.

**TalkBack**

No discussion exists, click here to start it.

▼ advertisement

Amazon countersues Cendant | CNET News.com



**The big picture** **Related stories** **What's hot** **Latest headlines**

- Symantec taps ex-airline exec as CFO
- Readers on their first computer
- Microsoft flagged Symantec software as spyware
- Banks scramble on debit card theft
- A showcase for all things wireless
- As Valentine's approaches, Craigslist heats up
- Microsoft, BT, Virgin team on mobile TV
- Swimsuit downloads for your iPod or phone
- Nvidia's new graphics chip rings up 'Quake'
- RIM unfazed as rivals take aim at BlackBerry
- MySQL lands $18.5 million in third round
- HP extends Oracle pact to cover middleware
- Open source: The newest competitive tool
- Seagate plans 12GB mini-hard drive
- Software vendors face rising offshore costs
- **See all headlines from the past week >**

**Dice Career Guidance Center**
- Post your resume on Dice where it will be seen by thousands of hiring companies.Find your next great career opportunity>>

- Are you earning what you're worth?Find out how your salary stacks up>>

- Search more than 60,000 tech jobs. Enter keywords skill, job title, location.Read all about it>>



The leading provider of online recruiting services for tech professionals

**Dice**™
Look to the tech leader first™

**Top picks from News.com readers**

Readers who read **Amazon countersues Cendant** also read…

- Cendant sues Amazon over book recommendations
- FAQ: The new 'annoy' law explained
- 600,000 Xbox 360 units sold in U.S.
- In Canada: Cache a page, go to jail?
- Yahoo updates antispam tools
- Planning to dump IE? Think again
- Congress to scrutinize patent tax breaks
- Sony looks to high end for hit products
- Google to bid on AOL?

**More Info**

---

**Markets**

Market news, charts, SEC filings, and more

**Related quotes**

- ▼ Amazon.com Inc. 37.86 -0.66 (-1.71%)

- ▼ DJIA 10,892.24 -26.81 (-0.25%)

- ▼ S&P 500 1,262.86 -4.13 (-0.33%)

- ▼ NASDAQ 2,239.81 -22.07 (-0.98%)

- ▼ CNET TECH 1,384.96 -13.56 (-0.97%)

Symbol Lookup

---

**Daily spotlight**

## Photos: Fans flock to comic convention



Imaginations wander at WonderCon 2006, a comic-book convention held in San Francisco over the weekend.

## Perspective: E-tracking through your cell phone



Against a law, prosecutors aim to track suspects' locations through cell phones, CNET News.com's Declan McCullagh says.

## Video: AMD video contest winners



AMD sponsored a film contest to express the concept of "waitlessness" in 64 seconds. Here are the winners.

## Intel's mantra: Let's make a deal



**news analysis** Chipmaker's pact with Skype highlights how exclusive content can outweigh technology or performance.

▶ Intel shows off quad core

▼ advertisement



**BNET** | **CNET.com** | **CNET Channel** | **CNET Download.com** | **CNET News.com** | **CNET Reviews** | **CNET Shopper.com** | **Computer Shopper**

**GameSpot** | **International Media** | **MP3.com** | **mySimon** | **Release 1.0** | **Search.com** | **TechRepublic** | **TV.com** | **Webshots** | **ZDNet**

Copyright ©2006 CNET Networks, Inc. All Rights Reserved. Privacy Policy | About CNET Networks | Jobs | Terms of Use

EXHIBIT C



### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CENDANT PUBLISHING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. ___ 0 4 - 1 4 0 5 |
| | ) | |
| v. | ) | |
| | ) | |
| AMAZON.COM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff, Cendant Publishing, Inc. ("Cendant Publishing"), for its cause of action against Amazon.com, Inc. ("Amazon"), states and alleges as follows:

### THE PARTIES

1.      Plaintiff Cendant Publishing is a Delaware corporation with its principal place of business at 10750 West Charleston, Suite 130, Las Vegas, Nevada 89135.

2.      Upon information and belief, Defendant Amazon is a Delaware corporation with its principal executive offices at 1200 12th Avenue South, Suite 1200, Seattle, Washington 98114. Amazon operates an internet-based marketplace selling millions of items including books as shown by its website at <http://www.amazon.com>. A key feature of Amazon's website includes web pages tailored to individual preferences, such as recommendations and notifications.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

4.      This Court has personal jurisdiction over defendant Amazon because of, *inter alia*, its incorporation in Delaware and its operation of its Internet website, amazon.com, which is accessible to and marketed to residents of Delaware.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## NATURE OF THE ACTION

6.      Cendant Publishing brings this action for infringement of United States Patent No. 6,782,370 ("'370 patent"). A copy of the '370 patent is attached as Exhibit A hereto.

7.      The '370 patent, entitled "System and Method for Providing Recommendation of Goods or Services Based on Recorded Purchasing History" was duly and properly issued by the United States Patent and Trademark Office ("PTO") on August 24, 2004. The '370 patent is valid and enforceable.

8.      Amazon operates an on-line marketplace through its amazon.com website. Amazon's online marketplace uses numerous features which recommend other goods to potential customers based on prior customer purchasing history. Amazon's recommendation features, *inter alia*, "Customers who bought this book also bought" infringe one or more claims of the '370 patent.

9.      Cendant Publishing was the assignee of the '370 patent at the time it was issued.

2

10.     Cendant Publishing is the owner of the '370 patent and has the right to sue for infringement of the '370 patent.

## CLAIM I
### Infringement of the '370 Patent

11.     Cendant Publishing realleges the allegations of Paragraphs 1 to 10 above as if set forth herein.

12.     Amazon has infringed the '370 patent and will continue to do so unless enjoined by this Court.

13.     Amazon's infringement of the '370 patent has damaged Cendant Publishing and will continue to cause Cendant Publishing harm unless enjoined by this Court.

## DEMAND FOR JURY TRIAL

14.     Pursuant To Fed. R. Civ. P. 38 and District of Delaware L.R. 38.1, Cendant Publishing respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Cendant Publishing prays for judgment as follows:

A.     That this Court adjudge and decree that the '370 patent is valid and infringed by Amazon;

B.     That this Court permanently enjoin Amazon, its agents, servants, employees, attorneys, and all others in active concert or participation with Amazon from infringing the '370 patent;

3

C.   That this Court award Cendant Publishing damages adequate to compensate for

Amazon's infringement of the '370 patent;

D.   That this Court award Cendant Publishing its costs, disbursements, and attorneys'

fees for this action, including those pursuant to 35 U.S.C. § 285;

E.   That Cendant Publishing be awarded such further relief as this Court may deem

just and appropriate.

ASHBY & GEDDES

Steven J. Balick (I.D. #2403)
John G. Day (I.D. #2114)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19989
(302) 654-1888

*Attorneys for Plaintiff Cendant Publishing, Inc.*

*Of Counsel:*

Steven Lieberman
Elizabeth A. Leff
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.
Suite 800
Washington, D.C.  20005
(202) 783-6040

Dated: October 29, 2004
149417 v1

4

US006782370B1

(12) **United States Patent**
Stack

(10) Patent No.: **US 6,782,370 B1**
(45) Date of Patent: **Aug. 24, 2004**

(54) SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY

(75) Inventor: **Charles Stack**, Cleveland, OH (US)

(73) Assignee: **Cendant Publishing, Inc.**, Aurora, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1030 days.

(21) Appl. No.: **08/923,293**

(22) Filed: **Sep. 4, 1997**

(51) Int. Cl.[7] .......................... G06F 17/60
(52) U.S. Cl. .............. 705/10; 705/26; 705/14
(58) Field of Search .............. 705/10, 26, 27, 705/28, 29, 14; 235/376; 707/10, 104.1

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,870,579 A | * | 9/1989 | Hey ..................... 705/27 |
| 4,996,642 A | * | 2/1991 | Hey ..................... 705/27 |
| 5,583,763 A | * | 12/1996 | Atcheson et al. ......... 707/3 |
| 5,749,081 A | * | 5/1998 | Whiteis ................ 707/102 |
| 5,754,938 A | * | 5/1998 | Herz et al. ............ 725/116 |
| 5,774,868 A | * | 6/1998 | Cragun et al. .......... 705/10 |
| 5,790,426 A | * | 8/1998 | Robinson .............. 702/179 |
| 5,790,935 A | * | 8/1998 | Payton ................ 455/5.1 |
| 5,832,457 A | * | 11/1998 | O'Brien et al. ......... 705/14 |
| 5,867,799 A | * | 2/1999 | Lang et al. ........... 707/1 |
| 6,041,311 A | * | 3/2000 | Chislenko et al. ....... 705/10 |
| 6,049,777 A | * | 4/2000 | Sheena et al. .......... 705/10 |
| 6,058,367 A | * | 5/2000 | Sutcliffe et al. ....... 705/1 |
| 6,092,049 A | * | 7/2000 | Chislenko et al. ....... 705/10 |
| 6,112,186 A | * | 8/2000 | Bergh et al. ........... 705/10 |
| 6,266,649 B1 | * | 7/2001 | Linden et al. .......... 705/26 |
| 6,507,872 B1 | * | 1/2003 | Geshwind .............. 709/226 |
| 2001/0013009 A1 | * | 8/2001 | Greening et al. ........ 705/10 |

FOREIGN PATENT DOCUMENTS

WO   WO-97/02537 A1 *   1/1997

OTHER PUBLICATIONS

"How ICL Is Ensuring That Your Retailer Knows More About You Than You Know Yourself," Computergram International, Jun. 14, 1996.*
Wilder, Clinton, "E–Commerce Emerges," Information Week, Jun. 14, 1996.*
IBM press release, M2 Presswire, "Wide variety of retailers sign up for World Avenue, IBM's online shopping service.", Nov. 12, 1996.*
Tedjer, Rivka, "Giving Content a Push," Communications Week, Jun. 2, 1997.*
Broadvision press release, M2 Presswire, "Virgin Net teams with Broadvision to deliver personalized services on Virgin Online", May 15, 1996.*
Lieb, Jennifer, "Reading your mind, reaching your wallet,", Nov. 1998.*
Hof et al., "Amazon.com: The Wide World of E–Commerce," Business Week, Dec. 14, 1998.*
PRNewswire, "Book Stacks Unlimited Announces Poetry Month Exhibit", Apr. 18, 1997.*
Business Wire, CUC International Inc. offers consumers customized book recommendations through its book stacks subsidiary, Apr. 22, 1997.*
Alexandria Digital Literature, www.alexlit.com, no date known.*
Amazon.com, www.amazon.com, no date known.*
"Amazon.com Catapults Electronic Commerce to Next Level With Powerful New Features", Sep. 23, 1997.*

* cited by examiner

*Primary Examiner*—Nicholas D. Rosen
(74) *Attorney, Agent, or Firm*—Rothwell, Figg, Ernst & Manbeck

(57) **ABSTRACT**

A computer-implemented method and system utilizing a distributed network for the recommendation of goods and/or services to potential costumers based on a potential customer's selection of goods and/or services and a database of previous customer purchasing history.

**16 Claims, 7 Drawing Sheets**





FIG.1



FIG.2



FIG. 3A



FIG. 3B

| CLEAR AND PRESENT DANGER | | | | |
|---|---|---|---|---|
| Search Type: TITLE | | Number of Books: 6 | | |

| | Title | Author | Date | Bind | Price |
|---|---|---|---|---|---|
| | Clear and Present Danger | Clancy, Tom | 08/94 | PAP | $5.94 |
| | Clear and Present Danger (Thorndike Large Print Series) | Clancy, Tom | 10/90 | TRD | $20.36 |
| | Clear and Present Danger | Clancy, Tom | 08/89 | TRD | $21.21 |
| 📖 | Clear and Present Danger | Clancy, Tom/ Stiers, David Ogden (Unk) | 07/94 | TRD | $17.00 |
| 📖 | Clear and Present Danger | Clancy, Tom | 07/96 | PAP | $6.38 |
| 📖 | Clear and Present Danger/Multi-Track Audio Cassettes | Clancy, Tom | 04/90 | TRD | $38.95 |

FIG. 3C

100

CLEAR AND PRESENT DANGER

By

Clancy, Tom

How Many Copies ?

PUBLISHER: BRKP
CATEGORY: Movies
PUB DATE: 08/94
BINDING: Paperback
PRICE: US$6.99

ISBN: 0425144372
BOOKMARKS: 5
YOU SAVE:$1.05 (15%)

YOUR PRICE: $5.94
MEMBER PRICE: $4.89

AFFINITY SM BY SAME PEN

100

FIG. 3D

af·fin·i|ty  n.  1 similarity  2 close relationship; connection  3 liking or inclination toward something

With *Affinity*, our own agent—based technology, you can explore the tastes of our other customers who've bought this same book. It's completely anonymous, and requires no effort. Finally, a helpful recommendation service based on *real people's real interests!* Based on 5 years of our customer's buying history, we think you might enjoy the book(s) listed below, purchased by customers who enjoyed *Clear and Present Danger.*

| Title | Author | Confidence In This Match |
|---|---|---|
| 📖 *Eaters of the Dead* | —Crichton, Michael | 100% |
| 📖 *Disclosure* | —Crichton, Michael | 100% |
| 📖 *Red Storm Rising* | —Clancy, Tom | 100% |
| 📖 *Patriot Games* | —Clancy, Tom | 100% |
| 📖 *The Sum of All Fears* | —Clancy, Tom | 100% |
| 📖 *Debt of Honor* | —Clancy, Tom | 100% |

📖 denotes additional information.

FIG. 3E

100



FIG.4

US 6,782,370 B1

1

# SYSTEM AND METHOD FOR PROVIDING RECOMMENDATION OF GOODS OR SERVICES BASED ON RECORDED PURCHASING HISTORY

## BACKGROUND OF THE INVENTION

### 1. Field Of The Invention

The present invention relates to the use of computer systems to facilitate the recommendation of goods or services utilizing a distributed network such as the Internet, specifically to provide recommendations of goods or services that may be of interest to potential customers based on a potential customers' selection of goods or services and a database of previous customer history with respect to the selected goods or services.

### 2. Description Of The Background Art

Providing recommendations of goods or services of interest to customers in a computer system environment has been based on demographic profiles and usually requires extensive customer participation and divulgence of personal information (for example, the input of: age, profession, hobbies, gender, . . . ) to create a user profile, which is then compared against other user profiles to determine possible items of interest to the user. The need for extensive customer input limits the appeal of these feedback systems because they require the user to expend substantial time and effort in addition to revealing personal details in order to obtain the requested information.

The present invention allows potential customers to utilize a computer system interfaced with a distributed network to obtain recommendations of goods or services that may be of interest to them while substantially reducing the degree of customer input required in comparison to prior art systems. Instead of relying on the personal information provided by each potential customer as a basis for determining recommendations, the subject invention utilizes a customer activity history database to facilitate the determination of recommendations.

## SUMMARY OF THE INVENTION

A method for recommending goods or services is provided which allows the user of a computer system connected to a distributed network such as the Internet to receive recommendations of goods or services of potential interest based on a particular good or service selected by the user and previous customer buying history. The previous customer buying history is assembled by passively tracking and retaining or storing all purchasing decisions by previous customers.

The user first selects a particular good or service he may be interested in obtaining. This selection is treated as filter data input to a host computers' data processor. The data processor then compares this input data with a customer activity history database to determine if there are any possible goods or services that can be recommended to the user. If there are possible recommendations the user can choose to have those goods or services recommended to him by the system. The data processor then utilizes the filter data input and the customer history database to determine all of the customers who have purchased the particular good or service selected by the user and all the goods or services those customers have purchased. The goods or services purchased in common by this group of customers are returned as filtered output data and displayed to the user as recommended goods or services.

2

According to another aspect of the invention, a confidence factor indicating the level of confidence in the strength of the recommendation may be provided.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram showing one preferred embodiment of the present invention.

FIG. 2 is a flow diagram showing one preferred embodiment of user interaction with a customer history database.

FIG. 3A is a depiction of the home page of the website as displayed to the user which provides the search option to the user.

FIG. 3B is a depiction of the search page as displayed to the user where the user can search by author, title, keyword, or ISBN.

FIG. 3C is a depiction of the search results page as displayed to the user where the user can select a particular book.

FIG. 3D is a depiction of the book selection page as displayed to the user where the user can select to have recommendations of potential interest returned to him.

FIG. 3E is a depiction of the recommendations result page as displayed to the user.

FIG. 4 is a flow diagram showing one preferred embodiment of the computer-implemented systems' structure and data flow.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the preferred embodiment, books are recommended over the Internet using World Wide Web technology although any communication medium could be used including distributed networks such as Local Area Networks (LANs), Wide Area Networks (WANs), or Electronic Bulletin Board Systems (BBSs). For purposes of illustration, the preferred embodiment will be described in the context where the goods or services are books; however, the invention may be practiced with respect to any good or service.

With reference to FIG. 1, a remote user utilizing an operator interface 1 accesses a distributed network communication medium 2, such as, for example, the Internet via the World Wide Web. The operator interface 1 may be any computer with a modem, network card or any other device including wireless devices utilized in computer systems to facilitate the transmission of data and may be found in personal computers used in households, business offices or schools. The computer can be any device capable of processing data such as computers based on technology from Apple Computer (e.g., The Macintosh, The Performa, the PowerMac series, etc.) or technology based on processors by Intel, AMD, Cyrix, etc. and commonly referred to as IBM compatibles. It should be noted however that a user need not have a computer (i.e., a machine with processing power); a so-called "dummy terminal" being sufficient. Once logged onto the Internet, the user accesses a host computer 3 by specifying a website domain address, as is well known. The host computer 3 contains information regarding goods or services (such as books) for sale and also contains a customer purchasing history database 4 which stores data describing all purchases of previous customers.

One preferred method of retrieving recommendation information will be explained with reference to FIGS. 1, 2 and 3A–3E, and will be described with particular reference to retrieving information regarding the purchase and recommendation of books.

US 6,782,370 B1

3

At step 10, a user logs onto the Internet network, such as by obtaining access through an Internet service provider, and at step 20, the user enters the website by retrieving information from host computer 3.

A screen display 100 as shown in FIG. 3A provides various hypertext selections for various actions to be performed. As indicated, a user may choose to browse, search, order, retrieve account information, or request help.

The user can select a book by choosing the Search function in FIG. 3A. Once the search function has been selected, the user may search for the book by either author, title, keyword or a International Standard Book Number (ISBN) as shown in FIG. 3B.

The user may utilize any of these methods to select a particular title. In FIG. 3C, a user has selected the title Clear and Present Danger by author Tom Clancy. As shown in FIG. 3C, any particular title may be available in a number of different formats or editions. Once a specific title is selected from among the choices in FIG. 3C, the host computer 3 determines if there are any possible recommendations available for this particular book. If so other books are available as recommendations, the host computer will not give the user the option to request recommendations; the user can still purchase the selected title or request other information concerning this book. If other books are available as recommendations the option to request recommendations is supplied to the user in the form of a hypertext display as shown in FIG. 3D as the Affinity™ service.

The system determines whether other books are available to be recommended by consulting the customer history database 4. The customer history database includes three relational database tables consisting of Customers, Orders and Items. The tables are related to each by keying unique customer IDs in the Customer table to order numbers in the Orders table and product identification numbers in the Items table. For example, books may be identified by their unique ISBN in the Items table. When a user has selected a particular book, the system searches the database 4 to determine all previous customers who have purchased that book. If there exist in the database at least two other customers who have purchased the user-selected book and those at least two customers have also purchased other books (or other products) in common, then the Affinity™ hypertext link will appear in the display page for the selected book. If the search does not find at least two customers who have purchased the selected book and who have also purchased another book in common, the Affinity™ hypertext link will not appear in the display page. Once the user activates the Affinity™ hypertext link, the books purchased in common will be displayed, as shown in FIG. 3E.

Another aspect of the invention is the indication of a "confidence match" factor as shown in FIG. 3E. The confidence factor is calculated based on the frequency of appearance of the recommended books (or other items) in the histories of the customers who have purchased the selected book (or other item). For example, if ten customers who purchased book A also purchased book B, the confidence factor in the recommendation of book B to a user who selected book A would be 100%. If on the other hand only 7 of the ten customers who purchased book A also purchased book B, the confidence factor for book B would be 70%. As previously explained above, if none of the customers who purchased book A also purchased at least one other book in common, the Affinity™ hypertext link would not be displayed.

The user makes a request for recommended books by selecting the Affinity™ hypertext using a tracking device

4

such as a mouse. The request is then transmitted to the host computer 3 via the Internet 2 and is processed at the host computer 3. To facilitate the processing and storage of data each customer is assigned a unique customer ID and each book is identified by its unique ISBN. The host computer utilizes these elements to track and retain the identification of all customers and their purchases. The retained customer purchasing history is stored in the customer history database 4 and is accessed whenever a request for recommendations is submitted to the host computer.

Utilizing the customer history database 4, the host computer 3 searches all the books purchased by all the customers who have purchased the particular book that was selected by the user. Titles which have been purchased in common among the customers are selected as recommendations for the user. This collaborative filter or intelligent agent is superior to other methods because it uses actual customer purchasing history to assemble recommendations. It does not require any customer effort nor impinge on customer privacy. The recommendations are then transmitted to the user via the Internet 2 and displayed on the user interface 1 as shown in FIG. 3E.

FIG. 4 illustrates one example of the system structure and data flow. An operator enters input data 21 consisting of a selected book. This input data 21 is transmitted from the operator to the processor 23 via a distributed network 22 similar to the distributed networks described earlier with reference to block 2 in FIG. 1. The processor utilizes database selection rules 25 as explained above in conjunction with the input data 21 to determine the recommendations that will be accessed from the database 26 which contains data on previous customer purchasing history. The recommendations are then transmitted from the processor 23 to the operator as output data 24 via a distributed network as previously described with reference to FIG. 1 block 2.

The invention having been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the following claims.

I claim:

1. A computer-implemented method for the recommendation of goods and/or services to potential customers over a distributed network based on customer buying history utilizing an information processing system containing processing means having transmission means for receiving and transmitting data, and database storage means for storing information in database files, the method comprising the steps of:

receiving customer commands specifying a particular good or service to be used as filter data;

storing information pertaining to goods and/or services purchasing history of previous customers;

comparing said filter data with said stored information and determining whether, for said filter data, corresponding entries exist within the stored information; and

if corresponding entries exist, displaying the identity of other goods and/or services purchased by said previous customers who have purchased the good and/or service used as said filter data.

2. The method of claim 1 wherein said distributed network is the Internet.

3. The method of claim 1 wherein said distributed network is a Local Area Network.

4. The method of claim 1 wherein said distributed network is a Wide Area Network.

US 6,782,370 B1

5

5. The method of claim 1 wherein said distributed network is a Bulletin Board System.

6. The method of claim 1 wherein said goods are books.

7. A computer-implemented interactive system for assisting a potential customer in purchasing decisions from among a plurality of goods or services, the system comprising:

an operator interface for enabling potential customers to input requests to said computer, including requests for:
the purchase of goods or services,
information concerning goods or services,
recommendations of goods or services based on operator input;

a database maintained in said computer, containing information pertaining to goods and/or services purchasing history of previous customers;

means for processing inputted requests and for filtering relevant history information regarding said inputted requests from said database;

a distributed network for transmitting requests from said operator interface to said computer and for transmitting responsive information from said computer to said operator interface;

interface whereby goods and/or services identification information corresponding to goods and/or services purchased by previous customers who have purchased the goods and/or services requested by said potential customers are transmitted to said operator interface for use by said potential customers.

6

8. The system of claim 7 wherein said distributed network is the Internet.

9. The system of claim 7 wherein said distributed network is a Local Area Network.

10. The system of claim 7 wherein said distributed network is a Wide Area Network.

11. The system of claim 7 wherein said distributed network is a Bulletin Board System.

12. The system of claim 7 wherein said goods are books.

13. The system of claim 7 wherein said operator interface is a personal computer.

14. The system of claim 7 wherein said operator interface is a workstation.

15. The system of claim 7 wherein said operator interface is a dummy terminal.

16. A computer program product having a computer readable medium having computer readable code recorded thereon for the recommendation of goods or services in response to user input, comprising:

input means for receiving user commands specifying a particular good or service to be used as filter data;

database storage means for the retention of data concerning goods or services purchase decisions of prior users; and

means for filtering said database storage means using said specified particular good or service to obtain recommendations of other goods or services to a user based on said inputted user commands.

* * * * *

# EXHIBIT D



▶

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
AGILENT TECHNOLOGIES, INC., Plaintiff,
v.
MICROMUSE, INC., Defendant.
**No. 04 Civ. 3090(RWS).**

Oct. 19, 2004.

Christian & Barton, Richmond, VA, By: Michael W. Smith, Craig T. Merritt, R. Braxton Hill, for Plaintiff, of counsel.

Gray Cary Ware & Freidenrich, San Diego, CA, By: Edward H. Sikorski, John Allcock, Sean C. Cunningham, Megan Whyman Olesek, for Plaintiff.

Brown Raysman Millstein Felder & Steiner, New York, NY, By: Seth Ostrow, Jeffrey P. Weingart, Eric C. Osterberg, for Defendant, of counsel.

Willcox & Savage, Norfolk, VA, By: Michael R. Katchmark, Gary A. Bryant, for Defendant, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendant Micromuse, Inc. ("Micromuse") has moved pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of plaintiff Agilent Technologies, Inc. ("Agilent") alleging patent infringement, and, in the alternative, for a more definite statement pursuant to Rule 12(e), and to add Hewlett Packard Company ("H-P") as a necessary party under Rules 12(b)(7) and 19(a) of those same Rules. Micromuse has also moved to disqualify Gray Cary Ware & Freidenrich, LLP ("Gray Cary") from representing Agilent in this action, Gray Cary having previously represented NetWork Harmoni, Inc. ("Network Harmoni"), an entity acquired by Micromuse prior to the filing of this action. Agilent has cross-moved for leave to file a supplemental declaration in opposition to Micromuse's motion to

disqualify Gray Cary. For the reasons set forth below, Micromuse's motion to dismiss is denied, the motion for a more definite statement is granted, the motion to add H-P as a party is denied at this time with leave granted to renew, and the motion to disqualify is denied at this time with leave granted to renew. Agilent's cross-motion for leave to file a supplemental declaration is granted.

*Prior Proceedings*

The complaint in this patent infringement action was filed in the United States District Court for the Eastern District of Virginia, Norfolk Division, on November 10, 2003.

On December 17, 2003, Micromuse filed the instant motions in the Eastern District of Virginia as well as a motion to transfer the action to this district, which latter motion was granted by order of the Honorable Raymond A. Jackson filed on April 16, 2004. The action was transferred to this district on April 22, 2004.

The remaining motions were argued and marked fully submitted on May 19, 2004.

*The Complaint*

The following facts are drawn from Agilent's complaint and do not constitute findings of fact by the Court.

According to the complaint, Agilent is a Delaware corporation having its headquarters in Palo Alto, California, and significant operations in Fort Collins, Colorado. It is alleged that Micromuse is a Delaware Corporation with headquarters in San Francisco, California, and significant operations in Northern Virginia, Georgia, Illinois, Texas, New York, London, and other overseas destinations. Subject matter jurisdiction is alleged under 28 U.S.C. § § 1331 and 1338.

With regard to the factual background of the complaint, it is alleged that:

6. Agilent is a leading provider of components, test, measurement, monitoring and management solutions for the communications industry. Agilent's broad set of solutions and services includes, among other technologies, optical,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

wireless, Internet and broadband technologies that span the entire communications life cycle. Having invested substantial resources in the development of these technologies, Agilent maintains a portfolio of patents covering its inventions, including the patents at issue.

**\*2** 7. On October 24, 2000, United States Patent No. 6,138,122 ("the '122 Patent"), entitled "Modeling of Internet Services," was duly and legally issued to Mark D. Smith, Deborah L. Caswell and Srinivas Ramanathan. All rights, title and interest in the '122 Patent were assigned to Agilent, which remains the sole owner of the '122 Patent....

8. On January 1, 2002, United States Patent No. 6,336,138 ("the '138 Patent"), entitled "Template-Driven Approach For Generating Models On Network Services," was duly and legally issued to Deborah L. Caswell, Srinivas Ramanathan, James D. Hunter, Scott S. Neal, Frederick A. Sicker and Mark D. Smith. All rights, title and interest in the '138 Patent were assigned to Hewlett-Packard Company. Agilent and Hewlett-Packard Company now jointly own the '138 Patent, and Agilent has the exclusive right to enforce the '138 Patent against Micromuse....

(Compl. at ¶¶ 6-8.) It is further alleged that Micromuse "makes, sells, or offers products for sale in this district that infringe Agilent's patents." (Compl. at ¶ 4.)

The complaint contains two counts and Micromuse's liability is alleged as follows:

### COUNT ONE
Infringement of U.S. Patent No. 6,138,122

9. Agilent realleges the foregoing paragraphs.

10. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '122 Patent.

11. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

12. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

13. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on their behalf from infringing the '122 Patent, Agilent will be greatly and irreparably harmed.

### COUNT TWO
Infringement of U.S. Patent No. 6,336,138

14. Agilent realleges the foregoing paragraphs.

15. Agilent is informed and believes that Micromuse has directly infringed and continues to infringe, has induced and continues to induce, and/or has committed and continues to commit acts of contributory infringement of, one or more claims of the '138 Patent.

16. Agilent is informed and believes that Micromuse's acts of patent infringement are and continue to be willful and deliberate.

17. As a result of Micromuse's patent infringement, Agilent has suffered damages in an amount not yet determined, and will continue to suffer damages in the future.

18. Unless an injunction is issued enjoining Micromuse and its agents, servants, employees, attorneys, representatives, and all others acting on its behalf from infringing the '138 Patent, Agilent will be greatly and irreparably harmed.

**\*3** (Compl. at ¶¶ 9-18.)

*Discussion*

I. *Micromuse's Motion To Dismiss Is Denied*

Micromuse has moved to dismiss Agilent's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint fails to meet the notice requirements of Rule 8(a) of those same Rules.

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v.. Daly,* 243 F.3d 687, 691 (2d Cir.2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' ' *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

(quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000); *accord Eternity Global Master Fund,* 375 F.3d at 176-77.

"The indulgent standard evident in these precedents is codified in Rule 8, which requires no more than 'a short and plain statement of [a] claim showing that the pleader is entitled to relief." ' *Id .* at 177 (quoting Fed.R.Civ.P. 8(a)(2)) (alteration in original); *see also Wynder v. McMahon,* 360 F.3d 73, 76-77 & n. 5 (2d Cir.2004) (referring to the "bare-bones standards of Rule 8" and noting that "Rule 8 pleading is extremely permissive"). The Supreme Court has interpreted Rule 8 "not to require a claimant to set out in detail the facts upon which he bases his claim." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Indeed,

> The federal rules require (with irrelevant exceptions) only that the complaint state a claim, not that it plead the facts that if true would establish (subject to any defenses) that the claim was valid.... All that need be specified is the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer.

*Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002); *see also Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 215 (2d Cir.2003) ( " 'More extensive pleading of fact is not required because the Federal Rules of Procedure provide other devices besides pleadings that will serve to define the facts and issues and to dispose of unmeritorious claims." ') (quoting 2 James Wm. Moore, *et al., Moore's Federal Practice* § 8.04[1] (3d ed.1999) (citation omitted)). Whether a complaint satisfies Rule 8(a)(2) is determined by whether the pleading provides fair notice to the opposing party. *See Conley,* 355 U.S. at 47; *see also Wynder,* 360 F.3d at 79 ("The key to Rule 8(a)'s requirements is whether adequate notice is given."). Accordingly, dismissal for failure to comply with the requirements of Rule 8 " 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." ' *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988)).

**\*4** Here, Agilent's complaint establishes the jurisdiction of this Court, sets forth the ownership of the patents in suit and alleges that Micromuse makes, sells, or offers products for sale that infringe Agilent's patents. The complaint further alleges that Micromuse is liable for direct infringement, contributory infringement and infringement by inducement. Agilent has provided a "short and plain statement" of its claims against Micromuse and the nature of those claims is discernible. Fed.R.Civ.P. 8(a)(2). Indeed, it would be difficult to frame a more skeletal pleading.

Micromuse nonetheless argues that dismissal of Agilent's complaint is appropriate because the complaint fails to specify any allegedly infringing product, fails to identify any allegedly infringing conduct, and fails to set forth any of the other actors implicated by the allegations that Micromuse has contributed to and induced patent infringement. The absence of allegations such as those described does not demonstrate that the harsh sanction of dismissal is appropriate here, as this absence does not make it "appear[ ] beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief," *Sweet,* 235 F.3d at 83, nor that the complaint is " 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." ' *Simmons,* 49 F.3d at 86 (quoting *Salahuddin,* 861 F.2d at 42); *see generally Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 235 (1959) ("It may well be that petitioner's complaint as now drawn is too vague, but that is no ground for dismissing his action.").

Where, as here, a pleading is sufficient to provide notice of the claim but does not contain sufficient information to allow a responsive pleading to be framed without risk of prejudice, the proper remedy is a motion for a more definite statement under Rule 12(e), Fed.R.Civ.P. *See, e.g., Scott v. City of Chicago,* 195 F.3d 950, 952 (7th Cir.1999); *Sisk v. Texas Parks & Wildlife Dep't,* 644 F.2d 1056, 1059 (5th Cir.1981); *Harman v. Nat'l Bank of Arizona,* 339 F.2d 564, 567 (9th Cir.1964); *but compare Ondeo Nalco Co. v. Eka Chems., Inc.,* No. 01 Civ. 537(SLR), 2002 WL 1458853, at \*1-2 (D. Del. June 10, 2002) (dismissing defendant's counterclaims where it was unclear which products were being accused, concluding that the pleading was "too vague to provide plaintiff with fair notice," and granting leave to amend).

II. *Micromuse's Motion For A More Definite Statement Is Granted*

Rule 12(e) of the Federal Rules of Civil Procedure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

provides in pertinent part that "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed.R.Civ.P. 12(e). Rule 12(e) applies only in limited circumstances:

**\*5** [T]he pleading must be sufficiently intelligible for the district court to be able to make out one or more potentially viable legal theories on which the claimant might proceed; in other words the pleading must be sufficient to survive a Rule 12(b)(6) motion to dismiss. At the same time, the pleading also must be so vague or ambiguous that the opposing party cannot respond to it, even with a simple denial as permitted by Rule 8(b), with a pleading that can be interposed in good faith or without prejudice to himself.

5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1376 at 311 (3d ed.2004) (footnote omitted); see Humpherys v. Nager, 962 F.Supp. 347, 352-53 (E.D.N.Y.1997) ("A 12(b)(6) motion is one made for a failure to state a claim, while a 12(e) motion is proper when a complaint pleads a viable legal theory, but is so unclear that the opposing party cannot respond to the complaint."); but compare Home & Nature Inc. v. Sherman Speciality Co., 322 F.Supp.2d 260, 265 (E.D.N.Y.2004) ("Rule 12(e) motion should be denied if a complaint comports with the liberal pleading requirements of Rule 8(a).") (collecting cases).

Although motions pursuant to Rule 12(e) are generally disfavored where prompt resort to discovery may provide an adequate means for ascertaining relevant facts, see id., courts have considered Rule 12(e) relief appropriate in patent infringement cases where a plaintiff has failed to identify any allegedly infringing product or products. See, e.g., In re Papst Licensing GmbH Patent Litig., Nos. MDL 1298 & 99 Civ. 3118, 2001 WL 179926, at *2 (E.D.La. Feb. 22, 2001) (concluding that the plaintiff's complaint must be amended to specifically identify which of the defendant's products are alleged to have infringed the plaintiff's patents); cf. In re Independent Serv. Org. Antitrust Litig., 85 F.Supp.2d 1130, 1169 (D.Kan.2000) (denying the plaintiff's motion for summary judgment on a defendant's counterclaim where the plaintiff argued that it did not have adequate notice of which of its devices allegedly infringed the defendant's patents, observing that the plaintiff had already answered the counterclaim and that, if the plaintiff "did not truly

know which parts were covered by the patents identified, it could have filed a motion for a more definite statement under Rule 12(e)"). The cases cited by Agilent in opposition to Micromuse's motion did not suggest that a contrary result is required here, as they stand for the propositions that a pleading need not identify every infringing product where some other limiting parameter has been set forth or at least one purportedly infringing product has been identified. See Symbol Tech., Inc. v. Hand Held Prods., Inc., No. 03 Civ. 102(SLR), 2003 WL 22750145, at *3 (D.Del. Nov. 14, 2003) (denying a Rule 12(e) motion where there was a "finite" set of potentially infringing products under identified patents held by the defendant); Oki Elec. Indus. Co. v. LG Semicon Co., No. 97 Civ. 20310(SW), 1998 WL 101737, at *3 (N.D.Cal. Feb. 25, 1998) (denying a motion to dismiss where the plaintiff identified infringing products by specifying that the products concerned were "devices that embody the patented methods, including 4 megabit and higher density DRAMs") (internal quotation marks omitted), aff'd, 243 F.3d 559 (Fed.Cir.2000).

**\*6** Agilent's complaint does not specify which products infringed plaintiff's patents; it merely states that the alleged infringements occurred as a result of the fact that Micromuse "makes, sells, or offers products for sale ... that infringe Agilent's patents." (Compl. at ¶ 4.) Although Micromuse's papers submitted in opposition to Micromuse's various motions suggest that Micromuse possesses at least four infringing products, those products have not been formally accused. Under these circumstances, Micromuse is entitled to know which of its products or services are alleged to have infringed Agilent's patents and a more definite statement setting forth that information is appropriate.

Micromuse has also argued that Agilent's complaint fails to identify the primary infringer with respect to the contributory and inducement claims. Micromuse has cited to a single unpublished authority in support of its argument that such identification is required to render a pleading answerable, and this authority, Net Moneyin, Inc. v. Mellon Fin. Corp., No. 01 Civ. 441(TUC)(RCC), slip op. (D.Ariz. July 30, 2003), itself cites no other case law directly on point. Micromuse has accordingly failed to establish that relief under Rule 12(e) with respect to the identity of any primary infringers is appropriate.

Where a motion made under Rule 12(e) has been granted, the order of the court to provide a more definite statement must be obeyed within ten days

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

after notice of the order "or within such other time as the court may fix." Fed.R.Civ.P. 12(e). Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion.

### III. H-P Will Not Be Deemed A Necessary Party At This Time

Micromuse argues that, if Agilent's complaint is not dismissed, H-P, as co-owner of the '138 Patent, should be joined as a necessary party to this lawsuit, pursuant to Rule 19(a) of the Federal Rules of Civil Procedure. In addition, Micromuse asserts that if H-P is not so joined, the case should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7).

"Fed.R.Civ.P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether an absent party belongs in the suit, *i.e.,* whether the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d. Cir.2000). Rule 19(a) provides in relevant part that,

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

*\*7* Fed.R.Civ.P. 19(a). Second, if a party is deemed necessary, it then must be determined whether the party's absence warrants dismissal pursuant to Rule 19(b), Fed.R.Civ.P. *See Viacom Int'l,* 212 F.3d at 725. "If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b)." *Id.* at 724 (citing *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir.1990)).

As a general matter, "United States patent law ... requires that all co-owners normally must join as plaintiffs in an infringement suit." *Int'l Nutrition Co.*

*v. Horphag Research Ltd.,* 257 F.3d 1324, 1331 (Fed.Cir.2001); *see also Ethicon, Inc. v. United States Surgical Co.,* 135 F.3d 1456, 1468 (Fed.Cir.1998) (stating that, "as a matter of substantive patent law, all co-owners must ordinarily consent to join as plaintiff in an infringement suit") (footnote omitted); *see generally Waterman v. MacKenzie,* 138 U.S. 252, 255- 56 (1891). As one court has explained, since " 'all co-owners have standing to sue for infringement, if all the co-owners are not joined in an infringement suit, there may be a risk that the defendant will be subject to multiple suits.' " *E.Z. Bowz, L.L.C. v. Prof'l Prod. Research Co.,* No. 00 Civ. 8670(LTS)(GWG), 2003 WL 22064257, at *3 (S.D.N.Y. Sept. 5, 2003) (quoting *Int'l Bus. Machs. Corp. v. Conner Peripherals, Inc.,* No. 93 Civ. 20591(RMW), 1994 WL 409493, at *3 (N.D.Cal. Jan. 28, 1994)); *see also Union Trust Nat'l Bank v. Audio Devices, Inc.,* 295 F.Supp. 25, 27 (S.D.N.Y.1969) ("That all co-owners be parties to a suit is a necessary requirement if conflicting decisions about the same patent (for example, its validity) are to be avoided."); *cf. Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991) ("The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer.").

"Since the introduction of Fed.R.Civ.P. 19 and the 1966 amendments to the rule, however, 'courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner." ' *E.Z. Bowz,* 2003 WL 22064257, at *3 (quoting *Michaels of Oregon Co. v. Mil-Tech, Inc.,* No. 95 Civ. 908(MA), 1995 WL 852122, at *1 (D.Or. Oct. 17, 1995)); *cf. Howes v. Med. Components, Inc.,* 698 F.Supp. 574, 576 (E .D. Pa.1988) ("[T]he adoption of the 1966 amendments to Rule 19 'makes inappropriate any contention that patent co-owners are *per se* indispensable in infringement suits.' ") (quoting *Catanzaro v.. Int'l Tel. & Tel. Corp.,* 378 F.Supp. 203, 205 (D.Del.1974)).

Thus, where the co-owner of a patent or other entity or individual whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has brought the suit, courts have held that joinder of the co-owner or other entity or individual is not necessary. *See Vaupel Textilmaschinen,* 944 F.2d at 875-76 (concluding that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

the policy to join an owner when an exclusive licensee bring suit in order to preclude the possibility of duplicative lawsuits was not undercut where, pursuant to express agreements, the right to sue rested solely with the licensee and denying the defendant's Rule 19 motion); *E-Z Bowz,* 2003 WL 22064257, at *4-5 (holding that the defendant would not be subject to a substantial risk of incurring inconsistent obligations where the former co-owner of certain patents had relinquished her interest in the patents as well as any rights of action relating to the patents and concluding that the rights of the parties could be fairly adjudicated without joinder of the absent former co-owner); *Michaels of Oregon,* 1995 WL 852122, at *2-3 (determining that an absent co-owner of certain patents was not a necessary party where that absent co-owner had entered into an agreement with the plaintiff providing that only the plaintiff might file actions for patent infringement); *compare Parkson Corp. v. Andritz Sprout-Bauer, Inc.,* 866 F.Supp. 773, 775 (S.D.N.Y.1995) (concluding that it was not possible to determine whether an owner was a necessary party to an action brought by an exclusive licensee where the licensing agreement did not unambiguously give the licensee control over whether infringement claims should be brought); *Howes,* 698 F.Supp. at 577 (concluding that an absent patent co-owner was a necessary party where the defendants might face the risk of relitigation by that co-owner).

 **\*8** Although the complaint alleges that Agilent and H-P jointly own the '138 Patent, it further alleges that Agilent enjoys the exclusive right to enforce the '138 Patent against Micromuse. In opposition to Micromuse's motion, Agilent has submitted a redacted version of an August 22, 2003 agreement between Agilent and H-P (the "August Agreement") regarding their respective rights concerning the enforcement of the '138 Patent. According to the August Agreement, H-P grants to Agilent "the exclusive right to license the ['138] Patent to Micromuse." (Declaration of Megan Whyman Olesek, dated Jan. 15, 2004 ("Olesek Decl."), Exh. X at ¶ 1.) H-P further grants to Agilent "the exclusive right to enforce the ['138] Patent to and against Micromuse" including by "filing and prosecuting the Agilent Patent Suit to final judgment, including appeals." [FN1] (*Id.*) H-P has also agreed that

> FN1. The "Agilent Patent Suit" is defined as "a patent infringement lawsuit against Micromuse." (Olesek Decl., Exh. X, preamble.)

[A]s between the parties, Agilent shall have the full power and authority to control the Agilent Patent Suit and any settlement thereof and shall retain one hundred percent (100%) of any damages or compensation received in connection with the Agilent Patent Suit or settlement thereof.
(*Id.* at ¶ 3.)

 Based on the terms of the August Agreement, it does not appear that H-P's absence from this lawsuit will subject Micromuse to any "substantial risk of incurring double, multiple, or otherwise inconsistent obligations," Fed.R.Civ.P. 19(a), because H-P has no independent capacity to file a patent infringement action against Micromuse based on the '138 Patent, having expressly disclaimed any interest in pursuing a claim against Micromuse with respect to the '138 Patent. In light of the broad contractual language by which H-P has granted Agilent the exclusive right to enforce the '138 Patent against Micromuse, the absence of any provision in the August Agreement stating that H-P agrees to be bound by the outcome of this litigation is not determinative here. Likewise, the absence of an affirmative representation that H-P has relinquished its right to sue Micromuse for any purported past infringement does not, contrary to the argument advanced by Micromuse, require joinder of H-P. On the facts now available, it thus appears that complete relief can be accorded among those already parties.

 Micromuse has noted, however, that the August Agreement makes explicit reference to the existence of a Master Patent Ownership and License Agreement and that the August Agreement is an agreement among Agilent and H-P "together with Hewlett Packard Development Company, L.P." (Olesek Decl., Exh. X, preamble), an entity that, according to Micromuse, may also have an interest in the '138 Patent. Micromuse has further observed that the redacted form of the August Agreement does not set forth its effective term or termination provisions and suggests that the absence of such provisions raises questions of whether H-P enjoys a reversion, termination, or expiration interest in the '138 Patent, questions which may, in turn, affect any determination as to whether H-P is a necessary party here. *See, e.g., Moore U.S.A. Inc. v. Standard Register Co.,* 60 F.Supp.2d 104, 109-110 (W.D.N.Y.1999) (concluding that a licensor was a necessary party to a patent infringement action despite the existence of an agreement with the plaintiff licensee granting the licensee sole and exclusive rights to sue for infringement where the agreement was of fixed term and where the licensor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

retained a reversionary interest in the patent).

**\*9** Although the facts presently available do not establish that H-P is a necessary party, Micromuse's observations suggest that developments resulting from discovery may cause the issue of H-P's joinder to be revisited. Accordingly, Micromuse's motion to join H-P is denied at this time and leave is hereby granted to renew the motion after further discovery.

IV. *Gray Cary Will Not Be Disqualified At This Time*

Micromuse has moved to disqualify Gray Cary from representing Agilent in this matter on the grounds that, for many years, Gray Cary provided extensive legal representation to Network Harmoni, a company acquired by Micromuse in August 2003. Micromuse argues that Network Harmoni's suite of proprietary intelligent software agents is now part of Micromuse's product offerings and, under the current complaint, potentially the target of Agilent's patent infringement claims. Micromuse asserts that Gray Cary thus formerly represented Network Harmoni in matters substantially related to the subject matter of this action and must be disqualified from representing Agilent as a result. Agilent opposes Micromuse's motion, arguing that in its representation of Network Harmoni Gray Cary was at all times in an adverse relationship to Micromuse and that Gray Cary's prior representation of Network Harmoni involved no confidential information about the product or products at issue in the present action. [FN2]

> FN2. Following briefing on Micromuse's motion, Agilent moved for leave to submit a supplemental declaration, claiming the need to respond to certain contentions in Micromuse's reply papers, and Micromuse opposed the motion. Agilent's motion for leave to submit the supplemental declaration is granted. Although submission of supplemental papers is often more of a hindrance than a help, the issues addressed in the supplemental papers presented here are carefully cabined and respond to arguably new contentions contained in reply papers on the underlying motion. Where this is true, and where, as here, the opposing party has disclaimed any prejudice resulting from the submission of the supplemental papers, and "the parties will be best served by the Court's deciding the ... issue presented to it on the most complete factual

basis possible," Nat'l *Union Fire Ins. Co. v. BP Amoco P.L.C.*, No. 03 Civ. 200(GEL), 2003 WL 1618534, at \*1 (S.D.N .Y. Mar. 27, 2003), leave to submit supplemental papers is appropriately granted.

Motions to disqualify counsel have long been disfavored in this Circuit. *See, e.g., Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791-92 (2d Cir.1983) (enumerating the reasons for which disqualification motions are disfavored); *Bennett Silvershein Assocs. v. Furman*, 776 F.Supp. 800, 802 (S.D.N.Y.1991) ("The Second Circuit has indeed been loathe to separate a client from his chosen attorney ....") (collecting cases). "Disqualification motions are often made for tactical reasons, and thereby unduly interfere with a party's right to employ counsel of his choice." *Skidmore v. Warburg Dillon Read LLC*, No. 99 Civ. 10525(NRB), 2001 WL 504876, at \*2 (S.D.N.Y. May 11, 2001) (citing *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979)). Moreover, disqualification motions, "even when made in the best of faith ... inevitably cause delay." *Evans*, 715 F.2d at 792 (quoting *Nyquist*, 590 F.2d at 1246). A "high standard of proof" is therefore required from one who moves to disqualify counsel. *Id.* at 791 (quoting *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir.1978)). The appearance of impropriety alone does not warrant disqualification. *See Nyquist*, 590 F.2d at 1246-47.

In determining whether an attorney can oppose his former client, courts evaluate whether the new matter is substantially related to the subject matter of the prior representation. An attorney may be disqualified from representing a client in a particular case if:

> (1) the moving party is a former client of the adverse party's counsel;
> **\*10** (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Id.* at 791. "Under this standard, proof of substantial similarity must be 'patently clear' to warrant disqualification." *Decora Inc. v. DW Wallcovering, Inc.*, 899 F.Supp. 132, 136 (S.D .N.Y.1995) (quoting *Government of India*, 569 F.2d at 739-40) (additional citations omitted). A "substantial relationship" exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation. *See U.S. Football League v. Nat'l*

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

*Football League,* 605 F.Supp. 1448, 1459-60 & n. 25 (S.D.N.Y.1985) ("It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes.") (emphasis in original).

According to Micromuse, Network Harmoni evolved from a research project in network visualization software conducted at Curtin University in Perth, Australia. In 1996, the founders of the project formed NDG Software, Inc., and in November 1998 the company received its first venture funding and moved its headquarters from Australia to San Diego, California. It is alleged that Gray Cary initially provided advice, counsel and representation in establishing and structuring this U.S.-based company and its operations, and served as outside counsel. Subsequently, NDG Software, Inc., changed its name to Network Harmoni, Inc.

During the time of Gray Cary's representation, Network Harmoni developed and licensed to its customers, including Agilent and Micromuse, proprietary intelligent software agents designed to provide users with information on the status and security of computer networks, systems and applications. Micromuse contends that Gray Cary, during its five-year relationship with Network Harmoni, represented Network Harmoni in its corporate affairs, employment issues, in prosecuting its patents and trademarks and handling other patent and trademark-related matters, in evaluating third-party patents, and in drafting and negotiating licensing agreements, financing instruments and other corporate-related documents.

Over the course of its representation of Network Harmoni, Gray Cary is alleged to have drafted and filed several patent applications with the United States Patent and Trademark Office relating to certain aspects of Network Harmoni's software products and was informed of virtually all attributes and potential uses of Network Harmoni's suite of proprietary intelligent software agents, as well as the company's plans for future software applications and services.

According to Micromuse, Gray Cary represented Network Harmoni in its negotiations to be purchased by Micromuse, and Network Harmoni and Micromuse executed a non-disclosure agreement to assure that the parties could have full and complete discussions without the use of such information for non-acquisition purposes.

**\*11** It is further alleged that in three rounds of

financing, Gray Cary was allowed to participate on the same basis as the initial preferred investors and became a shareholder of Network Harmoni, and until September 1999, one of its lawyers served as a member of its board of directors. Gray Cary sold its stock in connection with Network Harmoni's acquisition by Micromuse.

In opposition to Micromuse's motion it is alleged that Gray Cary first became aware of a potential claim against Micromuse by Agilent on September 19, 2003, when Agilent approached Gray Cary about the possibility of Gray Cary handling the matter for Agilent. It is also alleged that on December 8, 2003, an ethical wall was established to isolate all attorneys working on Agilent matters from any and all information related to any matter in which Network Harmoni had been a client for the firm.

Agilent asserts that Gray Cary never had an attorney-client relationship with Micromuse and that such a relationship may not be inferred from Micromuse's disclosure of confidential business information to Network Harmoni and its then-counsel Gray Cary during negotiations for the acquisition of Network Harmoni. At present, however, there appears to be no dispute that Micromuse is entitled to seek Gray Cary's disqualification based on Gray Cary's prior representation of Micromuse's wholly owned subsidiary, Network Harmoni. *See generally Harford Accident & Indem. Co. v. RJR Nabisco, Inc.,* 721 F.Supp. 534, 539-40 (S.D.N.Y.1989) (concluding that the plaintiff's law firm would be deemed to have previously represented the defendant where the plaintiff's law firm had previously represented the defendant corporation's subsidiary and the defendant corporation had taken in active role with regard to the law firm's representation of its subsidiary); *cf. Decora,* 899 F.Supp. at 137 (concluding that the plaintiff could properly seek disqualification of the defendant's attorney in a patent infringement action where the attorney had previously represented the plaintiff's parent corporation, thereby learning certain of the plaintiff's trade secrets).

Assuming without deciding that the first prong of the test set forth in *Evans* has therefore been satisfied, Micromuse's motion for disqualification is denied nonetheless, since, to date, Micromuse has not met its burden of proof with respect to establishing a "substantial relationship" between Gray Cary's former representation of Network Harmoni and its current representation of Agilent. It has not been shown that Gray Cary gave Network Harmoni advice on the validity of the patents in suit, including

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)
**(Cite as: 2004 WL 2346152 (S.D.N.Y.))**

whether there was infringement by Network Harmoni of the patents in suit. All that has been established is that Gray Cary advised Network Harmoni on corporate governance issues, employment matters, original equipment manufacturer ("OEM") agreements, patent and trademark filings, and financing instruments. Prior general business representation by the plaintiff's law firm of an entity related to the defendant on matters unrelated to the lawsuit at issue does not meet the high burden of establishing a conflict. *See, e.g., In re Maritima Aragua, S.A., 847 F.Supp. 1177, 1182-83 (S.D.N.Y.1994).*

**\*12** The Micromuse products and services alleged to be violative of the Agilent patent will be identified as a consequence of the granting of Micromuse's motion for a more definite statement. Thereafter, discovery may be sought with respect to the knowledge and participation of Gray Cary in the development of any such accused products or services. Should this discovery yield additional facts establishing that the prior representation of Network Harmoni by Gray Cary dealt with issues presented in this action, leave is granted to Micromuse to renew its disqualification motion, which motion is denied at this time.

*Conclusion*

For the reasons set forth above, Micromuse's motion to dismiss the complaint is denied and its motion for a more definite statement is granted. Agilent is directed to comply with the grant of Micromuse's motion for a more definite statement by filing and serving an amended complaint within thirty (30) days of entry of this order and opinion. In addition, Micromuse's motions to add HP as a party and to disqualify Gray Cary are denied at this time with leave to renew. Agilent's motion to file a supplemental declaration is granted.

It is so ordered.

Not Reported in F.Supp.2d, 2004 WL 2346152 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2841222 (Trial Motion, Memorandum and Affidavit) Micromuse Inc.'s Memorandum of Law in Opposition to Motion of Agilent Technologies, Inc., for Entry of Protective Order (Apr. 20, 2005)

• 2005 WL 2841221 (Trial Motion, Memorandum

and Affidavit) Memorandum of Points and Authorities in Support of Plaintiff Agilent Technologies, Inc.'s Opposition to Defendant Micromuse Inc.'s Motion to Consolidate (Mar. 21, 2005)

• 2005 WL 2841220 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Micromuse Inc. to Consolidate (Mar. 07, 2005)

• 2005 WL 2841219 (Trial Motion, Memorandum and Affidavit) Reply of Micromuse Inc. to Counterclaims of Agilent Technologies, Inc. (Jan. 03, 2005)

• 2004 WL 3567814 (Trial Motion, Memorandum and Affidavit) Palintiff Agilent Technologies, Inc.'s Reply to Counterclaims of Micromuse, Inc. (Dec. 14, 2004)

• 2004 WL 3567813 (Trial Pleading) Amended Answer and Counterclaims of Micromuse Inc. Inc Response to First Amended Complaint of Agilent Technologies, Inc. (Dec. 07, 2004)

• 2004 WL 3567812 (Trial Pleading) Answer and Counterclaims of Micromuse Inc. in Response to First Amended Complaint of Agilent Technologies, Inc. (Nov. 30, 2004)

• 2004 WL 3567811 (Trial Pleading) First Amended Complaint for Patent Infringement (Nov. 12, 2004)

• 1:04cv03090 (Docket) (Apr. 22, 2004)

• 2004 WL 3567815 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Motion of Micromuse Inc. to Consolidate (Jan. 01, 2004)

• 2004 WL 3567816 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Agilent Technologies, Inc.'s Motion for Entry of Protective Order (Jan. 01, 2004)

• 2004 WL 3567817 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Points and Authorities in Support of Agilent Technologies, Inc.'s Motion for Entry of Protective Order, (Jan. 01, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

LEXSEE 2004 U.S.DIST. LEXIS 14907

**TONY COLIDA, a citizen of Canada, Plaintiff,–against–SONY CORPORATION OF AMERICA and SONY ERICSSON COMMUNICATION (USA) INC., Defendants.**

**04 Civ. 2093 (RJH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 14907*

**July 29, 2004, Decided
August 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Complaint dismissed at, Sanctions disallowed by *Colida v. Sony Corp. of Am., 2005 U.S. Dist. LEXIS 1545 (S.D.N.Y., Feb. 2, 2005)*

**COUNSEL:** [*1] Tony Colida, Plaintiff, Pro se, Kirkland, Quebec Canada.

**JUDGES:** Richard J. Holwell, United States District Judge.

**OPINIONBY:** Richard J. Holwell

**OPINION:**

### MEMORANDUM OPINION AND ORDER

*Pro se* plaintiff Tony Colida ("Colida" or "plaintiff") filed the above–captioned complaint seeking damages and injunctive relief against defendant corporations, who he alleges infringed two United States design patents for cellular telephones by manufacturing, selling, or offering to sell the "Sony Ericsson Z–600 cellular phone." Defendant Sony Corporation of America ("SCA") has moved to dismiss all claims against it pursuant to *Rules 12(b)(1) and 12(b)(6)* on the grounds that it is not a proper party because it does not manufacture, sell, or offer to sell the allegedly infringing product. Based on the submissions of both parties, the Court concludes that SCA has made a sufficient showing that it is not a proper party to justify dismissal of all claims against this defendant.

In support of its motion to dismiss, SCA has submitted the sworn declaration of the Jaime A. Siegel, Senior Director of Licensing and Intellectual Property of SCA ("Siegel Decl."). That declaration states that the allegedly infringing [*2] phone is sold by Sony Ericsson Mobile Communications (USA) Inc. ("Sony Ericsson"), not SCA, and that SCA is a separate corporate entity that has only an

**DISPOSITION:** Defendant's motion to dismiss was granted. All claims against SCA were dismissed.

attenuated, indirect relationship to Sony Ericsson in that "SCA's ultimate corporate parent, Sony Corporation, a Japanese corporation, and Ericsson AB, a Swiss corporation, are partners in a joint venture, Sony Ericsson Mobile Communications AB, a Swedish corporation, which is the parent company of Sony Ericsson." Siegel Decl. P2. The declaration further states that "SCA does not manufacture, market, sell, offer for sale, repair or support" the allegedly infringing product. *Id.* Siegel further declares that prior to the commencement of this action, Colida contacted SCA to warn them of his intention to file suit, whereupon Siegel informed Colida in writing of SCA's lack of involvement in manufacturing or selling the allegedly infringing phone and provided Colida with contact information for the intellectual property general counsel at Sony Ericsson. *Id.* at P4 & Ex. A. In response, Colida wrote to inform SCA that he had commenced an action against SCA. *Id.* at P5 & Ex. B. SCA contacted Colida, offering to provide him with a [*3] sworn affidavit stating that SCA was in no way involved with the allegedly infringing product. In that conversation, Colida adverted to a newspaper article he had seen that had characterized Sony Ericsson as a joint venture between "Sony" and Ericsson and cited it as the basis for his naming SCA as a party in this action. *Id.* at P6 & Ex. C. Colida stated that he would not drop SCA as a party unless SCA paid him a settlement. *Id.*

In opposition to this motion, Colida has submitted a copy of an order issued by the Hon. William A. Webb, Magistrate Judge for the Eastern District of North Carolina, Western Division, in an unrelated matter entitled *Tony Colida v. Ericsson, Inc.* In that order, apropos of a potential recusal issue arising from Judge

Webb's social acquaintanceship with the Vice President for Human Relations at Sony Ericsson, Inc., the court wrote: "Addressing the Court's inquiry regarding the corporate relationship between Defendant and Sony–Ericsson, Mr. Bennett [counsel for defendant] explained that Sony–Ericsson was a joint venture between Sony Corp. and Ericsson, Inc., that manufactured the mobile phones which are sold by Sony and for which Ericsson develops [*4] the micro–chip technology." Enclosure to letter from Colida to the Court dated June 24, 2004, at 2. Colida argues in effect that this statement memorializes an admission that "Sony" sells cell phones, and therefore that SCA is the proper party. In reply, SCA submitted a declaration from David E. Bennett, counsel for defendant in the North Carolina case, stating that he had told the judge during a telephone conference that "Sony was a seller of cellular phones," but that he had been referring to Sony's business activities prior to the joint venture between Sony Corporation and Ericsson, Inc. that had formed Sony Ericsson. Sur–Reply [*sic*] Mem. of Law in Further Support of Mot. to Dismiss Claims Against Def. SCA, Bennett Decl. P3. Bennett declared that he did not represent to the court that SCA sells mobile phones made by Sony Ericsson, and that the North Carolina court misconstrued his statements during the telephone conference. *Id.* Attached to Bennett's declaration is a transcript of the telephone conference, which bears out the representations contained in the declaration. Bennett Decl. Ex. A.

The evidence submitted by plaintiff fails to demonstrate that SCA is involved [*5] in cellular phone manufacture, marketing, or sale. The ambiguous statement in the North Carolina court's Order appears to be an imprecise or inaccurate interpretation of a statement made by counsel before that court, and does not constitute an admission or evidence that SCA is a proper party to this action. SCA's submissions amply demonstrate that SCA is not involved in the manufacture or sale of the allegedly infringing cellular phone. As defendant points out, Mem. of Law in Support of Mot. to Dismiss Claims Against Def. SCA at 7–8, liability for infringing pursuant to *35 U.S.C. § 271* requires a showing that the defendant makes, uses, offers to sell, sells, or imports without authority any patented invention, or actively induces or contributes to the infringement of a patented invention. *35 U.S.C. § 271*. Because it does not appear that plaintiff can make such a showing as to SCA, defendant SCA's motion [5–1] is granted, and all claims against SCA are hereby dismissed for failure to state a claim upon which relief may be granted.

Plaintiff shall have sixty (60) days to serve summons and complaint upon the other defendant named in the [*6] action. If plaintiff amends his complaint, service of the amended complaint must be made upon all defendants named in the action within this period. If proper service is not effected within this period, this action shall be dismissed in its entirety.

A pretrial conference shall be held in this matter on Tuesday, September 28, 2004, at 11:00 a.m. in Room 17B, 500 Pearl Street.

SO ORDERED.

Dated: New York, New York

July 29, 2004

Richard J. Holwell

United States District Judge

EXHIBIT F

**Westlaw.**

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)
**(Cite as: 2003 WL 23884794 (N.D.Cal.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
HEWLETT-PACKARD COMPANY, Plaintiff,
v.
INTERGRAPH CORPORATION, Defendant.
No. C 03-2517 MJJ.

Sept. 6, 2003.

Morgan Chu, David Isaac Gindler, Elliot Brown,
Jason Dean Linder, Rachel Marie Capoccia, Irell &
Manella LLP, Los Angeles, CA, Peter P. Chen,
McDermott, Will & Emery, Palo Alto, CA, for
Plaintiffs.

Bureden J. Warren, McDermott Will & Emery, Eric
S. Namrow, James R. Burdett, Peter Curtin, William
D. Coston, Venable LLP, Washington, DC, Cole M.
Fauver, Inge Larish, William H. Manning, Robins
Kaplan Miller & Ciresi, Minneapolis, MN, David V.
Lucas, Todd P. Guthrie, Intergraph Corporation,
Huntsville, AL, Bijal V. Vakil, McDermott, James E.
Glore, Stephen J. Akerley, McDermott Will &
Emery, Palo Alto, CA, Jeffrey G. Knowles, Coblentz,
Patch, Duffy & Bass, Jennifer Lynn Polse, Martin D.
Bern, Munger Tolles & Olson LLP, San Francisco,
CA, George F. Pappas, Venable LLP, Baltimore,
MD, Michael W. Robinson, Venable LLP, Vienna,
VA, for Defendants.

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS

JENKINS, J.

**\*1** On May 28, 2003, Plaintiff Hewlett-Packard
Company ("Plaintiff") filed a complaint against
Defendant Intergraph Corporation ("Defendant")
alleging direct patent infringement, contributorily
infringement, and inducing infringement of four
United States patents ("patents-in-suit") in violation
of 35 U.S.C. § 271. [FN1] Defendant now moves to
dismiss Plaintiff's complaint or, in the alternative, for
a more definite statement. *See* FRCP 12(b), (e).
Specifically, Defendant argues that Plaintiff's

allegations are cursory and fail satisfy Rule 8(a)(2) of
the Federal Rules of Civil Procedure. Having
considered the briefing in this matter, the Court
GRANTS Defendant's motion.

> FN1. The specific patents-in-suit are United
> States patents (1) 5,297,241; (2) 4,649,499;
> (3)  6,105,028;  and  (4)  4,635,208. *See*
> Complaint ¶ ¶ 7-10. Plaintiff is the owner
> by assignment of all rights, title, and interest
> in each of these patents.

A. Infringement Generally

  According to Rule 8(a)(2) "a claim for relief ... shall
contain ... a short and plain statement of the claim
showing that the pleader is entitled to relief." The
Supreme Court has found that this provision is
satisfied so long as the factual allegations give
"defendant fair notice of what the plaintiff's claim is
and the grounds upon which it rests." *Conley v.
Gibson,* 355 U.S. 41, 47-48, 78 S.Ct. 99, 2 L.Ed.2d
80 (1957). In the context of patent litigation, the
Federal Circuit has noted that "[t]his requirement
ensures that an accused infringer has sufficient
knowledge of the facts alleged to enable it to answer
the complaint and defend itself." *Phonometrics v.
Hospitality Franchise Systems, Inc.,* 203 F.3d 790,
794 (Fed.Cir.2000). In addition, Form 16 of the
Federal Rules of Civil Procedure provides the
following as an example of a direct patent
infringement claim that is sufficient under Rule
8(a)(2):

  Defendant has for a long time past been and still is
  infringing [the patent-in-suit] by making, selling,
  and using electric motors embodying the patented
  invention, and will continue to do so unless
  enjoined by this court.

  *See also* FRCP 84 ("[t]he forms contained in the
Appendix of Forms are sufficient under the rules and
are intended to indicate the simplicity and brevity of
statement which the rules contemplate").

  Here, the complaint simply alleges:

  [Defendant], in violation of 35 U.S.C. § 271, has
  been and is currently infringing, contributorily
  infringing, or inducing infringement of [the
  patents-in-suit] by, among other things, *making,
  using, offering to sell and/or selling infringing
  software and hardware products* without authority
  or license from [Plaintiff].

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)
(Cite as: 2003 WL 23884794 (N.D.Cal.))

Complaint ¶ ¶ 11 (emphasis added).

However, Defendant "produces some 150 core technology platforms which are implemented in over 4000 end-user application products." *See* Motion to Dismiss or For a More Definite Statement ("Motion") at 7:15-17. In light of these facts, Plaintiff's claim must be read as follows: one or more of Defendant's 4000-plus products directly infringes, contributorily infringes, or induces infringement of at least one claim in each of the patents-in-suit. Form 16 simply does not address a factual scenario of this sort. Not only is the example in Form 16 limited to a single "type" of product (*i.e.,* electric motors) there is no indication as to the number of different electric motors the hypothetical defendant made, sold, or used. In this case, there are at least 150 different "types" of products (*i.e.* core technology platforms) with more than 4000 end-user applications. Based on these facts, the Court finds that Plaintiff's allegations do not provide Defendant with "fair notice" of what Plaintiff's claim or claims are and, therefore, fail to satisfy Rule 8(a)(2). *See Conley,* 355 U.S. at 47-48 (1957). [FN2]

> FN2. The Court acknowledges Defendant's citation to several district court opinions, including one from this district, which seem to interpret Rule 8(a)(2) and Form 16 more liberally. *See, e.g., OKI Electric Industry Co. v. LG Semicon Co., Ltd.,* 1998 WL 101737, *3 (N.D.Cal.1998)* ( "[t]he phrase 'devices that embody the patented methods' from [plaintiff's] allegation is substantially similar to the phrase 'electric motors embodying the patented invention' found in Form 16"). However, Plaintiff cites an equal number of decisions that reach the opposite conclusion based on similar facts. *See, e.g., Gen-Probe, Inc. v. Amoco Corporation, Inc.,* 926 F.Supp. 948, 961 (S.D.Cal.1996) ("Rule 8(a)(2) eliminates the needless distinctions and technicalities of code pleading, but still 'envisages the statement of circumstances, occurrences, and events in support of the claim ...' ") (quoting Advisory Committee's 1955 Report). None of these decisions are binding on this Court.

B. Specific Requirements for Contributory Infringement and Inducement

**\*2** Defendant also argues that Plaintiff's complaint fails to sufficiently allege particular elements necessary to state claims for contributory

infringement and inducing infringement. The Court will address each of these claims in turn.

1. Contributory Infringement

In order to state a claim for contributory infringement pursuant to § 271(c), Plaintiff must allege that Defendant offered to sell or sold a *"component* of a patented machine ... constituting a material part of the invention, *knowing* the same to be especially made or especially adapted for use in an infringement of such patent...." *Id.* (emphasis added); *see* also *Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 488, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). Although Plaintiff alleges that Defendant's conduct was "willful," which implies knowledge, Plaintiff fails to allege that Defendant offered to sell or sold any particular component or that such component was a material part of an infringing device. Plaintiff merely alleges that Defendant "committed acts of infringement in this District, for example, by selling infringing products to Calpine Corporation, which is headquartered in this District." Complaint ¶ 5. This is not sufficient to state a claim for contributory infringement.

2. Inducing Infringement

An inducement claim requires allegations of (1) specific intent and (2) direct infringement by someone other than the inducer. *See Hewlett-Packard Co. v. Bausch & Lomb,* 909 F.2d 1464, 1449 (Fed.Cir.1990)("proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement"); *Met-Coil Systems v. Korners Unlimited, Inc,* 803 F.2d 684, 687 (Fed.Cir.1987). As stated above, although the allegation of willfulness is sufficient to satisfy the state of mind requirement necessary for inducement-- in this case specific intent--there are no allegations of direct infringement by a third-party. Again, the alleged sales of "infringing products" to Calpine Corporation is insufficient to state a claim for inducing infringement.

Therefore, Defendant's motion to dismiss is GRANTED without prejudice; Plaintiff may file an amended complaint within twenty (20) days of this order.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)
**(Cite as: 2003 WL 23884794 (N.D.Cal.))**

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 2160290 (Trial Motion, Memorandum and Affidavit) Plaintiff Hewlett-Packard's Reply Brief Regarding Claim Construction (Oct. 22, 2004)

• 2004 WL 2160283 (Trial Motion, Memorandum and Affidavit) Notice of Manual Filing of Intergraph Corporation's Claim Construction Brief for U.S. Patents Nos. 5,297,241; 4,635,208; and 6,105,028 (Oct. 08, 2004)

• 2004 WL 2160273 (Trial Motion, Memorandum and Affidavit) Intergraph Corporation's Opposition To Bentley Systems Inc.'s Motion for Summary Adjudication; and Declaration of Bijal V. Vakil in Support Thereof (Aug. 17, 2004)

• 2004 WL 2160278 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Points and Authorities in Support of Bentley Systems, Inc.'s Motion for Summary Judgment on Claim One of Intergraph Corporation's First Amended Third Party Complaint (Aug. 17, 2004)

• 2004 WL 2160233 (Trial Motion, Memorandum and Affidavit) Intergraph Corporation's Opposition to Third Party Defendant Bentley Systems, Inc.'s Motion to Dismiss (Jul. 13, 2004)

• 2004 WL 2160248 (Trial Motion, Memorandum and Affidavit) Third-Party Defendant Bentley Systems Incorporated's Reply to Intergraph Corporation's Opposition to Motion to Dismiss Claim Two of First Amended Complaint (Jul. 03, 2004)

• 2004 WL 2160269 (Trial Motion, Memorandum and Affidavit) Third-Party Defendant Microsoft' Reply to Intergraph' Opposition to Microsoft's Motion for Summary Judgment (Jun. 29, 2004)

• 2004 WL 2160226 (Trial Pleading) Intergraph Corporation's First Amended Third Party Complaint Against Bentley Systems Incorporated (Mar. 23, 2004)

• 2004 WL 2160207 (Trial Motion, Memorandum and Affidavit) Intergraph Corporation's Opposition to Hewlett-Packard Company's Motion to Compel Repsonses to Interrogatory Nos. 1-3, 5-12, 14 and 15 (Mar. 10, 2004)

• 2004 WL 2160210 (Trial Motion, Memorandum and Affidavit) Plaintiff Hewlett-Packard's Reply Memorandum in Support of its Motion to Compel

Intergraph Corporation to Respond to Interrogatory Nos. 1-3, 5-12, 14, and 15 (Mar. 10, 2004)

• 2004 WL 2160183 (Trial Pleading) Intergraph Corporation's Third Party Complaint against Bentley Systems Incorporated (Jan. 28, 2004)

• 2004 WL 2160173 (Trial Motion, Memorandum and Affidavit) Plaintiff Hewlett-Packard's Opposition to Defendant Intergraph Corporation's Motion to Transfer This Action to the United States District Court for the Northern District of Alabama Pursuant To 28 U.S.C. § 1404(a) (Jan. 13, 2004)

• 2004 WL 2160175 (Trial Motion, Memorandum and Affidavit) Intergraph Corporation's Reply Memorandum in Further Support of its Motion to Transfer Pursuant to 28 U.S.C. § 1404(A) (Jan. 13, 2004)

• 2003 WL 23795748 (Trial Pleading) Intergraph Corporation's Third Party Complaint (Dec. 12, 2003)

• 2003 WL 23795761 (Trial Pleading) First Amended Answer of Intergraph Corporation to Hewlett-Packard Company's First Amended Complaint and Counterclaims (Dec. 12, 2003)

• 2003 WL 23795738 (Trial Pleading) Hewlett-Packard Company's Reply to Intergraph's Corporation's Counterclaims (Nov. 03, 2003)

• 2003 WL 23795731 (Trial Pleading) Answer of Intergraph Corporation to First Amended Complaint and Counterclaims (Oct. 14, 2003)

• 2003 WL 23795722 (Trial Pleading) First Amended Complaint for Patent Infringement (Sep. 25, 2003)

• 2003 WL 23795702 (Trial Motion, Memorandum and Affidavit) Plaintiff Hewlett-Packard Company's Memorandum in Opposition to Defendant Intergraph Corporation's Rule 12(b)(6) Motion to Dismiss for Failure to State A Claim, and Alternative Rule 12(e) Motion for A more Definite Statement (Sep. 09, 2003)

• 2003 WL 23795713 (Trial Motion, Memorandum and Affidavit) Defendant Intergraph Corporation's Reply to Plaintiff HP's Opposition to Defendant Intergraph Corporation's Rule 12(b)(6) Motion to Dismiss for Failure to State A Claim, and Alternative Rule 12(e) Motion for A more Definite Statement (Sep. 09, 2003)

Not Reported in F.Supp.2d                                                                                         Page 4
Not Reported in F.Supp.2d, 2003 WL 23884794 (N.D.Cal.)
**(Cite as: 2003 WL 23884794 (N.D.Cal.))**

• 2003 WL 23795930 (Trial Pleading) Intergraph Corporation's Second Amended Third Party Complaint against Microsoft Corporation (Sep. 07, 2003)

• 2003 WL 23795867 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Third Party Defendant Microsoft Corporation's Motion for Summary Judgment on Count One (Jul. 13, 2003)

• 2003 WL 23795893 (Trial Motion, Memorandum and Affidavit) Intergraph Corporation's Opposition to Microsoft Corporation's Motion for Summary Judgment; Accompanying Declaration of John Griswold; and Proposed Order (Jul. 13, 2003)

• 2003 WL 23795882 (Trial Motion, Memorandum and Affidavit) Third Party Defendant Microsoft Corporation's Memorandum of Points and Authorities in Reply to Third Party Plaintiff Intergraph Corporation's Opposition to Microsoft's Motion to Dismiss (Jun. 03, 2003)

• 3:03cv02517 (Docket) (May. 28, 2003)

• 4:03cv02517 (Docket) (May. 28, 2003)

• 2003 WL 23795832 (Trial Pleading) Intergraph Corporation's First Amended Third Party Complaint against Microsoft Corporation (Mar. 23, 2003)

• 2003 WL 23795808 (Trial Motion, Memorandum and Affidavit) Plaintiff Hewlett-Packard Company's Reply Memorandum in Support of Ex Parte Application for an Order Requiring The Parties to Meet and Confer Pursuant to Patent Local Rule 4-1(B) and Reduce The Number of Patent Claim Terms to be Construed (Feb. 07, 2003)

• 2003 WL 23795796 (Trial Motion, Memorandum and Affidavit) Corrected Version (Feb. 06, 2003)

• 2003 WL 23795788 (Trial Pleading) Intergraph Corporation's Third Party Complaint against Microsoft Corporation (Jan. 29, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

*Westlaw.*

Not Reported in F.Supp.2d                                                                                       Page 1
Not Reported in F.Supp.2d, 2001 WL 179926 (E.D.La.)
**(Cite as: 2001 WL 179926 (E.D.La.))**

▷

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
In re PAPST LICENSING GmbH PATENT
LITIGATION
**No. CIV. A. MDL 1298, CIV. A. 99-3118.**

Feb. 22, 2001.

MEMORANDUM AND ORDER

SEAR, District J.

*Background*

**\*1** On December 26, 2000, Papst Licensing GmbH
& Co. KG ("Papst") filed its complaint for patent
infringement against International Business Machines
Corporation ("IBM"). Papst alleges that IBM "has
made, used, sold, or offered to sell to customers in
the United States or imported into the United States
products that embody the elements of at least one
claim"  [FN1] of the twenty patents specifically
identified in the complaint by patent number and
issue date. Papst does not identify the IBM products
which allegedly infringe the patents.

> FN1. *See* Paragraphs 26 and 27 of Papst's
> Complaint for Patent Infringement, filed
> Dec. 26, 2000.

In response to the complaint, IBM has filed under
FRCP 12(e) a motion requesting a more definite
statement of which IBM products are alleged to
infringe the patent claims asserted against it.

*Discussion*

FRCP 12(e) provides that if a pleading "...is so vague
or ambiguous that a party cannot reasonably be
required to frame a responsive pleading, the party
may move for a more definite statement before
interposing a responsive pleading."

IBM asserts and Papst does not contest that there are
a total of 503 patent claims in the twenty patents at
issue in this lawsuit. Whether a particular product
infringes a particular patent claim first requires the
interpretation of the claim, and then a comparison of

the interpreted claim to the allegedly infringing
product. *Markman v. Westview Instruments, Inc.,* 52
F.3d 967, 976, *aff'd,* 517 U.S. 370, 116 S.Ct. 1384,
134 L.Ed.2d 577 (1996). Under Papst's complaint,
IBM will be required to interpret 503 claims, and
then compare them to any IBM product that contains
a hard disk drive. IBM does not object to interpreting
503 claims. However, it does object to having to
compare those claims to all of its products containing
hard disk drives.

IBM filed its Rule 12(e) motion on January 31,
2001. On February 1, 2001, counsel for Papst wrote a
letter to counsel for IBM, forwarding a document that
lists on a patent-by-patent basis the IBM hard disk
drives that Papst alleges are infringed. Several
hundred IBM hard disk drives are described by
model and part numbers. There are as many as one
hundred allegedly infringing products listed for some
patents, and only one listed for another patent. Papst
prefaces its list by informing IBM that it does not
consider the list to be exclusive:

> Papst Licensing's charges of infringement are not
> limited to the IBM hard disk drives that are
> specifically identified herein. Rather, Papst
> Licensing's charges of infringement are intended to
> include all IBM hard disk drives that have a
> construction that is similar from an infringement
> standpoint to that of the IBM hard disk drives that
> are specifically identified herein.

Upon receipt of this list, IBM offered to withdraw
its 12(e) motion if Papst would stipulate that its
infringement allegations would be limited to the
products specifically identified in the list. IBM and
Papst have apparently been unable to reach a
stipulation.

Papst argues that its complaint complies with the
sample patent infringement complaint provided in
Federal Form 16. It is apparent, however, that the
number of patents and products in the case before me
are far greater than those contemplated in the sample
complaint, which would justify a request for greater
specificity.

**\*2** Papst further contends that it filed a similar 12(e)
motion against Minebea in related action no. 99-
3118, which was denied. However, in that motion,
Papst sought to have Minebea identify the particular
claims of each patent which Minebea claims were
invalid. IBM is not making such a request. IBM is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 179926 (E.D.La.)
**(Cite as: 2001 WL 179926 (E.D.La.))**

willing to interpret each of the 503 claims of the twenty patents, but it seeks to limit the number of comparisons it will have to make to IBM products by obtaining a more specific description of the alleged infringing products.

I find that Papst's complaint must be amended to specifically identify the IBM products which it alleges infringe upon one or more claims of each of the twenty patents.

Accordingly,

IT IS ORDERED, that IBM's FRCP 12(e) motion for a more definite statement is GRANTED;

IT IS FURTHER ORDERED, that Papst amend its complaint on or before March 20, 2001, in order to specifically identify on a patent-by-patent basis the IBM products which it alleges infringe upon one or more of the claims of each of the twenty patents.

Not Reported in F.Supp.2d, 2001 WL 179926 (E.D.La.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

LEXSEE 2000 U.S.DIST. LEXIS 22525

**LEAR CORPORATION, a Delaware corporation, Plaintiff, vs. BERTRAND AND FAURE TECHNICAL CENTER, a Delaware corporation, Defendant.**

**Case No. 00–CV–72895**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2000 U.S. Dist. LEXIS 22525*

**October 10, 2000, Decided**
**October 10, 2000, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Stay granted by *Lear Corp. v. Bertrand Faure Tech. Ctr., 2001 U.S. Dist. LEXIS 25479 (E.D. Mich., Sept. 4, 2001)*

**COUNSEL:** For Lear Corporation, PLAINTIFF: John M Halan, Ginta D Kukainis, Brooks & Kushman, Southfield, MI USA.

For Lear Corporation, PLAINTIFF: Kevin D Hogg, Marshall, Gerstein, Chicago, IL USA.

For Bertrand Faure Technical Center, Incorporated, DEFENDANT: Stewart L Mandell, Dykema Gossett, Ann Arbor, MI USA.

**JUDGES:** GEORGE CARAM STEEH, United States District Judge.

**OPINIONBY:** GEORGE CARAM STEEH

**OPINION:**

OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS, AND GRANTING DEFENDANT'S MOTION FOR A MORE DEFINITIVE STATEMENT

Defendant Bertrand and Faure Technical Center ("BFTC") moves to dismiss plaintiff Lear Corporation's patent infringement claims or, in the alternative, for a more definitive statement. The facts and legal arguments presented in the parties' briefs are sufficient to adjudicate the motion. Oral argument would not significantly aid the decisional process. Pursuant to E.D. Mich. Local R. 7.1(e)(2), it is ORDERED that the motion be resolved without oral argument. The motion hearing scheduled for October 16, 2000 at 2:00 p.m. in Ann Arbor, Michigan **[*2]** is hereby ADJOURNED. For the reasons

**DISPOSITION: [*1]** Defendant BFTC's motion to dismiss DENIED, without prejudice. Defendant BFTC's motion for more definitive statement GRANTED.

set forth below, defendant BFTC's motion to dismiss will be DENIED. Defendant's motion for a more definitive statement will be GRANTED.

Lear filed its complaint on June 27, 2000 alleging it owns patent number 5,795,019 ("the 019 Patent") covering a motor vehicle seat and headrest arrangement. In the one count complaint, Lear alleges BFTC "has been, is, is engaged in an activity directed toward, and/or is making meaningful preparation for, inducing the infringement of and/or contributorily infringing, the '019 patent." Complaint, P 13, at 3. Plaintiff Lear further alleges BFTC's infringement "has been and/or is willful", that defendant has "indicated a refusal to change the course of its actions in the face of acts by [plaintiff] Lear sufficient to create a reasonable apprehension that a suit would be forthcoming", and that defendant BFTC "will continue directly, contributorily, and/or by inducement, to infringe the '019 patent, and/or will continue to be engaged in an activity directed toward, and/or making meaningful preparation for, directly, contributorily, and/or by inducement infringing the '019 patent, unless and until enjoined by this **[*3]** Court." Complaint, PP 14–16, at 4. Lear seeks damages, and declaratory and injunctive relief relative to their claim that defendant BFTC "has been, is, is engaged in an activity directed toward, and/or is making meaningful preparation for, infringing the '019 patent directly, contributorily, and/or by inducement." Complaint, at 4–5.

BFTC moves to dismiss plaintiff Lear's claims or for a more definitive statement arguing at the outset that Lear has failed to allege a third–party infringer requisite to sustaining an actionable claim of contributory infringement

or inducing infringement. BFTC continues that Lear cannot sustain a patent infringement claim premised on alleged preparatory conduct short of actual infringement. BFTC urges that, to prepare a proper defense, it must be notified whether Lear's claims are based upon an actual or threatened infringement, as well as the specific conduct and products that underlie plaintiff's infringement claims.

Pursuant to Title *35 U.S.C. § 271*:

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports [*4] into the United States any patented invention during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

*35 U.S.C. § 271(a–c)*. Indirect infringement by inducement or contribution requires a showing that the defendant caused others to use the patented product in an infringing way, and actively and knowingly aided or encouraged another's direct infringement. *Ductmate Industries, Inc. v. Famous Supply Corp., 55 F. Supp.2d 777, 786, 786 n.10 (N.D. Ohio 1999)* (citing *Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668* [*5] *(Fed.Cir.)*, cert. denied, *488 U.S. 968, 102 L. Ed. 2d 534, 109 S. Ct. 498 (1988))*. It must also be proven that the accused inducer actually intended to encourage the patent infringement. *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 488, 12 L. Ed. 2d 457, 84 S. Ct. 1526, 1964 Dec. Comm'r Pat. 760(1964)*; *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed.Cir.1990))*. Both infringement by inducement and infringement by contribution require proof that the defendant had actual knowledge of the plaintiff's patents. Id.

Procedurally, a complaint must contain a short plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for relief the pleader seeks. See *Fed. R. Civ. P. 8(a)*. If the complaint is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the defendant may move for a more definitive statement before filing the answer. See *Fed. R. Civ. P. 12(e)*. While a complaint need only give "fair notice" of what the plaintiff's claim is and [*6] the grounds upon which it rests, the "fair notice" standard requires more than the bare pleading of legal conclusions. *DeLorean Motor Co. v. Weitzman, 991 F.2d 1236, 1240 (6th Cir. 1993)* (citing *Lawler v. Marshall, 898 F.2d 1196, 1199 (6th Cir. 1990)* and *Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988))*. *Federal Rule of Civil Procedure 12(b)(6)* authorizes a court to dismiss a claim as a matter of law if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45–46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*.

Defendant's argument that no set of facts could support the plaintiff's claims of direct patent infringement, infringement by inducement, or infringement by contribution, is impossible to assess at this juncture because the complaint merely sets forth legal conclusions without any factual grounds upon these conclusions rest. *DeLorean, 991 F.2d at 1240*. Plaintiff Lear has alleged it owns the rights to the 019 Patent, and that defendant [*7] BFTC has directly and indirectly infringed upon the patent. Plaintiff Lear's allegations are vague, giving no hint how BFTC has allegedly infringed the 019 Patent – the grounds for alleging patent infringement. Without adequate notice, BFTC is left to speculate what it is accused of doing that infringes the '019 patent. As the complaint stands, BFTC is left only to answer whether it agrees that the '019 Patent is owned by Lear, and whether it believes it has in any way infringed the '019 Patent since it issued on August 18, 1998. The court finds defendant BFTC is entitled to "fair notice" of the grounds of plaintiff Lear's legal claims before filing a meaningful answer. Lear is entitled to provide such notice to defendant BFTC in an amended complaint in which Lear will have the opportunity to provide a more definitive statement of the grounds for its claims. Dismissal at this early juncture of the lawsuit would be inappropriate; it remains possible for plaintiff Lear to allege factual grounds under which it may be entitled to relief. *Conley, 355 U.S. at 45–46*. Accordingly,

Defendant BFTC's motion to dismiss is hereby DENIED, without prejudice. Defendant BFTC's motion [*8] for a more definitive statement is hereby GRANTED. Plaintiff Lear shall file a first amended complaint consistent with the analysis herein within 21 days of receipt of

2000 U.S. Dist. LEXIS 22525, *8

this Opinion and Order.

   SO ORDERED.

   GEORGE CARAM STEEH

United States District Judge

Dated: 10 OCT 2000

   Detroit, Michigan.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P 28,292, 2001 Copr.L.Dec. P 28,303
**(Cite as: 2001 WL 637378 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Joseph MAHNKE, Plaintiff(s),
v.
MUNCHKIN PRODUCTS, INC., Defendant(s).
**No. 99Civ.4684(LTS)(THK).**

June 7, 2001.

*OPINION AND ORDER*

SWAIN, J.

 **\*1** On March 29, 2001, Magistrate Judge Theodore H. Katz issued a Report and Recommendation ("Report") recommending that defendant's motion to dismiss the complaint in the above-captioned action be granted as to claims accruing earlier than the three years immediately prior to the filing of the complaint and that the motion be granted, with leave to replead in accordance with the Report, with regard to claims for infringement accruing within the three years immediately prior to the filing of the complaint. There were no objections interposed to the Report. The Court has thoroughly reviewed Judge Katz's comprehensive and well-reasoned Report and has determined that there is no clear error on the face of the record. The Court adopts the Report, which is reproduced below, for the reasons stated therein.

 On April 27, 2001, the undersigned received in chambers a document denominated "Amended Complaint," from plaintiff Joseph Mahnke, appearing *pro se.* The document is not accompanied by a certificate of service although it is indicated that a copy was sent to counsel for the defendant. The Amended Complaint appears to be plaintiff's effort to replead in accordance with Judge Katz's Report.

 On May 2, 2001, the parties signed a Stipulation of Adjournment granting defendant an extension of time to answer plaintiff's amended complaint. The stipulation was submitted to the Honorable Lewis A. Kaplan, who formerly presided over this matter. Judge Kaplan signed the stipulation, granting the request.

 Plaintiff is hereby directed to file the Amended Complaint with a certificate of service within twenty (20) days of the date hereof. In accordance with the Order of Reference to a Magistrate Judge, dated August 2, 2000, Judge Katz supervises all pretrial matters in the case. All communications regarding pretrial matters should therefore be directed to his attention.

REPORT AND RECOMMENDATION

 KATZ, Magistrate J.

 This action was referred to me, pursuant to 28 U.S.C. § § 636(b) (1)(B) and (C), for general pretrial supervision and the resolution of dispositive motions requiring a Report and Recommendation. *Pro se* plaintiff, Joseph Mahnke, brings this action against defendant Munchkin, Inc., alleging that defendant, through the production of a baby soda bottle, infringed plaintiff's registered copyright in a drawing. Defendant now moves to dismiss this action for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), for a more definite statement, pursuant to Fed.R.Civ.P. 12(e), and to strike irrelevant and immaterial references to patent issues, pursuant to Fed.R.Civ.P. 12(f). For the following reasons, I respectfully recommend that: 1) defendant's motion to dismiss as to infringement claims accruing earlier than the three years immediately prior to the filing of the Complaint, be granted; and 2) defendant's motion to dismiss as to claims, if any, for infringement accruing within the three years immediately prior to the filing of the Complaint, be granted, but with leave to replead consistent with the following recommendations.

BACKGROUND
 **\*2** Joseph Mahnke ("Mahnke"), through his sparse half-page Complaint filed March 23, 1999, ostensibly alleges that Munchkin Product's Inc. ("Munchkin"), beginning in 1993, infringed plaintiff's copyright-protected drawing through the production of a similar product. *See* Complaint.

 On June 29, 1999, then Chief Judge Griesa issued an Order dismissing Mahnke's Complaint for failure to properly allege a copyright infringement claim. *See* Order to Dismiss, dated June 29, 1999. The Court, in making its determination, found that the Complaint failed to establish proof of copyright ownership,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 2
Not Reported in F.Supp.2d, 2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P 28,292, 2001 Copr.L.Dec. P 28,303
(Cite as: 2001 WL 637378 (S.D.N.Y.))

proof of copyright registration certification, and failed to describe the work being infringed in sufficiently specific terms. *See id.* In response to the Order of Dismissal, Mahnke filed a Notice of Appeal, dated July 23, 1999, that was subsequently dismissed by the Court of Appeals on December 7, 1999. *See* Court of Appeals Mandate, *Mahnke v. Munchkin,* 99 Civ. 4684(LTS), Dkt. # 7.

 Undeterred, Mahnke, on February 3, 2000, filed a motion to reconsider the June 29 dismissal Order. *See* Plaintiff's Motion for Reconsideration ("Mot. for Rec."). After consideration of Mahnke's motion, Judge Griesa vacated his previous order and determined that Mahnke had sufficiently supported his claim for copyright infringement by providing the Court with a photocopy of the statutory certificate of copyright registration for Mahnke's work entitled "Toys for Soda Beverage Bottle" (effective date September 3, 1991), copyright registration number VA 219 103 pertaining to the work, and a photocopy of the drawing to which the copyright protection applies. *See* Mot. for Rec.; Order granting Mot. for Rec., dated March 16, 2000 ("March 16 Order"). In detailing his copyright infringement allegations for the Court, Mahnke alleged that Munchkin's manufacture of a "decorated baby soda bottle," beginning some time in 1993, constituted an infringing copy of his copyright-protected drawing. *See* Mot. for Rec.; March 16 Order.

 Defendant subsequently filed the instant motion seeking to dismiss the Complaint, or in the alternative, for a more definite statement and to strike certain immaterial or impertinent material from the Complaint. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss Complaint ("Def.Mem.").

DISCUSSION

I. *Standards under Rule 12(b)(6)*

 In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations of the Complaint in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974); *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F .3d 59, 67 (2d Cir.1996); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). Dismissal is warranted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45- 6, 78 S.Ct. 99, 102 (1957); *see also Harris v. City*

*of New York,* 186 F.3d 243, 250 (2d Cir.1999); *Automated Salvage,* 155 F.3d at 67; *Hernandez,* 18 F.3d at 136.

 *3 Furthermore, "[t]he Supreme Court has long held that courts must construe *pro se* complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliot v. Bronson,* 872 F.2d 20, 21 (2d Cir.1989) (per curiam) (citing *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175 (1980) and *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595 (1972) (per curiam)). Accordingly, where the plaintiff is proceeding *pro se,* the Court must read plaintiff's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Branham v. Meachum,* 77 F.3d 626, 628-29 (2d Cir.1996); *see also Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

II. *Copyright Infringement Claim*

 A. *Statute of Limitations*

 The applicable statutory limitations provision for copyright infringement actions provides in relevant part that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S .C. § 507(b); *see also Maurizio v. Goldsmith,* 84 F.Supp.2d 455, 461 (S.D.N.Y.2000); *Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 639-640 (S.D.N.Y.2000). A copyright infringement claim accrues, for purposes of § 507(b), when the plaintiff knows or should have known of the alleged infringement. *See Maurizio,* 84 F.Supp.2d at 461 (citing *Merchant v. Levy,* 92 F.3d 51, 56 (2d Cir.1996)); *Armstrong,* 91 F.Supp.2d at 640 (citing *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992)).

 Even a cursory examination of Mahnke's initial pleading and subsequent motion for reconsideration reveals an express acknowledgment by Mahnke that he viewed Munchkin as infringing his copyright in 1993, a full six years prior to Mahnke's filing of the Complaint in this action. *See* Complaint; Mot. for Rec. On the face of his initial Complaint, plaintiff readily acknowledges that the instant copyright infringement action relates to "a product that was manufactured in 1993." Complaint. Similarly, the first paragraph of plaintiff's two page memorandum supporting his motion for reconsideration plainly states that the "potential infringement of the two dimensional toy started in 1993." Mot. for Rec. Moreover, plaintiff clearly knew of the alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringement as of 1993, since he asserts that he contacted and subsequently submitted a copy of his drawing to Munchkin in 1993 in order to "resolve the matter amicably." Mot. for Rec.

Thus, Mahnke's Complaint, filed in 1999, seemingly comes three years after the expiration of the applicable statute of limitations for copyright infringement. *See* Mot. for Rec. Nonetheless, construing *pro se* plaintiff's Complaint and motion for reconsideration liberally, [FN1] plaintiff has potential claims for copyright infringement that accrued within three years of the filing of this action, thus preventing the dismissal of this action in its entirety.

> FN1. For purposes of this motion, the Court reads plaintiff's motion for reconsideration liberally as an amended pleading, given that it contains the gravamen of his allegations and was the basis for Judge Griesa's Order vacating his earlier dismissal of this action. *See* March 16 Order.

**\*4** The Second Circuit, although not endorsing a continuing violation approach to copyright infringement, permits recovery of damages for discrete acts of infringement occurring during the three-year period immediately prior to suit. *See Stone,* 970 F.2d at 1049-50; *see also Armstrong,* 91 F.Supp.2d at 641 (citations omitted); *Byron v. Chevrolet Motor Div. Of General Motors Corp.,* No. 93 Civ. 1116(AJP), 1995 WL 465130, at \*3 (S.D.N.Y. Aug. 7, 1995). Every infringing act is considered a distinct harm, giving rise to an independent claim for relief; however, recovery is limited to those infringing acts occurring within the three years preceding suit. *See Stone,* 970 F.2d at 1049-50; *see also Armstrong,* 91 F.Supp.2d at 642; *Rosner v. Codata Corp.,* 917 F.Supp. 1009, 1017 (S.D.N.Y.1996); *Byron,* 1995 WL 465130, at \*3.

It cannot be discerned simply from the pleadings whether Munchkin's allegedly infringing product, identified by Mahnke as a "baby soda bottle," was in production within the three years prior to the filing of the instant action. If it was, a timely and distinct cause of action would exist at each instance plaintiff's copyright-protected drawing was allegedly copied or distributed. *See Armstrong,* 91 F.Supp.2d at 642. Although damage claims for alleged infringement accruing earlier than three years prior to plaintiff's filing of this Complaint are time-barred under § 507(b), it would be improper to dismiss this claim with respect to acts of infringement occurring within

three years of the filing of this suit. *See Byron,* 1995 WL 465130, at \*3 (citing *Stone,* 970 F.2d at 1049-50); *see also Armstrong,* 91 F.Supp.2d at 642. Therefore, defendant's motion to dismiss, under § 507(b), should be granted only as to copyright infringement claims accruing earlier than March 23, 1996.

### B. Laches

Munchkin's memorandum in support of its motion to dismiss raises, but ultimately fails to fully articulate or demonstrate, a laches defense. *See* Def. Mem. at 6, n. 5. In order to successfully invoke the equitable doctrine of laches, Munchkin must demonstrate both a "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Peyser v. Searle Blatt & Co., Ltd.,* No. 99 Civ. 10785(WK), 2000 WL 1071804, at \*4-5 (S.D.N.Y. Aug. 2, 2000); *Armstrong,* 91 F.Supp.2d at 643 (citing *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543 (1961)); *see also Jose Armando Bermudez & Co. v. Bermudez Int'l,* No. 99 Civ. 9346(AGS), 2000 WL 1225792, at \*8 (S.D.N.Y. Aug. 29, 2000) (citing *Tri-Star Pictures Inc. v. Leisure Time Prods., BV,* 17 F.3d 38, 44 (2d Cir.1994)). Contrary to Munchkin's assertion, "mere delay is not, in and of itself, sufficient to bar a claim." *Armstrong,* 91 F.Supp.2d at 643 (citing *Fort Knox Music Inc. v. Baptiste,* 47 F.Supp.2d 481, 484 n. 1 (S.D.N.Y.1999).

**\*5** Although it is evident that Mahnke waited over six years to file his Complaint, Munchkin fails to proffer any evidence suggesting that Mahnke's delay in filing suit resulted in prejudice. *See Byron* 1995 WL 465130, at \*8 (requiring a showing of a "little prejudice," despite plaintiff's seven-year delay in bringing action, in order to prevail on a laches defense). Accordingly, this action cannot be dismissed on the basis of laches at this early stage of the proceedings. *Cf. Peyser,* 2000 WL 1071804, at \*3 (noting that a consideration of laches requires a fact-based inquiry, often unsuited to dispositive motions before discovery has taken place); *Jose Armando Bermudez & Co.,* 2000 WL 1225792, at \*8 (same). This is not intended to suggest, however, that laches would not be a valid basis for dismissal upon a more fully developed record.

### C. Sufficiency of Plaintiff's Copyright Infringement Pleading

A properly pled claim of copyright infringement must state 1) which specific original works are the

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P 28,292, 2001 Copr.L.Dec. P 28,303
**(Cite as: 2001 WL 637378 (S.D.N.Y.))**

subject of the copyright claim, 2) that plaintiff owns the copyright in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts and during what time the defendant infringed the copyright. *See Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D .N.Y.1992), *aff'd,* 23 F.3d 398 (2d Cir.1994); *see also Plunket v. Doyle,* No. 99 Civ. 11006(KMW), 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001); *Lindsay v. R.M.S. Titanic,* 52 U .S.P.Q.2d 1609, 1612 (S.D.N.Y.1999); *DiMaggio v. Int'l Sports Ltd.,* 49 U.S.P.Q.2d 1215, 1216 (S.D.N.Y.1998). The Court finds that Mahnke's Complaint only addresses the first three of these elements, and fails to satisfy the fourth element necessary in order to sufficiently state a claim for copyright infringement.

Through his motion for reconsideration, Mahnke clearly demonstrates his drawing, "Toys for Soda Beverage Bottle," is the original work subject to copyright protection, and he properly establishes ownership of that work by presenting a certificate of registration from the United States Register of Copyrights. [FN2]

> FN2. A certificate of registration issued from the United States Register of Copyrights, aside from establishing one of the necessary criteria for stating a copyright infringement claim, concurrently "constitutes prima facie evidence" of copyright ownership, although that "presumption may be rebutted." *Carell v. The Shubert Org., Inc.,* 104 F.Supp.2d 236, 251 n. 10 (S.D.N.Y.2000) (citing *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.1992)).

Mahnke has not, however, properly alleged by what acts and during what period of time the defendant infringed his copyright. This Court accepts defendant's assertion that it is difficult to respond to plaintiff's generic references to an infringing "baby soda bottle," which fail to identify those specific Munchkin products, or particular elements of the products, that are allegedly infringing. *See* Complaint; Mot. for Rec.; Def. Mem. For example, accepting that Munchkin has been manufacturing baby soda bottles since at least 1993, it cannot be discerned from the Complaint whether Mahnke alleges that all of Munchkin's bottle products infringe or whether defendant continues to produce these allegedly infringing bottles. Moreover, since Mahnke only has a copyright in an illustration, it is unclear if he is claiming that there is a pictorial element of Munchkin's bottles that infringes or that the bottles

themselves are infringing objects. These omissions leave plaintiff's Complaint lacking in detail sufficient to afford defendant the opportunity to draft a meaningful responsive pleading.

**\*6** For the foregoing reasons, plaintiff's copyright infringement claims should be dismissed without prejudice. Considering, however, that the pleading's deficiencies may be curable, the prudent course here is to afford the plaintiff an opportunity to replead. *See Plunket,* 2001 WL 175252, at * 6; *DiMaggio,* 49 U.S.P.Q.2d at 1218. If plaintiff chooses to replead, he should address, with sufficient specificity, the particular Munchkin product, products, or aspect of those products that allegedly infringes plaintiff's copyright, and he should further specify the dates or periods of time during which these particular products are alleged to have infringed plaintiff's copyright.

### *D. Motion to Strike*

Defendant has also moved, pursuant to Rule 12(f), to strike plaintiff's references to patent issues, as they are immaterial to the copyright infringement action. The Court agrees; however, in light of the dismissal of the present Complaint, the motion to strike is rendered moot. Nevertheless, the basis for defendant's motion is well-taken and should prompt plaintiff to avoid references to irrelevant patent matters in any amended complaint.

Plaintiff appears to suggest that defendant's alleged copyright infringement of his drawing obstructed or altogether prevented his ability to seek future patent protection of his idea. *See* Mot. for Rec. Nonetheless, Mahnke concedes that he does not possess patent protection, may or may not have a patent application pending, and that defendant's product has been in the public use for at least several years. *See* Mot. for Rec. On these facts it is clear that plaintiff is not arguing and cannot maintain a claim of patent infringement. [FN3] Moreover, plaintiff's mistaken conflation of patent and copyright issues creates confusion and further burdens defendant's ability to draft a responsive pleading as to the copyright infringement issue, which is the relevant subject matter of the instant litigation.

> FN3. In order to state a claim of patent infringement, the plaintiff must allege that a person (1) without authority of the patent holder, (2) makes, uses, offers to sell, sells, or imports any patented invention within the United States, (3) during the term of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

patent. *See* 35 U.S.C. § 271(a) (2000); *see also Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 374, 116 S.Ct. 1384, 1388 (1996). Even construing *pro se* plaintiff's Complaint and motion for reconsideration liberally, plaintiff, as a matter of law, cannot maintain a cognizable claim for patent infringement, without first being a patent owner.

Accordingly, any amended complaint filed by plaintiff should exclude any and all references regarding patent issues, as they are irrelevant and create confusion regarding his copyright infringement claim.

CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion to dismiss pursuant to Rule 12(b)(6) be granted, subject to certain conditions. First, as to any copyright infringement claims accruing more than three years prior to the filing of the Complaint, *i.e.* prior to March 23, 1996, I recommend that defendant's motion be granted and that these claims be dismissed with prejudice. As to defendant's motion to dismiss claims for copyright infringement accruing within the three years immediately prior to the filing of the Complaint, I recommend that defendant's motion be granted with leave to replead within thirty (30) days of the Court's decision with respect to this Report and Recommendation. Any amended pleading plaintiff files must be consistent with this Report and Recommendation to the extent it is adopted by the District Court. Specifically, plaintiff must identify the specific acts of infringement for which he seeks to hold defendant responsible (*i.e.* by what acts and/or products plaintiff claims defendant infringed his copyright), as well as the dates or time frame of such acts of infringement. Finally, any amended pleading should not contain irrelevant and confusing references to plaintiff's attempt to secure a patent.

**\*7** Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Laura T. Swain, District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to United States District Judge Swain. Failure to file objections will result in a waiver of

those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund V. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

Not Reported in F.Supp.2d, 2001 WL 637378 (S.D.N.Y.), 2001 Copr.L.Dec. P 28,292, 2001 Copr.L.Dec. P 28,303

**Motions, Pleadings and Filings (Back to top)**

• 1:99cv04684 (Docket) (Jun. 29, 1999)

END OF DOCUMENT

# EXHIBIT J



**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
ONDEO NALCO COMPANY, a Delaware
Corporation, Plaintiff,
v.
EKA CHEMICALS, INC., a Delaware Corporation,
Defendant.
**No. Civ.A.01-537-SLR.**

June 10, 2002.

MEMORANDUM ORDER

ROBINSON, J.

**\*1** At Wilmington this 10th day of June, 2002, having reviewed the briefs submitted by the parties with respect to plaintiff's pending motions;

IT IS ORDERED that plaintiff's motion to dismiss defendant's counterclaims (D.I.23) is granted; and plaintiff's motion for leave to filed an amended complaint (D.I.42) is granted, for the reasons that follow:

1. The court has jurisdiction over this action pursuant to 35 U.S .C. § § 271 and 281 and 28 U.S.C. § 1338(a).

2. Motion to Dismiss Counterclaims. In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The moving party has the burden of

persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

3. Plaintiff argues that defendant's counterclaims, which allege that plaintiff's products infringe three of defendant's patents, [FN1] fail to provide fair notice of the claims and the grounds upon which they rest, as required by Federal Rule of Civil Procedure 8(a). *Conley,* 355 U.S. at 47 (Rule 8(a) requires that a claim provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests"). Plaintiff asserts that the counterclaims insufficiently identify which products are accused of infringement [FN2] and fail to adequately plead induced infringement. [FN3] Plaintiff also objects that the counterclaims do not specify when the alleged infringement occurred (the '961 and '150 patents are now expired) and they combine the direct, contributory, and induced infringement claims into one count for each patent.

FN1. United States Patent No. 5,603,805 ("the '805 patent"); United States Patent No. 4,385,961 ("the '961 patent"); and United States Patent No. 4,388,150 ("the '150 patent").

FN2. The infringing products are described as "Nalco's products, including the 8692 product." (D.I.22, ¶ ¶ 29,34,40) The only additional clue to the identity of the alleged infringing products is the averment "Nalco makes and sells products, including the product numbered 8692, ... that are used in paper-making processes ..." or "to make paper." (*Id.* at ¶ 24)

FN3. Defendant simply avers that "[u]pon information and belief, Nalco has induced the infringement of the claims of the ... patent, in violation of 35 U.S.C. § 271(b), by selling its products, including the 8692 product, and in instructing and encouraging others in the use of its products, including the 8692 product." (D.I.22, ¶ ¶ 30,36,42)

4. The court agrees with plaintiff that the counterclaims do not satisfy Rule 8(a). With the exception of the description of the 8692 product, the pleadings are too vague to provide plaintiff with fair notice of which products are accused of infringing defendant's patents. *See Conley,* 355 U.S. at 47; *Gen-*

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.)
**(Cite as: 2002 WL 1458853 (D.Del.))**

*Probe, Inc. v. Amoco Corp., 926 F.Supp. 948, 961 (S.D.Cal.1996)* (vague reference to "products and/or kits" does not provide adequate notice). *Compare Interdigital Technology Corp. v. OKI America, Inc., 845 F.Supp. 276, 283 (E.D.Pa.1994)* (patent claim need not identify specific products that are alleged to infringe by name so long as they are "sufficiently identified in some way"). In addition, the pleadings fail to allege direct infringement by a party other than ONDEO Nalco and, therefore, insufficiently plead induced infringement. *See Met-Coil Systems Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed.Cir.1986)* (direct infringement required element of induced infringement); *Shearing v. Optical Radiation Corp.,* 30 U.S.P.Q. 1878, 1880 (D.Nev.1994) (complaint must allege direct infringement by someone other than the inducer).

**\*2** 5. Based on the above, the court dismisses defendant's counterclaims with leave to amend.

6. Motion for Leave to File a First Amended Complaint. Under Federal Rule of Civil Procedure 15(a), leave to file amended complaints "shall be freely given when justice so requires." *See also Gooding v. Warner-Lambert Co., 744 F.2d 354, 358 (3d Cir.1984).* Plaintiff seeks leave to amend its complaint (a) to remove two alien defendants whom plaintiff and defendant have agreed to dismiss with prejudice (see Stipulation and Order, D.I. 20, ¶ 1); and (b) to add declaratory judgment counts related to invalidity of the patents-in-suit. Defendant objected that the proposed amended complaint would be deficient for failure to plead with specificity inequitable conduct and for asserting "unenforceability" of the subject patents in combination with invalidity. In response, plaintiff added more specific allegations of inequitable conduct with respect to the procurement of the '805 patent to a revised first amended complaint (D.I.45, Ex. D, ¶ ¶ 22-54); plaintiff makes no inequitable conduct allegations with respect to the '150 patent or the '961 patent (*Id.* at 5-6; Ex. D, ¶ ¶ 55-65). Based on the above, the court grants plaintiff leave to file a first amended complaint.

Not Reported in F.Supp.2d, 2002 WL 1458853 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00537 (Docket) (Aug. 10, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K



▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
RISTVEDT-JOHNSON, INC., a Tennessee
corporation, and Cummins-Allison
Corporation, an Indiana corporation, Plaintiffs,
v.
Nelson PELTZ, an individual, and Peter W. May, an
individual, Defendants.
No. 91 C 3273.

Nov. 18, 1991.

*MEMORANDUM OPINION AND ORDER*

ANN C. WILLIAMS, District Judge.

 *1 Plaintiffs Ristvedt-Johnson, Inc. ("Ristvedt") and
Cummins-Allison Corp. ("Cummins") originally
brought a suit against Brandt, Inc. ("Brandt"), a
corporation owned by Nelson Peltz ("Peltz") and
Peter W. May ("May"), for patent infringement. *See
Ristvedt-Johnson, Inc. v. Brandt, Inc.,* No. 88 C 3834.
The plaintiffs now bring this action, claiming that the
defendants, based upon their status as directors and
sole shareholders of Brandt, induced Brandt to
infringe upon the plaintiffs' patent in violation of 35
U.S.C. § 271(b). Pursuant to Federal Rule of Civil
Procedure 12(b)(6), the defendants now move to
dismiss the complaint for lack of personal jurisdiction
and a failure to state a claim for which relief can be
granted. For the reasons stated below, the Court
grants the defendants' motion to dismiss.

*Background*

 Based upon the allegations in the plaintiffs'
complaint, Ristvedt owns U.S. Patent Nos.
4,098,280; 4,234,003; 4,444,212; 4,531,531;
4,549,561; and 4,731,043. These patents were
issued to Ristvedt for their coin handling machines
and coin sorters. Ristvedt exclusively licenses the
rights to these patents to Cummins. The plaintiffs
already have brought an action against Brandt for
infringing upon these patents. [FN1] In the instant
case, the plaintiffs allege that Peltz and May induced

these infringements in violation of 35 U.S.C. §
271(b).

 The plaintiffs allege that Peltz and May own 100%
of Brandt's outstanding stock and are two of the three
directors of the corporation. They further allege that
Peltz and May have been paid substantial
management fees by Brandt and that they "control the
business" by reviewing monthly business reports
summarizing monthly operations, pre-approving
capital expenditures greater than $25,000, and
occasionally meeting with Brandt's president to
discuss Brandt's budget, product development, sales
promotions, engineering projects, international
developments, and Brandt's patent infringement
litigation with Ristvedt.

 The plaintiffs also allege that Peltz and May have
not left Brandt with sufficient assets to satisfy the
damages sought by the plaintiffs in this suit. Brandt
was sold in 1984 and, as noted above, Peltz and May
became its sole shareholders in 1988. The plaintiffs
allege that since Peltz and May began controlling
Brandt, the corporation has incurred losses of $1.1
million in 1986, $4.3 million in 1987, $2.5 million in
1988, and $1.0 million in 1990.

 The plaintiffs claim that the defendants used their
positions and control as the owners and directors of
Brandt, to induce Brandt to infringe on Ristvedt's
patents. The plaintiffs also assert that Peltz and May
induced Brandt to infringe upon their patents by
directing officers of Brandt to copy plaintiffs'
patented products. The defendants now move to
dismiss this case, pursuant to Federal Rule of Civil
Procedure 12(b)(6), for lack of personal jurisdiction
and a failure to state a claim for which relief can be
granted.

*Discussion*
 A. *The Motion to Dismiss for Lack of Personal
Jurisdiction*

 *2 This court only has personal jurisdiction over an
out-of-state defendant if an Illinois court could assert
such jurisdiction. *Young v. Colgate-Palmolive Co.,*
790 F.2d 567, 569 (7th Cir.1986). In this case, the
plaintiffs claim that this court has personal
jurisdiction over the defendants under the Illinois
long-arm statute, 110 Ill.Rev.Stat. ¶ 2-209(1982).
Defendants argue that this Court does not have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1991 WL 255691 (N.D.Ill.)
**(Cite as: 1991 WL 255691 (N.D.Ill.))**

jurisdiction over them because they are protected by the fiduciary shield doctrine, one of the limitations placed upon the Illinois long-arm statute by the Illinois Supreme Court.

The fiduciary shield doctrine prohibits personal jurisdiction over an individual when that individual's contact with the forum state is limited to acts performed as a representative or fiduciary of a corporation. *State Security Insurance Co. v. Frank B. Hall & Co., Inc.,* 530 F.Supp. 94, 97 (N.D.Ill.1981); *Olinski v. Duce,* 155 Ill.App.3d 441, 443-44, 508 N.E.2d 398, 400 (1st Dist.1987). This doctrine protects the defendant from defending a suit brought against him personally "in a forum in which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir.1981); *Torco Oil Co. v. Innovative Thermal Corp.,* 730 F.Supp. 126, 133 (N.D.Ill.1989). The court's inquiry into the applicability of the fiduciary shield doctrine thus focuses on whether the defendant's actions advanced personal, rather than employer, interests. *Torco Oil Co.,* 730 F.Supp. at 134.

This determination cannot be made mechanically. It is well established that the fiduciary shield exception is an equitable principle intended to be applied with discretion. *Id.; Washburn v. Becker,* 186 Ill.App.3d 629, 542 N.E.2d 764 (1989). While the applicability of the doctrine must be considered on a case-by-case basis, Illinois Courts have carved out several standard exceptions to the doctrine. In this case, the plaintiffs respond to the defendant's invocation of the fiduciary shield doctrine, citing the most common exception to the doctrine--that the corporation is merely the "alter-ego" of the defendants.

At this early stage of the litigation, the plaintiffs only need to establish a prima facie case of jurisdiction in the case. *Ameritech Mobile Communications, Inc. v. Cellular Communications Corp.,* 664 F.Supp. 1175, 1177 (N.D.Ill.1987). As long as the plaintiffs' allegations are not "patently without merit," the plaintiff's claim of jurisdiction will stand. *Torco Oil Co.,* 730 F.Supp. at 136. Application of the alter ego exception can only be refused "where no facts are alleged supporting a finding that the corporation is a sham ... or where the supporting evidence is so manifestly insufficient that the alter ego argument is not even minimally viable." *Id.*

In *Kula v. J.K. Schofield & Co., Inc.,* the court found that the evidence presented by the plaintiff did not

meet the minimum standard of viability required to establish personal jurisdiction. 668 F.Supp. 1126 (N.D.Ill.1987). In that case, the plaintiff alleged that the corporation at issue was the alter ego of the defendant because the defendant was the chairman of the board, chief executive officer, and sole shareholder of the corporation. *Id.* at 1129. The court determined, however, that these allegations did not suffice to defeat the defendant's assertion of the fiduciary shield doctrine. The court noted that being a member of management or holding a controlling position in a corporation did not nullify the protection of the equitable doctrine. *Id.* The court further noted that corporate officers, directors, and shareholders, were "separate and distinct" from the corporation. *Id.* The *Kula* court therefore refused to pierce the fiduciary shield based upon these allegations since the plaintiff had not alleged any other facts in his complaint suggesting that the corporation was merely a shell. *Id.* at 1130.

**\*3** Like *Kula,* the plaintiffs in this case allege that the fiduciary shield doctrine should be pierced because the defendants are the sole shareholders of Brandt, and they actively engage in the management and control of Brandt. As established in *Kula,* the defendants' sole ownership of Brandt stock and their involvement in the management of Brandt do not, without additional evidence, suffice to establish that the corporation is actually the alter ego of the defendants. The plaintiffs' claims that the defendants prepared business reports and met periodically with Brandt's president to discuss the business of Brandt do not provide the requisite additional evidence to support the plaintiffs' alter ego argument. These actions can be considered managerial tasks which, as alleged, do not suggest that the defendants were acting in their personal interest rather than in the interests of the corporation.

The plaintiffs claim that their allegation that Brandt lacked sufficient assets also provides sufficient proof that Brandt was merely the alter ego of Ristvedt and Cummins. This Court recognizes that inadequate capitalization can provide a basis for piercing the fiduciary shield, *see Torco Oil Co.,* 730 F.Supp. at 138, however, this allegation, is not sufficient here. Even assuming this claim is true, the plaintiffs do not suggest that Brandt's alleged undercapitalization came about by the design of the defendants in an attempt to benefit themselves personally. Given this omission and the lack of allegations showing that the defendants performed their managerial tasks or used their positions as sole shareholders of the corporation to directly benefit their interests rather than Brandt's,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1991 WL 255691 (N.D.Ill.)
**(Cite as: 1991 WL 255691 (N.D.Ill.))**

the Court finds that the plaintiffs have not met their burden of proving that this Court has personal jurisdiction over the defendants.

B. *The Motion to Dismiss for Failure to State a Claim*

 The Court must also dismiss the case for a failure to state a claim for which relief could be granted.  It is well settled that a complaint cannot be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  Furthermore, the Federal Rules of Civil Procedure generally do not require the claimant to set out these facts in detail.  *Id.* at 47.  Rather, the plaintiff is only required to provide "a short and plain statement of the claim" that gives the defendant fair notice of that claim and the grounds upon which it rests.  *Id.*

 However, as the defendants suggest, the modern requirement of mere notice pleading does not affect the requirement that the plaintiff allege every essential element to show the violations of law claimed.  As the Supreme Court stated in *United States v. Employing Plasterers Ass'n.,* it is when "a bona fide complaint is filed that charges *every element necessary to recover*" that summary dismissal for failure to state a claim cannot usually be justified. 347 U.S. 186, 189 (1953) (emphasis added).

 **\*4** In § 271(b) actions, corporate officers who are found to have actively assisted in their corporation's infringement of a patent may be held personally liable for inducing infringement regardless of whether the circumstances require the court to disregard the corporate entity and consider the corporation the alter ego of the defendant corporate officers.  *Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 553 (Fed.Cir.1990).* The defendants properly assert that to establish a § 271(b) claim, the plaintiffs must establish "that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements."  *Id.* (emphasis in original); *see Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668 (Fed.Cir.1988); Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1468-69 (Fed.Cir.1990).*  To properly allege that the infringer knowingly induced infringement, the plaintiffs must demonstrate that the defendants possessed specific intent to encourage their corporation's supposed infringement and not merely that the defendants had knowledge of the acts alleged

to constitute inducement.  *Manville Sales Corp., 917 F.2d at 553.*

 Even construing the allegations in the complaint liberally, as Federal Rule of Civil Procedure 12(b)(6) requires, this Court finds that the allegations in the plaintiffs' complaint are so deficient that they fail to demonstrate that the plaintiffs could have a valid § 271(b) claim.  For example, the plaintiffs fail to allege any facts showing how the defendants induced Brandt to infringe upon Ristvedt's patents as required under *Manville.*  Instead, the plaintiffs merely assert that the defendants induced Brandt to infringe upon Ristvedt's patents.  Plaintiff's Complaint at ¶ ¶ 6, 8. This bald assertion, without the allegation of any facts supporting it, plainly does not meet the pleading requirements of the Federal Rules of Civil Procedure. Moreover, the plaintiffs' reliance upon their allegations that the defendants owned and controlled Brandt are also factually insufficient to demonstrate a valid claim under § 271(b).  The plaintiffs fail to allege any way in which the defendants used their supposed ownership and control over Brandt to induce the corporation to infringe upon Ristvedt's patents.

 The plaintiffs also do not properly allege the second *Manville* requirement that the defendants intended to induce Brandt to infringe upon Ristvedt's patents. As already noted, regardless of the brevity of the assertion, the plaintiffs are nevertheless required to allege each element of their claim.  In this case, the plaintiffs have failed to explicitly allege that the defendants had the requisite intent to induce Brandt. Furthermore, even if intent could be inferred from other allegations in the plaintiffs' complaint, *see Cannon v. University of Chicago,* 648 F.2d 1104, 1110 (7th Cir.1981), the plaintiffs' other allegations, such as that the defendants induced Brandt or that they owned and controlled Brandt, do not suggest the requisite intent on the part of the defendants to induce Brandt to infringe on Ristvedt's patents.

 **\*5** As required under Federal Rule of Civil Procedure 12(b)(6), this Court recognizes that we must not dismiss a case for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot establish a valid claim for relief.  *See Conley,* 355 U.S. at 45-46.  In this case, the plaintiffs' allegations are so factually insufficient that they do not even suggest how or when the defendants induced Brandt or that the defendants intended to induce Brandt to infringe on the plaintiffs' patens as required to prove a § 271(b) violation.  Because this Court does not have proper jurisdiction over the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1991 WL 255691 (N.D.Ill.)
**(Cite as: 1991 WL 255691 (N.D.Ill.))**

defendants and the plaintiffs present a claim for
which no relief can be granted, the Court grants the
defendants' motion to dismiss.

### Conclusion

For the reasons stated above, the Court grants the
defendants' motion to dismiss for lack of personal
jurisdiction and failure to state an actionable claim.

> FN1. *Ristvedt-Johnson, Inc. v. Brandt, Inc.,*
> No. 88-3834.

Not Reported in F.Supp., 1991 WL 255691
(N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:91CV03273 (Docket) (May. 28, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

LEXSEE 2002 U.S.DIST. LEXIS 27427

**SEIKO EPSON CORPORATION; EPSON AMERICA, INC.; EPSON PORTLAND, INC., Plaintiffs, v. PRINT–RITE HOLDINGS, LTD.; MULTI–UNION TRADING CO., LTD.; PRINT–RITE MANAGEMENT SERVICES CO.; DYNAMIC PRINT USA, INC.; AND DOES 1–10, Defendants.**

**CV 01–500–BR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

*2002 U.S. Dist. LEXIS 27427*

**April 30, 2002, Decided**

**DISPOSITION: [*1]** Holdings' Motion to Dismiss for lack of personal jurisdiction and Management's Motion to Dismiss for lack of personal jurisdiction were granted.

**COUNSEL:** For Plaintiffs: DAVID AXELROD, REGINA HAUSER, Schwabe, Williamson & Wyatt, P.C., Portland, OR.

For Plaintiffs: HAROLD A. BARZA, STEVEN M. ANDERSON, KEITH A. MEYER, RYAN S. GOLDSTEIN, TIGRAN GULEDJIAN, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, CA.

For Defendants: RANDOLPH C. FOSTER, STEVEN T. LOVETT, Stoel Rives LLP, Portland, OR.

For Defendants: SCOTT D. BAKER, ADALINE J. HILGARD, Crosby, Heafey, Roach & May, San Francisco, CA.

**JUDGES:** Anna J. Brown, United States District Judge.

**OPINIONBY:** Anna J. Brown

**OPINION:**

**AMENDED OPINION AND ORDER (REDACTED FOR PUBLIC REVIEW)**

**BROWN, Judge.**

This is a redacted version of the Amended Opinion and Order issued under seal on April 11, 2002. The redacted form of the Amended Opinion and Order omits from the Court's Findings of Fact material of a proprietary nature. The legal analysis has not been redacted.

This matter comes before the Court on the Motion to **[*2]** Dismiss ( # 36) for lack of personal jurisdiction

Plaintiffs' claims against Print–Rite Holdings, Ltd. and Print–Rite Management Services Co. were dismissed.

filed by Defendant Print–Rite Management Company, Ltd. (Management) n1 and the Motion to Dismiss ( # 39) for lack of personal jurisdiction filed by Defendant Print–Rite Holdings, Ltd. (Holdings). n2

> n1 Print–Rite Management Co., Ltd., apparently is the true name of Defendant Print–Rite Management Services Co. The Court refers to the two companies interchangeably as "Management."

> n2 During the evidentiary hearing held on March 8, 2002, the Court denied Plaintiffs' Motion to Strike ( # 75) certain evidence and argument in the Joint Reply Memorandum and overruled the Objections to Plaintiffs' Evidence ( # 95) filed by Holdings and Management. The Court took the Motions to Dismiss filed by Holdings and Management under advisement.

For the reasons that follow, the Court **GRANTS** Holdings' Motion to Dismiss ( # 39) for lack of personal jurisdiction and **GRANTS** Management's Motion to Dismiss ( # 36) for lack of personal jurisdiction. Accordingly, Plaintiffs' **[*3]** claims against Print–Rite Holdings, Ltd., and Print–Rite Management Services Co. are **DISMISSED**.

**PROCEDURAL BACKGROUND**

On April 10, 2001, Plaintiffs (Epson) filed a Complaint in which they alleged Defendants violated *35 U.S.C. § 271* by infringing on 28 patents held by Epson that relate to inkjet printer cartridges. Epson also asserted Defendants are a group of affiliated corporations with

common ownership and control, and each Defendant infringed on Epson's patents as an agent and co-conspirator of the other Defendants subject to the supervision and control of the other Defendants.

On July 13, 2001, Holdings and Management filed Motions to Dismiss for lack of personal jurisdiction. The parties subsequently stipulated Epson could complete discovery on the jurisdictional issues before filing a response to the Motions, and the Court ordered the parties to conduct jurisdictional discovery. On November 6, 2001, Epson filed its Response to the Motions to Dismiss and asserted this Court had personal jurisdiction over Holdings and Management on the basis of alter ego jurisdiction or their contacts with the United States as a whole pursuant to *Fed. R. Civ. P. 4(k)(2)* [*4] . On November 26, 2001, Holdings and Management filed their joint Reply Memorandum.

During a telephone conference held on February 22, 2002, the parties agreed the jurisdictional issues were ripe for decision. The parties also agreed the Court should hold an evidentiary hearing pursuant to *Data Disc, Inc. v. Sys. Technology Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977)*, to determine whether Epson had established by a preponderance of the evidence that Holdings and Management are subject to the jurisdiction of this Court.

On March 8, 2002, the Court held an evidentiary hearing. Although the parties were given the opportunity to call live witnesses, the parties only presented deposition testimony, written discovery materials, and exhibits.

**FINDINGS OF FACT**

Based on its review of the evidentiary record, the Court makes the following findings of fact:

1. In 1981, Arnald Ho (a.k.a. Ho Leung Mui) and his sister, Joyce, formed A&J Office Services (A&J) to sell office products. In 1985, Ho and several other investors formed Multi-Union Trading Co. to manufacture and to supply office products. In 1989, Ho formed a holding company named Sino-Expo Holdings to [*5] hold the stock of both A&J and Multi-Union Trading Co. Sino-Expo Holdings changed its name to Print-Rite Holdings, Ltd., in 1994. At this time, Multi-Union Trading Co. became a limited liability company and changed its name to Multi-Union Trading Co., Ltd. (Multi-Union). Ho Dep. at 24, 27.

2. Holdings was organized under the laws of Hong Kong. Ex. A at P 3. n3 Holdings now owns stock in many separate companies, including imaging supply manufacturers and distributors, stationary and paper product manufacturers, and companies engaged in management and consulting services and property investment. Ex. A at P 3.

Holdings is engaged in the business of seeking and considering additional investment opportunities and managing its portfolio of investments. Ex. A at P 19. Holdings' subsidiaries are sometimes referred to collectively as the "Print-Rite Group." Ex. A at P 3.

> n3 All citations to exhibits refer to the parties' Joint Exhibits presented during oral argument. The parties' Joint Exhibits, Joint Deposition Excerpts, and print-out of the parties' Power Point presentations and visual aids are hereby made part of the record.

[*6]

3. The majority of Holdings' shares are owned by a company named Starbo Investment, Ltd. (Starbo). Starbo's controlling shareholders are Arnald Ho and his wife, Gayle Fung. Ho Dep. at 59. The second largest shareholder is Wong Kong King (Holdings) Ltd. Nectron, an American company located in Texas, owns 8.5% of Holdings' shares. Other companies and individuals own the remaining shares. Ex. 1.

4. Holdings owns all of the stock of Management and Dynamic Print USA, Inc. (Dynamic). Ex. A at P 19. Holdings also owns 599,999 of the 600,000 shares of Multi-Union. Arnald Ho holds the remaining share. Ex. 2.

5. The directors of Holdings are Arnald Ho; Ho's wife, Gayle Fung; Gayle Fung's sister, Fung Po Chun; Lai Hon Ming; and Edward Tsui. Mutual Victory, Ltd., an outside company, serves as secretary of Holdings. Holdings does not have any other officers. Ex. E.

6. Tian Wei, a Chinese company located in China, is also a subsidiary of Holdings. Tian Wei is the exclusive manufacturer of Print-Rite brand products, including the inkjet printer cartridges at issue in this matter. Wong Dep. at 148. Ho is a director of Tian Wei. Ho Dep. at 245.

7. Multi-Union is also a subsidiary of Holdings. [*7] Multi-Union is a Hong Kong company with its principal place of business in Hong Kong. Ex. A at P 19. Multi-Union is a manufacturer and supplier of imaging products, including inkjet printer cartridges, ribbons, laser toner kits, stationery items, and plastics. Wong Dep. at 108-09.

8. Multi-Union was in business before the patents at issue came into being. Multi-Union has operated continually since its formation as a limited liability company and joinder with Holdings in 1989. Ex. Q. Epson's earliest patent involved in this case was issued in 1992, several years after Holdings and Multi-Union began operating. Compl. at PP 20-21. Multi-Union did not begin any op-

erations that relate to the products at issue until approximately 1994. Ex. R at P 10.

9. The directors of Multi-Union were selected by the shareholders of Multi-Union; i.e., the directors of Multi-Union were chosen by Holdings. Ho Dep. at 73–74. Multi-Union's directors are Arnald Ho's wife, Gayle Fung; Gayle Fung's brother, Fung Kam Ming; Arnald Ho's former secretary, Or Pui Chun; and Chan Yee Mui. Ex. 2. According to the general manager of Multi-Union, David Wong, Or Pui Chun, Chan Yee Mui, and Fung Kam Ming have no duties **[*8]** as directors of Multi-Union. Wong Dep. at 83, 86. Although Fung and Fung Kam Ming attend regular board meetings, Or Pui Chun and Chan Yee Mui do not. Wong Dep. at 77–78.

10. Multi-Union's officers were chosen by the Multi-Union board of directors. Ho Dep. at 77. The officers of Multi-Union are David Wong, Rita Kwok, and Donald Chan. Wong Dep. at 107. David Wong is the general manager of Multi-Union. Wong Dep. at 61. He reports directly to the board of directors of Multi-Union and, in particular, to Gayle Fung. Wong Dep. at 62. Rita Kwok's title at Multi-Union is General Manager (Administration). Her responsibilities include office management and personnel issues, logistics, and shipping and transportation. Wong Dep. at 108–09. Donald Chan is the Assistant General Manager for sales. Wong Dep. at 109.

11. Dynamic is also a subsidiary of Holdings. Holdings formed Dynamic in 1996. Dynamic is a California corporation with its principal place of business in San Jose, California. Ex. A at P 19. Dynamic purchases imaging supplies and stationery from suppliers, including but not limited to Multi-Union, and sells those products in the United States. Dynamic also sells products that do not **[*9]** carry the Print-Rite logo. Chan Dep. at 58–59.

12. Dynamic's directors also were chosen by Dynamic's shareholder, Holdings. Ex. 25; Ho Dep. at 74. Holdings' board appointed Dynamic's first board of directors in a written, "unanimous resolution" signed by Ho only. Ex. 25. The current directors of Dynamic were appointed by a unanimous resolution of the Holdings' board signed by Fung in May 2000. Ex. 26. Dynamic's directors are Gayle Fung's brother, Fung Kam Ming; Arnald Ho's sister, Louise Ho; Ernest Chu; and Lai Hon Ming.

13. The directors of Dynamic chose Dynamic's officers. All four directors signed a resolution appointing the current officers, James Chan, Wayne Cooper, and Ernest Chu. Ernest Chu is the Chief Executive Officer (CEO) of Dynamic, and James Chan is the President. Ex. U.

14. Management also is a subsidiary of Holdings. Ex. A at P 19. Management was organized under the laws of the British Virgin Islands. Its principal and only place of business is in Hong Kong. Ex. B at P 2.

15. Holdings created Management in 1997 for two reasons: Holdings perceived a need in the marketplace for an outside management and consulting service company, and Holdings believed its subsidiaries **[*10]** needed assistance with their "internal management procedures." Wong Dep. at 41. Basically, Holdings determined it would be "better" to create a company within the Print-Rite Group to manage the internal management of the subsidiaries rather than outsourcing those management services to an outside company. Wong Dep. at 42–43.

16. Management's services include accounting assistance, information technology, insurance procurement, human resources, investment services, and policy documentation assistance. Ex. B at P 3. Management provides services to Holdings and some of its subsidiaries, including Dynamic and Multi-Union. Management also provides services to companies that are not affiliated with the Print-Rite Group. Ex. B at P 3; Lee Dep. at 59.

17. Management's directors were selected by the shareholders of Management; i.e., the directors were selected by Holdings. Ho Dep. at 75–76. Management's directors are Arnald Ho; Ho's former assistant, Zheng Yu Xia; and David Wong. Ho Dep. at 19. Zheng Yu Xia is an inactive member of the board of directors with no duties. Wong Dep. at 88.

18. Management's officers were selected by Ho personally in his capacity as the Managing Director, but **[*11]** the directors of Management were ultimately responsible for appointing its officers. Ho Dep. at 76. The officers of Management are Arnald Ho; his wife's brother, Fung Kam Ming; David Wong; and Alice Lee. David Wong is currently the deputy general manager of Management. Ho promoted Wong to his current position. Wong Dep. at 60. Wong reports directly to Ho, the Managing Director of Management. Wong Dep. at 61–62.

19. In summary, five of Defendants' directors hold titles in at least two of Defendants' organizations. Arnald Ho is both a member of the board of directors of Holdings, and the Managing Director and a member of the board of Management. He also is the former Managing Director of Multi-Union. Ho Dep. at 41. Gayle Fung is a member of the boards of directors of Holdings and Multi-Union. David Wong is the Deputy General Manager and a member of the boards of directors of Management and the General Manager of Multi-Union. Fung Kam Ming is a member of the board of directors of Holdings, Multi-Union, and Dynamic. Lai Hon Ming is a member of the boards of directors of both Holdings and Dynamic.

20. The offices of Holdings, Management, and Multi-Union all are located on the same floor **[*12]** of the same

Case 1:06-cv-00041-JJF     Document 49-13     Filed 02/14/2006     Page 5 of 22

Page 4
2002 U.S. Dist. LEXIS 27427, *12

building in Hong Kong. Lee Dep. at 39–40.

21. Management allows Multi–Union to use part of its facilities, but the two companies operate in separate units of the floor. Lee Dep. at 40. Management uses Unit E and Multi–Union uses Unit A and part of Unit B. Lee Dep. at 40; Wong Dep. at 66–67. Unit B also contains employees of another Holdings subsidiary, May–May Company. Wong Dep. at 66–67. This arrangement is memorialized in a service agreement between Management and Multi–Union. Lee Dep. at 40. Management and Multi–Union have separate entrances to their units, each with a different digital lock. Lee Dep. at 142.

22. As noted above, Fung is a director of Multi–Union and the direct supervisor of Multi–Union's general manager, David Wong. Pursuant to Management's service agreement with Holdings, Fung occupies an office within Management's suite in her capacity as director of Holdings. Lee Dep. at 84. Arnald Ho, Managing Director of Management and a member of the Holdings board, also has an office in Management's Unit E. Lee Dep. at 182. David Wong, deputy general manager and a member of the board of directors of Management and an officer of Multi–Union, has an office in [*13] Multi–Union's Unit A. Lee Dep. at 182–83. Fung Kam Ming, director for Multi–Union and Dynamic and officer of Management, has an office in either Unit C or D. Wong Dep. at 64.

24. Wong receives telephone calls regarding Management's business in his office in Multi–Union's Unit A every day. Wong Dep. at 68–69. Wong also has received telephone calls regarding Multi–Union's business while located within Management's suite. Wong Dep. at 72–73. Wong has access on his computer to files for both companies. Wong Dep. at 69. Wong also visits Management's offices on a daily basis. Wong Dep. at 68.

25. Wong has two secretaries: One secretary is employed by Multi–Union and is located in Multi–Union's Unit, and one secretary is employed by Management and located in Management's unit. Wong Dep. at 71–72.

26. Holdings, Management, and Multi–Union share a common receptionist who is an employee of Management. Lee Dep. at 42–43. The receptionist directs visitors for other companies to the appropriate employees of those companies. Multi–Union has its own receptionist within its offices. Wong Dep. at 73.

27. Management and Multi–Union also share a common server. Pursuant to the services agreement between [*14] Management and Multi–Union, Management provides certain computer services to Multi–Union, including use and maintenance of Management's server. Lee Dep. at 59. The documents, however, are partitioned so that employees of one company cannot access documents from another company. Lee Dep. at 44, 60; Wong Dep. at 315. Wong, as an officer of both companies, has access on his computer to the files of both Management and Multi–Union.

28. The three Hong Kong Defendants share a telephone system that enables employees of one company to reach employees of another company by dialing an extension. Lee Dep. at 57.

29. Before Holdings formed Management in 1997, Holdings' board reviewed at its annual meetings the operating performance of the Group as a whole. Ex. 15. At that time, Holdings received an annual financial report from each subsidiary's accounting department. Ho Dep. at 167–71. The record does not reveal whether these reports were distributed to the directors. The directors, however, were not interested in the details of the subsidiaries' businesses and primarily looked at "the bottom line." Ho Dep. at 170–71.

30. Management provides services to its clients, including collateral accounting [*15] support, policy documentation assistance, information technology services, insurance procurement, supplemental human resources services, and investment services. Ex. B at PP 3–4.

31. Pursuant to Management's service contract with Holdings, Management collects monthly profit-and-loss statements and balance sheets from Holdings' subsidiaries, consolidates that information into financial reports that assess the performance of Holdings' subsidiaries as a whole, and forwards those financial reports to Holdings. Lee Dep. at 49–51. Management also collects annual budgets from Holdings' subsidiaries and determines whether the subsidiaries are performing within their budget estimates. Ex. GG; Ho Dep. at 264. Management provides comments on Holdings' monthly reports regarding the profit and expense trends of the Holdings subsidiaries as a whole. Lee Dep. at 200. Both Dynamic and Multi–Union provide these monthly profit-and-loss statements and annual budgets to Management. Wong Dep. at 215–16; Chan Dep. at 103.

32. As part of their services, Management occasionally reviews the daily invoices and verifies that the information of Holdings' subsidiaries is correct. Lee Dep. at 188–89. Management [*16] has contacted individual subsidiaries in the past when it discovered discrepancies in the reports. Lee Dep. at 77. Management has never made any suggestions to Dynamic regarding this financial information. Chan Dep. at 87, 104.

33. Management sends the financial reports to Arnald Ho first. After Ho reviews the reports, they are passed to Gayle Fung. The reports are then hand-delivered to Holdings' other directors. Lee Dep. at 81.

34. Holdings' directors, including Tsui and Ho, occasionally called Management to discuss the contents of the financial reports. Lee Dep. at 51.

35. Management provides Holdings with investment advice and looks for new investment opportunities for Holdings. Ex. GG.

36. Management entered into a service agreement with Dynamic in 1998. Chan Dep. at 101. Pursuant to that agreement, Dynamic pays Management a portion of its annual sales turnover or revenue. Lee Dep. at 131. In exchange, Management serves as a consultant for Dynamic's business and accounting affairs. The agreement provides specifically that Management "shall devote such of its time attention and abilities to the business of" Dynamic as Dynamic's board of directors requests. The scope of the [*17] consulting agreement includes "strategic development, marketing and accounting matters." Ex. 36.

37. Under Management's service agreement with Multi–Union, Management "shall provide Multi–Union with full support on professional management consultancy." Multi–Union pays Management a monthly fee for this service. Ex. FF.

38. In April 2000, Management and Multi–Union entered into an agreement that provides Management will furnish Multi–Union "with full support on professional IT services such as system & technical support, trouble shooting, software and hardware installation and enhancement." Again, Multi–Union pays Management a monthly fee for this service. Ex. FF.

39. Management's services are limited generally to responding to clients' specific requests for assistance. Wong Dep. at 301–03; Lee Dep. at 89–90, 138.

40. Management's human resources services to Dynamic and Multi–Union are limited to finding and to recommending staff and management training courses offered by outside companies. Lee Dep. at 65–66. Dynamic's President, Chu, and Vice President, Chan, attended two training courses/seminars in China recommended by Management. Chan Dep. at 141. Those courses pertained to [*18] team building and management skills. Chan Dep. at 142.

41. In the past, two Management officers, David Wong and Ricky Wong, visited Dynamic in California at the request of Chan, Dynamic's Vice President. Chan asked Wong to assist him with matching Dynamic's accounting practices to its warehouse operations. Dynamic did not pay Management an additional fee for this service, but the cost of these services may have been included in Dynamic's normal consultation fee. Chan Dep. at 87–90.

42. Management helps Multi–Union's bookkeepers finalize their accounts and recommends insurance agents. Lee Dep. at 113. Management also provides aging reports for accounts receivable to Multi–Union on a monthly basis. Lee Dep. at 209.

43. Management does not help Multi–Union or Dynamic to prepare their annual budgets and has never been consulted by the subsidiaries for budgetary advice. Lee Dep. at 93–94; Chan Dep. at 87; Wong Dep. at 152. Management also does not assist Multi–Union or Dynamic to prepare their monthly profit-and-loss statements or balance sheets. Chan Dep. at 104; Wong Dep. at 215–16. Multi–Union's budget, however, must be approved by its Managing Director, Gayle Fung, who is also a [*19] director of Holdings, and by Wong, who is also the deputy general manager of Management. Wong Dep. at 152.

44. The accounting departments of Multi–Union and Dynamic perform the daily accounting tasks for those companies, including receiving purchase orders and accounts receivable without Management's assistance. Chan Dep. at 103.

45. Management has no expertise in sales and marketing and offers no advice on those topics. Lee Dep. at 84–85. Management does not provide pricing advice to Multi–Union or Dynamic. Lee Dep. at 122–23; Chan Dep. at 157; Wong Dep. at 123, 125.

46. Management prepares memoranda on market practices and procedures at the request of its customers. Lee Dep. at 89–90; Ex. 7, 8, 9. Essentially, Management gives recommendations to its clients, including Dynamic and Multi–Union, based on its experience and public information about other companies in similar markets. Lee Dep. at 90–91. Management distributes its memoranda to all of its clients that might benefit from the information. Wong Dep. at 319–21. Management intended these memoranda to be merely suggestions or recommendations, and both Dynamic and Multi–Union understood the recommendations in the memoranda [*20] were not mandatory. Lee Dep. at 89–91; Chan Dep. at 243; Wong Dep. at 301–02. In fact, Dynamic did not implement many of Management's suggestions. Lee Dep. at 153; Chan Dep. at 241–50.

47. Dynamic purchases inkjet cartridges from suppliers other than Multi–Union. Dynamic does not have to obtain the approval of Management or Holdings before choosing its suppliers nor does it consult with Holdings or Management before choosing its customers. Chan Dep. at 155–57.

48. Multi–Union purchases printer supplies from companies other than Holdings' subsidiary, Tian Wei. Wong Dep. at 112–13. Holdings has never approved or

disapproved of any of Multi-Union's suppliers or customers. Wong Dep. at 122.

49. Management obtained credit insurance on behalf of Multi-Union and Dynamic. Ex. 30; Wong Dep. at 227–28. Four of Holdings' subsidiaries requested Management consolidate their requests in order to obtain lower premiums for insurance. Wong Dep. at 230–31.

50. Although Management serves clients that are not associated with the Print-Rite Group, thirty to sixty percent of Management's income is derived solely from its contract with Multi-Union. Lee Dep. at 88. Management's service contract with Multi-Union **[*21]** generated [REDACTED] in 2000 and 2001. Lee Dep. at 141. In addition, Management's IT agreement with Multi-Union generates an additional [REDACTED] per month. Lee Dep. at 144–45. Management's total income for the year 2000 was between [REDACTED]. Lee Dep. at 88.

51. Management, Multi-Union, and Dynamic all maintain separate bank accounts. Ex. X; Lee Dep. at 44–45.

52. Multi-Union holds annual general directors' meetings. Wong Dep. at 77.

53. Management holds its own annual general directors' meetings. Lee Dep. at 25. These meetings are separate from Holdings' meetings. Lee Dep. at 25.

54. Dynamic purchases its own advertising for Print-Rite inkjet cartridges. Chan Dep. at 176–77. Neither Holdings nor Management pays for the advertisements purchased by Dynamic. Chan Dep. at 177; Wong Dep. at 77.

55. Dynamic owns and operates the following website: printriteusa.com. Chan Dep. at 177. Dynamic is solely in charge of the information on the site. Chan Dep. at 177–78. The information on the website is adapted from Multi-Union's catalog or from the print-rite.com website that is owned by Multi-Union. Chan Dep. at 180; Wong Dep. at 162.

56. Dynamic has never borrowed money from Management **[*22]** or Holdings. Chan Dep. at 214.

57. Dynamic prepares its own federal and state tax returns. Neither Holdings nor Management reviews Dynamic's tax returns before they are filed. Chan Dep. at 167–68.

58. Dynamic has never defaulted on any of its obligations to Multi-Union. Wong Dep. at 259.

59. Multi-Union sells products to American customers other than Dynamic. Ho Dep. at 99–100.

60. Management was originally capitalized through Holdings. Ho Dep. at 79; Wong Dep. at 44. Holdings has made additional capital infusions [REDACTED] into Management over the years. Wong Dep. at 46. Holdings has loaned Management [REDACTED] since the company was initially formed. Ho Dep. at 79–80. Holdings does not charge Management interest on those loans. Ho Dep. at 80. It is unclear, however, whether these interest-free "loans" are, in fact, distinguishable from the capital infusions.

61. Multi-Union has annual sales of approximately HK$ 350 million. Ex. Q.

62. In 1998 and 1999, Dynamic's revenues from United States sales totaled approximately US$ 1.6 million. Ex. T. Dynamic has never defaulted on its payments to Multi-Union for supplies. Wong Dep. at 259.

63. Defendants do not always maintain **[*23]** strict corporate formalities. On two separate occasions, David Wong, as general manager of Management, gave Chan, President of Dynamic, "special authorization" to sign two confidentiality agreements on behalf of Management acting as the "Vice President of Management's American Operations." Ex. 10, 12; Wong Dep. at 266–67, 278–79. Chan was given this special authorization for "the sake of convenience" because he was in California and the agreements physically were located there. Wong Dep. at 269. Management does not, in fact, have any "American Operations." Wong Dep. at 268.

64. Defendants did not maintain strict corporate formalities when Ernest Chu, CEO and a member of Dynamic's board of directors, signed a document on behalf of Holdings as the sole shareholder of Dynamic even though Chu was never a director or officer of Holdings. Ho Dep. at 251–52.

65. Multi-Union produces brochures and product catalogs describing the products it sells. Wong Dep. at 284. Holdings does not approve the brochures before Multi-Union publishes them. Wong Dep. at 286–87.

66. Multi-Union's marketing brochures refer generally to the "Print-Rite Group" and contain the Print-Rite logo. Arnald Ho is referred **[*24]** to as the Managing Director of the Group. Ex. 4, 5, 6, 11. In these brochures, Multi-Union touts the Group's "extensive international sales and distribution network that provides [the Group] with a truly global reach." Ex. 6. One of the brochures also states the Group is "an advanced, well organized and totally vertically integrated corporation that has the competence of functioning all the way from design, molding, injection, chemical engineering and production engineering to sales and marketing." Ex. 5. Many of these brochures contain a "Message from Managing Director" accompanied by a picture of Arnald Ho and his stamped signa-

ture. The message discusses the "group's" many achievements. Ex. 5, 6, 11. Ho signed this statement as Managing Director of Holdings. Ho Dep. at 236.

67. Some of Multi-Union's brochures also refer to Dynamic's officers, Chu and Chan, as the President and Vice-President of American Operations of Management. Ex. 5, 6, 11.

68. Some of Multi-Union's brochures also contain a flow chart that explains the corporate structure and indicates Multi-Union's place in that structure. Ex. 5, 6, 11. The relationships between the companies, however, are not always clear.  [*25]  In one of the brochures, the corporate flow chart appears to indicate Holdings and Management are affiliates or sister companies rather than a parent and its subsidiary. The brochure also appears to indicate that Management is the parent corporation of Dynamic and Multi-Union rather than being a sister company. Ex. 11.

69. All Print-Rite brand products share a common logo. Wong Dep. at 148. The trademarks have been used by several Holdings' subsidiaries throughout the years, including A&J; its predecessor Cardic Limited; and, most recently, Hana Company Limited. Ex. 16-19. Ho and Fung have signed various applications with the Patent and Trademark Office as officers of these subsidiaries. They also have signed several powers of attorney to enable attorneys in Seattle to assist these companies with the trademark applications. Ex. 18-19.

70. The same Print-Rite logo is used by Management and Holdings. Wong Dep. at 148. Neither Dynamic nor Multi-Union pays anyone for the right to use the Print-Rite logo. Chan Dep. at 176; Wong Dep. at 175.

71. Nectron receives dividends once or twice a year as a shareholder of Holdings. Ho Dep. at 91, 93. Ho visited Nectron's Houston facility on one [*26] or two occasions as a representative of Multi-Union. Ho Dep. at 90-91, 197-99.

72. In 1990, Holdings, Multi-Union, and Nectron's predecessor corporation, National Eagle, entered into an agreement in which Sino-Expo Holdings agreed to link the sale of Sino-Expo's stock to National Eagle with National Eagle's purchase of Multi-Union products. Ex. 20; Ho Dep. at 175-77. At the time this agreement was signed by Ho, he was also the Managing Director of Multi-Union. Ho Dep. at 176. Ho, however, did not sign the agreement in both capacities; instead, the general manager of Multi-Union signed on behalf of that corporation. Ex. 20; Ho Dep. at 176.

73. A second sales and stock purchase agreement between the three companies was signed in 1993. Ho Dep.

at 185. Ho again signed on behalf of Sino-Expo Holdings only. Ex. 21.

74. Finally, a settlement agreement between the companies was signed in 1993. Ex. 22; Ho Dep. at 188-89. The final document was signed by Ho both as Managing Director of Multi-Union and as director of Sino-Expo Holdings because the general manager from Multi-Union had to leave before the negotiations were completed. Ex. 22; Ho Dep. at 191, 194.

75. Ho once traveled to New [*27] York as director of Holdings to meet with [REDACTED] officials and to discuss a business opportunity in the digital products market. Ho Dep. at 208. Ho signed a Confidentiality Agreement with respect to those negotiations. Ho Dep. at 205-06. This meeting did not generate any business for Holdings. Ex. E.

76. WKK America (Holdings) Inc., is a subsidiary of Wong Kong King (Holdings), Ltd., one of the shareholders of Holdings. WKK America (Holdings) Inc., guaranteed Dynamic's lease in San Jose, California. Ex. 1, 27.

77. Management communicates with Dynamic in California in regard to Dynamic's monthly financial reports via electronic mail and fax. These contacts occur at least once a month. The monthly reports from Dynamic arrive at Management as file attachments to electronic mail messages. Lee Dep. at 79-80.

78. Representatives of Management, including Ho and Fung Kam Ming, have appeared annually at two trade shows in Las Vegas, Nevada, since 1998. Wong Dep. at 185-87, 189, 191.

79. Management is a party to two nondisclosure or confidentiality agreements with companies based in the United States. Lee Dep. at 99, 101. Apparently, these two agreements are the same two agreements [*28] signed by Chan as "Vice President of American Operations." Neither of those confidentiality agreements led to a viable investment opportunity, and no investments materialized from those contacts. Wong Dep. at 283-84.

80. Management has never advertised in the United States and provides no services to any customers in the United States except Dynamic. Lee Dep. at 94.

## STANDARDS

A district court must apply the law of the Federal Circuit rather than the law of regional circuits to determine personal jurisdiction in a patent infringement case. *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1358 (Fed. Cir. 1998)*.

Personal jurisdiction over a foreign defendant is ap-

propriate if a statute permits the assertion of jurisdiction and maintenance of the action would not offend the "traditional notions of fair play and substantial justice" of federal due process. *Id. See also 3D Sys., Inc. v. Aarotech Lab., Inc., 160 F.3d 1373, 1376 (Fed. Cir. 1998)*. The statutory authorization may derive from a state long-arm statute, a federal statute that provides for worldwide process, or the so-called "federal long-arm statute" at *Fed. R. Civ. P. 4(k)(2)* [*29] . *United States v. Swiss Am. Bank, Ltd., 191 F.3d 30, 36 (1st Cir. 1999)*.

"Oregon's long-arm statute confers jurisdiction to the extent permitted by due process." *Gray & Co. v. Firstenberg Mach. Co., 913 F.2d 758, 760 (9th Cir. 1990)*. *See* ORCP 4L. Consequently, the only inquiry is whether the exercise of jurisdiction over Holdings and Management comports with constitutional requirements. *See 3D Systems, 160 F.3d at 1377*. *See also Core-Vent Corp. v. Nobel Indus. AB, 11 F.3d 1482, 1484 (9th Cir. 1993)*.

*Fed. R. Civ. P. 4(k)(2)* provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

The Federal Circuit has not interpreted the reach of *Rule 4(k)(2)* and has never applied this Rule to assert jurisdiction over a foreign defendant. Thus, the Court [*30] turns to regional circuit and district court cases that interpret and apply *Rule 4(k)(2)*.

Jurisdiction over a foreign defendant is proper under *Rule 4(k)(2)* if: 1) the plaintiff's claim arises under federal law, 2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, and 3) the federal court's exercise of personal jurisdiction over the defendant does not offend the Constitution or other federal law. *Swiss American, 191 F.3d at 38*. *See also Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 589-90 (9th Cir.), supplemented by 95 F.3d 1156 (1996)*. "The constitutional requirements are the same" under *Rule 4(k)(2)* as the minimum contacts analysis applied in normal jurisdictional inquiries, "but the analytic exercises are performed with reference to the United States as a whole, rather than the reference to a particular state." *Swiss American, 191 F.3d at 36*.

Although the *Due Process Clause of the Fifth Amendment* provides the constitutional personal jurisdiction limitations for an action based on federal question subject matter jurisdiction, the Federal Circuit has [*31] held the "minimum contacts" analysis under the *Fourteenth Amendment* applies to jurisdictional issues under the *Fifth Amendment*. *Akro Corp. v. Luker, 45 F.3d 1541, 1544-45 (Fed. Cir.), cert. denied, 515 U.S. 1122, 132 L. Ed. 2d 281, 115 S. Ct. 2277 (1995)*. In other words, the district court must examine whether the foreign defendant has established sufficient minimum contacts with the forum "'such that it should reasonably anticipate being haled into court there.'" *Red Wing, 148 F.3d at 1358-59* (citing *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980))*. If the district court determines the defendant purposefully established such minimum contacts with the forum state, those contacts "may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Id. at 1359* (internal quotations and citations omitted).

The plaintiff has the burden of establishing personal jurisdiction. *Ziegler v. Indian River County, 64 F.3d 470, 473 (9th Cir. 1995)*. When pertinent facts bearing on the question of jurisdiction [*32] are controverted or a more satisfactory showing of the facts is necessary, the trial court may permit discovery to aid in determining whether personal jurisdiction exists. *Data Disc, 557 F.2d at 1285 n.1*. In addition, the district court has the discretion to take evidence at a preliminary hearing if issues of credibility or disputed questions of fact with regard to jurisdiction are present. *Id. at 1285*. At such a hearing, the plaintiff has the burden to show jurisdictional facts by a preponderance of the evidence. *Id.*

## DISCUSSION AND CONCLUSIONS OF LAW

The parties agree neither Holdings nor Management has sufficient minimum contacts with the State of Oregon to support the exercise of traditional personal jurisdiction over those entities. The parties, however, also agree Dynamic and Multi-Union are subject to this Court's specific jurisdiction for Epson's claims that arise out of or relate to their Oregon contacts. n4 Epson asserts this Court may exercise personal jurisdiction over Holdings and Management because Dynamic and Multi-Union are the alter egos of Holdings and Management and, therefore, the Oregon contacts of Dynamic and Multi-Union [*33] may be imputed to Holdings and Management for jurisdictional purposes.

> n4 Epson does not allege Multi-Union or Dynamic is subject to personal jurisdiction in Oregon based on general jurisdiction.

In addition, the parties further agree the national contacts of Holdings and Management do not support this Court's exercise of specific jurisdiction because Epson's claims against those entities do not arise out of or relate to the national contacts of Holdings or Management. Epson contends, however, Holdings and Management have sufficient national contacts to support this Court's exercise of general jurisdiction over those entities pursuant to *Rule 4(k)(2)*. n5

n5 Management and Holdings argue Epson waived its alter ego argument because Epson "certified" pursuant to *Rule 4(k)(2)* that Management and Holdings are not subject to the jurisdiction of the court of any state, including this Court. *See Swiss American, 191 F.3d at 41–42* (plaintiff need not prove the defendant is not subject to personal jurisdiction in any state, but must at least certify that, based on the information available to plaintiff, defendant is not subject to the personal jurisdiction in the courts of any state).

As the Court explained during oral argument, the Court will not require Epson to choose between these two alternative and exclusive jurisdictional theories at this stage in the litigation. The Court, therefore, assumes Epson's certification pursuant to *Rule 4(k)(2)* is only effective if this Court first determines it lacks jurisdiction over Holdings and Management under Epson's alter ego theory. The Court concludes, therefore, Epson's certification does not act as a waiver of Epson's alter ego argument.

**[*34]**

## I. Alter Ego Jurisdiction

### A. Standards

The parties agree this Court must apply federal common law as interpreted by the Federal Circuit on the issue of piercing the corporate veil for jurisdictional purposes. The Federal Circuit has held "a court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc., 757 F.2d 1256, 1265 (Fed. Cir. 1985)*. The district court's power to pierce the corporate veil for purposes of exercising personal jurisdiction over a foreign defendant that lacks minimum contacts with the forum is an equitable power that is limited by the reasonableness and fairness requirements of due process. *Id.*

The court, however, "must 'start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception, [or] unless there is at least 'specific intent to escape liability for a specific tort . . . .'" *3D Systems, 160 F.3d at 1380* (quoting *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 552 (Fed. Cir. 1990))*. In the past, the Federal Circuit has [*35] referred to state and regional circuit law to determine the "specific, unusual circumstances" that justify piercing the corporate veil for jurisdictional purposes. *See, e.g., Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F.3d 1455, 1459-60 (Fed. Cir. 1997)* (applies Washington alter ego law); *Minnesota Mining, 757 F.2d at 1264–65* (examines Tenth, Eighth, and Second Circuit opinions on veil piercing).

A review of federal cases reveals courts have pierced the corporate veil to assert jurisdiction over foreign defendants in three separate but overlapping factual situations. First, some courts hold the corporate veil should be pierced and alter ego jurisdiction should be asserted over affiliated foreign corporations only if the plaintiff shows the defendant disregarded strict corporate formalities in such a manner and degree that the independence of the two companies, in fact, was breached. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 335–37, 69 L. Ed. 634, 45 S. Ct. 250 (1925)*. In addition, courts exercise their equitable powers to assert alter ego jurisdiction over foreign defendants that exert total control over the affairs [*36] and activities of the local defendant so that the two defendants are in reality a single entity. *See, e.g., Doe v. Unocal Corp., 248 F.3d 915 at 926, 928 (9th Cir. 2001)*. Finally, some courts have pierced the corporate veil and exercised personal jurisdiction over foreign companies because the local defendant was engaged in activities the foreign company would have been required to undertake itself if the local defendant did not exist. *See, e.g., Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1405 (9th Cir. 1994), cert. denied, 514 U.S. 1004, 131 L. Ed. 2d 196, 115 S. Ct. 1314 (1995)*. n6 The same proof supports all of these jurisdictional theories. *See Arch v. Am. Tobacco Co., Inc., 984 F. Supp. 830, 837 (E.D. Pa. 1997)*. *See also Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 426*. As the Ninth Circuit has noted, "questions of personal jurisdiction admit of no simple solutions and . . . ultimately due process issues of reasonableness and fairness must be decided on a case–by–case basis." *Wells Fargo, 556 F.2d at 426*.

n6 This theory occasionally is referred to as the general agency theory of jurisdiction. General agency theory is different than pure agency theory. A plaintiff that wants to hold a parent corporation liable under a pure agency theory must show the parent directed the subsidiary agent to take actions related to the plaintiff's cause of action. *See, e.g.,*

*Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 419–20 (9th Cir. 1977).* A pure agency theory does not require any sort of alter ego analysis and, in fact, does not even require a parent–subsidiary relationship. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir.), cert. denied,* 488 U.S. 908, 102 L. Ed. 2d 247, 109 S. Ct. 259 (1988). A general agency theory, on the other hand, is premised on the parent's domination of the subsidiary and the overall relationship between the parent and subsidiary without reference to the plaintiff's claims. *Id.*

Epson does not argue and, in any event, has not shown, any facts that support this Court's exercise of jurisdiction over Holdings or Management pursuant to a pure agency theory. Epson, however, has raised issues that pertain to a general agency theory as part of its alter ego argument. The Court, therefore, will address Epson's general agency arguments.

[*37]

This Court, therefore, must examine all relevant factors that relate to the intimacy and interrelatedness between Holdings and Management and to the parties over which the Court has jurisdiction, Dynamic and Multi–Union. This Court, in the exercise of its equitable power, must assess whether "specific, unusual circumstances" require the Court to disregard the general rule of corporate separateness and to impute the contacts of Dynamic and Multi–Union to Holdings or Management for purposes of the jurisdictional analysis. n7 Because of the strong presumption in favor of protecting the corporate form, the Court may exercise its equitable power and assert jurisdiction over Holdings and Management only if the failure to do so would result in fraud, injustice, or inequity. *Manville, 917 F.2d at 552.*

n7 The Court need not address and offers no opinion regarding the appropriate test for alter ego liability in this matter.

**B. Holdings' Motion to Dismiss**

Epson contends Holdings is subject to [*38] the personal jurisdiction of this Court because it is the alter ego of Dynamic and/or Multi–Union and those companies have conceded this Court has specific personal jurisdiction over them.

In the alternative, Epson contends Management is the alter ego of Holdings and also the alter ego of Dynamic and/or Multi–Union. Holdings, therefore, must also be the alter ego of Dynamic and/or Multi–Union, and, as a result, subject to the jurisdiction of this Court. In other words, Epson contends Management is the mere instrumentality or vehicle through which Holdings exerts undue influence and improper control over Dynamic and/or Multi–Union.

The Court first considers whether Epson has shown that Management is the alter ego of Holdings.

**1. Management as the vehicle through which Holdings controls Dynamic and/or Multi–Union**

**a. Holdings is not the alter ego of Management**

The touchstone of the alter ego or agency analyses is whether the parent actually controls the subsidiary's "internal affairs or daily operations." *Doe, 248 F.3d at 926* (citing *Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir.), cert. denied,* 449 U.S. 1062, 66 L. Ed. 2d 604, 101 S. Ct. 785 (1980)). [*39] "Activities . . . which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decision, and articulation of general policies and procedures" are evidence of a normal parent–subsidiary relationship and do not justify piercing the corporate veil. *Id.* at 72 (internal quotation and citation omitted). Thus, the Court may disregard the corporate separateness of the parties only if Epson shows Holdings "controlled virtually every phase of the subsidiary's operation." *A. Stucki Co. v. Worthington Indus., Inc., 849 F.2d 593, 596 (Fed. Cir. 1988).*

Epson essentially argues Defendants are part of a common enterprise known as Print–Rite Group that is headed and controlled by a single figure, Arnald Ho. Epson contends the members of the Print–Rite Group, including Management and Holdings, portray themselves to the public as a single operating unit and, in fact, fail to maintain separate corporate identities or to follow all corporate formalities. Epson contends these factors are evidence that Holdings in fact controls Management's internal operations and is Management's [*40] alter ego for jurisdictional purposes.

**1) Common Marketing Image**

Affiliated companies that "hold themselves out to the public as a single entity that is conveniently departmentalized" may be the alter egos of one another for jurisdictional purposes. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 402 F. Supp. 262, 328 (E.D. Pa. 1975). See also Cascade Steel Rolling Mills, Inc. v. C. Itoh and Co. (America) Inc., 499 F. Supp. 829, 839 (D. Or. 1980)* (relies in part on parent companies' efforts to create an image of a single entity with numerous offices around the world to pierce the corporate veil). Epson argues the Print–

Rite Group's public image as a single, integrated global entity leads to the reasonable conclusion that Holdings is the Group's alter ego because Holdings, in fact, controls the Group's subsidiaries, including Management.

Epson supports its argument as follows: Management and Holdings share a common trademark and public marketing image. The Print–Rite Group markets itself as a seamlessly integrated force with a global reach. While the Group's marketing materials were not produced by either Management or Holdings, they [*41] consistently have contained statements allegedly made by Ho, Managing Director of the Group, in which he touts the Group's global capacities and integrated network of corporations. Ho reviewed the brochures after they were produced and apparently did not suggest the Managing Director's statements or the Group's image as portrayed were incorrect.

Some of these marketing materials contain "corporate structure" charts that indicate Holdings and Management are actually affiliates or sister companies rather than a parent and subsidiary. Notably, the other Holdings subsidiaries are portrayed as offshoots of Management rather than Holdings. These offshoots include companies with various purposes, including purchasing, manufacturing (Tian Wei), local trading (Multi–Union), and overseas trading (Dynamic). Thus, this brochure supports Epson's contention that Management is the conduit through which Holdings controls its subsidiaries, Multi–Union and Dynamic.

The brochures also support Epson's argument that Ho has ultimate control over the Print–Rite subsidiaries, including the other Defendants. The Court, therefore, finds the Group's public image offers some evidence of the parties' true relationships [*42] with one another and weighs in favor of piercing the corporate veil between Holdings and Management. The Group's marketing image, however, is only probative insofar as it is proof of the actual relationship between the parties. This evidence alone is insufficient to justify disregarding the general rule of corporate distinctions to pierce the corporate veil.

### 2) Common directors and officers

Epson also argues the presence of Ho on the boards of both Holdings and Management supports its contention that Ho completely controls both of those entities and that they are, in fact, mere alter egos of one another. Overlapping directors and officers alone, however, do not establish an alter ego relationship.

The Supreme Court has noted, it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *United States v. Bestfoods, 524 U.S. 51, 69, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998)* (internal quotation and citations omitted). In fact, a complete

overlap of directors and officers does not necessarily indicate improper control or undue influence. *Id.* Corporate directors and officers often "change hats" to represent the parent and the subsidiary [*43] separately, and courts generally presume the directors are wearing their subsidiary hats rather than their parent hats when acting on behalf of the subsidiary. *Id.* Nonetheless, the extent to which directors overlap, and, perhaps more importantly, the extent to which active officers who participate in the daily operations of the two companies overlap, are factors that establish the parent corporation's ability to control the subsidiary's internal operations. Actual control, however, still must be shown.

Here the only overlap in the management teams and boards of Holdings and Management is Ho's presence. Ho, the apparently self–proclaimed "Managing Director" of the Print–Rite Group, is actively involved in the operation of Management and the investment strategy and oversight of Holdings. In fact, Ho and his wife, Gayle Fung, own most of the shares of Holdings' majority shareholder, Starbo, and Holdings is the sole shareholder of Management.

Ho is one of five members of Holdings' board of directors. Ho is also a member of Management's board. Holdings' board of directors selected the directors of Management, including Ho. Ho, as Managing Director of Management, chose the officers [*44] of Management himself even though Management's board of directors as a whole had to approve those appointments. Management's officers and employees ultimately report to Ho. He, however, must report to the full board of Management.

Epson argues Ho is the only active director of each of these companies and, therefore, he exerts undue and complete control over both companies. In support of this argument, Epson relies on the fact that the majority of the directors of Management and Holdings are Ho's relatives and former "assistants" or secretaries. There is no evidence in the record, however, that indicates Ho controls any of these relatives or former assistants. Many businesses are family–owned, and the Court will not infer from this fact alone that Ho exerts improper control.

Moreover, the record shows the directors who are not related to Ho (and over whom Epson does not assert Ho has "presumptive" control) actively participate in the business. David Wong, who is neither related to nor a former employee of Ho, is actively involved in the management and oversight of Management. He has signed several documents on behalf of Management and handles many of its day–to–day activities. In [*45] addition, Edward Tsui, one of Holdings' directors who is not related to Ho, receives the same monthly and annual financial information regarding the Holdings' subsidiaries that Ho and Fung re-

ceive. Tsui also has made inquiries to Management about this information in the past. Furthermore, the record contains minutes of a Holdings' board meeting that indicate many of Holdings' board members in addition to Ho and Fung, including Edward Tsui and Fung Kam Ming, attended a Holdings' board meeting in 1997. Although the Court finds Ho and Fung are indeed the most active members of the boards of Holdings and Management, Epson has not established the remaining directors are "sham" directors who do not participate in corporate functions.

Moreover, Ho's dual roles are not improper as long as Ho is not acting on behalf of one corporation based on his role with the other corporation. There is no evidence in the record that supports a finding that Ho failed to "change hats" before acting on behalf of Management. In addition, there is no evidence in the record that indicates Holdings' board or Ho himself exerts undue influence or control over Management's day–to–day activities beyond Ho's mere presence **[*46]** on the boards of both companies. The record does not reflect Management's daily operations are controlled either by Ho or Holdings as an entity. Management has a separate and independent set of officers, including Alice Lee, Ricky Wong, and David Wong, who oversee the "micro–management" of the company. Epson points to no decisions by these officers that were dictated by Holdings or Ho personally. The Court, therefore, finds Epson has failed to establish that Holdings exerts undue influence or control over Management's internal operations.

### 3) General Agency

Epson also contends Management is Holdings' alter ego because it operates as a mere division or department of Holdings that "performs services that are sufficiently important to [Holdings] that if it did not have a representative to perform them the corporation's own officials would undertake to perform substantially similar services." *See Doe, 248 F.3d at 928* (internal quotation and citations omitted). In other words, Epson contends Management was "'either established for, or is engaged in, activities that, but for [its] existence . . . [Holdings] would have to undertake itself.'" *See Chan, 39 F.3d at 1405* **[*47]** (quoting *Gallagher v. Mazda Motor of America, Inc., 781 F. Supp. 1079, 1083 (E.D. Pa. 1992))*. Generally, the subsidiaries of a holding company do not act as its "general agents." *Gallagher, 781 F. Supp. at 1085*. A holding company is in the business of locating investment opportunities and holding the stock of other companies. A holding company itself does not make or sell anything. A holding company is not necessarily engaged in any particular business; therefore, its subsidiaries do not engage in activities that the holding company would otherwise be required to undertake. *Id.* (a holding company can always

choose simply to hold a different type of subsidiary).

Holdings' relationship with Management, however, is not a typical holding company–subsidiary relationship because Management actually provides services to Holdings. Pursuant to Management's service agreement with Holdings, Management collects financial information from the Print–Rite subsidiaries on a monthly basis, compares that information to the past monthly financial documents and annual budgets supplied by the subsidiaries, consolidates that information into financial reports that **[*48]** assess the performance of the Holdings subsidiaries as a whole, and forwards those reports to Holdings. In addition, Management provides investment advice and searches for new investment opportunities for Holdings.

These tasks are the type of activities one would expect an investment or holding company to undertake itself. In fact, before Holdings formed Management in 1997, Holdings' subsidiaries sent their annual financial reports directly to Holdings so that it could review the operating performance of the Print–Rite Group as a whole at its annual board meetings. Thus, it appears Management is performing at least some of the tasks that Holdings used to perform and presumably would have continued to perform for itself had it not formed Management to handle those tasks.

Nonetheless, Management also provides additional services that Holdings was not performing itself, including consolidation of the subsidiaries' monthly financial reports and recommendations regarding the interim monthly reports. In addition, the record indicates Management was not established solely to perform tasks for Holdings. *See Gallagher, 781 F. Supp. at 1085 n.10* (the most persuasive evidence **[*49]** of a general agency relationship is that the subsidiary does all of its business with the parent corporation and, therefore, is merely a front for the parent). Holdings formed Management, in part, to provide outsourced management services to companies in the market at large, and Management provides services to clients other than Holdings. Management's clients include companies not associated with Holdings or the Print–Rite Group. Although Epson argues Management's services to the Holdings subsidiaries are tasks that Holdings itself would otherwise undertake, there is no evidence that Holdings provided human resources, accounting, and insurance services to its subsidiaries before Management was formed. In addition, the bulk of Management's business and revenue is generated through its agreement with Multi–Union rather than its service agreement with Holdings. Management, therefore, is more than a mere division of Holdings that performs tasks the holding company other-

wise would have to undertake itself.

#### 4) Corporate Formalities

The failure to comply strictly with the formalities of corporate organization is another factor that weighs in favor of piercing the corporate veil. **[*50]** *See Hoover Group, Inc. v. Custom Metalcraft, Inc., 84 F.3d 1408, 1411 (Fed. Cir. 1996). See also Doe, 248 F.3d at 926.* Epson argues Holdings and Management have failed to adhere to strict corporate formalities when interacting with each other.

The record shows Management and Holdings are individually incorporated entities with functioning boards of directors. Contrary to Epson's contentions, there is no evidence that indicates those boards are filled with sham directors. Holdings has only one officer, an outside company that acts as its secretary. Management has its own officers, each with independent duties and areas of expertise. Management holds its own general directors' meetings separate from Holdings board meetings. In addition, Management maintains its own bank account. Moreover, the relationship between Holdings and Management is memorialized in a formal, written service agreement that details the consulting services Management provides to Holdings. The agreement was signed by Ho on behalf of Holdings and David Wong, one of Management's directors who is not related to Ho, on behalf of Management. Holdings pays Management a fee for those services **[*51]** just as it would to any other outside consultant.

Nonetheless, Epson argues there are no true distinctions between Management and Holdings because those companies share many common resources that independent corporations normally would provide for themselves. For example, Holdings' offices consist of a single cubicle within Management's offices in Hong Kong. That office is occupied by Gayle Fung, the wife of Ho. Pursuant to the services agreement between Holdings and Management, Management also shares with Holdings a receptionist, a telephone system, a conference room, a domain name, and an email system.

Epson further argues Holdings failed to maintain strict corporate formalities when it made several interest-free loans to Management. The mere provision of interest-free loans is not indicative of a breach of corporate formalities; however, the failure to document such interest-free loans with promissory notes suggests the absence of corporate formalities. *See Doe, 248 F.3d at 928* (citing *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 524 (9th Cir. 1984)).* There is no evidence in the record, however, that **[*52]** Holdings' loans to Management were not properly documented.

The Court also notes it is unclear from the record

whether the interest-free loans were different from the capital infusions that Holdings made to Management throughout the years. Capital infusions in contrast to interest-free loans are not repaid. Moreover, capital infusions from a parent to a subsidiary are a normal, and, indeed, a necessary part of the parent-subsidiary relationship and do not in and of themselves indicate an alter ego relationship. In fact, Holdings' infusion of capital into Management actually defeats an alter ego finding because it is proof that Holdings is not siphoning assets from Management and is not improperly or unjustly trying to shield its assets by undercapitalizing its subsidiary and hiding behind the corporate veil.

#### 5) Fraud, Injustice, or Inequity

The Federal Circuit has held piercing the corporate veil is an equitable power of the court that should only be used to disregard the corporate form in order to prevent fraud, injustice, or inequity. *Manville, 917 F.2d at 552.* Few courts, however, have examined the meaning of fraud or injustice in this context. Most courts **[*53]** that have addressed this issue have held injustice would occur if the parent company either created a corporation with the fraudulent intent of shielding itself from liability or the parent depleted the resources of the subsidiary in order to make the subsidiary judgment-proof. *See, e.g., Minnesota Mining, 757 F.2d at 1264* (post-tort undercapitalization); *Laborers, 736 F.2d at 523* (undercapitalization at time of incorporation).

A corporation is considered to be undercapitalized if it does not hold an adequate amount of assets to carry on its normal business and to pay its debts. *Laborers, 736 F.2d at 523.* Epson offers no evidence that Management was undercapitalized when it was formed or at any other time. There is no evidence in the record that indicates Holdings' loans or capital infusions to Management were used to pay Management's normal operating expenses rather than to expand the business.

In addition, Epson has not shown Management was incorporated for a fraudulent purpose or to protect Holdings from liability. The record shows Holdings created Management to assist the Holdings' subsidiaries with their internal management **[*54]** procedures and to provide an investment opportunity for Holdings in the area of outsourced management services. Management indeed has performed both of these tasks, and there is no evidence that it is or ever has been a sham corporation.

Epson also argues maintenance of the corporate form would lead to an inequitable result because no meaningful judgment would be available to Epson unless the parent, Holdings, is enjoined from creating new subsidiaries that would infringe on Epson's patents. Epson, however, has

not shown it is prohibited from prosecuting such claims and obtaining the same injunctive relief against Holdings in another forum. The potential inconvenience of forcing Epson to litigate its patent infringement claims in another forum, such as Holdings' home of Hong Kong, is not the type of injustice or inequity that warrants piercing the corporate veil. n8 The possible inconvenience of dividing Epson's claims and forcing it to litigate two cases simultaneously also is not the type of inequity that would warrant piercing the corporate veil.

> n8 This is particularly true in this matter because one of the Epson Plaintiffs, the parent corporation of the other two Epson Plaintiffs, is a Japanese corporation.

[*55]

Although the Print-Rite Group portrays itself as a vertically-integrated unit and there is indeed substantial overlap in personnel and resources between Holdings and Management, the Court finds the companies are independently organized and consistently maintain almost all corporate formalities. The Court further finds Holdings does not exert the type or level of control over Management's daily operations or internal management necessary for alter ego jurisdiction. In addition, the Court finds Management is more than a mere subdivision of Holdings because it provides various services to companies both inside and outside of the Group. Moreover, Epson has not shown Holdings' use of the corporate form would result in injustice or fraud here.

Based on the foregoing, the Court concludes equity does not require it to disregard the corporate form or to find Holdings and Management are alter egos of one another. Accordingly, the Court will respect the corporate distinctions between Holdings and Management for purposes of this jurisdictional analysis.

**b. Management is not the alter ego of Dynamic or Multi-Union**

Even if the Court were to determine Management is the alter ego of Holdings, [*56] Epson still must show that Management also is the alter ego of Dynamic and/or Multi-Union in order for the Court to assert jurisdiction over Holdings based on Management's relationship with Dynamic and/or Multi-Union. Again, Epson contends all four Defendants are part of a larger enterprise, the Print-Rite Group. Epson argues Holdings controls the distribution portion of this enterprise, including Multi-Union and Dynamic, through Management's undue influence over and improper control of those companies.

**1) Common Marketing Image**

As noted, the Group portrays itself publicly as a vertically-integrated enterprise with Holdings at the top and Ho as Managing Director of the entire Group. In Multi-Union's most recent brochure, which was published without Management's input, Management is portrayed as a sister company to Holdings, and the individual subsidiaries, including Dynamic and Multi-Union, are portrayed as offshoots or subsidiaries of Management. Thus, the brochure indicates Management has some level of control or oversight over Dynamic and Multi-Union.

In addition, the brochure identifies two of Dynamic's officers, James Chan and Ernest Chu, as officers of Management's "American [*57] Operations." Dynamic is Management's only American client, and Management does not have any American operations. Management, however, has authorized Chan to sign two documents on its behalf as the Vice President of its "American Operations." Thus, Management itself has held Chan out as one of its top officers.

The Court finds this evidence supports a finding that Management is the alter ego of Multi-Union and, in particular, of Dynamic. This evidence alone, however, is not sufficient to establish alter ego jurisdiction.

**2) Common directors and officers**

Epson argues the substantial overlap in the officers and directors of Management and Dynamic and Multi-Union demonstrates Management's control over these subsidiaries. It is not unusual, however, for affiliated companies to share officers and directors.

One of Management's officers, Fung Kam Ming, serves as a member of the boards of directors for both Dynamic and Multi-Union. There is no evidence that Fung Kam Ming exerts undue influence or control over Multi-Union or Dynamic as an officer of Management. In fact, the evidence in the record reveals Fung Kam Ming has no duties in the active, day-to-day management of Multi-Union [*58] or Dynamic. David Wong, who serves as one of Management's directors and the Deputy General Manager of Management, is also the General Manager of Multi-Union. As such, Wong takes an active role in the daily operations of both companies. Wong's office is in Multi-Union's suite; however, he visits Management's facilities on a daily basis. He also receives telephone calls regarding Management's business in his office within Multi-Union's suite. Wong has two secretaries, one employed by Management and located in Management's suite, and one employed by Multi-Union and located in Multi-Union's suite. There is no evidence in the record, however, that shows Wong used his position to exert undue influence or control over Multi-Union on behalf of Management. There also is no evidence that Wong consulted with Ho

or other members of Management's board before taking any action on behalf of Multi-Union. As the Supreme Court has stated, officers and directors may wear two hats in different corporations, and courts generally presume the officers and directors are wearing the appropriate hats at the appropriate times unless there is evidence to the contrary. *Bestfoods, 524 U.S. at 69.* **[*59]** Epson has not presented any evidence to the contrary.

As Deputy General Manager of Management, Wong reports directly to Ho, the Managing Director. As General Manager of Multi-Union, Wong reports to the board, and, more specifically, to Fung. Although Ho and Fung also are members of Holdings' board of directors, there is no evidence in the record that Ho or Fung improperly supervised Wong's actions outside of their positions as officers of Management and Multi-Union. The record shows Management's relationships with Dynamic and Multi-Union are limited relationships that have been memorialized in formal, written service agreements, and there is nothing in the record to suggest these are not arms-length agreements. Pursuant to these agreements, Management acts as a consultant to the subsidiaries and provides certain accounting, human resources, information technology, and insurance procurement services for them. Management only provides services directly requested by the clients. Moreover, both Management and its clients understand Management's advice is not mandatory. In fact, many of Management's past recommendations have never been adopted by the subsidiaries.

Pursuant to its agreement **[*60]** with Holdings, Management collects detailed financial information from the subsidiaries on a monthly basis. Management may contact the subsidiaries for additional information or to inquire about discrepancies. Management's comments regarding the financial status of the Print-Rite Group, however are transmitted only to Holdings' board for its review. Management does not make financial suggestions to the subsidiaries based on these monthly reports unless the clients requested specific advice.

Management provides more extensive services to Multi-Union than it does to Dynamic, in part because Multi-Union is located in Hong Kong, rents office space from Management, and shares many resources with Management as a result of their proximity to one another, including a common server, telephone system, receptionist, and domain name.

Contrary to Epson's contention, the record reveals Management does not control the internal management of Dynamic or Multi-Union. Its services are limited in nature and are paid for by Dynamic and Multi-Union. The two subsidiaries perform nearly all of the day-to-day, important decision-making regarding purchasing, pricing,

distributing, accounting, and budgeting **[*61]** functions necessary to operate their respective businesses without consulting Management and without Management's prior approval.

Based on the foregoing, the Court finds Epson has not shown that Management exerts undue influence or control over "the internal affairs or daily operations" of Dynamic or Multi-Union. The Court also finds Management's assistance with peripheral or supplemental tasks does not justify piercing the corporate veil.

### 3) Corporate Formalities

As noted, Management authorized James Chan, President of Dynamic, to sign two confidentiality agreements on behalf of Management as its "Vice President of American Operations." In reality, Chan has never been an officer or director of Management, and Management does not have any American operations. Apparently, Chan was given special authorization to sign the documents to avoid the "inconvenience" of faxing or mailing the agreements from the United States to Hong Kong. The Court finds this "inconvenience" is not a sufficient reason to disregard corporate formalities or to deputize officers of sister corporations with nonexistent titles to sign documents on behalf of another corporation. While these two instances **[*62]** of failure to strictly observe corporate formalities are hardly pervasive, they do constitute some evidence that weighs in favor of an alter ego finding.

### 4) General Agency

Epson seems to argue that Management is a mere division or department of Dynamic and Multi-Union, and, at the same time, argues that Dynamic is a mere division or department of Management. In support of the latter argument, Epson points out Dynamic was referred to as Management's "American Operation" in Multi-Union's marketing brochures, and Chan signed two documents on behalf of Management as the "Vice President of American Operations." Beyond this evidence, Epson offers no proof that Dynamic is performing tasks that, absent Dynamic's existence, Management would be required to undertake. Management is a management services consultant, does not have any expertise in marketing or sales, and offers no advice on those topics. Dynamic, on the other hand, is a distributor of office products and printer supplies. Despite the fleeting references to Management's "American Operations," it is clear Management, a service company, would be unlikely to perform the same marketing and distributing functions as Dynamic even **[*63]** if Dynamic did not exist.

Whether Management can be considered a mere division or department of Dynamic and/or Multi-Union is a closer question. Management was formed, in part,

"to manage the internal management" of Holdings' subsidiaries. Some of the services that Management provides to Multi–Union and Dynamic are the type of services one would expect an independent corporation to perform for itself, such as the procurement of insurance. It is not uncommon, however, for corporations, especially small corporations like these, to outsource certain accounting, human resources, and information technology functions. In fact, the market demand for these outsourced services was Holdings' other impetus for forming Management. Management provides these services to companies outside of the Group and to Multi–Union and Dynamic. Based on the foregoing, the Court finds Management is not a mere subdivision of Dynamic or Multi–Union.

### 5) Fraud, Injustice, or Inequity

Management is not the parent of Dynamic or Multi–Union and does not finance or capitalize them; therefore, the sufficiency of the capitalization of those companies is not relevant to this inquiry. In any event, Epson has provided **[*64]** no evidence to establish that Dynamic and Multi–Union were undercapitalized when they were formed or that their assets have been siphoned off since the alleged infringing activities began.

There also is no evidence that Holdings formed Dynamic or Multi–Union with a fraudulent intent to escape liability in this action or any other lawsuit. Multi–Union operated many years before Epson's patents were issued. Multi–Union sells imaging and office products, including the alleged infringing goods, to companies around the world. It purchases products from and sells products to companies both inside and outside of the Group. Dynamic distributes printing supplies and office products in the United States, including but not limited to Print–Rite products. When it was formed for this purpose, Dynamic did not completely replace Multi–Union as a supplier of Print–Rite goods in the United States. Multi–Union continues to sell Print–Rite goods in America, and Dynamic buys products from Multi–Union and from companies outside of the Group.

There is no evidence in the record that Dynamic and/or Multi–Union are sham companies that were formed simply to shield Holdings' assets, let alone the assets **[*65]** of their sister company, Management. Epson offers no other basis for finding that fraud, injustice, or inequity will result from maintenance of the corporate distinctions between Management and Multi–Union and Dynamic.

Based on the foregoing, the Court finds Management, Multi–Union, and Dynamic are independently organized and perform distinctly separate functions even though Management performs some functions on behalf of Multi–Union and Dynamic and some overlap of per-

sonnel and resources exists between these companies. Management does not exert the type or level of control over the daily operations or internal management of Multi–Union and Dynamic that is required for a finding of alter ego jurisdiction. The services that Management provides are minimal and are the type of services that are commonly outsourced by small corporations. In addition, Management is more than a mere subdivision of Dynamic and Multi–Union because it provides various services to other subsidiaries as well as to companies outside of the Group. Moreover, Epson has not shown maintenance of the corporate form would work any injustice or fraud in this case. Accordingly, the Court concludes there are no specific, **[*66]** unusual circumstances to justify disregarding the corporations' separate identities, and no injustice or fraud will occur because of maintenance of those separate corporate forms. As a result, the Court will not exercise its equitable powers to pierce the corporate veil between these companies.

In addition, the Court finds Epson has failed to show that Holdings is the alter ego of Management and that Management is the alter ego of Dynamic and/or Multi–Union. Thus, the Court concludes Holdings is not subject to this Court's jurisdiction based on Management's connection with Dynamic and/or Multi–Union.

### 2. Holdings' own relationship with Dynamic and/or Multi–Union

Epson also contends Holdings is the alter ego of Multi–Union and Dynamic based on Holdings' direct relationship with those subsidiaries.

#### a. Common Marketing Image

Once again, Epson argues the Print–Rite Group is actually a single entity headed by Holdings, or more exactly, by Ho himself. Epson contends the Group portrays itself publicly as a vertically–integrated "corporation" with Holdings at the top and Ho as the Managing Director of the Group. Although this marketing image is some evidence of the way the **[*67]** parties relate to one another, the Court finds this evidence is not sufficient by itself to prove that Holdings controls the subsidiaries or that the parties are mere alter egos of one another.

#### b. Common Directors and Officers

Epson contends Holdings actually controls Dynamic and Multi–Union by placing its board members on the boards of its subsidiaries and then filling the remaining board seats with sham directors. Gayle Fung, Ho's wife, is a member of the boards of directors of both Holdings and Multi–Union. Lai Hon Ming is a member of the boards of directors of both Holdings and Dynamic. Ho, however, is not a member of the boards of either Multi–Union or

Dynamic.

The Court previously noted there is no evidence in the record that the board of Holdings contains sham directors or that it is completely controlled by Ho himself. Holdings is the sole shareholder of Dynamic and Multi–Union. Holdings' board chose all of the directors of Dynamic and Multi–Union and placed one of their own board members on each subsidiary's board. In fact, those joint board members appear to be the most active members on the subsidiaries' boards. As General Manager of Multi–Union, David Wong reports [*68] to Multi–Union's board of directors and, more specifically, to Gayle Fung individually. Fung apparently is the equivalent of a Managing Director for Multi–Union. The three remaining directors of Multi–Union "do not have any duties" as directors or are "inactive." One of the allegedly inactive directors, Fung Kam Ming, however, attends Multi–Union's annual board meetings. Thus, only two of Multi–Union's directors, Gayle Fung and Fung Kam Ming, participate in the board's general meetings.

Again, the presence of overlapping directors and officers between a parent and a subsidiary is not necessarily inappropriate unless there is some evidence that the Holdings' directors were acting in that capacity when they took some action on behalf of the subsidiaries. *Bestfoods, 524 U.S. at 71*. In fact, the full overlap of directors and officers between a parent and a subsidiary is considered acceptable. *Id.* Thus, the fact that the only "active" members of Multi–Union's board are Fung, who is also a member of Holdings' board, and her brother, Fung Kam Ming, does not necessarily support an alter ego finding.

The record shows Multi–Union's board meetings were separate from Holdings' [*69] meetings. None of Holdings' board members attended Multi–Union's meetings except Fung in her capacity as Multi–Union's director. Moreover, Epson has presented no evidence that Gayle Fung improperly took any actions on behalf of Multi–Union in her capacity as a Holdings' board member.

Epson further argues Dynamic "does not appear to have a functioning board at all." In support of this argument, Epson offers Chan's testimony that he, as President of Dynamic, does not know all of the directors nor does he know whether the board of directors has ever met. In fact, the record reveals all four of Dynamic's directors participated in the decision to appoint and signed a resolution appointing Chan as President of Dynamic. The fact that several of the board members are related to Ho does not indicate Holdings controls Dynamic. The Court, therefore, finds Epson has failed to show that Dynamic's board is a sham.

The Court also finds Epson has failed to show Holdings otherwise controls the day-to-day operations of Dynamic and Multi–Union. The record reveals Dynamic and Multi–Union choose their own suppliers, price their own products, set their own budgets, choose their own customers, and enter [*70] into contracts with other companies without any input or prior approval from Holdings or from Holdings' alleged agent, Management. The subsidiaries maintain separate bank accounts and pay for their own expenses.

Holdings receives monthly reports from Management that summarize the financial well-being of Holdings' subsidiaries, including Multi–Union and Dynamic. Holdings also receives annual financial statements and budgets from the subsidiaries. Parental monitoring of a subsidiary's performance and supervision of the subsidiary's finance and capital budget decisions, however, is not sufficient to justify piercing the corporate veil. *Bestfoods, 524 U.S. at 72*. Holdings is an investment company, and Multi–Union and Dynamic are two of its investments. Holdings necessarily must review the financial status of these companies, and that review does not constitute improper control or a specific, unusual circumstance that justifies piercing the corporate veil.

#### c. Corporate Formalities

Epson also argues Holdings does not always strictly observe corporate formalities in its relationships with Dynamic and Multi–Union. Holdings shares some resources with Multi–Union: Holdings, [*71] like Multi–Union, rents office space from Management; Holdings' office (occupied by Gayle Fung) is on the same floor as Multi–Union's office; and Multi–Union and Holdings share a common receptionist, telephone system, domain name, and an email system. In addition, Dynamic also uses the same domain name as Multi–Union and Holdings. These facts, while indicative of a close parent–subsidiary relationship, are insufficient to establish alter ego jurisdiction absent any proof of actual control by Holdings over the daily operations or internal management of Dynamic or Multi–Union.

In addition, the Court has found only a single instance of Holdings' failure to maintain strict corporate formalities with Dynamic. Ernest Chu, CEO of Dynamic and a member of Dynamic's board of directors, once signed a document on behalf of Holdings even though he was never a director or officer of Holdings. No explanation for this isolated event has been presented. Nonetheless, the Court finds this single absence of corporate formalities is insufficient to justify piercing the corporate veil between Dynamic and Holdings.

#### d. General Agency

As noted above, the subsidiary of a holding company is not necessarily [*72] performing a function that the parent otherwise would be required to perform for itself. A holding company always can simply form or procure another type of subsidiary in a different line of work. *Doe, 248 F.2d at 929* (citing *Gallagher, 781 F. Supp. at 1085*). Holdings is a holding company in the business of investing; Dynamic and Multi–Union are subsidiaries in the business of marketing and selling office and printing products. Holdings would not have to assume the functions of Dynamic and/or Multi–Union because it could simply procure or form different subsidiaries with different functions.

Epson attempts to paint a picture of the Group as a single "super-corporation" that designs, manufactures, distributes, markets, and sells office and printing supplies. Pursuant to Epson's theory, Holdings, or more exactly, Ho himself, is the Group's top level management. Tian Wei constitutes the manufacturing department of Print-Rite products. Multi–Union is the Hong Kong distribution department for Print-Rite products, and Dynamic is the American sales department for Print-Rite products. Epson contends this version of the Group's organization is supported by [*73] the marketing brochures produced by Multi–Union and the general public image that the companies exude.

In reality, both Multi–Union and Dynamic operate outside of the Group. Multi–Union purchases products from companies other than Tian Wei and sells products that do not bear the Print-Rite logo. Multi–Union also has continued to distribute products in the United States even after Holdings' formed Dynamic. Dynamic buys products from suppliers other than Multi–Union and also purchases products that do not carry the Print-Rite logo. Thus, neither Multi–Union nor Dynamic exclusively fulfill the roles identified by Epson.

In addition, Multi–Union actually pre-dates Holdings. Multi–Union was in operation for four years before Sino-Expo Holdings, Holdings' predecessor, was formed. Thus, Holdings did not form Multi–Union solely to be its Hong Kong distribution division because Multi–Union already existed.

Based on the foregoing, the Court concludes Epson has failed to show that Multi–Union or Dynamic are mere divisions or departments of their holding company parent.

**e. Fraud, injustice, or inequity**

The Court finds no evidence in the record to support a finding that Holdings formed [*74] Multi–Union or Dynamic with a fraudulent intent. Indeed, as noted above, Multi–Union pre-dates Holdings. There is no evidence that either company was inadequately capitalized at

the time of their formation or that Holdings siphoned off their assets after the alleged infringement or after Epson brought this action.

Epson's argument regarding the nonavailability of complete equitable relief also is not well taken. Epson has not shown that it is prohibited from pursuing its claims for equitable relief against Holdings in another forum. The mere inconvenience of pursuing its claims in another forum is not the type of inequity necessary to justify piercing the corporate veil.

Accordingly, the Court finds Holdings and its subsidiaries, Multi–Union and Dynamic, are independently organized and perform distinctly separate functions even though there is some overlap of directors and Holdings oversees some of its subsidiaries' functions and financial performance. The Court further finds Holdings does not exert, through its own actions or the actions of Management, the type or level of control over the daily operations or internal management of Multi–Union and Dynamic that is required for a [*75] finding of alter ego jurisdiction. Holdings' supervision of Multi–Union and Dynamic is well within the accepted norms of parental oversight of subsidiaries. In addition, Multi–Union and Dynamic are not mere subdivisions of Holdings because Holdings as a holding company is not required to perform any particular business functions, and Multi–Union and Dynamic operate outside of the Group. Moreover, Epson has not shown maintenance of the corporate form would result in injustice or fraud. The Court, therefore, concludes there are no specific, unusual circumstances to justify disregarding the corporations' separate identities, and no injustice or fraud will occur if those separate corporate forms are maintained. Consequently, the Court will not exercise its equitable powers to pierce the corporate veil between these companies.

In summary, the Court finds Epson has failed to show Holdings is the alter ego of either Dynamic or Multi–Union through proof of its direct relationship and control over those entities or through its conduit, Management. The Court, therefore, concludes this Courts lacks personal jurisdiction over Holdings on the basis of alter ego jurisdiction.

**C. Management's [*76] Motion to Dismiss**

As explained more fully above, the Court concludes there are no specific, unusual circumstances to justify disregarding the separate corporate identities of Management, Multi–Union, and Dynamic, and no injustice or fraud will occur if the corporate form is maintained. Accordingly, the Court will not exercise its equitable powers to pierce the corporate veil and to assert personal jurisdiction over Management as the alter ego

of Dynamic and/or Multi–Union based on Dynamic and Multi–Union's contacts with this forum.

## II. National Contacts Jurisdiction

Even if this Court concludes it does not have alter ego jurisdiction over Holdings and/or Management, Epson contends those Defendants are still subject to this Court's jurisdiction based on their contacts with the nation as a whole. Epson asserts Management's aggregate national contacts and Holdings' aggregate national contacts are sufficient for this Court to assert general personal jurisdiction over these Defendants.

### A. General Jurisdiction Standards

A court may assert general personal jurisdiction over a defendant whose contacts with the forum are "continuous and systematic" even if those contacts [*77] are wholly unrelated to the plaintiff's claims. *Red Wing, 148 F.3d at 1359* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414–16, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984))*. This "fairly high" standard requires the contacts to be the sort that approximate physical presence within the state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir. 2000)* (internal quotations and citations omitted). *See also North Am. Phillips Corp. v. Am. Vending Sales, Inc., 35 F.3d 1576, 1578 (Fed. Cir. 1994)* (appellate court need not address lower court's ruling on general jurisdiction because plaintiff concedes on appeal that defendants "lack the sort of substantial and continuing contacts that amount to physical presence in the forum."). Random, fortuitous, or attenuated contacts do not count. *Red Wing, 148 F.3d at 1359* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985))*. In addition, "contacts resulting from the 'unilateral activity' of others do not count." *Id.* (quoting *Burger King, 471 U.S. at 475* & n.17). [*78]

### B. Holding's Motion to Dismiss

Holdings concedes Epson's patent infringement claims arise under federal law. The Court accepts Epson's certification that, to the best of Epson's knowledge, Holdings is not subject to the jurisdiction of any state court of general jurisdiction if this Court determines Holdings is not subject to this Court's jurisdiction under an alter ego analysis. Such a certification is sufficient to satisfy the second element of the *Rule 4(k)(2)* jurisdictional analysis unless Holdings shows it is subject to the jurisdiction of another state n9 or Epson's own national contacts proof indicates Holdings would be subject to another state's jurisdiction. *See Swiss American, 191 F.3d at 41–42*.

n9 Holdings has not asserted it is subject to the jurisdiction of any state court of general jurisdic-

tion.

Holdings argues its contacts with the nation at large do not constitute sufficient minimum contacts to subject it to the jurisdiction of this Court. Holdings also contends it would [*79] not be reasonable for this Court to exercise jurisdiction even if Holdings' contacts met the minimum contacts standard. On the other hand, Epson contends Holdings has substantial and continuous contacts with the United States and is subject to this Court's jurisdiction based on the following contacts:

1. Holdings initially capitalized Dynamic, a California company, and is its sole shareholder;

2. two of Holdings' directors signed documents on file with the Patent and Trademark Office to register the Print–Rite logo, albeit in their capacities as directors of subsidiaries of Holdings rather than in their capacities as Holdings' directors;

3. two of Holdings' directors granted powers of attorney to Seattle attorneys to assist in the registration of the Print–Rite trademark, albeit in their capacities as directors of subsidiaries of Holdings rather than in their capacities as Holdings' directors;

4. Holdings entered into three agreements with Nectron, a Texas company, that involved the sale of shares of Holdings' stock to Nectron in exchange for Nectron's purchase of Multi–Union products;

5. Nectron currently owns 8.5% of Holdings' shares, and Holdings pays [*80] Nectron dividends at least once a year;

6. Holdings entered into a confidentiality agreement with Kodak during negotiations that did not result in any further business;

7. Holdings' directors "rely upon" the California Corporation Code when signing annual ratification documents for Dynamic's actions; and

8. a subsidiary of one of Holdings' shareholders guaranteed Dynamic's lease of property in San Jose, California.

Many of these contacts, however, do not count in the

jurisdictional analysis because they are contacts formed by or resulting from the "unilateral activity" of other entities rather than Holdings' own purposeful activity within the United States. Actions taken by Holdings' directors, Ho and Fung, on behalf of Holdings' subsidiaries have no bearing on Holdings' contacts with the United States. Doing business with a company that does business in the forum is not sufficient minimum contacts with the forum to establish general jurisdiction. *Red Wing, 148 F.3d at 1361.* Accordingly, the actions of Holdings' directors taken on behalf of other subsidiaries are irrelevant. In addition, the American contacts of a subsidiary of a Holdings' shareholder **[*81]** are too attenuated to be deemed the contacts of Holdings itself.

Mere ownership of an American subsidiary also is not sufficient to warrant general jurisdiction over the parent absent an alter ego finding. *Kramer, 628 F.2d at 1178.* Thus, the fact that Holdings owns Dynamic and incorporated it under California law does not justify this Court's exercise of general jurisdiction over Holdings. The Court extends this principle and concludes the mere presence of a shareholder of a corporation in the forum also is insufficient to warrant general jurisdiction over the foreign corporation absent an alter ego finding. Nectron is merely a shareholder of Holdings, and there is no evidence Nectron is Holdings' alter ego or controlled Holdings in any way. The Court, therefore, finds Nectron's partial ownership of Holdings is not an American contact attributable to Holdings.

Holdings' only remaining American contacts are the confidentiality agreement between Holdings and Kodak, Ho's ensuing trip to New York to negotiate with Kodak on behalf of Holdings, and Holdings' agreements with Nectron. None of these agreements resulted in ongoing business in the United States, and each contact **[*82]** was an isolated event. These nationwide contacts are not substantial, continuous, or systematic, and they do not approximate physical presence within the forum. Accordingly, the Court concludes it does not have general jurisdiction over Holdings pursuant to *Rule 4(k)(2)*. n10

> n10 The Court need not address whether the exercise of jurisdiction over Holdings would be reasonable under the circumstances because the Court has found Holdings lacks minimum contacts with this nation; due process, therefore, requires dismissal of the claims against Holdings.

## C. Management's Motion to Dismiss

Management also concedes Epson's patent infringement case arises under federal law. The Court accepts Epson's certification that, to the best of Epson's knowl-

edge, Management is not subject to the jurisdiction of any state court of general jurisdiction if this Court determines Holdings is not subject to this Court's jurisdiction under an alter ego analysis. Such a certification is sufficient to satisfy the second element of **[*83]** the *Rule 4(k)(2)* jurisdictional analysis unless Management shows it is subject to the jurisdiction of another state n11 or Epson's own national contacts proof indicates Management would be subject to another state's jurisdiction. *See Swiss American, 191 F.3d at 41–42.*

> n11 Management has not asserted that it is subject to the jurisdiction of any state court of general jurisdiction.

Management also argues this Court may not exercise general personal jurisdiction over it because its contacts with the United States do not constitute minimum contacts as due process requires. Epson contends Management's United States contacts are continuous and substantial enough to satisfy due process standards. In particular, Epson relies on Management's following American contacts:

> 1. Management receives and reviews Dynamic's profit-and-loss statements and balance sheets every month in its Hong Kong offices;
>
> 2. Management contacts Dynamic in California at least once a month to discuss Dynamic's financial **[*84]** statements;
>
> 3. two of Management's officers traveled to California once to provide warehousing and accounting advice;
>
> 4. Management procured insurance on behalf of Dynamic;
>
> 5. Management provided Dynamic with various management memoranda;
>
> 6. Multi–Union's brochures identify Dynamic's officers as officers of Management's "American Operations";
>
> 7. Management entered into two confidentiality agreements with American companies that were signed in California by Dynamic's President, Chan; and
>
> 8. a representative of Management has at-

tended trade shows in Nevada every year for the past three years.

Nearly all of Management's "nationwide" contacts are, in fact, California contacts. The only exception appears to be Management's presence at three trade shows in Nevada over the past three years. If the Court were to accept Epson's argument that Management's contacts with Dynamic and the state of California are sufficient to confer general jurisdiction on this Court under a nationwide analysis, however, the Court necessarily would have to find that Management also would be subject to the jurisdiction of the California courts. In order for the Court to exercise **[*85]** jurisdiction pursuant to *Rule 4(k)(2)*, however, the foreign defendant may not be subject to the jurisdiction of a court in any state. Management, therefore, cannot be subject to this Court's jurisdiction pursuant to *Rule 4(k)(2). See AT&T, 94 F.3d at 590 n.6.* The Court finds the addition of Management's attendance at three trade shows is insignificant and does not change the Court's jurisdictional analysis.

Accordingly, the Court finds Epson has failed to show both that Management has substantial and continuous contacts with the nation at large and that Management's contacts would not subject it to the jurisdiction of any state. This Court, therefore, may not exercise general personal jurisdiction over Management pursuant to *Rule 4(k)(2).*

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** Holdings' Motion to Dismiss ( # 39) for lack of personal jurisdiction and **GRANTS** Management's Motion to Dismiss ( # 36) for lack of personal jurisdiction. Accordingly, Plaintiffs' claims against Print–Rite Holdings, Ltd., and Print–Rite Management Services Co. are **DISMISSED**.

IT IS SO ORDERED.

Dated this 30th day of April, 2002.

/S/ Anna J. Brown **[*86]**

United States District Judge

# EXHIBIT M

LEXSEE 2005 U.S.DIST. LEXIS 6797

**SRI INTERNATIONAL, INC., Plaintiff, v. INTERNET SECURITY SYSTEMS, INC. and SYMANTEC CORPORATION, Defendants.**

**Civ. No. 04–1199–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 6797*

**April 13, 2005, Decided**

**COUNSEL:** **[*1]** For Timothy Devlin, Esquire of Fish & Richardson, Wilmington, Delaware. Howard G. Pollack, Esquire and Michael J. Curley, Esquire of Fish & Richardson, Redwood City, California, for Plaintiff.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon, Wilmington, Delaware, for Defendant Internet Security Systems, Inc.. Of Counsel: Holmes J. Hawkins, III, Esquire and Natasha H. Moffitt, Esquire of King & Spalding, Atlanta, Georgia.

Richard K. Herrmann, Esquire of Blank Rome, Wilmington, Delaware, for Defendant Symantec Corporation. Of Counsel: Lloyd R. Day, Jr., Esquire, Robert M. Galvin, Esquire and Paul S. Grewal, Esquire of Day Casebeer Madrid & Batchelder, Cupertino, California.

**JUDGES:** ROBINSON, Chief Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: April 13, 2005
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On August 26, 2004, plaintiff SRI International, Inc. ("SRI") filed this suit against defendants Internet Security Systems, Inc. ("ISS–DE") and Symantec Corporation ("Symantec") alleging infringement of four of its patents by Symantec and two of its patents by ISS–DE. (D.I. 1)

This court **[*2]** has jurisdiction over this action pursuant to *28 U.S.C. § 1331*. Pending before this court are ISS–DE's motion to dismiss or sever and transfer the action to the Northern District of Georgia, and Symantec's motion to sever and transfer this action to the Northern District of California. (D.I. 10, 14)

**II. BACKGROUND**

According to ISS–DE, it is a Delaware corporation and serves as the holding company for Internet Security Systems, Inc. ("ISS–GA"). (D.I. 12, Ex. C at P 4) SRI argues that ISS–DE is more than just a holding company because only one entity is listed with the Securities and Exchange Commission ("SEC"), Internet Security Systems INC/GA, and it is listed as incorporated in Delaware. (D.I. 19, Ex. B) ISS–GA is headquartered in Georgia. (Id. at P 1) ISS–GA researches and develops computer network security products, including the accused Proventia and SiteProtector products, at its engineering facilities in Georgia. (Id. at P 3)

ISS–DE asserts that it does not develop, manufacture or sell any products, it is strictly a holding company for ISS–GA. (Id. at P 4) SRI argues, however, that ISS–DE's Form 10–K, filed with the Securities **[*3]** and Exchange Commission ("SEC"), makes clear that it offers "a proactive line of security solutions that provide protection against a variety of ever–changing threats for gateways, networks, servers and desktops, and includes security software and appliances. (D.I. 19, Ex. B at 3) Furthermore, SRI contends that the Form 10–K indicates that ISS–DE grossed over $240 million in revenue in 2002 and employs over 1,100 people. (Id. at 18 and 27) The two companies allegedly maintain separate accounting records and have their own officers and employees. (Id. at PP 5, 6) ISS–DE admits that it has "regulatory and oversight obligations" for ISS–GA, but asserts that the day–to–day production activities are controlled by ISS–GA. (Id. at P 6) Dun & Bradstreet, however, classifies ISS–DE as one operational entity, headquarted in Georgia, but incorporated in Delaware. (D.I. 18, Ex. D) Dun & Bradstreet

does not classify ISS–DE as a holding company, but instead states that ISS–DE is in the business of "prepackaged software and custom computer programming." (Id.)

Symantec is a Delaware corporation with its principal place of business in Cupertino, California. (D.I 15 at 3) Symantec **[*4]** offers software and services to help businesses secure and manage computer networks. (Id.) Symantec is the maker of the accused product, ManHunt. (Id. at 4)

SRI is a California non–profit research institute. (D.I. 18 at 3) SRI developed a system to detect and stop certain activity on computer networks and to identify network security breaches. (Id. at 4) SRI received numerous patents on its systems.

In January of 2004, SRI initiated licensing negotiations with Symantec. (D.I. 19, Ex. J at P 5; D.I. 15 at 5) SRI and Symantec negotiated via letter, telephone and met at SRI's headquarters in Menlo Park, California. (D.I. 15 at 3) The negotiations were unsuccessful and no agreement was reached between the parties. (Id.)

SRI then contacted Symantec's competitor ISS via letter stating that it believed ISS's products infringed some of SRI's patents and that SRI was undergoing negotiations with a number of companies and would be "open to discussing license terms with ISS." n1 (D.I. 12, Ex. C at P 7; D.I. 19, Ex. H at P 2) After numerous communications, including a second letter from SRI indicating that it "takes intellectual property matters seriously," the two companies **[*5]** began license negotiations. (D.I. 12, Ex. C at P 8; D.I. 19, Ex. H at PP 3–10)

n1 It is unclear whether the letter was intended for ISS–GA or ISS–DE.

On August 17, 2004, ISS–GA filed a declaratory judgment action against SRI in the Northern District of Georgia seeking a declaration that its products do not infringe SRI's *United States Patents Nos. 6,321,338* ("the '338 patent"), *6,484,203* ("the '203 patent"), 6,704,874 ("the '874 patent"), *6,708,212* ("the '212 patent") and *6,711,615* ("the '615 patent"). n2 (D.I. 12, Ex. C at P 10) On August 20, 2004, there was a telephone conference between SRI and ISS–GA, in which ISS–GA's engineers asked SRI engineers questions regarding SRI's technology. (D.I. 19, Ex. H at P 24) At the close of the conversation, ISS–GA's engineers asked for copies of various technical papers written by SRI scientists on the technology, which were sent to ISS–GA on August 20.

n2 According to SRI, license negotiations between ISS–GA and SRI were still ongoing at the time the declaratory judgment action was filed. (D.I. 19, Ex. H at P 26)

**[*6]**

On August 26, 2004, SRI filed this action against ISS–DE and Symantec. (D.I. 1) SRI states that Symantec's ManHunt product infringes the *'338*, *'203*, *'212* and *'615* patents. SRI further alleges that ISS–DE's Site Protector and Proventia products infringe the *'615* and *'203* patents. SRI alleges that it filed its claims against Symantec and ISS–DE in one case in order to enforce its patent rights in an efficient manner. (D.I 18 at 6)

## III. ISS-DE'S MOTION TO DISMISS

### A. Standard of Review

Because the parties have referred to matters outside the pleadings, Idd–DE's motion to dismiss shall be treated as a motion for summary judgment. See *Fed. R. Civ. P. 12(b)(6)*. A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. **[*7]** "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995)*. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. **[*8]** If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317,*

*322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

**B. Discussion**

SRI asserts that ISS–DE is liable for any alleged patent infringement. ISS–DE claims it is not liable because it does not directly manufacture or sell the accused products and is merely ISS–GA's sole shareholder.

A parent company is not liable for the actions of a subsidiary solely because it is a subsidiary. See *United States v. Bestfoods, 524 U.S. 51, 61, 141 L. Ed. 2d 43, 118 S. Ct. 1876 (1998).* A finding of liability requires piercing the corporate veil. Id. Prior case law establishes two distinct tests for determining when piercing the corporate veil is appropriate: (1) the alter ego test; or (2) agency test. See, e.g., *Pearson v. Component Tech. Corp., 247 F.3d 471, 484–486 (3d Cir. 2001); C.R. Bard Inc. v. Guidant Corp., 997 F. Supp. 556, 559–560 (D. Del. 1998)*; *Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 265–272 (D. Del. 1989).* **[*9]**

**1. Alter Ego Test**

A corporate subsidiary can be considered the alter ego of its parent corporation where there is a lack of attention to corporate formalities or complete domination and control by the parent corporation. See *Mobil Oil Corp., 718 F. Supp. at 266*. Under Delaware law, however, a close connection alone is not sufficient, there must be a showing that the parent/subsidiary relationship would work a fraud, injustice or inequity. See *C.R. Bard, Inc., 997 F. Supp. at 559*; *Mobil Oil Corp., 718 F. Supp. at 267*.

Based on the record, it is unclear whether ISS–GA is ISS–DE's alter ego. ISS–DE is listed by the SEC and Dunn & Bradestreet as headquartered in Atlanta. ISS–DE is described as being in the business of producing network security products, as opposed to being listed as a holding company. From the facts of record, it is unclear what the relationship is between ISS–DE and ISS–GA; therefore, it is unclear whether their relationship will work an injustice on the patent system.

**2. Agency Test**

If a parent corporation directs the allegedly infringing activity, it can be liable for its subsidiary's infringement. **[*10]** The focus of this test is on "the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance of that arrangement to the plaintiff's claim." *C.R. Bard, Inc., 997 F. Supp. at 560*. In order for the parent corporation to be liable under this test, there must be "a close connection between the relationship of the corporations and the cause of action." *Id.*

Because it is unclear what the relationship is between

ISS–DE and ISS–GA, it is unclear how much control ISS–DE has over ISS–GA. It is undisputed that ISS–DE has some control over ISS–GA because it has oversight and regulatory obligations for ISS–GA. At some point, it must be able to direct ISS–GA's activities to fulfill these obligations. However, it is unclear whether it directed the alleged infringing activities at issue.

Therefore, ISS–DE's motion to dismiss is denied without prejudice to renew if, as discovery proceeds, it becomes evident that ISS–DE cannot be liable either independently or under the alter ego or agency tests.

**IV. MOTIONS TO SEVER**

*Federal Rule of Civil Procedure 21* gives courts discretion to **[*11]** sever parties due to misjoinder. Under *Federal Rule of Civil Procedure 20(a)*, defendants can be joined together if

> there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

*Fed. R. Civ. Proc. 20(a)* (2005) (emphasis added). This court finds that there are common transactions or occurrences, and questions of fact or law that warrant joinder of the defendants.

Plaintiff alleges patent infringement, which will require this court to hold Markman hearings and construe the asserted claims. Plaintiff has asserted four patents against Symantec and only two of those patents against ISS–DE. Nonetheless, all of the patents asserted arise out of computer network protection systems. It is the experience of this court that patents over the same technology often give rise to the same questions of law and fact (e.g., same prior art references, same level of ordinary skill **[*12]** in the art).

Both ISS–DE and Symantec have asserted invalidity defenses that will require this court to consider the validity of the asserted patents. These defenses will require the court to determine the date of conception and reduction to practice, the relevance of prior art and the level of ordinary skill in the art. It would be an inefficient use of judicial resources for this court to perform all of these tasks twice, once for ISS–DE and once for Symantec. Therefore, ISS–DE's and Symantec's motions to sever are denied at this stage of the proceedings.

**V. MOTIONS TO TRANSFER**

Under *28 U.S.C. § 1404(a)*, a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended *§ 1404* to give district courts discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988)* (quoting *Van Dusen v. Barrack, 376 U.S. 612, 622, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)*); *Affymetrix, Inc. v. Synteni, Inc., 28 F.Supp.2d 192, 208 (D. Del. 1998).* **[\*13]**

The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970).* "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp., 138 F.Supp.2d 565, 567 (D. Del. 2001)*; *Shutte, 431 F.2d at 25*.

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del 1998)*; *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, 2001 WL 1617186 (D. Del. Nov. 28, 2001)*; *Continental Cas. Co. v. Am. Home Assurance Co., 61 F.Supp.2d 128, 131 (D. Del. 1999)*. Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity **[\*14]** occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993)*.

Here, the plaintiff chose Delaware because both defendants are Delaware corporations and Delaware is the only forum with jurisdiction over both ISS-DE and Symantec. As already stated by this court, defendants are properly joined in order to conserve judicial resources and ensure a uniform evaluation of the patents in suit. In the interest of efficiency and justice, this court declines to transfer their respective cases, as neither forum would have jurisdiction over both defendants. n3

n3 ISS-DE argues that SRI's claims against it should be transferred to the District of Georgia because ISS-GA filed a declaratory judgment action against SRI in that district before SRI filed the suit at bar. "When a declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action." *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 938 (Fed. Cir. 1993)*, abrogated on other grounds, *Wilton v. Seven Falls Co., 515 U.S. 277, 132 L. Ed. 2d 214, 115 S. Ct. 2137 (1995)*. As the court has already stated, the relationship between ISS-DE and ISS-GA is unclear; therefore, it is also unclear whether the Georgia suit will adjudicate the issue facing this court (i.e., whether ISS-DE infringed the asserted patents). If ISS-DE and ISS-GA are in fact two distinct companies, as ISS-DE argues, then the first to file rule would not apply.

**[\*15]**

## VI. CONCLUSION

For the reasons stated, ISS-DE's motion to dismiss is denied without prejudice. ISS-DE's and Symantec's motions to sever are denied, as are their motions to transfer. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 13th day of April, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant ISS-DE's motion to dismiss (D.I. 10) is denied without prejudice;

2. Defendant ISS-DE's motion to sever and transfer (D.I. 10) is denied; and

3. Defendant Symantec's motion to sever and transfer (D.I. 14) is denied.

Sue L. Robinson

United States District Judge

# EXHIBIT N

LEXSEE 2002 U.S.DIST. LEXIS 4671

**TI GROUP AUTOMOTIVE SYSTEMS, (NORTH AMERICA), INC., Plaintiff, v. VDO NORTH AMERICA L.L.C. et al., Defendant.**

**C.A. No. 00–432–GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 4671; 62 U.S.P.Q.2D (BNA) 1599*

**March 7, 2002, Decided**

**DISPOSITION:** [*1] Defendants Atecs' and Mannesmann's motion to dismiss GRANTED.

**COUNSEL:** For TI GROUP AUTOMOTIVE SYSTEMS (NORTH AMERICA), INCORPORATED, plaintiff: Douglas E. Whitney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For VDO NORTH AMERICA L.L.C., MANNESMANN AG, ATECS MANNESMANN AG, VODAFONE AIRTOUCH PLC, ROBERT BOSCH GMBH, SIEMENS AG, MANNESMANN VDO AG, defendants: Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For TI GROUP AUTOMOTIVE SYSTEMS (NORTH AMERICA), INC., counter–claimant: Douglas E. Whitney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For VDO NORTH AMERICA L.L.C., counter–defendant: Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

On August 18, 2000, the plaintiff, TI Group Automotive Systems, NA, Inc. ("TI") filed the above–captioned action. In that action, TI charges the defendants, VDO NA ("VDO"), Mannesmann AG ("Mannesmann"), Siemens AG, Robert Bosch GMBH, Atecs Mannesmann AG ("Atecs") and Vodafone Group PLC ("Vodafone") n1

with infringement of its '714 patent. n2

n1 The parties have agreed to voluntarily dismiss Vodafone AG as a defendant.
[*2]

n2 Atecs is Mannesmann's subsidiary holding company for its non–telecommunications businesses. Prior to September 1999, Mannesmann was VDO AG's parent corporation. However, when Atecs was formed in September 1999, it became the parent company of VDO AG.

Presently before the court is Atecs' and Mannesmann's motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*. n3 In particular, they claim that TI cannot maintain a claim against them because they did not design, manufacture, use, or sell any of the fuel pump modules which are the subject matter of the '714 patent. They further argue that there is no evidence that they induced actual infringement or that they should be held liable on an agency theory of liability. For the reasons that follow, the court will grant this motion.

n3 As the parties rely on material outside the pleadings, the court will treat this motion as a motion for summary judgment. *See FED. R. CIV. P. 12(b).*

[*3]

**II. STANDARD OF REVIEW**

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

Case 1:06-cv-00041-JJF    Document 49-15    Filed 02/14/2006    Page 3 of 5

Page 2

2002 U.S. Dist. LEXIS 4671, *3; 62 U.S.P.Q.2D (BNA) 1599

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998)*. Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle, 139 F.3d at 392*. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999).* **[*4]**

### III. DISCUSSION

#### A. Direct Infringement

TI alleges that the defendants violated Section 271(a) of the U.S. Patent Laws. *35 U.S.C. § 271(a)*. This Section provides that, "whoever without authority makes, uses, offers to sell or sells any patented invention . . . infringes the patent." *Id.* In support of this allegation, TI argues that Mannesmann exercises "control and authority" over VDO which extends far beyond "mere economic approval" of VDO's transactions. Specifically, TI group contends that Mannesmann must approve transactions "which may involve infringement of protective rights of third parties." TI also points to the fact that Mannesmann and VDO have several common members on their respective Board of Directors. Notably, TI offers no evidence that Mannesmann itself made, used, or sold the fuel pump assemblies.

The court finds that these facts do not give rise to a genuine issue of material fact with regard to whether Mannesmann itself made, sold, or used fuel pump assemblies in violation of TI's patent rights.

#### B. Active Inducement

Section 271(b) of the Patent Act provides that "whoever actively induces infringement of a patent shall **[*5]** be liable as an infringer." In order to establish active inducement, the following elements must be proven by a preponderance of the evidence: (1) an inducer's knowledge of the asserted patent; (2) the presence of infringement by the third party allegedly induced; (3) an inducer's actual intent to cause the acts which he knew or should have known would induce actual infringements; and (4) the commission of an act that constitutes inducement, not merely the power to act or the failure to act. *See Black &*

*Decker (US) Inc. v. Catalina Lighting, Inc., 953 F. Supp. 134, 138 (E.D. Va. 1997).*

In support of its theory, TI alleges the following facts: (1) Mannesmann approved the making and selling of the accused devices, (2) Mannesmann financed VDO, (3) Herbert Koenekamp's ("Koenekamp") knowledge of the '714 patent and its infringement must be imputed to Mannesmann and Atecs, n4 and (4) that, because VDO and Mannesmann shared board members, Mannesmann knew or should have known of the infringement. n5

> n4 TI maintains that Koenkamp's knowledge must be imputed because he is the general counsel for VDO AG, he is also the board's secretary, and he corresponded with TI Group about this lawsuit in early 1999.

**[*6]**

> n5 The board member issue will be more fully discussed below in Section III.C.

Viewing these statements in the light most favorable to TI, as the court must at this stage, the court concludes that they do not sufficiently address each of the elements necessary to establish an active inducement claim. n6 While the court does not dispute that a reasonable factfinder could conclude that TI's allegations demonstrate that Mannesmann and Atecs knew or should have known about the alleged infringement, TI has failed to adequately set forth facts to meet the intent element. *See Manville Sales Corp. v. Paramount Sys., Inc. 917 F.2d 544, 553 (Fed. Cir. 1990)* (stating that "it must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the specific acts alleged to constitute inducement.") Further, it has failed to demonstrate that Mannesmann's approval requirement and financing of VDO were anything more than routine business practices between a parent and subsidiary.

> n6 For purposes of this motion only, the court assumes that a reasonable factfinder would find actual infringement.

**[*7]**

#### C. Agency

TI next argues that a parent corporation may be liable for the acts of its subsidiary corporation under an agency theory. n7 In support of this theory, TI relies upon Koenekamp's failure to deny an agency relationship in his deposition. Specifically, it argues, "Mr. Koenekamp does

2002 U.S. Dist. LEXIS 4671, *7; 62 U.S.P.Q.2D (BNA) 1599

not state that Atecs had no role in the design activity of the accused fuel pump module." (emphasis in original). Based on this statement, TI argues that the court must infer that some design and development activity was ongoing at the time Atecs became VDO's parent. With regard to Mannesmann, TI argues that Koenekamp "does not deny that Mannesmann controlled the activity of VDO AG." (emphasis in original)

> n7 The defendants do not deny that a general agency theory may be used to impute liability.

The court finds that, based on these allegations, TI is merely attempting to rely on what Koenekamp did not say, rather than what he did say. Koenekamp clearly stated that Mannesmann did not participate in the **[*8]** design or development of the VDO NA fuel pumps. He also stated that Atecs had no input into the design and development activity of VDO AG or VDO NA. Thus, TI's argument is effectively that the court should read negative inferences into Koenekamp's statements. This bare argument is unsupported by any factual basis. n8 *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (noting that, "in order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.")

> n8 TI urges the court to adopt the court's reasoning in *Manchack*, where the court declined to dismiss the action for want of more discovery on "inconsistent and unclear" statements in an affidavit. *Manchak v. Rollins, 1996 U.S. Dist. LEXIS 20542,* at *7–8, (D. Del. Dec. 18, 1996). There are no inconsistent and unclear statements in the present case. Koenekamp unequivocally states that Mannesmann and Atecs did not participate in the design of the fuel pumps. To the extent that TI desires explicit language regarding agency principles, it had the opportunity to ask such direct questions at Koenekamp's deposition.

**[*9]**

Additionally, TI alleges that there is a "direct link of [Mannesmann's and VDO AG's] controlling boards" as support for its claim that VDO AG's knowledge may be imputed to Mannesmann. Courts have consistently held that more than what TI terms a "direct link" is required to hold a parent liable for its subsidiary. *See Upjohn Co. v. Syntro Corp., 1990 U.S. Dist. LEXIS 11512, 14 U.S.P.Q.2D (BNA) 1469, 1472 (D. Del. 1990); see also Akzona Inc. v. E.I. duPont de Nemours & Co., 607 F. Supp. 227 (D. Del. 1984).* Indeed, on the following facts,

a court declined to hold a parent liable for its subsidiary:

> "the relationship between the parent and subsidiary was that the parent had 100% ownership of the subsidiary, the parent referred to the subsidiary as a division of the parent, the subsidiary's board reported to the parent, the parent approved substantial capital expenditures, the parent referred to the subsidiary's business as its project and took credit for the project in its annual report and the parent guaranteed loans for the subsidiary." *Akzona, 607 F. Supp. at 237.*

As TI offers nothing more than allegations of a "direct link, **[*10]** " the court declines to find a genuine issue of material fact with regard to liability on this basis. *See Upjohn Co. v. Syntro Corp., 1990 U.S. Dist. LEXIS 11512, 14 U.S.P.Q.2D (BNA) 1469, 1472 (D. Del. 1990)* (noting the "significant" degree of control necessary to warrant holding a parent liable for its subsidiary.)

Next, TI asserts that, because Mannesmann included financial information related to VDO in its annual report, Mannesmann is a proper defendant in the present suit. It offers no further evidence on this issue. However, Mannesmann is the ultimate parent corporation of VDO. Its annual report would necessarily include financial information about its subsidiaries. Thus, on this basis alone, the court cannot find a genuine issue of material fact.

Finally, as discussed above with regard to the issue of direct infringement, TI argues that Mannesmann requires its subsidiaries to obtain approval prior to entering into certain business arrangements, including transactions that may involve patent infringement issues. However, it has adduced no evidence that this approval is anything more than a parent corporation's normal and necessary exercise of control over its subsidiary. **[*11]** *See Akzona, 607 F. Supp. at 238* (noting that a subsidiary is not the parent's agent where the parent, among other things, must oversee and approve major capital expenditures.) Thus, TI's allegation cannot justify establishing liability against Mannesmann for the alleged patent infringement of its subsidiary.

## D. Ability to Pay

TI group candidly admits that, "from a deep pocket point of view, [it has] named the appropriate foreign parties." It further alleges that Mannesmann is "siphoning off assets" from VDO AG and VDO NA. Thus, in the absence of Mannesmann, its potential judgment will not be satisfied. The court finds this argument to be without merit. It is undisputed that VDO AG transfers its profits at year-end to Atecs, as it did to Mannesmann prior to the for-

2002 U.S. Dist. LEXIS 4671, *11; 62 U.S.P.Q.2D (BNA) 1599

mation of Atecs. However, at his deposition, Koenekamp stated that this is a routine business practice in Germany. TI has offered no contradictory evidence. Further, to the extent that damages are awarded in this litigation, such damages will be paid from VDO AG's profits. The profits transferred to Atecs that year would be correspondingly less.

### E. Contributory Infringement

TI makes a passing **[*12]** reference to contributory infringement claims in its opposition brief. However, it fails to offer any evidence that either Mannesmann or Atecs has supplied any components to VDO AG or VDO NA. Accordingly, to the extent that TI makes such a claim, the court will reject this argument.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Atecs' and Mannesmann's motion to dismiss (D.I. 25 in 01-3-GMS) is GRANTED.

Date: March 7, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## ORDER

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. VDO's renewed motion for judgment as a matter of law on non-fringement (D.I. 261) is GRANTED.

2. Judgment BE AND IS HEREBY ENTERED in favor of VDO.

3. TI's motion for prejudgment and post-judgment interest (D.I. 264) is declared MOOT.

4. TI's motion to alter or amend the judgment (D.I. 266) is declared MOOT.

5. TI's motin for an injunction (D.I. 268) is declared MOOT.

6. TI's motion for enhanced damages, attorneys' fees, and expenses (D.I. 270) is declared MOOT.

7. TI's amended motion for an injunction (D.I. 292) is declared MOOT.

Dated: **[*13]** September 4, 2002

/s/

UNITED STATES DISTRICT JUDGE

# EXHIBIT O

LEXSEE 1990 U.S.DIST. LEXIS 11512

**THE UPJOHN COMPANY, Plaintiff, v. SYNTRO CORPORATION, Defendant**

**Civil Action No. 89-107 – JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1990 U.S. Dist. LEXIS 11512; 14 U.S.P.Q.2D (BNA) 1469*

**March 9, 1990**

**COUNSEL:** [*1]

Josy W. Ingersoll, Esquire of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware. OF COUNSEL: Thomas L. Creel, Esquire, Stuart D. Sender, Esquire and Steven J. Armstrong, Esquire of Kenyon & Kenyon, New York, New York, Attorneys for Plaintiff.

Jack B. Blumenfeld, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. OF COUNSEL: John P. White, Esquire, Norman H. Zivin, Esquire and Donna A. Tobin, Esquire of Cooper & Dunham, New York, New York, Attorneys for Defendant.

**JUDGES:**

Joseph J. Farnan, United States District Judge.

**OPINIONBY:**

FARNAN

**OPINION:**

*OPINION*

The Upjohn Company ("Upjohn") filed this lawsuit on March 7, 1989 against Syntro Corporation ("Syntro"), alleging direct infringement and inducement of United States Patent No. *4,810,634*. Subsequently, defendant filed a Motion to Dismiss the action under *Fed.R.Civ.P. 12(b)*. Oral argument was held on January 12, 1990. The Court has jurisdiction over this matter pursuant to *28 U.S.C. § 1338*(a). For the reasons stated below, the Court concludes that summary judgment will be granted in part and denied in part.

*I. FACTS*

On March 7, 1989, United States Patent No. *4,810,634* [*2] issued to Upjohn for Pseudorabies Virus Mutants Incapable of Producing Glycoprotein X (the *"634*

patent"). The patent relates to a genetically engineered virus useful as a vaccine against the pseudorabies virus for animals, including swine. It enables one to distinguish between animals that have been infected with the pseudorabies virus and those that have been vaccinated. Upjohn has obtained U.S.D.A. approval to market the vaccine under the trademark TOLVID.

Syntro is a Delaware corporation with its principal place of business in San Diego, California. It was established in 1981 to apply biotechnology to develop animal vaccine and human health care products. Sometime thereafter, Syntro employees developed a pseudorabies vaccine which is currently sold under the registered trademark PRV/MARKER. In 1985, Syntro created a wholly-owned subsidiary, SyntroVet, Inc. ("SyntroVet") for the purpose of manufacturing and marketing this product. SyntroVet is a Kansas corporation and has its only place of business, a manufacturing facility, in Lenexa, Kansas.

PRV/MARKER is the only product sold by Syntro or SyntroVet. SyntroVet is identified on the label of the product as its maker and seller. [*3] In addition, SyntroVet is licensed by the U.S.D.A. to sell the product. In July, 1988, Syntro filed an international patent application covering the PRV/MARKER vaccine, then in May, 1989, Syntro moved its office to SyntroVet's Kansas facility for consolidation of administrative activities and reduction of expenses. The San Diego research facility has been retained, but on a much smaller scale.

Upjohn's complaint alleges that Syntro makes, uses or sells PRV/MARKER which infringes Upjohn's *'634* patent, and that Syntro is willfully directly infringing and inducing the infringement of the patent. The complaint does not name SyntroVet, the Kansas subsidiary, as a party. n1

n1 The parties agree that SyntroVet is not subject to suit in Delaware given the patent infringe-

Case 1:06-cv-00041-JJF    Document 49-16    Filed 02/14/2006    Page 3 of 6

Page 2

1990 U.S. Dist. LEXIS 11512, *3; 14 U.S.P.Q.2D (BNA) 1469

ment venue statute, *28 U.S.C. § 1400*(b). That section provides that SyntroVet could have been sued only in districts where it resides or has a principal place of business.

On September 8, 1989, Upjohn brought an action alleging [*4] infringement of the same patent against SyntroVet, the subsidiary corporation, in the United States District Court for the District of Kansas. That action is styled The Upjohn Company v. SyntroVet Inc., Civil Action No. 89-2397-0 and arises from essentially the same facts underlying the pending action in this Court. The Kansas complaint alleges that SyntroVet makes, uses, or sells PRV/MARKER, that Syntro initiated the development of the product and is closely involved with SyntroVet's business and that SyntroVet is directly infringing and inducing the infringement of the Upjohn patent. In addition, there appears to be yet another proceeding involving the same parties. According to Syntro, an interference proceeding is about to be declared in the Patent and Trademark Office involving the same technology as the patent issued to Upjohn. With briefing now complete and the oral argument having been held, the motion is ripe for decision.

## II. DISCUSSION

### A. Standard of Review

Defendant's moving papers are styled as a motion to dismiss. However, since the parties have referred to matters outside the pleadings, the motion presently before the Court shall be treated as [*5] a motion for summary judgment and disposed of in accordance with *Fed.R.Civ.P. 56(c)*. n2 See *Fed.R.Civ.P. 12(b)*.

> n2 At a discovery conference on March 2, 1990, both parties indicated that this matter was appropriately treated as an application for summary judgment.

Summary judgment is appropriate if there is no genuine issue as to any material fact and the defendant is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. A court must view the evidence in the light most favorable to the non-moving party. *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 900* (3d Cir), cert. dismissed, *483 U.S. 1052 (1987)*. However, the moving party is entitled to summary judgment as a matter of law against a non-moving party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at [*6] trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)*. In such a situation, there is "no genuine issue as to any ma-

terial fact" since a failure of proof on an essential element renders others facts immaterial. *Id. at 323*.

Defendant's motion presents two questions:  1) can Syntro be found to be liable for willful direct infringement either through its own acts or through the acts of its wholly-owned subsidiary; and 2) can Syntro be found to be liable for willful inducement of infringement. n3 These issues will be discussed seriatim.

> n3 At the January 12, 1990 oral argument on this motion, counsel for Upjohn indicated that in plaintiff's view, it had two claims against Syntro, one for direct infringement and one for inducement both of which, according to Upjohn, have been willful. Transcript of Oral Argument at 21.

### B. Direct Infringement

As a plaintiff in a patent infringement action alleging direct infringement, Upjohn bears the burden of proving at trial that [*7] Syntro has directly infringed the patent or that Syntro makes, uses, or sells a product in violation of plaintiff's patent rights. The crux of defendant's argument is that Upjohn sued the wrong party. To the extent that any infringement of plaintiff's patent occurred, and Syntro does not concede that this is the case, Syntro argues that it was by SyntroVet, the Kansas subsidiary, and not by Syntro. Since SyntroVet is not a party, Syntro argues that plaintiff has failed to state a viable claim. Plaintiff vigorously argues that Syntro either directly infringed the patent by its own acts, or in the alternative, through the acts of its subsidiary.

### 1. Syntro's Acts

A cause of action for direct infringement is governed by the terms of *35 U.S.C. § 271*(a) which provides:

Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

Syntro could be liable for direct infringement for interfering with any of the patentee's three [*8] basic rights (make, use, or sell) because, in enumerating these rights, section 271(a) employs the disjunctive.

In support of its motion, Syntro presented the affidavit of its president which explicitly states, "Syntro does not make, use or sell any pseudorabies virus vaccines, including particularly any pseudorabies vaccine called PRV/MARKER, as alleged in the Complaint." Affidavit of Cam L. Garner ("Garner affidavit"), para. 4. Further, the affidavit provides, "SyntroVet makes and sells . . . a

Case 1:06-cv-00041-JJF    Document 49-16    Filed 02/14/2006    Page 4 of 6

Page 3

1990 U.S. Dist. LEXIS 11512, *8; 14 U.S.P.Q.2D (BNA) 1469

pseudorabies virus vaccine sold under SyntroVet's registered trademark PRV/MARKER." Garner affidavit, para. 6.

In support of its position, Upjohn introduced an affidavit and exhibits thereto (the "Ingersoll affidavit") including various public filings of Syntro with the Securities and Exchange Commission, Syntro's annual and quarterly reports for 1987, and news articles. Plaintiff argues that these publicly available facts demonstrate that Syntro uses and sells the product. Plaintiff's arguments are typified by the following syllogism: Syntro developed PRV/MARKER in its research and development facility. Syntro must use the product in its laboratory in the course of product development. **[*9]** Therefore, Syntro uses the product. Plaintiff's Answering Brief in Opposition to Motion to Dismiss at 11.

The Court finds Upjohn's argument unpersuasive. Section 271(a) imposes temporal limits on a direct infringement claim with the explicit provision that the infringement must occur "during the term of the patent". Therefore, "[a]cts of making, using or selling prior to issuance give rise to no liability under the federal patent laws." 4 D. *Chisum, Patents § 16.04*[3], at 16–53–54 (1990); see *Powerlock Floors, Inc. v. Robbins Flooring Co., 327 F.Supp. 388, 390 (D. Del. 1971)* (infringing acts must have been committed after the patent issued), aff'd, *464 F.2d 1022 (3d Cir. 1972).*

Upjohn's *'634* patent issued on March 7, 1989. There is no evidence of any use of the accused product, PRV/MARKER in the laboratory by Syntro since that date. All work done since 1988 when PRV/MARKER was licensed to SyntroVet is by SyntroVet in the Kansas facility. "PRV/Marker is, and additional vaccines developed by the Company will be, manufactured at SyntroVet's manufacturing, distribution and sales facility in Lenexa, Kansas." Ingersoll affidavit, Exhibit C, **[*10]** p. 15. Therefore, the Court concludes that Upjohn has failed to make any colorable showing in support of its claim that Syntro uses the allegedly infringing product.

Second, Upjohn asserts that Syntro is liable for direct infringement because it publicly refers to PRV/MARKER as its only product, reports sales of the product in consolidated balance financial reports, and promotes the product, and thus, Upjohn concludes that Syntro sells the product.

The consolidated financial statements filed by the companies are entitled "Syntro Corporation and Subsidiary", and the notes to the financial statement provide that "the consolidated financial statements include the accounts of the Company and its wholly–owned subsidiary." Ingersoll affidavit, Exhibit C, F5–8. Thus, the financial statements apparently reflect aggre-

gate sales of both companies and do not prove that Syntro sells the product. In addition, much of the evidence regarding promotion of the product points to SyntroVet. "SyntroVet has entered into agreements for the distribution of PRV/Marker with five regional distributors that service . . . swine producing states. SyntroVet sells PRV/Marker to these distributors in various **[*11]** dose sizes." Exhibit C, p. 18. While Syntro does refer to the product in a possessory manner, these references are not evidence that it sells the product.

On this record, the Court concludes that plaintiff has produced no evidence from which a reasonable fact–finder could find that the parent has used or sold the vaccine, thereby directly infringing the Upjohn patent by its own acts, and therefore, Syntro is entitled to summary judgment on plaintiff's claim for direct infringement.

2. Is Syntro Liable for SyntroVet's Acts?

Plaintiff also contends that Syntro should be liable for patent infringement actually perpetrated by its subsidiary, SyntroVet. Plaintiff asserts that Syntrovet is so closely controlled by and intertwined with Syntro that its acts may be imputed to Syntro. In effect, Upjohn argues that the two corporations are a single corporate entity, and Syntro is liable to Upjohn for direct infringement through SyntroVet's activities.

"Where one corporation is so organized and controlled and its affairs are conducted so that it is, in fact, a . . . mere adjunct of the other" **[*12]** a court may disregard a corporation's identity. 1 W. Fletcher Cyclopedia of the Law of Private Corporations § 43.10, at 490 (rev. perm. ed. 1983). The precise nomenclature for theories that are used by courts holding parents liable for acts of the subsidiary is far from clear. See *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476* (3d Cir.), cert. denied, *109 S.Ct. 259,* cert. denied, *109 S.Ct. 273 (1988).* Some courts focus on finding that the subsidiary is a "alter ego" or "mere instrumentality" or pursue a process called "piercing the corporate veil," while others apply general agency theory. Id. Since Upjohn's arguments are solely directed to demonstrating the degree of parental control over its subsidiary, the Court's focus will be on determining whether Syntro exercises such complete control over SyntroVet to warrant disregard of the separate corporate entities.

The Third Circuit has listed some of the factors to be considered by a court in determining whether two corporations are truly separate. These include: adequacy of capitalization, overlapping directors and officers, separate record keeping, payment **[*13]** of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the

Case 1:06-cv-00041-JJF    Document 49-16    Filed 02/14/2006    Page 5 of 6

Page 4

1990 U.S. Dist. LEXIS 11512, *13; 14 U.S.P.Q.2D (BNA) 1469

subsidiary, and the subsidiary's control over day–to–day operations. *Phoenix Canada, 842 F.2d at 1476;* see also *United States v. Pisani, 646 F.2d 83, 88* (3d Cir. l98l). n4 Whether the parent exercises "complete domination" over the subsidiary is decisive. *Phoenix Canada, 842 F.2d at 1477; Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227, 237 (D. Del. 1984)* ("The parent must have actual, participatory and total control of the subsidiary.").

> n4 Plaintiff cites eleven factors relevant to a determination of whether the parent exercises such control over its subsidiary to warrant disregard of corporate existence as set forth in *Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 161 (7th Cir. 1963).* These factors are adequately subsumed in subsequent Third Circuit cases that address this issue.

**[*14]**

Even the exercise of a significant degree of control by a parent over a subsidiary will not suffice to warrant the disregard of separate corporate entities. See *Pisani, 646 F.2d at 88* (a number of factors must exist for court to disregard corporate entity). In *Akzona Inc. v. E.I. Du Pont de Nemours & Co., 607 F.Supp. 227 (D. Del. 1984),* the relationship between the parent and subsidiary was that the parent had l00% ownership of the subsidiary, the parent referred to the subsidiary as a division of the parent, the subsidiary's board reported to the parent, the parent approved substantial capital expenditures, the parent referred to the subsidiary's business as its project and took credit for the project in its annual report, and the parent guaranteed loans for the subsidiary. *Id. at 237.* Based on these facts, the court concluded that the record was insufficient to support a finding that the subsidiary was the alter ego of the parent. *Id. at 240.*

Here, plaintiff Upjohn has shown that: 1) Syntro owns the capital stock of the subsidiary and caused its incorporation; 2) directors are shared between the two corporations; **[*15]** 3) SyntroVet was capitalized with 1000 shares of $1.00 par stock; 4) Syntro guarantees the lease of SyntroVet's headquarters; 5) consolidated financial statements are filed; and 6) Syntro refers to the product as its own in various public filings. However, the following facts are also relevant: 1) SyntroVet has its own assets and liabilities; 2) it files a domestic corporation annual report and paid taxes in Kansas; 3) it is licensed to sell PRV/MARKER; 4) it manufactures PRV/MARKER; 4) it enters into distribution contracts for PRV/MARKER; and 5) it leases its building and entered a bond agreement with Lenexa wherein it has an option to purchase the building.

The Court concludes that plaintiff has adduced no ev-

idence of SyntroVet's failure to keep separate records or accounts, or any lack of authority over its day–to–day operations. To a large degree, plaintiff establishes merely a normal, legitimate parent–subsidiary relationship and has not demonstrated that Syntro exercises such complete domination and control over SyntroVet that would warrant disregard of the separate corporate entities.

Accordingly, summary judgment will be granted to Syntro since Upjohn has failed to carry **[*16]** its burden to demonstrate that SyntroVet can be regarded as the alter ego or instrumentality of Syntro thus rendering Syntro liable for direct infringement.

C. Inducement

The patent statute provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." *35 U.S.C. § 271*(b) (1982). Thus, inducement occurs by "actively and knowingly aiding and abetting another's direct infringement." *Water Technologies Corp. v. Calco, Ltd., 850 F.2d 660, 668* (Fed. Cir.), cert. denied, *109 S.Ct. 498 (1988).* There can be no liability for inducement unless an actual infringement in violation of § 271(a) is induced. *Stukenborg v. Teledyne, Inc., 441 F.2d 1069, 1071–72* (9th Cir.), cert. denied, *404 U.S. 852 (1971); Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp. 1485, 1487 (D. Del. 1985).*

Syntro argues that there can be no inducement because no direct infringement is alleged and no direct infringer is identified by the complaint. Upjohn asserts **[*17]** that the direct infringers are identified as SyntroVet and its customers and that the direct infringers need not be named in the inducement suit.

Despite the rule that there can be no contributory infringement absent direct infringement, as is the case with inducement, courts have held that it is not necessary that the direct infringer be joined as a party to a suit against a contributory infringer. See *Refac International, Ltd. v. IBM, 790 F.2d 79, 81 (Fed. Cir. 1986)* (direct infringer need not be party to action for contributory infringement), modified, *798 F.2d 459 (Fed. Cir. 1986).* Although contributory infringement and inducement are distinct forms of liability, the reasoning behind the rule is just as compelling in an inducement situation. See 4 D. *Chisum, Patents § 17.04*[3] at 17–46 (the two sections intended as complementary provisions); see also *Stukenborg, 441 F.2d at 1071–72* (court concludes no contributory infringement exists absent direct infringement and finds the identical conclusion is compelled in the case of inducement of infringement).

The Court is, therefore, unpersuaded by Syntro's arguments because **[*18]** Syntro concedes that PRV/MARKER is made, used and sold by SyntroVet.

Case 1:06-cv-00041-JJF    Document 49-16    Filed 02/14/2006    Page 6 of 6

Page 5

1990 U.S. Dist. LEXIS 11512, *18; 14 U.S.P.Q.2D (BNA) 1469

Garner affidavit, para. 4, 6. Thus, a direct infringer is identified. In addition, although the alleged direct infringer, SyntroVet, is not named by the complaint, Upjohn is not precluded from maintaining its inducement claim against Syntro in this Court and eliciting proof of the direct infringement through discovery.

Alternatively, Syntro argues that because it had no knowledge of the scope of the Upjohn patent there can be no knowing inducement of a patent which has not yet issued, or that there can be no liability for pre-issuance activities. Upjohn argues that pre-issuance activity culminating in post-issuance direct infringement is actionable and that Syntro is charged with knowledge of direct infringement after the issuance of the patent.

Upjohn argues that Syntro developed the vaccine, set up the manufacturing subsidiary, extols its benefits in the press and in annual reports, and otherwise encourages others to use the product and therefore, Upjohn declares that Syntro induces the direct infringement of the product. It cannot be denied that Syntro is an "active participant" in the infringing conduct of [*19] which SyntroVet may be guilty. See *Sims v. Western Steel Co., 551 F.2d 811, 817* (10th Cir.), cert. denied, *434 U.S. 858 (1977).* Syntro's continuous encouragement of SyntroVet's manufacture and sale of the product is exemplified by the fact that an agreement was entered into by Syntro on January 4, 1990, whereby a third party will also market and sell SyntroVet's PRV/MARKER line of products. Assuming that PRV/MARKER is an infringing product, such acts by Syntro will arguably cause yet another to infringe Upjohn's patent. This type of activity is the essence of any inducement claim, and therefore, exposes Syntro to defend the Upjohn allegation.

Similarly, Syntro's pre-issuance argument must fail. In *Procter & Gamble Co. v. Nabisco Brands, Inc., 604 F.Supp 1485 (D. Del. 1985),* the court concluded that liability for inducement under section 271(b) could be based on pre-issuance activities. *Id. at 1489-90.* The court rejected the argument that temporal limits applied to the inducement claim and found that as long as a viable claim for direct infringement existed, there could be liability for inducement, regardless [*20] of the timing of the inducing acts. Id. at 1089. Although the defendant there allegedly rushed product to market with knowledge of the pending patent, there is no reason to conclude that the court specifically limited its holding to such a situation, and the Court concludes that there is no reason to apply such a limitation to the facts presented here. Indeed, the state of Syntro's knowledge of the application is in dispute. Syntro concedes that it knew of the pendency of Upjohn's application, but argues that this knowledge is insufficient to constitute knowing inducement. Defendant's Reply Brief in Support of Its Motion to Dismiss at 5. Upjohn argues that Syntro knew the exact nature of the patent because it had a copy of one of Upjohn's applications. Transcript of Oral Argument at 14-15. This factual dispute regarding the extent of knowledge is one of several on the inducement issue that preclude summary judgment on behalf of defendant.

### III. CONCLUSION

For the reasons stated above, Syntro's motion for summary judgment as it pertains to direct infringement will be granted, however, as that motion pertains to Upjohn's inducement claim, it will be denied.

An appropriate [*21] order will be entered.

### ORDER

At Wilmington this 9th day of March, 1990, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS ORDERED that defendant's Motion for Summary Judgment is granted in part and denied in part.

IT IS FURTHER ORDERED that:

1. The parties shall submit a Rule 16 Scheduling Order within ten days of the date of this Order.

2. Trial shall commence on November 13, 1990.

3. The time to respond to the complaint and discovery requests pursuant to the Federal Rules of Civil Procedure shall run from the date of this Order.